GIBSON, DUNN & CRUTCHER LLP
AVI WEITZMAN, *pro hac vice* forthcoming
aweitzman@gibsondunn.com
LEE R. CRAIN, *pro hac vice* forthcoming
LIESEL SCHAPIRA, *pro hac vice* forthcoming
KAYLIE SPRINGER, *pro hac vice* forthcoming
200 Park Avenue
New York, NY  10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
VIVEK GOPALAN, SBN 296156
VGopalan@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8200
Facsimile: (415) 374-8306
*Attorneys for Plaintiffs Bryan Muehlberger,
Frank Blackwell, and Giffords Law Center to
Prevent Gun Violence*

XAVIER BECERRA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
MARK R. BECKINGTON
Supervising Deputy Attorney General
R. MATTHEW WISE, SBN 238485
Matthew.Wise@doj.ca.gov
Deputy Attorney General

1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone:  (916) 210-6046
Facsimile:  (916) 324-8835

*Attorneys for Plaintiff State of California, by
and through Attorney General Xavier Becerra*

[*Additional Counsel Listed on Next Page*]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, BRYAN MUEHLBERGER, FRANK BLACKWELL, and GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE,<br><br>Plaintiffs,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, REGINA LOMBARDO, in her official capacity as Acting Deputy Director of Bureau of Alcohol, Tobacco, Firearms and Explosives, MICHAEL R. CURTIS, in his official capacity as Chief, Firearms Technology Industry Services Branch of Bureau of Alcohol, Tobacco, Firearms and Explosives, UNITED STATES DEPARTMENT OF JUSTICE, and WILLIAM BARR, in his official capacity as Attorney General of the United States,<br><br>Defendants. | CIVIL CASE NO.: 3:20-cv-06761<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Additional Counsel

GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
HANNAH SHEARER, SBN 292710
268 Bush St. # 555
San Francisco, CA 94104
Telephone: (415) 433-2062
Facsimile: (415) 433-3357

J. ADAM SKAGGS, *pro hac vice forthcoming*
DAVID M. PUCINO, *pro hac vice forthcoming*
223 West 38th St. # 90
New York, NY 10018
Telephone: (917) 680-3473

*Attorneys for Plaintiffs Bryan Muehlberger,*
*Frank Blackwell, and Giffords Law Center to Prevent Gun Violence.*

Plaintiffs the State of California, Bryan Muehlberger, Frank Blackwell, and Giffords Law Center to Prevent Gun Violence, for their complaint allege, by and through their respective attorneys, against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); Regina Lombardo, in her official capacity as Acting Deputy Director of ATF; Michael R. Curtis, in his official capacity as Chief of the Firearms Technology Industry Services Branch of ATF; the United States Department of Justice ("DOJ"), and William Barr, in his official capacity as Attorney General of the United States, as follows:

## INTRODUCTION

1. Since 1968, federal law, starting with the Gun Control Act ("GCA"), has imposed important, common-sense gun safety restrictions on the purchase and sale of firearms in the United States.[1] These include, among other requirements, that any firearm sold or imported in the United States must have a unique serial number, and that licensed gun dealers must maintain identifying records, including the serial numbers of guns they sell and the identity of the buyer. These requirements allow law enforcement to trace guns recovered at crime scenes to their first retail purchaser. The GCA also requires licensed gun dealers to conduct criminal background checks on would-be gun purchasers, ensuring that weapons do not fall into the wrong hands. Federal law prohibits numerous categories of people from purchasing guns, including minors and individuals with disqualifying criminal convictions, people with records of domestic violence, those suffering from serious mental illness, or individuals who are addicted to drugs. These restrictions have been hallmarks of federal firearms regulation for decades. By limiting those who pose the greatest threat of violence from purchasing firearms, these laws have protected an incalculable number of Americans from harm.

2. But today, these protections are threatened by the rapid proliferation of so-called "ghost guns." Ghost guns are, in effect, a lethal do-it-yourself ("DIY") project that allows anyone at home to build a fully operable firearm *within minutes,* using nothing more than commonly owned tools and a pre-packaged kit. The resulting DIY weapons are "ghosts" because, lacking serial numbers, they are not traceable by law enforcement when they are used in a crime, and they are not regulated by the federal government in any way. That is a result of decisions by Defendants—ATF and its leadership—

---

[1] *See generally* Gun Control Act of 1968, Pub. L. No. 90-618 (1968); Brady Handgun Violence Prevention Act, Pub. L. No. 103-159 (1993).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

to exclude these ghost guns from the ambit of the GCA.  In other words, ghost guns can be purchased without a background check, by people who are prohibited from possessing firearms; the firearms do not have serial numbers; and gun dealers are not required to maintain any records of their sales or the identity of their purchasers.  Anyone can buy them, no one can trace them, and the federal government has done nothing to regulate or limit their spread.

3.    As a result, ghost guns are quickly becoming the weapon of choice for illegal gun traffickers and those—like organized criminal gangs and mass murderers—who seek to bear arms not for lawful means, but rather to engage in criminal activity and acts of violence.  And most sellers have done little to dissuade prohibited people from buying ghost guns and have even actively encouraged such sales, leaving their customers and the public—not the sellers—to bear the consequences.

4.    Specifically, Defendants have decided that a specific type of product colloquially called an "80 percent receiver" for long guns or an "80 percent frame" for handguns is not a "firearm" under the GCA.  The 80 percent receiver or frame is a nearly finished firearm receiver or frame, although the "80 percent" moniker is an arbitrary term used by sellers that does not in fact connote how much work remains to convert the frame or receiver into an operable firearm.[2]

5.    The receiver or frame is the central piece of any firearm—so central, in fact, that the GCA expressly provides that a "frame or receiver" *is* a "firearm" for purposes of the GCA's regulatory regime.   18 U.S.C. § 921(a)(3).  The GCA also provides that "firearms" include, not only fully functional weapons, but also receivers and frames of such weapons that are "***designed to or may readily be converted***" into functional weapons.  *Id*.

---

[2]  27 C.F.R. § 478.11 (defining "frame or receiver" as the "part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward position to receive the barrel").  This Complaint uses the terms "80 percent receiver" and "80 percent frame," and the terms "receiver" and "frame," interchangeably unless otherwise noted.

6.      80 percent receivers and frames are pieces of metal forged for the sole and express purpose of allowing people to create a fireable weapon quickly and easily.  To the lay eye, in fact, 80 percent receivers and frames are in all material respects ***indistinguishable*** from a ready-to-fire receivers and frames, as shown in Image 1 below, in which the top images are 80 percent frames while the bottom images are the substantially similar finished frames:



**Image 1: 80 Percent Frame Compared to Finished Frame**

7.      Yet Defendants have determined that 80 percent receivers and frames are not "firearms" under the GCA.  Thus, the statutory requirements and prohibitions of the GCA do not apply to these products.  Consequently, with nothing more than an internet connection and a credit card—and without needing to validate as to whether the purchaser is alive or dead, real or fake—anyone including minors and people with serious, violent criminal records can purchase an 80 percent receiver and convert it into a fireable weapon with ease.

8.      Defendants' position, as set forth on ATF's website and in letters to manufacturers, that 80 percent receivers and frames are unregulated by the GCA is arbitrary and capricious and defies the plain meaning of the statute.  Indeed, it is inconsistent with ATF's own stated position before 2006. Prior to that date, ATF considered unfinished receivers and frames that are identical to the 80 percent receivers and frames on the market today as equivalent to finished frames and receivers (and thus, as

4

firearms regulated by the GCA).  ATF came to this conclusion by employing a temporal test that looked at the speed and ease with which a receiver or frame could be converted into an operable firearm.  In around 2006, ATF began to change course, without any justification.  It began analyzing which "machining operations" still needed to be completed—*i.e.*, focusing on certain remaining tasks left to the DIY-gunsmith, regardless of how quickly or easily the tasks could be completed.  Under this new analysis, ATF has repeatedly determined that 80 percent receivers and frames no longer qualify as "firearms" under the GCA even though they can quickly and easily be converted into fully functioning receivers or frames and even though the only intended result of 80 percent receivers and frames is to create fully functioning firearms.  They have no other purpose.

9.     As a result of this dramatic and unsupportable shift, the ghost gun market has exponentially expanded.  Today, 80 percent receivers and frames are widely available at gun stores, gun shows, and online.  There are at least 80 online retailers of 80 percent receivers and frames, contributing to the increasing number of ghost guns year after year.  Ghost gun sales are also surging during the COVID-19 pandemic, which is raising serious concerns that people who are prohibited from possessing firearms based on their criminal or mental health history may be obtaining ghost guns while stay at home orders are in place.[3]

10.     Manufacturers have also developed tools that make it possible to convert 80 percent receivers and frames into fully operable firearms "***in under 15 minutes***."[4]  One of these tools, called a "jig kit," depicted in Image 2 below, provides pre-designed cutting and milling templates, which eliminate the need for measurement tools and make drilling the remaining holes simple.[5]  One seller

---

[3]  Letter from Jerrold Nadler, Chairman, U.S. House Judiciary Committee, to Regina Lombardo, Acting Director, ATF (Apr. 23, 2020), https://judiciary.house.gov/uploadedfiles/2020-04-23_letter_to_the_atf_re_ghost_guns.pdf?utm_campaign=2714-519 ( "[A]t least 16 companies that sell ghost gun kits have reported order backlogs and shipping delays due to overwhelming demand" during the COVID-19 pandemic.); *see also* Tess Owen, *People Are Panic-Buying Untraceable 'Ghost Guns' Online in the Coronavirus Pandemic*, VICE (Mar. 27 2020), https://www.vice.com/en_us/article/g5x9q3/people-are-panic-buying-untraceable-ghost-guns-online-in-the-coronavirus-pandemic.

[4]  *The Router Jig Pro Multiplatform – AR-15 / AR-9/AR-45/.308/AR-10,* 5D Tactical, https://www.5dtactical.com/multiplatform-80-lower-jig-p/5d-pmj.htm (last visited Sept. 13, 2020) (emphasis added).

[5]  *See e.g*., *80% AR-15 Easy Jig Gen 1*, 80% Arms, https://www.80percentarms.com/products/80-ar-15-easy-jig-gen-1/ (last visited Sept. 28, 2020).

boasted that jig kits are "easy enough for a caveman to use."[6]  And an ATF special agent noted that "[i]f you can put Ikea furniture together, you can [turn an 80 percent receiver into a functional ghost gun]."[7]  Because jig kits are commonly packaged with 80 percent receivers and frames, their conversion to operable firearms is simple and convenient.



**Image 2:  Jig Kit Diagram**

11.     In addition, manufacturers have developed pre-programmed milling machines that allow users to finish 80 percent receivers and frames at the press of a button with no manual work whatsoever.  The expensive price of these machines, which often exceeds $2,000, raises the question of whether buyers intend to obtain a return on their investment by mass producing ghost guns.[8]  Indeed, these machines facilitate the bulk production of unserialized, untraceable weapons by illegal gun traffickers, representing what a former New York State Attorney General described as a "new, dangerous frontier of illegal firearm trafficking."[9]  Some ghost gun retailers even appear to appeal to

---

[6]  *Id.*  (linking to an "Easy Jig manual" and an "instructional video" and explaining that "[t]his 80% lower receiver router jig is easy enough for a caveman to use").

[7]  Alain Stephens, *What Makes a Gun a Ghost Gun?,* THE TRACE, (Dec. 5, 2019), https://www.thetrace.org/2019/12/what-makes-a-gun-a-ghost-gun.

[8]  *See e.g.*, *Ghost Gunner 3 Deposit*, GHOST GUNNER, https://ghostgunner.net/product/ghost-gunner-3-deposit/ (last visited Sept. 28, 2020) (listing milling machine for $2,100 with $500 deposit).

[9]  Press Release, N.Y. State Attorney General's Office, A.G. Schneiderman Announces Thirty-Two Count Indictment of Two Defendants Charged With Illegally Trafficking Untraceable "Ghost Guns" (Sept. 21, 2015), https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-thirty-two-count-indictment-two-defendants-charged.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

criminal traffickers by offering bulk-discounts on five- or ten-packs of 80 percent receivers and frames.[10]

12.    The fact that 80 percent receivers and frames and jig kits are sold unserialized and without background checks or record-keeping is the very reason these products have dangerously proliferated.  As one seller advertised, 80 percent receivers "provide an all-in-one convenience to build your own AR 15. . . without any type of serialization or registration."[11]

13.    Given the ease of purchase and assembly, ghost guns have flooded the country.  In recent years, record numbers of ghost guns have been recovered in California, as well as in the District of Columbia, Colorado, New York, and Pennsylvania.  *60 Minutes* recently found that "at least 38 states and Washington D.C. have seen criminal cases involving ghost guns" and that ghost guns were used in "at least four mass shootings, violent police shootouts, high-profile busts of gangs making and selling guns on the street, and cases involving terrorism and white supremacists."[12]  One widely publicized ghost gun mass shooting occurred at Saugus High School on November 14, 2019, where a 16-year-old high school student wielding a ghost gun killed two classmates—15-year-old Gracie Anne Muehlberger, daughter of Plaintiff Bryan Muehlberger, and 14-year-old Dominic Blackwell, son of Plaintiff Frank Blackwell—and wounded three others before taking his own life.[13]  And recently,

---

[10]  *See generally*  Nick Corasaniti, *The Target Was a Drug Ring. They Found 'Ghost Guns'*, N.Y. TIMES (Mar. 18, 2019), https://www.nytimes.com/2019/03/18/nyregion/ghost-guns-nj.html for a discussion on bulk sales; *see, e.g.*, *80% Lowers Fire/Safe Marked (10-pack)*, 80-LOWER.COM, https://www.80-lower.com/products/80-lowers-fire-safe-marked-10-pack/ (last visited Sept. 28, 2020).

[11]  *How to Build Your Own AR 15 – Legally and Unregistered,* 80% LOWERS (Aug. 28, 2017), https://www.80-lower.com/80-lower-blog/how-to-build-your-own-ar-15-legally-and-unregistered/.  The same seller explained that, "one  reason why the 80% lower is now in high demand" is to stop "disarmament" because "those [referring to "the current gun control lobby"] whose ultimate goal is a socialist agenda [and which] would undoubtedly like to prevent the sale or require the registration of all such firearms." *Id*.

[12]  Bill Whitaker, *Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Laws and Are Virtually Untraceable*, CBS (May 10, 2020), https://www.cbsnews.com/news/ghost-guns-untraceable-weaponscriminal-cases-60-minutes-2020-05-10/.  (Attached as Ex. 3); *see also Ghost Guns: A Weapon of Choice for White Supremacists Arrested Ahead of Virginia Rally,* EVERYTOWN (Jan. 27, 2020), https://everytown.org/press/ghost-guns-a-weapon-of-choice-for-white-supremacists-arrested-ahead-of-virginia-rally/ (last visited Sept. 28, 2020) (explaining the connection between white supremacists and the ghost gun industry).

