1    JEFFREY BOSSERT CLARK
     Acting Assistant Attorney General
2
     LESLEY FARBY
3    Assistant Branch Director

4    ERIC J. SOSKIN (PA Bar # 200663)
     Senior Trial Counsel
5    United States Department of Justice
     Civil Division
6    Federal Programs Branch

7         1100 L Street NW, Room 12002
          Washington, DC 20005
8         Telephone: (202) 353-0533
          FAX: (202) 616-8470
9         Eric.Soskin@usdoj.gov

10   Attorneys for Defendants

11                      UNITED STATES DISTRICT COURT

12                    NORTHERN DISTRICT OF CALIFORNIA

13                        SAN FRANCISCO DIVISION

14

15   STATE OF CALIFORNIA,                  )  Case No. 3:20-cv-06761-EMC
                              *et al.*      )
16            Plaintiffs,                   )  **FEDERAL DEFENDANTS' NOTICE OF**
                                            )  **MOTION AND MOTION TO DISMISS**
17       v.                                 )  **PLAINTIFFS' COMPLAINT FOR**
                                            )  **DECLARATORY AND INJUNCTIVE RELIEF;**
18   BUREAU OF ALCOHOL, TOBACCO,            )  **[PROPOSED] ORDER**
     FIREARMS, and EXPLOSIVES ("ATF"),      )
19                            *et al.*,     )  Noting Date: January 14, 2021
                                            )  Time:  1:30 p.m.
20            Defendants.                   )  Place:  Courtroom 5, 17th Floor
     _____    )

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2 TABLE OF AUTHORITIES ............................................................................................. ........... ii

3 I.   INTRODUCTION ............................................................................................. ...........1

4 II   STATUTORY AND REGULATORY BACKGROUND.............................. ...........2

5 III. PLAINTIFFS' CLAIMS ...................................................................................... ...........4

6 IV. LEGAL STANDARD................................................................................................5

7 V. ARGUMENT ................................................................................. ...........6

8      A.      Plaintiffs Cannot Establish Standing For Their Claims...................................6

9              1. Giffords. ......................................................................................7

10             2. State of California. .....................................................................8

11             3. Individual Plaintiffs. ...............................................................11

12     B.      The Statute Of Limitations Bars Challenges To ATF's Alleged 2006 Decision
13             To Change Interpretive Approaches And Classifications Over Six Years Old. ...............13

14     C.      Plaintiffs' Claims Should Be Dismissed Because ATF's Interpretation Of The
15             Statute And Classification Letters Satisfy The Standards Of The APA. ...........................15

16             1. The Statute Unambiguously Excludes Receiver Blanks From Subparagraph
               (A) Of The Statutory Definition Of A Firearm................................................................15

17             2. A Receiver Blank Is Not A Receiver. ..........................................................................19

18             3. ATF's Interpretation Reasonably Balances The Purposes Of The GCA.....................19

19     D.      The Face of Plaintiffs' Complaint Fails To Establish Plaintiffs' Arbitrary And
20             Capricious Claims.............................................................................21

21             1. Plaintiffs' Claims Are Contradicted By The Exhibits To The Complaint....................21

22             2. The Exhibits To The Complaint Demonstrate That ATF Made Reasonable
23             Classification Decisisons.. ...............................................................................24

24 VI.   CONCLUSION........................................................................................25

25

26

27

28

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ........................................................................................ 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................................... 6

*ATLF v. Lake Forest*,
   No. SA CV 07-250, 2008 WL 11411732 (C.D. Cal. Aug. 18, 2008) ............................. 7

*Avery v. Dep't of the Army*,
   Case No. 14–cv–01077–YGR, 2015 WL 4451591 (N.D. Cal. July 20, 2015) ................ 14

*Bell Atl. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................................... 6

*Bezet v. United States*,
   276 F. Supp. 3d 576 (E.D. La. 2017) ............................................................................ 21

*Brady Campaign to Prevent Gun Violence United with the Million Mom March v. Ashcroft*,
   339 F. Supp. 2d 68 (D.D.C. 2004) .......................................................................... 11, 12

*Calif. Sea Urchin Comm'n v. Bean*,
   828 F.3d 1046 (9th Cir. 2016) ...................................................................................... 14

*Caviness v. Horizon Community Learning Ctr.*,
   590 F.3d 806 (9th Cir. 2010) .......................................................................................... 6

*Chapman v. Pier 1 Imports*,
   631 F.3d 939 (9th Cir. 2011) ........................................................................................ 13

*Chevron, USA v. NRDC*,
   467 U.S. 837 (1984) .......................................................................................... 15, 17, 18

*Chimei Innolux Corp.*,
   659 F.3d 842 (9th Cir. 2011) ........................................................................................ 10

*City and County of San Francisco v. USCIS*,
   944 F.3d 773 (9th Cir. 2019) ................................................................................... 15, 16

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ..................................................................................................... 9, 12

*Clapper v. Amnesty Int'l*,
   568 U.S. 398 (2013) ................................................................................................. 12, 13

*Conner v. Burford*,
   848 F.2d 1441 .............................................................................................................. 24

*DaimlerChrysler v. Cuno*,
   547 U.S. 332 (2006) ....................................................................................................... 6

1

*Daniels-Hall v. NEA*,
   629 F.3d 992 (9th Cir. 2010) ............................................................................................... 21

2

*Davidson v. Kimberly-Clark*,
   889 F.3d 956 (9th Cir. 2018) ............................................................................................... 12

3

4

*Decker v. N.W. Envt'l Ctr.*,
   568 U.S. 597 (2013) ..................................................................................................... 19, 20

5

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ............................................................................................................ 20

6

7

*Duncan v. Becerra*,
   970 F.3d 1133 (9th Cir. 2020) .............................................................................................. 2

8

*Eggar v. City of Livingston*,
   40 F.3d 312 (9th Cir. 1994) ................................................................................................. 13

9

10

*Erickson v. Pardus*,
   551 U.S. 89 (2007) ................................................................................................................ 6

11

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ......................................................................................... 7, 10

12

13

*FTC v. Standard Oil Co.*,
   449 U.S. 232 (1980) ............................................................................................................ 14

14

*Gorospe v. C.I.R.*,
   451 F.3d 966 (9th Cir. 2006) ............................................................................................... 17

15

16

*Gustavson v. Wrigley Sales*,
   961 F. Supp. 2d 1100 (N.D. Cal. 2013) ................................................................................ 6

17

*Happe v. Lloyd*,
   2 Fed. App'x 519 (7th Cir. 2001) ....................................................................................... 13

18

19

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) .......................................................................................................... 7, 8

20

*Heller v. Dist. of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ............................................................................................ 2

21

22

*In re Seagate Technology LLC Litig.*,
   233 F. Supp. 3d 776 (N.D. Cal. 2017) ................................................................................ 19

23

*Innovator Enters. v. Jones*,
   28 F. Supp. 3d 14 (D.D.C. 2014) ................................................................................. 3, 4, 14

24

25

*Jackson v. City and County of San Francisco*,
   746 F.3d 953 (9th Cir. 2014) ............................................................................................... 21

26

*Kalani v. Starbucks Corp.*,
   81 F. Supp. 3d 876 (N.D. Cal. 2015) .................................................................................. 13

27

28

*La Asociacion de Trabajadores de Lake Forest ("ATLF") v. Lake Forest*,
   624 F.3d 1083 (9th Cir. 2010) ........................................................................................... 7, 8

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................................... passim

*Maryland v. U.S. Dep't of Educ.,*
    --- F. Supp. 3d ---, 2020 WL 4039315 (D.D.C. July 17, 2020) ............................................ 9

*Maya v. Centex Corp.,*
    658 F.3d 1060 (9th Cir. 2011) ........................................................................................... 10

*Mecinas v. Hobbs,*
    468 F. Supp. 3d 1186 (D. Ariz. 2020) ................................................................................. 8

*Mfrs. Ass'n v. State Farm,*
    463 U.S. 29 (1983) ....................................................................................................... 5, 15

*Munns v. Kerry,*
    782 F.3d 402 (9th Cir. 2015) ............................................................................................. 13

*Nat'l Ass'n of Mfrs. v. DoD,*
    138 S. Ct. 617 (2018) ......................................................................................................... 17

*New York v. U.S. Dep't of Labor,*
    363 F. Supp. 3d 109 (D.D.C. 2019) ................................................................................... 10

*Openwave Messaging, Inc. v. Open-Xchange, Inc.,* No.16-cv-00253-WHO,
    2016 WL 6393503 (N.D. Cal. Oct. 28, 2016) .............................................................. 21, 23

*P.W. Arms, Inc. v. United States,*
    2016 WL 9526687 (W.D. Wash. 2016) .............................................................................. 16

*Parks Sch. of Bus. v. Symington,*
    51 F.3d 1480 (9th Cir. 1995) ............................................................................................... 6

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976) ............................................................................................................ 9

*Ranchers Cattlemen Action Legal Fund v. USDA,*
    499 F.3d 1108 (9th Cir. 2007) ..................................................................................... 24, 25

*Rupert v. Bond,*
    68 F. Supp. 3d 1142 (N.D. Cal. 2014) .......................................................................... 6, 17

*Sabra v. Maricopa Cty. Community College,*
    --- F. Supp. 3d ---, 2020 WL 4814343 (D. Ariz. 2020) ....................................................... 7

*Safe Air for Everyone v. Meyer,*
    373 F.3d 1035 (9th Cir. 2004) ............................................................................................. 5

*San Diego Cty. Gun Rights Comm. v. Reno,*
    98 F.3d 1121 (9th Cir. 1996) ............................................................................................. 12

*Shwarz v. U.S.,*
    234 F.3d 428 (9th Cir. 2000) ............................................................................................. 21

*Sierra Club v. U.S. EPA,*
   346 F.3d 955 (9th Cir.2003) ............................................................................... 24

*Sierra Forest Legacy v. Sherman,*
   646 F.3d 1161 (9th Cir. 2011) ............................................................................ 10

*Sig Sauer, Inc. v. Brandon,*
   826 F.3d 598 (1st Cir. 2016) ............................................................................... 14

*Sig Sauer, Inc. v. Jones,*
   133 F. Supp. 3d 364 (D.N.H. 2015) ................................................................... 24

*Spokeo, Inc. v. Robins,*
   136 S. Ct. 1540 (2016) .......................................................................................... 7

