Ok wGIBSON, DUNN & CRUTCHER LLP
AVI WEITZMAN, *pro hac vice*
aweitzman@gibsondunn.com
LEE R. CRAIN, *pro hac vice*
LIESEL SCHAPIRA, *pro hac vice*
KAYLIE SPRINGER, *pro hac vice*
200 Park Avenue
New York, NY  10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
VIVEK GOPALAN, SBN 296156
VGopalan@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8200
Facsimile: (415) 374-8306

*Attorneys for Plaintiffs Bryan Muehlberger,
Frank Blackwell, and Giffords Law Center to
Prevent Gun Violence*

XAVIER BECERRA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
MARK R. BECKINGTON
Supervising Deputy Attorney General
R. MATTHEW WISE, SBN 238485
Matthew.Wise@doj.ca.gov
Deputy Attorney General

1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone:  (916) 210-6046
Facsimile:  (916) 324-8835

*Attorneys for Plaintiff State of California, by
and through Attorney General Xavier Becerra*

[*Additional Counsel Listed on Next Page*]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES et al.,<br><br>Defendants. | CIVIL CASE NO.:  3:20-CV-06761-EMC<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Hon. Edward M. Chen<br><br>Hearing Date:  February 25, 2021<br>Hearing Time:  1:30 p.m. |

1    Additional Counsel

2    GIFFORDS LAW CENTER TO
3    PREVENT GUN VIOLENCE
     HANNAH SHEARER, SBN 292710
4    268 Bush St. # 555
     San Francisco, CA 94104
5    Telephone: (415) 433-2062
     Facsimile: (415) 433-3357
6

7    J. ADAM SKAGGS, *pro hac vice*
     DAVID M. PUCINO, *pro hac vice*
8    223 West 38th St. # 90
     New York, NY 10018
9    Telephone: (917) 680-3473

10   *Attorneys for Plaintiffs Bryan Muehlberger,*
11   *Frank Blackwell, and Giffords Law Center to*
     *Prevent Gun Violence*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................................ 1

II. BACKGROUND ............................................................................................................... 3

III. STANDARD OF REVIEW .............................................................................................. 6

IV. ARGUMENT ................................................................................................................... 7

    A.    Plaintiffs Have Standing ............................................................................... 7

        1.    State of California ........................................................................... 7

        2.    Bryan Muehlberger and Frank Blackwell ..................................... 11

        3.    Giffords Law Center to Prevent Gun Violence .............................. 15

    B.    Plaintiffs Adequately Allege that Defendants Violated the APA .............................. 18

        1.    Plaintiffs Challenge Determinations Made Within the Statute Of Limitations ................................................................................. 18

        2.    ATF's Interpretation of the GCA Is Both Wrong and Unreasonable ............. 19

            a.    ATF Is Not Entitled to *Chevron* Deference ........................................ 19

            b.    80 Percent Frames and Receivers Are "Firearms" Under the GCA ........... 20

        3.    ATF's Interpretations Are Arbitrary and Capricious ..................................... 23

V. CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982) ....................................................................................................7

*Asgrow Seed Co. v. Winterboer,*
    513 U.S. 179 (1995) ..................................................................................................21

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ....................................................................................................6

*ATLF v. Lake Forest,*
    624 F.3d 1083 (9th Cir. 2010) .................................................................................16

*Bair v. Cal. State Dep't of Transp.,*
    867 F. Supp. 2d 1058 (N.D. Cal. 2012) ..................................................................24

*Barnhart v. Walton,*
    535 U.S. 212 (2002) ..................................................................................................19

*Barnum Timber Co. v. U.S. E.P.A.,*
    633 F.3d 894 (9th Cir. 2011) .....................................................................................7

*Barrett v. United States,*
    423 U.S. 212 (1976) ..................................................................................................22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................................19

*Bennett v. Spear,*
    520 U.S. 154 (1997) ..........................................................................................10, 14

*Bonin v. Calderon,*
    77 F.3d 1155 (9th Cir. 1996) ...................................................................................20

*Brady Campaign to Prevent Gun Violence United with the Million Mom March v.*
    *Ashcroft,*
    339 F. Supp. 2d 68 (D.D.C. 2004) .......................................................12, 13, 14, 16

*Butte Envtl. Council v. U.S. Army Corps of Eng'rs,*
    620 F.3d 936 (9th Cir. 2010) ...................................................................................18

*California v. Azar,*
    911 F.3d 558 (2018) .........................................................................................9, 10, 11

*Carey v. Population Servs. Int'l,*
    431 U.S. 678 (1977) ....................................................................................................7

*Chaudhry v. City of Los Angeles,*
    751 F.3d 1096 (9th Cir. 2014) .................................................................................11

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ...............................................................................................19, 22

*Christensen v. Harris Cty.*,
    529 U.S. 576 (2000) .......................................................................................................19

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .......................................................................................................18

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .........................................................................................................13

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 ..............................................................................................................9, 15

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
    657 F.3d 936 (9th Cir. 2011) .....................................................................................15, 16

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017) ......................................................................................................9

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ...............................................................................................11, 14

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ....................................................................................................25

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) .......................................................................................................25

*Eggar v. City of Livingston*,
    40 F.3d 312 (9th Cir. 1994) ............................................................................................13

*Elliott v. QF Circa 37, LLC*,
    2017 WL 6389775 (S.D. Cal. Dec. 14, 2017) ...............................................................11

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ..................................................................................................3, 20

*In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
    402 F. Supp. 3d 767 (N.D. Cal. 2019) .............................................................................7

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,
    666 F.3d 1216 (9th Cir. 2012) .........................................................................................17

*Happe v. Lloyd*,
    2 F. App'x 519 (7th Cir. 2001) .......................................................................................13

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .......................................................................................................15

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Humane Soc'y v. Locke*,
626 F.3d 1040 (9th Cir. 2010).........................................................................................3

*Innovator Enterprises, Inc. v. Jones*,
28 F. Supp. 3d 14 (D.D.C. 2014).....................................................................................20

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
478 U.S. 221 (1986)........................................................................................................12

*Judulang v. Holder*,
565 U.S. 42 (2011)..........................................................................................................23

*Larson v. Valente*,
456 U.S. 228 (1981)........................................................................................................11

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001)............................................................................................3

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014)..........................................................................................6

*Leonard v. Clark*,
12 F.3d 885 (9th Cir. 1993)..............................................................................................7

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).............................................................................................7, 12, 14

*Mangaoang v. Special Default Servs., Inc.*,
427 F. Supp. 3d 1195, 1207 (N.D. Cal. 2019) ...............................................................22

*Maryland v. U.S. Dep't of Educ.*,
2020 WL 4039315 (D.D.C. July 17, 2020) ....................................................................10

*Massachusetts v. EPA*,
549 U.S. 497 (2007).....................................................................................................8, 15

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011)........................................................................................10

*McCutchen v. United States*,
145 Fed. Cl. 42 (2019) ...................................................................................................20

*Mecinas v. Hobbs*,
468 F. Supp. 3d 1186 (D. Ariz. 2020).............................................................................16

*Mendia v. Garcia*,
768 F.3d 1009 (9th Cir. 2014).........................................................................7, 10, 11, 14

*Michigan v. EPA*,
576 U.S. 743 (2015)........................................................................................................23

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................................................................................................23

*Mountain States Legal Foundation v. Glickman*,
92 F.3d 1228 (D.C. Cir. 1996) ...............................................................................12

*Munns v. Kerry*,
782 F.3d 402 (9th Cir. 2015) ..................................................................................15

*Natural Resources Defense Council v. Kempthorne*,
506 F. Supp. 2d 322, 370 (E.D. Cal. 2007) ...........................................................23

*Nat'l Audobon Soc'y v. Davis*,
307 F.3d 835 (9th Cir. 2002) ..................................................................................10

*Nat'l Council of La Raza v. Cegavske*,
800 F.3d 1032 (9th Cir. 2015) .................................................................15, 17, 18

*P.W. Arms, Inc. v. United States*,
2016 WL 9526687 (W.D. Wash. 2016) ...................................................................20

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) ...................................................................................................9

*Pinnacle Armor, Inc. v. United States*,
648 F.3d 708 (9th Cir. 2011) ....................................................................................6

*Powell v. Illinois*,
2019 WL 4750265 (N.D. Ill. Sept. 30, 2019) ...................................................13, 14

*Price v. Stevedoring Servs. of Am., Inc.*,
697 F.3d 820 (9th Cir. 2012) ..................................................................................19

*Robinson v. United States*,
586 F.3d 683 (9th Cir. 2009) ..................................................................................20

*Sabra v. Maricopa Cty. Comty Coll.*,
2020 WL 4814343 (D. Ariz. Aug. 18, 2020) .........................................................18

*Shroyer v. New Cingular Wireless Servs.*,
622 F.3d 1035 (9th Cir. 2010) ..................................................................................6

