JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

DANIEL D. MAULER
(Virginia State Bar No. 73190)
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch

1100 L Street NW
Washington, DC 20005
Telephone: (202) 616-0773
FAX: (202) 616-8470
dan.mauler@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA,** *et al.*, | CIVIL CASE NO.: 3:20-CV-06761-EMC |
| Plaintiffs, | |
| v. | **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS** |
| **BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,** *et al.*, | Hon. Edward M. Chen |
| Defendants. | Hearing Date: Temporarily Vacated |

**TABLE OF CONTENTS**

I. INTRODUCTION AND SUMMARY ........................................................................................ 1

II. ARGUMENT .............................................................................................................................. 1

    A. Plaintiffs Fail to Demonstrate Standing. ........................................................................ 1

        1. The State of California Fails to Demonstrate an Injury. .................................... 1

        2. The Individual Plaintiffs Present a Generalized Fear of Future Crime............. 3

        3. The Organizational Plaintiff Fails to Demonstrate a Diversion of Resources. ............................................................................................................ 4

    B. Plaintiffs Fail to Adequately Allege Claims under the APA. ......................................... 5

        1. Plaintiffs' Challenges to ATF Determinations Made More than Six Years Ago Are Barred by the Statute of Limitations. ........................................ 5

        2. ATF's Interpretation of the GCA Is Both Correct under the Statute and Reasonable under the Circumstances. ................................................................. 5

            a. The Statutory Text Supports ATF's Determination. ............................ 5

            b. ATF's Interpretation Prevails, Regardless of the Level of Deference. ............................................................................................... 8

            c. Plaintiffs' Arbitrary-and-Capricious Claim Fails in Light of the Exhibits Attached to the Complaint. ...................................................... 9

            d. Plaintiffs' Reliance Upon an Ongoing Investigation of Polymer80 Undercuts their Arbitrary-and-Capricious Claims. .......... 10

            e. Plaintiffs' Own Interpretation of the GCA Fails Arbitrary-and-Capricious Analysis. .......................................................................... 11

III. CONCLUSION ....................................................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*City and County of San Francisco v. USCIS*,
   944 F.3d 773 (9th Cir. 2019) ................................................................................................. 8

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................................................... 4

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ............................................................................................................. 11

*El Paso Cty., Texas v. Trump*,
   982 F.3d 332 (5th Cir. 2020) ................................................................................................. 4

*Firearms Import/Export Roundtable Trade Group v. Jones*,
   854 F. Supp. 2d 1 (D.D.C. 2012) .......................................................................................... 8

*Sabra v. Maricopa Cty. Cmty. Coll.*,
   2020 WL 4814343 (D. Ariz. Aug. 18, 2020) ........................................................................ 4

*Sierra Club v. Trump*,
   977 F.3d 853 (9th Cir. 2020) ................................................................................................. 2

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ............................................................................................................... 8

*Teixeira v. County of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ............................................................................................... 11

*United States v. Lam*,
   20 F.3d 999 (9th Cir. 1994) ................................................................................................. 11

*United States v. Wick*,
   2016 WL 10637098 (D. Mont. July 1, 2016) ........................................................................ 8

*United States v. Wick*,
   697 F. App'x 507 (9th Cir. 2017) ......................................................................................... 8

**Statutes**

18 U.S.C. § 921(a)(3) ............................................................................................................ *passim*

Cal. Pen. Code § 16520(g) ............................................................................................................ 7

**Other Authorities**

*Difference Between Milling and Drilling*,
   WMW Machinery Company (Apr. 30, 2020) ...................................................................... 7

*Introduction to Milling Tools and their Application*,
    MachiningCloud, Inc. (2016) ........................................................................................................ 7

Robert H. Todd, Dell K. Allen, & Leo Alting,
    *Manufacturing Processes Reference Guide* (1994) ..................................................................... 7

Shawn J. Nelson, *Unfinished Lower Receivers*,
    63 U.S. Attorney's Bulletin No. 6 (Nov. 2015) ............................................................................ 7

Webster's New World Dictionary of the American Language (2d ed. 1970) ..................................... 7


**Regulations**

27 C.F.R. § 478.11 ............................................................................................................................ 6

## I. INTRODUCTION AND SUMMARY

Plaintiffs' Opposition demonstrates that this case is, at its core, a policy dispute. The Defendants' longstanding classification of certain receiver blanks as outside the reach of the Gun Control Act ("GCA") comports with the decision made by Congress, as expressed in the text of the GCA, to omit unfinished receiver blanks from the formal definition of a "firearm." Yet Plaintiffs are unhappy with the statutory policy set by Congress, and they attempt to change the law through this APA lawsuit. A lawsuit is not the proper vehicle to vindicate Plaintiffs' policy preferences; Plaintiffs' remedy lies with Congress, not with this Court. The Plaintiffs' claims should be dismissed in total.

