GIBSON, DUNN & CRUTCHER LLP
SCOTT A. EDELMAN, SBN 116927
sedelman@gibsondunn.com
2029 Century Park East
Los Angeles, CA  90067-3026
Telephone: (310) 552-8500
Facsimile: (310) 551-8741

LEE R. CRAIN, *pro hac vice*
LIESEL SCHAPIRA, *pro hac vice*
200 Park Avenue
New York, NY  10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

PAUL HASTINGS LLP
AVI WEITZMAN, *pro hac vice*
aviweitzman@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 752-3620
*Attorneys for Plaintiffs Bryan Muehlberger,*
*Frank Blackwell, and Giffords Law Center to*
*Prevent Gun Violence*

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
Supervising Deputy Attorney General
S. CLINTON WOODS, SBN 246054
Deputy Attorney General
Clint.Woods@doj.ca.gov
455 Golden Gate Ave,
Suite 11000
San Francisco, CA 94102-7004
Telephone:  (415) 510-3807
Facsimile:  (415) 703-5843

*Attorneys for Plaintiff State of California, by*
*and through Attorney General Rob Bonta*

[*Additional Counsel Listed on Next Page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA, BRYAN MUEHLBERGER, FRANK BLACKWELL, GIFFORDS LAW CENTER to PREVENT GUN VIOLENCE<br><br>Plaintiffs,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, STEVEN DETTELBACH, in his official capacity, DANIEL HOFFMAN, in his official capacity, DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity.<br><br>Defendants. | CIVIL CASE NO.:  3:20-CV-06761-EMC<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Additional Counsel

GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
DAVID M. PUCINO, *pro hac vice*
244 Madison Ave Ste 147
New York, NY 10016
Telephone: (917) 524-7816

*Attorney for Plaintiffs Bryan Muehlberger,
Frank Blackwell, and Giffords Law Center to
Prevent Gun Violence*

Plaintiffs State of California, Bryan Muehlberger, Frank Blackwell, and Giffords Law Center to Prevent Gun Violence, for their complaint allege, by and through their respective attorneys, against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); Steven Dettelbach, in his official capacity as Director of ATF; Daniel Hoffman, in his official capacity as Chief of the Firearms Technology Industry Services Branch of ATF; the United States Department of Justice ("DOJ"); and Merrick Garland, in his official capacity as Attorney General of the United States, as follows:

## INTRODUCTION

1.     Since 1968, the Gun Control Act ("GCA") has imposed important, common-sense gun safety restrictions on the purchase and sale of firearms in the United States.[1]  These include, among other requirements, that any firearm sold or imported in the United States must have a unique serial number, and that licensed gun dealers must maintain identifying records, including the serial numbers of guns they sell and the identity of the buyer.  These requirements allow law enforcement to trace guns recovered at crime scenes to their first retail purchaser.  The GCA also requires licensed gun dealers to conduct criminal background checks on would-be gun purchasers, ensuring that weapons do not fall into the wrong hands.  Federal law prohibits numerous categories of people from purchasing guns, including minors and individuals with disqualifying criminal convictions, people with records of domestic violence, those suffering from serious mental illness, or individuals who are addicted to drugs. These restrictions have been hallmarks of federal firearms regulation for decades.  By preventing those who pose the greatest threat of violence from purchasing firearms, these laws have protected an incalculable number of Americans from harm.

2.     But the protections of the GCA have been threatened by the rapid proliferation of so-called "ghost guns."[2]  Ghost guns are, in effect, lethal do-it-yourself ("DIY") projects that allow anyone at home to build a fully operable firearm *within minutes*.  The resulting DIY weapons are "ghosts" because, lacking serial numbers, they are not traceable by law enforcement when they are used in a crime.  These ghost guns are readily accessible because of ATF's erroneous determination that the

---

[1]  *See generally* Gun Control Act of 1968, Pub. L. No. 90-618 (1968); Brady Handgun Violence Prevention Act, Pub. L. No. 103-159 (1993).

[2]  Ghost guns are also sometimes referred to as privately made firearms or "PMFs."

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

critical components of these firearms are excluded from the ambit of the GCA.  Because of ATF's recent rulemaking and other final agency actions, ghost guns can be purchased without a background check by people who are prohibited from possessing firearms; the firearms do not have serial numbers; and gun dealers are not required to maintain any records of their sales or the identity of their purchasers. Anyone can buy them, and no one can trace them.  As a result, ghost guns have become the weapon of choice for illegal gun traffickers and those—like organized criminal gangs and mass murderers—who seek to bear arms not for lawful means, but rather to engage in criminal activity and acts of violence.

3.    Defendants have allowed ghost guns to proliferate because they have determined that the core component of a ghost gun is not a "firearm" under the GCA.  That core component is a product that the ghost gun industry calls "80 percent" "receivers" for long guns or "frames" for handguns.  A receiver or frame is the central piece of any firearm—the part of the firearm that houses the hammer, bolt, or breechblock, as well as the firing mechanism;[3] it is so central that the GCA expressly provides that a "frame or receiver" *is* a "firearm" for purposes of the GCA's regulatory regime.  18 U.S.C. § 921(a)(3).  The GCA also provides that "firearms" include not only fully functional weapons, but also receivers and frames of such weapons that are "***designed to or may readily be converted***" into functional weapons.  *Id.* (emphasis added).  In reality, "80 percent" or "unfinished" receivers and frames are nearly finished firearms—products that require mere minutes to go from "unfinished" to ready-to-fire.  They are therefore both "designed to" *and* "may readily be converted" into functional firearms with ease.  For that reason, the monikers "80 percent" or "unfinished" are arbitrary terms that do not accurately reflect the limited amount of work remaining to convert a frame or receiver into an operable weapon.

---

[3]  27 C.F.R. § 478.12 (defining "frame" as "the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure" and "receiver" as "the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or aa structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.").

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



**Image 1:  80 Percent Frame Compared to Finished Frame**

4.      80 percent receivers and frames are pieces of metal or composite plastic created for the sole and express purpose of allowing people to create a fireable weapon quickly and easily.  To the lay eye, 80 percent receivers and frames are in all material respects ***indistinguishable*** from ready-to-fire receivers and frames, as shown in Image 1 above, in which the top images are 80 percent frames while the bottom images are the substantially similar finished frames.

5.      Ghost gun manufacturers have also developed tools that make it easier than ever to convert 80 percent receivers and frames into fully operable firearms in as little as ***15 minutes***.[4]  These tools include jig kits (a collection of tools, measurements, and physical guides designed to quickly make unfinished or 80 percent receivers functional), milling machines (a pre-programmed "mill" that automatically turns 80 percent receivers into functioning weapons) and even free, easy to use printable blueprints for building ghost guns.[5]  Even without these products however, anyone with internet access

---

[4]  *80 Percent Lower Jig*, GUN BUILDERS DEPOT, https://*www.gunbuilders.com/80-lower-jig/* (last visited Oct. 12, 2022); *see Glock 80% Compact Polymer Pistol Frame Kit*, FANDWGUNS.GUNSAMERICA.COM, http://fandwguns.gunsamerica.com/ItemDetails/762360860/Glock-80-Compact-Polymer-Pistol-Frame-Kit.htm (last visited Oct. 18, 2022).

[5]  Keegan Hamilton, *A Simple Plastic Tool Is Undermining New Ghost Gun Rules*, VICE (Sept. 12, 2022), https://www.vice.com/en/article/epzb3a/ghost-gun-jig-tool.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

can easily find detailed instructions for completing their frame or receiver with common household tools.  The fact that 80 percent receivers and frames are so easy to assemble into ghost guns and are sold without background checks or recordkeeping is the very reason these DIY products have dangerously proliferated.  As one seller advertised, 80 percent receivers "allow gun owners to build their own firearms without having to go through a licensed dealer."[6]

6.      Yet Defendants have determined that 80 percent receivers and frames are not "firearms" under the GCA, and that therefore the statutory requirements and prohibitions of the GCA do not apply to these products.  Consequently, with nothing more than an internet connection and a credit card— and without needing to validate as to whether a purchaser is alive or dead, real or fake—anyone including minors and people with serious, violent criminal records can purchase an 80 percent receiver and convert it into a fireable weapon, often within mere minutes.

7.      Plaintiffs originally filed this action over two years ago, in September 2020, to challenge Defendants' prior agency actions regarding ghost guns as arbitrary and capricious and in defiance of the plain meaning of the GCA.  In April 2022, the administration issued new rulemaking that seemed intended to combat the proliferation of ghost guns.  But ATF's new rule, which took effect in August 2022, is contrary to the text of the GCA in one critical aspect.[7]  *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, 479) (hereinafter, the "Final Rule").  Though the Final Rule takes important steps to eliminate ghost gun-making "kits"—meaning where 80 percent receivers or frames are sold together with other essential firearm parts, such as the magazine to store ammunition, and the jigs to assemble the firearm—the Rule ***still permits*** the selling of unserialized "80 percent" receivers and frames as stand-alone items without any background checks or serialization.  For example, Juggernaut Tactical sells both 80 percent lower receivers *and* jigs and tool kits on their website.  These items are sold completely unregulated—as long as a buyer purchases each in a separate transaction.  The company even

---

[6]  *Why Our 80 Lower Jig Tools?*, 5D Tactical, https://www.5dtactical.com/categories/80-lower-jig-tools/ (last visited Oct. 19, 2022).

[7]  Anjeanette Damon, *Why Outlawing Ghost Guns Didn't Stop America's Largest Maker of Ghost Gun Parts*, PROPUBLICA (Aug. 24, 2022), https://www.propublica.org/article/nevada-ghost-guns-polymer80-firearms-laws.

specifically instructs its customers to purchase all the items needed to create a firearm from an 80 percent receiver or frame in separate transactions, as an easy workaround to the Final Rule.[8]

8.     The Final Rule's exclusion of stand-alone 80 percent receivers and frames is contrary to the plain text of the GCA and arbitrarily and capriciously ignores the widely acknowledged truth that 80 percent receivers and frames "*may readily be*" converted into operable firearms quickly and easily, using basic household tools, even when sold without supporting kits or jigs.   18 U.S.C. § 921(a)(3).   The Rule also ignores that these 80 percent receivers and frames are also "*designed to*" be converted into operable firearms, as there is no consumer market for 80 percent receivers and frames other than to convert them into operable firearms.[9]  *Id.*

9.     Indeed, ghost gun manufacturers and sellers have quickly recognized the narrow scope of the Final Rule, declaring:  "there is really very little practical effect" of "the New ATF 'Ghost Gun' Kit Ban"[10] and "this rule will not stop anyone who really wants to make a gun from building their own."[11]   And the federal government has not disputed this interpretation in litigation defending the Final Rule, confirming that it is "not going to be a problem" for ghost gun manufactures to continue to "sell[] receiver blanks . . . without a [] license."[12]

10.     In the meantime, there continue to be record numbers of ghost guns sold, possessed by prohibited purchasers, and used in crimes.  Since this lawsuit began in September 2020, the gun market has expanded exponentially, and, on information and belief, the ghost gun market has similarly expanded.  According to the FBI, while an average of 13 million guns were sold legally in the U.S.

---

[8]  See infra ¶ 97

[9]  *See, e.g., What Are the Benefits of Building Your Own AR? – Quick Assembly*, 5D TACTICAL, https://www.5dtactical.com/#tab-assembly (last visited Oct. 15, 2022) ("Our equipment provides the capability to swiftly complete an 80% lower receiver, with unparalleled precision. The Router Jig Pro can be assembled fast and ready to be used in just a few minutes. Once you're familiar with the user-friendly process, you can finish an 80 lower receiver and begin installing the lower parts kit in as little as 30 minutes!"); *see also supra* note 4 (noting that an 80 percent lower frame can be made into a fully functional firearm in as little as "15 minutes").

[10]  The Reload, *The Early Impacts of the New ATF 'Ghost Gun' Kit Ban*, YOUTUBE (Sept. 2, 2022), https://www.youtube.com/watch/PU9fJjNI9Go/.

[11]  *ATF Final Rule 2021R-05F (aka 80% Receiver Rule) Explained*, THEFIREARMBLOG.COM (Aug. 26. 2022), https://www.thefirearmblog.com/blog/2022/08/26/atf-2021r-05f-80-receiver-rule/.

[12]  *See* Ex. 1, Transcript of Hearing on Plaintiff's Motion for Preliminary Injunction at 16:2–5, *Div. 80 v. Garland*, No. 3-22-CV-00148 (S.D. Tex. Aug. 9, 2022).

each year between 2010 and 2019, that number increased to about 20 million annual gun sales in both 2020 and 2021.[13]  Although purchases of ghost guns are, by definition, not required to be recorded or disclosed, ghost gun retailers widely reported substantially increased demand.  Indeed, ghost gun manufacturers have experienced backlogs and shipping delays due to increased demand since the beginning of the COVID-19 pandemic in early 2020.[14]

11.     Given Defendants' failure to regulate 80 percent receivers and frames, ghost guns have flooded the country.  In recent years, a record number of ghost guns were recovered in California as well as in numerous other states.  In May 2020, for instance, *60 Minutes* reported that "at least 38 states and Washington D.C. have seen criminal cases involving ghost guns" and that ghost guns were used in "at least four mass shootings, violent police shootouts . . . and cases involving terrorism and white supremacists."[15]  One widely publicized ghost gun mass shooting occurred at Saugus High School on November 14, 2019.  On that day, a 16-year-old high school student wielding a ghost gun wounded three classmates and killed two others—15-year-old Gracie Anne Muehlberger, daughter of Plaintiff Bryan Muehlberger, and 14-year-old Dominic Blackwell, son of Plaintiff Frank Blackwell.[16]  The Saugus shooting has unfortunately not been the last ghost gun school shooting.  On November 29, 2021, a 15-year-old student shot and wounded a 16-year-old classmate with a ghost gun at Cesar

---

[13]  *One in Five American Households Purchased a Gun During the Pandemic*, UNIVERSITY OF CHICAGO: NORC (March 24, 2022), https://www.norc.org/NewsEventsPublications/PressReleases/Pages/one-in-five-american-households-purchased-a-gun-during-the-pandemic.aspx.

[14]  *Letter from Jerrold Nadler, Chairman, U.S. House Judiciary Committee, to Regina Lombardo, Acting Director*, ATF (Apr. 23, 2020), https://judiciary.house.gov/uploadedfiles/2020-04-23_letter_to_the_atf_re_ghost_guns.pdf?utmcampaign=2714-519 ( "[A]t least 16 companies that sell ghost gun kits have reported order backlogs and shipping delays due to overwhelming demand" during the COVID-19 pandemic.); *see also* Tess Owen, *People Are Panic-Buying Untraceable 'Ghost Guns' Online in the Coronavirus Pandemic*, VICE (Mar. 27 2020), https://www.vice.com/en_us/article/g5x9q3/people-are-panic-buying-untraceable-ghost-guns-online-in-the-coronavirus-pandemic.

[15]  Bill Whitaker, *Ghost Guns: The Build-It-Yourself Firearms That Skirt Most Federal Gun Laws and Are Virtually Untraceable*, CBS NEWS (May 10, 2020), https://www.cbsnews.com/news/ghost-guns-untraceable-weapons-criminal-cases-60-minutes-2020-05-10/.

[16]  *15-Year Old Gracie Anne Muehlberger, 14-Year-Old Dominic Blackwell ID'd as Saugus High School Shooting Victims*, CBS L.A. (Nov. 15, 2019), https://losangeles.cbslocal.com/2019/11/15/gracie-anne-muehlbergerdominic-blackwell-saugus-high-school-shooting-victims/.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Chavez High School in Phoenix, Arizona.[17]  On January 21, 2022, a 17-year-old student in Rockville, Maryland used a ghost gun to shoot and critically wound a classmate.[18]  On February 25, 2022, a 14-year-old student in New Mexico shot and killed his classmate during a fight over the ghost gun itself.[19]  And on March 4, 2022, an 18-year-old student used a ghost gun to wound two teachers at a high school in Kansas.[20]

12.    Defendants are keenly aware of the damage the ghost gun epidemic is inflicting—even noting in the Final Rule the "substantial increase" in ghost gun recoveries nationwide over the last several years.[21]  Just weeks ago, in fact, the Department of Justice acknowledged its "serious concerns about the proliferation of untraceable firearms easily assembled from firearm parts kits and unfinished frames and receivers."[22]  And President Biden "lamented the proliferation of these firearms, as they can be purchased in parts, are assembled at home with no serial number, can't be traced, and they're as deadly as any other weapon out there."[23]  Thomas Chittum, ATF's former Assistant Director of Field Operations, recently admitted that it is "challenging [for ATF] to keep [ghost guns] outta the hands of people who are not allowed to possess firearms," and that the number of crimes committed with ghost guns is "increasing significantly and rapidly."[24]  Current ATF Director Steven Dettelbach recently put a finer point on it, reiterating that ghost guns "hurt people like regular guns," but are "impossible to trace."[25]  ATF also states on its website that when ghost guns without serial numbers

[17]  Ivan Pereira, *'Ghost Guns' Showing Up in School Shootings, Experts Fear Trend Will Get Worse*, ABC NEWS (Mar. 17, 2022), https://abcnews.go.com/US/ghost-guns-showing-school-shootings-experts-fear-trend/story?id=83346844.

[18]  *Id.*

[19]  *Id.*

[20]  *Id.*

[21]  87 Fed. Reg. 24,656 (explaining that from 2016 to 2021, "approximately 45,240 suspected [ghost guns]" were reported to have been recovered by law enforcement agencies; 1,758 in 2016, 2,552 in 2017, 3,960 in 2018, 7,517 in 2019, 10,109 in 2020, and 19,344 in 2021).

[22]  Statement of Interest of the United States of America, *City of New York v. Arm or Ally, LLC*, No. 22-cv-5525, (S.D.N.Y. July 22, 2022), ECF No. 64 at 2.

[23]  *Id.* (cleaned up).

[24]  Ex. 5, Bill Whitaker, Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and Are Virtually Untraceable.

[25]  Andy Sheehan, *ATF Director Says Agency Will Use All Its Tools to Stop Gun Violence*, CBS NEWS (Sept. 26, 2022), https://www.cbsnews.com/pittsburgh/news/atf-director-steven-dettelbach-stopping-gun-violence/.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

"are found at [] crime scene[s], it is usually not possible to trace th[ose] firearm[s] or determine [their] history, which hinders crime gun investigations and jeopardizes public safety."[26]   Despite these obvious and predictable consequences, ATF has failed to properly apply the plain text of the GCA to slow or stop the proliferation of the 80 percent frames and receivers fueling the ghost gun epidemic.

13.     Plaintiffs therefore bring this action to require ATF to faithfully interpret and enforce the dictates of the GCA.   ATF's determinations that 80 percent receivers are *not* firearms are both contrary to law and arbitrary and capricious.

14.     *First*, ATF's determinations, codified in the Final Rule, that 80 percent or unfinished receivers and frames—which can be converted into firearms in as little as 15 minutes—are *not* firearms contravenes the plain text of the GCA.   Because 80 percent receivers are **"*designed to or may be readily converted*"** into fully fireable weapons, they ***are*** firearms under the GCA.   To be sold legally, then, these products must be serialized, and their purchasers must undergo background checks.

