1  GIBSON, DUNN & CRUTCHER LLP
2  SCOTT A. EDELMAN, SBN 116927
   sedelman@gibsondunn.com
3  2029 Century Park East
   Los Angeles, CA 90067-3026
4  Telephone: (310) 552-8500
   Facsimile: (310) 551-8741
5
6  LEE R. CRAIN, *pro hac vice*
   ERICA SOLLAZZO PAYNE, *pro hac vice*
7  LIESEL SCHAPIRA, *pro hac vice*
   200 Park Avenue
8  New York, NY 10166-0193
   Telephone: (212) 351-4000
9  Facsimile: (212) 351-4035
10
   PAUL HASTINGS LLP
11 AVI WEITZMAN, *pro hac vice*
   aviweitzman@paulhastings.com
12 200 Park Avenue
   New York, NY 10166
13 Telephone: (212) 318-6000
   Facsimile: (212) 752-3620
14
15 *Attorneys for Plaintiffs Bryan Muehlberger,*
   *Frank Blackwell, and Giffords Law Center to*
16 *Prevent Gun Violence*

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
Supervising Deputy Attorney General
S. CLINTON WOODS, SBN 246054
Deputy Attorney General
Clint.Woods@doj.ca.gov
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-7004
Telephone:  (415) 510-3807
Facsimile:  (415) 703-5843

*Attorneys for Plaintiff State of California, by*
*and through Attorney General Rob Bonta*

17              *[Additional Counsel Listed on Next Page]*

18              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
19               **SAN FRANCISCO DIVISION**

20 STATE OF CALIFORNIA, BRYAN
21 MUEHLBERGER, FRANK BLACKWELL,
   GIFFORDS LAW CENTER TO PREVENT
22 GUN VIOLENCE,
23              Plaintiffs,
24 v.
25 BUREAU OF ALCOHOL, TOBACCO,
26 FIREARMS AND EXPLOSIVES, et al.,
27              Defendants.
28

CIVIL CASE NO.:  3:20-CV-06761-EMC

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Hon. Edward M. Chen

Hearing Date:   January 26, 2023
Hearing Time:  1:30 PM PST
Hearing Place:  Courtroom 5, 17th Floor

1   Additional Counsel

2   GIFFORDS LAW CENTER TO
    PREVENT GUN VIOLENCE
3   DAVID M. PUCINO, *pro hac vice*
4   244 Madison Ave Ste 147
    New York, NY 10016
5   Telephone: (917) 524-7816

6   *Attorney for Plaintiffs Bryan Muehlberger,*
    *Frank Blackwell, and Giffords Law Center to*
7   *Prevent Gun Violence*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2                               **TABLE OF CONTENTS**

3   I. INTRODUCTION ........................................................................................................1

4   II. BACKGROUND .........................................................................................................4

5        A.      Ghost Guns—a Lethal "DIY" Project .........................................................4

6        B.      The Lethal Costs of Ghost Guns .................................................................5

         C.      Statutory and Regulatory Background .........................................................8

7        D.      Procedural Background ..............................................................................12

8   III. STANDARD OF REVIEW .....................................................................................14

9   IV. ARGUMENT ...........................................................................................................14

         A.      All Plaintiffs Have Standing .....................................................................14

10               1.       State of California .........................................................................15

11               2.       Giffords Law Center to Prevent Gun Violence.............................20

                 3.       Bryan Muehlberger and Frank Blackwell ....................................23

12       B.      Plaintiffs' In-The-Alternative Claims Challenging ATF's Pre-Final Rule

13               Guidance Are Ripe......................................................................................27

         C.      The Court Should Reject the Arguments in the BlackHawk Applicants'

14               Amicus Brief...............................................................................................30

    V. CONCLUSION .........................................................................................................31

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Pages

**Cases**

*Adkins v. Facebook, Inc.*,
424 F. Supp. 3d 686 (N.D. Cal. 2019) ........................................................................20

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982) ........................................................................................................15

*Am. Diabetes Ass'n v. U.S. Dep't of the Army*,
938 F.3d 1147 (9th Cir. 2019) ........................................................................................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................14

*Ass'n of Irritated Residents v. U.S. EPA*,
10 F.4th 937 (9th Cir. 2021) ..........................................................................................28

*Barnum Timber Co. v. E.P.A.*,
633 F.3d 894 (9th Cir. 2011) ..........................................................................................15

*Bennett v. Spear*,
520 U.S. 154 (1997) ..........................................................................................19, 26, 27

*Bishop Paiute Tribe v. Inyo Cty.*,
863 F.3d 1144 (9th Cir. 2017) ........................................................................................28

*Bova v. City of Medford*,
564 F.3d 1093 (9th Cir. 2009) ........................................................................................29

*Brady Campaign to Prevent Gun Violence United with the Million Mom March v.*
*Ashcroft*,
339 F. Supp. 2d 68 (D.D.C. 2004) ......................................................................21, 25, 26

*California v. Azar*,
911 F.3d 558 (2018) ..........................................................................................17, 18, 19

*California v. Bureau of Land Mgmt.*,
2020 WL 1492708 (N.D. Cal. Mar. 27, 2020) ................................................................18

*California v. Ross*,
358 F. Supp. 3d 965 (N.D. Cal. 2018) ......................................................................17, 18

*Carey v. Populations Servs. Int'l*,
431 U.S. 678 (1977) ........................................................................................................15

*Cent. Delta Water Agency v. United States*,
306 F.3d 938 (9th Cir. 2002) ....................................................................................25, 26

*Chaudhry v. City of L.A.*,
751 F.3d 1096 (9th Cir. 2014) ........................................................................................24

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) .................................................................................................24, 25

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) .................................................................................................17, 24

*In re Coleman,*
   560 F.3d 1000 (9th Cir. 2009) ........................................................................................28

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
   657 F.3d 936 (9th Cir. 2011) ..........................................................................................20

*Czyzewski v. Jevic Holding Corp.,*
   137 S. Ct. 973 (2017) .....................................................................................................17

*Davidson v. Kimberly-Clark Corp.,*
   889 F.3d 956 (9th Cir. 2018) ..........................................................................................24

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) ..............................................................................................19, 27

*Div. 80 v. Garland,*
   No. 3:22-cv-00148 (S.D. Tex. May 9, 2022) ...........................................................13, 27

*Eggar v. City of Livingston,*
   40 F.3d 312 (9th Cir. 1994) ............................................................................................26

*Elliot v. QF Circa 37, LLC,*
   2017 WL 6389775 (S.D. Cal. Dec. 14, 2017) ...............................................................24

*In re Facebook, Inc. Consumer Privacy User Profile Litig.,*
   402 F. Supp. 3d 767 (N.D. Cal. 2019) ...........................................................................14

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC,*
   666 F.3d 1216 (9th Cir. 2012) ........................................................................................23

*Fair Hous. Council of Oregon v. Travelers Home & Marine Ins. Co.,*
   2016 WL 7423414 (D. Or. Dec. 2, 2015) ......................................................................21

*Gonzalez v. U.S. Imm. & Customs Enforcement,*
   975 F.3d 788 (9th Cir. 2020) ..........................................................................................15

*Happe v. Lloyd,*
   2 F. App'x 519 (7th Cir. 2001) ......................................................................................26

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ........................................................................................................20

*La Asociation de Trabajadores de Lake Forest v. City of Lake Forest,*
   624 F.3d 1083 (9th Cir. 2010) ........................................................................................21

*Larson v. Valente,*
   456 U.S. 228 (1982) ........................................................................................................19

*Leite v. Crane Co.,*
   749 F.3d 1117 (9th Cir. 2014) ........................................................................................14

*Leonard v. Clark*,
  12 F.3d 885 (9th Cir. 1993)....................................................................................................15

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...............................................................................................14, 15, 26

*Maryland v. U.S. Dep't of Educ.*,
  2020 WL 4039315 (D.D.C. July 17, 2020)............................................................................18

*Maryland v. U.S. Dep't of Educ.*,
  No. 20-5268 (D.C. Cir. Dec. 22, 2020)..................................................................................18

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ................................................................................................................15

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011).................................................................................................18

*Mendia v. Garcia*,
  768 F.3d 1009 (9th Cir. 2014).............................................................................15, 18, 19, 26

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  No. 3:22-cv-00116-PDW-ARS (D.N.D. July 5, 2022).....................................13, 14, 27

*Mountain States Legal Found. v. Glickman*,
  92 F.3d 1228 (D.C. Cir. 1996).................................................................................................25

*Nat'l Audubon Soc'y v. Davis*,
  307 F.3d 835 (9th Cir. 2002)...................................................................................................19

*Nat'l Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015)....................................................................................20, 22, 23

*Paulsen v. Daniels*,
  413 F.3d 999 (9th Cir. 2005)...................................................................................................29

*Pennsylvania v. New Jersey*,
  426 U.S. 660 (1976) ................................................................................................................17

*Pinnacle Armor, Inc. v. United States*,
  648 F.3d 708 (9th Cir. 2011)...................................................................................................14

*Powell v. Illinois*,
  2019 WL 4750265, at *3 (N.D. Ill. Sept. 30, 2019)........................................................24, 26, 27

*Sabra v. Maricopa Cty. Cmty. Coll. Dist.*,
  44 F.4th 867 (9th Cir. 2022)...........................................................................3, 20, 22, 23

*San Diego Cty. Gun Rts. Comm. v. Reno*,
  98 F.3d 1121 (9th Cir. 1996)...................................................................................................24

*Sandoval v. Saticoy Lemon Ass'n*,
  1990 WL 484150 (C.D. Cal. Apr. 27, 1990) ........................................................................28

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,
  968 F.3d 738 (9th Cir. 2020)...........................................................................................14, 30

*Smith v. Pac. Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004)................................................................20, 23

*Snyder & Assocs. Acquisitions LLC v. United States*,
    859 F.3d 1152 (9th Cir. 2017)............................................................................14

*Summers v. Earth Island Inst.*,
    55 U.S. 488 (2009)............................................................................................15

*Syed v. M-I, LLC*,
    853 F.3d 492 (9th Cir. 2017)............................................................................26

*Thompson v. City of Fresno*,
    2006 WL 2850374 (E.D. Cal. Oct. 4, 2006) ....................................................28

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) ......................................................................................15

*Twitter, Inc. v. Paxton*,
    26 F.4th 1119 (9th Cir. 2022)............................................................................29

*United States v. Students Challenging Regul. Agency Procs.*,
    412 U.S. 669 (1973) ..........................................................................................20

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013)............................................................................22