[13]  *15-Year Old Gracie Anne Muehlberger, 14-Year-Old Dominic Blackwell ID'd as Saugus High School Shooting Victims*, CBSLOCAL (November 15, 2019), https://losangeles.cbslocal.com/2019/11/15/gracie-anne-muehlbergerdominic-blackwell-saugus-high-school-shooting-victims/.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

federal prosecutors charged a man with murder after he allegedly used a ghost gun to kill two law enforcement officers in California, including a federal security officer during a protest over the killing of George Floyd.[14]

14.     Defendants are surely aware of the damage the ghost gun epidemic is inflicting—including its violent impact on society and how it undermines federal law enforcement priorities. Before he retired, former ATF Acting Director Thomas Brandon acknowledged that certain ghost gun kits should be classified as firearms because of how easy they are to put together.[15]  "Well, right now we have a public safety concern," Brandon recalls saying.[16]  "[A]s the head of the agency at the time—I said, 'I'm gonna do everything I can for public safety with my team.' If you wanted to buy a kit and make your own gun, it's just gonna . . . have a serial number on it."[17]  Similarly, Thomas Chittum, ATF's Assistant Director of Field Operations, recently admitted that it is "challenging [for ATF] to keep [ghost guns] outta the hands of people who are not allowed to possess firearms," and that the number of crimes committed with ghost guns is "increasing significantly and rapidly."[18]  ATF also states on its website that when ghost guns without serial numbers "are found at [] crime scene[s], it is usually not possible to trace th[ose] firearm[s] or determine [their] history, which hinders crime gun investigations and jeopardizes public safety."[19]  Despite these obvious and predictable consequences, ATF has not reconsidered its determinations that have permitted 80 percent receivers to proliferate.

15.     Plaintiffs bring this action to finally put a stop to the spread of ghost guns and to reaffirm the dictates of the GCA.  ATF determinations that 80 percent receivers are *not* firearms are both contrary to law and arbitrary and capricious.

---

[14]  *Alleged Oakland, Ben Lomond Gunman Steve Carrillo Linked To Far Right 'Boogaloo' Movement*, CBS (June 16, 2020), https://sanfrancisco.cbslocal.com/2020/06/16/steven-carrillo-david-underwood-murder-santa-cruz-deputy-fatal-shooting-fatal-oakland-federal-building-shooting/.

[15]  Ex. 3, Whitaker, *supra* note 12.

[16]  *Id.*

[17]  *Id.*

[18]  *Id.*

[19]  *Can Functioning Firearms Made From Receiver Blanks Be Traced?*, ATF, https://www.atf.gov/firearms/qa/can-functioning-firearms-made-receiver-blanks-be-traced (last updated Feb. 6, 2020).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

16.     *First*, ATF's decision that 80 percent receivers and frames—which can be converted into firearms in as little as 15 minutes—are *not* firearms contravenes the plain text of the GCA.  Because 80 percent receivers are "***designed to or may be readily converted***" into fully fireable weapons, they ***are*** firearms under the GCA and must be regulated by ATF.

17.     *Second*, ATF's determinations that 80 percent receivers are not firearms are arbitrary and capricious, for multiple reasons.  Specifically, ATF—whose ghost gun determinations are the product of an unexplained regulatory reversal beginning in 2006—has failed to consider important aspects of the problem it should regulate, such as the consequences of both allowing prohibited possessors to access untraceable ghost guns and expanding the sale of untraceable weapons.  ATF has acknowledged these serious problems with the current ghost gun regulatory landscape, yet has failed to consider the resulting costs and consequences of its decisions on law enforcement and communities across this country—not to mention the victims of such gun violence.

18.     For any and all of these reasons, this Court should vacate ATF's determinations and direct ATF in the future to classify 80 percent receivers for what they are:  lethal weapons subject to federal firearms statutes and regulations.

## PARTIES

19.     Plaintiff State of California, represented by and through its Attorney General, is a sovereign state of the United States of America.

20.     Plaintiff Bryan Muehlberger resides in Santa Clarita, California.  His daughter, 15-year-old Gracie Anne Muehlberger, was tragically murdered in the November 2019 Saugus High School Shooting in Santa Clarita, California, when a 16-year-old high school student used an untraceable ghost gun and opened fire on Mr. Muehlberger's daughter and her fellow students—killing Gracie and Dominic Blackwell, and injuring three others.

21.     Plaintiff Frank Blackwell resides in Santa Clarita, California.  His son, 14-year-old Dominic Blackwell, was tragically murdered in the November 2019 Saugus High School Shooting in Santa Clarita, California, when a 16-year-old high school student used an untraceable ghost gun and opened fire on Mr. Blackwell's son Dominic and his fellow student Gracie Anne Muehlberger, and injured three others.  Blackwell has filed this action in his personal capacity only.

22.     Plaintiff Giffords Law Center is a nonprofit unincorporated association operating under section 501(c)(3) of the Internal Revenue Code.  Based in San Francisco, California, Giffords Law Center also has staff members located in New York, New York, and Washington, D.C.  Plaintiff is one of the nation's leading legal and policy organizations dedicated to finding sensible solutions that will prevent further gun violence.

23.     Defendant ATF is an administrative agency within the DOJ responsible for protecting communities from violence, violent criminal organizations, the illegal use and trafficking of firearms, the illegal use and storage of explosives, acts of arson and bombings, acts of terrorism, and the illegal diversion of alcohol and tobacco products.  ATF is headquartered in Washington, D.C.

24.     Defendant Regina Lombardo is the Acting Director of ATF.  Her official address is in Washington, D.C.  She is being sued in her official capacity.  In that capacity, Acting Director Lombardo has responsibility for oversight of the activities of ATF.

25.     Defendant Michael R. Curtis is the Chief of the Firearms Technology Industry Services Branch of ATF.  His official address is in Martinsburg, West Virginia.  He is being sued in his official capacity.  In that capacity, he is responsible for classifying firearms and ammunition under federal rules and regulations.

26.     Defendant DOJ is an executive agency within the federal government of the United States.

27.     Defendant William Barr is the Attorney General of the United States.  His official address is in Washington, D.C.  He is being sued in his official capacity.  In that capacity, Attorney General Barr has authority to prescribe rules and regulations for carrying out the provisions of the Gun Control Act. 18 U.S.C. § 926(a).  The Attorney General delegated the responsibility to investigate, administer, and enforce the provisions of the Gun Control Act to ATF.  28 C.F.R. § 0.130(a)(1).

## JURISDICTION AND VENUE

28.     Plaintiffs bring this action under the Administrate Procedure Act, 5 U.S.C. §§ 500 *et seq*.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the laws of the United States.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff State of California, and Giffords Law Center reside in this District, and a substantial portion of the

events giving rise to this case occurred in this District.  Defendant ATF also maintains numerous Field Offices in this District.

### STATUTORY BACKGROUND:  THE GUN CONTROL ACT OF 1968

30.     The GCA has been the foundation of federal firearms law for more than half a century. Its genesis began with the assassination of President John F. Kennedy, who was shot and killed with a mail-order rifle Lee Harvey Oswald purchased for $19.95 in response to a magazine advertisement. Shortly after President Kennedy's death, Senator Thomas Dodd of Connecticut introduced legislation restricting mail-order sales of shotguns and rifles.  That legislation garnered bipartisan support and was endorsed by the National Rifle Association.  But the bill ultimately died in committee.  The debate continued, however, gaining even greater urgency in 1968 after the assassinations of Martin Luther King Jr. and Robert F. Kennedy.

31.     Following these jolting national tragedies, on October 22, 1968, President Lyndon B. Johnson signed into law the GCA, landmark legislation that asserted significant federal control over the firearms industry and those who were legally permitted to possess guns.  Gun Control Act of 1968, Pub. L. No. 90-618 (1968).  The GCA's major provisions include: (i) a ban on sales of guns to people convicted of felonies, people addicted to drugs, minors, and individuals with serious mental illnesses;[20] (ii) a requirement that all firearms dealers obtain a federal firearms license; (iii) a prohibition on the importation of firearms "with no sporting purpose"; and (iv) a mandate that all firearms be serialized. 18 U.S.C. §§ 921 *et seq*.

32.     The GCA has been amended multiple times to expand federal regulation of firearms.  In 1993, for instance, following another national tragedy—the attempted assassination of President Ronald Reagan, which left his Press Secretary James Brady permanently disabled—President William J. Clinton signed the Brady Handgun Violence Prevention Act, which required that federal background checks be conducted on *all* sales of guns by licensed dealers.  Brady Handgun Violence Prevention Act, Pub. L. No. 103-159 (1993).  Federal law was amended further in 1994 with the passage of the

---

[20]  Specifically, federal law restricts people from accessing firearms if they have been committed to any mental institution or adjudicated as a mental defective, *see* 18 U.S.C. § 922(d)(4), which means they have been found by a court, board, commission, or other lawful authority to be a danger to self or others, or to lack the mental capacity to contract or manage their own affairs, as a result of their mental condition or illness, *see* 27 C.F.R. § 478.11(a).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Violence Against Women Act, which prohibited gun possession by individuals subject to certain domestic violence restraining orders, and again in 1996 to prohibit those convicted of particular domestic abuse crimes from possessing a firearm.  18 U.S.C. §§ 922(g)(8), (g)(9).

33.     The GCA regulates the possession and purchase of "firearms."   Under the GCA, "firearm" is broadly defined to include not only fully functional weapons that "expel [] projectile[s] by the action of an explosive," but also items that are "designed to or may readily be converted" into fully functional weapons, and the "receiver" or "frame" of such weapons.  18 U.S.C. § 921(a)(3).  A firearm frame or receiver is the part of the firearm that houses the hammer, bolt, or breechblock, as well as the firing mechanism.[21]  The parts of a pistol and rifle are depicted in Images 3 and 4 below.

34.     Because receivers and frames are defined as "firearms" in the GCA, these parts must also carry serial numbers.  18 U.S.C. § 923(i).  Sellers and manufacturers of receivers and frames must obtain a federal firearms license, and individuals who purchase receivers and frames from gun dealers are subject to federal background checks.  18 U.S.C. §§ 923(a), 922(t).



**Image 3: Semiautomatic-Pistol[22]**

---

[21] *Firearms - Guides - Importation & Verification of Firearms, Ammunition - Gun Control Act Definitions – Firearm*, ATF, https://www.atf.gov/firearms/firearms-guides-importation-verification-firearms-ammunition-gun-control-act-definitions (last updated Apr. 27, 2018).

[22] *Firearms parts and components,* UNODC (Feb. 2019), https://www.unodc.org/e4j/en/firearms/module-2/key-issues/firearms-parts-and-components.html.



**Image 4: AR-15 Rifle[23]**

35.     ATF was established as an independent agency in 1972 to regulate firearms, among other things.[24]   According to the agency's website, ATF "recognizes the role that firearms play in violent crimes" and uses federal firearm legislation like the GCA "to target, investigate and recommend prosecution of [criminal] offenders to reduce the level of violent crime and to enhance public safety."[25]

36.     ATF, like any other agency, takes a wide variety of agency action, including standard notice-and-comment rulemaking and issuing guidance.  It also issues "Classification Letters" with regard to specific products it regulates, like firearms and explosives.  In these letters, ATF responds to questions that manufacturers, distributors, and others submit to ATF to adjudicate, such as whether the product they are proposing to sell is subject to the GCA's requirements, including background checks and serialization.  According to the ATF Handbook, ATF encourages firearms manufacturers to "seek an ATF classification of its product prior to manufacture" in order to "avoid an unintended classification and violations of the law."  *See* Ex. 1, *Do you know how ATF would classify your product?*, *in* ATF NATIONAL FIREARM ACTS HANDBOOK, § 7.2.4 (Apr. 2009), https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download.  The ATF handbook

---

[23]  *Simple AR-15 Diagram*, 3D WAREHOUSE, https://3dwarehouse.sketchup.com/model/1a2d3089-04fc-47a0-af95-fd3ff78ab966/Simple-AR15-Diagram (last visited Sept. 13, 2020).

[24]  Prior to the establishment of ATF, Congress had delegated the enforcement of the GCA to the Alcohol and Tobacco Division of the Internal Revenue Service.  When first formed, ATF was part of the United States Department of the Treasury, but following the 9/11 terrorist attacks, the Homeland Security Act of 2002 transferred ATF to the DOJ.

[25]  *Firearms*, ATF, https://www.atf.gov/firearms (last visited Sept. 13, 2020).

further explains that such Classification Letters "may generally be relied upon by their recipients as the agency's official position concerning the status of the firearms under Federal firearms laws." *Id.* at § 7.2.4.1.   ATF also issues broad-ranging industry guidance in the form of questions and answers ("Q&As"), which are published on ATF's official website—guidance that on information and belief market participants refer to and/or rely on in designing, marketing, and distributing the 80 percent frames and receivers used to build ghost guns.

37.     As a law enforcement agency within the DOJ, ATF also investigates violent crimes.  In that role, ATF relies significantly upon the GCA's requirement that firearms be adorned with unique, traceable serial numbers.  GCA's serialization requirement requires firearm manufacturers or importers to affix weapons with unique serial numbers and other marks that identify the manufacturer or importer, as well as the make, model, and caliber of the firearm.  Using this information, ATF's National Tracing Center can track a firearm recovered at a crime scene from the manufacturer or importer through the distribution chain to the first retail purchaser.

38.     Tracing provides critical information necessary to investigate and solve crimes.  ATF processes hundreds of thousands of crime gun trace requests each year from domestic and international law enforcement agencies.[26]  Because there is no comprehensive electronic federal database of gun purchases, ATF relies on the records held by each dealer to connect a recovered firearm to its first retail buyer.  As depicted in Image 5 below, when firearms contain serial numbers, ATF can generally determine the original Federal Firearms Licensee who sold the weapon.  From that entity, using the records it is required to keep under the GCA, ATF is able to learn the name of the person who originally purchased the weapon.  Identifying that initial purchaser is critical to law enforcement's ability to investigate and solve crimes committed with the recovered firearm.

---

[26] *ATF By the Numbers*, ATF (June 14, 2018), https://www.atf.gov/resource-center/infographics/atf-numbers.



**Image 5:  How ATF Traces Firearms**[27]

39.     In addition to its critical role in the investigation of criminal activity, tracing also acts as a powerful deterrent—discouraging straw purchases or trafficking of firearms through secondary sales to prohibited persons.

40.     But tracing is effective *only if* law enforcement officials can trace a firearm based on its serial number.  And ATF and its leaders have not required manufacturers and sellers of ghost gun kits to affix serial numbers to their component parts, so they do not in fact feature them.  As a result, firearms dealers are not required to keep records of their sales of ghost gun components and kits.  Thus, ATF and law enforcement are completely obstructed in their attempts to trace a ghost gun to its original source, and prohibited purchasers are more likely to purchase a ghost gun because they know that there are no records that would allow the purchase to be traced back to them.

---

[27] *How ATF Traces Firearms*, ATF (Aug. 17, 2018), https://www.atf.gov/resource-center/infographics/how-atf-traces-firearms.