*Springfield, Inc. v. Buckles,*
   116 F. Supp. 2d 85 (D.D.C. 2000) ..................................................................... 16

*Stavrianoudakis v. U.S. Dep't of Fish & Wildlife,*
   435 F. Supp. 3d 1063 (E.D. Cal. 2020) ............................................................... 5

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) .............................................................................................. 12

*Summers v. Earth Island Institute,*
   555 U.S. 488 (2009) .............................................................................................. 7

*Teixeira v. County of Alameda,*
   873 F.3d 670 (9th Cir. 2017) .............................................................................. 21

*United States v. Ritchie,*
   342 F.3d 903 (9th Cir. 2003) .............................................................................. 23

*United States v. 16,179 Molso Italian .22 Caliber Winler Derringer Convertible Starter Guns,*
   443 F.2d 463 (2d Cir. 1971) ............................................................................... 18

*United States v. Carona,*
   660 F.3d 360 (9th Cir. 2011) .............................................................................. 16

*United States v. Cruikshank,*
   92 U.S. 542 (1875) .............................................................................................. 20

*United States v. Estate of Hage,*
   810 F.3d 712 (9th Cir. 2016) ........................................................................ 13, 15

*United States v. Lam,*
   20 F.3d 999 (9th Cir. 1994) ................................................................................ 20

*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010) ................................................................................. 21

*United States v. TRW Rifle 7.62x51mm Caliber, One Model 14 Serial 593006,*
   447 F.3d 686 (9th Cir. 2006) .............................................................................. 18

*United Transp. Union v. ICC,*
   891 F.2d 908 (D.C. Cir. 1989) ........................................................................... 11

*Vermont Agency of Nat. Resources v. U.S. ex rel. Stevens*,
   529 U.S. 765 (2000) ................................................................................................ 6, 12

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ........................................................................................ 5

## **Statutes and Public Laws**

18 U.S.C. § 901(3) ................................................................................................................ 3

18 U.S.C. § 921(a)(3) ...................................................................................................... *passim*

18 U.S.C. § 922(k) ............................................................................................................... 4

18 U.S.C. § 922(r) ............................................................................................................... 4

18 U.S.C. § 923(a) ............................................................................................................... 3

18 U.S.C. § 926(a) ............................................................................................................. 24

26 U.S.C. § 5845 ................................................................................................................. 2

28 U.S.C. § 2401(a) ........................................................................................................... 13

Pub. L. No. 90-618 ..................................................................................................... 2, 3, 20

Pub. L. 99-308 .................................................................................................................... 3

## **Rules and Regulations**

Federal Rule of Civil Procedure 12(b)(1) ........................................................................... 1

Rule 12(b)(6) ...................................................................................................................... 6

ATF Ruling 2015-1 ........................................................................................................... 23

27 C.F.R. § 478.11 ..................................................................................................... 3, 19, 20

27 C.F.R. § 478.41 ............................................................................................................... 3

27 C.F.R. § 478.92 ............................................................................................................... 3

28 C.F.R. § 0.130(a)(1) ........................................................................................................ 2

33 Fed. Reg. 18558 (1968) ................................................................................................. 19

1
2
3
4
5
6
7
8
9

## __Dictionaries__

Samuel Johnson, A Dictionary of the English Language (1755) ............................................................. 16

Webster's New World Dictionary of the American Language 311 (2d ed. 1970) .................................... 16

Funk & Wagnall's Standard College Dictionary 1121 (1973) ................................................................ 16

Random House Dictionary of the English Language, Unabridged 1195 (1966). ................................... 16

Ballentine's Law Dictionary 1058 (3d ed. 1969) ................................................................................... 16

Oxford English Dictionary (1933) ......................................................................................................... 16

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## __Other Authorities__

140 Cong. Rec. S12557, S12558 .............................................................................................................. 9

ATF Firearms Technology Branch Technical Bulletin 14-01 ........................................................... 17, 19

ATF, National Firearms Handbook ......................................................................................................... 2

Brief of the United States, *In re: The Search of: ARES AMOR*, No.,
    14-56550, 2015 WL 7185171 (9th Cir. Nov. 10, 2015) ................................................................. 24

Anthony Braga, et al., *The Illegal Supply of Firearms*,
    29 Crime & Just. 319 (2002) ........................................................................................................ 4, 5

Ronald B. Brown, Homemade Guns and Homemade Ammo (1986) ...................................................... 12

T. Markus Funk, *Gun Control and Economic Discrimination*,
    85 J. Crim. Law and Criminology 764 (1995) ................................................................................. 9

Stephen Halbrook, Firearms Law Deskbook § 2.4 at n.25-33 ............................................................... 19

David T. Hardy et al., *Of Arms and the Law*, 51 Chi.-Kent L. Rev. 62 (1974) .................................. 12

Bill Holmes, Home Workshop Guns for Defense and Resistance: The Handgun (1979) ...................... 12

Peter Jensen-Haxel, *3D Printers, Obsolete Firearm Supply Controls, and the Right to Build Self-Defense
    Weapons Under Heller*, 42 Golden Gate U. L. Rev. 447 (2012) ...................................................... 4

Bruce Koffler, *Zip Guns and Crude Conversions*, 60 J. Crim. L. Criminology & Pol. Sci. 515 (1969) . 12

Shawn J. Nelson, *Unfinished Lower Receivers*, 63 U.S. Attorney's Bulletin (Nov. 2015) .............. 17, 19

Duncan Long, *Building Your Own Rifle*, The AR-15/M-16: A Practical Guide ..................................... 12

https://openjustice.doj.ca.gov/exploration/crime-statistics/ crimes-clearance ....................................... 8,9

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on January 14, 2021 at 1:30 p.m. or as soon thereafter as the parties may be heard, in the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, before the Honorable Edward M. Chen, Defendants United States Department of Justice, William Barr, United States Bureau of Alcohol, Tobacco, Firearms and Explosives, Regina Lombardo, and Michael Curtis (collectively "Federal Defendants") will move this Court for an order dismissing the claims by Plaintiffs State of California, Bryan Muehlberger, Frank Blackwell, and Giffords Law Center to Prevent Gun Violence ("Plaintiffs") claims pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Federal Defendants' Motion is based on this notice; the following memorandum of points and authorities; and such oral argument as the Court may permit.


DATED:  November 30, 2020                    Respectfully submitted,

                                             JEFFREY BOSSERT CLARK
                                             Acting Assistant Attorney General

                                             LESLEY FARBY

                                             Assistant Branch Director

                              By:     */s/ Eric J. Soskin*
                                             ERIC J. SOSKIN
                                             Senior Trial Counsel

NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT                    C-20-6761- EMC

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

For over fifty years, courts, Congress, and the Executive Branch have consistently understood and interpreted the Gun Control Act of 1968 ("GCA"), 18 U.S.C. § 921 *et seq*., to establish a uniform, federal floor for firearms regulation that takes into account public interests in managing crime, regulating commerce, and protecting the ability of law-abiding citizens to use firearms lawfully, while providing flexibility for States to implement their own regulations on firearms that account for their individual traditions and conditions.  Having chosen to implement stricter regulations over some types of firearms parts, California, joined by other Plaintiffs, now seeks to upend that balance in this lawsuit, based on the novel theory that any decision by Congress, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), or another state to regulate firearms parts less strictly than California does is an unlawful act that inflicts harm on California.  These claims should be dismissed.

As a threshold matter, Plaintiffs cannot establish standing to maintain their claims based on the remote causal chains set forth in their Complaint.  Plaintiffs' failure to establish standing is particularly pronounced under the heightened standards applicable here, where Plaintiffs' challenge is not to regulations of themselves, but to classifications issued to third parties.  Plaintiffs' claims should also be dismissed because they are time-barred by the statute of limitations in the Administrative Procedure Act ("APA").  But even if the Court were to exercise jurisdiction over Plaintiffs' claims, they fail as a matter of law.  Plaintiffs' challenge to the interpretation by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") of the GCA cannot succeed because ATF reasonably interpreted the statutory terms "firearm" and "readily" in accordance with their plain meaning, and Plaintiffs' arbitrary-and-capricious claims are contradicted by the very materials attached to their Complaint.

As a statutory matter, Congress has legislatively defined a "firearm" to be a weapon that may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of such weapon,[1] but has explicitly excluded "firearms parts" from that definition.  Congress has determined that "firearms" are subject to regulation under the GCA, and that anything that is not a firearm is largely

---

[1] The "receiver" is the part of a rifle that houses vital fire-control components that allow the weapon to shoot, such as the trigger and hammer.  *See* Compl. ¶ 4 n.2 (citing 27 C.F.R. § 478.11).  The "frame" of a handgun serves a similar purpose.  "The Complaint uses the terms . . . "receiver" and "frame" interchangeably," *id.*, and for that reason, Defendants will do the same.

1    excluded from federal regulation.  This leaves a State like California free to enact its own regulations of

2    firearms parts (as it has done), but does not permit ATF to extend federal regulation beyond the limits

3    imposed by Congress.  To the extent Plaintiffs disagree, their concerns are properly addressed to

4    Congress, not ATF or this Court.

5          Plaintiffs' challenges to ATF's classifications also seek to undercut the process under which, for

6    decades, ATF has reviewed numerous items to determine if they should be classified as "firearms" under

7    the GCA, bringing to bear the agency's technical, scientific, mechanical, and legal expertise.  Receivers

8    for the AR-15, the most common rifle in America, have a space within them called the fire-control

9    cavity, which accommodates the firing components.  The longstanding position of ATF is that, where a

10   block of metal (or other material) that may someday be manufactured into a receiver bears no markings

11   that delineate where the fire-control cavity is to be formed and has not yet been even partially formed,

12   that item is not yet a receiver and may not "readily be converted to expel a projectile."  This

13   straightforward conclusion comports with the text of the statute, whereas Plaintiffs' view—that such an

14   item is a firearm—does not.  Thus, the Court not only lacks jurisdiction over Plaintiffs' claims, but the

15   claims themselves cannot succeed.