*Sierra Club v. Trump*,
977 F.3d 853 (9th Cir. 2020) ....................................................................................7

*Silvester v. Harris*,
843 F.3d 816 (9th Cir. 2016) ..................................................................................25

*Skidmore v. Swift & Co*,
323 U.S. 134 (1944) .................................................................................................19

## TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Smith v. Pac. Props. & Dev. Corp.*,
   358 F.3d 1097 (9th Cir. 2004)..................................................................15, 16, 17

*State of California v. Bureau of Land Mgmt.*,
   2020 WL 1492708 (N.D. Cal. Mar. 27, 2020) .......................................................10

*State of California v. Ross*,
   358 F. Supp. 3d 965 (N.D. Cal. 2018) .............................................................9, 10

*Syed v. M-I, LLC*,
   853 F.3d 492 (9th Cir. 2017)................................................................................14

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) ...........................................................................................7

*United States v. 16, 179 Molso Italian*,
   443 F.2d 463 (2d Cir. 1971).................................................................................21

*United States v. Estate of Hage*,
   810 F.3d 712 (9th Cir. 2016)................................................................................18

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010)...................................................................................25

*United States v. Mead Corp.*,
   533 U.S. 218 (2001).......................................................................................19, 20

*United States v. Students Challenging Regulatory Agency Procedures*,
   412 U.S. 669 (1973).............................................................................................15

*United States v. Wick*,
   2016 WL 10637098 (D. Mont. July 1, 2016).......................................................20

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013)..............................................................................17

**Constitutional Provisions**

U.S. Const. amend II ................................................................................................24

**Statutes**

5 U.S.C. § 706 .........................................................................................................18

18 U.S.C. § 921 ................................................................................1, 3, 4, 20, 21, 22

28 U.S.C. § 2401 .....................................................................................................18

# TABLE OF AUTHORITIES
*(continued)*

**Rules**                                                                 Page(s)

Fed. R. Civ. P. 8 ...................................................................................................19

Fed. R. Evid. 201 ...................................................................................................3

**Other Authorities**

Webster's Third New International Dictionary of the English Language Unabridged
    (1965) ...................................................................................................21

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:20-CV-06761-EMC

# I. INTRODUCTION

The Gun Control Act of 1968 ("GCA") defines a regulated "firearm" to include "*any* weapon (including a starter gun) which will *or is designed to or may readily be converted to expel a projectile by the action of an explosive*" and "the frame or receiver of any such weapon."  18 U.S.C. § 921(a)(3) (emphasis added).  Plaintiffs' Complaint extensively details how 80 percent receivers and frames can easily be converted in minutes into fully operable firearms using common household tools, and how Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") decisions in recent years to permit the unregulated sale of those nearly finished receivers and frames violate the GCA and are arbitrary and capricious.  Unlike almost all other firearms in the United States, these deadly firearms, colloquially called "ghost guns," can be purchased without undergoing a background check and without being serialized, rendering them untraceable by law enforcement.  Because of ATF's determinations, ghost guns are fast becoming the weapon of choice for criminals and others who would otherwise be prohibited from possessing firearms under federal law, including domestic abusers, minors, people convicted of felonies or addicted to drugs, and individuals with serious mental illness.  With just a credit card and a mailing address, *anyone* can purchase these untraceable do-it-yourself ("DIY") guns.

Defendants attempt to sidestep Plaintiffs' detailed, more-than-sufficient factual allegations, asking this Court to dismiss the Complaint at the pleading stage on three grounds: (1) Plaintiffs lack standing; (2) the statute of limitations bars certain of Plaintiffs' claims; and (3) ATF's agency actions neither conflict with the GCA nor are arbitrary and capricious.  These arguments lack merit—and are undermined by ATF's own recent admissions in another action.

***Each of the Plaintiffs Has Standing to Sue Under the APA.***  The Complaint more than adequately pleads ongoing harms suffered by each of the Plaintiffs.  *First*, California—which is an epicenter of the ghost gun epidemic—has suffered and will continue to suffer financial harm as increased State resources are spent both implementing state legislation intended to close the loophole created by ATF's determinations and training law enforcement personnel statewide on ghost guns.  Compl. ¶ 93.  In addition to these monetary injuries, California has suffered harm to its quasi-sovereign interests in protecting the security and well-being of its residents.  Compl. ¶ 93.  *Second*, Plaintiffs Muehlberger and Blackwell (the "Individual Plaintiffs") have been experiencing continuing injury

since the senseless murder of their children at Saugus High School.  They now live in acute fear of ghost gun violence and suffer ongoing emotional and psychological harm knowing that at any moment ghost gun violence could, once again, impact them and their families.  Compl. ¶¶ 108, 112.  Were ghost guns not generally available, the Individual Plaintiffs' fear of ghost gun violence and the trauma they experience as a result of the ghost gun epidemic would be significantly reduced.  Compl. ¶¶ 108, 112. *Third*, ATF's unlawful determinations have forced Giffords Law Center to Prevent Gun Violence ("Giffords") to expend substantial resources and staff time and, in many respects, to change fundamentally many organizational priorities and activities.  Compl. ¶¶ 113-15.

**The Complaint Timely Challenges ATF Determinations Within the Applicable Six-Year Statute of Limitations.**  The Complaint adequately identifies and challenges multiple forms of agency action that fall within the six-year statute of limitations.  Compl. ¶¶ 71-77, 86-91.  That the Complaint also mentions ATF decisions that occurred more than six years ago does not prohibit Plaintiffs from timely challenging agency actions within the statute of limitations.

**ATF's Interpretation of the GCA and the Determinations in its Classification Letters Violate the APA.**  The Complaint more than adequately pleads allegations that demonstrate that ATF's construction of the GCA conflicts with the statute itself and is arbitrary and capricious.  But according to Defendants, ghost guns—which are created with "80 percent receivers" for long guns or "80 percent frames" for hand guns—are not "firearms," despite the clear evidence that these products are forged for the *sole and express purpose* of easily and quickly creating a fireable weapon.  Defendants assert that these products are nothing more than chunks of metal; they are "not yet a receiver and may not 'readily be converted to expel a projectile.'"  Br. 2.  Relying on statements that contradict the well-supported allegations of the Complaint—made by a "career prosecutor" with no apparent technical expertise—Defendants contend that the process for converting an 80 percent receiver into an operable fireman requires "time and skill," and relies on a "lengthy series of steps."  Br. 18-19.

That statement blinks reality.  Plaintiffs' Complaint cites substantial evidence supporting their allegations that 80 percent receivers may be converted into operable firearms in as little as fifteen minutes.  *See*, *e.g.*, Compl. ¶¶ 2, 10, 16, 47, 64, 76, 123; ECF No. 46-8 at 2.  Indeed, Defendants' argument here conflicts with the Department of Justice's ("DOJ") own assessments and ATF's recent

sworn testimony that the very 80 percent receivers and frames challenged by Plaintiffs in this lawsuit (*e.g.*, ghost gun kits sold by Polymer80, Inc.) are in fact "firearms" under the GCA.  In a 119-page search warrant affidavit sworn on December 9, 2020 (the "Affidavit"), a certified firearms expert at the ATF swore that Polymer80's "Buy Build Shoot" ghost gun kits (which Plaintiffs challenge here) could be converted into a "fully functional firearm in approximately 21 minutes" or as much as "approximately three hours," and that they thus qualify as "firearms" under the GCA.  *See* Affidavit at 3-4, 4-5.[1]  Defendants' apparently contradictory positions, taken merely days apart, seriously undermine their motion here and provide additional evidence that ATF's agency actions are arbitrary and capricious.  *Cf. Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("unexplained inconsistency" supports holding action arbitrary and capricious (citation omitted)); *Humane Soc'y v. Locke*, 626 F.3d 1040, 1049-50 (9th Cir. 2010) (agency's "seemingly inconsistent approach[es]" were arbitrary and capricious).  In short, ATF's determinations are contrary to law and are arbitrary and capricious on their face.

This Court should deny Defendants' motion to dismiss in its entirety.

## II. BACKGROUND

Enacted in 1968, the GCA was landmark legislation that asserted federal control over the firearms industry and those who were legally permitted to possess firearms.  Compl. ¶¶ 30-31.  The GCA's major provisions ban sales of guns to people convicted of felonies, people addicted to drugs, minors, and individuals with serious mental illnesses, and include requirements that: (i) firearm dealers obtain a federal firearms license; (ii) firearm purchasers undergo background checks to ensure they are legally permitted to purchase and possess weapons; and (iii) firearms be serialized.  18 U.S.C. § 921 *et*

---

[1]  The Affidavit is available as a link (https://s.wsj.net/public/resources/documents/ ghostraid-121420-warrant.pdf) in a Wall Street Journal article.  See Zusha Elinson, Ghost-Gun Company Raided by Federal Agents, WSJ (Dec. 11, 2020), https://www.wsj.com/articles/ghost-gun-company-raided-by-federal-agents-11607670296 (last visited Dec. 30, 2020).  This Court may take judicial notice of the Affidavit because it is a matter of public record and its contents are "not subject to reasonable dispute."  *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001); Fed. R. Evid. 201(b)(2);  *see* Plaintiffs' Request for Judicial Notice in Support of Plaintiffs' Opposition to the Motion to Dismiss (December 30, 2020).   In an abundance of caution, Plaintiffs do not file the Affidavit as an exhibit because a search of the docket, Case No. 3:20-mj-123-WGC (D. Nevada), suggests that the case is currently sealed.