## II. ARGUMENT

### A. Plaintiffs Fail to Demonstrate Standing.

#### 1. The State of California Fails to Demonstrate an Injury.

Plaintiffs' Opposition demonstrates that California lacks standing to impose its preferred policy choices upon the rest of the nation. In its Complaint, California goes to great lengths to describe the alleged threats posed by "ghost guns." But the State can only identify *eight* specific crimes in California over a *six-year* period that were either committed or "allegedly committed" with unserialized firearms. *See* Compl., ¶¶ 53-56, 98, 101. While any specific crime is a tragedy, *eight* such crimes out of the 1.1 million violent crimes committed in the relevant six-year-period is a far cry from an overwhelming wave that would cause a State injury sufficient to confer standing. *See* https://openjustice.doj.ca.gov/exploration/crime-statistics/ crimes-clearance (Cal. Dep't of Justice web page providing annual crime statistics). And while California claims that "ATF's determinations are the source of the State of California's injury," Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, ECF No. 54 ("Pls.' Opp.") at 9, they provide no support for this assertion. ATF did not commit those eight crimes—third-party criminals did. And California can offer no facts to show that those crimes were committed with unserialized firearms made of the receiver blanks at issue in this case. Nor can California plausibly plead that those crimes would not have occurred with traditional, serialized firearms.

As Defendants point out, *see* Defendants' Motion to Dismiss, ECF No. 29 ("Defs.' Mot.") at 9-10, a *parens patrie* theory of general responsibility for the safety of residents does not provide standing

for a State to challenge a Federal agency's decision. The Plaintiffs recognize and effectively concede this problem in their Opposition. *See* Pls.' Opp., at 7 n.4. But to get around this obstacle, Plaintiffs pivot and focus on California's expected budget expenditures to "retain additional staff and extend the Department's existing firearms systems, including those systems used for California-only background checks." *Id.* at 8. California states that it will spend $5.9 million in FY 2020-21 and $8.3 million in FY 2021-22 (*see id.*), and asserts that these expenditures confer standing.

Not only is California's spending voluntary, Plaintiffs fail to establish the requisite nexus with ATF's challenged actions. California fails to state with specificity what portion of this spending is traceable to ATF's longstanding classification of receiver blanks, and what portion would occur anyway, even if ATF acquiesced to California's demands in this case. California's spending on "California-only background checks" (*id.*) will presumably continue regardless of whether the ATF classifies receiver blanks as firearms. According to California's own FY 2020-21 Budget Change Proposal[1], the voluntary spending is for the "enhancement of existing systems" to accomplish more than simply tracking unserialized receivers. For example, the enhancements will include systems and staff to "license precursor part vendors; conduct eligibility checks for precursor part transactions (sales and transfers) and approve the transactions at the point of sale (if applicable); establish a single firearms precursor part transaction process; and retain records of sales and transfers of ownership of firearm precursor parts." Budget Proposal, at 10. And, as a further example, California's Budget Proposal sets forth enhancements to its "Ammunition Processor" system (*id.* at 11), which presumably tracks the sale of ammunition and ammunition-components inside California. Yet, ammunition is not at issue in this case. Thus, California is voluntarily spending resources on items that are not affected by the ATF classifications challenged in this lawsuit.

For similar reasons, California's reliance upon *Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020), *petition for cert. filed* (U.S. Nov. 17, 2020) (No. 20-685), is misplaced. In that case, the Ninth Circuit held that States had standing to challenge the Department of Defense's ("DoD") cancellations

---

[1] Filed in this case as Exhibit A to ECF No. 55 (referred hereinafter at the "Budget Proposal"). The Budget Proposal is 12-page document that omits any internal page numbers. Therefore, the following page citations will refer to the page numbers assigned by the ECF system and printed at the top of each page.