15.     *Second*, the Final Rule and ATF's determinations that 80 percent receivers are not firearms are arbitrary and capricious.   ATF's Final Rule has arbitrarily determined that only 80 percent receivers and frames *sold with* jig kits, templates, or similar items qualify as firearms under the GCA, while leaving the 80 percent receivers and frames themselves entirely unregulated.   The industry is already taking advantage of this arbitrariness, advising consumers how they can easily develop their own "kits" even if purchasers are now required to order more than one product in separate transactions.[27]   The Final Rule thus fails to consider important aspects of the problem, such as the deadly consequences of allowing manufacturers to sell untraceable weapons to prohibited possessors.

16.     The ghost gun epidemic is real.   This Court should declare that 80 percent receivers and frames are firearms that must be regulated under the GCA, and that ATF's decision to permit the

---

[26]   *Can Functioning Firearms Made From Receiver Blanks Be Traced?*, ATF, https://www.atf.gov/firearms/qa/can-functioning-firearms-made-receiver-blanks-be-traced (last updated Feb. 6, 2020).

[27]   *See* Ex. 2 (Polymer80 webpage advertising "Product Changes in Accordance with ATF Final Rule") (noting that consumers are free to purchase one "Assemble for Thyself" kit to use on multiple, unserialized receivers they buy separately).   *See also AR-15 80% Lower Adjustable Universal Jig Kit*, Juggernaut Tactical, https://jtactical.com/products/9 (last visited Oct. 15, 2022) ("Note: Due to ATF final rule 2021R-05F . . . you cannot order an 80% Lower and jig-related products at the same time. If you have both in your cart, you will not be able to complete the checkout process.").

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

unregulated sale of "80 percent" and "unfinished" receivers and frames that are *not* within kits is arbitrary and capricious.

## PARTIES

17.     Plaintiff State of California, represented by and through its Attorney General, is a sovereign state of the United States of America.

18.     Plaintiff Bryan Muehlberger resides in Santa Clarita, California.  His daughter, 15-year-old Gracie Anne Muehlberger, was tragically murdered in the November 2019 Saugus High School Shooting in Santa Clarita, California, when a 16-year-old high school student used an untraceable ghost gun and opened fire on Mr. Muehlberger's daughter and her fellow students—killing Gracie and Dominic Blackwell, and injuring three others.

19.     Plaintiff Frank Blackwell resides in Santa Clarita, California.  His son, 14-year-old Dominic Blackwell, was tragically murdered in the November 2019 Saugus High School Shooting in Santa Clarita, California, when a 16-year-old high school student used an untraceable ghost gun and opened fire on Mr. Blackwell's son Dominic and his fellow student Gracie Anne Muehlberger, and injured three others.  Mr. Blackwell has filed this action in his personal capacity only.

20.     Plaintiff Giffords Law Center is a nonprofit unincorporated association operating under section 501(c)(3) of the Internal Revenue Code.  Based in San Francisco, California, Giffords Law Center also operates offices in New York and Washington, D.C.  Giffords Law Center is one of the nation's leading legal and policy organizations dedicated to finding sensible solutions that will prevent further gun violence.

21.     Defendant ATF is an administrative agency within the DOJ responsible for protecting communities from violence, violent criminal organizations, the illegal use and trafficking of firearms, the illegal use and storage of explosives, acts of arson and bombings, acts of terrorism, and the illegal diversion of alcohol and tobacco products.  ATF is headquartered in Washington, D.C.

22.     Defendant Steven Dettelbach is the Director of ATF.  His official address is in Washington, D.C.  He is being sued in his official capacity.  In that capacity, Director Dettelbach has responsibility for oversight of the activities of ATF.

23.     Defendant Daniel Hoffman is the Chief of the Firearms Technology Industry Services Branch of ATF.  His official address is in Martinsburg, West Virginia.  He is being sued in his official capacity.  In that capacity, he is responsible for classifying firearms and ammunition under federal rules and regulations.

24.     Defendant DOJ is an executive agency within the federal government of the United States.

25.     Defendant Merrick Garland is the Attorney General of the United States.  His official address is in Washington, D.C.  He is being sued in his official capacity.  In that capacity, Attorney General Garland has the authority to prescribe rules and regulations for carrying out the provisions of the Gun Control Act. 18 U.S.C. § 926(a).  The Attorney General delegated the responsibility to investigate, administer, and enforce the provisions of the Gun Control Act to ATF.  28 C.F.R. § 0.130(a)(1).

## JURISDICTION AND VENUE

26.     Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the laws of the United States.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff State of California, and Giffords Law Center reside in this District, and a substantial portion of the events giving rise to this case occurred in this District.  Defendant ATF also maintains numerous Field Offices in this District.

## STATUTORY BACKGROUND:  THE GUN CONTROL ACT OF 1968

28.     The GCA has been the foundation of federal firearms law for more than half a century.  Its genesis began with the assassination of President John F. Kennedy, who was shot and killed with a mail-order rifle Lee Harvey Oswald purchased for $19.95 in response to a magazine advertisement.  Shortly after President Kennedy's death, Senator Thomas Dodd of Connecticut introduced legislation restricting mail-order sales of shotguns and rifles.  That legislation garnered bipartisan support and was endorsed by the National Rifle Association.  But the bill ultimately died in committee.  The debate continued, however, gaining even greater urgency in 1968 after the assassinations of Martin Luther King Jr. and Robert F. Kennedy.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

29.     Following these jolting national tragedies, on October 22, 1968, President Lyndon B. Johnson signed into law the GCA, landmark legislation that asserted significant federal control over the firearms industry and those who were legally permitted to possess guns.  Gun Control Act of 1968, Pub. L. No. 90-618 (1968).  The GCA's major provisions include: (i) a ban on sales of guns to, *inter alia*, people convicted of felonies, people addicted to drugs, minors, and individuals with serious mental illnesses;[28] (ii) a requirement that all firearms dealers obtain a federal firearms license; (iii) a prohibition on the importation of firearms "with no sporting purpose"; and (iv) a mandate that all firearms be serialized.  18 U.S.C. §§ 921 *et seq.*

30.     The GCA has been amended multiple times to expand federal regulation of firearms.  In 1993, for instance, following another national tragedy—the attempted assassination of President Ronald Reagan, which left his Press Secretary James Brady permanently disabled—President William J. Clinton signed the Brady Handgun Violence Prevention Act, which required that federal background checks be conducted on ***all*** sales of guns by licensed dealers.  Brady Handgun Violence Prevention Act, Pub. L. No. 103-159 (1993).  Federal law was amended further in 1994 with the passage of the Violence Against Women Act, which prohibited gun possession by individuals subject to certain domestic violence restraining orders, and again in 1996 to prohibit those convicted of particular domestic abuse crimes from possessing a firearm.  18 U.S.C. §§ 922(g)(8), (g)(9).

31.     The GCA regulates the possession and purchase of "firearms."  Under the GCA, "firearm" is broadly defined to include not only fully functional weapons that "expel [] projectile[s] by the action of an explosive," but also items that are "designed to or may readily be converted" into fully functional weapons, and the "receiver" or "frame" of such weapons.  18 U.S.C. § 921(a)(3).  A firearm frame is the part of a handgun that houses "the hammer, striker, bolt or similar component prior to initiation of the firing sequence."  *See* 27 C.F.R. § 478(a)(1).  And a firearm receiver is the part of a rifle or shotgun or projectile weapon other than a handgun that houses "the primary component designed to block or seal the breech prior to initiation of the firing sequence (*i.e.*, bolt, breechblock, or

---

[28]  Specifically, federal law restricts people from accessing firearms if they have been committed to any mental institution or adjudicated as a mental defective, *see* 18 U.S.C. § 922(d)(4), which means they have been found by a court, board, commission, or other lawful authority to be a danger to self or others, or to lack the mental capacity to contract or manage their own affairs, as a result of their mental condition or illness, *see* 27 C.F.R. § 478.11(a).

equivalent)."  *Id*. at § 478.12(a)(2).  The parts of a handgun and rifle are depicted in Images 2 and 3 below.

32.    Because receivers and frames are defined as "firearms" in the GCA, these parts must also carry serial numbers.  18 U.S.C. § 923(i).  Sellers and manufacturers of receivers and frames must obtain a federal firearms license, and individuals who purchase receivers and frames from gun dealers are subject to federal background checks.  18 U.S.C. §§ 923(a), 922(t).



**Image 2:  Semiautomatic-Pistol**[29]



**Image 3:  AR-15 Rifle**[30]

---

[29]  *Firearms Parts and Components,* UNODC (Feb. 2019), https://www.unodc.org/e4j/en/firearms/module-2/key-issues/firearms-parts-and-components.html.

[30]  *Simple AR-15 Diagram*, 3D WAREHOUSE, https://3dwarehouse.sketchup.com/model/1a2d3089-04fc-47a0-af95-fd3ff78ab966/Simple-AR15-Diagram (last visited Oct. 18, 2022).

**BACKGROUND ON ATF AND ITS ROLE IN REGULATING FIREARMS**

33.     ATF was established as an independent agency in 1972 to regulate firearms, among other things.[31]  According to the agency's website, ATF "recognizes the role that firearms play in violent crimes" and uses federal firearm legislation like the GCA "to target, investigate and recommend prosecution of [criminal] offenders to reduce the level of violent crime and to enhance public safety."[32]

34.     ATF, like any other agency, takes a wide variety of agency action, including standard notice-and-comment rulemaking and issuing guidance.  It also issues "Classification Letters" with regard to specific products it regulates, like firearms and explosives.  In these letters, ATF responds to questions that manufacturers, distributors, and others submit to ATF to adjudicate, such as whether the product they are proposing to sell is subject to the GCA's requirements, including background checks and serialization.  According to the ATF Handbook, ATF encourages firearms manufacturers to "seek an ATF classification of its product prior to manufacture" in order to "avoid an unintended classification and violations of the law."  *See* Ex. 3, *Do You Know How ATF Would Classify Your Product?*, *in* ATF NATIONAL FIREARM ACTS HANDBOOK, § 7.2.4 (Apr. 2009), https://www.atf.gov/ firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download.  The ATF Handbook further explains that such Classification Letters "may generally be relied upon by their recipients as the agency's official position concerning the status of the firearms under Federal firearms laws."  *Id.* at § 7.2.4.1.  ATF also issues broad-ranging industry guidance in the form of questions and answers ("Q&As"), which are published on ATF's official website—guidance that on information and belief market participants refer to and/or rely on in designing, marketing, and distributing the 80 percent frames and receivers used to build ghost guns.

35.     As a law enforcement agency within the DOJ, ATF also investigates violent crimes.  In that role, ATF relies significantly upon the GCA's requirement that firearms be adorned with unique, traceable serial numbers.  GCA's serialization requirement requires firearm manufacturers or importers to affix weapons with unique serial numbers and other marks that identify the manufacturer or importer,

---

[31]  Prior to the establishment of ATF, Congress had delegated the enforcement of the GCA to the Alcohol and Tobacco Division of the Internal Revenue Service.  When first formed, ATF was part of the United States Department of the Treasury, but following the 9/11 terrorist attacks, the Homeland Security Act of 2002 transferred ATF to the DOJ.

[32]  *Firearms*, ATF, https://www.atf.gov/firearms (last visited Oct. 18, 2022).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

as well as the make, model, and caliber of the firearm.  Using this information, ATF's National Tracing Center can trace a firearm recovered at a crime scene from the manufacturer or importer through the distribution chain to the first retail purchaser.

36.     Tracing provides critical information necessary to investigate and solve crimes.  ATF processes hundreds of thousands of crime gun trace requests each year from domestic and international law enforcement agencies.[33]  Because there is no comprehensive electronic federal database of gun purchases, ATF relies on the records held by each dealer to connect a recovered firearm to its first retail buyer.  As depicted in Image 4 below, when firearms contain serial numbers, ATF can generally determine the original Federal Firearms Licensee who sold the weapon.  From that entity, using the records it is required to keep under the GCA, ATF is able to learn the name of the person who originally purchased the weapon.  Identifying that initial purchaser is critical to law enforcement's ability to investigate and solve crimes committed with the recovered firearm.

---

[33]  *ATF By the Numbers*, ATF (June 14, 2018), https://www.atf.gov/resource-center/infographics/atf-numbers.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



**Image 4: How ATF Traces Firearms[34]**

37.     In addition to its critical role in the investigation of criminal activity, tracing also acts as a powerful deterrent—discouraging straw purchases or trafficking of firearms through secondary sales to prohibited persons.

38.     But tracing is effective *only if* law enforcement officials can trace a firearm based on its serial number.  And ATF and its leaders have not required manufacturers and sellers of 80 percent frames and receivers to affix serial numbers to their products, so they do not in fact feature them.  As a result, firearms dealers are not required to keep records of their sales of ghost gun frames and receivers.  Thus, ATF and law enforcement are completely obstructed in their attempts to trace a ghost gun to its original source, and prohibited purchasers are more likely to purchase a ghost gun because they know that there are no records that would allow the purchase to be traced back to them.

---

[34] *How ATF Traces Firearms*, ATF (Aug. 17, 2018), https://www.atf.gov/resource-center/infographics/how-atf-traces-firearms.

# FACTUAL BACKGROUND

A.  **Ghost Guns Are Designed to Circumvent Federal Firearms Requirements, Resulting in an Overwhelming Threat to Public Safety.**

39.  Before a licensed gun dealer sells any firearm in the United States, a buyer must pass a background check to confirm that they are authorized to possess a firearm—namely, that they are not a minor, not disqualified because of a criminal conviction or domestic violence restraining order, and not otherwise prohibited from gun possession.  18 U.S.C. § 922(t).

40.  Licensed manufacturers or importers must also legibly identify each firearm with a unique serial number.  27 C.F.R. § 478.92.  Specifically, the GCA requires that manufacturers and importers engrave, cast, stamp, or otherwise conspicuously place on the frame or receiver of each firearm an individual serial number and other identifying information, such as the model of the firearm, its caliber or gauge, and the manufacturer's name or the name of the foreign manufacturer. 27 C.F.R. § 478.92(a)(1)(i)-(ii).  This serialization process ensures that every firearm—including those firearms recovered by law enforcement agencies at crime scenes—can be traced back to its manufacturer or importer and first retail purchaser.  Tracing firearms helps link a recovered firearm to crime suspects in a criminal investigation by helping law enforcement officials track the movement of a firearm through the supply chain.

41.  Assault weapons, such as AR-15 rifles, were once placed under even stricter regulations under federal law, and remain subject to heightened regulation in many states.  Generally, assault weapons are a class of semiautomatic firearms that share characteristics with military firearms specifically designed to kill humans quickly and efficiently.  Wounds caused by assault rifles like AR-15s are more lethal than wounds caused by handguns because the bullets they fire travel at a higher velocity and impart a correspondingly higher level of energy when passing through a body.  And when paired with large magazines full of ammunition, assault weapons can kill a large number of people extremely quickly.  Because assault weapons are extremely dangerous and designed to kill, certain "semiautomatic assault weapons" were banned at the federal level between 1994 and 2004.  While that law lapsed and there is currently no federal law prohibiting these lethal, military grade weapons,

seven states—including California—prohibit the purchase, sale and/or possession of assault weapons. California, for example, has banned over 75 assault weapon types, models, and series by name.

42.    Serialization requirements apply not only to complete, fully functional firearms, but also to "[a] firearm frame or receiver that is not a component part of a complete weapon at the time it is sold." 27 C.F.R. § 478.92(a)(2). The ATF website provides sample images of frames and receivers, along with the explanation that "A Frame or Receiver constitutes a FIREARM."



**Image 5:  ATF's Diagram of a Sample Frame and Receiver, Noting that Each Constitutes a Firearm[35]**

43.    Ghost guns are designed specifically to circumvent these common-sense requirements in the GCA. The 80 percent components used to build ghost guns are designed as, and may readily be converted into, lethal firearms. Today, they can be purchased by anyone with an internet connection and a credit card or other form of online payment (as well as at gun shows and from brick-and-mortar gun stores)—including people convicted of felonies or domestic violence, people addicted to drugs, minors, and individuals with serious mental illnesses, despite the fact that all of them are prohibited by federal law from purchasing and possessing firearms. As a result of ATF's decisions, no background check is required to buy 80 percent receivers and frames, no records of the buyers' identities must be kept, and no 80 percent receiver or frame has to carry federal serial numbers or other markings that clearly identify the product's manufacturer, importer, make, model, or caliber. Thus, while a person cannot purchase an assembled gun at a gun store without passing a background check to ensure that he is not a prohibited person under the GCA, a prohibited person can purchase an

---

[35]    *Firearms - Guides - Importation & Verification of Firearms, Ammunition - Gun Control Act Definitions – Firearm*, ATF, https://www.atf.gov/firearms/firearms-guides-importation-verification-firearms-ammunition-gun-control-act-definitions (last visited Oct. 18, 2022).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

80 percent frame or receiver from the very same gun store without any background check or any questions asked.  With an 80 percent receiver or frame in hand, that prohibited person can then purchase all ancillary products needed to complete the firearm (like jigs and templates), either in a different contemporaneous transaction or from a different seller, and quickly and easily assemble a firearm functionally indistinguishable from the firearm he would have been be barred from buying after a background check.

44.    As illustrated in Images 6, 7, and 8 below, which ATF itself provides, the sole difference between an 80 percent receiver and a finished receiver is hardly noticeable:  an 80 percent receiver, shown in Images 6 and 7, "has a solid, un-machined fire-control cavity area with no holes or dimples for the selector, trigger, or hammer pins."  ATF has concluded that the receiver does not meet the GCA definition of a "firearm."[36]

 

**Images 6 and 7:  80% Receiver – *Not* a Firearm**

---

[36]  *Are "80%" Or "Unfinished" Receivers Illegal*, ATF (Apr. 6, 2020), https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal.

The second receiver, shown in Image 8, "has a partially machined fire-control cavity and ATF has concluded that it **does** meet the GCA definition of a firearm."[37]



**Image 8:  Finished Receiver – *Is* a Firearm**

45.     As a result of these minor differences, 80 percent receivers can easily be turned into lethal assault weapons.   Using a jig—a device that guides the drilling and milling necessary to complete the receiver—a buyer can finish an 80 percent receiver "in **under 30 minutes**" using basic household tools, such as simple drill bit, file set, and a hand drill, to drill the remaining holes.[38]  As noted, one seller even boasted that using its jig could help complete an 80 percent frame or receiver in as little **as 15 minutes**.[39]   Of course, the same is true whether the jig is purchased in the same transaction as the 80 percent receiver (which would fall within the ambit of the Final Rule) or sold in a separate transaction as the purchase of the 80 percent receiver (which falls outside the Rule's ambit).

46.     Similarly, 80 percent frames, depicted in Image 9 below,[40] closely resemble finished frames, depicted in Image 10 below.[41]   To complete an 80 percent frame, the buyer need only make

---

[37] *Id.*

[38] *Easy Jig Gen 3 Multi-Platform – AR-15, AR-9 and .308 80% Lower Ji*g, 80 PERCENT ARMS, https://www.80percentarms.com/products/easy-jig-gen-3-multi-platform-ar-15-ar-9-and-308-80-lower-jig// (last visited Oct. 11, 2022).

[39] *See supra* note 4.

[40] *Fusion Pro Line 80% 1911 Government Frame*, FUSION FIREARMS, https://fusionfirearms.com/fusion-pro-line-80-1911-government-frame-checkered-stainless (last visited Oct. 10, 2022) (stating that the operations left to be completed are "[c]utting of the slide rails," "[c]utting of the barrel seat," "[d]rilling of the hammer pin hole," and "[d]rilling of the sear pin hole").