*VanDerStok v. Garland*,
    No. 4:22-cv-00691-O (N.D. Tex. Aug. 11, 2022)........................13, 27, 29, 30

*Washington v. U.S. Dep't of State*,
    2:20-cv-99111-RAJ (W.D. Wash. 2020) ..........................................................18

**Constitutional Provisions**

U.S. Const. art. III ................................................................14, 20, 23, 24, 25

**Statutes**

18 U.S.C. § 921 .....................................................................................1, 8, 14

Gun Control Act, Pub. L. No. 90-618 (1968) ............................................1, 8

**Other Authorities**

Armando Garcia & Libby Cathey, *Biden Announces Rule on 'Ghost Guns,' New ATF Nominee*, ABC NEWS (Apr. 11, 2022), https://abcnews.go.com/Politics/biden-announces-rule-ghost-guns-atf-nominee/story?id=83998105. ...................................................10

*Combatting Gun Violence*, C-SPAN (Apr. 11, 2022), https://www.c-span.org/video/?519413-1/president-biden-announces-rule-regulate-ghost-guns-nominates-atf-director ..........................................................10

Revised Firearm Precursor Part Definitions and Guidebook, CAL. DEP'T OF JUSTICE, https://oag.ca.gov/firearms/regs/revised-fpp (last visited Dec. 20, 2022) ......................................17

1

**Rules**

2

Fed. R. Civ. P. 8 ...................................................................................................................4, 28

3

Fed. R. Civ. P. 12 .................................................................................................................13, 28

4

**Regulations**

5

27 C.F.R. § 478.12 ...............................................................................................................10, 11

6

87 Fed. Reg. 24,656 ...................................................................................................................6

7

87 Fed. Reg. 24,661 .................................................................................................................10

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:20-CV-06761-EMC

# I. INTRODUCTION

The Gun Control Act of 1968 ("GCA") defines a regulated "firearm" to include "*any* weapon (including a starter gun) which will *or is designed to or may readily be converted to expel a projectile by the action of an explosive*" and "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3) (emphases added). Plaintiffs' Amended Complaint extensively details how nearly finished or "80 percent" receivers and frames can easily be converted in minutes into fully operable firearms using common household tools, and how the actions and decisions of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to permit the unregulated sale of such 80 percent receivers and frames violate the GCA and are arbitrary and capricious. Unlike all other firearms in the United States, these deadly weapons—colloquially called "ghost guns"—can be purchased without a background check and without being serialized, rendering them untraceable to law enforcement.

Plaintiffs filed this action more than two years ago to challenge Defendants' agency actions regarding ghost guns as arbitrary and capricious and contrary to the plain meaning of the GCA. As detailed in the original Complaint, Defendants' ghost gun regulatory regime allowed an epidemic of ghost guns to sweep the nation, emboldening criminals, increasing violence, and destroying lives. After Defendants moved to dismiss, ATF undertook a new rulemaking, and the case was stayed. Unfortunately, ATF's enforcement of the new rule (the "Final Rule"), which took effect in August 2022, fails to remedy a critical deficiency plaguing ATF's previous determinations. While the GCA's plain language requires the regulation of weapons that are designed to and "may readily be converted to expel a projectile," the Final Rule prohibits only the sale of ghost gun "kits"—single-transaction purchases that provide the buyer all the building blocks needed to construct a ghost gun in a single package. Thus, under the Final Rule, ATF still permits the sale of 80 percent receivers and frames as standalone products—and even in combination with other transactions that contain the tools needed to convert such receivers and frames into finished, unserialized weapons.

The ghost gun industry has taken notice—manufacturers and dealers understand that the Final Rule's narrow restriction on the sale of ghost gun *kits* leaves a massive loophole in the new regulatory regime.  As long as consumers buy the 80 percent receivers separately from the other items in a kit— which could include templates, equipment, tools, jigs, or build-instructions—they can still purchase these lethal DIY projects at will without undergoing a background check.  *See* Amended Complaint ("AC") ¶¶ 92-95.  Indeed, major ghost gun manufacturers have started to specifically structure their sales this way—allowing buyers to first purchase 80 percent receivers and then, minutes later, purchase a separate "Assemble for Thyself" kit that includes all remaining parts necessary to build the ghost gun.  *Id.* ¶ 96.  In other words, the Final Rule allows ghost guns manufacturers to split up their products into multiple sales, as one prominent manufacturer displays on its own website:



*Id.* ¶ 97.

ATF's ongoing failure to properly regulate ghost guns has left Plaintiffs no choice but to continue to pursue the claims they first brought in September 2020.  Ghost guns remain the weapons of choice for criminals and those who would otherwise be prohibited from possessing firearms under federal law, including domestic abusers, minors, people convicted of felonies or addicted to drugs, and individuals with serious mental illness.  With just a credit card and a mailing address, *anyone* can purchase these untraceable DIY guns in minutes.  ATF's determinations excluding the regulation of these firearms have therefore allowed the proliferation of ghost guns, causing concrete and ongoing injuries to each of the Plaintiffs.

Unlike Defendants' motion to dismiss the original Complaint, ECF No. 29, the instant motion does not attempt to argue that Plaintiffs have failed to state a claim that the Final Rule conflicts with the GCA and is arbitrary and capricious.  Instead, Defendants attempt to sidestep the merits by asking this Court to dismiss the Amended Complaint at the pleading stage on two grounds: (1) that Plaintiffs lack standing to assert any of their claims; and (2) that certain of Plaintiffs' claims are unripe.  These arguments lack merit.  This Court should reject them and allow this case to proceed to final resolution.

*1. Standing.*  Each of the Plaintiffs has standing to challenge ATF's agency actions.

**The State of California**: Plaintiff California—an epicenter of the ghost gun epidemic—has suffered and will continue to suffer financial harm, as it is forced to expend resources implementing state legislation intended to close the loophole created by ATF's actions and training law enforcement personnel on ghost guns.  AC ¶¶ 116-21.  In addition to these financial injuries, California has suffered harm to its quasi-sovereign interests in protecting the security and well-being of its residents.  *Id.* ¶¶ 112-15.

**Giffords Law Center**: ATF's unlawful determinations have forced Giffords Law Center to Prevent Gun Violence ("GLC") to expend substantial resources and staff time and, in many respects, to fundamentally change its organizational priorities and activities.  AC ¶¶ 135-36.  ATF's failure to comply with the law has required GLC to launch a series of ghost gun initiatives including (among other things) drafting proposed legislation, publishing white papers, and producing educational materials for the public—all in an attempt to further its core mission of saving lives and preventing gun violence.  The Ninth Circuit has repeatedly recognized that organizations like GLC have standing based on such expenditures—including recently when it reversed a ruling that Defendants relied on in their motion to dismiss the original Complaint.  *Sabra v. Maricopa Cty. Cmty. Coll. Dist.*, 44 F.4th 867, 873, 879-80 (9th Cir. 2022); *see* ECF No. 29 at 7-8.

**The Individual Plaintiffs**: Plaintiffs Bryan Muehlberger and Frank Blackwell continue to experience ongoing injuries following the senseless murder of their children in the Saugus High School ghost gun shooting.  They now live in acute fear of ghost gun violence and suffer ongoing emotional and psychological harm, knowing that at any moment ghost gun violence could, once again, visit them and their families.  AC ¶¶ 130, 134.  Were ghost guns not generally available, their fear of ghost gun

1    violence and the trauma they experience as a result of the ghost gun epidemic would be significantly

2    reduced. *Id.* ¶¶ 127-34.

3        **2. *Ripeness of Alternative Claims.*** Defendants do *not* contest the ripeness of Plaintiffs' claims

4    challenging the Final Rule.  Instead, Defendants argue that the claims that Plaintiffs assert "[i]n the

5    alternative[]"—which challenge ATF's pre-Final Rule regulatory regime "to the extent the Final Rule

6    is vacated, altered, or amended"—are unripe.  AC ¶¶ 144-45, 153-55.  But the prospect that the Final

7    Rule will be vacated in full or in relevant part is not "speculative," as Defendants claim.  In fact, there

8    are multiple lawsuits currently pending against the same Defendants here that seek to vacate the Final

9    Rule in its entirety.  One court has *already* preliminarily enjoined the Final Rule as applied to certain

10   individuals and entities.  Should the Final Rule be vacated, ATF's preexisting classification letters and

11   ghost gun guidance would take the Final Rule's place.  Plaintiffs' alternative claims are plainly

12   sufficient to be pled in the alternative.  *See* Fed. R. Civ. P. 8(d).

13       This Court should deny Defendants' motion to dismiss in its entirety.

14                                **II. BACKGROUND**

15   **A.    Ghost Guns—a Lethal "DIY" Project**

16       Ghost guns are projects that allow anyone at home to build a fully operable, lethal firearm within

17   minutes.  AC ¶ 2.  The resulting DIY weapons are "ghosts" because they are not regulated by the

18   federal government and, lacking serial numbers, are not traceable by law enforcement when they are

19   used in a crime.  *Id.* ¶¶ 2, 38.  Anyone can purchase a ghost gun at any time without a background

20   check, meaning that categories of prohibited purchasers such as domestic abusers and minors can easily

21   access fully fireable weapons with nothing more than a credit card, a shipping address, and a few

22   minutes to piece their gun together.  *Id.* ¶ 43.

23       The core component of a ghost gun is an "80 percent" or "unfinished" receiver (for long guns)

24   or frame (for handguns).  AC ¶ 3.  A receiver or frame is the central piece of any firearm—the part of

25   the firearm that houses the firing mechanism.  *Id.*  80 percent receivers and frames are pieces of metal

26   or composite plastic created for the sole and express purpose of allowing people to create a fireable

27   weapon quickly and easily.  *Id.* ¶¶ 3-4.  To the lay eye, 80 percent receivers and frames ***are in all***

28

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:20-CV-06761-EMC

*material respects indistinguishable* from ready-to-fire receivers and frames—as shown in the image below—yet ATF has decided that only the fully "finished frames" are subject to federal regulation. *Id.*



B. **The Lethal Costs of Ghost Guns**

On November 14, 2019, 15-year-old Gracie Anne Muehlberger and 14-year-old Dominic Blackwell were shot at Saugus High School and killed by one of their classmates wielding a ghost gun. AC ¶ 11. Gracie was shot once in the back—the ghost gun was fired at point blank range, penetrating her backpack, entering her back, and puncturing her left lung before exiting through her left breast. *Id.* ¶ 126. She dropped to the ground and succumbed to her life-ending injury. *Id.* Dominic suffered a similar fate. *Id.* As Gracie and Dominic died, three other students were injured in the attack—all innocent children who would have been safe at school had their classmate not had such ready access to a ghost gun. *Id.*

The Saugus High School shooter opened fire on his classmates using a ghost gun that law enforcement officials believe he obtained from his father, who was prohibited from legally owning and possessing firearms. AC ¶ 126. The below image shows the ghost gun used in the Saugus High School Shooting. *Id.* ¶ 125.