# FACTUAL BACKGROUND

**A.**   **Ghost Guns Are Designed To Circumvent Federal Firearms Requirements, Resulting in an Overwhelming Threat To Public Safety.**

41.   Before a licensed gun dealer sells any firearm in the United States, a buyer must pass a background check to confirm that he or she is authorized to possess a firearm—namely, that he or she is not a minor, not disqualified on the basis of a criminal conviction or domestic violence restraining order, and not otherwise prohibited from gun possession.  18 U.S.C. § 922(t).

42.   Licensed manufacturers or importers must also legibly identify each firearm with a unique serial number.  27 C.F.R. § 478.92.  Specifically, the GCA requires that manufacturers and importers engrave, cast, stamp, or otherwise conspicuously place on the frame or receiver of each firearm an individual serial number and other identifying information, such as the model of the firearm, its caliber or gauge, and the manufacturer's name or the name of the foreign manufacturer.  27 C.F.R. § 478.92(a)(1)(i)-(ii).  This serialization process ensures that every firearm—including those firearms recovered by law enforcement agencies at crime scenes—can be traced back to its manufacturer or importer and first retail purchaser.  Tracing firearms helps link a recovered firearm to crime suspects in a criminal investigation by helping law enforcement officials track the movement of a firearm through the supply chain.

43.   Assault weapons, such as AR-15 rifles, were once placed under even stricter regulations under federal law, and remain subject to heightened regulation in many states.  Generally speaking, assault weapons are a class of semi-automatic firearms that share characteristics with military firearms specifically designed to kill humans quickly and efficiently.  Wounds caused by assault rifles like AR-15s are more lethal than wounds caused by handguns because the bullets they fire travel at a higher velocity and impart a correspondingly higher level of energy when passing through a body.  And when paired with large magazines full of ammunition, assault weapons can kill a large number of people extremely quickly.  Because assault weapons are extremely dangerous and designed to kill, certain "semiautomatic assault weapons" were banned at the federal level between 1994 and 2004.  While that law lapsed and there is currently no federal law prohibiting these lethal, military grade weapons, seven

states—including California—prohibit the purchase, sale and/or possession of assault weapons.  In California, for example, over 75 assault weapon types, models, and series are banned by name.

44.     Serialization requirements apply not only to complete, fully-functional firearms, but also to "[a] firearm frame or receiver that is not a component part of a complete weapon at the time it is sold." 27 C.F.R. § 478.92(a)(2).  The ATF website provides sample images of frames and receivers, along with the explanation that "A Frame or Receiver constitutes a FIREARM":



**Image 6:  ATF's Diagram of a Sample Frame and Receiver, Noting that Each Constitutes a firearm[28]**

45.     Ghost guns are designed specifically to circumvent these common-sense requirements in the GCA.  The 80 percent components used to build ghost guns are designed as, and may readily be converted into, lethal firearms.[29]  Today, they can be purchased by anyone with an internet connection and a credit card or other form of online payment (as well as at gun shows and from brick-and-mortar gun stores)—including people convicted of felonies or domestic violence, people addicted to drugs, minors, and individuals with serious mental illnesses, despite the fact that all of them are prohibited by federal law from purchasing and possessing firearms.  As a result of ATF's decisions, no background check is required to buy 80 percent receivers and frames, no records of the buyers' identities must be kept, and no 80 percent receiver or frame has to carry federal serial numbers or other markings that

---

[28] *Firearms - Guides - Importation & Verification of Firearms, Ammunition - Gun Control Act Definitions – Firearm*, ATF, https://www.atf.gov/firearms/firearms-guides-importation-verification-firearms-ammunition-gun-control-act-definitions (last visited Sept. 13, 2020).

[29] Ghost guns can also be created using new technologies such as 3D printers, which allow a person to produce a three-dimensional firearm much in the way that a traditional printer can produce a printed document.  Guns produced with 3D printers are especially dangerous because they may be produced largely or even entirely from plastic, which means they are undetectable by security checkpoints that use metal detectors.

clearly identify the product's manufacturer, importer, make, model, or caliber. Thus, while a person cannot purchase an assembled gun at a gun store without passing a background check to ensure that he isn't a prohibited person under the GCA, a prohibited person can purchase a kit containing an 80 percent frame or receiver from the very same gun store without any background check or any questions asked. And once bought, that prohibited person can use the kit to easily and quickly assemble a firearm functionally indistinguishable from the weapon a background check prohibited him from purchasing.

46.    As illustrated in Images 7 and 8 below, which ATF itself provides, the sole difference between an 80 percent receiver and a finished receiver is hardly noticeable: an 80 percent receiver, shown in Image 7, "has a solid, un-machined fire-control cavity area with no holes or dimples for the selector, trigger, or hammer pins." ATF has concluded that the receiver does not meet the GCA definition of a "firearm."[30]

 

**Images 7: 80% Receiver – *Not* a Firearm**

---

[30]    *Are "80%" or "unfinished" receivers illegal?*, ATF (Apr. 6, 2020), https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal.

The second receiver, shown in Image 8, "has a partially machined fire-control cavity and ATF has concluded that it "***does*** meet the GCA definition of a firearm."[31]



**Image 8: Finished Receiver – *Is* a Firearm**

47.     As a result of these minor differences, 80 percent receivers can easily be turned into lethal assault weapons.  Using a jig—a device that guides the drilling and milling necessary to complete the receiver—a buyer can finish an 80 percent receiver in under an hour using basic household tools, such as simple drill bit, file set, and a hand drill, to drill the remaining holes.[32]  As noted, one seller even boasted that "[i]n testing, [they] were able to ***finish an AR-15 80% lower including jig assembly, in under 15 minutes with excellent results.***"[33]

---

[31] *Are "80%" or "unfinished" receivers illegal?*, ATF (Apr. 6, 2020), https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal.

[32] *Easy Jig Gen 3 Multi-Platform – AR-15, AR-9 and .308 80% Lower Ji*g, 80% ARMS, https://www.80percentarms.com/products/easy-jig-gen-3-multi-platform-ar-15-ar-9-and-308-80-lower-jig// (last visited Sept. 28, 2020) ("[O]ur patented Easy Jig Gen 3 Multiplatform replaces the Gen 2 as the world's easiest to use, fully universal, 80% lower jig capable of finishing AR-15, AR-9, etc.."); *How to Build Your Own AR 15 – Legally and Unregistered*, *supra* note 11  ("Finishing an 80% lower can be easy and anyone with DIY skills can complete an 80% lower.  To some, the thought of building your own AR 15 starting with an 80% lower may seem intimidating, but it shouldn't.  Thousands of people have finished their own 80% lowers without an issue - experts and novices, alike.").

[33] *The Router Jig Pro Multiplatform – AR-15 / AR-9/AR-45/.308/AR-10,* 5D TACTICAL, https://www.5dtactical.com/multiplatform-80-lower-jig-p/5d-pmj.htm  (last visited Sept. 13, 2020) (emphasis added).

48.     Similarly, 80 percent frames, depicted in Image 9 below,[34] closely resemble finished frames, depicted in Image 10 below.[35]  To complete an 80 percent frame, the buyer needs to "[s]imply finish the cutting on [the] frame,"[36] which is a quick and easy process, especially when a jig kit is used.[37] Even without a jig kit, common household tools—such as a simple drill bit, file set, and a hand drill, each of which can be inexpensively obtained from any hardware store—can be used to complete the firearm.

 

**Image 9:  80% Frame**          **Image 10:  Finished Frame**

---

[34] *Pro-Series 80% 1911 Frame - Government Size*, FUSION FIREARMS, https://fusionfirearms.com/pro-series-80-1911-frame-government-size (last visited Apr. 27, 2020) (stating that the operations left to be completed are "[c]utting of the slide rails," "[c]utting of the barrel seat," "[d]rilling of the hammer pin hole," and "[d]rilling of the sear pin hole").

[35] *1911 Government / Full Size Frames*, FUSION FIREARMS, https://fusionfirearms.com/1911-gov-t-full-size-frames (last visited Sept. 13, 2020).

[36] *9mm 1911 Pistol Build Kit (5" Barrel, Government Length) with 80% Picatinny Railed Black Frame w/ Free Portable Handgun Lock Box*, 80% LOWERS, https://www.80-lower.com/products/9mm-1911-pistol-build-kit-5-barrel-government-length-with-80-picatinny-railed-black-frame-w-free-portable-handgun-lock-box/ (last visited Sept. 13, 2020).

[37] *Polymer80 PF940v2™ 80% Full Size Frame and Jig Kit (Glock® 17/22/24/31/34/35 Compatible)*, 80% LOWERS, https://www.80-lower.com/products/polymer80-pf940v2-80-full-size-frame-and-jig-kit/ (last visited Apr. 27, 2020).

49.    If the buyer wants to avoid drilling altogether, pre-programmed milling machines, called computer numerical controlled ("CNC") machines can finish 80 percent receivers and frames at the press of a button.[38]   To use a CNC machine, a buyer with no technical expertise needs only a generic computer and an 80 percent receiver or frame—which the machine's seller can ship, alone or in bulk, along with the machine itself.   CNC machines, which can cost $2,100, have been used to mass produce ghost guns.[39]   For example, earlier this year, a resident of Washington State who had eight prior felony convictions and had been recently released from prison after serving time on a gun charge, was found with an arsenal of ghost guns, a drill press, and a CNC machine.[40]   The arsenal included 17 pistols, 24 rifles, 10 silencers, 20 80 percent lower receivers, and 300 pounds of ammunition.[41]

50.    After the receiver or frame is finished, the buyer can easily complete the building process by using an assembly kit, which contains every part needed to make a fully functioning firearm, and are often sold by the same firms selling 80 percent receivers and frames.   As one seller explained, "AR-15 kits . . . come with all the standard parts of an AR-15 . . . . [and] *is essentially a complete [AR-15] that needs to be assembled* . . . [so] building time doesn't take too long.   *Within an hour or two, you should be breaking it in at the range*."[42]   In other words, within "an hour or two," an individual intent on harming others could use an 80 percent receiver to build a highly lethal, dangerous assault weapon capable of killing a large number of human beings quickly and efficiently.

---

[38]   EVERYTOWN FOR GUN SAFETY, UNTRACEABLE: THE RISING SPECTER OF GHOST GUNS (May 14, 2020) at 11.   *See, e.g.*, *Ghost Gunner 3 Deposit*, *supra* note 8 ("Ghost Gunner 3 is a general purpose CNC mill that gives you the ability to finish 80% receivers and frames with ease, in the comfort of your own home.").

[39]   *See e.g.*, *Ghost Gunner 3 Deposit*, *supra* note 8.

[40]   *See Edmonds felon accused of having 'ghost gun' arsenal in home,* HERALD NET (Mar. 1, 2010), https://www.heraldnet.com/news/supervised-edmonds-felon-accused-of-having-ghost-gun-arsenal/.

[41]   *Id.*

[42]   *Why is Purchasing an AR-15 Kit is Great for Beginners?*, THUNDER TACTICAL (May 10, 2019), https://thundertactical.com/ar-15-kits-great-for-beginners/ (emphasis added).

21



HOME I COMPLETE BUILD KITS I AR 15 BUILD KITS I **COMPLETE 16" .223/5.56/300BLK AR-15 80% BUILD KIT**

**Image 11:  AR-15 Assembly Kit[43]**

51.    Regardless of the method used to assemble the ghost gun, these unserialized weapons are hugely popular, affordable, and widely available online.  Currently, there are at least 80 online retailers of ghost guns—68 percent of which entered the ghost gun market after 2014—that sell all of the parts necessary to build a ghost gun.  That number is likely even larger than reported, because dealers are not required to obtain an ATF license to sell their products.

52.    Advertisements for ghost guns often highlight that 80 percent receivers and frames are unregistered and can be purchased without a background check.  One seller, for example, touts that "the 80% lower bypasses the need for an FFL [federal firearms license]," "there is no background check or registration involved," and "there is generally [no] fee involved."[44]  As depicted in Image 12, another seller notes that all the parts needed to build a DIY assault weapon can be shipped "conveniently to your door without the need and hassle of an FFL"—that is, without submitting to a background check

---

[43]  Preston Arnet, *Muzzle Brake vs Compensator vs Flash Hider: Learn the* Difference, 80% ARMS  (October 31, 2019), https://www.80percentarms.com/blog/muzzle-brake-vs-compensator-vs-flash-hider/

[44]  Preston Arnet, *Buying Guns Online Without an FFL [Federal Firearms License]*, 80% ARMS (Dec. 3, 2019), https://www.80percentarms.com/blog/buying-guns-online-without-ffl/.

at a licensed gun dealer.  Further, some retailers sell an 80 percent frame and jig kit online for as little as $80.

**BUY A GUN ONLINE WITH 80% ARMS!**

So, after all this legal jargon and information I've thrown at you; you might be able to conclude that the only way to buy a modern firearm online without an FFL, is to buy an 80% lower. Luckily for you, 80% Arms has all the tools, materials, and high quality parts needed to get you going. Check out our full line of jigs, pistol and lower receivers, as well as aftermarket parts—all eligible to ship conveniently to your door without the need and hassle of an FFL.

**Image 12:  80% ARMS Advertisement[45]**

53.    Because 80 percent receivers and frames can be obtained by individuals who are otherwise prohibited from purchasing firearms, and cannot be traced by law enforcement, it is unsurprising that ghost guns have become a weapon of choice for criminal organizations, gangs or groups engaging in violence, and other individuals intent on doing harm.  For example:

    a.    In 2013, a Southern California man, who failed a background check because of his mental instability that caused a run-in with the police, could not legally purchase a gun built an assault rifle from a ghost gun kit that he bought online.  He then used the ghost gun to kill five people during a rampage in Santa Monica.[46]

    b.    In 2017, a Northern California man that prosecutors described as a "deranged, paranoid killer," who was prohibited from owning a gun and under prosecution for multiple crimes, was nevertheless able to kill five people and injure at least 10 with two assault-style rifles he assembled from unregulated ghost gun parts he ordered online.[47]

---

[45] *Id*.

[46] Robert Cavnar, *Santa Monica Shooter Built His Gun From Parts He Bought Online*, Huffington Post (June 15, 2013), https://www.huffingtonpost.com/robert-l-cavnar/santa-monica-shooter-buil_b_3447220.html (last visited Sept. 28, 2020).