16   **II.    STATUTORY AND REGULATORY BACKGROUND**

17         Most federal regulation of firearms used for lawful purposes, including most semiautomatic

18   handguns and rifles of .50 caliber or less (such as the AR-15[2]) is contained in the GCA, Pub. L. No. 90-

19   618, 82 Stat. 1213 (1968),[3] which is designed not to itself impinge on the authority of States to impose

20   more stringent regulations.  *See* 18 U.S.C. § 927.  ATF is the federal agency charged with the

21   ───────────────────────────

22   [2] The designation "AR" refers to the company that originally designed the rifle, Armalite Rifle, although
     the AR-15 is currently manufactured by the Colt Company, and "AR-15-type" clones of this weapon are
     made by numerous other manufacturers.  The AR-15 is the "most popular rifle in American history,"

23   *Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020); *see also Heller v. Dist. of Columbia*, 670 F.3d
     1244, 1287-88 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) (explaining these and similar

24   rifles are "commonly used for self-defense in the home, hunting, target shooting and competitions").  An
     AR-15 is semi-automatic, meaning that it is "capable of firing only one shot with each pull of the trigger,"

25   in contrast to a machine gun or other automatic weapon.  *Id.*  An AR-15 is typically composed of two
     separate combinations of parts: an upper assembly and a lower receiver, the latter containing the trigger,

26   hammer, disconnector, pins, and springs, all of which are housed in the fire control cavity.
     [3] Dangerous and unusual firearms, such as machine guns, short-barreled rifles, sawed-off shotguns, and

27   "disguised devices" such as umbrella guns, are regulated under the National Firearms Act ("NFA"), 26
     U.S.C. ch. 53; *see generally* ATF, National Firearms Handbook, Chapter 2, *What are Firearms Under*

28   *the NFA?*, *available at*: https://go.usa.gov/x77c6 (last visited Nov. 25, 2020).  The NFA contains a
     definition of "firearm" distinct from that in the GCA. *See* 26 U.S.C. § 5845.

1    administration of the GCA.  *See* 28 C.F.R. § 0.130(a)(1).  Among ATF's responsibilities is the

2    classification of firearms, which is handled by the Firearms and Ammunition Technology Division

3    ("FATD"),   previously   called   the   Firearms   Technology   Branch   ("FTB").   *See*

4    https://www.atf.gov/firearms/firearms-and-ammunition-technology/   ("FATD   website").   FATD

5    employs numerous firearms examiners with expertise in ATF's technical authority relating to firearms

6    and their classification under federal firearms laws.  *See Innovator Enters. v. Jones*, 28 F. Supp. 3d 14,

7    22 (D.D.C. 2014) ("[FTB] has expertise in classifying firearms and firearm silencers -- much more so

8    than the Court").  FATD routinely inspects devices submitted by the public or industry and classifies the

9    submissions accordingly.  *See* FATD website.

10       The GCA specifically revised the definition of "firearm" used in prior federal law, the Federal

11   Firearms Act ("FFA"), to exclude firearms parts other than the "frame" or "receiver" of a firearm.[4]  *See*

12   S. Rep. 90-1097 at 110-11 (Apr. 29, 1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2200.  This definition

13   is written to cover four alternatives: "(A) any weapon (including a starter gun) which will or is designed

14   to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or

15   receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device."

16   18 U.S.C. § 921(a)(3); *see also* 27 C.F.R. § 478.11 (same).  When Congress revisited 18 U.S.C. § 921

17   and made revisions in the Firearm Owner's Protection Act ("FOPA"), Pub. L. 99-308, 100 Stat. 449

18   (May 19, 1986), Congress left this definition unchanged.

19       Pursuant to its authority to enforce the GCA, ATF defines a "receiver" as "[t]hat part of a firearm

20   which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually

21   threaded at its forward portion to receive the barrel."  27 C.F.R. § 478.11.  Those who wish to import,

22   manufacture, or deal in firearms as defined by the GCA must be licensed, *see* 18 U.S.C. § 923(a), 27

23   C.F.R. § 478.41; must serialize each firearm for identification purposes, *see* 18 U.S.C. § 923(i), 27

24   C.F.R. § 478.92; and must maintain records of their firearms transactions, 27 C.F.R. Subpart H.  The

25   GCA does not impose such requirements on those who wish to manufacture firearms for personal use,

26

27   _____
     [4] The FFA was the operative federal law regulating most firearms prior to the GCA.  It defined a "firearm"
     as "any weapon . . . which is designed to expel a projectile or projectiles by the action of an explosive and
28   a firearm muffler or firearm silencer, or any part or parts of such a weapon." 18 U.S.C. § 901(3) (1964).
     The revised definition of "firearm" in the GCA first appeared in the FFA Amendments of 1966.  *See* S.
     Rep. 89-1866 at 14 (Oct. 19, 1966)

*see* ATF, *What is ATF doing in regards to people making their own firearms*?, *available at*: https://go.usa.gov/x7Vuz, meaning that "[a]n individual may generally make a firearm for personal use." *Id.; see also* Peter Jensen-Haxel, *3D Printers, Obsolete Firearm Supply Controls, and the Right to Build Self-Defense Weapons Under Heller*, 42 Golden Gate U. L. Rev. 447, 459 (2012) ( "Jensen-Haxel, *Right to Build*") (Congress has elected to leave "[i]ndividuals who produce guns for personal use . . . outside the major regulatory system," so "[a]s long as a person is not otherwise prohibited from possessing a firearm and conforms to applicable state laws, he or she may legally make a non-NFA firearm" (*i.e.*, a firearm not regulated by the NFA) from domestically-manufactured parts).[5]

The term "receiver blank," or "unfinished receiver," is used to describe forgings, castings, or machined bodies such as AR-15 receiver castings, in various stages of folding or machining that are not yet ready to house the hammer or other firing components.  Compl. Ex. 10.  Various manufacturers have used the colloquial term "80% receiver"—a term ATF does not employ—to describe a receiver blank on which some machining has been performed, but is not yet a finished receiver.  *See* Compl. ¶ 4.  Over the last forty years, ATF has issued numerous classification decisions regarding items that may be receiver blanks; some of these classification decisions have found the specific receiver blank reviewed to be a firearm part, while classifications of other items have determined the item to be a receiver, and thus, a "firearm" within the meaning of the GCA.  *See, e.g.*, Compl. at Ex. 14 (classifying submitted items as both firearms and non-firearms, based on an examination of their relative completeness).

### III.    PLAINTIFFS' CLAIMS

The Complaint discusses at length the potential risks and harms of so-called "ghost guns," which, like "80% receiver," is a colloquial term that does not appear in federal law.  Plaintiffs define this term to mean firearms "lacking serial numbers" that "are not traceable by law enforcement when they are used in a crime."  Compl. ¶ 2.  The term typically used by ATF and law enforcement for this category of weapon is "unserialized firearm."  Regardless of the label— "unserialized firearm" or "ghost gun"— such weapons include firearms produced in a variety of ways, including commercially-manufactured firearms that have later had the serial numbers unlawfully removed, personally-manufactured firearms

---

[5] Although firearms parts are mostly unregulated under the GCA, there are certain exceptions; for example, imported firearms parts may not be used to assemble rifles or shotguns "identical to [those] prohibited from importation." 18 U.S.C. § 922(r).

made through other means (including with a 3-D printer, *see* Compl. ¶ 45 n.29), as well as firearms made from commercially-produced receiver blanks.[6]   Plaintiffs' challenge to ATF's "ghost gun determinations," and "ghost gun actions," *see* Compl. p. 51, 54 (titles of "Count One" and "Count Two") ("ghost gun actions"); *id.* ¶¶ 118, 120, 130, 133 ("ghost gun determinations"), appears limited to a subset of these weapons, namely, those receiver blanks which ATF determined not to be "firearms" (and thus, may be commercially made and sold as firearms parts) because the "fire-control cavity areas" are "solid and un-machined."  *See* Compl. ¶¶ 66-70, 86-87, 118-20, 126-31.  Plaintiffs challenge both ATF's use of this standard in general, and specific classification letters applying this standard.  *See, e.g.*, Compl. ¶¶ 66, 70, 71-77; *id.* Ex. 4 - Ex. 15.

In Count One, Plaintiffs assert that ATF's interpretation of the GCA's definition of "firearm" to exclude receiver blanks is "not in accordance with law" because ATF's interpretation (and the classification letters based on ATF's interpretation) purportedly conflicts with the text of the GCA.  *See* Compl. ¶¶ 119-20.  In Count Two, Plaintiffs assert that ATF made a  decision in 2006 to "switch from its original temporal approach" to analyzing receiver blanks and that this "switch," subsequently reflected in classification letters and "questions and answers" posted on ATF's website,  is arbitrary and capricious.  Compl. ¶ 136 (quoting *Motor Veh. Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 56 (1983)).  Plaintiffs also assert that ATF's classification decisions on receiver blanks are arbitrary and capricious. As explained below, these claims are factually and legally wrong and should be dismissed.

## IV.    LEGAL STANDARD

Jurisdictional attacks under Rule 12(b)(1) may be either facial or factual.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction," whereas in a factual attack, "the challenger disputes the truth of the allegations" asserted.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In a facial attack, the Court accepts the truth of the allegations in the complaint, whereas to resolve a factual attack on jurisdiction the court "need not presume the truthfulness of the plaintiff's allegations" and may review evidence beyond the complaint.  *White*, 227 F.3d 1242.

---

[6] In 18 U.S.C. § 922(k), Congress has made it illegal to possess a firearm with a "removed, obliterated, or altered" serial number. "Guns with thoroughly obliterated serial numbers are untraceable," and one study has shown that nearly 20% of firearms used in crimes "had obliterated serial numbers." Anthony Braga et al., *The Illegal Supply of Firearms*, 29 Crime & Just. 319, 333-34 (2002) ("Braga, *Illegal Supply*").

1    Once jurisdiction has been challenged, the plaintiff bears the burden of establishing jurisdiction. *See*

2    *Stavrianoudakis v. U.S. Dep't of Fish & Wildlife*, 435 F. Supp. 3d 1063, 1076 (E.D. Cal. 2020).

3         A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the

4    complaint. *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484-85 (9th Cir. 1995).  The court "must

5    accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89,

6    94 (2007).   The court does not accept as true conclusory allegations, legal characterizations or

7    unreasonable inferences. *Caviness v. Horizon Community Learning Ctr.*, 590 F.3d 806, 812 (9th Cir.