*seq.*; Compl. ¶¶ 31, 41.  To effectuate the GCA's goals of preventing prohibited purchasers from obtaining guns and aiding law enforcement, the GCA defines "firearm" broadly to include not only fully assembled, functional weapons but also items that are "designed to or may readily be converted" into fireable weapons, as well as the "receiver" or "frame" of such weapons.  18 U.S.C. § 921(a)(3); Compl. ¶ 33.  A firearm frame or receiver is the central component of a firearm that houses the hammer, bolt, or breechblock, as well as the firing mechanism.  Compl. ¶ 33.

Ghost guns are specifically designed to circumvent the GCA's commonsense requirements. Compl. ¶ 45.  Built with "80 percent receivers" or "80 percent frames" that are nearly finished frames and receivers, ghost guns are often sold in DIY gun kits that allow purchasers to create fully operable weapons in as little as fifteen minutes.  Compl. ¶¶ 4, 10-14, 40, 45, 48, 50.  They can be purchased by anyone with an internet connection and a credit card (as well as at gun shows and from brick-and-mortar gun stores).  Compl. ¶ 45.  This includes people convicted of felonies or domestic violence, people addicted to drugs, minors, and individuals with serious mental illnesses, despite the fact that all of them are prohibited by federal law from purchasing and possessing firearms.  Compl. ¶ 45.  Because of ATF's actions, no background check is required to buy an 80 percent receiver or frame, no records of the buyers' identities must be kept, and no 80 percent receiver or frame has to carry any serial number or other marking to identify the product's manufacturer, make, model, or caliber.  *See*, *e.g.*, Compl. ¶ 45.

The proliferation of ghost guns is the result of Defendant ATF's conclusions that 80 percent frames and receivers are not "firearms" under the GCA and not subject to federal law.  ATF encourages manufacturers to seek ATF classification of their products prior to manufacturing to "avoid unintended classification and violations of the law."  Compl. ¶ 36, Ex. 1.  ATF uses these classification letters— which Defendants concede are final determinations under the APA, Br. 14—to clarify obligations under federal law, such as whether specific products (including receivers and frames) are subject to the GCA.  Compl. ¶ 36.  ATF also provides information related to compliance with the GCA on its website through guidance frequently relied on by manufacturers, retailers, and buyers.  Compl. ¶¶ 36, 86-87.

ATF has determined that 80 percent receivers and frames are not firearms not by assessing whether they are designed or may readily be converted to fire ammunition, but by focusing on which

machining operations still need to be performed by the purchaser before they may do so.  Compl. ¶ 65.

Using this approach, ATF concluded that certain 80 percent receivers do not qualify as firearms under

the GCA because they include "cavity area[s] [that are] completely solid and un-machined."  Compl.

¶¶ 66-70.  ATF memorialized this "machining" analysis in Classification Letters issued to Polymer80

between 2015 and 2017.  In the Classification Letters, ATF determined that various Polymer80

products, including an AR-15 type receiver and an 80 percent receiver for an AR-10 assault rifle, did

not qualify as firearms under the GCA.  Compl. ¶ 71.  The Classification Letters did not deny that

Polymer80's proposed products were designed to be converted into fully operable weapons and could

easily be converted with common household tools.  Compl. ¶¶ 72-76.  ATF also explained its official

position regarding ghost guns in 2015 on a section of its website entitled "Questions and Answers" (the

"Ghost Gun Guidance").  Compl. ¶ 86.  The Ghost Gun Guidance, which manufacturers and dealers

cite as authority proving the legality of their products, echoes ATF's determination that 80 percent

receivers are not firearms under the GCA.  Compl. ¶ 91.

ATF's determinations have allowed ghost guns to spread throughout the country, letting

prohibited purchasers procure these weapons without undergoing a background check and use guns

that are unserialized and thus untraceable.  Compl. ¶¶ 37-40.  Ghost gun kits—sold with all of the parts

and tools necessary for assembly—are especially popular, Compl. ¶¶ 50, 54, 55, 57, 76, 80, 82, and

ghost guns have become a weapon of choice for criminal organizations, gangs, and other individuals

and groups engaged in violence, Compl. ¶¶ 3, 11-13, 53, 95, 100, 102.  Between 2010 and April 2020,

law enforcement agencies have connected at least 2,513 ghost guns to criminal activity.  Compl. ¶ 58.

Over half—1,300 ghost guns—were used or sold by criminal enterprises to facilitate crimes, including

terrorism, murder, robbery, and gun, drug, and human trafficking crimes.  *Id*.  Multiple crimes were

committed with ghost guns by people with severe mental illnesses, those criminally prohibited from

owning weapons, and far right extremists.  Compl. ¶¶ 53-59.

Faced with the devastating impact of ATF's determinations, Plaintiffs commenced this APA

action on September 29, 2020, alleging that Defendants' agency action conflicts with the GCA and is

arbitrary and capricious.  Approximately two months later, Defendants moved to dismiss, arguing that

ghost guns are not "firearms" under the GCA because they are not "readily convertible" into fireable

weapons.  Br. 1-2, 15-21.[2]  But just ten days later, an ATF special agent submitted a search warrant affidavit in which he testified that ATF has determined that a Polymer80 ghost gun kit, even if not yet assembled, *is* a "firearm" as defined under the GCA, as well as a weapon "which will or is designed or may readily be converted to expel a projectile by the action of an explosive."  *See* Affidavit at 4.  The search warrant application was part of ATF's investigation of Polymer80's "Buy Build Shoot" ghost gun kits, which consumers can purchase online and assemble at home without a background check.  *Id*. at 3-4.  ATF agents bought two such kits, and assembled them into fully functional firearms; one firearm took approximately three hours to assemble, while the other was ready to shoot in a mere 21 minutes.  *Id*. at 3-4; 24-36.  The search warrant affiant even relied on evidence made public in *Plaintiffs' Complaint* in allegations addressing the unlawful distribution of ghost guns by Polymer80.  *See id*. at 45.  On the strength of those allegations, a United States Magistrate Judge issued the search warrant, and on December 10, federal law enforcement agents raided a Polymer80 warehouse in Nevada.  *See* Mem. of Law in Supp. of Polymer80's Mot. to Intervene, Dkt. 47-1 at 1-2.

### III. STANDARD OF REVIEW

A plaintiff "only needs to allege 'sufficient subject matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 721 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable."  *Iqbal*, 556 U.S. at 678.  The court must "accept as true" the Complaint's factual allegations.  *Id*; *see Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (same standard on facial challenge to standing under Rule 12(b)(1)).  Dismissal is "proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory."  *Shroyer v. New Cingular Wireless Servs.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

---

[2]  The same federal defendants, represented by the U.S. Attorney's Office for the Southern District of New York, agreed that a substantially similar complaint was sufficient pled, and requested a briefing schedule proceeding directly to summary judgment.  *See City of Syracuse, N.Y. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, Case No. 1:20-cv-8665-GHW (S.D.N.Y), ECF No. 30 [Defs.' Letter, Sept. 23, 2020].

## IV. ARGUMENT

### A.       Plaintiffs Have Standing

"In order to establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision." *Sierra Club v. Trump*, 977 F.3d 853, 865 (9th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)), *petition for cert. filed* (U.S. Nov. 17, 2020) (No. 20-685).  In assessing standing, the Court must assume that Plaintiffs will prevail on the merits.  *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 788 (N.D. Cal. 2019).[3] Although this burden has been met for each Plaintiff, "once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others."  *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) (citing *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977)); *see Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017).

### 1.       State of California

The State of California has more than plausibly alleged a "panoply," *see* Br. 8, of "concrete and particularized" injuries resulting from ATF's failure to regulate ghost gun parts.  *See Lujan*, 504 U.S. at 560.  These injuries include both expenditures to implement and accelerate implementation of state legislation regulating ghost gun parts, as well as the expenditure of increased State resources to train law enforcement personnel statewide on ghost guns.  These injuries also substantiate and coincide with the State of California's independent interest in protecting the security and well-being of its residents.[4]

---

[3]  No "heightened pleading" standards apply here.  *Contra* Br. 1.  Rather, Plaintiffs must demonstrate only a "plausible" standing theory and need show only that "the government's unlawful conduct 'is at least a substantial factor motivating the third parties' actions.'"  *Mendia v. Garcia*, 768 F.3d 1009, 1013-14 (9th Cir. 2014) (citation omitted); *accord Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 901 (9th Cir. 2011) (holding that a plaintiff "need not eliminate any other contributing causes to establish its standing").