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS – CASE NO. 3:20-CV-06761-EMC

of certain infrastructure projects on the ground that the States would lose tax revenue from the cancellations. *See* 977 F.3d at 871-72. Further, the court held that the State of California had standing due to the threat that DoD's alternative construction activities, involving a wall on the Mexican border, would proceed in violation of the state's environmental laws. *See id.* at 866-69. Those grounds are different from the pending case. Here, ATF has not cancelled any projects that might generate tax revenue for the state. And ATF is not violating California state law nor directing any third party to violate California state law. Any person who purchases an unserialized receiver blank can still comply with California state law, regardless of ATF's actions. ATF is, in no way, blocking California from enforcing its own law.

Moreover, California argues for a breathtakingly wide expansion of the standing doctrine. The Complaint fails to plausibly demonstrate that California is suffering any special injury due to unserialized firearms. In this, California is no different than the other 49 states in the Union. And yet, California proposes that by voluntarily spending more tax dollars on a laundry list of law enforcement systems and staff (some of which are unrelated to the issues in this case), it can manufacture standing to challenge Federal policy with which it disagrees. There is no limiting principle to this argument. It would permit any other State to spend $1.00 on any other hot-button policy area and then challenge Federal administrative action (or lack thereof) connected to the policy area. If California prevails on this argument, the expansion of the standing doctrine would be dramatic. Without more, this is not the proper route to settle policy disagreements, and the standing doctrine does not permit it.

**2.  The Individual Plaintiffs Present a Generalized Fear of Future Crime.**

There is no dispute that Mr. Muehlberger and Mr. Blackwell have suffered horrific tragedies in losing family members to gun violence. Despite these tragedies, Plaintiffs' Opposition can only articulate a generalized fear of future crime victimization and "ongoing psychological harm" as supposedly conferring standing to the Individual Plaintiffs in this case. *See* Pls.' Opp., at 11-15.

First, Plaintiffs' argument that "ongoing psychological harm" confers standing proves far too much. Nearly every (if not every) victim of violent crime likely suffers some psychological trauma from the experience. If Plaintiffs' argument is accepted, then nearly every crime victim throughout the

country has standing to challenge Federal actions or decisions that touch upon law enforcement and public safety policy. It is difficult to imagine a limiting principle under this scenario.

Moreover, the Plaintiffs have failed to explain why the Individual Plaintiffs face any special threat from crime that is not already faced by the general public. Plaintiffs do not allege that the Individual Plaintiffs are being targeted by criminals using unserialized firearms. And the Plaintiffs effectively concede that the "untraceable" firearm used in the Saugus High School shooting would not be implicated by ATF's classifications in this case. *See* Pls.' Opp., at 14. That leaves the Individual Plaintiffs with generalized concerns about future crime. While the Individual Plaintiffs might fear living and working in Los Angeles due to potential crime, they "cannot manufacture standing merely by inflicting harm on [themselves] based on [their] fears of hypothetical future harm that is not certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

### 3. The Organizational Plaintiff Fails to Demonstrate a Diversion of Resources.

Plaintiffs likewise fail to demonstrate why the Giffords Law Center has standing in this action. Giffords is in the business of advocating for stricter gun control measures across the nation. This is the reason for the organization's existence. Any supposed "injury" suffered by Giffords is simply a "normal function of their advocacy." *See Sabra v. Maricopa Cty. Cmty. Coll.*, 2020 WL 4814343, at *4 (D. Ariz. Aug. 18, 2020). To avoid this problem, Giffords stakes its standing claim on the diversion of "substantial resources," including "financial resources" and "'human capital' used to provide 'technical assistance' to monitor 'over 100 state and federal bills pertaining to ghost guns.'" Pls.' Opp., at 17 (quoting Compl., ¶¶ 113-15). Beyond these conclusory allegations of diverting "substantial resources," however, Giffords offers no concrete facts showing the amount of the supposed diversion or detailing how much time its staff spent to track "ghost gun" bills across the country, as opposed to its other, regular business of pro-gun-control lobbying efforts. Significantly, Giffords fails to quantify exactly how much money and resources it supposedly diverted. *See, e.g.*, *El Paso Cty., Texas v. Trump*, 982 F.3d 332, 344-45 (5th Cir. 2020) ("[The organizational plaintiff's] single vague, conclusory assertion that the organization had to divert resources is insufficient to establish that [the Federal action] has 'perceptibly impaired' the organization's ability to carry out its mission. [The organization] does