[41] *1911 Frame, C-Class – Government Size*, FUSION FIREARMS, https://fusionfirearms.com/1911-frame-c-class-government-size (last visited Oct. 10, 2022).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

simple cuts and drills into the frame,[42] which is a quick and easy process, especially when a jig kit is used.  Even without a jig kit, common household tools—such as a simple drill bit, file set, and a hand drill, each of which can be inexpensively obtained from any hardware store—can be used to complete the firearm.

 

**Image 9:  80% Frame**                     **Image 10:  Finished Frame**

If the buyer wants to avoid drilling altogether, pre-programmed milling machines, called computer numerical controlled ("CNC") machines, can finish 80 percent receivers and frames at the press of a button.[43]  To use a CNC machine, a buyer with no technical expertise needs only a generic computer and an 80 percent receiver or frame—which the machine's seller can ship, alone or in bulk, along with the machine itself.  CNC machines, which can cost $2,500, have been used to mass produce ghost guns.[44]  For example, in 2020, a resident of Washington State who had eight prior felony convictions and had been recently released from prison after serving time on a gun charge, was found with an arsenal of ghost guns, a drill press, and a CNC machine.[45]  The arsenal included 17 pistols,

---

[42]  *80 Lower Jig*, GUN BUILDERS DEPOT, https://www.gunbuilders.com/80-lower-jig/ (last visited Oct. 12, 2022) ("We offer 80% jigs that require little to no machining experience and only require basic tools—a hand drill or drill press, a small vise, and other hand tools—to successfully cut and drill your new firearm").

[43]  Ex. 4, EVERYTOWN FOR GUN SAFETY, UNTRACEABLE: THE RISING SPECTER OF GHOST GUNS (May 14, 2020) at 11. *See, e.g.*, *Ghost Gunner 3 Deposit*, Ghost Gunner, https://ghostgunner.net/product/ghost-gunner-3-deposit/ (last visited Oct. 10, 2022) ("Ghost Gunner 3 is a general purpose CNC mill that gives you the ability to finish 80% receivers and frames with ease, in the comfort of your own home.").

[44]  *See e.g.*, *Ghost Gunner 3 Deposit*, *supra* note 43.

[45]  *See Edmonds Felon Accused of Having 'Ghost Gun' Arsenal in Home*, HERALD NET (Mar. 1, 2020), https://www.heraldnet.com/news/supervised-edmonds-felon-accused-of-having-ghost-gun-arsenal/.

24 rifles, ten silencers, 20 unfinished lower receivers, and 300 pounds of ammunition.[46]  And just this month, the New York Police Department arrested a Manhattan resident with a prior felony conviction preventing him from possessing firearms for using a CNC machine to finish and sell dozens of ghost guns.[47]  Between October 2016 and May 2022, the man bought at least 55 ghost gun parts worth more than $7,000.[48]  Two of the firearms found in his apartment were not locked or safely stored and were easily accessible to the two toddlers living in the apartment.[49]  To state the obvious, the dangers associated with these arsenals are not diminished by the fact that the drill press or CNC machine was purchased in a separate transaction than the 80 percent receivers and frames.

47.     After the receiver or frame is finished, the buyer can easily complete the building process by using an assembly kit, which contains every part needed to make a fully functioning firearm, and is often sold by the same firms selling 80 percent receivers and frames.  As one seller explained, "AR-15 kits . . . come with all the standard parts of an AR-15 . . . . [and] *is essentially a complete [AR-15] that needs to be assembled* . . . [so] building time doesn't take too long.  *Within an hour or two, you should be breaking it in at the range*."[50]  In other words, within "an hour or two," an individual intent on harming others could use an 80 percent receiver to build a highly lethal, dangerous assault weapon capable of killing a large number of human beings quickly and efficiently.

---

[46]  *Id.*

[47]  Jonathan Dienst, Cache of Ghost Guns Found in Ex-Con's Lower East Side Apartment: DA, NBC N.Y. (Oct. 12, 2022), https://www.nbcnewyork.com/news/local/crime-and-courts/cache-of-ghost-guns-found-in-ex-cons-lower-east-side-apartment-da/3903381/.

[48]  *Id.*

[49]  *Id.*

[50]  *Why is Purchasing an AR-15 Kit is Great for Beginners?*, THUNDER TACTICAL (May 10, 2019), https://web.archive.org/web/20200923221047/https://thundertactical.com/ar-15-kits-great-for-beginners/ (emphases added).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



**Image 11:  AR-15 Assembly Kit[51]**

48.     Regardless of the method used to assemble the ghost gun, these unserialized weapons are hugely popular, affordable, and widely available online.  Currently, there are at least 80 online retailers of ghost guns—68 percent of which entered the ghost gun market after 2014—that sell all of the parts necessary to build a ghost gun.  That number is likely even larger than reported, because dealers are not required to obtain an ATF license to sell their products.

49.     Advertisements for ghost guns often highlight that 80 percent receivers and frames are unregistered and can be purchased without a background check.  One seller, for example, touts that "ATF does NOT recognize an 80% complete lower as a firearm, and therefore an unfinished receiver is not subject to the same regulations as any other complete firearm . . . [t]his means no RED TAPE including:  NO Registering . . . NO FFL Required . . . NO Transfer fees."[52]  The same seller provides a basic guide to completing an 80% receiver and, as Image 12 demonstrates, makes a point of noting the ease with which anyone can turn an 80% receiver into a fully functioning firearm.[53]

---

[51]  Complete 16 .223/5.56/300BLK AR-15 80% Build Kit, 80 PERCENT ARMS, https://www.80percentarms.com/products/complete-16-223-5-56-300blk-ar-15-80-build-kit/ (last visited October 18, 2022).

[52]  *80% Lowers*, 80 PERCENT ARMS, https://www.80percentarms.com/80-lowers/ (last visited Oct. 11, 2022).

[53]  *Id*.

> **IS IT HARD TO COMPLETE AN 80% LOWER?**
>
> Completing an 80% lower doesn't require experience at all! 80% lowers are finished with equipment such as a standard drill and router. So, all you need is a little patience and care. With enough practice, they can be made in less than two hours. For more information on machining your 80% lower, consult our complete guide.

**Image 12:  80 Percent Arms Advertisement**[54]

50.     Because 80 percent receivers and frames can be obtained by individuals who are otherwise prohibited from purchasing firearms, and cannot be traced by law enforcement, it is unsurprising that ghost guns have become a weapon of choice for criminal organizations, gangs or groups engaging in violence, and other individuals who are intent on doing harm.  For example:

    a.   In 2013, a Southern California man, who failed a background check because of his mental instability that caused a run-in with the police, could not legally purchase a gun built an assault rifle from a ghost gun kit that he bought online.  He then used the ghost gun to kill five people during a rampage in Santa Monica.[55]

    b.   In 2017, a Northern California man that prosecutors described as a "deranged, paranoid killer," who was prohibited from owning a gun and under prosecution for multiple crimes, was nevertheless able to kill five people and injure at least ten with two assault-style rifles he assembled from unregulated ghost gun parts he ordered online.[56]

    c.   In 2020, 18 individuals in Los Angeles, California with links to a drug ring that also sold ghost guns were arrested, after law enforcement officers seized 28 pounds of

---

[54]  *Id*.

[55]  Robert Cavnar, *Santa Monica Shooter Built His Gun From Parts He Bought Online*, HUFFINGTON POST (June 15, 2013), https://www.huffingtonpost.com/robert-l-cavnar/santa-monica-shooter-buil_b_3447220.html (last visited Sept. 28, 2020).

[56]  Ray Sanchez et al., *Gunman in Northern Rampage Was Not Supposed to Have Guns*, CNN (Nov. 15, 2017), https://www.cnn.com/2017/11/15/us/california-tehama-county-shootings/index.html; *see also* Andrew Blankstein & Corky Siemaszko, *California Mass Shooter Made His Own Rifles*, NBC NEWS (Nov. 16, 2017), https://www.nbcnews.com/news/us-news/california-mass-shooter-made-his-own-killing-machines-n821516.

1    methamphetamine, a quarter-pound of cocaine, crack cocaine, and 16 firearms,

2    including several ghost guns.[57]

3    51.    Far right extremists have been using ghost guns to target communities of color.  In

4    2020, the FBI seized ghost guns and arrested alleged white supremacists planning to start a race war

5    at a Richmond, Virginia gun rights rally,[58] and a man linked to the right-wing "boogaloo" movement

6    allegedly used a ghost gun to murder two law enforcement officers in California.[59]

7    52.    Other high-profile violent crimes allegedly committed with ghost guns include:

8         a.    In Stockton, California, in 2014, perpetrators of a bank robbery used at least one

9              ghost gun in the crime.[60]

10        b.    In Walnut Creek, California, in 2015, a former Stanford student fatally shot his ex-

11             girlfriend and then himself using guns he had assembled from parts he had ordered

12             online.[61]

13        c.    In Fresno, California, in 2017, investigators discovered that a criminal organization

14             suspected of trafficking young women, firearms, and narcotics possessed a cache of

15             ghost guns.[62]

---

[57]    Richard Winton, *FBI Arrests Drug Ring that Also Sold 'Ghost Gun' AR-15s*, L.A. TIMES (Sept. 15, 2020), https://www.latimes.com/california/story/2020-09-15/fbi-arrests-drug-ring-that-also-sold-ghost-gun-ar-15s.

[58]    Alain Stephens, *They Planned to Start a Race War. DIY Gun Kits Allowed Them to Build an Arsenal*, THE TRACE (Jan. 23, 2020), https://www.thetrace.org/2020/01/white-supremacists-the-base-fbi-virginia-diy-ghost-gun/.

[59]    Cheri Mossburg, *A Man Allegedly Linked to the Boogaloo Movement Accused of Going to a BLM Protest with a Homemade Machine Gun to Kill Cops*, CNN (June 16, 2020), https://www.cnn.com/2020/06/16/us/steven-carrillo-california-officers-deaths-suspect-boogaloos/index.html.

[60]    Joe Goldeen, Another Arrest, Reward in Bank of the West Heist, RECORD NET (Sept. 16, 2014), https://web.archive.org/web/20190411004805/https://www.recordnet.com/article/20140916/NEWS/140919728.

[61]    Rick Hurd, *Former Stanford Student Built the Gun He Used to Kill Ex-girlfriend, Himself*, MERCURY NEWS (Aug. 4, 2015), https://www.mercurynews.com/2015/08/04/former-stanford-student-built-the-gun-he-used-to-kill-ex-girlfriend-himself/.

[62]    Sontaya Rose, *Fresno Police Gang Crackdown Busts Prostitution Ring, Dozens Arrested*, ABC30 ACTION NEWS (Sept. 8, 2017), https://abc30.com/fresno-police-bulldog-gang-jerry-dyer-bust/2393264/.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

d.   In Washington, D.C., in the summer of 2018, a 25-year-old man was killed with a ghost gun during a shootout.[63]

e.   In Santa Barbara, California, in 2019, a suspected cocaine dealer was found in possession of a ghost gun.[64]

f.   In Longmont, Colorado, in 2019, police recovered ghost guns in connection with a drug trafficking investigation.[65]

g.   In Evesham, New Jersey, in 2019, a man wanted for violation of federal probation was found to be in possession of three ghost guns, as well as large quantities of cocaine and methamphetamine.[66]

h.   In Washington, D.C., in December 2019, a man, who was previously convicted of illegally possessing an unregistered handgun two years prior, shot at two reserve police officers using a ghost gun.[67]

i.   In San Francisco, California, in September 2020, a man who was previously convicted of a felony was arrested and found to be in possession of a ghost gun, ammunition, and significant quantities of methamphetamine and fentanyl.[68]

---

[63]   Peter Hermann & Tom Jackman, *District Seeks to Ban 'Ghost Gun' Kits as Seizures of Homemade Weapons Soar*, WASH. POST (Feb. 27, 2020), https://www.washingtonpost.com/local/public-safety/district-seeks-to-ban-ghost-gun-kits-as-seizures-of-homemade-weapons-soar/2020/02/27/d12be0da-5416-11ea-9e47-59804be1dcfb_story.html.

[64]   Indy Staff, *Suspected Cocaine Dealer Arrested with a 'Ghost Gun*,' SANTA BARBARA INDEPENDENT (May 17, 2019), https://www.independent.com/2019/05/17/suspected-cocaine-dealer-arrested-with-a-ghost-gun/.

[65]   Kelsey Hammon, *More Arrested Monday in Alleged Connection with Drug-Trafficking Operation*, TIMES-CALL (July 12, 2019), https://www.timescall.com/2019/07/10/more-arrested-monday-in-alleged-connection-with-drug-trafficking-operation/.

[66]   Erin Vogt, *'Armed & Dangerous' Duo Found with Coke, Meth and Kids - Cops*, N.J. 101.5 (Aug. 6, 2019), https://nj1015.com/armed-dangerous-duo-found-with-coke-meth-and-kids-cops/.

[67]   Peter Hermann, *Officers Who Were Fired on 'Could See the Muzzle Flashes,' Police Say*, WASH. POST (Dec. 13, 2019), https://www.washingtonpost.com/local/public-safety/officers-who-were-fired-on-could-see-the-muzzle-flashes-police-say/2019/12/13/72d645e2-1dcb-11ea-b4c1-fd0d91b60d9e_story.html.

[68]   Press Release, U.S. Attorney's Office for the Northern District of California, *San Francisco Resident Sentenced to Six Years in Prison for Possession of Guns, Ammunition, and Drugs* (Sept. 20, 2022), https://www.justice.gov/usao-ndca/pr/san-francisco-resident-sentenced-six-years-prison-possession-guns-ammunition-and-drugs.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

j.   In Fultonville, New York, in 2020, a man manufactured and sold or transferred 19 fully assembled ghost guns, including short-barreled rifles and guns modified to be capable of fully automatic fire.[69]

k.   In Fresno, California, in June 2021, federal agents searched the home of a man accused of dealing fentanyl and uncovered 13 firearms, including a ghost gun modified with an "auto sear" to be capable of fully automatic fire.[70]

l.   In New York City, in July 2022, a Connecticut man with a prior felony conviction was charged with trafficking firearms.  The man allegedly sold a number of ghost guns from 2019 to 2022 including to members of the Bloods street gang.[71]

---

[69]  Press Release, U.S. Attorney's Office for the Northern District of New York, *Montgomery County Man Sentenced to 30 Months for Unlawfully Selling "Ghost Guns"* (Sept. 2, 2021), https://www.justice.gov/usao-ndny/pr/montgomery-county-man-sentenced-30-months-unlawfully-selling-ghost-guns.

[70]  Press Release, U.S. Attorney's Office for the Eastern District of California, *Federal Drug and Gun Charges Brought Against Fresno Man Accused of Dealing Fentanyl* (July 15, 2021), https://www.justice.gov/usao-edca/pr/federal-drug-and-gun-charges-brought-against-fresno-man-accused-dealing-fentanyl.

[71]  Press Release, U.S. Attorney's Office for the Southern District of New York, *Connecticut Man Charged in Manhattan for Trafficking "Ghost" Guns* (July 21, 2022), https://www.justice.gov/usao-sdny/pr/connecticut-man-charged-manhattan-trafficking-ghost-guns.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



**Image 13:  AR-15-Style Ghost Gun Custom-Made for the Bloods Street Gang**[72]

    m.  In San Diego, California, in April 2021, a man equipped with a ghost gun killed one person and seriously injured four others in what appeared to be a random shooting spree.[73]

    n.  In McAllen, Texas, in May 2021, a 73-year-old man manufactured 11 fully automatic ghost guns intending to sell them to members of a Mexican drug cartel.[74]

    o.  In Salem, Oregon, in March 2022, an ATF raid exposed a massive ghost gun manufacturing operation.  Federal agents recovered 63 ghost guns, including rifles, pistols, and shotguns, high-capacity magazines, and a variety of other components and manufacturing equipment, in addition to hundreds of "counterfeit blue M30 oxycontin pills" laced with fentanyl and heroin.[75]

---

[72]  *Id.*

[73]  Clara Benitez, '*Ghost Gun' Used in Gaslamp Shooting*, FOX 5 NEWS (Apr. 24, 2021), https://fox5sandiego.com/news/local-news/ghost-gun-used-in-gaslamp-shooting/.

[74]  Press Release, U.S. Attorney's Office for the Southern District of Texas, *Septuagenarian Charged with Manufacturing "Ghost Guns"* (June 15, 2021), https://www.justice.gov/usao-sdtx/pr/septuagenarian-charged-manufacturing-ghost-guns.

[75]  Maxine Bernstein, '*Massive' Ghost Gun Manufacturing Operation Found in Oregon Raid, Feds Say*, OREGONIAN (Mar. 18, 2022), https://www.oregonlive.com/crime/2022/03/salem-man-accused-of-selling-homemade-ghost-guns-and-trafficking-fentanyl-in-exchange-for-guns-feds-say.html.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

p. In Las Vegas, Nevada, in September 2022, two men engaged in a violent crime spree over multiple weeks, using a ghost gun to shoot four people across at least five crime scenes. [76]

53.    Similarly, reports indicate that ghost guns have increasingly been purchased and/or used by individuals who are prohibited from owning firearms under the GCA, including:

a. In Temple City, California, in 2018, a man who was banned from owning a gun was found with 28 firearms—11 of which were untraceable ghost guns—and 65,000 rounds of ammunition. [77]

b. In Plattsburgh, New York, in 2018, a man with a prior felony conviction brandished, during an argument, an unserialized Glock ghost gun that he purchased partially completed and finished himself. [78]

c. In Upper Darby, Pennsylvania, in 2018, a teenage exchange student bought parts online and built a ghost gun he planned to use to commit a school shooting. [79]

d. In Syracuse, New York, in 2019, a man with a prior felony conviction used a ghost gun to shoot his six-year-old nephew in the back. [80]

e. In Evansville, Indiana, in 2019, a 17-year-old teenager bought parts online to create a handmade ghost gun. [81]

---

[76] David Charns, *2 Accused of Shooting 4 Across Las Vegas in Violent Crime Spree with Ghost Gun*, 8NEWSNOW (Sept. 29, 2022), https://www.8newsnow.com/crime/2-accused-of-shooting-4-across-las-vegas-in-violent-crime-spree-with-ghost-gun/.

[77] Josh Haskell, *Temple City Father, Adult Daughter Found with Stockpile of Illegal Weapons, Ammunition*, KABC-TV L.A. (Feb. 21, 2018), https://abc7.com/temple-city-weapons-cache-father-daughter-guns-found-charged/3120273/.

[78] Bob Bennett, *Police: Convicted Felon Revealed Gun During Argument*, PRESS-REPUBLICAN (Apr. 16, 2018), https://www.pressrepublican.com/news/local_news/police-convicted-felon-revealed-gun-during-argument/article_690748e1-3549-5324-acef-42eb7cc2f82e.html/.

[79] Chad Pradelli, *Police: Exchange Student Built Gun from Parts Bought Online*, 6ABC ACTION NEWS (Apr. 2, 2018), https://6abc.com/police-exchange-student-built-gun-from-parts-bought-online/3292963/.

[80] Douglass Dowty, *DA: Syracuse Man Shot 6-Year-Old Nephew with Untraceable 'Ghost Gun'*, SYRACUSE.COM (Jan. 6, 2020), https://www.syracuse.com/crime/2020/01/da-syracuse-man-shot-6-year-old-nephew-with-untraceable-ghost-gun.html/.