This preventable murder of two high school teenagers led to unshakeable grief, trauma, and ongoing acute fear for Plaintiffs Mr. Muehlberger and Mr. Blackwell. Not only did the tragedy deprive Mr. Muehlberger and Mr. Blackwell of their children, it instilled fear in them as the epidemic of ghost guns grew (and continues to grow) in Los Angeles County. AC ¶ 127. Indeed, Saugus High School has seen at least one credible threat of gun violence since the shooting. *Id.* ¶ 129. Mr. Muehlberger and Mr. Blackwell still live in Santa Clarita, where Saugus High School is located, and one of Mr. Blackwell's children still attends the school. *Id.* ¶¶ 126, 131.

Tragically, the Saugus High School ghost gun shooting is not unique. The ghost gun epidemic continues to spread. ATF itself has recognized that there has been a "substantial increase" in ghost gun or privately made firearm ("PMF") recoveries nationwide over the last several years. 87 Fed. Reg. 24,656. From 2016 to 2021, "approximately 45,240 suspected PMFs" were reported to have been recovered by law enforcement agencies. *Id.* The number of recoveries has grown exponentially over that period, from 1,758 in 2016 to 19,344 in 2021. *Id.* And the increasing production and availability of ghost guns built with 80 percent components has led to a commensurate rise in national violence attributable to unregistered, untraceable ghost guns. AC ¶ 55. Between 2010 and April 2020, law enforcement agencies connected at least 2,513 ghost guns to criminal activity. *Id.* Of that number, more than half—1,300 guns—were used or sold by criminal enterprises to facilitate crimes including gun or drug trafficking, robbery, terrorism, and murder. *Id.* Such criminal activity is widespread.

Between late 2018 and May 2020, "at least 38 states and Washington D.C. have seen criminal cases involving ghost guns," including "four mass shootings, violent police shootouts . . . and cases involving terrorism and white supremacists." *Id.* ¶ 11 (quoting reporting by CBS *60 Minutes*).

The ghost gun epidemic is particularly acute in California, where annual ghost gun seizures have increased by 47,546% between 2015 and 2021.  AC ¶ 112.  According to California law enforcement agencies, ghost guns "accounted for 25 to 50 percent of firearms recovered at crime scenes" in California in 2020 and 2021.  *Id.* ¶ 57.  The "vast majority" of these weapons were wielded by individuals prohibited from owning a firearm.  *Id.*  California also disproportionately experiences ghost gun smuggling and ghost gun-related violence: 65% of all ghost guns seized nationally by ATF were located in California.  *Id.* ¶ 115.  California's law enforcement officers must now devote additional time and resources to solve and deter ghost gun-related crimes, risking their personal safety. *Id.*  Because the ghost gun epidemic has disproportionately affected California, *id.* ¶¶ 115-19, the State has enacted a robust regulatory regime to protect its citizens and officials from ghost guns, *id.* ¶¶ 116-21.  The State is also spending millions of additional dollars to implement background checks to regulate the sale of ghost guns.  *Id.* ¶ 117.  But because of the national character of the ghost gun epidemic, and because ghost gun owners can transport these weapons across borders, California's carefully designed regulatory scheme is undermined by the Final Rule's inadequate regulation of these deadly weapons.  *Id.* ¶ 120.

Plaintiff GLC is also at the forefront of the ghost gun epidemic.  Founded 29 years ago, GLC is a national public interest law center and non-profit organization that promotes gun safety in the United States.  AC ¶ 135.  GLC is the legal arm of the gun safety organization led by former Congresswoman Gabby Giffords, who has dedicated her life to reducing gun violence after she was shot in the head on January 8, 2011 at a meeting with constituents in Tucson, Arizona.  GLC expends substantial resources to challenge policies that exacerbate gun violence and to protect Americans through its advocacy and educational work.  *Id.*  The organization has spent many hours and substantial resources to educate the public and combat the violence that ghost guns cause, with the regulation of ghost guns becoming one of GLC's top legislative priorities.  *Id.*  But the continuing ghost gun epidemic, facilitated and exacerbated by ATF's actions, has required GLC to expend even more

1    resources and staff time combatting ghost guns and educating the public about them—to the detriment

2    of other critical issues, such as GLC's advocacy for universal background checks.  *Id.* ¶ 136.  GLC's

3    considerable efforts in this area, including the provision of direct services to reduce gun violence in

4    vulnerable communities like Oakland, California, have been undermined by the massive surge of ghost

5    guns and the attendant risk of increased gun violence—which are attributable in large part to ATF's

6    failure to properly regulate 80 percent frames and receivers.  *Id.* ¶ 137.

7    **C.    Statutory and Regulatory Background**

8            The Gun Control Act has been the foundation of federal firearms law for more than half a

9    century.  AC ¶ 28.  The legislation arose from the assassination of President John F. Kennedy, who

10   was shot and killed with a mail-order rifle Lee Harvey Oswald purchased for $19.95 in response to a

11   magazine advertisement.  *Id.*  Shortly after President Kennedy's death, Senator Thomas Dodd of

12   Connecticut introduced legislation restricting mail-order sales of shotguns and rifles.  *Id.*  That

13   legislation garnered bipartisan support and was endorsed by the National Rifle Association.  But the

14   bill ultimately died in committee.  *Id.*  The debate continued, however, gaining even greater urgency in

15   1968 after the assassinations of Martin Luther King Jr. and Robert F. Kennedy.  *Id.*

16           Following these national tragedies, President Lyndon B. Johnson signed into law the GCA,

17   which asserted significant federal control over the firearms industry and those who were legally

18   permitted to possess firearms.  Gun Control Act, Pub. L. No. 90-618 (1968).  This landmark legislation

19   bans sales of firearms to people convicted of felonies, people addicted to drugs, minors, and individuals

20   with serious mental illnesses, and it includes requirements that: (i) firearm dealers obtain a federal

21   firearms license; (ii) firearm purchasers undergo background checks to ensure they are legally

22   permitted to purchase and possess weapons; and (iii) firearms be serialized.  18 U.S.C. § 921 *et seq.*;

23   AC ¶¶ 28-29.  To achieve the GCA's goals of preventing prohibited purchasers from obtaining guns,

24   the GCA defines "firearm" broadly to include not only fully assembled, functional weapons but also

25   items that are "designed to or may readily be converted" into fireable weapons, as well as the "receiver"

26   or "frame" of such weapons.  18 U.S.C. § 921(a)(3); AC ¶¶ 31-32.  A firearm frame or receiver is the

27   central component of a firearm that houses the hammer, bolt, or breechblock, as well as the firing

28   mechanism.  AC ¶ 31.

Between 2015 and 2017, ATF issued guidance regarding ghost guns through a variety of agency actions—including Classification Letters where ATF responded to inquiries from industry members in order to clarify "the agency's official position" concerning certain 80 percent receiver and frame products (AC ¶ 34 (quoting ATF Handbook § 7.2.4.1); *see also* AC ¶¶ 69-76); questions and answers published on ATF's official website (AC ¶¶ 82-87); and a formal ruling, "Ruling 2015-1,"[1] regarding the manufacture and sale of ghost guns (AC ¶¶ 65-67).   In particular, ATF issued a series of Classification Letters to Polymer80—a leading ghost gun manufacturer that markets and sells 80 percent receivers and frames and other ghost gun components to individuals online and via firearms dealers. AC ¶¶ 69-80.  Those letters concluded that four Polymer80 products—its AR-15-type receiver, its AR-10-type receiver, its Glock-type "CG" or "CG9" Blank handgun frame, and its Glock-type "PF940C Blank" frame—were not "firearms" subject to regulation under the GCA. *Id.* ¶¶ 69-76.  The Classification Letters followed the explanatory guidelines on ATF's questions and answers page entitled "Receiver Blanks," which has been live since 2015 (and remains online). *Id.* ¶¶ 82-87.  The website guidance provides the below images, among others, showing that receivers or frames lacking certain machining or indexing are not regulated as firearms. *Id.* ¶¶ 44, 83.




---

[1]  Ruling 2015-1 was issued to clarify whether sellers or gunsmiths could convert 80 percent frames or receivers into fully functioning firearms for buyers.  AC ¶ 65.  In its Ruling, ATF clarified that the obligations of sellers or gunsmiths depended on the "machining operations" performed on the 80 percent receivers.  Specifically, Ruling 2015-1 explains that "when a person performs machining or other manufacturing process on [an unfinished frame or receiver] to make a firearm 'frame or receiver' . . . that person has performed a manufacturing operation."  AC ¶ 66 (quoting ATF, Ruling 2015-1 (Jan. 2, 2015) at 3).

ATF's prior Classification Letters regularly deemed products to not be firearms regardless of how easy and quick it was to render them fireable. *Id.* ¶¶ 64, 69-75. Some of the nearly finished frames and receivers that ATF endorsed as *not* firearms could be modified to become fully fireable within just fifteen minutes using common household tools. *Id.* ¶ 74.

In 2021, after devastating mass shootings in Boulder, Colorado and Atlanta, Georgia, and amid increasing calls for actions to address gun violence across the United States, the White House announced that it intended to "issue a proposed rule to help stop the proliferation of 'ghost guns.'" AC ¶ 88. With survivors of the Saugus High School shooting in attendance, President Biden stated at a Rose Garden press conference that the goal of the rule was to prevent untraceable firearms from making their way to persons prohibited from owning firearms.[2] The President noted that the rule would regulate guns that can be assembled in "as little as 30 minutes," such as the "weapons [] used at Saugus High School."[3] The proposed rule was published on May 21, 2021. *Id.* ATF published the Final Rule on April 11, 2022. *Id.* ¶ 89. The Final Rule, titled "Definition of 'Frame or Receiver' and Identification of Firearms," was intended to "provide a more comprehensive definition of 'frame' or 'receiver' so that these terms more accurately reflect how most modern-day firearms are produced and function," 87 Fed. Reg. 24,661, and, critically, to "reduce unserialized 'ghost guns.'" AC ¶ 89.