[47] Ray Sanchez et al., *Gunman in Northern California rampage was not supposed to have guns*, CNN (Nov. 15, 2017), https://www.cnn.com/2017/11/15/us/california-tehama-county-shootings/index.html; *see also* Andrew Blankstein & Corky Siemaszko, *California Mass Shooter Made His Own Rifles*, NBC NEWS (Nov. 16, 2017), https://www.nbcnews.com/news/us-news/california-mass-shooter-made-his-own-killing-machines-n821516.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

    c.  In 2020, 18 individuals in Los Angeles, California with links to a drug ring that also sold ghost guns were arrested, after law enforcement officers seized 28 pounds of methamphetamine, a quarter-pound of cocaine, crack cocaine, and 16 firearms, including several ghost guns.[48]

54.  Far right extremists have been using ghost guns to target communities of color.  Just this year, the FBI seized ghost guns and arrested alleged white supremacists planning to start a race war at a Richmond, Virginia gun rights rally,[49] and a man linked to the right-wing "boogaloo" movement allegedly used a ghost gun to murder two law enforcement officers in California.[50]

55.  Other high-profile violent crimes allegedly committed with ghost guns include:

    a.  In Stockton, California, in 2014, perpetrators of a bank robbery used at least one ghost gun in the crime.[51]

    b.  In Walnut Creek, California, in 2015, a former Stanford student fatally shot his ex-girlfriend and then himself using guns he had assembled using parts he had ordered online.[52]

    c.  In Fresno, California, in 2017, investigators discovered that a criminal organization suspected of trafficking young women, firearms, and narcotics possessed a cache of ghost guns.[53]

---

[48]  Richard Winton, *FBI arrests drug ring that also sold 'ghost gun' AR-15s*, L.A. TIMES (Sept. 15, 2020), https://www.latimes.com/california/story/2020-09-15/fbi-arrests-drug-ring-that-also-sold-ghost-gun-ar-15s.

[49]  Alain Stephens, *They Planned to Start a Race War. DIY Gun Kits Allowed Them to Build an Arsenal*, THE TRACE (Jan. 23, 2020)

[50]  Cheri Mossburg, *A Man Allegedly Linked to the Boogaloo Movement Accused of Going to a BLM Protest with a Homemade Machine Gun to Kill Cops*, CNN (June 16, 2020), https://www.cnn.com/2020/06/16/us/steven-carrillo-california-officers-deaths-suspect-boogaloos/index.html.

[51]  Joe Goldeen, *Another arrest, reward in Bank of the West heist*, RECORDNET.COM (Sept. 16, 2014), https://www.recordnet.com/article/20140916/NEWS/140919728.

[52]  Rick Hurd, *Former Stanford student built the gun he used to kill ex-girlfriend, himself*, MERCURY NEWS (Aug. 4, 2015), https://www.mercurynews.com/2015/08/04/former-stanford-student-built-the-gun-he-used-to-kill-ex-girlfriend-himself/.

[53]  Sontaya Rose, *Fresno Police gang crackdown busts prostitution ring, dozens arrested*, ABC30 ACTION NEWS (Sept. 8, 2017), https://abc30.com/fresno-police-bulldog-gang-jerry-dyer-bust/2393264/.

24

d.  In Washington, D.C., in the summer of 2018, a 25-year-old man was killed with a ghost gun during a shootout.[54]

e.  In Santa Barbara, California, in 2019, a suspected cocaine dealer was found in possession of a ghost gun.[55]

f.  In Longmont, Colorado, in 2019, police recovered ghost guns in connection with a drug trafficking investigation.[56]

g.  In Evesham, New Jersey, in 2019, a man wanted for violation of federal probation was found to be in possession of three ghost guns, as well as large quantities of cocaine and methamphetamine.[57]

h.  In Washington, D.C. in December 2019, a man, who was previously convicted of illegally possessing an unregistered handgun two years prior, shot at two reserve police officers using a ghost gun.[58]

56.  Similarly, reports indicate that ghost guns have increasingly been purchased and/or used by individuals who are prohibited from owning firearms under the GCA, including:

i.  In Temple City, California in 2018, a man who was banned from owning a gun was found with 28 firearms—11 of which were untraceable ghost guns—and 65,000 rounds of ammunition.[59]

---

[54]  Peter Hermann & Tom Jackman, *District Seeks to Ban 'Ghost Gun' Kits as Seizures of Homemade Weapons Soar*, WASH. POST (Feb. 27, 2020), https://www.washingtonpost.com/local/public-safety/district-seeks-to-ban-ghost-gun-kits-as-seizures-of-homemade-weapons-soar/2020/02/27/d12be0da-5416-11ea-9e47-59804be1dcfb_story.html.

[55]  Indy Staff, *Suspected Cocaine Dealer Arrested with a 'Ghost Gun,'* SANTA BARBARA INDEPENDENT (May 17, 2019), https://www.independent.com/2019/05/17/suspected-cocaine-dealer-arrested-with-a-ghost-gun/.

[56]  Kelsey Hammon, *More arrested Monday in alleged connection with drug-trafficking operation*, TIMES-CALL (July 12, 2019), https://www.timescall.com/2019/07/10/more-arrested-monday-in-alleged-connection-with-drug-trafficking-operation/.

[57]  Erin Vogt, *'Armed & Dangerous' Duo Found with Coke, Meth and Kids -Cops*, NEW JERSEY 101.5 (Aug. 6, 2019), https://nj1015.com/armed-dangerous-duo-found-with-coke-meth-and-kids-cops/.

[58]  Peter Hermann, *Officers who were fired on 'could see the muzzle flashes, police say*, THE WASHINGTON POST (Dec. 13, 2019), https://www.washingtonpost.com/local/public-safety/officers-who-were-fired-on-could-see-the-muzzle-flashes-police-say/2019/12/13/72d645e2-1dcb-11ea-b4c1-fd0d91b60d9e_story.html.

[59]  Josh Haskell, *Temple City father, adult daughter found with stockpile of illegal weapons, ammunition*, KABC-TV L.A. (Feb. 21, 2018), https://abc7.com/3120273/?ex_cid=TA_KABC_FB&utm_campaign=trueAnthem:+Trending+Content&utm_content=5a8e4e5b3ed3f0000762bd63&utm_medium=trueAnthem&utm_source=facebook.

j.  In Plattsburgh, New York in 2018, a man with a prior felony conviction obtained and completed assembling a partially-assembled Glock firearm, later brandishing it.[60]

k.  In Upper Darby, Pennsylvania in 2018, a teenage exchange student bought parts online and built a ghost gun he planned to use to commit a school shooting.[61]

l.  In Syracuse, New York in 2019, a man with a prior felony conviction used a ghost gun to shoot his nephew in the back.[62]

m.  In Evansville, Indiana in 2019, a 17-year-old teenager bought parts online to create a handmade ghost gun.[63]

57.     Ghost guns are also increasingly used by illegal gun-trafficking rings.  In 2015, for example, the New York State Attorney General announced a 32-count indictment of two defendants charged with illegally trafficking at least a dozen untraceable ghost guns, including AR-15s.[64]  The two defendants were convicted of illegally trafficking ghost guns, and were sentenced to nine and 11 years in prison, respectively.[65]   And in June 2019, the New Jersey Attorney General announced the indictment of nine men allegedly part of a criminal network that was illegally trafficking untraceable ghost guns, including assault rifles, assembled from kits purchased online.[66]  In July 2020, one of these

---

[60]  Bob Bennett, *Police: Convicted felon revealed gun during argument*, PRESS-REPUBLICAN (Apr. 16, 2018), https://www.pressrepublican.com/news/local_news/police-convicted-felon-revealed-gun-during-argument/article_690748e1-3549-5324-acef-42eb7cc2f82e.html.

[61]  Chad Pradelli, *Police: Exchange student built gun from parts bought online*, 6ABC ACTION NEWS (Apr. 2, 2018), https://6abc.com/police-exchange-student-built-gun-from-parts-bought-online/3292963/.

[62]  Douglass Dowty, *DA: Syracuse man shot 6-year-old nephew with untraceable 'ghost gun,'* SYRACUSE.COM (Jan. 6, 2020), https://www.syracuse.com/crime/2020/01/da-syracuse-man-shot-6-year-old-nephew-with-untraceable-ghost-gun.html.

[63]  Philip Joens, *Indiana teen built 'ghost gun' from online parts*, COLUMBIA DAILY TRIBUNE (May 25, 2019), https://www.columbiatribune.com/news/20190525/indiana-teen-built-ghost-gun-from-online-parts.

[64]  N.Y. State Attorney General's Office, *supra* note 9.

[65]  Press Release, N.Y. State Attorney General's Office, A.G. Schneiderman Announces 11 Year Jail Sentence Of Defendant Convicted For Illegally Trafficking Untraceable "Ghost Guns" (Apr. 28, 2016), https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-11-year-jail-sentence-defendant-convicted-illegally.

[66]  Press Release, N.J. Attorney General's Office, Indictment in "Operation Stone Wall" Charges Nine Alleged Members of Ring that Trafficked Untraceable "Ghost Gun" Assault Rifles & Cocaine (June 5, 2019), https://www.nj.gov/oag/newsreleases19/pr20190605a.html.

men was sentenced to 14 years in prison for his role in the trafficking ring.[67]  Two other leading members of the ring pleaded guilty and await sentencing.[68]  Charges against other members of the ring are still pending.[69]

58.     The increasing production and availability of ghost guns built with 80 percent components has led to a commensurate rise in violence attributable to unregistered, untraceable ghost guns.  Law enforcement agencies connected at least 2,513 ghost guns to criminal activity between 2010 and April 2020.  *See* Ex. 2, EVERYTOWN FOR GUN SAFETY, UNTRACEABLE: THE RISING SPECTER OF GHOST GUNS (May 14, 2020) at 17.  Of that number, more than half—1,300 ghost guns—were used or sold by criminal enterprises to facilitate crimes including gun trafficking, robbery, drug trafficking, terrorism, and murder.[70]  Ghost guns were linked to criminal cases in at least 38 states between late 2018 and May 2020.  *See* Ex. 3, Bill Whitaker, *Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and Are Virtually Untraceable*, CBS News 60 Minutes (May 10, 2020), https://www.cbsnews.com/news/ghost-guns-untraceable-weapons-criminal-cases-60-minutes-2020-05-10/.

59.     The number of ghost guns recovered in connection with criminal activity is growing each year.  For example, before 2016, District of Columbia law enforcement had never recovered a ghost gun in the District.  By 2019, law enforcement recovered 116 ghost guns in one year, before recovering another 106 ghost guns in just the first five months of 2020.[71]  According to information from the District of Columbia's Department of Forensic Sciences, of the 250 ghost guns recovered in

---

[67]  Julie Shaw, *Camden County man has been sentenced to 14 years in prison for his role in "ghost guns" trafficking ring, AG says*, THE PHILADELPHIA INQUIRER (July 10, 2020), https://www.inquirer.com/news/new-jersey-attorney-general-operation-stone-wall-ghost-guns-christopher-stoner-sentence-20200710.html.

[68]  *Id.*

[69]  *Id.*

[70]  *Id.*

[71]  *AG Racine Sues Gun Manufacturer Polymer80 for Illegally Advertising and Selling Untraceable Firearms to District Consumers*, OAG.GOV (June 24, 2020), https://oag.dc.gov/release/ag-racine-sues-gun-manufacturer-polymer80 (last visited Sept. 28, 2020).

Washington D.C. between 2017 and May 29, 2020, at least 208, or 83.2%, were manufactured by a single company, Polymer80.[72]

60.    According to ATF, as of last year, 30% of all firearms it was recovering in California were unserialized.[73]  In Los Angeles, the number of ghost guns recovered increased by 144% from 2015 to 2019.[74]  In San Francisco, **no** ghost guns were recovered in 2015, but beginning in 2016, ghost gun recoveries began to sharply rise – increasing by *1517%* from 2016 to 2019.[75]

61.    These statistics likely grossly under-report the massive scale of the problem because these statistics rely on instances where ghost guns are recovered by law enforcement.  Countless shootings and other acts of violence using ghost guns are never reported as ghost gun violence because no firearm was recovered, and ammunition from the scene of the crime cannot reveal that it was fired from a ghost gun, as opposed to a traditional, serialized weapon, since the ways that serialized and unserialized guns fire ammunition—and function in every other way—are indistinguishable.

62.    The sale of ghost guns in the United States presents an overwhelming threat to communities and people who may become victims of violence.  Unregulated, ghost guns can be purchased by people with lengthy criminal records or serious mental illnesses, and other prospective shooters intent on doing harm.  These ghost guns open the floodgates for such prohibited persons to obtain and use a range of firearms—from small hand-held pistols to high-powered AR-15 military-style assault weapons—in gun crimes, targeted acts of violence, and indiscriminate public mayhem. After these terrible crimes are committed and ghost guns are recovered, the inability to trace the ghost gun back to a particular buyer and seller prevents law enforcement from fully investigating the crime, allowing reckless sellers and illegal traffickers to operate with near impunity.  Victims of crimes committed with ghost guns are often left without answers, and ghost gun trafficking remains

---

[72] *Id.*

[73] Alain Stephens, *Ghost Guns Are Everywhere in California*, THE TRACE (May 17, 2019), https://www.thetrace.org /2019/05/ghost-gun-california-crime/; *see also* David Chipman, *Ghost Guns Are Specifically Designed for Criminals*, Giffords.org (May 13, 2020), https://giffords.org/blog/2020/05/ghost-guns-are-specifically-designed-for-criminals-blog/#:~:text=Today%20more%20than%2040%25%20of,has%20already%20been%20borne%20out..

[74] Data released to Giffords Law Center following FOIA request.

[75] *Id.*

undetected.  Yet, year after year, the number of ghost guns continues to grow—including a surge of sales during the COVID-19 pandemic.[76]  This threat to public safety can be stopped, if only ATF—the federal agency delegated the authority to regulate firearms—reasonably applies the GCA and agrees to regulate ghost guns in the way it regulates *all other* guns.

**B.**  **ATF At First Properly Concludes Ghost Guns Fall Under The GCA, And Then Inexplicably Reverses Its Position.**

63.     Beginning in the early 1980's and into the twenty-first century, ATF took the position in its Classification Letters that many unfinished receivers and frames that are identical to the 80 percent receivers and frames on the market today were "firearms" under the GCA, meaning that buyers of these unfinished frames and receivers were required to undergo background checks to determine whether they were legally entitled to own a firearm.

64.     The agency's conclusion, during this period, was based on an approach that analyzed how quickly and easily an unfinished receiver or frame could be turned into a fully functional firearm— that is, whether it could "readily be converted" to function as the firearm it was specifically designed to be.  Using this "temporal" approach, ATF found that 80 percent receivers that required some machining but could be finished in under 75 minutes or in a "minimal amount of time" qualified as "firearms."  *See, e.g.*:

- Ex. 4, Letter from Edward M. Owen, Jr., Chief, Firearms Technology Branch, ATF, to Henry A. Roehrich, SGW Incorporated (May 3, 1983) (classifying as a firearm a partially completed receiver that could be completed with additional milling that took roughly "**75 minutes**") (emphasis added).

- Ex. 5, Letter from Curtis H.A. Bartlett, Chief, Firearms Technology Branch, ATF, to Lane Browne, Mega Machine Shop, Inc. (Dec. 27, 2002) (classifying as a firearm each of the four "AR-15 type lower receiver samples" submitted for examination despite the fact that one of the samples had a "solid interior" because it could be finished in **approximately 75 minutes**) (emphasis added).

- Ex. 6, Letter from Sterling Nixon, Chief, Firearms Technology Branch, ATF, to Robert Serva, Dan Wessons Firearms (Aug. 19, 2004) (classifying as a firearm a "1911-type semiautomatic pistol frame" because the frame "can be completed **in a minimal amount of time** by a competent individual having the necessary equipment") (emphasis added).

---

[76]  *See supra* note 3.