8    2010); *see Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007) (the court is "not bound to accept as true a legal

9    conclusion couched as a factual allegation").   To survive a motion to dismiss, a plaintiff must allege

10   "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Facial

11   plausibility" means the plaintiff "pleads factual content that allows the court to draw the reasonable

12   inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

13   (2009). The facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation

14   of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  In considering a Rule

15   12(b)(6) motion, a court may look to the facts contained in the complaint and may "take judicial notice of

16   [other] adjudicative facts," such as "matters of public record" and "documents filed in judicial and

17   administrative proceedings," *Rupert v. Bond*, 68 F. Supp. 3d 1142, 1154 (N.D. Cal. 2014), as well as

18   government documents made "available on government agency websites." *Gustavson v. Wrigley Sales*,

19   961 F. Supp. 2d 1100, 1113 n.1 (N.D. Cal. 2013).

20   **V.     ARGUMENT**

21        **A.  Plaintiffs Cannot Establish Standing For Their Claims.**

22        None of the four Plaintiffs can meet their burden of establishing Article III standing, which requires

23   that they satisfy three elements.  First, Plaintiffs must identify an injury-in-fact: "an invasion of a legally

24   protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

25   hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).  Second, they must

26   show "a causal connection between the injury" and the challenged action. *Id*.  "Third, it must be likely,

27   as opposed to merely speculative, that the . . . injury will be redressed by a favorable decision." *Id*. at 561;

28   *Vermont Agency of Nat. Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) ("substantial

likelihood" required that "relief will remedy the alleged injury").  Standing is "not dispensed in gross," and a "plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler v. Cuno*, 547 U.S. 332, 352-53 (2006).

At the pleading stage, a plaintiff must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Where, as here, "the plaintiff is not himself the object of the government action," standing "is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562.  ATF's interpretations of the GCA neither regulate nor forbid any action on the part of any of the plaintiffs, so this higher standard applies.  *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009).  Plaintiffs here have not established that they meet this standard for any of their claims.

### 1.     Giffords

To "establish an injury," "[a]n organization suing on its own behalf" must show it has "suffered both a diversion of its resources and a frustration of its mission." *La Asociacion de Trabajadores de Lake Forest* ("*ATLF*") *v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) ("*ATLF II*").  Among other things, the group "must . . . show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.*  The alleged injury it seeks to counteract must be "more than simply a setback to the organization's abstract social interests."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  This means that an organization like Giffords must show that ATF's actions "perceptibly impaired the organization's ability to provide services," not just that its "mission has been compromised" in the abstract. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).  The organization "cannot manufacture the injury by . . . simply choosing to spend money."  *ATLF II*, 624 F.3d at 1088.

Giffords' allegations do not meet either part of the standard.  A "diversion of resources" exists only when it is "a necessity" for the organization to spend resources on "activities outside its normal realm," *i.e.*, those not "in line with the organization['s] missions."  *ATLF v. Lake Forest*, No. SA CV 07-250, 2008 WL 11411732, at *6 (C.D. Cal. Aug. 18, 2008) ("*ATLF I*").  Here, Giffords is in the business of lobbying, policymaking, and carrying out legal activities related to gun control, *see* Compl. ¶ 22; http://giffords.org.  Thus, engaging in such activities for any particular gun control law or legal interpretation in support of Giffords' mission is not a "diversion of resources" that can serve as an Article III injury.  *See Sabra v. Maricopa Cty. Community College*, --- F. Supp. 3d ---, 2020 WL 4814343 at *4

1   (D. Ariz. 2020) (religious advocacy organization's hiring of "religious scholar to create materials to

2   advocate" against specific government actions was not "out of the realm of the normal advocacy that they

3   do"). As to the second prong—the purported injury if Giffords does not "diver[t] resources"—Giffords

4   identifies only its "ability to save lives," by carrying out its self-described mission of "shifting culture,

5   changing policies, and challenging injustice."   Compl. ¶ 113.  This is nothing more than a "setback to the

6   organization's abstract social interests" that *Havens* characterized as insufficient for organizational

7   standing.  455 U.S. 379; *see Mecinas v. Hobbs*, 468 F. Supp. 3d 1186, 1203-04 (D. Ariz. 2020) (allegations

8   that a statute made it harder to elect their candidates described only "abstract social interests" of political

9   organizations insufficient for standing).   In short, Giffords cannot "manufacture [an] injury" within the

10  meaning of Article III by disagreeing with an interpretation of federal law and then "simply choosing to

11  spend money" on efforts to change that interpretation or develop a policy in response, as it has done here.

12  *ATLF II*, 624 F.3d at 1088;  *see ATLF I* at *6 (immigrant worker interest group plaintiffs lacked

13  organizational standing to challenge Sheriff's office targeting of day laborers since plaintiffs' "actions in

14  support of the day laborers . . . are directly in line with the organizations' missions").

15          **2.      State of California**.

16          **i. Injury.** California offers a panoply of purported injuries in support of standing, but none that

17  satisfy the standards of Article III.  First, California asserts an alleged direct injury from "increased costs

18  of policing and law enforcement" and "interference with . . . [its] ability to enforce its legal code."  Compl.

19  ¶ 93. However, California has not pleaded facts that demonstrate "increased costs of policing and law

20  enforcement."   For example, although California identifies eight specific crimes in California either

21  committed, or "allegedly committed," with unserialized firearms, Compl. ¶¶ 53-56, 98, 101, California

22  nowhere links the unserialized firearms used to any specific ATF action or classification letter challenged

23  in this lawsuit.[7]  California also does not and cannot plausibly allege that this handful of crimes caused an

24  "increase[]" in law enforcement costs in a state that suffered over 1.1 million violent crimes during the

25  same period (2013-19).  *See* https://openjustice.doj.ca.gov/exploration/crime-statistics/ crimes-clearance

26  (Cal. Dep't of Justice web page providing annual crime statistics) ("Cal. Crimes").  And California does

27

28  _____
    [7] California identifies three other criminals who allegedly possessed unserialized firearms, but does not
    allege those weapons were used in a crime other than possession.  Compl. ¶¶ 55(c),(e); 56(i).

1  not allege that if unserialized firearms had been unavailable, these crimes would not have been committed

2  with unlawful firearms obtained through traditional means, as are most other crimes.[8]  The Court need not

3  "accept inferences that are unsupported by the facts set out in the complaint," as required to infer injury

4  from Plaintiffs' enumeration of a handful of crimes.  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)

5  (internal quotation marks omitted).[9]

6        California's suggestion that the sale of receiver blanks makes "local detective work solving crimes

7  more difficult," Compl. ¶ 96, is also unsupported by sufficient facts to establish injury.  At the outset,

8  California makes no allegation linking "local detective work" to a harm experienced by the State.  Further,

9  as noted above, California has not set out facts that distinguish between untraceable firearms created from

10  receiver blanks and other sources of untraceable firearms, such as those with obliterated serial numbers

11  that likely dominate the total.  *See supra* n.6 and accompanying text.  Finally, published statistics reflect

12  that only a minority of crimes in California even lead to attempts to trace firearms; even when firearms

13  are traced, there is no guarantee of a successful trace; and there is no allegation by California in the

14  Complaint that these numbers are changing.  *Compare* https://www.atf.gov/file/146966/ (describing

15  41,883 firearms traces in California during 2019) *with* Cal. Crimes, *supra*, (reporting 173,205 violent

16  crimes in 2019); Braga, *Illegal Supply* at 332 (table showing that only 55% of traces in Los Angeles,

17  which was not "based on comprehensive tracing," were successful).  Plaintiffs have not credibly alleged

18  that ATF's treatment of receiver blanks is making detective work more difficult.

19        The expenses associated with California's decision itself to regulate receiver blanks and its

20  "accelerated efforts to implement" that statute, *see* Compl. ¶¶ 97-98, also cannot give rise to Article III

21  standing.  "[D]ecisions by . . . state legislatures" to expend money from the public fisc or otherwise to

22  _____

[8] *See generally* T. Markus Funk, Gun Control and Economic Discrimination, 85 J. Crim. Law and
Criminology 764, 773 (1995) ("[C]riminals generally obtain their guns in one of two ways: They either
steal them, or they buy them on the black market—either way, the guns are untraceable . . . of those crimes
which are committed with handguns, ninety-three percent of the guns used in those crimes are obtained
through unlawful purchases"); 140 Cong. Rec.. S12557-01, S12558 (daily ed. Aug. 25, 1994) (statement
of Sen. Hatch) (explaining that guns held by criminals are generally acquired "from the black market,
from other criminals, or by stealing them").

[9] Although California cites a total percentage of "unserialized" firearms recovered in California, Compl.
¶ 60, this number does not distinguish between homemade firearms created from receiver blanks and other
unserialized firearms, such as those that have had their serial numbers removed, *See supra* n. 6.  California
also cannot rely on anecdotes or statistics about crimes occurring in other states (particularly those without
state laws like California's banning unserialized firearms) because a plaintiff seeking prospective relief
must show not just that the predicted injury will reoccur, but also that the plaintiff itself will suffer it. *See*
*City of Los Angeles v. Lyons*, 461 U.S. 95, 107-08 (1983).

enact new laws are "self-inflicted," and "[n]o State can be heard to complain about [such] damage." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976); *see Maryland v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2020 WL 4039315 at *14 (D.D.C. July 17, 2020) (where "nothing requires the State[]" to incur expenditures, its voluntary choices to do so cannot give rise to standing).  California's decision to regulate receiver blanks and then to accelerate that implementation reflect the State's own choice of how to expend resources among a myriad of potential law enforcement activities, not an "injury" inflicted by longstanding ATF decisions.

Damage to California's "quasi-sovereign" interest in "protecting the security and well-being of its residents," Compl. ¶ 93, is also not a cognizable Article III injury.  This type of alleged harm falls squarely within the *parens patriae* doctrine, *see Wash. v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011), under which it is well established that a state "does not have standing as *parens patriae* to bring an action against the Federal Government."  *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011); *see also New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 124 (D.D.C. 2019) ("[T]he States' general responsibility for their citizens' health and welfare . . . cannot directly support State standing [to sue the federal government] because the underlying harms would be suffered by the States' citizens.").

**ii. Traceability.**  Even if any of its alleged injuries could satisfy Article III, California has also failed to establish that they are traceable to the absence of federal regulation of receiver blanks.  "In cases where a chain of causation involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' [alleged] injuries, the Supreme Court and [Ninth Circuit] have found the causal chain too weak to support standing at the pleading stage."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (internal quotations omitted).  And because this chain of injury allegedly affects Plaintiffs by increasing the risk of crime, the scale of alleged injury must be sufficient to "substantially increase[] the risk" of crime and other purported harms.  *Vilsack*, 808 F.3d 915.