[4]  The State of California does not argue, as Defendants suggest, Br. 10, that the State's general responsibility for its residents directly confers standing, but instead that the State's injuries (as established below) are sufficiently concrete that the State can assert, as an additional basis for standing, its "'quasi-sovereign interest in the health and well-being . . . of its residents in general.'"  *See Sierra Club*, 977 F.3d at 866 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)).

Like all states, the State of California is "'entitled to special solicitude in [the] standing analysis.'" *See Sierra Club*, 977 F.3d at 866 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)).

ATF's determinations allowing the sale of 80 percent receivers and frames to go unregulated, outside the scope of the GCA, have facilitated the ghost gun epidemic's severe impact on the State of California. California is home to nearly a quarter of the ghost gun retailers Plaintiffs are aware of—18 of 80, Compl. ¶ 93—and its residents, including law enforcement officers, have repeatedly been victimized in recent years in devastating incidents involving ghost guns, *see*, *e.g.*, Compl. ¶¶ 98, 101. Recognizing that the status quo was unacceptable, the California Legislature has attempted to close the loophole created by ATF's flawed decisions by enacting legislation to protect its residents from ghost guns. In particular, the Legislature enacted two relevant statutes: A.B. 857 (Cal. 2016), which requires self-assembled firearms to be stamped with unique serial numbers provided by the California Department of Justice, and also requires those possessing unserialized firearms to apply to the Department for serial numbers; and A.B. 879 (Cal. 2019), which requires sales of unfinished frames and receivers to be conducted through licensed dealers, subject to a California-only background check and sale record. Compl. ¶ 97. In the wake of the tragic deaths of two law enforcement officers allegedly shot with ghost guns, the Legislature enacted S.B. 118 (Cal. 2020) to implement A.B. 879 beginning on July 1, 2022—three years earlier than originally planned. Compl. ¶ 98.

The State of California has incurred, and will continue to incur, costs to implement this legislation, which was necessary in large part because ATF has exercised its duty to regulate ghost gun parts in an unlawful manner. In last year's budget bill, for example, the Legislature approved $5.9 million in FY 2020-21 and $8.3 million in FY 2021-22 for the California Department of Justice's Bureau of Firearms and California Justice Information Systems (CJIS) to retain additional staff and extend the Department's existing firearms systems, including those systems used for California-only background checks. Compl. ¶ 98 (citing S.B. 74 (Cal. 2020), which includes the referenced funding in item 0820-001-0001); Ex. A[5] [State of California Budget Change Proposal dated May 14, 2020] at 2, 6-8. When requesting this allocation, the Department recognized that "tak[ing] no action" to implement

---

[5] Citations to "Ex. A" are to the Declaration of Avi Weitzman in Support of Plaintiffs' Opposition to the Motion to Dismiss (December 30, 2020).

A.B. 879 was not a "[f]easible [a]lternative[]" because it would prevent the Department from "track[ing] the sale of precursor parts," which, in turn, would "endanger[] public safety." *Id*. at 8. These expenditures were thus "'reasonably incur[red] costs to mitigate or avoid' a 'substantial risk' of harm." *State of California v. Ross*, 358 F. Supp. 3d 965, 1004 (N.D. Cal. 2018) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5, in holding that California's "expenditures on census outreach to attempt to mitigate" the effects of the federal government's decision to add a citizenship question to the 2020 census were "sufficient to establish injury-in-fact for standing purposes").

Defendants argue that these expenditures do not confer standing because they are "'self-inflicted.'" Br. 9 (quoting *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976)).[6] But the Ninth Circuit rejected that same argument in *California v. Azar*, 911 F.3d 558 (2018). There, the dissent, citing *Pennsylvania v. New Jersey*, suggested that, rather than having been caused by the federal government's proposed rule, California's economic injuries were self-inflicted because California "voluntarily chose" to enact legislation "to provide money for contraceptive care to its residents through state programs." *Id*. at 573-74. The Ninth Circuit held otherwise. The Court first expressed doubt that "the holding of *Pennsylvania* applies outside the specific requirements for the invocation of the Supreme Court's original jurisdiction." *Id*. at 574. The Court then concluded that, even if *Pennsylvania*'s reasoning extends beyond original jurisdiction cases, California's rising contraceptive coverage costs were "not 'self-inflicted' within the meaning of *Pennsylvania*." *Id*. While Pennsylvania's legislation "directly and explicitly" subjected the state's finances to New Jersey's laws (by providing tax credits in equal value to New Jersey's taxes on nonresident income), California's contraceptive coverage laws were "not so tethered to the legislative decisions of other sovereigns." *Id*. In short, the federal government's proposed rule, not California's legislation, was the source of the State's injury.

So too here. ATF's determinations are the source of the State of California's injury, not the State's legislation, which was enacted because the State lacked a viable alternative to protect its residents. Because the State of California "need[ed] to ensure state regulatory compliance to fill the

---

[6] Defendants do not contest that "[f]or standing purposes, a loss of even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).

9

regulatory gap . . . created" by the absence of federal enforcement, it has stated "an injury in fact." *See State of California v. Bureau of Land Mgmt.*, 2020 WL 1492708, at \*4 (N.D. Cal. Mar. 27, 2020), *appeal docketed*, No. 20-16157 (9th Cir. June 12, 2020).[7]

The proliferation of ghost guns resulting from ATF's determinations has also compelled the State of California to shift valuable law enforcement resources toward statewide training on ghost guns. Compl. ¶ 94. That ghost guns are more difficult to trace than serialized firearms is not disputed. Compl. ¶ 38. Nor is the steep rise of ghost guns in California—and the role that unserialized firearms have played in recent tragedies throughout the state. *See*, *e.g.*, Compl. ¶¶ 94, 96; Br. 8 (citing Compl. ¶¶ 53-56, 98, 101). The experience of the California Department of Justice's Bureau of Firearms agents in the field is consistent with these trends. Compl. ¶ 94 (citing *State of Washington v. U.S. Dep't of State*, 2:20-cv-00111-RAJ (W.D. Wash.), ECF No. 56 [Decl. of Blake Graham] ¶ 30). Because of the prevalence of ghost gun crime in California, Bureau of Firearms staff have devoted increasing resources to training law enforcement personnel statewide on ghost guns. Compl. ¶ 94. These "reasonably incurred" expenditures further confer standing. *See Ross*, 358 F. Supp. 3d at 1005.

Defendants do not seriously contest that ghost guns pose a danger to California's residents. Instead, they maintain that the connection between ATF's determinations and the spread of ghost guns and rising ghost gun crime throughout the state is a "chain of unsupported speculation." Br. 10-11. But a causal chain "does not fail simply because it has several 'links.'" *Azar*, 911 F.3d at 571-72 (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011)); *see also Mendia*, 768 F.3d at 1012 ("[C]ausation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain.") (citing *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)). What "matters is not the 'length of the chain of causation,' but rather the 'plausibility of the links that comprise the chain,'" *Nat'l Audobon Soc'y v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002) (citations

---

[7] Defendants similarly argue that "where 'nothing requires the State[]' to incur expenditures, its voluntary choices to do so cannot give rise to standing." Br. 10 (quoting *Maryland v. U.S. Dep't of Educ.*, 2020 WL 4039315, \*14 (D.D.C. July 17, 2020)). But the opinion they cite has been vacated. *Maryland v. U.S. Dep't of Educ.*, No. 20-5268 (D.C. Cir. Dec. 22, 2020). In any event, *Azar* controls here.

1  omitted), and whether the "government's unlawful conduct is at least a substantial factor motivating

2  the third parties' actions," *Mendia*, 768 F.3d at 1013 (internal citations and quotations omitted).

3      Here, the State of California's "theory of standing" rests not on "mere speculation" but on "the

4  predictable effect of Government action on the decisions of third parties." *See Dep't of Commerce v.*

5  *New York*, 139 S. Ct. 2551, 2566 (2019).  It is reasonable (if not inescapable) to conclude that, as a

6  result of the ATF's determinations that 80 percent receivers and frames are not regulated by the GCA,

7  ghost gun distributors have been freely selling ghost gun parts to prohibited persons who use them in

8  criminal activity—and that the State of California has reasonably incurred expenditures to address this

9  problem.  *See Azar*, 911 F.3d at 572 (finding standing where there was a "reasonable probability" that

10  a chain of events would "result in economic harm to the [plaintiff] states").  Indeed, the Complaint lays

11  out overwhelming proof supporting this chain of causation. Compl. ¶¶ 93-103.[8]

12      A decision setting aside ATF's determinations would redress the State of California's injuries.

13  Although the State of California's carefully crafted regulatory scheme will mitigate some of the State's

14  injuries, the absence of federal regulation allows ghost guns and the myriad dangers that attend them

15  to flow more freely across California's borders from other states.  That the remedy Plaintiffs seek may

16  not solve the entire problem, Br. 11-12, does not defeat redressability.  Plaintiffs need only show that

17  "*an* injury"—not "*every* injury"—is redressed by a favorable decision.  *Larson v. Valente*, 456 U.S.