not provide any details on how the organization is helping its members respond to the harmful impacts of [the Federal action.] In addition, it is unclear whether any of the resources [the organization] diverted are being used for litigation and legal counseling, or whether its efforts fall within the general ambit of its normal operations—activities that would not satisfy the requirements of standing."). Giffords has the burden to demonstrate its standing, and conclusory allegations, without proper supporting facts, do not satisfy that burden.

Like its co-plaintiffs, Giffords is arguing for a dramatic expansion of the standing doctrine. If Giffords is correct, then any other public advocacy organization can merely spend $1.00 more or divert some time of a few staff members to manufacture standing to challenge most any Federal administrative action. And, again, if the Plaintiffs' expansive standing argument is accepted here, it is difficult to imagine a limiting principle that would not permit any advocacy organization to routinely challenge Federal administrative actions tangential to the organization's self-selected mission.

### B. Plaintiffs Fail to Adequately Allege Claims under the APA.

#### 1. Plaintiffs' Challenges to ATF Determinations Made More than Six Years Ago Are Barred by the Statute of Limitations.

Plaintiffs effectively concede in their Opposition that any challenge to an ATF determination made more than six years ago is barred by the applicable statute of limitations. *See* Pls.' Opp., at 18-19. Despite attaching to their Complaint multiple ATF classification letters that are older than six years, Plaintiffs now state in their Opposition that their challenge is limited to the "Classification Letters to Polymer 80 and the Ghost Gun Guidance," which were issued within the past six years. *Id.* at 18 (citing Compl., ¶¶ 118, 133). Those Classification Letters to Polymer 80 are attached as Exhibits 11, 12, and 13 to the Complaint, while the "Ghost Gun Guidance" is attached as Exhibit 16. In the event this litigation moves forward, the Court should limit Plaintiffs' challenges to those documents.

#### 2. ATF's Interpretation of the GCA Is Both Correct under the Statute and Reasonable under the Circumstances.

##### a. The Statutory Text Supports ATF's Determination.

ATF's treatment of receiver blanks faithfully and correctly applies the text of the GCA:

> The term "firearm" means (A) any weapon (including a starter gun) which will or *is designed to* or *may readily be converted* to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon . . . .

18 U.S.C. § 921(a)(3) (emphasis added). Congress has defined "firearm" with specificity and care. And in crafting this definition, Congress *changed* a previous definition, purposely omitting "'any part or parts' of a firearm," other than a receiver. *See* S. Rep. 89-1866 at 14; S. Rep. 90-1097, 1968 U.S.C.C.A.N. at 2200. This definitional change represents Congress's considered intent to refrain from regulating firearm parts, other than a "frame or receiver."

As relevant here, Section 921(a)(3) provides two ways to define a firearm: subparagraph A (any weapon "designed to or may readily be converted") and subparagraph B ("frame or receiver of any such weapon").

Starting with subparagraph B, it is clear that a receiver blank does not meet the definition of "receiver." That is because a receiver blank does not have an internal cavity or space to house a hammer and firing mechanism. Since 1968, the ATF has defined a "[f]irearm frame or receiver" as that "part of a firearm which provides housing for the hammer . . . and firing mechanism." 27 C.F.R. § 478.11; 44 FR 18558 (1968). Plaintiffs do *not* challenge this 50-year-old definition in their Complaint, nor do they even address this definition in their Opposition, despite Defendants citing it repeatedly in their Motion. *See* Defs.' Mot., at 3, 19, 20. Plaintiffs are thus foreclosed from arguing that a receiver blank qualifies as a firearm under subparagraph B of Section 921(a)(3).