[81] Philip Joens, *Indiana Teen Built 'Ghost Gun' from Online Parts*, COLUMBIA DAILY TRIBUNE (May 25, 2019), https://www.columbiatribune.com/news/20190525/indiana-teen-built-ghost-gun-from-online-parts/.

f.  In New Orleans, Louisiana, in June 2021, a man with a prior felony pled guilty to being a felon in possession after he attempted to pass through airport security while carrying a Polymer80 ghost gun and two 30-round magazines. [82]

g.  In Albany, New York, in August 2021, a man with a prior felony was sentenced to thirty months after being convicted of unlawfully possessing ghost guns. [83] Despite his prior felony, the man had over 38 firearms, an "auto sear," multiple silencers, two completed ghost rifles, and 15 unserialized finished receivers and frames. [84]

h.  In Sacramento, California, in March 2022, a man prohibited from owning a firearm used an AR-15-style ghost gun to murder his three daughters and their court-mandated chaperone in a church. [85]

54.    Ghost guns are also increasingly used by illegal gun-trafficking rings.  In 2015, for example, the New York State Attorney General announced a 32-count indictment of two defendants charged with illegally trafficking at least a dozen untraceable ghost guns, including AR-15s. [86]  The two defendants were convicted of illegally trafficking ghost guns, and were sentenced to nine and eleven years in prison, respectively. [87]  And in June 2019, the New Jersey Attorney General announced the indictment of nine men allegedly part of a criminal network that was illegally trafficking

---

[82]  Press Release, U.S. Attorney's Office for the Eastern District of Louisiana, *LaPlace Man Pleads Guilty to Being Felon in Possession of Ammunition* (June 25, 2021), https://www.justice.gov/usao-edla/pr/laplace-man-pleads-guilty-being-felon-possession-ammunition/.

[83]  Press Release, U.S. Attorney's Office for the Northern District of New York, *Rensselaer County Felon Sentenced to 30 Months on Firearms Convictions* (Aug. 10, 2021), https://www.justice.gov/usao-ndny/pr/rensselaer-county-felon-sentenced-30-months-firearms-convictions.

[84]  *Id*.

[85]  *Man Used 'Ghost Gun' to Kill 3 Daughters in Church*, ABC10 (Mar. 6, 2022), https://www.abc10.com/article/news/local/sacramento/david-mora-church-shooting-gun/103-36f31f43-9c24-4b39-b9cf-0097910ae817.

[86]  Press Release N.Y. State Attorney General's Office, A.G. Schneiderman Announces Thirty-Two Count Indictment Of Two Defendants Charged With Illegally Trafficking Untraceable 'Ghost Guns' (Sept. 21, 2015), https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-thirty-two-count-indictment-two-defendants-charged.

[87]  Press Release, N.Y. State Attorney General's Office, *A.G. Schneiderman Announces 11 Year Jail Sentence Of Defendant Convicted For Illegally Trafficking Untraceable "Ghost Guns"* (Apr. 28, 2016), https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-11-year-jail-sentence-defendant-convicted-illegally.

untraceable ghost guns, including assault rifles, assembled from kits purchased online.[88]  In July 2020, one of these men was sentenced to 14 years in prison for his role in the trafficking ring.[89]  Similarly, in August 2021, a federal jury indicted four men for their part in a California drug and gun-trafficking ring.[90]  Before their arrest, the men sold confidential informants a variety of drugs and ghost guns including an AR-15-style rifle, a shotgun, and handguns.[91]  In June 2022, a joint state and federal investigation took down a Philadelphia-area ghost gun and drug trafficking ring that, while operative, was a one-stop shop for methamphetamine and fully automatic and fully untraceable ghost guns.[92]  Law enforcement officials believe more arrests may be coming as they ascertain the full extent of this trafficking ring.[93]

55.   The increasing production and availability of ghost guns built with 80 percent components has led to a commensurate rise in violence attributable to unregistered, untraceable ghost guns.  Law enforcement agencies connected at least 2,513 ghost guns to criminal activity between 2010 and April 2020.  *See* Ex. 4, EVERYTOWN FOR GUN SAFETY, UNTRACEABLE: THE RISING SPECTER OF GHOST GUNS (May 14, 2020) at 17.  Of that number, more than half—1,300 ghost guns—were used or sold by criminal enterprises to facilitate crimes including gun trafficking, robbery, drug trafficking, terrorism, and murder.  *Id.*  Ghost guns were linked to criminal cases in at least 38 states between late 2018 and May 2020.  *See* Ex. 5, Bill Whitaker, *Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and Are Virtually Untraceable*, CBS NEWS 60 MINUTES

---

[88]  Press Release, N.J. Attorney General's Office, Indictment in "Operation Stone Wall" Charges Nine Alleged Members of Ring that Trafficked Untraceable "Ghost Gun" Assault Rifles & Cocaine (June 5, 2019), https://www.nj.gov/oag/newsreleases19/pr20190605a.html.

[89]  Julie Shaw, *Camden County Man Has Been Sentenced to 14 Years in Prison for His Role in "Ghost Guns" Trafficking Ring, Ag Says*, PHILA. INQUIRER (July 10, 2020), https://www.inquirer.com/news/new-jersey-attorney-general-operation-stone-wall-ghost-guns-christopher-stoner-sentence-20200710.html.

[90]  Press Release, U.S. Attorney's Office for the Eastern District of California, *Three South Lake Tahoe Residents Charged with Drug Trafficking and Texas Man Charged with Trafficking Firearms* (Aug. 23, 2021), https://www.justice.gov/usao-edca/pr/three-south-lake-tahoe-residents-charged-drug-trafficking-and-texas-man-charged.

[91]  *Id.*

[92]  *'Ghost Guns' Trafficking Ring Taken Down in Bucks County*, MYCHESCO (June 12, 2022), https://www.mychesco.com/a/news/regional/ghost-guns-trafficking-ring-taken-down-in-bucks-county/.

[93]  *Id.*

(May 10, 2020), https://www.cbsnews.com/news/ghost-guns-untraceable-weapons-criminal-cases-60-minutes-2020-05-10/.

56.     The number of ghost guns recovered in connection with criminal activity is growing each year.  In 2017, the District of Columbia recovered only three ghost guns.[94]  But by 2019, law enforcement recovered 116 ghost guns in one year, before recovering another 106 ghost guns in just the first five months of 2020.[95]  According to information from the District of Columbia's Department of Forensic Sciences, of the 250 ghost guns recovered in Washington D.C. between 2017 and May 29, 2020, at least 208, or 83.2%, were manufactured by a single company, Polymer80.[96]

57.     According to California law enforcement agencies, during 2020 and 2021, ghost guns "accounted for 25 to 50 percent of firearms recovered at crime scenes."[97]  The "vast majority" of these weapons were wielded by individuals prohibited from owning a firearm.[98]  In Los Angeles, the number of ghost guns recovered increased by 144% from 2015 to 2019.[99]  In San Francisco, no ghost guns were recovered in 2015, but beginning in 2016, ghost gun recoveries began to sharply rise—increasing by 1517% from 2016 to 2019.[100]

58.     This is a national problem.  In its 2022 Final Rule, ATF noted that there has been a "substantial increase" in ghost gun or privately made firearm ("PMF") recoveries nationwide over the last several years.  87 Fed. Reg. 24,656.  From 2016 to 2021, "approximately 45,240 suspected PMFs" were reported to have been recovered by law enforcement agencies; 1,758 in 2016, 2,552 in 2017, 3,960 in 2018, 7,517 in 2019, 10,109 in 2020, and 19,344 in 2021.  *Id.*

---

[94]  *AG Racine Sues Gun Manufacturer Polymer80 for Illegally Advertising and Selling Untraceable Firearms to District Consumers*, OFFICE OF THE ATT'Y GENERAL OF D.C. (June 24, 2020), https://oag.dc.gov/release/ag-racine-sues-gun-manufacturer-polymer80

[95]  *Id.*

[96]  *Id.*

[97]  Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel Epidemic of Violence*, N.Y. TIMES (Jan. 26, 2022), https://www.nytimes.com/2021/11/14/us/ghost-guns-homemade-firearms.html.

[98]  *Id.*

[99]  Data released to Giffords Law Center following FOIA request.

[100]  *Id.*

59.     These statistics—as indicative of exponential growth as they are—likely grossly underreport the massive scale of the problem because they rely on instances where ghost guns are recovered by law enforcement.  Countless shootings and other acts of violence using ghost guns are never reported as ghost gun violence because no firearm was recovered, and ammunition from the scene of the crime cannot reveal that it was fired from a ghost gun, as opposed to a traditional, serialized weapon, since the ways that serialized and unserialized guns fire ammunition—and function in every other way—are indistinguishable.

60.     The sale of ghost guns in the United States presents an overwhelming threat to communities and people who may become victims of violence.  Unregulated, ghost guns can be purchased by people with lengthy criminal records or serious mental illnesses, and other prospective shooters intent on doing harm.  These ghost guns open the floodgates for such prohibited persons to obtain and use a range of firearms—from small hand-held pistols to high-powered AR-15 military-style assault weapons—in gun crimes, targeted acts of violence, and indiscriminate public mayhem.  After these terrible crimes are committed and ghost guns are recovered, the inability to trace the ghost gun back to a particular buyer and seller prevents law enforcement from fully investigating the crime, allowing reckless sellers and illegal traffickers to operate with near impunity.  Victims of crimes committed with ghost guns are often left without answers, and ghost gun trafficking remains undetected.  Yet, year after year, the number of ghost guns continues to grow—including a surge of sales during the COVID-19 pandemic.  This threat to public safety can be stopped, if only ATF—the federal agency delegated the authority to regulate firearms—reasonably applies the GCA's plain text and regulates ghost guns in the way that it regulates all other guns.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**B.      ATF at First Properly Concludes that Ghost Guns Fall Under the GCA, but Then Inexplicably Reverses Its Position.**

61.      Beginning in the early 1980s and into the twenty-first century, ATF took the position in its Classification Letters that many unfinished receivers and frames that are identical to the 80 percent receivers and frames on the market today were "firearms" under the GCA, meaning that buyers of these unfinished frames and receivers were required to undergo background checks to determine whether they were legally entitled to own a firearm.

62.      The agency's conclusion, during this period, was based on an approach that analyzed how quickly and easily an unfinished receiver or frame could be turned into a fully functional firearm—that is, whether it could "readily be converted" to function as the firearm it was specifically designed to be.   Using this "temporal" approach, ATF found that 80 percent receivers that required some machining but could be finished in under 75 minutes or in a "minimal amount of time" qualified as "firearms."  *See, e.g.*:

- Ex. 6, Letter from Edward M. Owen, Jr., Chief, Firearms Technology Branch, ATF, to Henry A. Roehrich, SGW Incorporated (May 3, 1983) (classifying as a firearm a partially completed receiver that could be completed with additional milling that took roughly "**75 minutes**") (emphasis added).

- Ex. 7, Letter from Curtis H.A. Bartlett, Chief, Firearms Technology Branch, ATF, to Lane Browne, Mega Machine Shop, Inc. (Dec. 27, 2002) (classifying as a firearm each of the four "AR-15 type lower receiver samples" submitted for examination despite the fact that one of the samples had a "solid interior" because it could be finished in "**approximately 75 minutes**") (emphasis added).

- Ex. 8, Letter from Sterling Nixon, Chief, Firearms Technology Branch, ATF, to Robert Serva, Dan Wesson Firearms (Aug. 19, 2004) (classifying as a firearm a "1911-type semiautomatic pistol frame" because the frame "can be completed **in a minimal amount of time** by a competent individual having the necessary equipment") (emphasis added).

63.      ATF's temporal analysis was also consistent with the GCA, which provides that "firearms" include not only fully functional weapons, but also receivers and frames of such weapons that are "***designed to or may readily be converted***" into functioning ones.  18 U.S.C. § 921(a)(3) (emphasis added).  The speed and ease with which an 80 percent receiver or frame can be turned into a functioning firearm speaks directly to whether or not that item was "designed to" be a functional weapon, and whether it "may readily be converted" into a functional weapon.

64.     But around 2006, ATF began changing course, without providing any justification for the switch.  ATF stopped considering whether an unfinished frame or receiver is "designed to or may readily be converted" into a functioning firearm under the GCA.  Instead, ATF began to mechanically analyze which machining operations still needed to be performed to determine whether a partially completed receiver or frame is a "firearm" under the GCA.  Under this approach, ATF concluded that 80 percent receivers with fire-control cavity areas that are completely **"*solid and un-machined*"** do not qualify as firearms under the GCA.  Ex. 9, Letter from Sterling Nixon, Chief, Firearms Technology Branch, ATF to Justin Halford (Apr. 24, 2006) (classifying an "AR-15 pattern receiver" as a "firearm" because the sample did not have a solid "trigger/hammer area").  In recent years, ATF has analyzed 80 percent frames and receivers under the "machining operations" approach, with no mention of the ease or time it would take to convert the product into a functioning firearm.  *See, e.g.*:

- Ex. 10, Letter from John R. Spencer, Chief, Firearms Technology Branch, ATF, to Alan Aronstein, Hi-Standard Manufacturing Company (Sept. 28, 2012) (classifying as not "firearms" a "1911-type receiver blank" and "target-pistol type receiver blank" after analyzing which "**machining operations**" had been "partially or fully completed") (emphasis added).

- Ex. 11, Letter from Earl Griffith, Chief, Firearms Technology Branch, ATF, to Doug Hughes, Kenney Enterprises, Inc. (May 17, 2013) (classifying as "not . . . a 'firearm'" a "partially completed AR-type receiver" because certain "**machining operations**" including "[m]illing out of fire-control cavity" were not yet performed) (emphasis added).

- Ex. 12, Letter from Earl Griffith, Chief, Firearms Technology Branch, ATF, to Bradley Reece, Palmetto State Defense, LLC (May 25, 2014) (classifying as "not a 'firearm'" an "AR-10 type receiver blank" because it "is completely **solid and un-machined** in the fire-control recess area") (emphasis added).

65.     ATF further memorialized the mechanical "machining operations" approach in a formal ruling (Ruling 2015-1, issued on January 2, 2015) regarding the manufacture and sale of ghost guns.  *See* Ex. 13, ATF, Ruling 2015-1 (Jan. 2, 2015).  ATF explained that Ruling 2015-1 was issued in response to "inquiries from the public asking whether Federal Firearms Licensees (FFL), or unlicensed machine shops, may engage in the business of completing, or assisting in the completion of, the manufacture of firearm frames or receivers *for unlicensed individuals* without being licensed as a manufacturer of firearms."  *Id.* at 1  (emphasis added).  In other words, ATF was asked to clarify

whether sellers or gunsmiths could convert 80 percent frames or receivers into fully functioning firearms for buyers.

66.     In its Ruling, ATF clarified the obligations by again focusing on the "machining operations" performed on the 80 percent receivers.  Specifically, Ruling 2015-1 explains that "when a person *performs machining or other manufacturing process* on [an unfinished frame or receiver] to make a firearm 'frame or receiver' . . . that person has performed a manufacturing operation."  *Id*. at 3 (emphasis added).  Similarly, when any person "make[s] available its machinery . . . to individuals who bring in raw materials, blanks, unfinished frames or receivers . . . for the purpose of creating operable firearms," that person is also "engaged in the business" of manufacturing firearms.  *Id*. at 5.  In both situations, where "machining" occurs, the seller "must be licensed as a manufacturer under the Gun Control Act of 1968 (GCA); identify (mark) any such firearm; and maintain required manufacturer's records."  *Id*. at 1.

67.     In explaining the purported reasoning behind the Ruling, ATF stated that allowing a seller or gunsmith to perform "manufacturing processes on a frame or receiver" would result in firearms being "manufactured without any markings or serialization" which would "run[] contrary to a major purpose of the GCA [by] eliminat[ing] the ability of law enforcement to trace firearms used in a crime, or stolen or lost firearms."  *Id*. at 5.  But the machining test permits consumers to acquire partially complete receivers and frames without serial numbers, and use tools (in some cases, common household tools) to quickly and easily turn them into usable firearms.  The result of ATF's mechanical "machining operations" test is the proliferation of unserialized, untraceable weapons, and ATF has doubled down on the "machining operations" approach in its explanation of the Final Rule. [101]

68.     Through its continued use of the mechanical "machining operations" approach, ATF has issued a series of Classification Letters to Polymer80, beginning in 2015, that have gravely endangered the lives of Americans and severely inhibited law enforcement's ability to fight crime.

---

[101]   ATF clarified in the Final Rule that "ATF has maintained and continues to maintain that a partially complete frame or receiver alone is not a frame or receiver if it still requires performance of certain *machining operations* (e.g., milling out the fire control cavity of an AR-15 billet or blank, or indexing for that operation) because it may not readily be completed to house or hold the applicable fire control components."  87 Fed. Reg. 24,668 (emphasis added).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.   **ATF's Classification Letters Regarding Polymer80 Have Permitted
and Encouraged the Proliferation of Ghost Guns.**

a.   **ATF's Ghost Gun Classification Letters Issued to Polymer80.**

69.    Polymer80 is a leading ghost gun component manufacturer that markets and sells 80 percent receivers and frames and other ghost gun components to individuals online and via firearms dealers.  Between 2015 and 2017, ATF issued a series of Classification Letters to Polymer80, analyzing Polymer80's products under the mechanical "machining" approach.  Exs. 14, 15, 16.  *First*, in early 2015, ATF issued a Classification Letter that classified Polymer80's AR-15-type receiver as "NOT a firearm receiver, or a firearm" (the "February 2015 Polymer80 Letter").  *See* Ex. 14, Letter from Michael R. Curtis, Acting Chief, Firearms Technology Industry Services Branch, ATF, to Jason Davis, Davis & Associates.  ATF reasoned that because the receiver had a "**solid fire control cavity area**, and was cast in a homogenous manner" using "a single shot of molten material," it was not a firearm. *Id*. at 2 (emphasis added).

70.    ATF's February 2015 Polymer80 Letter did not deny that Polymer80's proposed product was designed to and may be readily converted into a fully functional weapon.  Nor did the letter consider how quickly a DIY gunsmith could convert the product into a functional firearm using standard household tools, such as a simple drill bit, file set, and a hand drill, or a CNC machine. Notably, at least one retailer of the Polymer80 receiver advertised that the specific AR-15 type firearm at issue in the February 2015 Polymer80 Letter was "a fully automated system" that required "NO expensive jig kits and parts."[102]  A 2018 product review of the receiver states, "Great product for first time build . . . [e]asy to cut."[103]  Another review from 2016 states, "Easy milling process, and very durable.  Have had zero issues with this product."[104]

71.    In November 2015, ATF issued a second Classification Letter to Polymer80 (the "November 2015 Polymer80 Letter"), this time regarding two separate 80 percent components:  first,

---

[102]   *See Polymer80 G150 Phoenix2 80% Receiver Lower Receiver Kit AR-15 Polymer*, MIDWAY USA, https://www.midwayusa.com/product/1092916295905 (last visited Oct. 18, 2022).  As of October 19, 2022, the product has been discontinued.

[103]   *Id*. (Review by Six_shooter).