Under the Final Rule, "frame" is defined as "the part of a handgun, or variants thereof, that provides housing or a structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component prior to initiation of the firing sequence." 27 C.F.R. § 478.12(a)(1). "Receiver" is defined as the "part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence." *Id.* § 478.12(a)(2). The Final Rule also purports to address 80 percent frames and receivers by stating that the definition of "frame"

---

[2] Armando Garcia & Libby Cathey, *Biden Announces Rule On 'Ghost Guns,' New ATF Nominee*, ABC NEWS (Apr. 11, 2022), https://abcnews.go.com/Politics/biden-announces-rule-ghost-guns-atf-nominee/story?id=83998105.

[3] *President Biden on Combatting Gun Violence*, C-SPAN (Apr. 11, 2022), https://www.c-span.org/video/?519413-1/president-biden-announces-rule-regulate-ghost-guns-nominates-atf-director.

or "receiver" includes "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver."  *See id.* § 478.12(c).

In other words, the Final Rule provides that un-machined 80 percent frames and receivers sold ***with*** a jig, parts kit, and template are firearms subject to the serialization and background check requirements of the GCA,[4] but that 80 percent frames and receivers sold ***without*** a template, jig, parts kit, or other materials are not firearms.  AC ¶ 90.[5]  ATF described the distinction clearly in a recent PowerPoint presentation it issued after adopting the Final Rule:

 

*Id.* ¶ 99.  As ATF admits, so long as a customer buys an 80 percent frame or receiver in a separate transaction from the jig and tool kit and the manufacturer's instructions are separately provided, a ghost gun company can sell the 80 percent receiver to anyone—including a prohibited person under the GCA—without complying with the GCA's serialization, background check, and recordkeeping requirements.  *Id.*  These unfinished receivers and frames sold alone are thus left unregulated, no matter how easily or quickly they can be turned into fully functioning firearms.  *See id.* ¶¶ 90-101.

---

[4]  *See* 27 C.F.R. § 478.12(c), Example 1 to Paragraph (c) (deeming a firearm: "A frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver.").

[5]  *See* 27 C.F.R. § 478.12(c), Example 4 to Paragraph (c) (deeming *not* a firearm: "A billet or blank of an AR–15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver").

The Final Rule has emboldened the ghost gun industry, with manufacturers like Division 80, Polymer80, and Juggernaut Tactical still selling unserialized 80 percent receivers and frames that can be used to easily assemble ghost guns.  AC ¶¶ 93-97.  For example, to comply with the Final Rule, Juggernaut Tactical simply advises customers to purchase 80 percent receivers and jigs in separate transactions.  *Id.* ¶ 97.  As long as 80 percent components are sold separately from jigs and toolkits, the parts are not subject to the serialization, background check, and recordkeeping requirements of the GCA, as seen in the image below.  *Id.* ¶ 98.


**Leo fights back** 3 weeks ago
So what we are doing now are buying 70% lowers. We are buying The jig and other components separately. From the same place in the same order but just not buying complete kits of it all together. Just got mines today. The ATF is stupid
👍 2  👎  REPLY


**Mr. Gowron** 3 weeks ago
All an ffl has to do is sell the part separate, the 80% and then a "tool set" sold separately with the instructions online somewhere else. Also you can print out jigs with 3D printers.
👍 1  👎  REPLY
▾ **2 REPLIES**


**Daniel** 3 weeks ago
It sounds to me like you can still sell the unfinished receiver as long as you don't also sell instructions, jigs, and tools. And I guess someone else could sell the instructions, jigs, and tools that are compatible with your product, and that would be fine.
👍  👎  REPLY
▴ **1 REPLY**

**Mike Edwards** 3 weeks ago
lol, yup. that's how several of the big 80% lower companies are going to be going about business now. already confirmed from P80 and several others
👍  👎  REPLY

The Final Rule therefore fails to sufficiently regulate ghost guns.  With just minor tweaks to their distribution and sales process, ghost gun manufacturers, dealers, and sellers may continue selling these DIY weapons at will.

### D.    Procedural Background

Plaintiffs commenced this Administrative Procedure Act ("APA") action on September 29, 2020, alleging that Defendants' agency actions concerning ghost guns conflict with the GCA and are arbitrary and capricious.  Defendants moved to dismiss on November 30, 2020.  ECF No. 29.  In their motion to dismiss, Defendants argued that (i) Plaintiffs could not establish standing; (ii) the statute of limitations barred claims challenging any ATF classification decision over six years old; (iii) ATF's interpretation of the GCA satisfied the standards of the APA; and (iv) Plaintiffs failed to state an

1   "arbitrary and capricious" claim.  *See id.*  Plaintiffs opposed Defendants' motion to dismiss on

2   December 30, 2020, and Defendants filed a reply brief on January 11, 2021.  ECF Nos. 54, 64.[6]

3           As noted above, on April 7, 2021, the Biden Administration announced a new proposed rule to

4   "help stop the proliferation of ghost guns."  AC ¶ 88.  On April 9, 2021, the parties jointly agreed to

5   stay this action in light of the proposed rule.  ECF No. 86.  Plaintiffs were hopeful that the Final Rule

6   would acknowledge that 80 percent receivers and frames must be regulated as firearms under the GCA

7   and thus would curb the proliferation of ghost guns through the federal serialization and background

8   check requirements already required by that federal statute.  The new rule became final on April 7,

9   2022 and went into effect on August 24, 2022.  On September 19, 2022, after it had become apparent

10  that the Final Rule did not sufficiently regulate unfinished frames and receivers, Plaintiffs moved to

11  lift the stay, and the Court granted Plaintiffs leave to file an Amended Complaint.  ECF No. 118.

12  Plaintiffs filed their Amended Complaint on October 20, 2022.  ECF No. 122.

13          After the Final Rule took effect, ghost gun manufacturers brought challenges.  *See VanDerStok*

14  *v. Garland*, No. 4:22-cv-00691-O (N.D. Tex. Aug. 11, 2022); *Morehouse Enters., LLC v. Bureau of*

15  *Alcohol, Tobacco, Firearms & Explosives*, No. 3:22-cv-00116-PDW-ARS (D.N.D. July 5, 2022); *Div.*

16  *80 v. Garland*, No. 3:22-cv-00148 (S.D. Tex. May 9, 2022).  Unlike Plaintiffs here, the plaintiffs in

17  each of these actions seek to vacate the Final Rule in its entirety.  In other words, the plaintiffs in those

18  cases essentially claim that they have a right to buy, build, and sell ghost guns and component parts

19  either in a kit or standing alone without the background check or serialization required by federal law

20  for all other firearms.  In *VanDerStok*, the District Court for the Northern District of Texas has

21  preliminarily enjoined the Final Rule with respect to two different ghost gun manufacturers, concluding

22  that the plaintiffs in that case demonstrated a "substantial likelihood of success" on their claims.  *See*

23  Opinion & Order on BlackHawk Manufacturing Group Inc. Preliminary Injunction, *VanDerStok v.*

24  *Garland*, No. 4:22-cv-00691-O, at 3, 5-6 (N.D. Tex. Nov. 3, 2022).  The court determined that the

25  ─────────────

26  [6]   In November and December 2020, Zachary Fort, Frederick Barton, BlackHawk Manufacturing
    Group, Inc., and Firearms Policy Coalition, Inc. (the "BlackHawk Applicants") and Polymer80 Inc.
    ("Polymer80") (together, "Proposed Intervenors") moved to intervene in this case.  ECF Nos. 24,

27  47. Plaintiffs opposed both motions.  ECF Nos. 46, 66.  Oral argument on the Proposed Intervenors'
    respective motions to intervene occurred on February 26, 2021.  ECF No. 77.  The motions to

28  intervene remain pending.

plaintiffs were likely to succeed in showing that the Final Rule exceeded ATF's statutory authority under the GCA, *id.* at 6-14—despite the GCA's clear application to "any weapon that . . . may readily be converted to expel a projectile by the action of an explosive," 18 U.S.C. § 921(a)(3).  Meanwhile, in *Morehouse Enterprises*, the District Court for the District of North Dakota stayed proceedings pending the interlocutory appeal of the order denying the plaintiffs' motion for a preliminary injunction.  No. 3:22-ccv-00116-PDW-ARS (Nov. 29, 2022).  And in *Division 80*, the District Court for the Southern District of Texas denied the plaintiffs' motion for a preliminary injunction, No. 3:22-cv-00148 (S.D. Tex. Aug. 23, 2022); briefing on the merits will conclude in May 2023, No. 3:22-cv-00148 (S.D. Tex. Sept. 14, 2022).

### III. STANDARD OF REVIEW

To defeat a motion to dismiss under Rule 12, a plaintiff "only needs to allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 721 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable."  *Iqbal*, 556 U.S. at 678.  The Court must "accept as true" all factual allegations in the Amended Complaint, *id.*, and draw all reasonable inferences in Plaintiffs' favor, *see Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1157 (9th Cir. 2017) (citing *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014)).  The same standard applies when a plaintiff challenges subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Leite*, 749 F.3d at 1121.

### IV. ARGUMENT

#### A.    All Plaintiffs Have Standing

To establish Article III standing, "a plaintiff must establish 'three elements': (1) injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) that is likely to be redressed by a favorable decision."  *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 746 (9th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992)).  In assessing standing, the Court must assume that Plaintiffs will prevail on the merits.  *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 788 (N.D. Cal. 2019).  "[O]nce the court

1   determines that one of the plaintiffs has standing, it need not decide the standing of others." *Leonard*

2   *v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) (citing *Carey v. Populations Servs. Int'l*, 431 U.S. 678, 682

3   (1977)); *see Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017).

4       Contrary to Defendants' contention, Plaintiffs need not satisfy any heightened pleading standard

5   or be directly regulated by the challenged conduct to have standing.  *See* Br. 5 (citing *Lujan*, 504 U.S.

6   at 562, and *Summers v. Earth Island Inst.*, 55 U.S. 488, 493 (2009)).  As with every other element of

7   their claims, Plaintiffs need only make "plausible" allegations that "the government's unlawful conduct

8   'is at least a substantial factor motivating the third parties' actions.'"  *Mendia v. Garcia*, 768 F.3d 1009,

9   1013-14 (9th Cir. 2014) (citations omitted); *accord Barnum Timber Co. v. E.P.A.*, 633 F.3d 894, 901

10  (9th Cir. 2011) (holding that a plaintiff "need not eliminate any other contributing causes to establish

11  its standing"); *see also Gonzalez v. U.S. Imm. & Customs Enforcement*, 975 F.3d 788, 806 (9th Cir.

12  2020) (applying the same analysis).

13      Here, Plaintiffs easily meet their modest pleading burden.  The Amended Complaint sufficiently

14  pleads that each Plaintiff has suffered a cognizable injury that can be redressed by this Court and that

15  there is a causal link between ATF's unlawful actions and each Plaintiff's injuries.