65.     ATF's temporal analysis was also consistent with the GCA, which provides that "firearms" include not only fully functional weapons, but also receivers and frames of such weapons that are "*designed to or may readily be converted*" into functioning ones.  18 U.S.C. § 921(a)(3).  The speed and ease with which an 80 percent receiver or frame can be turned into a functioning firearm speaks directly to whether or not that item was "designed to" be a functional weapon, and whether it "may readily be converted" into a functional weapon.

66.     But around 2006, ATF began changing course, without providing any justification for the switch.  ATF stopped considering whether a frame or receiver is "designed to or may readily be converted" into a functioning firearm under the GCA.  Instead, ATF began to mechanically analyze which machining operations still needed to be performed to determine whether a partially completed receiver or frame is a "firearm" under the GCA.  Under this approach, ATF concluded that 80 percent receivers with "fire-control cavity area[s] [that are] completely *solid and un-machined*" do not qualify as firearms under the GCA.  Ex. 7, Letter from Sterling Nixon, Chief, Firearms Technology Branch, ATF to Justin Halford (Apr. 24, 2006) (classifying an "AR-15 pattern receiver" as a "firearm" because the sample did not have a solid "trigger/hammer area").  From 2006 through today, ATF has continued to analyze 80 percent frames and receivers under the "machining operations" approach, with no mention of the ease or time it would take to convert the product into a functioning firearm.  *See, e.g.*:

- Ex. 8, Letter from John R. Spencer, Chief, Firearms Technology Branch, ATF, to Alan Aronstein, Hi-Standard Manufacturing Company (Sept. 28, 2012) (classifying as not "firearms" a "1911-type receiver blank" and "target-pistol type receiver blank" after analyzing which "**machining operations**" had been "partially or fully completed") (emphasis added).

- Ex. 9, Letter from Earl Griffith, Chief, Firearms Technology Branch, ATF, to Doug Hughes, Kenney Enterprises, Inc. (May 17, 2013) (classifying as "not . . . a 'firearm'" a "partially completed AR-type receiver" because certain "**machining operations**" including "[m]illing out of fire-control cavity" were not yet performed) (emphasis added).

- Ex. 10, Letter from Earl Griffith, Chief. Firearms Technology Branch, ATF, to Bradley Reece, Palmetto State Defense, LLC (May 25, 2014) (classifying as "not a 'firearm'" an "AR-10 type receiver blank" because it "is completely **solid and un-machined** in the fire-control recess area") (emphasis added).

67.     ATF further memorialized the mechanical "machining operations" approach in a formal ruling (Ruling 2015-1, issued on January 2, 2015) regarding the manufacture and sale of ghost guns.

ATF explained that Ruling 2015-1 was issued in response to "inquiries from the public asking whether Federal Firearms Licensees (FFL), or unlicensed machine shops, may engage in the business of completing, or assisting in the completion of, the manufacture of firearm frames or receivers *for unlicensed individuals* without being licensed as a manufacturer of firearms." (Emphasis added). In other words, ATF was asked to clarify whether sellers or gunsmiths could convert 80 percent frames or receivers into fully functioning firearms for buyers.

68.     In its Ruling, ATF clarified the obligations by again focusing on the "machining operations" performed on the 80 percent receivers. Specifically, Ruling 2015-1 explains that "when a person **performs machining or other manufacturing process** on [an unfinished frame or receiver] to make a firearm 'frame or receiver' . . . that person has performed a manufacturing operation." (emphasis added). Similarly, when any person "make[s] available its machinery . . . to individuals who bring in raw materials, blanks, unfinished frames or receivers . . . for the purpose of creating operable firearms," that person is also "engaged in the business" of manufacturing firearms. In both situations, where "machining" occurs, the seller "must be licensed as a manufacturer under the Gun Control Act of 1968 (GCA); identify (mark) any such firearm; and maintain required manufacturer's records."

69.     In explaining the purported reasoning behind the Ruling, ATF states that allowing a seller or gunsmith to perform "manufacturing processes on a frame or receiver" would result in firearms being "manufactured without any markings or serialization" which would "run[] contrary to a major purpose of the GCA [by] eliminat[ing] the ability of law enforcement to trace firearms used in a crime, or stolen or lost firearms." But this is ***exactly*** the result created by ATF's mechanical "machining operations" test—the proliferation of unserialized, untraceable weapons—because the frame or receiver was "solid and un-machined" at the point of purchase.

70.     Through its continued use of the mechanical "machining operations" approach, ATF has issued a series of Classification Letters to Polymer80, beginning in 2015, that have gravely endangered the lives of Americans and severely inhibited law enforcement's ability to fight crime.

1          **1.     ATF's Classification Letters Regarding Polymer80, Inc. Have Permitted**
2              **and Encouraged the Proliferation of Ghost Guns.**

3              **a.     ATF's Ghost Gun Classification Letters Issued to Polymer80.**

4          71.     Polymer80 is a leading ghost gun component manufacturer that markets and sells 80

percent receivers and frames and other ghost gun components to individuals online and via firearms

dealers.  Between 2015 and 2017, ATF issued a series of Classification Letters to Polymer80, analyzing

Polymer80's products under the mechanical "machining" approach.  Exs. 11, 12, 13.  *First*, in early

2015, ATF issued a Classification Letter that classified Polymer80's AR-15-type receiver as "NOT a

firearm receiver, or a firearm" (the "February 2015 Polymer80 Letter").  *See* Ex. 11, Letter from

Michael R. Curtis, Acting Chief, Firearms Technology Industry Services Branch, ATF, to Jason Davis,

Davis & Associates, https://www.Polymer80.com/media/wysiwyg/porto/LegalDocs/P80_Product_

Determination_Letters.pdf.  ATF reasoned that because the receiver had a "**solid fire control cavity**

**area**, and was cast in a homogenous manner" using "a single shot of molten material," it was not a

firearm.  (Emphasis added.)

          72.     ATF's February 2015 Polymer80 Letter did not deny that Polymer80's proposed

product was designed to and may be readily converted into a fully functional weapon.  Nor did the

letter consider how quickly a DIY gunsmith could convert the product into a functional firearm using

standard household tools, such as a simple drill bit, file set, and a hand drill, or a CNC machine.

Notably, at least one retailer of the Polymer80 receiver advertises that the specific AR-15 type firearm

at issue in the February 2015 Polymer80 Letter is "incredibly simple to drill and mill, and the material

is forgiving."[77]  A product review of the receiver states that "I would recommended [sic] for first time

builders & I would rebuy this in the future due to ease of build."[78]  Another review states that "This

was exactly as described, with some easy to follow instructions this was completed in no time."[79]

---

[77]  *See Polymer80 80% Receiver and Jig Kit (AR-15),* 80% Lowers, https://www.80-lower.com/products/Polymer80-
      lower-receiver-and-jig-kit-ar-15/ (last visited Sept. 13, 2020).

[78]  *See* Matthew T.*, Polymer80 80% Receiver and Jig Kit (AR-15),* 80% Lowers, https://stamped.io/twittercard?review
      Id=25431335 (last visited Sept. 18, 2020).

[79]  *See* Todd A.*, Polymer80 80% Receiver and Jig Kit (AR-15),* 80% Lowers, https://stamped.io/twittercard?reviewId
      =25241362 (last visited Sept. 18, 2020).

73.     In November 2015, ATF issued a second Classification Letter to Polymer80 (the "November 2015 Polymer80 Letter"), this time regarding two separate 80 percent components:  first, an 80 percent receiver for an AR-10 assault rifle which Polymer80 identified as a "WARRHOGG BLANK" and, second, a Glock-type "CG" or "CG9" Blank handgun frame.  *See* Ex. 12, Letter from Michael R. Curtis, Chief, Firearms Technology Industry Services Branch, ATF, to Jason Davis, Davis & Associates (Nov. 2, 2015), https://www.polymer80.com/CMS-Images/ATF-DetLetters.pdf.  ATF concluded that both items were not firearms under the GCA because certain "machining operations" or "design features" were "not yet present or completed" on the items.  In particular, ATF's Classification Letter pointed out that the AR-10 receiver lacked (1) complete removal of material from the fire-control cavity area, (2) machining or indexing of selector-lever hole, (3) machining or indexing of trigger slot, (4) machining or indexing of trigger-pin hole, or (5) machining or indexing of hammer-pin hole.  ATF's letter noted that the GC9 Blank lacked a (1) machined or indexed trigger-pin hole, (2) machined or indexed locking block-pin hole, (3) front or rear frame rails, or a (4) machined or formed barrel seat.

74.     ATF's November 2015 Polymer80 Letter did not deny that Polymer80's proposed products were designed to function as and could be readily converted into fully functional weapons.  Nor did the letter consider how quickly a DIY gunsmith could convert the products into functional firearms.  According to a review of the AR-10 type receiver at issue in the 2015 Polymer80 Letter on an online retailer's website, "This was easy . . . *I was done in about an hour and another hour to install the* [remaining parts].  Really is that easy."[80]

75.     On January 18, 2017, ATF issued a third Classification Letter to Polymer80 (the "2017 Polymer80 Letter"), regarding its Glock-type "PF940C Blank," ruling that it was "not sufficiently complete to be classified as the frame or receiver of a firearm and thus is not a 'firearm' as defined in the GCA."  *See* Ex. 13, Letter from Michael R. Curtis, Chief, Firearms Technology Industry Services Branch - ATF to Jason Davis, Davis & Associates (Jan. 18, 2017), https://www.polymer80.com/CMS-Images/ATF-DetLetters.pdf.  The letter explained that the item was not "sufficiently complete" because

---

[80]     *See Polymer80 Warrhogg 80% Receiver Kit,* MIDWAY USA, https://www.midwayusa.com/product/1092916305283 (last visited Sept. 13, 2020) (emphasis added).

the following "machining operations or design features were <u>not</u> yet present or completed": (1) trigger-pin hole machined or indexed, (2) trigger mechanism housing pin machined or indexed, (3) locking block-pin hole machined or indexed, (4) devoid of front or rear frame rails, (5) barrel seat machined or formed, and (6) incapable of accepting Glock locking-block.

76.     ATF's 2017 Polymer80 Letter did not deny that Polymer80's proposed product was designed to function as and could be readily converted into a fully functional weapon.  Nor did the letter consider how quickly a DIY gunsmith could convert the product into a functional firearm.  Notably, at least one retailer of the Glock-type receiver at issue in ATF's 2017 Polymer80 Letter states in its marketing for the 80 percent receiver that "***It's amazing to think in just 10-15 minutes you can have a fully functioning Glock that you made at home.***"[81]

77.     The Classification Letters ATF issued to Polymer80 are just a few of the Classification Letters that ATF has issued to manufacturers of 80 percent receivers and frames.  Indeed, a number of other manufacturers of 80 percent receivers and frames—including KE Arms,[82] 80 Percent Arms,[83] Palmetto State Defense,[84] and TPS Arms[85]—have similarly received Classification Letters that permit those manufacturers to sell ghost guns outside the strictures of the GCA.  Individually and even more so collectively, these Classification Letters have resulted in exponential explosion of the size of the ghost gun market, which has accelerated during the COVID-19 pandemic, when these manufacturers have publicized that "excessive demand" has outstripped their available supply.[86]

---

[81]  *See Glock 80% Compact Polymer Pistol Frame Kit*, FANDWGUNS.GUNSAMERICA.COM, http://fandwguns.gunsamerica.com/ItemDetails/762360860/Glock-80-Compact-Polymer-Pistol-Frame-Kit.htm (last visited Sept. 28, 2020).

[82]  *See* KE ARMS, http://www.kearms.com/ (last visited Sept. 16, 2020); Ex. 9 Letter from Earl Griffith, Chief of Firearms Technology Branch, ATF, to Doug Hughes, Kenney Enterprises, Inc. (May 17, 2013), at 2.

[83]  *See* 80% ARMS, https://www.80percentarms.com/ (last visited Sept. 16, 2020); Ex. 14, Letter from Earl Griffith, Chief of Firearms Technology Branch, ATF, to Tilden Smith, 80 Percent Arms (July 15, 2013), at 2.

[84]  *See* PALMETTO STATE DEFENSE, https://www.psdmfg.com/ (last visited Sept. 16, 2020); Ex. 10, Letter from Earl Griffith, Chief of Firearms Technology Branch, ATF, to Bradley Reece, Palmetto State Defense, LLC (May 25, 2014), at 2.

[85]  *See* TP ARMS, http://tparms.com/ (last visited Sept. 16, 2020); Ex. 15, Letter from Earl Griffith, Chief of Firearms Technology Branch, ATF to David Trease, President, TPM Arms, LLC (Nov. 22, 2013), at 3.

[86]  On the homepage for Polymer80.com, a banner across the top notes "[d]ue to an overwhelmingly high demand, we will be shipping items 6-8 weeks after the initial order."  POLYMER80, https://www.polymer80.com/ (last visited

### b.      Polymer80 Is A Major Contributor To the Ghost Gun Epidemic.

78.     As a result of these three Classification Letters, Polymer80 has become a prominent manufacturer of 80 percent receivers and frames and other ghost gun parts.  It has been advertising, offering, and selling firearms on its website, www.Polymer80.com, and through a network of firearms dealers that consumers can access through the company's website.

79.     Polymer80 contributes significantly to ghost gun violence nationwide.  On information and belief, Polymer80's products constitute a significant percentage of the ghost guns sold nationwide.  Indeed, Polymer80's products constitute 83.2% of the ghost guns recovered by law enforcement officers in the District of Columbia since 2017.[87]  On information and belief, Polymer80 ghost guns have become so ubiquitous that law enforcement in some jurisdictions colloquially refer to all DIY handguns they recover as "Polys," even if a recovered gun was assembled with parts bought from a different seller.

80.     Polymer80 advertises and sells a variety of weapons on its website that can be made into fully operational firearms with minimal effort, including an AR-15 military-style semi-automatic rifle, a .308 semi-automatic rifle, and at least seven types of handguns.  The company sells 80 percent receivers in "Buy, Build, Shoot" kits, which contain "all the necessary components" to turn the 80 percent receivers into fully functional firearms.  The handgun kits contain 80 percent frames as well as a "complete slide assembly, complete frame parts kit, 10 round magazine and a pistol case":

---

Sept. 16, 2020).  On KEarms.com a banner notes "due to extremely high order volumes, orders may take 1-2 weeks to ship."  KE ARMS, http://www.kearms.com/ (last visited Sept. 16, 2020).  On https://www.psdmfg.com, a large warning pops up on the homepage explaining "DUE TO EXTREME DEMAND TO ENSURE DELIVERY TO DEALERS . . . ALL RETAIL SALES HAVE BEEN SUSPENDED INDEFINITELY."  PALMETTO STATE DEFENSE, https://www.psdmfg.com/ (last visited Sept. 16, 2020).  On 80percentarms.com a banner across the homepage reads: "Due to unprecedented order volume, orders may take several weeks to ship."  80% ARMS, https://www.80percentarms.com/ (last visited Sept. 16, 2020).