Here, California hypothesizes chains of causation involving speculation about the actions of numerous, independent third parties, and the causes of their actions, that are far too weak to support standing.  To wit, California suggests that ATF's interpretation has: 1) led new companies to enter the market for receiver blanks; 2) those companies have then decided to market receiver blanks to prohibited persons who wish to obtain firearms unlawfully; 3) such prohibited persons have decided to violate state

laws barring their possession of firearms; 4) rather than obtaining finished, operative firearms through another source, those persons have chosen to make their own unserialized firearms (in further violation of the California law requiring serialization); 5) those persons have then chosen to acquire receiver blanks from a company whose activities were influenced by ATF's interpretation rather than from other companies and rather than making their own, homemade firearms from other firearms parts; and 6) after making a firearm, the prohibited persons have chosen to use those firearms in a crime.  This chain of unsupported speculation cannot meet the traceability requirements.  *See Brady Campaign . . . [&] Million Mom March v. Ashcroft*, 339 F. Supp. 2d 68, 77-78 (D.D.C. 2004) (plaintiff must "adduce facts showing that [third parties] would not seek some alternative means" to establish traceability from attenuated increased risk of crime);  *United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989) ("When considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) and those which predict a future injury that will result from present or ongoing actions[.]").

**iii. Redressability.** California's alleged injuries are also not redressable in this action, because the hypothesized injuries are all caused by the independent, criminal acts of third parties.  *See Lujan*, 504 U.S. at 562 (where relief from injury is dependent "on the unfettered choices made by independent actors . . . [who] exercise [] broad and legitimate discretion," there is no redressability).  California's own allegations underscore this fact, given that California alleges that harms from unserialized firearms continue even after California enacted the state-law serialization requirements in A.B. 857.  *See* Compl. ¶¶ 97-98.  Where independent criminal actors are already flouting the law, California's claim that an additional law will cure the State's injury does not credibly show redressability.

Redressability is also lacking because of the available alternatives that would exist even if California demonstrated that some receiver blanks should be treated as firearms under federal law.  As explained above, Congress has chosen to exclude firearms parts from the scope of the GCA, including parts that could be assembled with a homemade receiver and frame to make a firearm.  Congress has also chosen to permit the home manufacture of unserialized firearms for personal use.  This means that, regardless of whether any particular item is classified as a "firearm" under federal law, the independent, criminal actors allegedly causing harm to California will still be able to make "unfettered choices" to make

a firearm at home out of federally-unregulated firearms parts, and attempt exactly the same future crimes on which the State relies for standing.[10]  *Lujan*, 504 U.S. at 562.  There is thus no "substantial likelihood" that relief will remedy California's alleged injury, *Stevens*, 529 U.S. 771, let alone meet the "substantially more difficult" standard required because California is not the object of the regulation here.  *Lujan*, 504 U.S. at 562.

### 3.   Mr. Muehlberger and Mr. Blackwell ("Individual Plaintiffs").

There is no doubt that the Individual Plaintiffs have experienced a heartbreaking loss as the fathers of crime victims.  However, because Plaintiffs seek only declaratory and injunctive remedies—forms of prospective relief—they must support their standing with "allegations of *future* injury [that are] particular and concrete."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) (emphasis added).  "[I]t is insufficient for [plaintiffs] to demonstrate only a past injury" from ATF's actions; instead, "there is a further requirement that they show a very significant possibility of future harm."  *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996); *see Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) ("threatened injury must be *certainly impending*" and not merely "*possible*") (emphasis in original; internal quotations omitted).  To meet this standard, such future injury may not be based on a "speculative chain of possibilities," *Clapper*, 568 U.S. at 410, and Plaintiffs must show that they are "realistically threatened by a repetition of [the] experience."  *Lyons*, 461 U.S. at 109; *see Davidson v. Kimberly-Clark*, 889 F.3d 956, 967 (9th Cir. 2018) (to obtain a "prospective remedy . . . premised entirely on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood that he will again be wronged in a similar way'") (quoting *Lyons*).

The Individual Plaintiffs have not met this standard.  The Complaint lacks any specific allegation that they are "realistically threatened" by an actual likelihood they—or their surviving family members—will be the victims of a crime committed with an unserialized firearm made from a receiver blank in the

---

[10] There is nothing novel about the use of unregulated firearms parts to manufacture firearms for personal use; that possibility (whether by lawful makers or by prohibited persons) has been evident since Congress's 1968 decision to exclude firearms parts from the GCA  *See, e.g.*, Bruce Koffler, *Zip Guns and Crude Conversions*, 60 J. Crim. L. Criminology & Pol. Sci. 515, 520, 525-26 (1969), *available at*: https://bit.ly/37jNAvD (describing designs for homemade guns and discussing the ease of doing so); David T. Hardy et al., *Of Arms and the Law*, 51 Chi.-Kent L. Rev. 62, 99-100 (1974), *available at*: https://bit.ly/3fTaX2N (similar); Bill Holmes, Home Workshop Guns for Defense and Resistance: The Handgun (1979); Duncan Long, *Building Your Own Rifle*, The AR-15/M-16: A Practical Guide ch. 9; *id.* at 74 (enumerating parts suppliers); Ronald B. Brown, Homemade Guns and Homemade Ammo (1986).

future, which would be required at a minimum to challenge government action based on the harm from a past crime.  In a comparable context where plaintiffs challenge law-enforcement policies, courts in the Ninth Circuit have applied *Lyons* to hold that even where Plaintiffs have been subjected to particular law-enforcement policies repeatedly, the possible recurrence of such injuries is too speculative to establish standing.  *See, e.g.*, *Eggar v. City of Livingston*, 40 F.3d 312, 317 (9th Cir. 1994) (plaintiff who had been repeatedly convicted without court-appointed counsel lacked standing because whether she "will commit future crimes in the City, be indigent, plead guilty, and be sentenced to jail is speculative").  Here, Plaintiffs would need to allege not only that they would again be victims of a violent crime, but that the crime would be carried out with a firearm made from one of the receiver blanks at issue in this lawsuit, an allegation which would be "purely speculative." *Happe v. Lloyd*, 2 Fed. App'x 519, 521 (7th Cir. 2001).[11]

The Individual Plaintiffs' claims also suffer the same problems of traceability and redressability as California's, described *supra*, including the need to meet the heightened standard of redressability, *see Lujan*, 504 U.S. at 562.  Further, traceability does not exist because the Complaint contains only a general allegation that the firearm used in Saugus High School was an untraceable firearm, not a specific allegation that the weapon was made from a receiver blank that ATF classified as a firearms part.  And Plaintiffs cannot sidestep the problem of redressability by asserting that they are in fear from the risk of future crimes because Article III standing is not available "based on a plaintiff's fear of future injury that itself was too speculative to confer standing." *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015); *see also Clapper*, 568 U.S. at 416 (plaintiffs "cannot manufacture standing merely . . . based on their fears of hypothetical future harm that is not certainly impending").

### B.   The Statute Of Limitations Bars Challenges To ATF's Alleged 2006 Decision To Change Interpretive Approaches And Classifications Over Six Years Old.

"The six-year statute of limitations found in 28 U.S.C. § 2401(a) applies to APA claims." *United*

---

[11]  The Individual Plaintiffs include allegations that they "live and work" in Los Angeles County, *see* Comp. ¶¶ 105, 110, suggesting they seek standing akin to the past injury plus "intent to return" recognized in certain Americans with Disability Act ("ADA") cases.  *See Chapman v. Pier 1 Imports*, 631 F.3d 939, 949 (9th Cir. 2011).  But this type of standing has rarely been recognized in the Ninth Circuit outside of the ADA context, where it is rooted in the specific statutory protections of the ADA.  *See id.* at 947.  Moreover, the foundation of the likelihood of future harm in such cases involves an intent to return to a specific public accommodation, such as an individual retailer, *see, e.g.*, *id.* at 950; *Kalani v. Starbucks Corp.*, 81 F. Supp. 3d 876, 891-92 (N.D. Cal. 2015), coupled with a *certainty* that the same harm will be experienced in that visit.  The broad allegations that plaintiffs might again be victims of a crime somewhere in Los Angeles County's 4,700 square miles meet neither of these elements.

1   *States v. Estate of Hage*, 810 F.3d 712, 720 (9th Cir. 2016).  Both counts of the Complaint attempt to

2   challenge an unspecified set of "classification letters," including classification letters issued more than six

3   years ago.  *See, e.g.*, Compl. Ex. 8, Ex. 9, Ex. 10.  In addition, Count Two seeks to challenge as "arbitrary

4   and capricious" ATF's supposed decision in 2006 to allegedly "switch from its original temporal

5   approach" to interpreting the statutory language "to its current mechanical approach of analyzing which

6   machining operations still need to be performed" because ATF purportedly did not meet the standards

7   required "[w]hen an agency has previously held one view and then changes its positions."  Compl. ¶¶ 135-

8   37.  These claims must be dismissed because Plaintiffs have not met the six-year statute of limitations.

9          Courts have generally held that "ATF's issuance of a classification letter is a 'final agency action'

10  that is reviewable under the Administrative Procedure Act."  *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598,

11  600 (1st Cir. 2016); *see Innovator Enters.*, 28 F. Supp. 3d at 21.  "[T]here are no further steps in ATF's

12  administrative process," and ATF's classification decision sets the standards with which a firearms

13  manufacturer must comply in making and selling its products.  *Sig Sauer* at 600 n.1 (citing, *e.g.*, *FTC v.