18  228, 243 n.15 (1981).  The State of California has met that requirement here.

19      **2.    Bryan Muehlberger and Frank Blackwell**

20      Mr. Muehlberger and Mr. Blackwell each assert two ongoing injuries that provide standing to

21  seek prospective relief.  *First*, Messrs. Muehlberger and Blackwell experience ongoing psychological

22  harm, for which they both undergo regular therapy, as a result of  "liv[ing] in acute fear of ghost gun

23  violence."  Compl. ¶ 105; *see also* Compl. ¶¶ 107, 110-11.  Such ongoing psychological harm, which

24  Defendants do not even attempt to address, is plainly cognizable.  *See, e.g.*, *Chaudhry v. City of Los*

25  *Angeles*, 751 F.3d 1096, 1109 (9th Cir. 2014); *Elliott v. QF Circa 37, LLC*, 2017 WL 6389775, at *6

---

[8]  Defendants' claim that this chain of causation is based on "speculation" is a direct result of ATF's failure to track the sale of 80 percent receivers and frames.  Defendants should not be permitted to challenge standing based on their own unlawful determinations.

(S.D. Cal. Dec. 14, 2017).  For example, in *Powell v. Illinois*, the court found that guardians of children who lived in a Chicago neighborhood suffering from a high rate of gun violence had standing to seek an injunction "requiring defendants to promulgate regulations designed to curb future gun violence on Chicago's streets" based on the guardians' allegations that "exposure to gun violence on a daily basis contributed substantially" to their children's ongoing psychological trauma, including Post-Traumatic Stress Disorder and "problems at home and school."  2019 WL 4750265, at *3, 7 (N.D. Ill. Sept. 30, 2019).  The court noted the "trauma each child suffered in the past" was relevant to "frame this ongoing injury."  *Id.* at *7.  The court rejected defendants' argument that such harm was a generalized grievance: "It is reasonable to infer that the concentrated violence begets trauma and the psychological and behavioral injuries described in the complaint."  *Id.*

Similarly, here, the Individual Plaintiffs have established that their psychological harm is a "direct response to the increased risk of violence [they] face[]" and the underlying trauma they have experienced "as a result of the proliferation of these untraceable weapons in the area [where they] live[] and work[]."  Compl. ¶¶ 106, 110.  Both Individual Plaintiffs are acutely "aware of the spread of ghost guns in Los Angeles County" and therefore "fear[] that individuals that [they] and [their] famil[ies] encounter in places like restaurants and coffee shops may be in possession of ghost guns."  Compl. ¶¶ 106, 110.  Messrs. Muehlberger and Blackwell also constantly worry that their children could become victims of ghost gun violence just like their late daughter and son, respectively.  Compl. ¶¶ 106, 111.  The Individual Plaintiffs' past trauma "frames" their ongoing psychological harm and ensures their ongoing injuries satisfy Article III.  *Powell*, 2019 WL 4750265, at *7.

*Second*, the Individual Plaintiffs' increased risk of suffering from future ghost gun violence as a result of living and working in areas that experience disproportionate rates of such violence also independently qualifies as an injury-in-fact.  Courts have commonly found that an increased risk of future injury is cognizable.  *See, e.g., Lujan*, 504 U.S. at 562-63; *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 231 (1986); *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996).  For example, in *Brady Campaign to Prevent Gun Violence United with the Million Mom March v. Ashcroft*, the court found that Brady had standing to bring a lawsuit "challeng[ing] [an] ATF policy [that] increase[d] the risk . . . of violent [semi-automatic weapon ('SAW')] crimes" on

behalf of members who "live[d] in neighborhoods where violent crimes involving SAWs occur at higher than average rates" and thus experienced an "increas[ed] [] risk of violent SAW crimes."  339 F. Supp. 2d 68, 75-76 (D.D.C. 2004).  The court reasoned that finding "the risk of injury by a SAW" not cognizable would "gut the requirement of a 'concrete and particularized' injury, reducing standing doctrine to a set of distinctions without differences turning on each particular judge's view of whether or not a certain type of injury should qualify for judicial attention."  *Id*. at 76.  Brady had standing because its "members have particular, personal reasons to fear that they may be particularly susceptible to SAW-related violent crime."  *Id*. at 76.  Here, the Individual Plaintiffs are similarly situated: they live and work in the epicenter of the nation's ghost gun epidemic in communities that suffer from disproportionate rates of ghost gun violence—violence they themselves have personally experienced to devastating effect.  Compl. ¶¶ 93-112.

In response, Defendants argue that "[t]he Complaint lacks any specific allegations" that Mr. Muehlberger and Mr. Blackwell are "'realistically threatened' by an actual likelihood they—or their surviving family members—will be the victims of a crime committed with an unserialized firearm made from a receiver blank."  Br. 12-13 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)).[9]  But the Individual Plaintiffs are not required to have a crystal ball predicting the future, and their standing cannot be denied merely because they cannot show that they or their children *are likely* to be harmed by ghost guns *again*.  No court has ever so held.[10]  *See Powell*, 2019 WL 4750265, at *3, 6.  That the only decision Defendants cite was on summary judgment[11] makes clear that Plaintiffs

_____

[9]  *Lyons* is inapposite.  There, the plaintiff failed to demonstrate that he would likely suffer any future harm because he had failed to demonstrate that the police practice he challenged— unlawful chokeholds—was a widespread practice likely to recur.  461 U.S. at 110.

[10]  Even more tenuously, Defendants argue that Plaintiffs must show they will be victims of a violent crime "carried out with a firearm made from one of the receiver blanks at issue in this lawsuit."  Br. 13.  But in *Ashcroft*, the court did not require proof that the plaintiffs would suffer violence with one of the specific grandfathered SAWs at issue.  339 F. Supp. 2d at 72.  Here, Defendants rely on a single, unpublished, out-of-circuit case involving a challenge to a particular individual's future conduct, not a regulatory challenge to cure widespread harm to Plaintiffs.  Br. 13 (citing *Happe v. Lloyd*, 2 F. App'x 519, 521 (7th Cir. 2001) (plaintiff lacked standing to remove particular prosecutor from future trials involving the plaintiff)).

[11]  In *Eggar v. City of Livingston*, 40 F.3d 312 (9th Cir. 1994), the court considered a challenge to local practices of jailing indigent defendants without counsel.  In affirming summary judgment,

here—"[a]t the pleading stage," *Lujan*, 504 U.S. at 561—have alleged sufficient facts to confer standing. *See Syed v. M-I, LLC*, 853 F.3d 492, 499 n.4 (9th Cir. 2017). Plaintiffs' increased risk of harm—given that they live and work in areas with widespread ghost gun violence and informed by their severe and traumatic losses—is plainly sufficient to establish standing. *See Ashcroft*, 339 F. Supp. 2d at 75; *Powell*, 2019 WL 4750265, at *7.

The Individual Plaintiffs' injuries are "fairly traceable" to ATF's decisions to allow 80 percent receivers and frames to be sold and used in future crimes. Compl. ¶¶ 108, 112; *see also Bennett*, 520 U.S. at 168–69 (defendant's conduct need not be "the very last step in the chain of causation"). Such actions had a "predictable effect . . . on the decisions of third parties" in that ATF's determinations allowing companies to sell profitable, untraceable weapons unsurprisingly result in those companies doing just that. *New York*, 139 S. Ct. at 2566 (2019); *see also Bennett*, 520 U.S. at 168–69 (causation can be "produced by [a] determinative or coercive effect upon the action of someone else."); *Powell*, 2019 WL 4750265, at *9–10. Indeed, distributors and manufacturers of 80 percent receivers and frames even use ATF's decisions as marketing tools, and ghost guns have become the "weapon of choice" for criminals, gangs, and illegal gun traffickers. Compl. ¶ 3. These third-party actions—which harm Plaintiffs—are the predictable result of ATF's decisions to bless these ghost guns as legal and beyond the GCA's prescriptions. Compl. ¶¶ 36, 55-59.

Defendants contend that the Complaint does not include "a specific allegation that the weapon [used in the Saugus High School killings] was made from a receiver blank that ATF classified as a firearms part." Br. 13. That is a straw man. Messrs. Muehlberger and Blackwell do not here assert damages claims based on the deaths of their children. Plaintiffs thus need not establish a fear or increased risk of being harmed by the same 80 percent frame used to build the Saugus shooter's gun. Instead, the proper question is whether the "ATF policy [] contribute[s] to the increased risk of [ghost gun] violence precipitated by the net increase in the number of available [ghost guns]." *Ashcroft*, 339 F. Supp. 2d at 77; *accord Mendia*, 768 F.3d at 1013. Here, ATF's actions have increased the prevalence

the court found that whether the plaintiff "will commit future crimes in the City, be indigent, plead guilty, and be sentenced to jail is speculative." *Id.* at 317.