Turning to subparagraph A of Section 921(a)(3), there are two "prongs" that permit classification as a "firearm": 1) an object that is "designed to" expel a projectile by an action of an explosive, or 2) an object that is "readily" converted to do so. But a receiver blank satisfies neither of these two prongs. First, it is physically impossible for a receiver blank to fire a bullet, and this is not disputed by the parties. The reason for this is, again, simple: there is no space within the receiver blank to house the trigger and necessary firing mechanism. As such, a receiver blank is *not* designed to fire a bullet, as evident because it *cannot* fire a bullet. Instead, the receiver blank must first be milled

out (*i.e.*, converted) to provide space for the trigger and firing mechanism before it can be used (in conjunction with other parts) to fire a bullet.[2]

And second, a receiver blank is not "readily" converted to expel a projectile by an explosion. Dictionary definitions are virtually unanimous that "readily" means something that can be done "quickly," "without difficulty," and "without delay." READILY, Webster's New World Dictionary of the American Language 1182 (2d ed. 1970).[3] But such a conversion when the receiver is blank or un-machined is neither easy, quick, nor "readily" performed. Instead, the conversion requires specialized tools and specialized skill. *See, e.g.*, Shawn J. Nelson, *Unfinished Lower Receivers*, 63 U.S. Attorney's Bulletin No. 6 at 44-49 (Nov. 2015), available at: https://go.usa.gov/x7pP3 (hereinafter, "U.S. Attorney's Bulletin"). The tools include multiple drill bits strong enough to drill aluminum or polymer (or whatever hard substrate material that forms the receiver blank), along with lubricants to reduce heat and prevent the drill bits from melting. But those are not the only tools needed. Once the necessary holes have been drilled, specialized tools, such as end mills[4], must be used to excavate the cavity to house the trigger and fire control mechanism. *See id.* 47. These necessary tools are beyond the "common household tools" that Plaintiffs repeatedly characterize as sufficient to complete this detailed work. *See* Pls.' Opp., at 1, 5, 21,

In addition to specialized tools, specialized knowledge is also needed to complete the conversion, which will involve at least the following steps: 1) "[m]illing out of fire-control cavity"; 2) "[d]rilling of selector-level hole"; 3) "[c]utting of trigger slot"; 4) "[d]rilling of trigger pin hole"; and

---

[2] Unlike California law, Cal. Pen. Code § 16520(g), which specifically references "unfinished" receiver, the GCA uses no such qualifier.

[3] Plaintiffs offer essentially the same dictionary definitions for "readily." *See* Pls.' Opp., at 21.

[4] An "end mill" is a type of "milling machine" that uses a "rotating cutting tool having a cylindrical shank with teeth at the end, used for machining the faces and sides of metal pieces and other objects." END MILL, Dictionary.com, last accessed: Jan. 8, 2021. While looking similar to a traditional drill bit, an end mill bit is distinguishable. A traditional drill bit can only cut in the axial direction (*i.e.*, up-and-down), but an end mill can cut in the radial direction (*i.e.*, side-to-side). *See, e.g.*, *Introduction to Milling Tools and their Application*, MachiningCloud, Inc. (2016), 3-6, https://www.machiningcloud.com/wp-content/uploads/2016/05/MachiningCloud_MillingToolsAndTheirApplication.pdf; *Difference Between Milling and Drilling*, WMW Machinery Company (Apr. 30, 2020), https://wmwmachinery.com/blog/difference-between-milling-and-drilling/. *See also* Robert H. Todd, Dell K. Allen, & Leo Alting, *Manufacturing Processes Reference Guide* 49-53 (1994).

5) "[d]rilling of hammer pin hole." *See* Compl., Ex. 9. These cuts must be exact, and the fire-control cavity must be milled "slowly and carefully." U.S. Attorney's Bulletin, at 47.

Plaintiffs' reliance upon *United States v. Wick*, 2016 WL 10637098 (D. Mont. July 1, 2016), *aff'd on other grounds*, 697 F. App'x 507 (9th Cir. 2017), is unavailing. While the Ninth Circuit affirmed the defendant's convictions, the court expressly did not reach the question of whether "demilled" receivers were firearms under the statute: "The evidence demonstrated that, in addition to demilled receivers, Wick was selling complete Uzi parts kits that could 'readily be converted to expel a projectile by the action of an explosive'", and therefore, the court "need not reach Wick's argument as to whether a demilled receiver may, by itself, support a firearm conviction under 18 U.S.C. § 922(a)(1)(A)." 697 F. App'x at 508.