[104]   *Id*. (Review by Brian).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

an 80 percent receiver for an AR-10 assault rifle which Polymer80 identified as a "WARRHOGG BLANK" and, second, a Glock-type "CG" or "CG9" Blank handgun frame. *See* Ex. 15, Letter from Michael R. Curtis, Chief, Firearms Technology Industry Services Branch, ATF, to Jason Davis, Davis & Associates (Nov. 2, 2015). ATF concluded that both items were not firearms under the GCA because certain "machining operations" or "design features" were "not yet present or completed" on the items. *Id*. at 3-4. In particular, ATF's Classification Letter pointed out that the AR-10 receiver lacked (1) complete removal of material from the fire-control cavity area, (2) machining or indexing of selector-lever hole, (3) machining or indexing of trigger slot, (4) machining or indexing of trigger-pin hole, or (5) machining or indexing of hammer-pin hole. *Id*. at 3. ATF's letter noted that the GC9 Blank lacked a (1) machined or indexed trigger-pin hole, (2) machined or indexed locking block-pin hole, (3) front or rear frame rails, or a (4) machined or formed barrel seat. *Id*. at 4.

72.     ATF's November 2015 Polymer80 Letter did not deny that Polymer80's proposed products were designed to function as and could be readily converted into fully functional weapons. Nor did the letter consider how quickly a DIY gunsmith could convert the products into functional firearms. According to a 2016 review of the AR-10 type receiver at issue in the 2015 Polymer80 Letter on an online retailer's website, "This was easy . . . *I was done in about an hour and another hour to install the* [remaining parts]. Really is that easy."[105]

73.     On January 18, 2017, ATF issued a third Classification Letter to Polymer80 (the "2017 Polymer80 Letter"), regarding its Glock-type "PF940C Blank," ruling that it was "not sufficiently complete to be classified as the frame or receiver of a firearm and thus is not a 'firearm' as defined in the GCA." *See* Ex. 16, Letter from Michael R. Curtis, Chief, Firearms Technology Industry Services Branch, ATF to Jason Davis, Davis & Associates (Jan. 18, 2017), at 3. The letter explained that the item was not "sufficiently complete" because the following "machining operations or design features were <u>not</u> yet present or completed": (1) trigger-pin hole machined or indexed, (2) trigger mechanism housing pin machined or indexed, (3) locking block-pin hole machined or indexed, (4) devoid of front

---

[105]  *See Polymer80 Warrhogg 80% Receiver Kit LR-308 Polymer*, MIDWAY USA, https://www.midwayusa.com/product/1092916305283 (last visited Oct. 19, 2022) (Review by Bill the plumber) (emphasis added). As of October 19, 2022, the product has been discontinued.

or rear frame rails, (5) barrel seat machined or formed, and (6) incapable of accepting Glock locking-block. *Id.* at 2.

74.     ATF's 2017 Polymer80 Letter did not deny that Polymer80's proposed product was designed to function as and could be readily converted into a fully functional weapon.  Nor did the letter consider how quickly a DIY gunsmith could convert the product into a functional firearm. Notably, at least one retailer of the Glock-type receiver at issue in ATF's 2017 Polymer80 Letter stated in its marketing for the 80 percent receiver that "***It's amazing to think in just 10-15 minutes you can have a fully functioning Glock that you made at home.***"[106]

75.     The Classification Letters ATF issued to Polymer80 are just a few of the Classification Letters that ATF has issued to manufacturers of 80 percent receivers and frames.  Indeed, a number of other manufacturers of 80 percent receivers and frames—including KE Arms,[107] 80 Percent Arms,[108] Palmetto State Defense,[109] and TPM Arms[110]—have similarly received Classification Letters that permit those manufacturers to sell ghost guns outside the strictures of the GCA.  Individually and even more so collectively, these Classification Letters have resulted in exponential explosion of the size of the ghost gun market, which accelerated during the COVID-19 pandemic, when demand for ghost guns surged.[111]

---

[106]   *See Glock 80% Compact Polymer Pistol Frame Kit*, FANDWGUNS, http://fandwguns.gunsamerica.com/ItemDetails/762360860/Glock-80-Compact-Polymer-Pistol-Frame-Kit.htm (last visited Oct. 18, 2022) (emphasis added).

[107]   *See* KE ARMS, http://www.kearms.com/ (last visited Oct. 18, 2022); Ex. 11 Letter from Earl Griffith, Chief of Firearms Technology Branch, ATF, to Doug Hughes, Kenney Enterprises, Inc. (May 17, 2013), at 2.

[108]   *See* 80 PERCENT ARMS, https://www.80percentarms.com/ (last visited Oct. 18, 2022); Ex. 17, Letter from Earl Griffith, Chief of Firearms Technology Branch, ATF, to Tilden Smith, 80 Percent Arms (July 15, 2013), at 2.

[109]   *See* PALMETTO STATE DEFENSE, https://www.psdmfg.com/ (last visited Oct. 18, 2022); Ex. 12, Letter from Earl Griffith, Chief of Firearms Technology Branch, ATF, to Bradley Reece, Palmetto State Defense, LLC (May 25, 2014), at 2.

[110]   *See* TPM ARMS, https://tpmarms.com/ (last visited Oct. 18, 2022); Ex. 18, Letter from Earl Griffith, Chief of Firearms Technology Branch, ATF to David Trease, President, TPM Arms, LLC (Nov. 22, 2013), at 3.

[111]   *See supra* note 13.

76.     As a result of these Classification Letters, [112] Polymer80 has become a prominent manufacturer of 80 percent receivers and frames and other ghost gun parts.  It has been advertising, offering, and selling firearms on its website, www.Polymer80.com, and through a network of firearms dealers that consumers can access through the company's website.  Moreover, ATF's Classification Letters to Polymer80 have been a linchpin for the industry.  Indeed, individuals and businesses alike have relied on ATF's Classification Letters, such as the Polymer80 Classification Letters, when purchasing, selling, and/or designing 80 percent lower receivers and frames in the United States. [113]

**b.      Polymer80 Is a Major Contributor to the Ghost Gun Epidemic.**

77.     Polymer80 contributes significantly to ghost gun violence nationwide.  On information and belief, Polymer80's products constitute an outsized percentage of the ghost guns sold nationwide.  Indeed, almost 90% of the ghost guns recovered by the Los Angeles Police Department last year were Polymer80's products. [114]  The New York Police Department also reported that 90% of recovered ghost guns are made with parts from Polymer90. [115]  Similarly, since 2017, Polymer80's products constitute over 83% of the ghost guns recovered by law enforcement officers in the District of Columbia. [116]  On information and belief, Polymer80 ghost guns have become so ubiquitous that law enforcement in some jurisdictions colloquially refer to all DIY handguns they recover as "Polys," even if a recovered gun was assembled with parts bought from a different seller.

78.     On information and belief, Polymer80 customers and other ghost gun consumers can purchase large quantities of ghost guns and resell them for a profit.  For example, a five-time convicted

---

[112]   ATF has refused to say clearly whether its pre-Final Rule Classification Letters remain in effect.  However, recent guidance, ATF statements, and actions taken by Polymer80 and others in the industry suggest these letters still remain in effect.  *See infra* ¶¶ 101-09.

[113]   *See e.g.*, Complaint at ¶ 41, *Cal. Rifle & Pistol Ass'n v. ATF*, No. 1:14-cv-01211 (E.D. Cal. July 21, 2014) where the California Rifle & Pistol Association (an organization comprised of individuals and businesses who, among other things, own, manufacture, and/or sell 80 percent receivers), stated that it has "reli[ed] . . . on the ATF's prior opinions, interpretations, and **letter rulings** regarding what constitutes a 'firearm' 'frame' or 'receiver.'" (emphasis added).

[114]   Joshua Eaton, *Polymer80's Name Has Become Synonymous with 'Ghost Guns.' Now It's in the Crosshairs*, NBC NEWS (Mar. 27, 2022), https://www.nbcnews.com/news/us-news/polymer80-ghost-guns-kits-crime-rcna20864.

[115]   Ali Bauman, *New York City Hall Targets Manufacturer Polymer80 in Fight against Ghost Guns*, CBS NEWS (May 11, 2022), https://www.cbsnews.com/newyork/news/polymer80-ghost-guns-new-york-city/.

[116]   *See* Complaint at ¶ 1, *District of Columbia v. Polymer80, Inc.*, Case No. 2020-CA-002878-B (D.C. Super. June 24, 2020) (available at https://oag.dc.gov/sites/default/files/2020-06/Polymer80-Complaint.pdf (last visited Oct. 18, 2022)).

felon from Easthampton, Massachusetts pled guilty to building AR-15 rifles from parts bought online and then sold in New Hampshire, making a $300 profit on each military-style rifle.[117]   Another convicted felon, in Salem, Massachusetts, sold completed firearms for three times what he spent to purchase the parts, spending only 30 minutes to build each gun.[118]

79.   Polymer80 advertises and sells a variety of weapons on its website that can be made into fully operational firearms with minimal effort—including AR-15 rifles and multiple types of handguns.  And until recently, Polymer80 sold 80 percent receivers in "Buy, Build, Shoot" kits, which contained "all the necessary components" to turn the 80 percent frames into fully functional firearms.[119]   The handgun kits contained 80 percent frames as well as a "complete slide assembly, complete frame parts kit, 10 round magazine and a pistol case."[120]   Many "buy, build, shoot" kits sold out during the first half of 2020, as manufacturers experienced rapidly increased ghost gun sales during the COVID-19 pandemic.[121]

80.   Like other ghost gun retailers, Polymer80 has permitted bulk purchases of its products and kits without restriction—including without any proof of identification, age, or eligibility to possess firearms as would be confirmed by undergoing a background check.  Polymer80 has made no effort to confirm that its customers are even alive—claiming it sells firearms to a "growing market of individuals who 'value their Fourth Amendment rights' to privacy."[122]   In spring 2020, in fact, Plaintiff Bryan Muehlberger was able to order a ghost gun from Polymer80 in his deceased daughter's name, only four months after Gracie Anne Muehlberger was murdered in the Saugus High School ghost gun shooting.

---

[117]   Dan Crowley, *Easthampton Man Pleads Guilty to Illegal Possession of Firearms He Assembled, Intended to Sell*, DAILY HAMPSHIRE GAZETTE (Aug. 13, 2016) https://www.gazettenet.com/Easthampton-man-pleads-guilty-in-NH-federal-court-to-illegal-possession-of-a-firearm-as-a-convicted-felon-4061253 (last visited Sept. 16, 2020).

[118]   Complaint, *United States v. Echeverria, et al.*, 19-MJ-06527, 11–12 (D. Mass. Oct. 28, 2019); *see also supra* Ex. 4, EVERYTOWN FOR GUN SAFETY, UNTRACEABLE: THE RISING SPECTER OF GHOST GUNS (May 14, 2020), at 11.

[119]   *P80® Buy Build Shoot™ kit PF940v2™ - 10 Round Magazine*, POLYMER 80 (Aug. 12, 2020), https://web.archive.org/web/20200811213619/https://www.polymer80.com/pistol-frames/buy-build-shoot-kits/p80-bbs-kit-pf940v2-2343 (last visited Oct. 18, 2022).

[120]   *Id.*

[121]   *See* Letter from Jerrold Nadler, Chairman, U.S. House Judiciary Committee, to Regina Lombardo, Acting Director, *supra* note 14.

[122]   Anjeanette Damon, *Why Outlawing Ghost Guns Didn't Stop America's Largest Maker of Ghost Gun Parts*, PROPUBLICA (Aug. 24, 2022), https://www.propublica.org/article/nevada-ghost-guns-polymer80-firearms-laws.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Despite the fact that the name he provided as the purchaser—Gracie's—did not match the name on the credit card used—Mr. Muehlberger's own—in mere minutes, he purchased a ghost gun kit on Polymer80.com for $650.  Even if Gracie Anne Muehlberger were still alive, she would have been underage and prohibited from purchasing a firearm under the GCA.  Polymer80's other "80 percent" and "unfinished" products are equally accessible.

81.     In December 2020, ATF executed a search warrant at Polymer80's headquarters.  The search warrant relied in part on the allegations described above from Plaintiffs' original Complaint concerning Plaintiff Bryan Muehlberger's purchase of a Polymer80 ghost gun kit in his daughter's name. [123]  In addition to that example, the search warrant identified at least seven other instances where Polymer80 shipped its products "to individuals within the United States who are prohibited from receiving or possessing firearms." [124]  The search warrant also described Polymer80's social media marketing techniques—including marketing their products specifically to individuals who might not pass a background check. [125]  Specifically, the search warrant pointed to an April 17, 2020 Instagram post where an individual featured in a video posted by Polymer80 explains that with Polymer80's products, "you don't have to worry about a background check." [126]  An account with the name "@ellipsis415" responded to the video, remarking that it was strange to market products to people who would not pass a background check.  In response, Polymer80 expressed that any background check is an "infringement." [127]

**2.     ATF Provides Public Guidance Related to Ghost Guns.**

82.     Also in 2015, ATF decided to explain its official agency position regarding ghost guns on a subsection of the Questions and Answers section of its website, entitled "Receiver Blanks"

---

[123]  Polymer80 Search Warrant Affidavit at ¶ 87(h), available at https://s.wsj.net/public/resources/documents/ghostraid-121420-warrant.pdf (last visited Oct. 5, 2022) (explaining that "a Buy Build Shoot Kit was shipped by POLYMER80 in May 2020 to "Gracie Muehlberger;" at an address in Santa Clarita, CA" and that Gracie "was a 15 year old girl who was killed in the shooting at Saugus High School on November 14, 2019 by a minor who was using a ghost gun.").

[124]  *Id.* at ¶¶ 87(a)-(g).

[125]  *Id.* at ¶¶ 89-90.

[126]  *Id.* at ¶ 89.

[127]  *Id.*

(hereinafter, the "Ghost Gun Guidance").[128]  In or around June or September of 2015, the Ghost Gun Guidance was posted as a subsection on ATF's Question and Answers page.[129]  *See* Ex. 19, pages from Archive.org showing the first archived version of the Ghost Gun Guidance page in September 2015. The Ghost Gun Guidance page states that it contains "answers to some common questions specific to receivers known as 80% receivers or unfinished receivers" and contains eight links to questions and answers.  The questions and answers do not appear to have been materially changed since their initial debut on the website, nor have they changed after the Final Rule was made effective.  The same eight questions and answers remain on the site today, each containing a note of the date that the answer was "last reviewed."  The eight answers have last been reviewed by ATF between February 6, 2020 and June 24, 2020.  *See* Ex. 20, *Receiver Blanks,* ATF, https://www.atf.gov/qa-category/receiver-blanks (last visited Oct. 10, 2022).

83.     The Ghost Gun Guidance contains legally determinative information regarding when ATF considers a receiver to have become a "firearm" for purposes of the GCA.  For example, one of the listed questions asks: "Are '80%' or 'unfinished receivers' illegal?"  ATF's answer states:

> Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA).  ATF has long held that items such as receiver blanks, "castings" or "machined bodies" in which the fire-control cavity area is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA.

*See* Ex. 20. The same response then includes three photos as "examples" of a finished receiver that meets the definition of a firearm and unfinished receivers that ATF has said do not.  *See* Images 6-8, *supra* Section A.

84.     A further question asks: "Can functioning firearms made from receiver blanks be traced?"  ATF responds that "it is usually not possible to trace the firearm or determine its history"

---

[128]  The Ghost Gun Guidance page is still live on ATF's website.  *See Receiver Blanks*, ATF, https://www.atf.gov/qa-category/receiver-blanks (last visited Oct. 14, 2022).

[129]  According to a website that catalogs webpage archives, the WayBackMachine (Archive.org), the earliest known Ghost Gun Guidance page was captured in September 2015.  *See* Ex. 19, Pages from Archive.org showing the first archived version of the Ghost Gun Guidance page in September 2015.  The screen capture contains the date that the website section was "last reviewed" by ATF and states it was last reviewed in June 2015.  (Note that this was the first time that the "automated crawlers" became aware of the site and archived it, although the page may have been published some time earlier before detected by the archiving system).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

when it was made from an 80 percent receiver.  ATF then acknowledges that the inability to trace these firearms "hinders crime gun investigations and jeopardizes public safety."

85.     Similarly, another question reads: "Have firearms made from unmarked receiver blanks been recovered after being used in a crime?"  In response, ATF again acknowledges that these untraceable ghost guns continue to be "recovered after shooting incidents, from gang members, and from prohibited people after they have been used to commit crimes."

86.     This Ghost Gun Guidance constitutes final agency action.  Until recently, the Ghost Gun Guidance had presented ATF's definitive guidance to the industry and the public regarding 80 percent receivers, and was the primary authority that the public and manufacturers could rely on to understand ATF's position on the legality of 80 percent receivers.

87.     Moreover, ATF's Ghost Gun Guidance reflects actual agency policy, consistent with the Polymer80 Classification Letters, that "bind[s] private parties without undergoing the rulemaking process."[130]  ATF's determination regarding 80 percent receivers, as described on its Q&A page, has directly resulted in a massive proliferation in both 80 percent receivers *and* in gun violence perpetrated with ghost guns, as described herein.  Ghost gun manufacturers and dealers have cited the Ghost Gun Guidance as authority on their websites—for example, a dealer called "80% Lowers" quoted the Ghost Gun Guidance on its website, arguing that "80% lowers are not considered firearms" because ghost guns are "not capable of meeting the definition of a firearm under federal law."[131]

---

[130]   *See* Memorandum from Att'y Gen. Jefferson B. Sessions III to ATF (Nov. 16, 2017), at 1, https://www.justice.gov/opa/press-release/file/1012271/download (explaining that agencies may no longer "issue guidance documents" that "bind private parties without undergoing the rulemaking process").

[131]   *Are 80% Lowers Legal*, 80% LOWERS (June 11, 2020), https://web.archive.org/web/20220117095107/https://www.80-lower.com/80-lower-blog/are-80-lowers-legal/ (last visited Sept. 28, 2020) (note that the website has been saved by the WayBackMachine and is an archived version).

**Image 14: 80% Lowers' Guidance on the Legality of Ghost Guns, Quoting ATF's Ghost Gun Guidance**

### C.    ATF Issues the Final Rule but Carves Out Exceptions that Swallow the Rule.

88.    In 2021, after devastating mass shootings in Boulder, Colorado and Atlanta, Georgia, and amid increasing calls for actions to address gun violence across the United States, the White House announced that it intended to "issue a proposed rule to help stop the proliferation of 'ghost guns.'"[132] That proposed rule was published on May 21, 2021.[133]

89.    Eleven months later, on April 11, 2022, ATF issued its Final Rule, which was titled "Definition of 'Frame or Receiver' and Identification of Firearms."  ATF stated that the goals of the Rule were to "provide a more comprehensive definition of 'frame' or 'receiver' so that these terms more accurately reflect how most modern-day firearms are produced and function," 87 Fed. Reg.

---

[132]  *FACT SHEET: Biden-Harris Administration Announces Initial Actions To Address The Gun Violence Public Health Epidemic*, WHITE HOUSE (Apr. 7, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/.

[133]  *See* Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27,720 (May 21, 2021).

24,661, and to "reduce unserialized 'ghost guns.'"[134]  Under the Final Rule, the term "frame" means "the part of a handgun, or variants thereof, that provides housing or a structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component prior to initiation of the firing sequence."  27 C.F.R. 478.12(a)(1).  And a "receiver" means the "part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence."  *Id*. at (a)(2).  Additionally, the Final Rule purports to address 80 percent component frames and receivers by stating that the definition of "frame" or "receiver" includes a partially complete frame or receiver, *including a parts kit*, "that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver."  *See* 27 C.F.R. § 478.12(c).