16                      **1. State of California**

17       The State of California has plausibly alleged a number of "concrete and particularized" injuries

18  resulting from ATF's failure to regulate 80 percent frames and receivers.  *See Lujan*, 504 U.S. at 560.

19  These injuries include both expenditures to implement and accelerate implementation of State

20  legislation regulating ghost gun parts, as well as the expenditure of increased State resources to train

21  law enforcement personnel statewide on ghost guns.  These injuries also substantiate and coincide with

22  the State of California's independent interest in protecting the security and well-being of its residents.[7]

23  Like all states, California is "'entitled to special solicitude in [the] standing analysis.'"  *Massachusetts*

24  *v. EPA*, 549 U.S. 497, 520 (2007).

25

26  ───────────────
      [7]  The State of California does not argue, as Defendants suggest, Br. 7, that the State's general
27     responsibility for its residents directly confers standing, but instead that the State's injuries (as
       established below) are sufficiently concrete that the State can assert, as an additional basis for
28     standing, its "'quasi-sovereign interest in the health and well-being . . . of its residents in general.'"
       *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).

ATF's determinations allowing the sale of 80 percent receivers and frames to go unregulated, outside the scope of the GCA, have facilitated the ghost gun epidemic's severe impact on the State of California.  California is home to nearly a quarter of the ghost gun retailers Plaintiffs are aware of—18 of 80, AC ¶ 111—and its residents, including law enforcement officers, have repeatedly been victimized in recent years in devastating incidents involving ghost guns, *see*, *e.g.*, *id.* ¶¶ 114, 122-24. Recognizing that the status quo was unacceptable, the California Legislature has attempted to close the loophole created by ATF's flawed decisions by enacting legislation to protect its residents from ghost guns.  In particular, the Legislature enacted three relevant statutes.  First, the California Legislature passed A.B. 857 (Cal. 2016), which requires self-assembled firearms to be stamped with unique serial numbers provided by the California Department of Justice, and also requires those possessing unserialized firearms to apply to the Department for serial numbers.  *Id.* ¶ 116.  Then, the Legislature passed A.B. 879 (Cal. 2019), which would have required sales of unfinished frames and receivers to be conducted through licensed dealers, subject to a California-only background check and sale record. *Id.*[8]  Most recently, as the rate of ghost gun violence continued to accelerate, the Legislature passed A.B. 1621 (Cal. 2022), which builds on the goals of A.B. 879 by expanding the definition of "firearm precursor part" to include any precursor part that has reached a stage in manufacture where it may be readily converted into a firearm or is marketed or sold to the public for use as the frame or receiver of a firearm.  *Id.* ¶ 118.  A.B. 1621 also generally prohibits the sale or transfer of all firearm precursor parts that are not covered by the Final Rule, such as 80 percent frames and receivers.  *Id.* ¶ 119.

To implement this legislation—which was necessary in large part because ATF has failed in its duty to properly regulate 80 percent frames and receivers—the State of California has incurred, and will continue to incur, substantial costs.  *Id.* ¶¶ 119-21.  Failure to make such expenditures to retain additional staff in the California Department of Justice's Bureau of Firearms for, among other purposes, policing California's borders, regulating the serialization of unserialized firearms and firearm parts,

---

[8]  In the wake of the tragic deaths of two law enforcement officers allegedly shot with ghost guns, the Legislature enacted S.B. 118 (Cal. 2020) to implement A.B. 879 beginning on July 1, 2022—three years earlier than originally planned.  AC ¶ 117.

and providing public guidance[9] would risk upsetting California's careful regulatory scheme by allowing 80 percent frames and receivers to flow into the State and be left unregulated. *Id.* ¶ 121. Thus, these increased expenditures are "'reasonably incur[red] costs to mitigate or avoid' a 'substantial risk' of harm." *California v. Ross*, 358 F. Supp. 3d 965, 1004 (N.D. Cal. 2018) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013), in holding that California's "expenditures on census outreach to attempt to mitigate" the effects of the federal government's decision to add a citizenship question to the 2020 census were "sufficient to establish injury-in-fact for standing purposes").

Defendants argue that these expenditures do not confer standing because they are "'self-inflicted.'" Br. 7 (quoting *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976)).[10]  But the Ninth Circuit rejected that same argument in *California v. Azar*, 911 F.3d 558 (2018).  There, the dissent, citing *Pennsylvania v. New Jersey*, suggested that, rather than having been caused by the federal government's proposed rule, California's economic injuries were self-inflicted because California "voluntarily chose" to enact legislation "to provide money for contraceptive care to its residents through state programs." *Id.* at 573-74.  The Ninth Circuit held otherwise.  The Court first expressed doubt that "the holding of *Pennsylvania* applies outside the specific requirements for the invocation of the Supreme Court's original jurisdiction." *Id.* at 574.  The Court then concluded that, even if *Pennsylvania*'s reasoning extends beyond original jurisdiction cases, California's rising contraceptive coverage costs were "not 'self-inflicted' within the meaning of *Pennsylvania*." *Id.*  While Pennsylvania's legislation "directly and explicitly" subjected the State's finances to New Jersey's laws (by providing tax credits in equal value to New Jersey's taxes on nonresident income), California's contraceptive coverage laws were "not so tethered to the legislative decisions of other sovereigns." *Id.* In short, the federal government's proposed rule, not California's legislation, was the source of the State's injury.

---

[9]  *See, e.g.*, *Revised Firearm Precursor Part Definitions and Guidebook*, CAL. DEP'T OF JUSTICE, https://oag.ca.gov/firearms/regs/revised-fpp (last visited Dec. 20, 2022).

[10]  Defendants do not contest that "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).

So too here.  ATF's determinations are the source of the State of California's injury, not the State's legislation, which was enacted because the State lacked a viable alternative to protect its residents.  Because the State of California "need[ed] to ensure state regulatory compliance to fill the regulatory gap . . . created" by the absence of federal enforcement, it has stated "an injury in fact." *California v. Bureau of Land Mgmt.*, 2020 WL 1492708, at *4 (N.D. Cal. Mar. 27, 2020), *appeal docketed*, No. 20-16157 (9th Cir. June 12, 2020).[11]

The proliferation of ghost guns resulting from ATF's determinations has also compelled the State of California to shift valuable law enforcement resources toward statewide training on ghost guns. AC ¶ 112.  That ghost guns are more difficult to trace than serialized firearms is not and cannot be disputed.  *Id.* ¶ 12.  Nor can the steep rise of ghost guns in California—or the role that unserialized firearms have played in recent tragedies throughout the State—be disputed.  *See, e.g.*, *id.* ¶¶ 114, 122-24.  The experience of the California Department of Justice's Bureau of Firearms agents in the field is consistent with these trends.  *Id.* ¶ 112 (citing *Washington v. U.S. Dep't of State*, 2:20-cv-00111-RAJ (W.D. Wash. 2020), ECF No. 56 at ¶ 30).  Because of the prevalence of ghost gun crime in California, Bureau of Firearms staff have devoted increasing resources to training law enforcement personnel statewide on ghost guns.  AC ¶ 112.  These "reasonably incurred" expenditures further confer standing. *See Ross*, 358 F. Supp. 3d at 1005.

Defendants do not seriously contest that 80 percent frames and receivers pose a danger to California's residents.  Instead, they maintain that the connection between ATF's determinations and the spread of federally unregulated ghost gun parts used to commit crimes throughout the state is a "chain of unsupported speculation."  Br. 8-9.  But "a causal chain does not fail simply because it has several 'links.'"  *Azar*, 911 F.3d at 571-72 (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011)); *see also Mendia*, 768 F.3d at 1012 ("Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no

---

[11] Defendants similarly argue that "where 'nothing requires the State[]' to incur expenditures, its voluntary choices to do so cannot give rise to standing."  Br. 7 (quoting *Maryland v. U.S. Dep't of Educ.*, 2020 WL 4039315, at *14 (D.D.C. July 17, 2020)).  But the opinion they cite has been vacated.  *Maryland v. U.S. Dep't of Educ.*, No. 20-5268 (D.C. Cir. Dec. 22, 2020).  In any event, *Azar* controls here.

1    requirement that the defendant's conduct comprise the last link in the chain." (citing *Bennett v. Spear*,

2    520 U.S. 154, 168-69 (1997))).  What "matters is not the 'length of the chain of causation,' but rather

3    the 'plausibility of the links that comprise the chain,'" *Nat'l Audobon Soc'y v. Davis*, 307 F.3d 835,

4    849 (9th Cir. 2002) (citations omitted), and whether the "government's unlawful conduct 'is at least a

5    substantial factor motivating the third parties' actions,'" *Mendia*, 768 F.3d at 1013 (internal citations

6    and quotations omitted).

7         Here, the State of California's "theory of standing" rests not on "mere speculation" but on "the

8    predictable effect of Government action on the decisions of third parties."  *Dep't of Commerce v. New*

9    *York*, 139 S. Ct. 2551, 2566 (2019).  It is reasonable (if not inescapable) to conclude that, as a result of

10   ATF's determinations that 80 percent receivers and frames are not regulated by the GCA, ghost gun

11   distributors have been freely selling ghost gun parts to prohibited persons who use them in criminal

12   activity—and that the State of California has reasonably incurred expenditures to address this problem.

13   *See Azar*, 911 F.3d at 572 (finding standing where there was a "reasonable probability" that a chain of

14   events would "result in economic harm to the [plaintiff] states").  Indeed, the Amended Complaint lays

15   out not just a handful of allegations but overwhelming evidence supporting this chain of causation.  AC

16   ¶¶ 111-25.[12]

17        A decision setting aside ATF's determinations would redress the State of California's injuries.

18   Although California's carefully crafted regulatory scheme will mitigate some of the State's injuries,

19   the absence of federal regulation allows 80 percent frames and receivers and the myriad dangers that

20   attend them to flow more freely across California's borders from other states.  That the remedy

21   Plaintiffs seek may not solve the entire problem, Br. 9, does not defeat redressability.  Plaintiffs need

22   only show that "*an* injury"—not "*every* injury"—is redressed by a favorable decision.  *Larson v.*

23   *Valente*, 456 U.S. 228, 243 n.15 (1982).  The State of California has met that requirement here.

---

[12]  Defendants' claim that this chain of causation is based on "speculation" is a direct result of ATF's failure to track the sale of 80 percent receivers and frames.  Defendants should not be permitted to challenge standing based on their own unlawful determinations.