[87] *See* Complaint at ¶ 1, *District of Columbia v. Polymer80, Inc.*, Case No. 2020 CA 002878 B (D.C. Super. June 24, 2020) (complaint available at https://oag.dc.gov/sites/default/files/2020-06/Polymer80-Complaint.pdf (last visited Sept. 16, 2020)).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



**Image 13:  Advertisement for Polymer80 "Buy, Build, Shoot" Kit**

On information and belief, many "buy, build, shoot" kits sold out during the first half of 2020, as manufacturers experienced rapidly increased ghost gun sales during the COVID-19 coronavirus pandemic.[88]

81.    Polymer80 makes purchasing and assembling fully functional firearms, including assault rifles, simple for its customers.  The company's website publishes step-by-step instructions and instructional videos that teach customers how to convert their 80 percent kits into fully functional firearms.

82.    And, like other ghost gun retailers, Polymer80 allows bulk purchases of firearm kits without restriction.  Customers on Polymer80's website may order unlimited quantities of ghost gun receiver kits, including AR-15 receiver kits, without providing any proof of identification, age, or eligibility to possess firearms as would be confirmed by undergoing a background check.  In fact, Polymer80 apparently makes no effort to confirm that its customers are even alive:  in March 2020, Plaintiff Bryan Muehlberger was able to purchase a ghost gun from Polymer80 in his deceased daughter's name, only four months after Gracie Anne Muehlberger was murdered in the Saugus High School ghost gun shooting.  Despite the fact that the name he provided as the purchaser—Gracie's—did not match the name on the credit card used—Mr. Muehlberger's own—in mere minutes, he

---

[88] *See supra* note 3.

purchased a ghost gun kit on Polymer80.com for $650.  Even if Gracie Anne Muehlberger were still alive, she would have been underage and prohibited from purchasing a firearm under the GCA.

83.     On information and belief, Polymer80 customers and other ghost gun consumers can purchase large quantities of ghost guns and resell them for a profit.  For example, a five-time convicted felon from Easthampton, Massachusetts pled guilty to building AR-15 rifles from parts bought online and then sold in New Hampshire, making a $300 profit on each military-style rifle.[89]  Another convicted felon, in Salem, Massachusetts, sold completed firearms for three times what he spent to purchase the parts, spending only thirty minutes to build each gun.[90]

84.     In order to complete a purchase, even for large quantities of ghost guns, Polymer80 has its customers first confirm that they have complied with the below terms and conditions by checking a box—a classic attempt to avoid liability.  As confirmed by Bryan Muehlberger's recent purchase in the name of his deceased daughter, the company undertakes no independent background check or other means to verify these responses from its customers:

- I am not under indictment or information in any court for a felony, or any other crime, for which the judge could imprison me for more than one year.
- I have never been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned me for more than one year, even if I received a shorter sentence including probation.
- I am not prohibited by federal, state, or local laws from purchasing, acquiring, possessing, manufacturing, using or owning a firearm.
- I agree to comply all state, federal, and local laws relating to purchasing, acquiring, possessing, manufacturing, using or owning a firearm.
- I am not an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance.
- I am not a fugitive from justice.
- I have never been adjudicated mentally defective (which includes a determination by a court, board, commission, or other lawful authority that I am a danger to myself or others or am incompetent to manage my own affairs.)
- Nor have I been involuntarily held for a mental health evaluation within the last 5 years.
- I have never been committed to a mental institution.
- I have never renounced my United States citizenship.
- I am not an alien illegally in the United States.
- I am not prohibited from possessing firearms under federal or state law.
- I have not had any suicidal thoughts or suicidal ideations now or at any time prior to my presence here today.
- I will not use any of the training and instruction provided for any unlawful purpose.
- I have read and understand all legislation that pertains to ownership of 80% products, building a firearm at home, and firearm ownership in the State that I reside in.

---

[89]  Dan Crowley, *Easthampton man pleads guilty to illegal possession of firearms he assembled, intended to sell*, DAILY HAMPSHIRE GAZETTE (Aug. 13, 2016) https://www.gazettenet.com/Easthampton-man-pleads-guilty-in-NH-federal-court-to-illegal-possession-of-a-firearm-as-a-convicted-felon-4061253 (last visited Sept. 16, 2020).

[90]  *Supra* note 38 at 11.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

85.     Polymer80 advertises to its customers that its sales practices are legal and that its 80 percent receivers and frames do not qualify as firearms under the GCA.  The company's position that its ghost gun products are legal is based on the Classification Letters ATF issued to the company, described above.  For example, the company's homepage includes a screenshot of an ATF Classication Letter sent to Polymer80 alongside the words "Is it legal? YES!"  Polymer80's website provides no information regarding the legality of its products other than those addressed in the Classification Letters, and no information regarding the legality of its products under particular states' laws.  ATF's Classification Letters to Polymer80 are a linchpin for the industry.  Indeed, individuals and businesses alike rely on ATF's Classification Letters, such as the Polymer80 Classification Letters, when purchasing, selling, and/or designing 80 percent lower receivers and frames in the United States.[91]

## 2.     ATF Provides Public Guidance Related To Ghost Guns.

86.     Also in 2015, ATF decided to explain its official agency position regarding ghost guns on the section of its website entitled Questions and Answers ("Ghost Gun Guidance").  In or around June or September of 2015, the Ghost Gun Guidance was posted as a subsection on ATF's website entitled "Receiver Blanks."[92]  *See* Ex. 17 (Pages from Archive.org showing the first archived version of the "Receiver Blanks" page in September 2015).  The Ghost Gun Guidance page states that it contains "answers to some common questions specific to receivers known as 80% receivers or unfinished receivers" and contains eight links to questions and answers.  The questions and answers do not appear to have been materially changed since their initial debut on the website.  The same eight questions and answers remain on the site today, each containing a note of the date that the answer was "last reviewed."  As of this date of this Complaint, each of the eight answers have last been reviewed

---

[91]   *See e.g.*, Complaint at ¶ 41, *Cal Rifle v. ATF*, 1:14-cv-01211 (July 31, 2014, E.D.Cal), where the California Rifle & Pistol Association (an organization comprised of individuals and businesses who, among other things, own, manufacture, and/or sell 80% percent receivers), stated that it has "reli[ed] . . . on the ATF's prior opinions, interpretations, and **letter rulings** regarding what constitutes a 'firearm' 'frame' or 'receiver.'" (Emphasis added).

[92]   According to a website that catalogs webpage archives, the WayBackMachine (Archive.org), the earliest known Ghost Gun Guidance page was captured in September 2015.  *See* Ex. 17.  The screen capture contains the date that the website section was "last reviewed" by ATF and states it was last reviewed in June 2015.  (Note that this was the first time that the "automated crawlers" became aware of the site and archived it, although the page may have been published some time earlier before detected by the archiving system.)

by ATF between **February 6, 2020 and June 24, 2020.**   *See Receiver Blanks,* ATF.gov, https://www.atf.gov/qa-category/receiver-blanks (last visited Sept. 13, 2020) (also attached as Ex. 16).

87.     The Ghost Gun Guidance contains legally determinative information regarding when ATF considers a receiver to have become a "firearm" for purposes of the GCA.  For example, one of the listed questions asks:  "Are '80%' or 'unfinished receivers' illegal?"  ATF's answer states:

> Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA).  ATF has long held that items such as receiver blanks, "castings" or "machined bodies" in which the fire-control cavity area is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA.

The same response then includes three photos as "examples" of finished receivers that meet the definition of a firearm and unfinished receivers that ATF has said do not.  *See* Images 7-8, *supra* Section A.

88.     A further question asks:  "Can functioning firearms made from receiver blanks be traced?"  ATF responds that "it is usually not possible to trace the firearm or determine its history" when it was made from an 80 percent receiver.  ATF then acknowledges that the inability to trace these firearms "hinders crime gun investigations and jeopardizes public safety."

89.     Similarly, another question reads:  "Have firearms made from unmarked receiver blanks been recovered after being used in a crime?"  In response, ATF again acknowledges that these untraceable ghost guns continue to be "recovered after shooting incidents, from gang members, and from prohibited people after they have been used to commit crimes."

90.     This Ghost Gun Guidance constitutes final agency action, despite the absence of any formal agency rulemaking process.  The Ghost Gun Guidance presents ATF's definitive guidance to the industry and the public regarding 80 percent receivers, and is the primary authority that the public and manufacturers can rely on to understand ATF's position on the legality of 80 percent receivers.  Indeed, the Ghost Gun Guidance is the *only* direct public guidance from ATF available to private citizens seeking to understand whether or not their 80 percent receivers are "firearms" and thus subject to the serialization and background check requirements of the GCA.

91.     Moreover, ATF's Ghost Gun Guidance reflects actual agency policy, consistent with the Polymer80 Classification Letters, that "bind[s] private parties without undergoing the rulemaking

process."[93]  ATF's determination regarding 80 percent receivers, as described on its Q&A page, has directly resulted in a massive proliferation in both 80 percent receivers *and* in gun violence perpetrated with ghost guns, as described herein.  Ghost gun manufacturers and dealers have cited the Ghost Gun Guidance as authority on their websites—for example, a dealer called "80% Lowers" quotes the Ghost Gun Guidance on its website, arguing that "80% lowers are not considered firearms" because ghost guns are "not capable of meeting the definition of a firearm under federal law."[94]



**Image 14:  80% Lowers Guidance on the Legality of Ghost Guns,
Quoting ATF's Ghost Gun Guidance**

**C.    ATF's Ghost Gun Actions Have Harmed and Will Continue to Harm Plaintiffs.**

92.    ATF's decisions allowing ghost guns, including those manufactured by Polymer80, have allowed ghost guns to proliferate and will continue to cause concrete injury to each of the named Plaintiffs.

---

[93] *See* Memorandum from Att'y Gen. Jefferson B. Sessions III to ATF (Nov. 16, 2017), at 1, https://www.justice.gov/opa/press-release/file/1012271/download (explaining that agencies may no longer "issue guidance documents" that "bind private parties without undergoing the rulemaking process").

[94] *Are 80% Lowers Legal,* 80% LOWERS (June 11, 2020), https://www.80-lower.com/80-lower-blog/are-80-lowers-legal/ (last visited Sept. 28, 2020).

93.     **State of California**.  Plaintiff State of California is an epicenter of the growing ghost gun epidemic.  It is home to 18 of the 80 current online ghost gun retailers Plaintiffs are aware of—the most of any state—and more than double the number of retailers than existed in the State just six years ago.[95]  As one of the states most affected by the proliferation of ghost guns, California has suffered, and will continue to suffer, concrete harm caused by ATF, including (1) significantly increased costs of policing and law enforcement; (2) interference with California's ability to enforce its legal code with respect to firearms and firearm-related crime; and (3) harm to its quasi-sovereign interest in protecting the security and well-being of its residents.

94.     The proliferation of ghost guns increases the difficulty and costs of policing and law enforcement in California.  The California Department of Justice's Bureau of Firearms, which conducts enforcement investigations to confiscate firearms from prohibited persons, noted a 512% increase in ghost gun seizures in such investigations in 2019 compared to 2018.[96]  This statistical evidence is consistent with the experience of Bureau of Firearms agents in the field.[97]  As a result, in recent years, Bureau of Firearms staff have devoted an increasing amount of time providing training to law enforcement personnel statewide on ghost guns.  Given the lack of federal restrictions on 80 percent receivers and frames, this training has focused particularly on the circumstances in which the ghost guns assembled from such parts are noncompliant with state law.

95.     The California Department of Justice's Bureau of Investigation, which provides statewide expert investigative services combating multi-jurisdictional criminal organizations, has also noted a rise in ghost gun seizures in recent years.  In a multi-agency state and federal operation last year, in which the Bureau of Investigation and the California Highway Patrol teamed with local and federal law enforcement, 21 ghost guns (including seven fully automatic weapons) were seized from

---

[95] *See supra* note 38 at 12.

[96] *See* California Department of Justice, *Armed and Prohibited Persons System (APPS) 2019* at 19, https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/apps-2019.pdf.

[97] *See State of Washington v. U.S. Dep't of State*, 2:20-cv-00111-RAJ (W.D. Wash.), ECF No. 56 [Declaration of Blake Graham] ¶ 30.

suspected Norteño street gangs engaged in alleged criminal activity in Kings and Tulare Counties.[98] That operation resulted in a total of 96 arrests, for offenses including murder, conspiracy to commit robbery, narcotics trafficking, and manufacturing, sales, and possession of firearms.  This is just one example of the many investigations in which state law enforcement officers have seized ghost guns from persons involved in criminal activity.

96.     In addition, allowing untraceable firearms to be created in or transported into California makes California's local detective work solving crimes more difficult and amplifies the risk of violent attacks using these weapons.  Law enforcement agencies in California have reported recovering ghost guns at dramatically increased rates—including a 940% increase in San Diego and a 51% increase in San Jose from 2017 to 2018.[99]  In January 2020, the ATF special agent in charge of the Los Angeles Field Division stated that 41% of the Los Angeles Field Division's cases have involved ghost guns.[100] He further noted that "it concerns me as a law enforcement official that someone with rudimentary or basic skills can mass produce untraceable firearms in the comfort of their own home."[101]  As ghost guns become more widespread, California law enforcement personnel continue to devote additional time and resources to attempt to solve or deter crime and are losing, at an alarming rate, the ability to hold dangerous individuals accountable by tracing firearms using serial numbers.

97.     ATF's refusal to regulate the sale of 80 percent receivers and frames has also required California to take legislative action to attempt to close this loophole.  California has constructed a comprehensive regulatory regime to protect its citizens from the dangers posed by firearms, including regulations that ensure that firearms sales and transfers are overseen by licensed firearms dealers, prohibit classes of dangerous people from possessing firearms, and prohibit the manufacture and possession of military-style firearms and large capacity magazines. In 2016, California enacted

---

[98] *See* California Department of Justice, *Attorney General Becerra Announces 54 Arrests in Kings County Gang Takedown* (June 19, 2019), https://www.oag.ca.gov/news/press-releases/attorney-general-becerra-announces-54-arrests-kings-county-gang-takedown.

[99] *See* Alain Stephens, Ghost Guns Are Everywhere in California, The Trace (May 17, 2019).

[100] *See* Brandi Hitt, *'Ghost guns' investigation:  Law enforcement seeing unserialized firearms on daily basis in SoCal*, ABC7 (Jan. 30, 2020), https://abc7.com/ghost-guns-california-gun-laws-kits/5893043.