14  Standard Oil Co.*, 449 U.S. 232, 241 (1980) (APA's finality requirement is satisfied when a decision is a

15  "definitive statement of the agency's position and had a direct and immediate effect on the day-to-day

16  business" of the affected parties) (cleaned up)).  Apart from a series of three classification letters issued

17  to a company called "Polymer80," *see* Compl. ¶¶ 71-76, Plaintiffs' Complaint identifies 6 other

18  classification letters, all of which were issued more than six years before the filing of the Complaint.  *See*

19  Compl. ¶ 66 (citing Ex. 7 (letter issued Apr. 24, 2006), Ex. 8 (letter issued Sept. 28, 2012), Ex. 9 (letter

20  issued May 17, 2013), Ex. 10 (letter issued May 25, 2014)), ¶ 77 (citing Ex. 14 (letter issued July 15,

21  2013), Ex. 15 (letter issued Nov. 22, 2013)).  In an APA action, "the six-year statute of limitations begins

22  to accrue when the final agency action issues," *Avery v. Dep't of the Army*, Case No. 14–cv–01077–YGR,

23  2015 WL 4451591 at *4 (N.D. Cal. July 20, 2015); *see Calif. Sea Urchin Comm'n v. Bean*, 828 F.3d 1046,

24  1049 (9th Cir. 2016), so the six-year statute of limitations has expired for letters issued six years or more

25  before the filing date of Plaintiffs' Complaint.[12]

26         Count Two of the Complaint alleges that ATF changed its approach to analyzing receiver blanks

27  in 2006 and that its decision to do so violates the APA's prohibition on arbitrary and capricious actions

28

---

[12] The statute of limitations would not bar a challenge to the Polymer 80 letters issued in the last 6 years.

1    under the standard for an agency change-of-position as described in *State Farm*, 463 U.S. 56.  As to the

2    merits, ATF does not agree that its position has changed (or that its position is flawed in any other way),

3    *see infra* Part V.D.1, but the Court need not reach this issue because the statute of limitations in Section

4    2401(a) bars this claim.  Plaintiffs assert that "around 2006, ATF . . . chang[ed] course], without providing

5    any justification for the switch," and "concluded that 80% receivers with fire-control cavity area[s] [that

6    are] completely solid and unmachined do not qualify as firearms under the GCA."  Compl. ¶ 66; *see id.*

7    ¶¶ 136-37 (challenging "post-2006 approach").  If the Court credits Plaintiffs' theory, nearly fifteen years

8    have passed since the agency established this purported policy, and thus, the allegation "plainly cannot

9    provide the foundation for an APA claim, because it occurred . . . years before" Plaintiffs filed their claims.

10   *Hage*, 810 F.3d 720.

## C.  Plaintiffs' Claims Should Be Dismissed Because ATF's Interpretation Of The Statute And Classification Letters Satisfy The Standards Of The APA.

13         Congress has defined "firearm" with specificity as, *inter alia*, "(A) any weapon . . . which will or

14   is designed to or may readily be converted to expel a projectile by the action of an explosive," or "(B) the

15   frame or receiver of any such weapon."  In doing so, Congress changed the prior definition to explicitly

16   exclude "'any part or parts' of a firearm," other than a receiver.  *See* S. Rep. 89-1866 at 14; S. Rep. 90-

17   1097.  A receiver blank may not "readily be converted to expel a projectile by the action of an explosive,"

18   is not "designed to . . . expel a projectile" in and of itself, and is not itself a "receiver."  It is therefore not

19   a "firearm" within the meaning of the statute.

### 1.  The Statute Unambiguously Excludes Receiver Blanks From Subparagraph (A) Of The Statutory Definition Of A Firearm.

21         "When confronted with an argument that an agency's interpretation of a statute that it administers

22   is wrong, we employ the familiar *Chevron* two-step test."  *City and County of San Francisco v. USCIS*,

23   944 F.3d 773, 790 (9th Cir. 2019).  "When a court reviews an agency's construction of the statute which

24   it administers," the first question is "whether Congress has directly spoken" to the interpretive issue at

25   hand.  *Chevron, USA v. NRDC*, 467 U.S. 837, 842 (1984).  "If the intent of Congress is clear, that is the

26   end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed

27   intent of Congress."  *Id.* at 842-43.  "[I]f the statute is silent or ambiguous . . ., the question . . . is whether

28   the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.  At this step, the

agency's interpretation is "entitled to respect based on [ATF's] specialized expertise," *P.W. Arms, Inc. v. United States*, 2016 WL 9526687 at *6 (W.D. Wash. 2016), as well as "whether the rationale given for [ATF's] decision was persuasive." *Springfield, Inc. v. Buckles*, 116 F. Supp. 2d 85, 89 (D.D.C. 2000).

A statutory term bears "its commonly understood meaning at the time [Congress adopted the term], as evidenced by contemporary sources" to that adoption. *S.F.*, 944 F.3d at 793. Courts and agencies carry out this analysis particularly "with reference to its dictionary definition at the time the statute was enacted." *United States v. Carona*, 660 F.3d 360, 367 (9th Cir. 2011); *see S.F.*, 944 F.3d at 793. The statutory definition has two key terms, the first of which, "convert," means to "change from one form or use to another." Webster's New World Dictionary of the American Language 311 (2d ed. 1970) ("Webster's 1970"). There appears to be no dispute that a receiver blank must be "change[d] from one form . . . to another" before it can "expel a projectile by the force of an explosive." 18 U.S.C. § 921(a)(3).

The plain meaning of the term "readily" in 1968 demonstrates that a receiver blank may not "readily be converted" to expel a projectile by the force of an explosive. Dictionary definitions are virtually unanimous in the definition of the word. "Readily" means something that can be done "without delay" and "quickly," or "without difficulty." READILY, Webster's 1970 at 1182; *see also* READILY, Funk & Wagnall's Standard College Dictionary 1121 (1973) ("In a ready manner, promptly, easily"). This definition is consistent with that found in a major unabridged dictionary issued in 1966, the same year the new definition appeared in proposed amendments to the FFA: "promptly; quickly; easily." READILY, Random House Dictionary of the English Language, Unabridged 1195 (1966). Although leading legal dictionaries of the time do not separately define "readily," one such source defined "readily accessible" as "available for immediate use," suggesting that the word "readily" did not bear a different legal meaning than in ordinary usage. Ballentine's Law Dictionary 1058 (3d ed. 1969).[13]

A receiver blank cannot "readily" be "converted to expel a projectile by the action of an explosive" within the meaning of these definitions. An unfinished receiver that has not yet had "machining of any kind performed in the area of the trigger/hammer (fire-control) recess (or cavity)," *see* ATF Firearms

---

[13] The meaning of "readily" remained stable over time. The thirty-year-old, but then-current, version of the Oxford English Dictionary ("OED") defined "readily" as "[p]romptly, in respect of the time of action; quickly, without delay; also, without difficulty, with ease or facility." READILY, 2., 8 OED 195 (1933) (1978 printing). Two hundred years earlier, Samuel Johnson defined "readily" likewise, as "Expeditely, with little hinderance or delay." Johnson, A Dictionary of the English Language (1755).

Technology Branch Technical Bulletin 14-01 ("Bulletin 14-01"), filed in *Calif. Rifle and Pistol Ass'n v. ATF*, Case No. 1:14-cv-01211, ECF No. 24 at 285 (E.D. Cal. Jan. 9, 2015),[14] requires that numerous steps be performed simply to yield a receiver, that then in turn must be assembled with other parts into a device that can expel a projectile by the action of an explosive.  These milling and metalworking steps—each of which require skills, tools, and time—include: 1) "milling out of fire-control cavity"; 2) "drilling of selector-lever hole"; 3) "cutting of trigger slot"; 4) "drilling of trigger pin hole; and 5) "drilling of hammer pin hole."  Compl. Ex. 9.  Importantly, ATF will treat any "indexing"—the inclusion, in the receiver blank, of visual or physical indicators regarding the two-dimensional or three-dimensional parameters of the machining that must be conducted—as rendering the receiver blank a firearm.  *See* Compl. Ex. 12; Ex. 13; Shawn J. Nelson, *Unfinished Lower Receivers*, 63 U.S. Attorney's Bulletin No. 6 at 44-49 (Nov. 2015) ("Nelson, *Unfinished Receivers*"), *available at*: https://go.usa.gov/x7pP3.  This prevents the makers of receiver blanks from annotating the blank to instruct the purchaser as to the precise measurements needed, in three dimensions, to "excavate the fire control cavity and drill the holes for the selector pin, the trigger pin, and the hammer pin."  Nelson, *Unfinished Receivers*, at 47.  The need to conduct these machining steps from scratch, without indexing, and "carefully" means a working gun cannot be produced "without difficulty."  *Id.*  And the work to excavate the cavities and drill holes in a solid, unmachined substrate requires care rather than speed to avoid doing so raggedly or in the wrong area.  *See id.*  Therefore, the receiver cannot be completed "without delay," even leaving aside the further assembly with many other parts needed to have a weapon that can expel a bullet by explosive action.  A receiver blank therefore may not "readily be converted" into a firearm.[15]

Judicial constructions of the statute contemporaneous to 1968 reinforce the conclusion that Congress has "directly spoken to the issue" of whether a receiver blank is a firearm.  *Chevron*, 467 U.S. 842.  "For example, shortly after Congress adopted the definition of "firearm," the Second Circuit rejected

---

[14] The Court may take judicial notice of this document, a guide that assists ATF Special Agents and others in analyzing receiver blanks, as a filed court record.  *See Rupert*, 68 F. Supp. 3d at 1154.

[15] Nor is a receiver blank "designed to . . . expel a projectile by the action of an explosive." 18 U.S.C. 921(a)(3)(A).  To the contrary, it is "designed to" be a receiver, which, although a key component of a firearm that expels a projectile through explosive action, is not itself the firearm.  A receiver itself may not permissibly be interpreted to satisfy subparagraph (A) of the statutory definition of "firearm" because that would "render an entire subparagraph meaningless," *i.e.*, subsection (B), Congress's specific inclusion of "receiver" as an alternative meaning of "firearm." *Nat'l Ass'n of Mfrs. v. DoD*, 138 S. Ct. 617, 632 (2018); *see Gorospe v. C.I.R.*, 451 F.3d 966, 970 (9th Cir. 2006) (applying canon of surplusage).

a vagueness challenge to the "readily be converted" language, holding the language of the statute to be "sufficiently definite" because it "clearly warns that any weapon . . . which can be converted by a relatively simple operation taking only a few minutes is a firearm."  *U.S. v. 16,179 Molso Italian . . . Starter Guns*, 443 F.2d 463, 465-66 (2d Cir. 1971); *see id.* at 465 (explaining that the guns in question "could be converted to shoot live ammunition within three to twelve minutes").  The Second Circuit's analysis accords with the dictionary definitions described above in identifying that "readily" has two components that must be met: simplicity and speed.  *See id.*  In a different context—the regulation of machine guns under the NFA—the Ninth Circuit has held that the meaning of "readily" is "plain and unambiguous" in light of the simplicity and speed components of the definition of the word. *U.S. v. TRW Rifle . . . Serial 593006*, 447 F.3d 686, 690 (9th Cir. 2006).  These analyses confirm that Plaintiffs' interpretive challenge fails at *Chevron* Step One.