1   of ghost guns, causing palpable, ongoing harms to Mr. Muehlberger and Mr. Blackwell. That is

2   sufficient to plead Article III standing.

3       Although the loss of their children can never be remedied, Messrs. Muehlberger and

4   Blackwell's *ongoing* injuries are redressable. Vacating ATF's ghost gun determinations would result

5   in a significant reduction in the supply of ghost guns and a guarantee that ghost guns will not be lawfully

6   sold to those most likely to harm innocent individuals, thereby tangibly reducing Plaintiffs' ongoing

7   trauma and their risk of suffering injury from ghost guns in the future. *See Massachusetts*, 549 U.S. at

8   526 (stating that redressability only requires that the "risk [of harm] would be reduced to some extent

9   if [Plaintiffs] receive[] the relief they seek").[12]

10       **3.    Giffords Law Center to Prevent Gun Violence**

11       Giffords has standing to sue because "ATF's actions have forced [it] to adjust many of its

12   organizational priorities and divert substantial resources to combat ghost guns and resulting violence."

13   Compl. ¶ 115. An organization satisfies Article III's injury-in-fact requirement if it can demonstrate:

14   "(1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular

15   [conduct] in question." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). In

16   doing so, an organization must only establish that its activities have been "perceptibly impaired."

17   *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also United States v. Students*

18   *Challenging Regulatory Agency Procedures*, 412 U.S. 669 (1973) ("[A]n identifiable trifle is enough

19   for standing."). Applying this standard, the Ninth Circuit has consistently found that organizations

20   have standing where they have "expend[ed] additional resources" to combat the challenged practices

21   than "they would have spent . . . to accomplish other aspects of their organizational missions." *Nat'l*

22   *Council of La Raza v. Cegavske*, 800 F.3d 1032, 1039 (9th Cir. 2015); *see also Comite de Jornaleros*

23   *de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943-44 (9th Cir. 2011) (organization

24   diverted resources because of challenged ordinance). Giffords satisfies these requirements.

25

26

27   —————————————

28   [12] The redressability cases that Defendants cite, Br. 13 (citing *Munns v. Kerry*, 782 F.3d 402 (9th Cir. 2015), and *Clapper*, 568 U.S. at 414 n.5), address attenuated theories that are inapplicable here.

*First*, Defendants' challenged conduct frustrates Giffords' mission "to save lives from gun violence by shifting culture, changing policies, and challenging injustice." Compl. ¶ 113. "ATF's regulatory classification undermines every other firearm policy that Giffords . . . advocates for," including "the organization's core policy platform of supporting background check and licensing laws at the federal and state level." Compl. ¶ 114. It does so by "creat[ing] a loophole by which buyers can evade all otherwise applicable firearm sales regulations," which "for[ces] Giffords [] to redouble its violence prevention efforts and direct even more resources into addressing gun violence even in states with strong firearm laws, like the organization's home state of California." Compl. ¶ 114.

In response, Defendants argue that Giffords' mission of saving lives is an "abstract social interest," Br. 8, and that Giffords "manufacture[d] [an] injury" by "simply choosing to spend money" related to the challenged classifications, Br. 7, 8. But efforts to save lives are not "abstract social interests." *See*, *e.g.*, *Ashcroft*, 339 F. Supp. 2d at 75 ("[T]here can be no doubt" that "[semiautomatic weapon]-related violence" is both "actual" and "concrete and particularized."). The case that Defendants cite, *Mecinas v. Hobbs*, 468 F. Supp. 3d 1186 (D. Ariz. 2020), is inapposite. There, the court determined that an alleged "unfair . . . advantage to Republicans" in Arizona during an election was "abstract," given that the plaintiffs "acknowledge[d] that despite [the challenged conduct], they plan[ned] to expend significant time and resources in Arizona." *Id*. at 1200, 1205. Unlike in *Mecinas*, Giffords has shown that its "resources [are] being diverted from other states" to states like California that have strict gun laws but are disproportionately impacted by ghost gun violence. *Id*. at 1205. That suffices for standing purposes. *Comite de Jornaleros*, 657 F.3d at 943-44; *Smith*, 358 F.3d at 1105.

Defendants' argument that Giffords manufactured its injury is likewise misplaced. Giffords has a mission, and when the ATF's actions affect its mission, Giffords must react responsibly by diverting resources. That is far from the type of "manufactured . . . injury" discussed in *ATLF v. Lake Forest*, 624 F.3d 1083 (9th Cir. 2010), on which Defendants rely. There, the court warned about a manufactured injury where an organization "incur[s] *litigation* costs or simply choos[es] to spend money fixing a problem that otherwise would not affect the organization at all." *Id*. at 1088 (emphasis added). Neither situation is implicated here. The ghost gun problem strikes at the core of Giffords'

mission because the organization's entire *raison d'etre* is to save lives from the very type of gun violence ATF's actions have allowed.  Compl. ¶¶ 113-15.

Second, Plaintiffs allege that Giffords has diverted substantial resources to combat Defendants' actions.  Those include financial resources and "human capital" used to provide "technical assistance" to monitor "over 100 state and federal bills pertaining to ghost guns," Compl. ¶¶ 113-15; "support [] violence intervention programs in communities disproportionately impacted by gun violence and ghost gun violence," Compl. ¶ 115; and "launch[] a series of specific ghost gun initiatives, including drafting proposed legislation, publishing white papers, and helping produce videos and other educational materials for the public," Compl. ¶ 113.  In doing so, Giffords has not been "simply going about [its] 'business as usual,'" *Cegavske*, 800 F.3d at 1040-41, but has altered fundamentally its resource allocation specifically to combat the ghost gun epidemic that ATF has created, *see Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013).

Defendants' suggestion that Giffords lacks standing because it engages in "lobbying, policymaking, and carrying out legal activities related to gun control" is meritless, and Defendants cite no case so holding.  Br. 7.  The Ninth Circuit has commonly found that the "diversion of resources" prong is met when particular laws frustrate an organization's purpose.  Take *Cegavske*, where the court found that three civil rights groups had standing to challenge the State government's violation of a federal law requiring states "to distribute voter registration materials and to make assistance available to people who visit . . . public assistance offices."  800 F.3d at 1034-35.  The groups diverted their resources when they spent additional funds on voter registration drives in communities where public assistance should have been offered—resources that otherwise "would have [been] spent on some other aspect of their organizational purpose," like "registering voters the [federal law's] provisions do not reach, increasing their voter education efforts, or any other activity that advances their goals."  *Id*. at 1040; *see also Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1224 (9th Cir. 2012) ("organizations that shared [the] core mission of eliminating housing discrimination in their communities" could bring action against online roommate-matching website to challenge demographic sorting and steering of users); *Smith*, 358 F.3d at 1105 (organization dedicated to "eliminat[ing] discrimination against individuals with disabilities by ensuring compliance with

[accessibility] laws" could sue real estate developer who constructed properties in violation of those laws). The organizational injury that Giffords is experiencing here is no different; Giffords has been deprived of the opportunity to expend resources that would have been "allocate[d] . . . to other activities central to its mission." *Cegavske*, 800 F.3d at 1037. The sole case that Defendants cite in support of their argument is irrelevant because Giffords has not alleged that it has suffered injury as a result of activities that are "a normal function of their advocacy" or "business as usual." *See Sabra v. Maricopa Cty. Comty Coll.*, 2020 WL 4814343, at *4 (D. Ariz. Aug. 18, 2020). Giffords has standing.

### B.       Plaintiffs Adequately Allege that Defendants Violated the APA

Under the APA, a court "shall" set aside final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 945 (9th Cir. 2010). To ensure agency actions are lawful, a court must conduct a "thorough, probing, in-depth review" of the agency's reasoning and a "searching and careful" inquiry into the factual underpinnings of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971). Here, ATF has regulated ghost guns in concededly "final" actions, Br. 14, that both (1) conflict with the GCA and (2) are arbitrary and capricious. *See* Compl. ¶¶ 63-91, 117-131.