### b. ATF's Interpretation Prevails, Regardless of the Level of Deference.

ATF's interpretation of a statute that it administers is entitled to *Chevron* deference, as the Defendants explained previously. *See* Defs.' Mot., at 15-19; *City and County of San Francisco v. USCIS*, 944 F.3d 773, 790 (9th Cir. 2019) ("When confronted with an argument that an agency's interpretation of a statute that it administers is wrong, we employ the familiar *Chevron* two-step test."). Yet, Plaintiffs argue that the Defendants are not entitled to *Chevron* deference. *See* Pls.' Opp., at 19-20. Plaintiffs' argument is wrong because ATF is interpreting and applying the text of a Congressional statute in its classification letters. *See, e.g.*, *Firearms Import/Export Roundtable Trade Group v. Jones*, 854 F. Supp. 2d 1, 18 (D.D.C. 2012) (applying *Chevron* deference to ATF's interpretation of the Gun Control Act set forth in an open letter to federal firearm licensees).

But the Court need not actually decide the issue of the proper level of deference because ATF's interpretation would still prevail under the lower deference of *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Even if *Chevron* deference is not applicable, ATF's reasoning and interpretation of the text of the GCA is sound and persuasive. It is based on technical experience that goes back to at least 1983 on this issue (*see, e.g.*, Compl., Ex. 4), involving multiple classifications of firearms and firearm parts.

### c. Plaintiffs' Arbitrary-and-Capricious Claim Fails in Light of the Exhibits Attached to the Complaint.

In support of their arbitrary-and-capricious claim under Count Two, the Plaintiffs argue that ATF "failed to consider" two aspects of the underlying problem: First, "how quickly receivers and frames can be converted," and second, "how these products undermine the GCA's purposes by facilitating the proliferation of these unlawful, dangerous, untraceable weapons across the United States." Pls.' Opp., at 23. Plaintiffs' argument in their Opposition on this point appears to be half-hearted, however, because it merely regurgitates bald assertions from the Complaint. *See id.* at 23-25. In contrast, Defendants' Motion goes into detail—over four pages—explaining how ATF considered those very factors, and relies upon the exhibits that Plaintiffs themselves attached to their Complaint. *See* Defs.' Mot., at 21-25. That Plaintiffs' Opposition utterly fails to grapple with Defendants' Motion on this point is significant.

Regarding Plaintiffs' first contention, the exhibits attached to the Complaint clearly demonstrate that ATF has thoroughly considered the efforts, steps, and tools needed to convert receiver blanks into firearms, along with the time necessary to do so when relevant or appropriate, going back to as early as 1983. *See, e.g.*, Compl., Ex. 4 at 1. The same is true of the 2002 classification letter featured in Exhibit 5, a 2005 classification letter in Exhibit 6, and multiple others attached as Exhibits 7 through 15. The common thread through all of these letters is a detailed analysis of exactly what steps are needed to convert a receiver blank into a firearm.

Plaintiffs' second contention, that ATF failed to consider how the proliferation of unserialized firearms undercuts the purposes of the GCA, is contradicted by Exhibit 16 to the Complaint. That document contains ATF's public answers to common questions about the use of unserialized firearms in crimes, among other questions. Compl., Ex. 16, p. 6. But, in any event, because receiver blanks do not fall within the plain meaning of the GCA's definition of "firearm," the consequences of that definition are for Congress to address.

### d. Plaintiffs' Reliance Upon an Ongoing Investigation of Polymer80 Undercuts their Arbitrary-and-Capricious Claims.

In their Opposition, Plaintiffs frequently tout a search warrant that ATF executed in a separate investigation in Nevada as supposedly undermining Defendants' arguments. Plaintiffs' reliance is misplaced.

First, as shown by the Search Warrant Application,[5] the investigation focused on the sale of "Buy Build Shoot kits," which included not only a receiver blank, but all other parts and tools necessary to build a functioning handgun (such as barrel, slide, springs, and all other necessary parts and tools). *See, e.g.*, *id.* at ¶¶ 8, 45. This is distinguishable from the receiver blank itself. In fact, the Search Warrant Application recognizes that ATF determined the receiver blank contained in the Polymer80 kit did not, by itself, meet the definition of a receiver or firearm under the GCA. *See, e.g.*, *id.* at ¶¶ 12, 38-43. As also shown in the Application, while Polymer80 did submit individual receiver blanks to the ATF for review prior to sale (and for which the ATF returned a determination that the blanks by themselves did not qualify as "firearms), *see id.* at ¶¶ 37-43, the company never submitted the complete kit to ATF for review despite being prompted to do so. *See id.* at ¶¶ 44-45.