90.    But the Final Rule also reiterates portions of ATF's legally flawed pre-Rule interpretation of the GCA.  While the Final Rule provides that un-machined 80 percent frames and receivers **sold with** a jig, parts kit, and template are firearms subject to the serialization and background check requirements of the GCA,[135] in the next breath, it states that 80 percent receivers and frames are **not firearms** under the GCA if they are sold **without** a template, jig, or other items and materials.[136]  So long as a customer buys an 80 percent frame or receiver in a separate transaction from the jig and tool kit and the manufacturer's instructions are separately provided, a customer (or prohibited person under the GCA) can purchase the 80 percent receiver without complying with the GCA's serialization, background check, and recordkeeping requirements.

91.    That result severely undermines the effectiveness of the GCA.  It is also wrong as a matter of law.  Even without a kit, an 80 percent receiver sold alone *can be* "readily converted" into a firearm.  Indeed, that is its sole purpose.  Until ATF begins classifying all 80 percent frames and

---

[134] *FINAL RULE 2021R-05F-Definition of "Frame or Receiver" And Identification Of Firearms*, ATF, https://www.atf.gov/firearms/docs/guide/overview-final-rule-2021r-05f-definition-%E2%80%9Cframe-or-receiver%E2%80%9D-and-identification/download (last visited Oct. 4, 2022).

[135] *See* 27 C.F.R. § 478.12(c) Example 1 to Paragraph (c) (deeming the following a firearm:  "A frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver.").

[136] *Id*. at Example 4 to Paragraph (c) (deeming *not* a firearm:  "A billet or blank of an AR–15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver").

46

receivers as firearms, it will continue to defy the GCA's plain language and leave mile-wide loopholes in the GCA's regulatory regime, resulting in a Final Rule that is arbitrary and capricious.

92.     When ghost gun manufacturers sought to enjoin the Final Rule in court, Defendants confirmed what the text of the Rule suggests:  that gun manufacturers can still sell un-machined 80 percent components so long as they do not bundle those components with jigs or tool kits in the same package.  To date, ghost gun manufacturers have brought three lawsuits against the Final Rule.  In each, ATF has taken the position that ghost gun manufacturers would suffer no harm as a result of the Final Rule because they can still sell 80 percent frames and receivers without serialization, background check, and reporting requirements—just as they could prior to the Final Rule—so long as jigs and tool kits are sold separately.

93.     For example, on May 9, 2022, Division 80, a ghost gun manufacturer, brought suit in the Southern District of Texas seeking a nationwide preliminary injunction to suspend the Final Rule. *See Div. 80 v. Garland*, No. 3:22-cv-00148 (S.D. Tex. May. 9, 2022).  At oral argument on the motion for preliminary injunction, ATF confirmed that it was not "going to be a problem" under the Final Rule for ghost gun manufactures to "sell[] receiver blanks . . . without a [] license." *See* Ex. 1, Transcript of Hearing on Plaintiff's Motion for Preliminary Injunction at 16:2-5, *Div. 80*, No. 3-22-CV-00148 (S.D. Tex. Aug. 9, 2022), ECF No. 68.  ATF even clarified that selling both jigs and 80 percent frames and receivers, so long as they are purchased in different transactions, does not violate the Final Rule.  *See id*. at 30:17-24; 31:13-16.

94.     In two other cases, ATF took similar positions, acknowledging that the Final Rule does not have the sweeping effect promised.  On July 5, 2022, ghost gun manufacturers, some state attorneys general, and ghost gun consumers filed suit in the District of North Dakota seeking to enjoin the Final Rule from taking effect as scheduled.  *See Morehouse Enters., LLC v. Bureau of Alcohol*, *Tobacco*, *Firearms, and Explosives*, No. 3:22-cv-00116-PDW-ARS (D.N.D. July 5, 2022).  In their opposition to the plaintiffs' motion for preliminary injunction, Defendants argued that ATF was not "regulating the individual tools, jigs, templates, or instructions sold with firearm parts kits" and that, "for the most part[,] ATF does not regulate individual firearm parts." *See* Defendants' Brief in Opposition to Plaintiffs' Motion for Preliminary and/or Permanent Injunction, *Morehouse Enters.*, No. 3:22-cv-

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

00116-PDW-ARS (D.N.D. Aug. 23, 2022), ECF No. 43.  Similarly, in *VanDerStok v. Garland*, ghost gun consumers joined by a ghost gun manufacturer and a nonprofit organization brought suit in the Northern District of Texas seeking to enjoin the Final Rule.  *VanDerStok, et al. v. Garland, et al.*, No. 4:22-cv-00691-O (N.D. Tex. Aug. 11, 2022).  In opposing injunctive relief, Defendants confirmed that it "remains true that 'partially complete frame or receiver alone is not a frame or receiver if it still requires performance of certain machining operations'" and that the "only relevant policy change concerns ATF's consideration of jigs, templates, instructions, equipment, or tools that are sold alongside a partially-complete frame or receiver to determine whether that clearly-identifiable component has reached the 'critical stage of manufacture.'"  *See* Defendants' Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, *VanDerStok*, No. 4:22-cv-00691-O (N.D. Tex. Aug. 29, 2022), ECF No. 41 (citing 87 Fed. Reg. 24,668).  In other words, ATF has determined that the one-stop-shop purchase of single-transaction *kits* are firearms that are subject to the GCA, but that 80 percent frames and receivers brought separately *are not*, no matter how easy it is to convert these parts into a fully fireable weapon.

95.     As a result, the ghost gun industry now recognizes the obvious:  the Final Rule contains a massive loophole.  Ghost gun manufactures, like Polymer80 and 80 Percent Arms, continue to sell 80 percent frames at will, and such products remain unregulated; they are still sold without background checks, serial numbers and recordkeeping. [137]

96.     Polymer80, for example, continues to sell unfinished receivers and frames.  *See P80 80% Pistol Blanks*, POLYMER80, https://www.polymer80.com/pistols/pistolblanks (last visited Oct. 18, 2022), attached as Ex. 21 ("P80 80% Pistol Blanks"); *AR Receiver Blanks*, POLYMER80, https://www.polymer80.com/arreceivers (last visited Oct. 18, 2022), attached as Ex. 22 ("P80 AR Receiver Blanks").  Polymer80 has issued a press release noting that its unserialized 80 percent products are in full compliance with the Final Rule.  Ex. 2, Polymer80 Product Changes in Accordance with ATF Final Rule.  Moreover, while Polymer80 says that its "kits" that include receivers/frames

---

[137] Ex. 2, Polymer80 Product Changes in Accordance with ATF Final Rule; *see also ATF Final Ruling 2021R-05F | Complete Breakdown*, 80 PERCENT ARMS (Aug. 25, 2022), https://www.80percentarms.com/blog/atf-final-ruling-2021r05f-complete-breakdown/ ("Lowers are still shipping: you can keep placing new orders for lower receivers.").

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

plus jigs and other tools will be serialized, it will continue to sell "their complete line of pistols," other "parts and accessories," **and** "their AFT 'Assemble for Thyself' kit, which includes all the necessary components to build a complete firearm, no drilling required." *Id.* Consumers are free to purchase one "Assemble for Thyself" kit to use on multiple, unserialized receivers they buy separately.

97. Similarly, Juggernaut Tactical still stocks both 80 percent lower receivers as well as jigs and tool kits on its website and sells them free and clear of the regulations that govern firearm transactions—so long as a buyer purchases each in a separate transaction. Juggernaut Tactical's policy is reflected in a warning at the bottom of its webpage stating that a receiver and jig cannot be purchased in the same transaction:



**Image 15: Juggernaut Tactical's Universal Jig Kit for Sale (emphasis added)**

98. Ghost gun customers and commentators also quickly recognized the narrow scope of the Final Rule. In response to a YouTube video posted by a gun-rights lawyer describing the effects of the Final Rule, commenters recognized that so long as 80 percent components are sold separately from jigs and tool kits, they can continue using ghost guns without being subjected to the serialization, background check, or recordkeeping requirements of the GCA.[138] For these commenters, the Final Rule is little more than a minor inconvenience:

---

[138] *What The ATF's New Rules On Unfinished Frames And Receivers Really Means To You...*, YOUTUBE (Aug. 31, 2022), https://www.youtube.com/watch?v=XCZPSmx4hzw.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



**Image 16:  YouTube Comments Identifying Flaws in the Final Rule**

99.    ATF has said nothing to repudiate the ghost gun industry's interpretation of the Final Rule.  Instead, ATF confirmed the Final Rule's limited scope in a new section of its website dedicated to providing guidance documents and examples of firearm frames and receivers.[139]  In a slide-deck detailing the effect of the Final Rule, ATF observed that un-machined 80 percent receivers not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools are *not* firearm receivers under the GCA.[140]

---

[139] *Definition Of "Frame Or Receiver" And Identification Of Firearms*, ATF (Oct. 17, 2022), https://www.atf.gov/rules-and-regulations/definition-frame-or-receiver.

[140] *FINAL RULE 2021R-05F-Definition Of "Frame Or Receiver" And Identification Of Firearms*, ATF, https://www.atf.gov/firearms/docs/guide/overview-final-rule-2021r-05f-definition-%E2%80%9Cframe-or-receiver%E2%80%9D-and-identification/download (last visited Oct. 4, 2022).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



**Image 17:  ATF Slides Explaining that, Under the Final Rule, Un-Machined 80 Percent Frames and Receivers Are Not Firearms Unless Sold in the Same Transaction as a Jig, Template, or Tool Kit**

100.    Similarly, in an August, 26, 2022 YouTube video produced by ATF presenting those

same slides, it confusingly stated that "not all items previously marketed as 80 percent firearms or 80

percent kits will be regulated under the final rule."[141]   Again, ATF confirmed that an un-machined

receiver billet or blank "not sold, distributed, or possessed with instructions, jigs, templates, equipment,

or tools that make it readily [] completed, is not a receiver."[142]

---

[141]  FINAL RULE 2021R-05F-Definition Of "Frame Or Receiver" And Identification Of Firearms, YOUTUBE, at 9:33 (Aug. 26, 2022), https://www.youtube.com/watch?v=q7XWhcx_Q3A.

[142]  *Id.*

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

101.    In a "training aid" intended to clarify the definition of a "frame" or "receiver" under the Final Rule, ATF took the same position.  In response to the question "Which "80 [percent] receiver" kits are regulated under the final rule?," ATF answered that an 80 percent receiver kit did not include an "unmachined body." [143]   Only when "sold, distributed, or possessed with a compatible jig or template" will such 80 percent components be considered firearms. [144]

102.    On September 27, 2022, ATF issued an "Open Letter" "to all federal firearms licensees," for the purpose of "further assist[ing] the firearms industry and the public in understanding whether a 'partially complete, disassembled, or nonfunctional' receiver of an AR-15/M-16 variant weapon" is a "frame or receiver" or "firearm" under the Final Rule.  Ex. 23, ATF, *Open Letter to All Federal Firearms Licensees – Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* at 1 (Sept. 27, 2022) (hereinafter "2022 Open Letter").  In the 2022 Open Letter, ATF confirmed that 80 percent AR-type receivers—identical to ones sold before the Final Rule was issued— are *not* firearms if they lack "indexing or machining of any kind . . . in the area of the fire control cavity" and are "not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides, such as within a receiver parts kit."  *Id.* at 3 (emphasis in original).  The 2022 Open Letter clarifies ATF's understanding and interpretation of the Final Rule— including that the pre-Rule machining analysis still stands and the only pertinent change with respect to 80 percent frames and receivers is whether or not those items are "sold, distributed, or marketed" with accessories like a jig or template.

103.    Moreover, ATF's 2022 Open Letter included the *exact same images* of un-machined 80 percent receivers used in the pre-Rule Ghost Gun Guidance to underscore that these receivers are *not* firearms. [145]   Indeed, the Ghost Gun Guidance, *supra* Section B.2., which was originally posted to ATF's website in 2015, remains accessible today.  *See Receiver Blanks,* ATF.gov, https://www.atf.gov/qa-category/receiver-blanks (last visited Oct. 10, 2022) (also attached as Ex. 20).

---

[143]  ATF, *Training Aid For The Definition Of Frame Or Receiver & Identification Of Firearms: Overview Of Final Rule 2021R-05F* at 7 (2022), https://www.atf.gov/firearms/docs/guide/new-training-aid-overview-final-rule-2021r-05f-definition-frame-or-receiver-and/download.

[144]  *Id*. at 4-5.

[145]  *Compare* Images 6 and 7, *supra with* Image 18, *infra*.





**Firearm**

(if not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides)



(if not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides)

**Image 18:  Using the Same Photos from the 2015 Ghost Gun Guidance Documents, ATF Confirms in Its Open Letter that 80 Percent Receivers Sold Without Templates, Jigs, Molds, Equipment, Tools, Instructions, or Guides Are Not Considered Firearms**

104.    The 2022 Open Letter clarifies ATF's view that classifications of AR-15 or M-16 unfinished receiver variants have not changed—as long as those items are sold without "associated templates, jigs, molds, equipment, tools, instructions, or guides."  Ex. 23 at 3.  Thus, the 2022 Open Letter implies as a consequence that at least some previously issued Classification Letters of 80 percent receivers sold without templates, jigs, or other accessories may still be in effect.

105.    As for the specific Classification Letters issued to Polymer80 in February 2015, November 2015, and January 2017, identified *supra*, at least one—if not all—of the Letters has likely survived the Final Rule.  The February 2015 Polymer80 Letter specifically classified Polymer80's AR-15 type receiver as "NOT a firearm receiver, or a firearm."  Ex. 14.  So, too, in the 2022 Open Letter, ATF confirmed that 80 percent AR-15 type receivers are *still* not considered "firearms" for purposes of the GCA.  Ex. 23 at 3.  Moreover, in Defendants' Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction in *VanDerStok*, Defendants clarified that the Final Rule "expressly grandfathers its prior classifications of the frame or receiver of existing split frame or receiver firearm designs,

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*including AR-15* and M-16 variants."   Defendants' Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction at 28-29, *VanDerStok*, No. 4:22-cv-00691-O (N.D. Tex. Aug. 29, 2022), ECF No. 41 (emphasis added).

106.   ATF has not specifically opined on the Polymer80 products in the November 2015 and January 2017 Classification Letters (Exs. 15 and 16), which collectively classified Polymer80's AR-10 type receiver and two different types of Glock-type frames as not "firearms" under the GCA.[146] But those classifications may still be in effect.   The Final Rule explains that classification decisions regarding "partially complete, disassembled, or nonfunctional frames" are not grandfathered in where those classifications were made "without [consideration of] any of the other parts, jigs, templates, or materials that are sold or distributed with the item or kit."   87 Fed. Reg. at 24,673.   This language from the Final Rule taken together with the 2022 Open Letter suggests that Classification Letters for other unfinished frames and receivers, where there is no accompanying jig, template, or other materials, might still be in effect.   And, in addition to its AR-15 style receiver, Polymer80 continues to sell Glock-style frames on its website, *see* Ex. 21, supporting the view that under the Final Rule, Polymer80's November 2015 and January 2017 Classification Letters continue to stand.   Defendants' statements in litigation have also suggested that the Classification Letters issued to Polymer80 in February 2015, November 2015, and January 2017 likely remain in effect.   Specifically, in *Division 80*, Defendants stated that "most classifications were grandfathered."[147]   Defendants also provided the plaintiffs in that case with assurance that they could continue to "sell[] receiver blanks . . . without a [] license."[148]

107.   Upon information and belief, ATF has also provided and/or will continue to provide ghost gun dealers with classification letters confirming that they may still make and sell 80 percent receivers and frames without abiding by the GCA's serial number, background check, and

---

[146]   The November 2015 Polymer80 Letter classified two separate 80 percent components:  an 80 percent receiver for an AR-10 assault rifle which Polymer80 identified as a "WARRHOGG BLANK" and a Glock-type "CG" or "CG9" Blank handgun frame.  The 2017 Polymer80 Letter classified Polymer80's Glock-type "PF940C Blank."  *Supra* ¶¶ 70-72.

[147]   *See* Ex. 1, Transcript of Hearing on Plaintiff's Motion for Preliminary Injunction at 48:3-11, *Div. 80 v. Garland*, No. 3-22-CV-00148 (S.D. Tex. Aug. 9, 2022) ("As to the classification letters, Your Honor, most classifications were grandfathered."); *see also* 87 Fed. Reg. 24,653.

[148]   *Id.* at 16:2-5.

recordkeeping requirements.   In an interview with VICE News, one ghost gun dealer, Tactical Machining, stated that ATF "approved in writing" the company's ability to continue to sell unserialized 80 percent receivers so long as they did not sell the receivers bundled with jigs or tool kits. [149]

108.   Email discussions with ATF's counsel also confirm this understanding.   When asked whether 80 percent receivers could continue to be sold without serialization, background check, or recordkeeping requirements, Defendants referred Plaintiffs to a portion of the Final Rule stating that: "Companies that sell or distribute only unfinished frame or receiver billets or blanks, and not any associated jigs, templates, or similar tools to the same customer are not required to be licensed or to mark those articles with identifying information." [150]

109.   Defendants also directed Plaintiffs to two examples provided in the Final Rule— Example 1 and Example 4—illustrating circumstances under which the sale of a receiver blank would not be considered a frame or receiver. [151]   Both examples underscore that receiver blanks and jig and tool kits sold separately are not regulated as firearms under the GCA.   Example 1 states that a partially complete frame or receiver "sold, distributed, or possessed with a compatible jig or template" is a frame or receiver and thus, a firearm.   87 Fed. Reg. 24,739.   Example 4 states that an un-machined receiver that is "not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools" is *not* a receiver and thus, *not a firearm*.   *Id*.   But ghost gun consumers can easily and quickly machine receiver blanks so long as they have access to instructions for doing so and can purchase jigs, tool kits or CNC machines.   *Supra* ¶¶ 94-98.   Indeed, that is the *entire point* of purchasing these products. Unless and until ATF closes the Final Rule's loophole, unfinished ghost guns will continue to quickly proliferate and cause harm in communities across the country.

---

[149]   Keegan Hamilton, *A Simple Plastic Tool Is Undermining New Ghost Gun Rules*, VICE (Sept. 12, 2022), https://www.vice.com/en/article/epzb3a/ghost-gun-jig-tool ("'As we've been instructed, and our understanding here in Orlando, the unfinished receiver, without a jig, instructions, or template is NOT A FIREARM,' Jusick's letter from the ATF said.  'The combination of such an item (unfinished receiver) with other parts (Excluding the Jig) does not reach the standard for Readily Convertible. In other words, your manufacture and selling of unfinished receivers with a lower parts kit does not meet the firearm threshold.'").

[150]   *See* Ex. 24, Email from Martin M. Tomlinson to Liesel N. Schapira (Sept. 3, 2022) (citing 87 Fed. Reg. 24,700).

[151]   *Id*.

**D. ATF's Ghost Gun Actions Have Harmed and Will Continue to Harm Plaintiffs.**

110.     ATF's final agency action, including the Final Rule, has allowed and continues to allow ghost guns to proliferate, causing concrete injury to each of the named Plaintiffs.