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:20-CV-06761-EMC

1

2. **Giffords Law Center to Prevent Gun Violence**

2          GLC has standing to sue because "ATF's actions have forced [it] to adjust many of its

3   organizational priorities and divert substantial resources to combat ghost guns and resulting violence."

4   AC ¶ 137; *see also id.* ¶¶ 135-36.  An organization satisfies Article III's injury-in-fact requirement if

5   it can demonstrate: "(1) frustration of its organizational mission; and (2) diversion of its resources to

6   combat the particular [conduct] in question."  *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105

7   (9th Cir. 2004).  In doing so, an organization must only establish that its activities have been

8   "perceptibly impaired."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also United*

9   *States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.15 (1973) (explaining that

10  "an identifiable trifle is enough for standing"); *Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 692

11  (N.D. Cal. 2019) (applying this principle).  Applying this standard, the Ninth Circuit has consistently

12  held that organizations have standing where they have "expend[ed] additional resources" to combat the

13  challenged practices than "they would have spent . . . to accomplish other aspects of their organizational

14  missions."  *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1039 (9th Cir. 2015); *see also Sabra*,

15  44 F.4th at 873, 879-80 (an organization "that advocates for the civil rights of American Muslims"

16  diverted resources "in order to combat [defendant's] distorted portrayal of Islam"); *Comite de*

17  *Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943-44 (9th Cir. 2011)

18  (organization diverted resources because of challenged ordinance).  GLC satisfies these requirements.

19          *First*, the challenged conduct frustrates GLC's "core mission . . . to save lives from gun violence

20  by shifting culture, changing policies, and challenging injustice."  AC ¶ 135.  "ATF's regulatory

21  approach undermines every other firearm policy that [GLC] advocates for," including "the

22  organization's core policy platform of supporting background check and licensing laws at the federal

23  and state level." *Id.* ¶ 136.  It does so by "creat[ing] a loophole by which buyers can evade all otherwise

24  applicable firearm sales regulations," which "force[s] [GLC] to redouble its violence prevention efforts

25  and direct even more resources into addressing gun violence even in states with strong firearm laws,

26  like the organization's home state of California." *Id.*

27          In response, Defendants argue that GLC's critical mission of saving lives is an "abstract social

28  interest."  Br. 6.  But specific efforts to save lives from a gun violence epidemic exacerbated by ghost

20

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:20-CV-06761-EMC

guns are not "abstract social interests." *See, e.g.*, *Brady Campaign to Prevent Gun Violence United with the Million Mom March v. Ashcroft*, 339 F. Supp. 2d 68, 75 (D.D.C. 2004) ("[T]here can be no doubt" that "[semiautomatic weapon]-related violence" is both "actual" and "concrete and particularized"). Defendants' reliance on *Fair Housing Council of Oregon v. Travelers Home & Marine Insurance Co.*, 2016 WL 7423414 (D. Or. Dec. 2, 2015), is misplaced. There, the court held that the plaintiff organization *satisfied* "the 'frustration of mission' requirement for organizational standing." *Id.* at *4. The court concluded that the plaintiff organization lacked standing only because it had not alleged a diversion of resources: its alleged injuries included only costs incurred exclusively in anticipation of the litigation and "anticipated" but ill-defined "*future* expenses." *Id.* at *6-7 (emphasis added). The court made clear that an actual or imminent diversion of resources that strikes at the heart of an organization's mission—like the diversions that GLC alleges—suffices to confer standing. *See id.*; AC ¶¶ 135-37.

Defendants' argument that GLC has "manufacture[d an] injury" by "simply choosing to spend money" is likewise unavailing. Br. 6. GLC has a mission, and when ATF's actions affect its mission, it must react responsibly and divert its limited resources. This is far from the kind of "manufactured . . . injury" addressed in *La Asociation de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083 (9th Cir. 2010) ("*ATLF*"). There, the court cautioned that an injury is manufactured where an organization incurs only "litigation costs or simply choos[es] to spend money fixing a problem that otherwise *would not affect the organization at all.*" *Id.* at 1088 (emphasis added). Neither circumstance is implicated here.[13] The ghost gun problem strikes at the core of GLC's mission because the organization's entire *raison d'etre* is to save lives from the very type of gun violence that ATF's actions have exacerbated. AC ¶¶ 135-36.

*Second*, Plaintiffs allege that GLC has "divert[ed] substantial resources" to combat Defendants' actions. *Id.* ¶ 137. Those resources include financial resources and "human capital" used to provide "technical assistance" to monitor "over 100 state and federal bills pertaining to ghost guns," *id.* ¶¶ 135,

---

[13] Unlike the plaintiff in *ATLF*, which made *no* "attempt to allege organizational standing in its complaint," GLC has made specific "factual allegations . . . that it was forced to divert resources to help" combat the ghost gun problem "because of the defendants' actions." 624 F.3d at 1088; *see* AC ¶¶ 135-36.

137; "support[] violence intervention programs in communities disproportionately impacted by gun violence and ghost gun violence," *id.* ¶ 137; and "launch[] a series of specific ghost gun initiatives, including drafting proposed legislation, publishing white papers, and helping produce videos and other educational materials for the public," *id.* ¶ 135.  In doing so, GLC has not been "simply going about [its] 'business as usual,'" *Cegavske*, 800 F.3d at 1040-41, but has fundamentally altered its resource allocation specifically to combat the ghost gun epidemic that ATF's decisions have exacerbated, *see Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (finding organizations had standing where they diverted resources to "educational programs" in response to the challenged law).

Defendants' suggestion that GLC lacks standing because it engages in "lobbying, policymaking, and carrying out legal activities related to gun safety," Br. 6, lacks merit.  Defendants cite just one inapposite case in support of that claim.  *See Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147 (9th Cir. 2019).  But in *American Diabetes Association*, the "only resource" that the plaintiff association claimed to have diverted as a result of the new policy at issue was "the time one of its two staff attorneys took to handle *a single intake call*."  938 F.3d at 1155 (emphasis added).  The plaintiff association did not allege or show that it "had altered or intended to alter its resource allocation" at all to address the new policy.  *Id.*  In contrast, GLC has been forced to "adjust many of its organizational priorities" and "expend more resources and staff time" combatting the effects of Defendants' actions "because ATF's regulatory approach [to ghost guns] undermines every other firearm policy that [GLC] advocates for."  AC ¶¶ 136-37.  In fact, the Ninth Circuit acknowledged in *American Diabetes Association* that it routinely finds the "diversion of resources" prong is met when particular laws or policies frustrate an organization's purpose.  938 F.3d at 1154-55 (citing cases).

Take, for instance, the Ninth Circuit's decision in *Sabra*.  There, a nonprofit organization "committed to advocacy and protecting the civil rights of American Muslims" claimed that a course module on Islamic terrorism taught by the defendants violated the Establishment Clause and Free Exercise Clause.  *Sabra*, 44 F.4th at 879.  The nonprofit organization alleged that the course module forced it to divert resources toward creating an educational campaign to combat Islamophobia.  *Id.* at 879.  The Ninth Circuit expressly "disagree[d]" with the district court's conclusion that the nonprofit

organization lacked standing. *Id.*[14] It explained that expenditures on "new education and outreach campaigns" are "sufficient to confer Article III standing on an organizational plaintiff." *Id.* Even though the organization's "diversion-of-resources injury [wa]s 'broadly alleged,'" its allegations that defendants' actions "frustrated its organizational mission and caused it to divert resources to counteract th[o]se actions" were sufficient. *Id.* at 880.[15]

So too with *Cegavske*, where the Ninth Circuit held that civil rights groups had standing to challenge the State government's violation of a federal law requiring states "to distribute voter registration materials and to make assistance available to people who visit . . . public assistance offices." 800 F.3d at 1034-35. Those groups had diverted resources when they spent additional funds on voter registration drives in communities where public assistance should have been offered—resources that otherwise "would have [been] spent on some other aspect of their organizational purpose," like "registering voters the [federal law's] provisions do not reach, increasing their voter education efforts, or any other activity that advances their goals." *Id.* at 1040; *see also Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1224 (9th Cir. 2012) ("organizations with the shared core mission of eliminating housing discrimination in their communities" could bring action against online roommate-matching website to challenge demographic sorting and steering of users); *Smith*, 358 F.3d at 1105 (organization dedicated to "eliminat[ing] discrimination against individuals with disabilities by ensuring compliance with [accessibility] laws" could sue real estate developer who constructed properties in violation of those laws). The injury that GLC has alleged here is no less sufficient. GLC has organizational standing.

### 3. Bryan Muehlberger and Frank Blackwell

Mr. Muehlberger and Mr. Blackwell allege two ongoing injuries that provide standing to seek prospective relief. *First*, they each experience ongoing psychological harm, for which they undergo regular therapy, as a result of "liv[ing] in acute fear of ghost gun violence." AC ¶¶ 127, 134. Such

---

[14] The Ninth Circuit affirmed the district court's dismissal *on the merits*, but it reversed the district court's holding as to standing. *Sabra*, 44 F.4th at 873, 879.

[15] Defendants relied on the now-reversed *Sabra* district court decision in their original motion to dismiss but ignore the Ninth Circuit's recent reversal in their current motion.

ongoing harm—which Defendants do not attempt to address in their motion—is plainly a cognizable injury under Article III. Br. 9; *see, e.g.*, *Chaudhry v. City of L.A.*, 751 F.3d 1096, 1109 (9th Cir. 2014); *Elliot v. QF Circa 37, LLC*, 2017 WL 6389775, at *6 (S.D. Cal. Dec. 14, 2017).[16]  For example, in *Powell v. Illinois*, the district court held that guardians of children who lived in a Chicago neighborhood suffering from a high rate of gun violence had standing to seek an injunction "requiring defendants to promulgate regulations designed to curb future gun violence on Chicago's streets" based on the guardians' allegations that "exposure to gun violence on a daily basis contributed substantially" to their children's ongoing psychological trauma, including Post-Traumatic Stress Disorder and "problems at home and school." 2019 WL 4750265, at *3 (N.D. Ill. Sept. 30, 2019).   The court rejected the defendants' argument that such harm was a generalized grievance:  "It is reasonable to infer that all concentrated violence begets trauma and the psychological and behavioral injuries described in the complaint." *Id.* at *7.