[101] *See* Brandi Hitt, *Orange County lawyer faces federal charges, accused of selling 'ghost guns'*, ABC7 (Feb. 20, 2020), https://abc7.com/ghost-guns-california-gun-laws-kits-melinda-romines/5950623.

legislation requiring a self-assembled firearm to be stamped with a unique serial number provided by the California Department of Justice, and requiring anyone in possession of an unserialized firearm to apply to the Department to serialize the firearm.  *See* A.B. 857 (Cal. 2016).  Last year, California enacted legislation to regulate ghost guns and the sale of 80 percent receivers and frames.  Specifically, California will require the sale of unfinished frames and receivers used to assemble ghost guns to be conducted through licensed dealers, pursuant to a California-only background check and sale record. *See* A.B. 879 (Cal. 2019).[102]

98.     California accelerated efforts to implement A.B. 879 due in part to the role of ghost guns in the tragic deaths of two law enforcement officers.  Last June, a gunman allegedly used two self-assembled AR-15-style assault rifles to ambush Officer Tara O'Sullivan and her training officer, killing O'Sullivan.[103]  Two months later, a convicted felon—who would have been unable to legally purchase a firearm—allegedly used a semiautomatic ghost rifle to shoot three California Highway Patrol officers, killing Officer Andre Moye.[104]  In the wake of these devastating incidents, the Legislature approved $5.9 million in 2020-21 and $8.3 million in 2021-22 for the California Department of Justice's Bureau of Firearms and California Justice Information Services to retain additional staff and enhance the Department's existing background check systems.  *See* S.B. 74 (Cal. 2020) (including referenced funding in item 0820-001-0001).  These expenditures will allow the Department to implement A.B. 879 beginning July 1, 2022—three years earlier than originally planned. *See* S.B. 118 (Cal. 2020).

99.     Yet ATF's determinations legalizing the sale of 80 percent frames and receivers at the federal level without these safeguards not only conflict with California's policies, but also threaten to disrupt California's carefully crafted regulatory scheme:  when these items can be manufactured and sold in states across the country, and untraceable firearms can be created without consequences, ghost

---

[102] The background check will be limited to California because the national background check database is only able to provide background checks for firearm purchases.

[103] *See* Sam Stanton, *Murder charge filed against Adel Ramos in death of Sacramento Officer Tara O'Sullivan*, The Sacramento Bee (June 21, 2019), https://www.sacbee.com/news/local/article231840593.html.

[104] *See* Richard Winton & Mark Puente, *Rifle used in deadly Riverside shooting was untraceable 'ghost gun,' sources say*, L.A. Times (Aug. 14, 2019), https://www.latimes.com/california/story/2019-08-14/rifle-used-in-deadly-riverside-shooting-was-untraceable-ghost-gun-sources-say.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

guns and the myriad dangers that attend them flow more freely across California's borders. Thus, ATF's actions frustrate the compelling ends served by California's firearms regulations.

100.    Ghost guns created from 80 percent receivers and frames also threaten California's interest in protecting the security and well-being of its residents from untraceable weapons. The sale of these components enables Californians with criminal intent to obtain firearms they would otherwise be legally barred from purchasing—increasing the likelihood of gun violence and gun-related crime in California.

101.    On November 14, 2019, a student at Saugus High School in Santa Clarita, California allegedly used a .45-caliber semiautomatic ghost gun to kill two students and injure three others before fatally shooting himself.[105] According to the United States Secret Service, the Saugus High School shooter was the youngest mass attacker in 2019.[106] The two victims killed during the Saugus shooting were 15-year-old Gracie Anne Muehlberger, Plaintiff Bryan Muehlberger's daughter, and 14-year-old Dominic Blackwell, Plaintiff Frank Blackwell's son.[107] Given the shooter's age, he would not have been able to legally obtain a "firearm," as defined under the GCA. In addition, the shooter's deceased father was reportedly a gun enthusiast from whom law enforcement had seized more than 40 firearms after a series of incidents that led to him becoming disqualified from possessing firearms. But despite being deemed unfit to own a firearm, authorities suspect the father turned to ghost guns—one of which landed in the hands of his underage son, the Saugus school shooter.[108] When law enforcement searched the boy's home after the Saugus shooting, they found a collection of unregistered firearms,[109] including

---

[105] *See* Dakin Andone, *The gunman in the Saugus High School shooting used a 'ghost gun,' sheriff says*, CNN (Nov. 21, 2019), https://www.cnn.com/2019/11/21/us/saugus-shooting-ghost-gun/index.html

[106] *Mass Attacks in Public Spaces – 2019*, U.S. SECRET SERVICE NATIONAL THREAT ASSESSMENT CENTER (Aug. 2020), https://www.secretservice.gov/data/protection/ntac/MAPS2019.pdf.

[107] Elizabeth Chou, *Hundreds attend memorial service for Gracie Anne Muehlberger, 15, killed in Saugus school shooting*, Los Angeles Daily News (Nov. 23, 2019), https://www.dailynews.com/2019/11/23/celebration-of-life-set-for-gracie-anne-muehlberger-killed-in-saugus-school-shooting-in-santa-clarita/.

[108] Ex. 3, Whitaker, *supra* note 12.

[109] Richard Winton, *Santa Clarita shooting: Weapon used in Saugus High attack a 'ghost gun,' sheriff says*, L.A. Times (Nov. 21, 2019), https://www.latimes.com/california/story/2019-11-15/santa-clarita-shooting-teen-girls-wounded-at-saugus-high-school-recovering-suspect-in-critical-condition.

a gun assembled from a kit.[110]  The more 80 percent receivers and frames legally produced and the more ghost guns that are created, the more likely it is that people prohibited from gun ownership will be able to use firearms to commit crimes in California, implicating the security and well-being of California residents.



**Image 15:  Ghost Gun Used in the Saugus High School Shooting[111]**

102.     The Classification Letters that ATF issued to Polymer80 between 2015 and 2017—for AR-15, AR-10, and Glock-type receivers and frames—have significantly contributed to California's ghost gun epidemic.[112]  Upon information and belief, weapons derived from these Polymer80 components constitute a significant share of all ghost guns recovered in California, including ghost guns used in the commission of various crimes.  Were it not for the Classification Letters that ATF has issued to Polymer80, the manufacturers of 80 percent receivers and frames used to build ghost guns would have no legal safe harbor for their sales, these unserialized parts could not have been sold, and many of these untraceable weapons would never have been created.  The Classification Letters thus have enabled more individuals unable to legally purchase firearms to build or obtain ghost guns and have emboldened would-be criminals by allowing them to commit crimes using untraceable firearms.  Therefore, the Classification Letters issued to Polymer80 and similarly situated manufacturers have substantially contributed to California's ghost gun violence epidemic.

---

[110] Dakin Andone, *The gunman in the Saugus High School shooting used a 'ghost gun,' sheriff says*, CNN (Nov. 21, 2019), https://www.cnn.com/2019/11/21/us/saugus-shooting-ghost-gun/index.html.

[111] Ex. 3, Whitaker, *supra* note 12.

[112] Classification Letters that ATF has issued to other manufacturers, referenced *supra* notes 84-87, also contribute to this problem.

103.    Furthermore, ATF's Ghost Gun Guidance expresses ATF's official position on 80 percent receivers and frames, which is further expressed in ATF's determinations in individual Classification Letters, thereby contributing to California's ghost gun epidemic.   The Ghost Gun Guidance also affects the primary conduct of potential manufacturers of these items: They provide manufacturers reassurance that they can enter the market and sell these components with little risk of being regulated like a firearms manufacturer or facing prosecution.   The Ghost Gun Guidance thus increases the number of ghost guns that are manufactured, possessed, or used in California, significantly contributing to the injuries California suffers as a result.

104.    **Bryan Muehlberger.**   Plaintiff Bryan Muehlberger is the father of a victim of fatal ghost gun violence.   Mr. Muehlberger lives in Santa Clarita, California, a city in Los Angeles County, and works in Los Angeles County.   On November 14, 2019, Mr. Muehlberger received a call that his daughter, 15-year-old Gracie Anne Muehlberger, had been shot and killed in a shooting at Saugus High School.   Gracie was only 14 weeks into her high school career when her life was tragically taken.   The Saugus High School shooter opened fire on his classmates using a ghost gun pistol that law enforcement officials believe he obtained from his father, who was legally prohibited from owning and possessing firearms.   Gracie and a fellow student, 14-year-old Dominic Blackwell, were murdered in the attack, while three other students were injured.   The attacker did not know Gracie or any of the other victims, all of whom were in the wrong place at the wrong time.   Gracie was shot one time in the back—the ghost gun was fired at point blank range, penetrating Gracie's backpack, entering her back, and ultimately puncturing her left lung before exiting through her left breast.   She dropped to the ground immediately, where she not only could not breathe due to the collapse of her left lung, but where she also drowned rapidly in her own blood, which filled her chest cavity completely.   Gracie likely suffered for a minute or two before succumbing to her life-ending injury.

105.    Particularly following his daughter's death, Mr. Muehlberger lives in acute fear of ghost gun violence.   Mr. Muehlberger is especially vulnerable to the threat of ghost guns because Los Angeles County, where Mr. Muehlberger lives and works, has a significant and growing rate of ghost gun possession and violence.   In May 2019, the California regional branch of ATF in Glendale—another city that, like Santa Clarita, lies in Los Angeles County—"announced that 30% of the confiscated guns

1  in its vault were ghost guns obtained by agents in the course of criminal investigations."[113]  Glendale

2  is one of many cities in Los Angeles County experiencing an explosion of ghost gun usage.

3      106.    Mr. Muehlberger's fear of ghost gun violence is a direct response to the increased risk

4  of violence he faces as a result of the proliferation of these untraceable weapons in the area he lives

5  and works.  Mr. Muehlberger works in Santa Monica, the same city where a shooter used a ghost gun

6  to kill five people in 2013.  At the time of the Santa Monica shooting, Mr. Muehlberger was at his

7  office, mere minutes from the scene of the crime.  Because he drives through neighborhoods highly

8  impacted by gun violence each day on his way to and from work, Mr. Muehlberger has become very

9  cautious about getting into confrontations with strangers, fearing that those individuals may be carrying

10  unregistered and dangerous ghost guns.

11      107.    Mr. Muehlberger has two other children; one son is a recent graduate of Saugus High

12  School and the other is a senior at Saugus High School.  Mr. Muehlberger's sons are no stranger to the

13  threat of gun violence:  in addition to losing their sister in the Saugus High School ghost gun shooting,

14  Mr. Muehlberger's older son experienced a school lockdown during his junior year at Saugus, after a

15  fellow student threatened the use of a firearm.  Mr. Muehlberger constantly worries that they, too, could

16  become victims of ghost gun violence.  When his sons spend time together or are in the same place at

17  the same time, Mr. Muehlberger worries that he could lose both of them at once, were a dangerous

18  individual to open fire with a ghost gun.  Mr. Muehlberger's fear and anxiety is especially acute when

19  he hears helicopters and ambulances, sounds which immediately bring him back to the moment he

20  learned that his only daughter was shot and killed by a shooter using a ghost gun.  Because of the grief

21  he continues to experience following Gracie's death, and because of his fear surrounding his sons'

22  safety, Mr. Muehlberger experiences ongoing trauma and undergoes regular therapy to assist him in

23  processing it.

24      108.    Mr. Muehlberger's acute and ongoing fear of ghost gun violence is directly attributed

25  to ATF's classifications of these weapons as not being "firearms" subject to the GCA.  Were these

26

27  ――――――――――――――

[113] James William Gibson, *Opinion: California is flooded with 'ghost' guns, and a new state law won't fix it*, L.A.
TIMES (Nov. 3, 2019), https://www.latimes.com/opinion/story/2019-11-03/ghost-guns-california-gun-shows-kits
(last visited Sept. 16, 2020).

28

guns not generally available as they are, Mr. Muehlberger would not need to fear the ongoing risk of violence caused by ghost guns.  ATF's Classification Letters for Polymer80 have allowed the legal sale of untraceable 80 percent receivers and frames and enabled the creation of a rampant market for ghost guns that now plagues Southern California, where Mr. Muehlberger lives and works.  Similarly, ATF's Ghost Gun Guidance causes ATF to continue issuing Classification Letters that allow the legal sale of ghost gun components and cause manufacturers to continue producing these dangerous items.  Together, ATF's actions allow 80 percent receivers and frames to enter the stream of commerce and become the ghost guns that threaten the lives of individuals like Mr. Muehlberger and his family.  If ATF regulated 80 percent receivers and frames like the firearms they are designed to function as (and which they are readily convertible to), ghost gun components could not legally be purchased by those ineligible to possess firearms, and the risk of violence faced by individuals like Mr. Muehlberger would be significantly reduced.  Dangerous people who cannot legally purchase a firearm would have more difficulty obtaining one, and would-be violent criminals could be deterred by the knowledge that their firearms could be traced.

109.   **Frank Blackwell.**  Plaintiff Frank Blackwell is the father of a victim of fatal ghost gun violence.  Mr. Blackwell lives in Santa Clarita, California, a city in Los Angeles County, and works in Los Angeles County.  On November 14, 2019, Mr. Blackwell's son, 14-year-old Dominic Blackwell, was shot and killed by the same shooter at Saugus High School who murdered Gracie Anne Muehlberger.

110.   Particularly following his son's death, Mr. Blackwell fears the threat of future violence committed with ghost guns.   Mr. Blackwell's fear is a direct response to the particular vulnerability to ghost gun violence that he faces as a result of living and working in Los Angeles County—where ghost gun possession and violence has been proliferating.  Because Mr. Blackwell is aware of the spread of ghost guns in Los Angeles County resulting from ATF's position on 80 percent receivers and frames, and has directly experienced the grave harm caused by ghost guns, he often fears that individuals that he and his family encounter in places like restaurants and coffee shops may be in possession of ghost guns.

111.   In addition to Dominic, Mr. Blackwell has three children, who currently attend elementary and middle schools that feed into Saugus High School.  Mr. Blackwell often worries that they, too, may become victims of ghost gun violence.  Mr. Blackwell experiences ongoing trauma, grief, and suffering as a result of Dominic's death at the hands of a shooter using a ghost gun and his ongoing fear for his other children's safety.  Mr. Blackwell regularly attends therapy to assist him in processing this trauma.

112.   Mr. Blackwell's acute and ongoing fear of ghost gun violence is directly attributed to ATF's classifications of these weapons as not being "firearms" subject to the GCA.  Were these guns not generally available as they are, Mr. Blackwell would not need to fear the ongoing risk of ghost gun violence.  ATF's Classification Letters for Polymer80 have allowed the legal sale of untraceable 80 percent receivers and frames and enabled the creation of the ghost gun market that now plagues Southern California, where Mr. Blackwell lives and works.  Similarly, ATF's Ghost Gun Guidance causes ATF to continue issuing Classification Letters that allow the legal sale of ghost gun components and cause manufacturers to continue producing these dangerous items.  Together, ATF's actions allow 80 percent receivers and frames to enter the stream of commerce and become the ghost guns that threaten the lives of individuals like Mr. Blackwell and his family.  If ATF regulated 80 percent receivers and frames like the firearms they are designed to function as (and which they are readily convertible to), ghost gun components could not legally be purchased by those ineligible to possess firearms, and the risk of violence faced by Mr. Blackwell would be significantly reduced and his fears, anxiety, and stressed ameliorated.  Dangerous people who cannot legally purchase a firearm would have more difficulty obtaining one, and would-be violent criminals could be deterred by the knowledge that their firearms can be traced.