For the same reasons, even if there is some ambiguity as to whether a receiver blank "may readily be converted to expel a projectile with the force of an explosive," 18 U.S.C. § 921(a)(3), ATF's interpretation is certainly "based on a permissible construction of the statute" and must be upheld at *Chevron* Step Two.  As explained above, interpreting the term "readily" may involve an assessment of the complexity and skill involved, the time needed, or both, and ATF evaluated those issues through physical examination of submitted receiver blanks and application of its expertise in the mechanics and engineering of firearms as well as its long experience examining firearms and firearms parts.  *See* Compl. at Ex. 6 - 14.  Applying these factors, ATF's conclusion that a receiver blank has not yet had "machining of any kind performed in the area of the trigger/hammer (fire-control) recess (or cavity)" is "entitled to respect, *P.W. Arms, Inc.* at *6, and is a "permissible construction of the statute."  *Chevron*, 467 U.S. 842.

Other sources confirm the reasonableness of ATF's interpretation.  In the Department of Justice publication cited above, a career prosecutor with a decade of experience prosecuting firearms crimes explained the time and skill required, and the complexity of the task involved, in finishing receiver blanks:

> Once the purchaser receives the partially completed AR-15 type lower receiver, he or she must excavate the fire-control cavity and drill the holes for the selector pin, the trigger pin, and the hammer pin. There are various ways to do this: at the more entry-level end of the spectrum, this can be done with a jig, a few drill bits, a couple of carbide end mills, a drill or drill press, eye protection, and cutting fluid or lubricant.  Once the purchaser has the necessary tools, supplies, and lower receiver, he is ready to begin by drilling some small, shallow guide holes with a smaller drill bit, and then a series of other holes before clearing

out more of the cavity with a larger drill bit. . . .

> After the initial drilling of the fire-control cavity, the purchaser must turn the jig and lower receiver on its side and drill the selector, hammer, and trigger pin holes. The fire-control cavity is complete once the purchaser slowly and carefully mills the cavity with end mills. [Once] the purchaser has a completed lower receiver . . ., he or she can order a lower receiver parts kit, an upper receiver, barrel, and other parts necessary to assemble a completed firearm that will expel a projectile by an explosive.

Nelson, *Unfinished Receivers*, at 47-48.  Technical Bulletin 14-01 further documents and illustrates the complexity of the analysis and the significant differences among receiver blanks.  *See generally* Bulletin 14-01.  Like the classification letters, these sources make clear that ATF's interpretation that this lengthy series of steps falls outside the definition of "readily" is, at the very least, "a permissible construction of the statute."[16]

### 2.  A Receiver Blank Is Not A Receiver.

ATF defines a "receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."  27 C.F.R. § 478.11.  A receiver blank does not yet "provide[] housing for the hammer, bolt, or breechblock, and firing mechanism," and is therefore not a "receiver" within this definition.

The Complaint does not challenge this longstanding regulation defining "receiver," and thus, any claim by Plaintiffs that a receiver blank is in fact a receiver would challenge only ATF's application of the definition of "receiver" to receiver blanks.[17]  "When an agency interprets its own regulation, the Court, as a general rule, defers to it unless that interpretation is plainly erroneous or inconsistent with the regulation."  *Decker v. N.W. Envt'l Ctr.*, 568 U.S. 597, 613 (2013).  "It is well established that an agency's

---

[16] Plaintiffs cannot credibly overcome ATF's reasonable application of its expertise by relying on what is "noticeable" in a cursory visual examination of photographs of firearms parts.  *See* Compl. ¶ 46; *compare* Bulletin 14-01 (ATF's guide should not "be used in lieu of a formal determination[, which] FTB cannot render . . . without physically examining a submitted sample.").  Nor can Plaintiffs rely on the marketing statements of the makers of receiver blanks, because such statements are understood to be mere puffery. *See In re Seagate Technology LLC Litig.*, 233 F. Supp. 3d 776, 792-93 (N.D. Cal. 2017).  ATF has long made clear that manufacturers' marketing labels are not dispositive, including by explaining that some "items being marketed as 'unfinished' or '80%' receivers do actually meet the definition of a 'firearm' as defined in the Gun Control Act (GCA)."  *See* ATF FAQ, *available at*: https://go.usa.gov/x72c7

[17] Any such challenge would be futile, as ATF adopted the definition of "receiver" in 27 C.F.R. § 478.11 contemporaneously with the enactment of the GCA, *see* 33 FR 18558 (1968), and adopted a definition of "receiver" that is not inconsistent with the plain meaning of the term.  *See generally* Stephen Halbrook, Firearms Law Deskbook § 2.4 at n.25-33 and accompanying text (citing, *e.g.*, Glossary of the Ass'n of Firearm & Toolmark Examiners 88 (3d ed. 1994) (defining "receiver" as the portion of the firearm "which houses the firing and breech mechanism and to which the barrel and stock are assembled")).

1   interpretation need not be the only possible reading of a regulation—or even the best one—to prevail."

2   *Id.* A receiver blank in which no "machining of any kind" has been "performed in the area of the

3   trigger/hammer (fire-control) recess (or cavity)" has no space yet that can "hous[e] . . . [the] firing

4   mechanism," 27 C.F.R. § 478.11, and therefore ATF's interpretation of "receiver" to exclude receiver

5   blanks is not inconsistent with the regulation.

**3.  ATF's Interpretation Reasonably Balances Multiple Purposes Of The GCA.**

7   Plaintiffs contend that ATF has ignored "a major purpose of the GCA" by determining that receiver

8   blanks are not firearms.  Compl. ¶ 69.  However, the GCA is a statute with multiple purposes, and, in its

9   actions, ATF has ignored neither the GCA's purpose of "support[ing] . . . law enforcement in [the] fight

10  against crime" nor the GCA's other purposes. As to crime-prevention, in all of its activities to administer

11  and apply the GCA, "ATF recognizes the role that firearms play in violent crimes" and therefore pursues

12  "an integrated regulatory and enforcement strategy."  ATF, *Firearms*, https://www.atf.gov/firearms.  ATF

13  explicitly recognizes the fact that of crime prevention in connection with the classification of receiver

14  blanks as firearms parts.  *See* ATF, *Firearms Q&As*, *available at*: https://go.usa.gov/x7pEG.

15  The prevention of crime is not the only purpose Congress set forth in the GCA, however, and ATF

16  has acted reasonably to account for other GCA purposes such as the avoidance of "unnecessary Federal

17  restrictions or burdens on responsible, law-abiding citizens with respect to the acquisition, possession, or

18  use of firearms appropriate to . . . hunting, [recreation], personal protection, or any other lawful activity

19  . . . [or the] ownership or use of firearms . . . for lawful purposes."  *United States v. Lam*, 20 F.3d 999,

20  1001 (9th Cir. 1994) (quoting Pub. L. No. 90-618, § 101, 82 Stat. 1213); *see* S. Rep. 89-1866 at 14 (Oct.

21  19, 1966) (Congress intended to avoid "interfere[nce] with the legitimate uses of firearms by . . . law-

22  abiding citizens . . . for hunting and other recreational purposes, self-protection, and other lawful

23  purposes"); *accord* S. Rep. 90-1097, 1968 U.S.C.C.A.N. 2112, 2214; FOPA, 100 Stat. 449 ("reaffirm[ing]

24  the intent" of the GCA).  As the Supreme Court recognized in *District of Columbia v. Heller*, 554 U.S.

25  570 (2008), the phrase "lawful purposes" is drawn from the Supreme Court's description of "the right

26  protected by the Second Amendment as 'bearing arms for a lawful purpose,'" 554 U.S. 620 (quoting

27  *United States v. Cruikshank*, 92 U.S. 542, 553 (1875)).  The Ninth Circuit has recognized that, beyond the

28  pre-existing right to keep and bear arms, "the Second Amendment protects ancillary rights necessary to

the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).  Among these ancillary rights is "'a corresponding right to obtain'" the "necessary" arms and ammunition, *id.* (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)), including through means such as purchase, private transfer, and private, non-commercial assembly or manufacture.  *See Bezet v. United States*, 276 F. Supp. 3d 576, 605 (E.D. La. 2017) (restrictions on "the use of imported parts to assemble a firearm . . . likely impinge on the rights of law-abiding, responsible citizens . . . to acquire" firearms), *aff'd* 714 F. App'x 336, 341 (5th Cir. 2017); Jensen-Haxel, *Right to Build*, at 475, 479.  In this instance, interpreting whether a part "may readily be converted" to be consistent with the plain meaning of the statutory text accords with the multiple purposes of the GCA and upholds the balance that Congress struck in the statute itself.  *See United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) (recognizing balance struck in 18 U.S.C. § 922(k)).

### D. The Face of Plaintiffs' Complaint Fails To Establish Plaintiffs' Arbitrary And Capricious Claims.

#### 1. Plaintiffs' Claims Are Contradicted By The Exhibits To The Complaint.

Besides being barred by the statute of limitations, *see supra* Part V.B, Plaintiffs' arbitrary and capricious claims "contradict exhibits attached to the Complaint [and] matters properly subject to judicial notice" and should be dismissed for this reason as well.  *Daniels-Hall v. NEA*, 629 F.3d 992, 998 (9th Cir. 2010); *see also Shwarz v. U.S.*, 234 F.3d 428, 435 (9th Cir. 2000) ("The court need not accept as true . . . allegations that contradict facts that may be judicially noticed by the court"); *Openwave Messaging, Inc. v. Open-Xchange, Inc.*, No.16-cv-00253-WHO, 2016 WL 6393503 at *5 (N.D. Cal. Oct. 28, 2016) ("Courts may dismiss a claim as not plausible where its supporting factual allegations are contradictory").