### 1.       Plaintiffs Challenge Determinations Made Within the Statute of Limitations

Plaintiffs challenge agency actions that occurred within the six-year statute of limitations. *United States v. Estate of Hage*, 810 F.3d 712, 720 (9th Cir. 2016) (citing 28 U.S.C. § 2401(a)); Compl. ¶¶ 86, 118, 123-267, 133. Defendants argue that Plaintiffs' claims more broadly challenge "an unspecified set" of classification letters. Br. 14. They are mistaken. Although the Complaint references other classification letters, both of its claims contest the "Classification Letters to Polymer80 and the Ghost Gun Guidance" only. Compl. ¶¶ 118, 133. Defendants similarly assert that Count Two challenges ATF's shift in 2006 from a temporal approach to a mechanical approach of analyzing 80 percent receivers and frames. Br. 14. Not so. To be sure, Count Two includes allegations that ATF's "post-2006 approach to 80 percent receivers informs ATF's analysis." Compl. ¶ 137. But Count Two does not contest any 2006 determination itself; Plaintiffs only challenge the Polymer80 "Classification Letters and the Ghost Gun Guidance" as "arbitrary and capricious." Compl. ¶ 142. Nor is there any

dispute that these Polymer80 Classification Letters and the Ghost Gun Guidance are within the six-year limitations period.  Because the Complaint makes clear the acts that Plaintiffs challenge, they have met their pleading burden.  *See*, *e.g.*, Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### 2.     ATF's Interpretation of the GCA Is Both Wrong and Unreasonable

#### a.     ATF Is Not Entitled to *Chevron* Deference

ATF's statutory construction—adopted in informal decisions made without any notice-and-comment procedure—is not entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See United States v. Mead Corp.,* 533 U.S. 218, 232-33 (2001).  Whether an agency's statutory construction is entitled to deference "depends on the *form and context* of [its] interpretation."  *Price v. Stevedoring Servs. of Am., Inc*., 697 F.3d 820, 826 (9th Cir. 2012) (emphasis added); *see Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002).  In *Mead*, the Supreme Court determined that statutory interpretation in letters issued by the U.S. Customs Service "setting tariff classifications for particular imports" was *not* entitled to *Chevron* deference.  533 U.S. at 221 (holding that "classification rulings" should analyzed under *Skidmore v. Swift & Co,* 323 U.S. 134 (1944)).  In its analysis, the Supreme Court explained that "classification rulings are best treated like 'interpretations contained in policy statements, agency manuals, and enforcement guidelines.'"  *Mead*, 533 U.S. at  220 (quoting *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000)).  Because such letters can usually be modified without notice-and-comment or formal administrative procedures, *id.* at 233, "[t]hey are beyond the *Chevron* pale," *id.* at 234.  *See also Price*, 697 F.3d at 826-87.

The statutory interpretation here—in Classification Letters and the Ghost Gun Guidance—is no different.  ATF itself states that classification letters are "generally to be relied upon by their recipients" but are "subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations."  ECF 1-1 § 7.2.4.1.  That classification letters are "subject to change" shows that they lack the required "force of law" for which *Chevron* deference is appropriate.  *Mead*, 533 U.S. at 226-27.  Moreover, as with the classification letters in *Mead*, the form of the statutory interpretation here—offered in brief letters or informal website FAQs—only confirms that they are unworthy of deference.  *Price*, 697 F.3d at 826.  In fact, two courts have already concluded that ATF classification

letters are not entitled to *Chevron* deference, and Defendants cite no case to the contrary.[13]   *See McCutchen v. United States*, 145 Fed. Cl. 42, 47 (2019); *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14, 21-22 (D.D.C. 2014).  One such court held that classification letters are "brief and informal document[s]" entitled only to *Skidmore* deference, *id.*, under which an agency's interpretation receives deference only where its interpretation is itself "persuasive."  *Mead*, 533 U.S. at 221.

### b.   80 Percent Frames and Receivers Are "Firearms" Under the GCA

"The purpose of statutory construction is to discern the intent of Congress in enacting a particular statute."  *Robinson v. United States*, 586 F.3d 683, 686 (9th Cir. 2009) (citation omitted); *accord Encino*, 136 S. Ct. at 2124-25.  Here, the GCA's relevant portions are unambiguous:

> The term "firearm" means (A) any weapon (including a starter gun) which will or *is designed to or may readily be converted* to expel a projectile by the action of an explosive; (B) *the frame or receiver of any such weapon*; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3). (emphasis added).  Any "weapon" that "may be readily converted to [] expel a projectile" *and* "the frame or receiver of *any such weapon*" qualify as GCA-regulated "firearms."  *Id.* (emphasis added). The receivers and frames in subsection B include not only items presently configured to fire, but also the items "designed to or [that] may readily be converted" into operable firearms in subsection A.  *See Bonin v. Calderon*, 77 F.3d 1155, 1161 (9th Cir. 1996) ("any such proceeding" in a statute "refers back" to an earlier phrase).  This includes readily converting the receiver itself into an operable firearm.  Indeed, in a criminal prosecution in this circuit, the government charged a defendant with unlawfully dealing in "firearms" without a license where the defendant was distributing "demilled" receivers—those that had been cut into pieces—in violation of 18 U.S.C. § 922(a)(1)(A).  *United States v. Wick*, 2016 WL 10637098, at *1 (D. Mont. July 1, 2016), *aff'd on other grounds*, 697 F. App'x 507 (9th Cir. 2017).  Interpreting § 923(a)(3) broadly, the court agreed with the government's position that even a receiver cut into pieces constitutes a firearm because "if the receiver of a weapon can be readily converted to expel a projectile, then that receiver can be considered

---

[13]  *P.W. Arms, Inc. v. United States*, 2016 WL 9526687 (W.D. Wash. 2016), did not concern "classification letters"; rather, it involved a "special advisory" issued by ATF.  *Id.* at *1.

a 'firearm' under the statute." *Id.* (government relied on testimony from firearms expert Michael Curtis (a Defendant here) that "an average to good welder" could create a completed receiver in 30 to 45 minutes). And Defendant Department of Justice has *already* acknowledged that the broad and inclusive "designed" and "readily be converted" language in subsection (A) of § 921(a)(3) applies to frames and receivers that qualify as firearms in subsection (B), arguing that "a receiver, even one in two or three pieces, that can readily be converted into a functioning gun with the addition of some other parts and a weld or two ***is a firearm***." Answering Br. of the United States, *United States v. Wick*, 2017 WL 774210 (Feb. 22, 2017) (emphasis added).

The words "designed," "readily," and "converted" must be given their "ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). The parties appear to largely agree on the meaning of those words. "Design" was and is ordinarily understood to mean "to plan or have in mind as a purpose." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 611 (1965). Defendants offer no contrary definition. As Defendants concede, "convert" means "to 'change from one form or use to another.'" Br. 16. And Defendants argue that the word "readily" "means something that can be done 'without delay' and 'quickly,' or 'without difficulty,'" *id.*, and that "a relatively simple operation taking only a few minutes is" "readily convertible," *United States v. 16, 179 Molso Italian*, 443 F.2d 463 (2d Cir. 1971).

These definitions make clear that Defendants' conclusion that 80 percent receivers and frames are *not* firearms is both wrong and (in the unlikely event *Chevron* deference applies) unreasonable. Defendants concede that "receiver blanks" (or 80 percent receivers or frames) are "'designed to' be a receiver." Br. 17 n.15. They also concede that an 80 percent frame or receiver can be "converted" or "change[d] from one form . . . to another" before it can "expel a projectile by the force of an explosive." Br. 16 (quoting Webster's and 18 U.S.C. § 921(a)(3)). Although Defendants argue that 80 percent receivers cannot "readily" be converted because of the "complexity" and "skill" required, Br. 18, that contention defies the well-pled allegations of Plaintiffs' Complaint, which state that ghost guns can be readily converted in minutes with common household tools, and that manufacturers even advertise the ease and speed with which their products can be readily converted. *See, e.g.*, Compl. ¶¶ 2, 10, 16, 47, 64, 76, 123; ECF No. 46-8 at 2 ("you can build [a functioning pistol] in 10-15 minutes"). These

concessions alone doom the determinations in Defendants' Classification Letters and Ghost Gun Guidance because a receiver of any weapon which is "designed to or may readily be converted" into a fireable gun is itself a firearm subject to the GCA.  *See* 18 U.S.C. § 921(a)(3)(A), (B).[14]

Defendants' recent search warrant affidavit used to justify ATF's raid on Polymer80's Nevada offices severely undermines Defendants' position in this case.  Here, Defendants suggest that the ghost gun DIY process requires "numerous steps" and must be performed "without indexing" (the inclusion of "visual or physical indicators" of where machining must be conducted), rendering these products *not* "firearms" under the GCA.  Br. 17.  But in Nevada, ATF's own search warrant makes clear that the ghost guns at issue there can be assembled in minutes and therefore *do* qualify as readily convertible weapons subject to the GCA.  Affidavit at 4; *accord* Compl. ¶¶ 2, 10, 16, 47, 64, 76, 123; *see also* Br. 18 (contending that "'readily' has two components that must be met:  simplicity and speed").  The ghost gun products at issue in this case, like those in the Nevada matter, manifestly *are* designed to function as and *are* "readily convertible" into fireable weapons.[15]

Even if ATF were entitled to deference (it is not), its interpretation of the GCA is not just wrong but unreasonable.  *See Chevron*, 467 U.S. at 842-43.  "Congress . . . *sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous.*  These persons are comprehensively barred by the Act from acquiring firearms by any means."  *Barrett v. United States*, 423 U.S. 212, 218 (1976) (emphasis added).  Concluding that 80 percent receivers and frames are *not* firearms contravenes the GCA's text and purpose.