ATF's decision to classify a kit of firearm parts as "readily" convertible into a firearm and thus subject to the GCA, under subpart A of the definition of firearm as opposed to subpart B, is rational and entitled to deference. It is certainly easier to build a working firearm when a person has all of the necessary components available in one place as opposed to having only one component. This classification in no way undercuts ATF's decision to classify a receiver blank, by itself, as not a "firearm."

Moreover, Plaintiffs' live challenges are only to ATF's classification of individual Polymer80 receiver blanks, along with issuance of guidance on ATF's website. *See* Compl., Exs. 11, 12, 13, and 16. According to Plaintiffs, "[a]lthough the Complaint references other classification letters, both of its claims contest the 'Classification Letters to Polymer80 and the Ghost Gun Guidance' only." Pls.'

---

[5] The Search Warrant Application is referenced in Plaintiffs' Request for Judicial Notice in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss (ECF No. 56). Defendants do not oppose Plaintiffs' request for the Court to take judicial notice of the two documents referenced in ECF No. 56.

Opp., at 18 (citing Compl., ¶¶ 118, 133). Even though Plaintiffs' Opposition references Polymer80 "kits" in certain places, Plaintiffs' actual challenges in this lawsuit do not involve the "kits" at issue in the Search Warrant Application because ATF has never issued a classification letter about those kits. There is, thus, no final agency action for Plaintiffs to challenge, and Plaintiffs' live challenges in this lawsuit are limited to Polymer80 individual receiver blanks.

### e. Plaintiffs' Own Interpretation of the GCA Fails Arbitrary-and-Capricious Analysis.

Plaintiffs' Complaint seeks to replace the ATF's interpretation of the GCA with their preferred interpretation that would immediately regulate all receiver blanks as firearms, despite the clear text of the GCA. Plaintiffs demand a broad and sweeping regulatory change, and yet, their Complaint and Opposition are utterly silent about an important aspect of the problem, namely balancing and safeguarding law abiding citizens' interest in acquiring and possessing firearms for lawful uses.

Plaintiffs do not seriously dispute that one purpose of the GCA was to avoid "unnecessary Federal restrictions or burdens on responsible, law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to . . . hunting, [recreation], personal protection, or any other lawful activity . . . [or the] ownership or use of firearms . . . for lawful purposes." *United States v. Lam*, 20 F.3d 999, 1001 (9th Cir. 1994) (quoting Pub. L. No. 90-618, § 101, 82 Stat. 1213). As the Supreme Court recognized in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the phrase "lawful purposes" is drawn from the Supreme Court's own description of the "right protected by the Second Amendment as 'bearing arms for a lawful purpose," 554 U.S. 620 (quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1875)). Following *Heller*, the Ninth Circuit then recognized that the "Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017). Among these ancillary rights is a "'corresponding right to obtain'" the "necessary" arms and ammunition, *id.* (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)).

Thus, Congress did not draft the GCA to develop a categorical anti-gun approach to firearm regulation. Instead, the GCA *requires* ATF to provide due consideration to the needs of law-abiding citizens who wish to exercise their Second Amendment rights. Interpreting whether a part "may be

readily converted" in a manner that is faithful to and consistent with the text of the GCA accords with this and multiple other purposes of the statute.

Even though Defendants set out these issues in their Motion (*see* Defs.' Mot., at 20-21), the Defendants' Opposition is correspondingly silent.  The Defendants do not mention *Teixeira*, nor do they offer any analysis regarding how ATF should consider the important factor of access to firearms and parts in the Plaintiffs' preferred interpretation.

### III.   CONCLUSION

For the foregoing reasons, and the reasons set forth in Defendants' Motion to Dismiss, the Plaintiffs' Complaint should be dismissed.

Respectfully Submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

/s/      Daniel D. Mauler
DANIEL D. MAULER (VA Bar # 73190)
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone: (202) 616-0773
FAX: (202) 616-8470
dan.mauler@usdoj.gov

*Counsel for Defendants*