111.     **State of California**.  Plaintiff State of California is an epicenter of the growing ghost gun epidemic.  As of 2020, the state was home to at least 18 of the then-estimated 80 current online ghost gun retailers—the most of any state—and more than double the number of retailers than existed in the State just six years before.[152]  As one of the states most affected by the proliferation of ghost guns, California has suffered, and will continue to suffer, concrete harm caused by ATF, including (1) significantly increased costs of policing and law enforcement; (2) interference with California's ability to enforce its laws with respect to firearms and firearm-related crime; and (3) harm to its quasi-sovereign interest in protecting the security and well-being of its residents.

112.     The proliferation of ghost guns increases the difficulty and costs of policing and law enforcement in California.  The California Department of Justice's Bureau of Firearms, which conducts enforcement investigations to confiscate firearms from prohibited persons, has documented an exponential increase in ghost gun seizures:  from 2015 to 2021, California's annual ghost gun seizures have increased from 26 to 12,388, representing a staggering 47,546% increase.[153]  This statistical evidence is consistent with the experience of California Bureau of Firearms agents in the field.[154]  As a result, in recent years, Bureau of Firearms staff have devoted an increasing amount of time providing training to law enforcement personnel statewide on ghost guns.  Given the insufficient federal restrictions on 80 percent receivers and frames, this training has focused particularly on the circumstances in which the ghost guns assembled from such parts are noncompliant with state law.

---

[152]  *See* Ex. 4 EVERYTOWN FOR GUN SAFETY, UNTRACEABLE: THE RISING SPECTER OF GHOST GUNS (May 14, 2020) at 12-14 (Everytown [for Gun Safety] undertook an investigation to better understand the size of the online marketplace for ghost guns and "uncovered a sample of 80 sellers offering unfinished frames and/or receivers for ghost guns."  According to Everytown's analysis of business registrations from these online sellers in 2020, approximately 18 were located in California.).

[153]  *See* Press Release, Attorney General of California, *Attorney General Bonta Announces Arrest Of Suspect With Illegal Ghost Guns, Machine Gun Kits, And Assault Weapons* (Oct. 7, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-arrest-suspect-illegal-ghost-guns-machine-gun.

[154]  *See State of Washington v. U.S. Dep't of State*, 2:20-cv-00111-RAJ (W.D. Wash. 2020), ECF No. 56 [Declaration of Blake Graham] ¶ 30.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

113.    The California Department of Justice's Bureau of Investigation, which provides statewide expert investigative services combating multi-jurisdictional criminal organizations, has also noted a rise in ghost gun seizures in recent years.  In a 2022 multiagency operation, state and local law enforcement officers seized 58 firearms—including 12 ghost guns and ten assault weapons—in addition to cash and a variety of drugs in Central California. [155]  That operation resulted in a total of 88 felony arrests of individuals suspected of robberies, at least two homicides, and a host of other violent crimes. [156]  Similarly, in an ATF operation in April 2022, seven Los Angeles-area men were arrested and indicted for narcotics and ghost gun trafficking. [157]  With the methamphetamine and cocaine seized was a cache of more than 30 firearms, most of which were ghost guns and seven of which were automatic. [158]  These are just two examples of the many investigations in which state and federal law enforcement officers have seized ghost guns from persons involved in criminal activity in California.

114.    In addition, the transportation of untraceable firearms from other states into California makes California's local detective work solving crimes more difficult and amplifies the risk of violent attacks using these weapons.  Law enforcement agencies in California have reported recovering ghost guns at dramatically increased rates—including, most notably, a 7,225% increase from 2015 to 2021 in Santa Clara County, home of San Jose. [159]  In January 2020, the ATF special agent in charge of the Los Angeles Field Division stated that 41% of the Los Angeles Field Division's cases have involved ghost guns. [160]  He further noted that "[i]t concerns me as a law enforcement official that someone

---

[155]  Press Release, Attorney General of California, *Attorney General Bonta Announces 90 Arrests as Part of a Multiagency Gang Takedown In Stockton* (June 2, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-90-arrests-part-multiagency-gang-takedown.

[156]  *Id.*

[157]  Richard Winton, *Seven Men Charged With Gun Trafficking in Inland Empire, 'Ghost Guns' Among 30 Firearms Seized*, L.A. TIMES (Apr. 13, 2022), https://www.latimes.com/california/story/2022-04-13/gun-trafficking-charges-inland-empire-ghost-guns-seized.

[158]  *Id.*

[159]  Eli Wolfe, *UPDATE: San Jose Approves Ban On Ghost Guns*, SAN JOSE SPOTLIGHT (May 10, 2022), https://sanjosespotlight.com/san-jose-city-council-considers-banning-ghost-guns-homemade-firearms-weapons/.

[160]  Brandi Hitt, *'Ghost Guns' Investigation:  Law Enforcement Seeing Unserialized Firearms on Daily Basis in SoCal*, ABC7 (Jan. 30, 2020), https://abc7.com/ghost-guns-california-gun-laws-kits/5893043.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

with rudimentary or basic skills can mass produce untraceable firearms in the comfort of their own home."[161]  California's law enforcement officers have good reason to be concerned.  In June 2019, a gunman used two self-assembled AR-15-style assault rifles to ambush Officer Tara O'Sullivan and her training officer, killing O'Sullivan.[162]  Two months later, a convicted felon—who would have been unable to legally purchase a firearm—used a semiautomatic ghost rifle to shoot three California Highway Patrol officers, killing Officer Andre Moye.[163]

115.   California's ghost gun epidemic has only worsened since those killings.  During the first half of 2021, the Los Angeles Police Department reported a nearly 300% increase in ghost gun seizures as compared to the same period in 2020.[164]  When compared to the rest of the United States, the urgency of California's ghost gun problem becomes clearer still:  in 2020, 65% of all ghost guns seized by ATF were seized in California.[165]  As ghost guns become more widespread, California's law enforcement personnel are forced not only to devote additional time and resources to solve or deter ghost gun-related crimes, but also to confront an ever-growing threat to their personal safety.

116.   ATF's refusal to regulate the sale of 80 percent receivers and frames has also required California to repeatedly take legislative action to attempt to close this deadly loophole.  California has constructed a comprehensive regulatory regime to protect its citizens from the dangers posed by firearms, including regulations that ensure that firearms sales and transfers are overseen by licensed firearms dealers, prohibit classes of dangerous people from possessing firearms, and prohibit the manufacture and possession of military-style firearms and large capacity magazines.  First, in 2016, California enacted legislation requiring a self-assembled firearm to be engraved or permanently

---

[161]  *See* Brandi Hitt, *Orange County Lawyer Faces Federal Charges, Accused of Selling 'Ghost Guns'*, ABC7 (Feb. 20, 2020), https://abc7.com/ghost-guns-california-gun-laws-kits-melinda-romines/5950623.

[162]  Sam Stanton, *Murder Charge Filed Against Adel Ramos In Death Of Sacramento Officer Tara O'Sullivan*, SACRAMENTO BEE (June 21, 2019), https://www.sacbee.com/news/local/article231840593.html.

[163]  Richard Winton & Mark Puente, *Rifle Used In Deadly Riverside Shooting Was Untraceable 'Ghost Gun,' Sources Say*, L.A. TIMES (Aug. 14, 2019), https://www.latimes.com/california/story/2019-08-14/rifle-used-in-deadly-riverside-shooting-was-untraceable-ghost-gun-sources-say.

[164]  Justin Ray, *'An Instrument Of Death': The Problem Of Ghost Guns In California*, L.A. TIMES (Nov. 15, 2021), https://www.latimes.com/california/newsletter/2021-11-15/ghost-guns-california-essential-california.

[165]  *Id*.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

affixed with a unique serial number provided by the California Department of Justice, and requiring anyone in possession of an unserialized firearm to apply to the Department to serialize the firearm.[166] Then, in 2019, California enacted legislation to regulate ghost guns and the sale of 80 percent receivers and frames. Specifically, A.B. 879 required the sale of unfinished frames and receivers used to assemble ghost guns to be conducted through licensed dealers, pursuant to a California-only background check and sale record.[167]

117. California accelerated efforts to implement A.B. 879 due in part to the role of ghost guns in the tragic deaths of law enforcement officers Tara O'Sullivan and Andre Moye. In the wake of these devastating incidents, the Legislature approved $5.9 million in 2020-21 and $8.3 million in 2021-22 for the California Department of Justice's Bureau of Firearms and California Justice Information Services to retain additional staff and enhance the Department's existing background check systems.[168] These expenditures would have allowed the Department to implement A.B. 879 beginning July 1, 2022—three years earlier than originally planned.[169]

118. Then, informed by "continued" tragic ghost gun events that "caused enormous harm and suffering," California enacted A.B. 1621 just one day before A.B. 879 was to take effect.[170] A.B. 1621—which builds on the goals of much of A.B. 879—followed a flurry of ghost gun bans enacted by California's cities and localities and takes a comprehensive approach to regulating ghost guns. The new law extends preexisting law requiring serialization of unserialized firearms and greatly expands the definition of firearm precursor parts to include "any forging, casting, printing, extrusion, machined body or similar article [1] that has reached a stage in manufacture where it may readily be completed, assembled or converted to be used as the frame or receiver of a functional firearm, or [2] that is

---

[166] A.B. 857, adding CAL. PENAL CODE § 29180 (2019).

[167] A.B. 879 (Cal. 2019), amending CAL. PENAL CODE §§ 16170, 18010, 27585, and 30400, and adding §§ 16351 and 16352 (2019).

[168] S.B. 74 (Cal. 2020) (including referenced funding in item 0820-001-0001).

[169] S.B. 118 (Cal. 2020).

[170] A.B. 1621 (Cal. 2022).

*marketed or sold to the public* to become or be used as the frame or receiver of a functional firearm once completed, assembled or converted." [171]

119.    Under A.B. 1621, the sale or transfer of a firearm precursor part is generally prohibited, and anyone who currently possesses a firearm precursor part must apply to the California Department of Justice for a serial number for the part (in addition to requesting a serial number before self-manufacturing a firearm). [172]    However, completed frames and receivers, as well as parts that are considered to be a firearm under the Final Rule, are treated as firearms (i.e. they may generally only be sold or transferred by a licensed firearm dealer after a background check). [173]    Thus, under A.B. 1621, firearm parts that fall outside the scope of the Final Rule may no longer be sold or purchased in California and must be serialized.   A.B. 1621 will require the California Department of Justice's Bureau of Firearms and California Justice Information Services to expend additional resources to implement the law.

120.    ATF's final agency actions legalizing the sale of 80 percent frames and receivers at the federal level without these safeguards not only conflict with California's policies, but also threaten to disrupt California's carefully crafted regulatory scheme:   when these items can be manufactured and sold in states across the country, and untraceable firearms can be made without consequences, ghost guns and the myriad dangers that attend them flow more freely across California's borders.   ATF's actions thus frustrate the compelling ends served by California's firearms regulations.

121.    Ghost guns built from 80 percent receivers and frames also threaten California's interest in protecting the security and well-being of its residents from untraceable weapons.   The sale of these components enables Californians with criminal intent to obtain from outside the state firearms that they would otherwise be legally barred from purchasing in California—increasing the likelihood of gun violence and gun-related crime in California.   Moreover, law enforcement must expend

---

[171]   CAL. PEN. CODE § 16531(a) (2020) (emphasis added).

[172]   CAL. PEN. CODE §§ 29180, 30400 (2020).

[173]   CAL. PEN. CODE §§ 16519, 16520, 30400 (2020).

resources proactively monitoring California's borders to attempt to prevent 80 percent receivers and frames sold legally in other states from crossing into California.

122.     On November 14, 2019, a student at Saugus High School in Santa Clarita, California allegedly used a .45-caliber semiautomatic ghost gun to kill two students and injure three others before fatally shooting himself.[174]  According to the United States Secret Service, the Saugus High School shooter was the youngest mass attacker in 2019.[175]  The two victims killed during the Saugus shooting were 15-year-old Gracie Anne Muehlberger, Plaintiff Bryan Muehlberger's daughter, and 14-year-old Dominic Blackwell, Plaintiff Frank Blackwell's son.[176]  Given the shooter's age, he would not have been able to legally obtain a "firearm," as defined under the GCA.  In addition, the shooter's deceased father was reportedly a gun enthusiast from whom law enforcement had seized more than 40 firearms after a series of incidents that led to him becoming disqualified from possessing firearms.  But despite being deemed unfit to own a firearm, authorities suspect the father turned to ghost guns—one of which landed in the hands of his underage son, the Saugus school shooter.[177]  When law enforcement searched the boy's home after the Saugus shooting, they found a collection of unregistered firearms,[178] including a gun assembled from a kit.[179]

123.     In April 2021, a man prohibited from possessing firearms used a ghost gun as he went on a rampage in San Diego's Gaslamp Quarter.[180]  The violence began after the shooter allegedly

[174]  Dakin Andone, *The Gunman In The Saugus High School Shooting Used A 'Ghost Gun,' Sheriff Says*, CNN (Nov. 21, 2019), https://www.cnn.com/2019/11/21/us/saugus-shooting-ghost-gun/index.html

[175]  U.S. SECRET SERVICE NATIONAL THREAT ASSESSMENT CTR., MASS ATTACKS IN PUBLIC SPACES – 2019, at 13 (Aug. 2020), https://www.secretservice.gov/sites/default/files/reports/2020-09/MAPS2019.pdf.

[176]  Elizabeth Chou, *Hundreds Attend Memorial Service For Gracie Anne Muehlberger, 15, Killed In Saugus School Shooting*, LOS ANGELES DAILY NEWS (Nov. 23, 2019), https://www.dailynews.com/2019/11/23/celebration-of-life-set-for-gracie-anne-muehlberger-killed-in-saugus-school-shooting-in-santa-clarita/.

[177]  Ex. 5, Bill Whitaker, Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and Are Virtually Untraceable.

[178]  Richard Winton, *Santa Clarita Shooting: Weapon Used In Saugus High Attack A 'Ghost Gun,' Sheriff Says*, L.A. TIMES (Nov. 21, 2019), https://www.latimes.com/california/story/2019-11-15/santa-clarita-shooting-teen-girls-wounded-at-saugus-high-school-recovering-suspect-in-critical-condition.

[179]  Dakin Andone, *supra* note 174.

[180]  Dennis Romero, Wilson Wong, & Bill Feather, '*Ghost Gun' Used in Random San Diego Shooting That Killed 1, Injured 4, Police Say*, NBC NEWS (Apr. 23, 2021), https://www.nbcnews.com/news/us-news/1-dead-4-injured-san-diego-shootings-suspect-arrested-n1265034.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

randomly targeted and executed 28-year-old Justice Boldin, a parking valet.   The shooter then confronted and shot four others "completely unprovoked," inflicting life-threatening injuries upon two men, at least one of whom would have died but for the efforts of a former combat medic who happened to be nearby.[181]

124.    This past February, a man used an AR-15-style ghost gun to shoot and kill his three daughters, their court-ordered chaperone, and himself at a Sacramento church.[182]   The shooter—who was subject to an involuntary mental health hold as recently as April 2021 and an ongoing domestic violence restraining order, and who was out on bail for charges including resisting arrest and battery of a police officer—was barred from possessing firearms.[183]   Nevertheless, the shooter was able to acquire a ghost gun and an illegal 30-round magazine and to use them to devastating effect during what should have been an ordinary supervised visitation.   His daughters were 13, ten, and nine years old.[184]

125.    The more 80 percent receivers and frames legally produced and the more ghost guns that are made, the more likely it is that people prohibited from gun ownership will be able to use firearms to commit crimes in California, implicating the security and well-being of California residents.

---

[181]   *Id.*

[182]   AP, *Investigators: Father Armed With Ghost Gun During Church Slaying of Daughters*, CBS NEWS (Mar. 6, 2022), https://www.cbsnews.com/sanfrancisco/news/investigators-father-armed-with-ghost-gun-during-church-slaying-of-daughters/.

[183]   *Id.*

[184]   *Id.*



**Image 19:  Ghost Gun Used in the Saugus High School Shooting[185]**

126.    **Bryan Muehlberger.**  Plaintiff Bryan Muehlberger is the father of a victim of fatal ghost gun violence.  Mr. Muehlberger lives in Santa Clarita, California, a city in Los Angeles County, and works in Los Angeles County.  On November 14, 2019, Mr. Muehlberger received a call that his daughter, 15-year-old Gracie Anne Muehlberger, had been shot and killed in a shooting at Saugus High School.  Gracie was only 14 weeks into her high school career when her life was tragically taken.  The Saugus High School shooter opened fire on his classmates using a ghost gun that law enforcement officials believe he obtained from his father, who was legally prohibited from owning and possessing firearms.  Gracie and a fellow student, 14-year-old Dominic Blackwell, were murdered in the attack, while three other students were injured.  The attacker did not know Gracie or any of the other victims, all of whom were in the wrong place at the wrong time.  Gracie was shot one time in the back—the ghost gun was fired at point blank range, penetrating Gracie's backpack, entering her back, and ultimately puncturing her left lung before exiting through her left breast.  She dropped to the ground immediately, where she not only could not breathe due to the collapse of her left lung, but where she also drowned rapidly in her own blood, which filled her chest cavity completely.  Gracie likely suffered in pain for a minute or two before succumbing to her life-ending injury.

127.    Particularly following his daughter's death, Mr. Muehlberger lives in acute fear of ghost gun violence.  Mr. Muehlberger is especially vulnerable to the threat of ghost guns because Los Angeles County, where Mr. Muehlberger lives and works, has a significant and growing rate of ghost

---

[185]  Ex. 5, Bill Whitaker, Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and Are Virtually Untraceable.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

gun possession and violence.  In 2021, the Los Angeles Police Department announced that ghost guns "accounted for 33 percent of all guns recovered by the department" and that "the number of ghost guns seized by the department increased 400 percent since 2017 and more than doubled from 2020 to 2021 alone."[186]

128.    Mr. Muehlberger's fear of ghost gun violence is a direct and reasonable response to the increased risk of violence he faces as a result of the proliferation of these untraceable weapons in the area he lives and works.  Mr. Muehlberger works in Santa Monica, the same city where a shooter used a ghost gun to kill five people in 2013.[187]  At the time of the Santa Monica shooting, Mr. Muehlberger was at his office, mere minutes from the scene of the crime.  Because he drives through neighborhoods highly impacted by gun violence each day on his way to and from work, Mr. Muehlberger has become very cautious about getting into confrontations with strangers, fearing that those individuals may be carrying unregistered and dangerous ghost guns.

129.    Mr. Muehlberger has two other children; both recent graduates of Saugus High School. Mr. Muehlberger's sons are no strangers to the threat of gun violence:  in addition to losing their sister in the Saugus High School ghost gun shooting, Mr. Muehlberger's older son experienced a school lockdown during his junior year at Saugus, after a fellow student threatened the use of a firearm.  Mr. Muehlberger constantly worries that they, too, could become victims of ghost gun violence.  When his sons spend time together or are in the same place at the same time, Mr. Muehlberger worries that he could lose both of them at once, were a dangerous individual to open fire with a ghost gun.  Mr. Muehlberger's fear and anxiety is especially acute when he hears helicopters and ambulances, sounds which immediately bring him back to the moment he learned that his only daughter was shot and killed by a shooter using a ghost gun.  Because of the grief he continues to experience following Gracie's death, and because of his fear surrounding his sons' safety, Mr. Muehlberger undergoes regular therapy to assist him in processing his ongoing trauma.