Mr. Blackwell and Mr. Muehlberger have similarly alleged that their psychological trauma is a "direct and reasonable response to the increased risk of violence [they] face as a result of the proliferation of these untraceable weapons in the areas" where they live and work.  AC ¶¶ 128, 132. Both parents are acutely "aware of the spread of ghost guns in Los Angeles County," and both have suffered unimaginably because of that spread.  *Id.* ¶¶ 130, 132.  Mr. Muehlberger and Mr. Blackwell also constantly worry that their children—one of whom still attends Saugus High School—could become victims of ghost gun violence just like their late daughter and son, respectively.  *Id.* ¶ 133.  Mr. Muehlberger's and Mr. Blackwell's past trauma undoubtedly "frame[s]" their ongoing injury and confers standing to pursue their claims.  *Powell*, 2019 WL 4750265, at *7.

*Second*, Mr. Blackwell's and Mr. Muehlberger's increased risk of suffering from future ghost gun violence as a result of living and working in areas that experience disproportionate rates of such violence independently qualifies as an injury-in-fact.  Courts routinely find that an increased risk of

---

[16]  The cases that Defendants cite are therefore inapposite.  *See* Br. 9-10 (citing *San Diego Cty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (past injury); *Clapper,* 568 U.S. at 410 ("speculative" future injury); *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (future injury claim involving illegal conduct not widespread enough to be likely to recur); *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (claim for prospective relief "premised *entirely* on the threat of repeated injury" (emphasis added)).

future injury is cognizable. *See, e.g.*, *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947-48 (9th Cir. 2002) (noting that "[t]he Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III standing requirements" and holding that farmers threatened by water "highly likely" to become excessively salinated had established a cognizable injury); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996) (risk of wildfire as a result of the challenged policy interfering with "hiking, hunting, camping, fishing, observing wildlife, finding solitude, and picking berries" deemed "clearly sufficient for Article III standing," as "[t]he more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing"). For example, in *Brady Campaign*, the court held that the Brady organization had standing to bring a lawsuit "challeng[ing] [an] ATF policy [that] increase[d] the risk . . . of violent [semi-automatic weapon ("SAW")] crimes" on behalf of members who "live[d] in neighborhoods where violent crimes involving SAWs occur at higher than average rates" and thus experienced an "increase[d] [] risk of violent SAW related crimes." 339 F. Supp. 2d at 75-76. The court observed that finding "the risk of injury by a SAW" not cognizable would "gut the requirement of a 'concrete and particularized' injury, reducing standing doctrine to a set of distinctions without differences turning on each particular judge's view of whether or not a certain type of injury should qualify for judicial attention." *Id.* at 76. Brady had standing because its "members [had] particular, personal reasons to fear that they may be particularly susceptible to SAW-related violent crime." *Id.* Mr. Blackwell and Mr. Muehlberger are similarly situated to the Brady members: they live and work in an epicenter of the nation's ghost gun epidemic in communities that suffer from disproportionate rates of ghost gun violence—violence that has visited their own lives to devastating and lasting effect. AC ¶¶ 126-34.

Referencing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), Defendants argue that "[t]he First Amended Complaint lacks any specific allegations" that Mr. Muehlberger and Mr. Blackwell are "'realistically threatened' by an actual likelihood they—or their surviving family members—will be the victims of a crime committed with an unserialized firearm." Br. 10. Not so. In *Lyons*, the plaintiff failed to demonstrate that he would likely suffer any future harm because he had not shown that the police practice that he challenged—unlawful chokeholds—was widespread and likely to recur. 461 U.S. at 110. Here, by contrast, the Amended Complaint plausibly alleges that the ghost gun epidemic

is ongoing, widespread, and has as a geographic epicenter Mr. Blackwell and Mr. Muehlberger's home region. AC ¶¶ 127-28, 131-32. Plaintiffs need not plead that they *will* suffer further trauma or crime to establish standing—only that Defendants' unlawful conduct increases the likelihood of such a risk. *See, e.g.*, *Cent. Delta Water Agency*, 306 F.3d at 947-48; *Powell*, 2019 WL 4750265 at *7. They have amply done so. *See* AC ¶¶ 126-34.

Defendants also advance the tenuous argument that Mr. Muehlberger and Mr. Blackwell must show that they will be victims of violent crime "committed with an unserialized firearm made from a receiver blank that would not be classified as a firearm under the Rule." Br. 10. But that is not an accurate characterization of Plaintiffs' pleading burden. All Plaintiffs need to do is plausibly allege that "the government's unlawful conduct 'is at least a substantial factor'" causing Plaintiffs' injuries. *Mendia*, 768 F.3d at 1013-14. They have done so: Mr. Muehlberger and Mr. Blackwell allege that ATF's unlawfully permissive ghost gun regulatory regime has exacerbated their trauma and fear of ghost gun crime and increased their exposure to and the risk of crime in their communities. AC ¶¶ 2, 126-34. Plaintiffs need not allege that they would suffer violence committed with one of the specific ghost guns at issue; rather, the increased risk of ghost gun violence is sufficient to confer standing. *Brady Campaign*, 339 F. Supp. 2d at 72, 75.[17]

In sum, the Amended Complaint alleges facts plausibly establishing ongoing injuries that are both directly traceable to ATF's conduct and redressable. *See, e.g.*, AC ¶¶ 130, 134; *see also Bennett*, 520 U.S. at 168-69 (defendants' conduct need not be "the very last step in the chain of causation"). By allowing companies to sell untraceable weapons to individuals otherwise prohibited from purchasing firearms, ATF's regulatory scheme, including the Final Rule, has had a "predictable effect . . . on the

---

[17] The Seventh Circuit's unpublished decision in *Happe v. Lloyd*, 2 F. App'x 519 (7th Cir. 2001), is inapposite. That case involved a challenge to a single individual's hypothetical future conduct, not a regulatory challenge to cure widespread harm like that at issue in *Brady Campaign* and this case. *Happe*, 2 F. App'x at 521 (plaintiff seeking to remove a particular prosecutor from future trials involving the plaintiff). The other cases cited by Defendants were decided on summary judgment and therefore support the conclusion that this action should proceed. *See* Br. 10. *Eggar v. City of Livingston*, 40 F.3d 312 (9th Cir. 1994), underscores that plaintiffs need only allege sufficient facts to confer standing "[a]t the pleading stage." Br. 5. And *Syed v. M-I, LLC*, 853 F.3d 492, 499 n.4 (9th Cir. 2017), similarly acknowledges that at the motion to dismiss stage, the court must "presume that 'general allegations embrace those specific facts that are necessary to support a claim,'" unlike on summary judgment. *Id.* (quoting *Lujan*, 504 U.S. at 561).

1   decisions of third parties" such as Mr. Blackwell and Mr. Muehlberger. *Dep't of Commerce*, 139 S.

2   Ct. at 2566; *see also Bennett*, 520 U.S. at 168-69 (causation can be "produced by [a] determinative . . .

3   effect upon the action of someone else"); *Powell*, 2019 WL 4750265, at *9-10 (injuries stemming from

4   gun violence are generally deemed sufficiently traceable to government conduct allowing the

5   proliferation of such gun violence).

6       And although the loss of their children can never be remedied, Mr. Muehlberger and Mr.

7   Blackwell's ongoing injuries are clearly redressable. Declaring that 80 percent frames and receivers

8   are "firearms" under the GCA would significantly reduce the supply of ghost guns and assure that ghost

9   guns will not be lawfully sold to those most likely to harm innocent individuals. AC ¶¶ 2-3. The relief

10  requested would tangibly reduce Mr. Blackwell's and Mr. Muehlberger's ongoing trauma and their risk

11  of suffering injury from ghost guns in the future. *Id.* ¶¶ 130, 134.

12      **B.    Plaintiffs' In-The-Alternative Claims Challenging ATF's Pre-Final Rule**

13             **Guidance Are Ripe**

14      Defendants argue that a portion of Plaintiffs' claims are unripe—those pled "[i]n the

15  alternative[] and to the extent the Final Rule is vacated, altered, or amended."[18] AC ¶ 144; *see* Br. 1,

16  10-11. These alternative claims challenge ATF's pre-Final Rule Classification Letters and guidance

17  documents finding that 80 percent receivers and frames are not "firearms" under the GCA. *See* AC

18  ¶¶ 144-45, 153-55. Plaintiffs included these claims as a result of litigation pending in other districts

19  seeking to enjoin the Final Rule in its entirety. *See VanDerStok v. Garland*, No. 4:22-cv-00691-O

20  (N.D. Tex. Aug. 11, 2022); *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms &*

21  *Explosives*, No. 3:22-cv-00116-PDW-ARS (D.N.D. July 5, 2022); *Div. 80 v. Garland*, No. 3:22-cv-

22  00148 (S.D. Tex. May 9, 2022). Because there is a sufficient likelihood that the Final Rule will be

23  vacated, these claims are ripe.

24      As an initial matter, the Federal Rules of Civil Procedure expressly contemplate and allow

25  exactly the type of in-the-alternative claims that Plaintiffs plead here. Rule 8(d)(2) provides that

26  ---
[18] At the September 20 case management conference, Defendants suggested that claims challenging
27      the Final Rule would not be ripe because ATF had not yet issued classification decisions applying
        the Final Rule to specific products. *See* ECF No. 118 at 5:16-22, 9:2-16. Defendants' motion to
28      dismiss, however, abandoned any such argument. *See* Br. 10-11.

Plaintiffs "may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." It further provides that "[i]f a party makes alternative statements, the pleading is sufficient *if any one of them is sufficient*." Fed. R. Civ. P. 8(d)(2) (emphasis added). Because Plaintiffs' claims challenging the Final Rule are ripe and adequately pled—as Defendants effectively concede by declining to move to dismiss for failure to state a claim under Rule 12(b)(6)—the Amended Complaint is necessarily "sufficient" under Rule 8(d)(2). *See, e.g.*, *Thompson v. City of Fresno*, 2006 WL 2850374, at *4 (E.D. Cal. Oct. 4, 2006) (holding that plaintiff's federal constitutional claims supported predicate claims for violation of state law, even if plaintiff's state constitutional claims in the alternative did not, because "[a]s provided in Rule [8(d)(2)], where one or more allegations within a claim alleging multiple alternative statements is sufficient to state a claim for relief, the insufficiency of one statement does not warrant dismissal of the claim"); *Sandoval v. Saticoy Lemon Ass'n*, 1990 WL 484150, at *1 (C.D. Cal. Apr. 27, 1990) (holding that plaintiff's "general allegation that the defendants have otherwise discriminated generally against their women employees, is adequate to support the alternative theories of discrimination under Title VII" (quotations omitted)).

In any event, Defendants err in contending that Plaintiffs' alternative claims are too speculative to be ripe. The ripeness doctrine is designed to ensure that courts adjudicate live cases or controversies and do not "issue advisory opinions or declare rights in hypothetical cases." *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153 (9th Cir. 2017) (internal citation and quotations omitted). So long as the issues presented are sufficiently "definite and concrete," claims are constitutionally ripe. *In re Coleman*, 560 F.3d 1000, 1005 (9th Cir. 2009) (quotations omitted). That a claim involves a "factual contingency" does not automatically render the claim unripe. *Id.*; *see Ass'n of Irritated Residents v. U.S. EPA*, 10 F.4th 937, 944 (9th Cir. 2021) (claims challenging EPA's approval of contingency measure in state plan were ripe even though contingency measure had not yet been activated).[19]

---

[19] Defendants argue only that Plaintiffs' alternative claims are not *constitutionally* ripe. *See* Br. 11 (arguing that the Court "lacks jurisdiction" over Plaintiffs' alternative claims). They make no attempt to argue that the Court should refrain from exercising its jurisdiction under the prudential ripeness doctrine.

Defendants argue that Plaintiffs' alternative claims challenging ATF's pre-Final Rule guidance are unripe because "[i]t is far from certain that the Rule will be vacated." Br. 11. This argument necessarily ignores that there are at least three other lawsuits now pending—brought primarily by ghost gun manufacturers against the same Defendants here—that seek to vacate the Final Rule. Indeed, in *VanDerStok*, the Northern District of Texas has *already* preliminarily enjoined enforcement of the Final Rule against two different ghost gun manufacturers. *See* Opinion & Order on Preliminary Injunction, *VanDerStok v. Garland*, No. 4:22-cv-00691-O (N.D. Tex. Sept. 2, 2022); Opinion & Order on BlackHawk Manufacturing Grp. Inc. Preliminary Injunction, *VanDerStok v. Garland*, No. 4:22-cv-00691-O (N.D. Tex. Nov. 3, 2022). The court did so after concluding that the ghost gun manufacturers demonstrated a "substantial likelihood of success" on their claims that provisions of the Final Rule exceed ATF's statutory authority. *See* Opinion & Order on BlackHawk Manufacturing Group Inc. Preliminary Injunction, *VanDerStok v. Garland*, No. 4:22-cv-00691-O, at 3, 5-6 (N.D. Tex. Nov. 3, 2022). On October 25, 2022, the court issued an order notifying the parties that it "intend[ed] to . . . consolidate" its preliminary injunction decision with "a trial on the merits" and directing the parties to submit supplemental briefs on the "excess of statutory authority" claims. Order, *VanDerStok v. Garland*, No. 4:22-cv-00691-O (N.D. Tex. Oct. 25, 2022). On this record, the possibility that the Final Rule will be vacated or set aside is not "speculative." Br. 1.[20]

Defendants also argue that it is "speculative" that ATF would again adopt an interpretation of "frame or receiver" that "matches [the] classifications and guidance" at issue. Br. 11. This argument misunderstands the legal effect of vacating the Final Rule. Should that occur, ATF's prior Classification Letters and guidance documents would fill that void. *See Paulsen v. Daniels*, 413 F.3d

---

[20] This case is not like *Twitter, Inc. v. Paxton*, 26 F.4th 1119 (9th Cir. 2022), or *Bova v. City of Medford*, 564 F.3d 1093 (9th Cir. 2009). In *Twitter*, the court held that claims challenging "non-self-executing document requests" regarding deceptive trade practices were not prudentially ripe because those claims would force the Texas Attorney General to "litigate its entire case . . . without even being able to investigate it and figure out if it wants to pursue it or not." 26 F.4th at 1122, 1124. And in *Bova*, the plaintiffs' only "alleged injury—denial of health insurance coverage—ha[d] not yet occurred" and was purely speculative. 564 F.3d at 1096-97. Here, Plaintiffs allege that they *already* "have been" injured by ATF's pre-Final Rule classification letters and guidance and "will continue to be impacted and injured by" those "ghost gun actions" should a court vacate the Final Rule. AC ¶ 155; *see id.* ¶¶ 69-87, 144.

999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force."). In fact, BlackHawk Manufacturing Group, one of the Proposed Intervenors here, recently acknowledged as much when urging the Northern District of Texas to "vacat[e] . . . the Final Rule in its entirety," explaining that vacatur of the Final Rule would "simply return [ATF] to the statutory status quo as it existed prior to" the Final Rule. BlackHawk Manufacturing Grp. Inc. Suppl. Br., *VanDerStok v. Garland*, No. 4:22-cv-00691-O, at 14-15 (N.D. Tex. Dec. 5, 2022). Even if ATF decided to initiate a new rulemaking after any vacatur of the Final Rule, it is not "speculative" to suggest that ATF would continue on its well-worn path with respect to the definition of "frame and receiver." *See Skyline Wesleyan Church*, 968 F.3d at 752 (holding that claims were ripe and observing that plaintiffs did not "need[] to jump through more hoops" just because the agency could theoretically "change course").

In sum, Plaintiffs' alternative claims are ripe.

### C. The Court Should Reject the Arguments in the BlackHawk Applicants' Amicus Brief

During the September 20 status conference, this Court granted Proposed Intervenors leave to file "a succinct brief on mootness." *See* ECF No. 121 at 25:10-13. One set of Proposed Intervenors—the BlackHawk Applicants—filed an amicus brief, though it largely ignores the mootness issue the Court authorized Proposed Intervenors to address. Instead, the BlackHawk Applicants make two meritless arguments.

*First*, the BlackHawk Applicants contend that this Court should dismiss the Amended Complaint "because it introduces a new and separate action than that contemplated in their original Complaint," Amicus Br. 1—*i.e.*, the Complaint filed before the Final Rule was even contemplated. To support that argument, the BlackHawk Applicants rely solely on inapposite cases addressing motions for leave to amend, *see id.* at 2-4, even though this Court *already* granted Plaintiffs leave to amend with Defendants' and BlackHawk Applicants' consent, *see* ECF No. 121 at 21:20-24. The BlackHawk Applicants offer no authority for their argument that an Amended Complaint must be dismissed simply because it amended the claims asserted in the original Complaint.

*Second*, the BlackHawk Applicants assert that this action should be dismissed based on or stayed pending other litigation challenging the Final Rule.  *See* Amicus Br. 4-8.  Not so.  The plaintiffs in those cases (ghost gun manufacturers and aligned parties) seek relief that is entirely different from the relief that Plaintiffs seek here; the plaintiffs in those cases have no interest in plugging the unfortunate loophole that allows for the proliferation of nearly finished frames and receivers.  No "judicial efficiency," *id.* at 4, would result from a dismissal or stay here.

The BlackHawk Applicants also suggest that this action should be stayed because the other cases challenging the Final Rule are further developed.  This argument is the product of inequitable forum shopping.  The BlackHawk Applicants did not oppose a stay of this action.  *See* ECF No. 87 at 2-3.  When the Final Rule took effect, and the BlackHawk Applicants believed that it was flawed, they did not seek to challenge the Final Rule in this Court, where this action had been pending since 2020.  Rather, they brought claims elsewhere, and now argue months later in this Court that it would be inefficient for their new litigation to proceed alongside this case.  Because any claimed judicial "inefficiency" is the product of their own forum-shopping, the Court should reject the BlackHawk Applicants' argument that this case should be stayed.[21]

## V. CONCLUSION

The Court should deny Defendants' Motion to Dismiss the Amended Complaint.

---

[21]  The BlackHawk Applicants also claim that California and GLC's participation as amici in certain of the pending litigations is sufficient to air their positions.  Amicus Br. 7-8.  But they argued otherwise at the February 26, 2021 hearing; at that time, they contended that "amicus participation is very limited" because arguments made by amici are not "directly before the Court" and would not "influence the litigation at all."  ECF No. 77 at 17-18.

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:20-CV-06761-EMC

1     *Dated:* December 21, 2022                    /s S. Clinton Woods_____

2                                                   ROB BONTA

3                                                   Attorney General of California
                                                    THOMAS S. PATTERSON

4                                                   Senior Assistant Attorney General
                                                    R. MATTHEW WISE, SBN 238485

5                                                   Supervising Deputy Attorney General
                                                    S. CLINTON WOODS, 246054

6                                                   Deputy Attorney General
                                                    Clint.Woods@doj.ca.gov

7                                                   455 Golden Gate Ave.,
                                                    Suite 11000

8                                                   San Francisco, CA 94102-7004
                                                    Telephone:  (415) 510-3807

9                                                   Facsimile:  (415) 703-5843

10                                                  *Attorneys for Plaintiff State of California, by
                                                    and through Attorney General Rob Bonta*

11                                                  /s Scott A. Edelman_____

12                                                  GIBSON, DUNN & CRUTCHER LLP
                                                    SCOTT A. EDELMAN, SBN 116927

13                                                  2029 Century Park East, Suite 4000
                                                    Los Angeles, CA 90067-3026

14                                                  sedelman@gibsondunn.com
                                                    Telephone: (310) 357-8061

15                                                  Facsimile: (310) 552-7041

16                                                  LEE R. CRAIN, *pro hac vice*
                                                    ERICA SOLLAZZO PAYNE, *pro hac vice*

17                                                  LIESEL SCHAPIRA, *pro hac vice*
                                                    200 Park Avenue

18                                                  New York, NY  10166-0193
                                                    Telephone: (212) 351-4000

19                                                  Facsimile: (212) 351-4035

20                                                  /s Avi Weitzman_____

21                                                  PAUL HASTINGS LLP
                                                    AVI WEITZMAN, *pro hac vice*

22                                                  aviweitzman@paulhastings.com
                                                    200 Park Avenue

23                                                  New York, NY 10166
                                                    Telephone: (212) 318-6000

24                                                  Facsimile: (212) 752-3620

25                                                  *Attorneys for Plaintiffs Bryan Muehlberger,
                                                    Frank Blackwell, and Giffords Law Center to Prevent*

26                                                  *Gun Violence*

27

28

1

*/s David M. Pucino* _____

2

GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE

3

DAVID M. PUCINO, *pro hac vice*
223 West 38th St. # 90

4

New York, NY 10018
Telephone: (917) 680-3473

5

6

*Attorney for Plaintiffs Bryan Muehlberger,*
*Frank Blackwell, and Giffords Law Center to Prevent*
*Gun Violence*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:20-CV-06761-EMC

## SIGNATURE ATTESTATION

Pursuant to Local Rule 5-1(i), I hereby attest that concurrence in the filing of the document has been obtained from each of the other Signatories.


*Dated*: December 21, 2022                    */s/ Scott A. Edelman*
                                              Scott A. Edelman

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 3:20-CV-06761-EMC