113.   **Giffords Law Center.**  Plaintiff Giffords Law Center's core mission is to save lives from gun violence by shifting culture, changing policies, and challenging injustice.  ATF's arbitrary, capricious, and unlawful stance on ghost guns directly affects Giffords Law Center's interests and mission by permitting the proliferation of untraceable firearms that can be purchased by prohibited and dangerous persons and without any background check.  Giffords Law Center's ability to save lives is inhibited on a daily basis as a result of ATF's approval of the sale of ghost guns.  That ghost gun sales

are unregulated requires Giffords Law Center to expend a substantial portion of its budget and substantial human capital and resources to educate the public and combat the violence ghost guns cause. Addressing ghost guns and the violence they facilitate is currently among the organization's top policy and legislative priorities: over the last six years, Giffords Law Center has contributed technical assistance to or monitored and analyzed over 100 state and federal bills pertaining to ghost guns. Giffords Law Center has also launched a series of specific ghost gun initiatives, including drafting proposed legislation, publishing white papers, and helping produce videos and other educational materials for the public.

114.    ATF's actions on ghost guns have required Giffords Law Center to expend more resources and staff time because ATF's regulatory classification undermines every other firearm policy that Giffords Law Center advocates for.  This includes the organization's core policy platform of supporting background check and licensing laws at the federal and state level.  Background check laws and other efforts to ensure firearms are legally and responsibly possessed are impeded and undermined by ATF's choice to create a loophole by which buyers can evade all otherwise applicable firearm sales regulations.  This loophole has forced Giffords Law Center to redouble its violence prevention efforts and direct even more resources into addressing gun violence even in states with strong firearm laws, like the organization's home state of California.  Giffords Law Center has made this issue an urgent priority based on the fact that in parts of California, ATF has reported that ghost guns are now up to 30% of crime guns it recovers—representing one of the single most dangerous loopholes undermining the state's laws.  Every day, more lives are lost to ghost guns despite Giffords Law Center's increased efforts and resource expenditures.

115.    In addition to its legislative work, Giffords Law Center provides policy expertise and technical assistance in support of violence intervention programs in communities disproportionately impacted by gun violence and ghost gun violence.  Giffords Law Center also frequently partners with community-based organizations that provide direct support services to victims of gun violence.  While these intervention efforts have contributed to dramatic reductions in gun violence in cities such as Oakland, California in recent years, many of these cities are also experiencing a surge in the numbers of ghost guns recovered, meaning all of these hard-fought gains in community safety are being

compromised by ATF's actions.  The risk of increased ghost gun violence and ATF's failure to regulate ghost gun sales have therefore contributed to increased expenditure of human and financial capital and resources by Giffords Law Center toward work supporting violence intervention programs and violence reduction work by community-based organizations.  In sum, ATF's actions have forced Giffords Law Center to adjust many of its organizational priorities and divert substantial resources to combat ghost guns and resulting violence.

116.    **Statutory standing**.  The interests of all named Plaintiffs—the State of California, Bryan Muehlberger, Frank Blackwell, and Giffords Law Center are within the zone of interests protected by the GCA.  In enacting the GCA, Congress found that the "ease with which any person can acquire firearms . . . is a significant factor in the prevalence of lawlessness and violent crime in the United States."  Omnibus Crime Control & Safe Streets Act of 1968, Pub. L. No. 90-357, § 901(a)(2), 82 Stat. 197, 225.  All named Plaintiffs allege injury involving the increased likelihood of violent crime that ATF's actions have caused.  Therefore, all named Plaintiffs allege harm to interests within the zone of interests that the GCA protects.

## CLAIMS FOR RELIEF

### COUNT ONE - Violation Of Administrative Procedure Act, 5 U.S.C. § 706(2)(A): ATF's Ghost Gun Actions Are Not In Accordance With Law.

117.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

118.    Individually and collectively, ATF's ghost gun determinations, including the Classification Letters to Polymer80 and the Ghost Gun Guidance, constitute "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

119.    Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusion found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).

120.    ATF's ghost gun determinations are "not in accordance with law" because they disregard the GCA, which provides that "[t]he term 'firearm' means (A) any weapon (including a starter gun) which will or *is designed or may readily be converted* to expel a projectile by the action

of an explosive;" and includes "(B) *the frame or receiver of any such weapon*."  18 U.S.C. 921(a)(3) (emphasis added).

121.    80 percent receivers and frames fall within the statutory definition of firearms subject to the GCA's requirements.  They are "designed" to be "readily converted" into firearms, as is evident from their design and marketing, which emphasizes how "ridiculously easy" it is for even a novice "to finish their 80% lower in under 1 hour with no" specialized tools "required."[114]

122.    ATF's disregard of the GCA's plain text is present in most, if not all, of its decision making around 80 percent receivers, including the challenged Classification Letters.

123.    ATF's adjudications reflected in its Classification Letters to Polymer80 similarly disregard the GCA.  For example, the 2017 Polymer80 Letter states that the 80 percent receiver in question was not "sufficiently complete" because of the "machining operations" that were yet to be "completed."  ATF's reasoning as reflected in the 2017 Polymer80 Letter does not take account of the GCA's command that a firearm includes anything which is "designed to or may readily be converted to expel a projectile."  Moreover, at least one retailer of the 80 percent receiver at issue in the 2017 Polymer80 Letter markets it with the statement "*It's amazing to think in just 10-15 minutes you can have a fully functioning Glock that you made at home.*"  It is difficult to conceive of what might possibly be "readily" converted to expel a projectile within the meaning of the GCA if an 80 percent receiver that requires only 10-15 minutes of labor does not.

124.    In the November 2015 Polymer80 Letter, ATF ruled that an AR-10 80 percent receiver was "not a 'firearm' as defined in the GCA," (emphasis in original).  The reasoning in the November 2015 Polymer80 Letter lists five "[m]achining operations or design features not yet present or completed" on the AR-10 80 percent receiver, but fails to analyze or dispute whether the receiver is designed to or "may not be readily converted to expel a projectile" within the meaning of the GCA.

---

[114] *See, e.g.*, *Easy Jig Gen 2 Multi-Platform – AR-15, AR-9 and .308 80% Lower Ji*g, 80% ARMS, https://www.80 percentarms.com/products/easy-jig-gen-2-multi-platform-ar-15-ar-9-and-308-80-lower-jig/(last visited Sept. 16, 2020); *How to Build Your Own AR 15 – Legally and Unregistered*, *supra* note 11 ("Finishing an 80% lower can be easy and anyone with DIY skills can complete an 80% lower.  To some, the thought of building your own AR 15 starting with an 80% lower may seem intimidating, but it shouldn't.  Thousands of people have finished their own 80% lowers without an issue - experts and novices, alike.").

125.    As alleged above, according to a review of the AR-10 80 percent receiver at issue in the November 2015 Letter on an online retailer's website, "This was easy . . . . *I was done in about an hour and another hour to install the [remaining parts]*.  Really is that easy."

126.    Similarly, the November 2015 Polymer80 Letter states that the "Glock-type 'GC9 Blank'" 80 percent receiver is "not a 'firearm' as defined in the GCA" because it "is not sufficiently complete to be classified as the frame or receiver of a firearm."  Nowhere in the November 2015 Polymer80 Letter does ATF explain why the "Glock-type 'GC9 Blank'" 80 percent receiver is not designed to or "readily converted to expel a projectile" within the meaning of the GCA.

127.    In addition, the February 2015 Polymer80 Letter states that an AR-15-type 80 percent receiver was not a firearm based on, among other things, the fact that the receiver "incorporates a solid fire control cavity area" that "was cast in a homogenous matter."  While ATF makes reference to "the Gun Control Act of 1968" in the February 2015 Polymer80 Letter, nowhere does it consider whether or not the 80 percent receiver in question is designed to or "may readily be converted to expel a projectile" within the meaning of the GCA.

128.    Online discussions about the 80 percent receiver at issue in the February 2015 Polymer80 Letter only further demonstrate that the receiver is a firearm under the GCA.  As alleged above, at least one retailer of the receiver advertises it as "incredibly simple to drill and mill, and the material is forgiving"; a product review of the receiver states that "I would recommend for first time builders & I would rebuy this in the future due to ease of build"; and another review states that "This was exactly as described, with some easy to follow instructions this was completed in no time."

129.    ATF's website's Q&A subsection entitled "Receiver Blanks" does not mention or make reference to the GCA's definition of a "firearm" as including a weapon that "*is designed or may readily be converted* to expel a projectile."  18 U.S.C. 921(a)(3) (emphasis added).

130.    ATF's ghost gun determinations, including its Classification Letters and the Ghost Gun Guidance, are therefore not in accordance with the law under the APA and Section 921(a)(3) of the GCA.

131.    Plaintiffs have been and will continue to be impacted and injured by the Classification Letters to Polymer80 (and other 80 percent receiver and frame manufacturers), because, among other

53
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

reasons, the firearms assembled from 80 percent receivers and frames have been used and in the future will be used in connection with criminal activity that undermines the legitimate regulatory and law enforcement interests of Plaintiff California and that has harmed and will foreseeably cause future harm to Plaintiffs Bryan Muehlberger, Frank Blackwell, and Giffords Law Center to Prevent Gun Violence.

### COUNT TWO - Violation Of Administrative Procedure Act, 5 U.S.C. § 706(2)(A): ATF's Ghost Gun Actions Are Arbitrary And Capricious.

132.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

133.    Individually and collectively, ATF's ghost gun determinations, including the Classification Letters to Polymer80 and the Ghost Gun Guidance, constitute "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

134.    Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusion found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).

135.    ATF's analysis of 80 percent receivers reflected in its Classification Letters and the Ghost Gun Guidance is "arbitrary and capricious."

136.    When an agency has previously held one view and then changes its positions, it must "explain its reasons for doing so."  *Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 56 (1983); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display an awareness that it *is* changing position.").

137.    ATF has never acknowledged its switch from its original temporal approach, *see supra* Section B, to its current mechanical approach of analyzing which machining operations still need to be performed to determine whether an 80 percent receiver or frame is a "firearm" under the GCA.  This unexplained, post-2006 approach to 80 percent receivers informs ATF's analysis.

138.    Moreover, ATF's approval of the unregulated manufacture and sale of 80 percent receivers and frames used to build ghost guns "entirely fail[s] to consider an important aspect of the

problem," *State Farm*, 556 U.S. at 43:  namely, whether 80 percent receivers are designed to be or "may readily be converted" into fully-functional firearms within the meaning of the GCA.

139.    ATF similarly failed to consider whether its treatment of 80 percent receivers would lead to the proliferation of untraceable firearms that now plagues Plaintiff the State of California, and has harmed and threatens future harm to Plaintiffs Bryan Muehlberger, Frank Blackwell, and Giffords Law Center.

140.    ATF has also ignored that 80 percent receivers and frames are often packaged with assembly kits, which include jigs and all of the parts necessary to easily convert the 80 percent receiver or frame into a fully functioning firearm.  Additionally, 80 percent receivers and frames can be purchased from a wide variety of online retailers, which sell all of the parts necessary to build a ghost gun.

141.    ATF understands this problem, as its website states that when a firearm fashioned from 80 percent receivers are recovered by law enforcement, "it is usually not possible to trace the firearm or determine its history, which hinders crime gun investigations and jeopardizes public safety." *Receiver Blanks*, ATF.gov, https://www.atf.gov/qa-category/receiver-blanks.  Moreover, the analysis of 80 percent receivers reflected in ATF's ghost gun determinations represent a change in position from the analysis of these devices reflected in its actions using the original temporal test.

142.    ATF's ghost gun determinations, including its Classification Letters and the Ghost Gun Guidance, are therefore arbitrary and capricious under the APA.

143.    Plaintiffs have been and will continue to be impacted and injured by the Classification Letters to Polymer80 (and other 80 percent receiver and frame manufacturers), because, among other reasons, the firearms assembled from 80 percent receivers and frames have been used and in the future will be used in connection with criminal activity that undermines the legitimate regulatory and law enforcement interests of Plaintiff State of California and that has harmed and will foreseeably cause future harm to Plaintiffs Bryan Muehlberger, Frank Blackwell, and Giffords Law Center.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter an order and judgment:

      a.      Declaring ATF's Classification Letters to Polymer80 (and other 80 percent receiver and frame manufacturers) and online guidance finding that 80 percent receivers and frames are not "firearms" under the GCA are null, void, and with no force and effect;

      b.      Declaring that ATF's Classification Letters to Polymer80 (and other 80 percent receiver and frame manufacturers) and online guidance finding that 80 percent receivers and frames are not "firearms" under the GCA are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A);

      c.      Preliminarily and permanently enjoining Defendants from implementing and enforcing ATF's Classification Letters to Polymer80 (and other 80 percent receiver and frame manufacturers) and online guidance finding that 80 percent receivers and frames are not "firearms" under the GCA;

      d.      Ordering that ATF conduct affirmative rulemaking regarding 80 percent receivers and frames in accordance with the GCA, which defines "firearms" as frames or receivers and items that are "designed to or may be readily converted" into functioning firearms.

      e.      Awarding Plaintiffs their reasonable costs, including attorneys' fees, in bringing this claim;

      f.      Granting such other and further relief as this Court deems just and proper.

*Dated:* September 29, 2020          */s R. Matthew Wise*

XAVIER BECERRA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
MARK R. BECKINGTON
Supervising Deputy Attorney General
R. MATTHEW WISE
Matthew.Wise@doj.ca.gov
Deputy Attorney General

1   State Bar No. 238485
1300 I Street, Suite 125
2   P.O. Box 944255
Sacramento, CA 94244-2550
3   Telephone:  (916) 210-6046
4   Facsimile:  (916) 324-8835

5   *Attorneys for Plaintiff State of California, by*
*and through Attorney General Xavier Becerra*
6

7   */s Vivek Gopalan*

8   GIBSON, DUNN & CRUTCHER LLP
AVI WEITZMAN, *pro hac vice* forthcoming
9   aweitzman@gibsondunn.com
LEE R. CRAIN, *pro hac vice* forthcoming
10  LIESEL SCHAPIRA, *pro hac vice* forthcoming
KAYLIE SPRINGER, *pro hac vice* forthcoming
11  200 Park Avenue
New York, NY  10166-0193
12  Telephone: (212) 351-4000
13  Facsimile: (212) 351-4035

14  VIVEK GOPALAN, SBN 296156
15  VGopalan@gibsondunn.com
555 Mission Street, Suite 3000
16  San Francisco, CA 94105-0921
Telephone: (415) 393-8200
17  Facsimile: (415) 374-8306

18  *Attorneys for Plaintiffs Bryan Muehlberger,*
19  *Frank Blackwell, and Giffords Law Center to Prevent*
*Gun Violence*
20

21  */s Hannah Shearer*

22  GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
23  HANNAH SHEARER, SBN 292710
268 Bush St. # 555
24  San Francisco, CA 94104
Telephone: (415) 433-2062
25  Facsimile: (415) 433-3357

26
J. ADAM SKAGGS, *pro hac vice forthcoming*
27  DAVID M. PUCINO, *pro hac vice forthcoming*
223 West 38th St. # 90
28

New York, NY 10018
Telephone: (917) 680-3473

*Attorneys for Plaintiffs Bryan Muehlberger,*
*Frank Blackwell, and Giffords Law Center to Prevent*
*Gun Violence*