Numerous allegations in the Complaint are contradicted by the materials attached as exhibits to their pleading.  As the legal theory undergirding their arbitrary-and-capricious claim, Plaintiffs allege that ATF's examination for purposes of classification of the extent to which machining of an unfinished receiver is complete—what Plaintiffs describe as the "machining operations approach," Compl. ¶ 66—is "inconsistent with ATF's own stated position before 2006." *Id.* ¶ 8; *see also id.* ¶ 9 (alleging a "dramatic . . . shift"); ¶¶ 136-37 & 141 (asserting ATF failed to explain the "post-2006" approach).  But the Complaint's exhibits demonstrate that ATF made its classification determinations based on a detailed examination of machining operations at least as early as 1983: in the earliest classification identified by

the Complaint, ATF analyzed whether "the interior cavity" of the receiver has or "has not been milled," and explained the drilling process by which ATF had made the unfinished receiver useable, including the calibers of the drill and rotary file used.[18]  Compl. Ex. 4 at 1.  The same is true of the 2002 classification letter featured in Plaintiffs' Exhibit 5, which analyzes: 1) whether there are "holes drilled for the takedown pins, selector, hammer, trigger, bolt catch, rear takedown pin retainer, and magazine catch"; 2) whether the "the magazine catch and bolt catch have been partially machined and the rear ring threaded for the buffer tube"; 3) the state of "[m]achining of the interior cavity and magazine well"; 4) whether the sample had the "trigger slot machined, trigger guard holes drilled, and the slots for the magazine catch and bolt catch completed"; 5) whether a "hole [was] drilled in the receiver ring for the buffer retainer"; and 6) whether "the hole for the grip screw [was] drilled and tapped, and the markings applied."  Compl. Ex. 5 at 1-2.  After this extensive examination of machining operations, ATF then compared the state of those machining operations to a "previously-examined" receiver—possibly the 1983 example from Exhibit 4— without making any assessment of the time required to convert the unfinished receiver to expel a projectile by the action of an explosive.  *See id.*[19]  The 2004 classification letter in Ex. 6 is no different, describing ATF's "[e]xamination of . . . machining operations," and enumerating a lengthy list of the machining operations that ATF evaluated in making its classification.  Plaintiffs' own exhibits demonstrate that ATF did not begin a new approach in 2006, and so the arbitrary and capricious claim should be dismissed.

The exhibits attached to the Complaint also disprove on their face Plaintiffs' allegation that ATF has not "consider[ed] an important aspect of the problem," *i.e.*, whether the classified unfinished receivers "may readily be converted . . . within the meaning of the GCA."  Compl. ¶ 138.  To the contrary, Plaintiffs' exhibits demonstrate that ATF has routinely considered that element of the problem.  *See* Compl. Ex. 7 (explaining that because "your sample is nearly complete, requiring only minor modifications to allow it

---

[18] Although Plaintiffs correctly note that Exhibit 4 also includes the time spent by ATF making the sample functional, the letter does not state that the time required, as opposed to the stage of machining, is the basis by which ATF made its determination. Further, the incoming letter to which ATF responded suggests that some initial marking or machining of the "area for the trigger, hammer, and disconnector" had been performed, characterizing those areas as "basically still unmachined," rather than "completely unmachined."  This underscores that ATF's determination in the 1983 letter is consistent with the standards applied in classification letters today, *i.e.*, whether the fire-control areas are "completely" unmachined.  *See* Compl. ¶ 66.

[19] Paragraph 64 of the Complaint appears to misread Exhibit 5, asserting that ATF stated the time required to convert one of the submitted samples; however, that paragraph of ATF's letter straightforwardly references the "previously-examined" unfinished receiver, not one of the items being classified in Ex. 5.

to function as the frame or receiver of a firearm, it is a firearm as defined in 18 USC 921(a)(3)"); *id.* Ex. 8 (quoting "may readily be converted" from the statutory definition and describing what parts a "receiver-blank or receiver-casting *must not have*" to fall outside that definition) (emphasis in original).[20]  And although Plaintiffs do not include it as an exhibit, the Complaint quotes at length from ATF Ruling 2015-1, *see* Compl. ¶¶ 67-69, which the Court may therefore consider as a "document[] incorporated by reference in the complaint." *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  That Ruling—although not itself defining "firearm" or classifying items—discusses the process of completing unfinished receivers and, in doing so, references the "may readily be converted" portion of the statutory definition no less than seven times.  ATF Ruling 2015-1, *available at*: https://go.usa.gov/x7pmq.  These sources demonstrate that Plaintiffs may not plausibly claim that ATF has not considered that language in its analysis and application of the statutory definition.

The exhibits to the Complaint and other public records also refute key premises around which Plaintiffs have framed this litigation.  Most prominently, Plaintiffs press repeatedly the thesis that it is ATF that is responsible for "the spread of ghost guns," Compl. ¶ 15, and not other factors such as the "new technologies" that Plaintiffs identify as a way "[g]host guns can also be created." Compl. ¶ 45 n. 29.  In service of this narrative, Plaintiffs state repeatedly that since 2006, ATF has categorically determined that receiver blanks are "not firearms," and "unregulated by the GCA," *see, e.g.*, Compl. ¶¶ 8, 15-17, 113, 138.  Plaintiffs' own exhibits demonstrate otherwise, including multiple classification letters from ATF to the contrary—*i.e.*, those demonstrating that ATF *has* regulated items submitted as "unfinished receivers" under the GCA as firearms when technical examinations of those receivers by ATF firearms experts indicate that they satisfy the statutory definition.  *See* Compl. Ex. 7, Ex. 14 (2 out of 3 samples classified as firearms); Ex. 16 (ATF warning to dealers and customers that "some . . . items being marketed as "unfinished" or "80%" receivers do actually meet the definition of a 'firearm'").  Further, the fact that ATF *has* regulated as firearms unfinished receivers "that [make] it easy for customers to know exactly what sections need to be drilled out in order to complete the manufacturing process" and has enforced those classification determinations, including in California, is a matter of public record.  *E.g.*, Br. for the

---

[20] *See also* Compl. Ex. 13 (examining requester's claim that the submitted receiver blank "is void of any indicators that designate or provide guidance in the completion of the firearm" in the context of Section 921(a)(3)'s "may readily be converted" language).

United States, *In re: The Search of: ARES AMOR*, No. 14-56550, 2015 WL 7185171 at *6 (9th Cir. Nov. 10, 2015).   Likewise, although Plaintiffs contend that ATF has "failed to consider . . . the proliferation of untraceable firearms," Compl.¶ 139, this allegation is contradicted by ATF's discussion of the proliferation and consequences of unfinished receivers that are made into unserialized firearms in Exhibit 16, which contains some of ATF's public "[a]nswers to some common questions specific to . . . unfinished receivers."  Compl. Ex. 16 at 1, 6, 8.   And, in any event, because receiver blanks do not fall within the plain meaning of the GCA's definition of "firearm," *see supra* Part V.C.1, the consequences of that definition are for Congress to address.  *See Conner v. Burford*, 848 F.2d 1441, 1455; 18 U.S.C. § 926(a) (limiting the scope of delegation under the GCA to interpretive and administrative matters).

### 2.   The Exhibits To The Complaint Demonstrate That ATF Made Reasonable Classification Decisions.

The APA's "arbitrary [or] capricious . . . standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund v. USDA*, 499 F.3d 1108, 1115 (9th Cir. 2007).  Where, as here, the agency decision involves "a high level of technical expertise," a court must be particularly deferential. *Sierra Club v. U.S. EPA*, 346 F.3d 955, 961 (9th Cir.2003); *see Sig Sauer, Inc. v. Jones*, 133 F. Supp. 3d 364, 371 (D.N.H. 2015) (explaining that examination of firearms parts and comparison with other items on the market "require[s] expertise that is well within ATF's grasp . . . [and] entitled to substantial deference").  Plaintiffs attached eight classification letters post-dating 2006 as exhibits 8 through 15 to the Complaint, and these demonstrate on their face that ATF's firearms classifications reflect physical examination and testing by experienced ATF firearms examiners with expertise in the GCA, the physical design and mechanical operation of firearms, and by reference to the agency's extensive firearms reference collection, consistent with ATF's procedures.  *See* Compl. Exs. 8-15; *accord* ATF, *Firearms and Ammunition Technology*, https://go.usa.gov/x7ydf.

As an example, in a classification letter issued May 17, 2013, Compl. Ex. 9, ATF examined both a submitted casting and a set of diagrams to evaluate whether 14 different machining operations would need to be completed in order to convert the receiver blank into a functioning receiver: 1) drilling of pivot pin holes; 2) drilling of pivot detent holes; 3) drilling of selector-retainer holes; 4) cutting of magazine

1   release and catch slots; 5) drilling of trigger guard holes; 6) drilling and threading of rear of receiver; 7)

2   drilling of buffer-retainer hole; 8) facing off and threading of pistol-grip mounting area; 9) machining of

3   magazine well; 10) milling out of fire-control cavity; 11) drilling of selector-lever hole; 12) cutting of

4   trigger slot; 13) drilling of trigger pin hole; and 14) drilling of hammer pin hole. *See id.* at 1-2.  In a 2015

5   classification letter issued through counsel to manufacturer Polymer 80, Compl. Ex. 12, ATF examined a

6   similar list of features in sufficient detail to determine that the item was made "utilizing additive

7   manufacturing," not "a single casting," and emphasized that ATF's analysis included the "manufacturing

8   process," "method of operation," and "materials" as well as the "design, dimensions, [and] configuration."

9   *Id.* at 4, 5.  Other exhibits illustrate that ATF's thorough examinations may include "cut[ting] into several

10  pieces" the submitted item, Ex. 11 at 2, and comparisons to items in the firearms reference collection, Ex.

11  12 at 18.  On their face, these analyses illustrate the "high level of technical expertise" employed in making

12  ATF's classification decisions, and Plaintiffs' own exhibits thereby demonstrate the "reasonable basis"

13  for those classification decisions that warrants a grant of judgment to ATF on the arbitrary-and-capricious

14  claim. *Ranchers Cattlemen*, 499 F.3d 1115.

15  **VI.  CONCLUSION**

16      For the foregoing reasons, all of Plaintiffs' claims should be dismissed.

18  DATED: November 30, 2020                    Respectfully submitted,

20                                              JEFFREY BOSSERT CLARK
                                                Acting Assistant Attorney General

21                                              LESLEY FARBY
22                                              Assistant Branch Director

23                                              */s/ Eric J. Soskin*
                                                ERIC J. SOSKIN
24                                              Senior Trial Counsel

25                                              *Attorneys for Defendants*