---

[14] Defendants' confusing argument that "a receiver blank is not a receiver" because it "does not yet 'provide[] housing for the hammer, bolt, or breechblock, and firing mechanism,'" Br. 19, ignores the "designed to or may be readily be converted" language in Section 921(a)(3).  As Defendants concede, ATF has concluded that other unfinished receivers are "firearms."  Br. 23.

[15] Defendants cannot credibly assert that their position in the criminal investigation of Polymer80 is consistent with their position here.  While the search warrant primarily focuses on Polymer80's "Buy Build Shoot" kits, the ATF affiant acknowledged that even without a kit, customers can purchase all "the necessary parts in one transaction," including an 80 percent receiver, from Polymer80's website.  Affidavit ¶ 48.  In short, it is not the "kit" that renders these ghost guns "firearms" but the 80 percent receivers and frames themselves.  And, in light of the positions taken in the Affidavit, the government should be estopped from arguing to the contrary.  *Cf. Mangaoang v. Special Default Servs., Inc*., 427 F. Supp. 3d 1195, 1207 (N.D. Cal. 2019) (judicial estoppel appropriate where party takes "inconsistent positions" in separate litigations).

### 3.   ATF's Interpretations Are Arbitrary and Capricious

An agency must "examine the relevant data" and "consider[] . . . the relevant factors" before taking final action.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).  Agency decisions are arbitrary and capricious when they "entirely fail[] to consider an important aspect of the problem" implicated by the agency decision.  *Id.*; *see also Natural Resources Defense Council v. Kempthorne*, 506 F. Supp. 2d 322, 370 (E.D. Cal. 2007). This means that the agency must "pay[] attention to the advantages *and* the disadvantages of agency decisions."  *Michigan v. EPA*, 576 U.S. 743, 753 (2015).  The APA requires the government to "exercise its discretion in a reasoned manner" and make discretionary decisions "based on non-arbitrary, 'relevant factors,'" *Judulang v. Holder*, 565 U.S. 42, 53, 55 (2011).  Indeed, the Supreme Court emphasized that, even where agencies retain substantial discretion, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking."  *Id.* at 53.  In such circumstances, courts "must assess, among other matters, 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  *Id.* (cleaned up).

Here, ATF, in its analysis of 80 percent frames and receivers, has "entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (explaining that an agency must "examine the relevant data" and connect "the facts found and the choice made").  ATF's findings with respect to the "machining" completed on 80 percent receivers and frames, which allow these products to fall beyond the requirements of the GCA, "fail[] to consider" multiple aspects of the underlying problem that ATF faced, including how quickly receivers and frames can be converted and how these products undermine the GCA's purposes by facilitating the proliferation of these unlawful, dangerous, untraceable weapons across the United States. *See, e.g.*, Compl. ¶¶ 132-43.  Consequently, Plaintiffs have adequately pleaded that ATF acted arbitrarily and capriciously.

The negative societal repercussions of ATF's decisions concerning receivers and frames are striking, and the Classification Letters and Ghost Gun Guidance evidence no consideration of these repercussions. *Michigan*, 576 U.S. at 751.  ATF's decisions have taken an enormous toll on local and state governments, not to mention victims of ghost gun violence and their families. Compl. ¶¶ 92-116.

By failing to hold that 80 percent receivers and frames are regulated "firearms" under the GCA, ATF's actions have caused the ghost gun market to explode.  Compl. ¶¶ 2, 12, 14, 69, 71-91.  Local and state governments have been inhibited from tracing ghost guns discovered within their borders, and prohibited possessors can easily possess firearms, directly undermining the GCA's goal.  *See, e.g.*, Compl. ¶¶ 45, 91.  ATF's decision-making and the record to date reveal no effort to evaluate these critical issues, and at a minimum, Plaintiffs are entitled to obtain the administrative record to show that ATF's decision-making is arbitrary and capricious.[16]

Defendants' brief addresses none of these issues—and instead shifts blame for the proliferation of ghost guns to "new technologies" allowing receivers and frames to be completed faster than ever before.  Br. 23.  That specious claim ignores the Complaint's allegations and ATF's *own search warrant admissions* that household tools are sufficient to complete the machining in minutes, *see* Compl. ¶ 47; Affidavit at 33-34.  Even if true, though, ATF's position only further establishes that ATF's decisions are arbitrary, because ATF has "failed to consider" the development of tools such as automating milling machines and assembly "kits" that contain all that is needed for even a novice to quickly convert an 80 percent receiver into a fully operational one.  Compl. ¶¶ 49-50.[17]

Finally, Defendants' invocation of the Second Amendment, Br. 20, only confirms that ATF's agency action is arbitrary and capricious.  Defendants' arguments that the products at issue are not "firearms" under the GCA but are simultaneously the types of "arms" that "the people [have a right] to keep and bear," *see* U.S. Const. amend II, are in tension.  In any event, the GCA restrictions at issue do not implicate any Second Amendment interest.  Courts have long considered the GCA's *de minimis*

---

[16] The Complaint's exhibits do not contradict any allegations.  *But see* Br. 21-22.  No exhibit suggests that ATF considered the negative effects of allowing these weapons into the market and the ease with which ATF was allowing prohibited purchasers to access weapons.  *See Bair v. Cal. State Dep't of Transp.*, 867 F. Supp. 2d 1058, 1065 (N.D. Cal. 2012) (courts "do not ignore an agency's failure to address factors pertinent to an informed decision").

[17] That ATF "has regulated [some] items submitted as 'unfinished receivers' under the GCA as firearms," Br. 23, does not explain why it has not regulated the 80 percent receivers and frames challenged here.

24

requirements for purchasing firearms to be consistent with the Second Amendment.[18]  And to the extent the Second Amendment motivated ATF to more freely allow the spread of ghost guns—a question of fact that requires a more complete record, not Defendants' *ipse dixit*—ATF's reliance on a flawed constitutional theory requires vacating ATF's determinations.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1896, 1915 (2020) (vacating agency action based on flawed legal theories).

# V. CONCLUSION

The Court should deny Defendants' Motion to Dismiss.

Dated: December 30, 2020                         */s  Avi Weitzman*

GIBSON, DUNN & CRUTCHER LLP
AVI WEITZMAN, *pro hac vice*
aweitzman@gibsondunn.com
LEE R. CRAIN, *pro hac vice*
LIESEL SCHAPIRA, *pro hac vice*
KAYLIE SPRINGER, *pro hac vice*
200 Park Avenue
New York, NY  10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

VIVEK GOPALAN, SBN 296156
VGopalan@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921

GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
HANNAH SHEARER, SBN 292710
268 Bush St. # 555
San Francisco, CA 94104
Telephone: (415) 433-2062

---

[18]  *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & 627 n.26 (2008) (Second Amendment does not preclude "longstanding prohibitions" and "presumptively lawful regulatory measures," such as "laws imposing conditions and qualifications on the commercial sale of arms"); *Silvester v. Harris*, 843 F.3d 816, 830 (9th Cir. 2016) (Thomas, C.J., concurring) (firearms background check and waiting requirements do not implicate Second Amendment); *United States v. Marzzarella*, 614 F.3d 85, 93-94, 101 (3d Cir. 2010).

25

1   Facsimile: (415) 433-3357

2   J. ADAM SKAGGS, *pro hac vice*
    DAVID M. PUCINO, *pro hac vice forthcoming*
3   223 West 38th St. # 90
    New York, NY 10018
4   Telephone: (917) 680-3473

5
    *Attorneys for Plaintiffs Bryan Muehlberger, Frank*
6   *Blackwell, Giffords Law Center to Prevent Violence*

7

8

9   *Dated:* December 30, 2020          */s  R. Matthew Wise*

10  XAVIER BECERRA
    Attorney General of California
11  THOMAS S. PATTERSON
    Senior Assistant Attorney General
12  MARK R. BECKINGTON
    Supervising Deputy Attorney General
13  R. MATTHEW WISE, SBN 238485
    Matthew.Wise@doj.ca.gov
14  Deputy Attorney General

15
    1300 I Street, Suite 125
16  P.O. Box 944255
    Sacramento, CA 94244-2550
17  Telephone:  (916) 210-6046
    Facsimile:  (916) 324-8835
18

19  *Attorneys for Plaintiff State of California, by*
    *and through Attorney General Xavier Becerra*
20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:20-CV-06761-EMC

1

## SIGNATURE ATTESTATION

2

3   Pursuant to Local Rule 5-1(i), I hereby attest that concurrence in the filing of the document has been
    obtained from each of the other Signatories.

4

5

6   *Dated*: December 30, 2020                              /s/      *Avi Weitzman*

7                                                                    Avi Weitzman

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:20-CV-06761-EMC