---

[186]  A.B. 1621 (Cal. 2022).

[187]  Stan Wilson, Josh Levs & Michael Martinez, *Santa Monica Shooting Victim Dies, Bringing Toll To 5*, CNN (June 9, 2013), https://www.cnn.com/2013/06/09/justice/california-college-gunman.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

130.     Mr. Muehlberger's acute and ongoing fear of ghost gun violence is directly attributed to ATF's classifications of these weapons as not being "firearms" subject to the GCA.  Were these guns not generally available—particularly to prohibited purchasers or people who can access them without background checks—Mr. Muehlberger would not need to fear the ongoing risk of violence caused by ghost guns.  ATF's failure to adequately regulate ghost guns has allowed the legal sale of untraceable 80 percent receivers and frames and has facilitated a rampant market for ghost guns that still plagues Southern California, where Mr. Muehlberger lives and works.  ATF's statements about the Final Rule suggest that the agency will continue issuing precisely the kinds of Classification Letters that allow the legal sale of ghost gun components and cause manufacturers to continue producing these dangerous items.  Together, ATF's actions allow 80 percent receivers and frames to enter the stream of commerce and become the ghost guns that threaten the lives of individuals like Mr. Muehlberger and his family.  If ATF adequately regulated 80 percent receivers and frames as firearms, ghost gun components could not legally be purchased by those ineligible to possess firearms, and the risk of violence faced by individuals like Mr. Muehlberger would be significantly reduced.  Dangerous people who cannot legally purchase a firearm would have more difficulty obtaining one, and would-be violent criminals could be deterred by the knowledge that their firearms could be traced.

131.     **Frank Blackwell.**  Plaintiff Frank Blackwell is the father of a victim of fatal ghost gun violence.  Mr. Blackwell lives in Santa Clarita, California, a city in Los Angeles County, and works in Los Angeles County.  On November 14, 2019, Mr. Blackwell's son, 14-year-old Dominic Blackwell, was shot and killed by the same shooter at Saugus High School who murdered Gracie Anne Muehlberger.

132.     Particularly following his son's death, Mr. Blackwell fears the threat of future violence committed with ghost guns.  Mr. Blackwell's fear is a direct and reasonable response to the particular vulnerability to ghost gun violence that he faces as a result of living and working in Los Angeles County—where ghost gun possession and violence have been increasing exponentially.  Because Mr. Blackwell is aware of the spread of ghost guns in Los Angeles County resulting from ATF's position on 80 percent receivers and frames, and has directly experienced the grave harm caused by ghost guns,

he often fears that individuals that he and his family encounter in places like restaurants and coffee shops may be in possession of ghost guns.

133.    In addition to Dominic, Mr. Blackwell has three children—one of whom currently attends Saugus High School.  Mr. Blackwell often worries that they, too, may become victims of ghost gun violence.  Mr. Blackwell experiences ongoing trauma, grief, and suffering as a result of Dominic's death at the hands of a shooter using a ghost gun and his ongoing fear for his other children's safety.  Mr. Blackwell regularly attends therapy to assist him in processing this trauma.

134.    Mr. Blackwell's acute and ongoing fear of ghost gun violence is directly attributed to ATF's classifications of these weapons as not being "firearms" subject to the GCA.  Were these guns not generally available—particularly to prohibited purchasers or people who can access them without background checks—Mr. Blackwell would not need to fear the ongoing risk of ghost gun violence.  ATF's failure to adequately regulate ghost guns has allowed the legal sale of untraceable 80 percent receivers and frames and has facilitated a rampant market for ghost guns that now plagues Southern California, where Mr. Blackwell lives and works.  ATF's statements about the Final Rule suggest that the agency will continue issuing precisely the kinds of Classification Letters that allow the legal sale of ghost gun components and cause manufacturers to continue producing these dangerous items.  Together, ATF's actions allow 80 percent receivers and frames to enter the stream of commerce and become the ghost guns that threaten the lives of individuals like Mr. Blackwell and his family.  If ATF regulated 80 percent receivers and frames as firearms, ghost gun components could not legally be purchased by those ineligible to possess firearms, and the risk of violence faced by Mr. Blackwell would be significantly reduced and his fears, anxiety, and stressed ameliorated.  Dangerous people who cannot legally purchase a firearm would have more difficulty obtaining one, and would-be violent criminals could be deterred by the knowledge that their firearms can be traced.

135.    **Giffords Law Center.**  Plaintiff Giffords Law Center's core mission is to save lives from gun violence by shifting culture, changing policies, and challenging injustice.  ATF's arbitrary, capricious, and unlawful stance on ghost guns directly affects Giffords Law Center's interests and mission by permitting the proliferation of untraceable firearms that can be purchased by prohibited and dangerous persons and without any background check.  Giffords Law Center's ability to save lives

is inhibited on a daily basis as a result of ATF's approval of the sale of ghost guns.  That ghost gun sales are unregulated requires Giffords Law Center to expend a substantial portion of its budget and substantial human capital and resources to educate the public and combat the violence ghost guns cause.  Addressing ghost guns and the violence they facilitate is currently among the organization's top policy and legislative priorities:  in recent years, Giffords Law Center has contributed technical assistance to or monitored and analyzed over 100 state and federal bills pertaining to ghost guns. Giffords Law Center has also launched a series of specific ghost gun initiatives, including drafting proposed legislation, publishing white papers, and helping produce videos and other educational materials for the public.

136.    ATF's actions on ghost guns have required Giffords Law Center to expend more resources and staff time because ATF's regulatory approach undermines every other firearm policy that Giffords Law Center advocates for.  This includes the organization's core policy platform of supporting background check and licensing laws at the federal and state level.  Background check laws and other efforts to ensure firearms are legally and responsibly possessed are impeded and undermined by ATF's choice to create a loophole by which buyers can evade all otherwise applicable firearm sales regulations.  This loophole has forced Giffords Law Center to redouble its violence prevention efforts and direct even more resources into addressing gun violence even in states with strong firearm laws, like the organization's home state of California.  Increasingly, these expenditures have come in the form of legal action, as co-counsel or an amicus in lawsuits seeking to vindicate state firearm laws and to protect Americans.  In addition to this action, Giffords Law Center has, as pro bono counsel to the San Francisco District Attorney, joined the California Attorney General and San Francisco District Attorney in a lawsuit against ghost gun retailers—*see People v. Blackhawk Manufacturing Group, Inc.*, No. CGC-21-594577 (S.F. Sup. Ct. Oct. 13, 2021)—and filed an amicus brief in a case, like this one, challenging ATF's action on ghost guns. [188]  *See Syracuse v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 1:20-cv-06885-GHW (S.D.N.Y. Jan. 2, 2021). [189]  Giffords Law Center has made

---

[188]  Glenn Thrush, *San Francisco Sues Three Online Retailers For Selling 'Ghost Guns,'* N.Y. TIMES (Aug. 18, 2021) https://www.nytimes.com/2021/08/18/us/sf-ghost-guns.html.

[189]  *Syracuse v. ATF: Challenging the ATF's Classification of Ghost Guns*, GIFFORDS L. CTR. (Dec. 12, 2020), https://giffords.org/lawcenter/amicus-brief/syracuse-v-atf-challenging-the-atfs-classification-of-ghost-guns/.

this issue an urgent priority based on the fact that, in California, for example, ghost guns range from 25 to 50% of all crime guns recovered—representing one of the single most dangerous loopholes undermining the state's laws.[190] Every day, more lives are lost to ghost guns despite Giffords Law Center's increased efforts and resource expenditures.

137.   In addition to its legislative and legal work, Giffords Law Center provides policy expertise and technical assistance in support of violence intervention programs in communities disproportionately impacted by gun violence and ghost gun violence.  Giffords Law Center also frequently partners with community-based organizations that provide direct support services to victims of gun violence.  While these intervention efforts have contributed to dramatic reductions in gun violence in cities such as Oakland, California in recent years, many of these cities are also experiencing a surge in the numbers of ghost guns recovered, meaning all of these hard-fought gains in community safety are being compromised by ATF's actions.  The risk of increased ghost gun violence and ATF's failure to regulate ghost gun sales have therefore contributed to increased expenditure of human and financial capital and resources by Giffords Law Center toward work supporting violence intervention programs and violence reduction work by community-based organizations.  In sum, ATF's actions have forced Giffords Law Center to adjust many of its organizational priorities and divert substantial resources to combat ghost guns and resulting violence.

138.   **Statutory standing**.  The interests of all named Plaintiffs—the State of California, Bryan Muehlberger, Frank Blackwell, and Giffords Law Center are within the zone of interests protected by the GCA.  In enacting the GCA, Congress found that the "ease with which any person can acquire firearms . . . is a significant factor in the prevalence of lawlessness and violent crime in the United States."  Omnibus Crime Control & Safe Streets Act of 1968, Pub. L. No. 90-357, § 901(a)(2), 82 Stat. 197, 225.  All named Plaintiffs allege injury involving the increased likelihood of violent crime that ATF's actions have caused.  Therefore, all named Plaintiffs allege harm to interests within the zone of interests that the GCA protects.

---

[190]   Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel Epidemic Of Violence*, N.Y. TIMES (Jan. 26, 2022), https://www.nytimes.com/2021/11/14/us/ghost-guns-homemade-firearms.html.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**CLAIMS FOR RELIEF**

**COUNT ONE:  Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A):
ATF's Ghost Gun Actions Are Not in Accordance with Law.**

139.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

140.    Individually and collectively, ATF's ghost gun determinations, including the Classification Letters, Ruling 2015-1, the Ghost Gun Guidance, the Final Rule, and additional explanatory materials interpreting the Final Rule, including the September 27, 2022 Open Letter, August, 26, 2022 YouTube video, and informational slide-deck, constitute "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

141.    Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusion found to be . . . not in accordance with law." *Id.* § 706(2)(A).

142.    ATF's ghost gun determinations are "not in accordance with law" because they disregard the GCA.  The GCA provides that "[t]he term 'firearm' means (A) any weapon (including a starter gun) which will or ***is designed or may readily be converted*** to expel a projectile by the action of an explosive;" and includes "(B) ***the frame or receiver of any such weapon***."  18 U.S.C. § 921(a)(3) (emphases added).  Namely, unfinished 80 percent receivers and frames—sold as part of an assembly kit, with associated templates, or alone—fall within the statutory definition of firearms subject to the GCA's requirements.  They are "designed" to be "readily converted" into firearms, as is evident from their design and marketing, which emphasizes how "easy" it is for even a novice to use the "world's fastest jig" to complete an 80% lower "in *under 30 minutes*."[191]  Yet 80 percent receivers and frames may still be purchased without serial numbers and background checks, in direct violation of the GCA, as a result of ATF's determinations.

143.    ***The Final Rule.***  ATF's Final Rule contravenes the plain text of the GCA.  Although it recognizes that 80 percent frames and receivers, when sold with jigs tool kits or other materials, are

---

[191] *See, e.g.*, *Easy Jig Gen 3 Multi-Platform – AR-15, AR-9 And .308 80% Lower Ji*g, 80 PERCENT ARMS, https://www. 80percentarms.com/products/easy-jig-gen-3-multi-platform-ar-15-ar-9-and-308-80-lower-jig/ (last visited Oct. 11, 2022).

firearms under the GCA, ATF fails to acknowledge that an 80 percent receiver, whether sold with or without other products, is "readily convertible" to a fully functional weapon.  Any buyer can easily and legally purchase, without serialization or background check safeguards, an 80 percent receiver in one transaction and a jig or tool kit in another.  Or consumers can purchase machines to automate the conversion process in minutes.  Even a novice can "readily convert[]" an 80 percent component into a fully functioning firearm in hours or minutes.  Such receivers are therefore "firearms," and the Final Rule's failure to regulate them conflicts with the GCA.

144. ***Classification Letters, Ruling 2015-1, Ghost Gun Guidance.***  In the alternative, and to the extent the Final Rule is vacated, altered, or amended at any point, ATF's determinations reflected in its Classification Letters to Polymer80, Ruling 2015-1, and the Ghost Gun Guidance similarly disregard the GCA.

145. Each of the products in the Classification Letters constitutes a "firearm" under the plain text of the GCA.  For example, the 2017 Polymer80 Letter states that the 80 percent receiver in question was not "sufficiently complete" because of the "machining operations" that were yet to be "completed."  But at least one retailer of the 80 percent receiver at issue in the 2017 Polymer80 Letter markets it with the statement "***[i]t's amazing to think in just 10–15 minutes you can have a fully functioning Glock that you made at home.***"[192]  It is difficult to conceive of what might possibly be "readily" converted to expel a projectile within the meaning of the GCA if an 80 percent receiver that requires only 10–15 minutes of labor does not.  Similarly, consumers have reported that the product addressed in the November 2015 Polymer80 Letter could be converted into a fireable weapon in an hour or two.  As one consumer said, it "[r]eally is that easy."[193]  And the product addressed in the February 2015 Polymer80 letter was expressly advertised as "incredibly simple to drill and mill, and the material is forgiving."[194]  Ruling 2015-1 and the Ghost Gun Guidance are no different; each

---

[192] *See supra* note 4.

[193] *See supra* note 105.

[194] *See* Polymer80 *80% Receiver and Jig Kit (AR-15),* 80% LOWERS, https://www.80-lower.com/products/Polymer80-lower-receiver-and-jig-kit-ar-15/ (last visited Oct. 19, 2022).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

permits products that are "***designed or may readily be converted*** to expel a projectile" to be sold as *non*-firearms exempt from the GCA's requirements.  18 U.S.C. § 921(a)(3) (emphasis added).

146.    Plaintiffs have been and will continue to be impacted and injured by the Final Rule and Classification Letters to Polymer80 (and other 80 percent receiver and frame manufacturers), because, among other reasons, the firearms assembled from 80 percent receivers and frames have been used and in the future will be used in connection with criminal activity that undermines the legitimate regulatory and law enforcement interests of Plaintiff California and that has harmed and will foreseeably cause future harm to Plaintiffs Bryan Muehlberger, Frank Blackwell, and Giffords Law Center to Prevent Gun Violence.

**COUNT TWO:  Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A):
ATF's Ghost Gun Actions Are Arbitrary and Capricious.**

147.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

148.    ATF's Final Rule, 87 Fed. Reg. 24,652 constitutes "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

149.    Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusion found to be . . . arbitrary, capricious, an abuse of discretion."  *Id.* § 706(2)(A).

150.    The Final Rule arbitrarily deems as firearms only those 80 percent receivers and frames sold in kits or alongside jigs, templates, or similar aids, leaving 80 percent receivers and frames sold separately wholly unregulated.  This arbitrary line leaves open obvious and easily navigable loopholes that run counter to the GCA's basic commands.  ATF's Final Rule is, therefore, arbitrary and capricious.

151.    Moreover, ATF's approval of the unregulated manufacture and sale of 80 percent receivers and frames used to build ghost guns "entirely fail[s] to consider an important aspect of the problem" that ATF was purporting to regulate.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  ATF has acknowledged serious problems with the current regulatory landscape, *see supra* ¶ 12, yet has failed to consider the ways in which the Final Rule will

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

not abate those problems and may even contribute to the proliferation of untraceable firearms that impose costs across the country, including to the State of California and its law enforcement officers, Plaintiffs Bryan Muehlberger, Frank Blackwell, and other victims of ghost gun violence, and organizations expending limited resources to combat rising ghost gun violence, like Plaintiff Giffords Law Center.

152.  ATF has also failed to consider that 80 percent receivers and frames may be easily and legally purchased separate from an assembly kit.

153.  Alternatively, should the Final Rule be vacated, altered, or amended at any point, ATF's ghost gun actions, including its Classification Letters, Ruling 2015-1, and Ghost Gun Guidance constitute "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

154.  Because they are contrary to the GCA and because of ATF's failure to consider "important aspect[s] of the problem," ATF's ghost actions are arbitrary and capricious.

155.  Plaintiffs have been and will continue to be impacted and injured by the Final Rule or, in the alternative, ATF's ghost gun actions, because, among other reasons, the firearms assembled from 80 percent receivers and frames have been used and will continue to be used in connection with criminal activity that undermines the legitimate regulatory and law enforcement interests of Plaintiff State of California and that has harmed and will foreseeably cause future harm to Plaintiffs Bryan Muehlberger, Frank Blackwell, and Giffords Law Center.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an order and judgment:

a.  Declaring that 80 percent receivers and frames are "firearms" under the GCA, even when sold without a kit, template, or other materials, because they are "designed to" *and* "may readily be converted" into functional firearms with ease, *see* 18 U.S.C. § 921(a)(3);

b.  Declaring null and void, with no force and effect, the portions of ATF's Final Rule and guidance providing that 80 percent receivers and frames are not "firearms" under the GCA unless sold with a kit, template, or other materials;

c.      Declaring arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) the portions of ATF's Final Rule and other guidance providing that 80 percent receivers and frames are not "firearms," under the GCA unless sold with a kit, template, or other materials;

d.      In the alternative, declaring null, void, and with no force and effect ATF's Classification Letters, Ruling 2015-1, and the Ghost Gun Guidance finding that 80 percent receivers and frames are not "firearms" under the GCA;

e.      In the alternative, declaring arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) ATF's Classification Letters, Ruling 2015-1, and the Ghost Gun Guidance finding that 80 percent receivers and frames are not "firearms" under the GCA;

f.      Preliminarily and permanently enjoining Defendants from implementing and enforcing any agency action, decision, or guidance providing that 80 percent receivers and frames are not "firearms" under the GCA;

g.      Awarding Plaintiffs their reasonable costs, including attorneys' fees, in bringing this claim;

h.      Granting such other and further relief as this Court deems just and proper.

Dated: October 20, 2022                    /s S. Clinton Woods

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
Supervising Deputy Attorney General
S. CLINTON WOODS, 246054
Deputy Attorney General
Clint.Woods@doj.ca.gov
455 Golden Gate Ave,
Suite 11000
San Francisco, CA 94102-7004
Telephone:  (415) 510-3807
Facsimile:  (415) 703-5843

*Attorneys for Plaintiff State of California, by
and through Attorney General Rob Bonta*

1

*/s Scott A. Edelman*_____

2

GIBSON, DUNN & CRUTCHER LLP
SCOTT A. EDELMAN, SBN 116927
2029 Century Park East, Suite 4000
Los Angeles, CA 90067-3026
sedelman@gibsondunn.com
Telephone: (310) 357-8061
Facsimile: (310) 552-7041

3

4

5

6

7

LEE R. CRAIN, *pro hac vice*
LIESEL SCHAPIRA, *pro hac vice*
200 Park Avenue
New York, NY  10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

8

9

10

11

*/s Avi Weitzman*_____

12

PAUL HASTINGS LLP
AVI WEITZMAN, *pro hac vice*
aviweitzman@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 752-3620

13

14

15

16

17

*Attorney for Plaintiffs Bryan Muehlberger,*
*Frank Blackwell, and Giffords Law Center to Prevent*
*Gun Violence*

18

19

*/s David M. Pucino*_____

20

GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
DAVID M. PUCINO
223 West 38th St. # 90
New York, NY 10018
Telephone: (917) 680-3473

21

22

23

24

*Attorney for Plaintiffs Bryan Muehlberger,*
*Frank Blackwell, and Giffords Law Center to Prevent*
*Gun Violence*

25

26

27

28

74
FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF