BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

MARTIN M. TOMLINSON (South Carolina Bar No. 76014)
DANIEL RIESS (Texas Bar No. 24037359)
TAISA M. GOODNATURE (New York Bar No. 5859137)
JEREMY S.B. NEWMAN (Massachusetts Bar No. 688968)
Trial Attorneys
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone: (202) 353-3098
FAX: (202) 616-8460
Daniel.Riess@usdoj.gov

Attorneys for Federal Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*<br>Plaintiffs,<br>v.<br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS, and EXPLOSIVES ("ATF"), *et al.*,<br>Defendants. | Case No. 3:20-cv-06761-EMC<br>**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br>Noting Date: January 26, 2023<br>Time: 4:30 p.m.<br>Place: Courtroom 5, 17th Floor |

## I. INTRODUCTION

Plaintiffs are a state (California), an organization (Giffords Law Center, or "GLC"), and two individuals (Bryan Muehlberger and Frank Blackwell) who support gun safety regulation, including regulation of products that individual purchasers can use to construct privately made firearms, sometimes colloquially known as "ghost guns." Plaintiffs primarily challenge a rule promulgated last year by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) ("Rule"). Plaintiffs agree with and support the Rule's central provisions, which make clear that a product that may readily be completed into an operable firearm (including a firearm frame or receiver) is a firearm subject to federal regulation. In essence, Plaintiffs' complaint is that the Rule does not go quite far enough, in that there are some incomplete frames and receivers that the Rule incorrectly fails to classify as firearms.

Plaintiffs' Opposition to Defendants' Motion to Dismiss, ECF No. 129 ("Opp."), confirms that Plaintiffs lack standing to challenge the Rule. Plaintiffs do not contend that ATF has directly harmed them. Rather, they claim indirect harm resulting from proliferation of ghost guns and crimes committed with ghost guns. Yet Plaintiffs' Opposition reinforces that their standing theories depend on harm caused by ghost guns in general, not harm caused by the specific products that are the subject of this narrow legal dispute (*i.e.*, the products that Plaintiffs contend ATF incorrectly fails to classify as firearms). Plaintiffs fail to articulate any plausible connection between their factual allegations of harm and their legal theories of standing.

Plaintiffs also challenge guidance documents and classifications ATF issued before the Rule went into effect, which have now been superseded by the Rule. Plaintiffs' Opposition confirms that these claims are unripe. Plaintiffs do not dispute that such guidance and classifications are not currently in effect. They merely assert ATF may readopt them if another court were to vacate the Rule. Such a challenge to hypothetical future agency actions is just the kind of abstract claim that the ripeness doctrine precludes.

## II. ARGUMENT

### A. Plaintiffs' Standing Arguments Rest on Theories of Harm That Do Not Match the Text of the Challenged Rule.

Plaintiffs' theory of harm does not match the rule they are challenging, a flaw that pervades all of

their arguments for standing. Plaintiffs claim to be harmed by ghost guns, writ large, as a result of the federal government's alleged failure to regulate ghost guns more extensively, *i.e.*, in the precise way Plaintiffs prefer. For example, Plaintiffs cite statistics and anecdotes about ghost guns recovered by law enforcement or used in crimes, all from before the Rule went into effect in August 2022. Opp. 6-7; *see also* First Am. Compl. for Declaratory & Injunctive Relief ¶¶ 50-58, 111-15, 122-24, ECF No. 122 ("Am. Compl.") (allegations about violence and crimes involving ghost guns). Plaintiffs contend their injuries are caused by "[t]he proliferation of ghost guns," Opp. 18 (California), "[t]he ghost gun problem," Opp. 21 (GLC), and "ghost gun violence," Opp. 23 (individuals) (citation omitted).

But Plaintiffs do not and cannot establish that alleged harm caused by ghost guns is general is traceable to the challenged Rule because the Rule regulates many products that are used to construct privately made firearms. Specifically, the Rule clarifies that the definition of firearms subject to regulation under the Gun Control Act (GCA) "include[s] a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *See* 87 Fed. Reg. at 24,735 (27 C.F.R. § 478.11). The Rule also defines the "frame or receiver" of a firearm (which is itself a firearm under the GCA) to "include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* at 24,739 (27 C.F.R. § 478.12(c)). Therefore, the Rule provides that any part or kit that may readily be converted either into a functional weapon or a functional frame or receiver is a "firearm" subject to full regulation under the GCA (including provisions requiring background checks and serialization and prohibiting certain groups from possessing firearms). Whatever harms Plaintiffs claim resulted from purported nonregulation of ghost guns before the Rule went into effect cannot establish injury caused by the Rule.

Plaintiffs nonetheless try to establish standing by arguing that the Rule provides that so-called "80 percent frames and receivers"[1] are not firearms if not sold with supporting materials such as templates, jigs, molds, equipment, tools, or instructions. *See, e.g.*, Opp. 1 ("under the Final Rule, ATF still permits

---

[1] "80 percent" is a marketing term used by companies in the firearms industry to refer to a wide variety of incomplete frames and receivers. "However, that term is neither found in Federal law nor accepted by ATF." 87 Fed. Reg. at 24,663 n.47.

the sale of 80 percent receivers and frames as standalone products"); Opp. 11 ("the Final Rule provides . . . that 80 percent frames and receivers sold *without* a template, jig, parts kit, or other materials are not firearms"); Opp. 12 ("As long as 80 percent components are sold separately from jigs and toolkits, the parts are not subject to the serialization, background check, and recordkeeping requirements of the GCA."). As an initial matter, the Amended Complaint contains no factual allegations about harm specifically caused by ghost guns constructed from 80 percent frames and receivers sold as standalone products.

More importantly, Plaintiffs mischaracterize the Rule. The Rule does not create a blanket rule that standalone 80 percent frames and receivers are not firearms. To the contrary, incomplete frames and receivers, including so-called 80 percent frames and receivers that are sold without supporting materials such as jigs, are firearms under the Rule if they "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 87 Fed. Reg. at 24,739 (27 C.F.R. § 478.12(c)). In fact, ATF recently issued an open letter to all federal firearms licensees clarifying that certain incomplete frames marketed as "80 percent" frames are firearms even when sold as standalone products. *See* ATF, Open Letter to All Federal Firearms Licensees, Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames (Dec. 27, 2022) (Ex. 1). ATF concluded:

> Applying the regulatory text of Final Rule 2021-05F, partially complete Polymer80, Lone Wolf, and similar striker-fired semiautomatic pistol frames, including, but not limited to, those sold within parts kits, have reached a stage of manufacture where they *"may readily be completed, assembled, restored, or otherwise converted"* to a functional frame. This definition of "readily" applies to each and every classification of a partially complete frame or receiver under this Rule, whether sold alone or as part of a kit. Therefore, *even without* any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials, these partially complete pistol frames are "**frames**" and also "**firearms**" as defined in the GCA and its implementing regulations, 18 U.S.C. § 921(a)(3)(B) and 27 CFR 478.12(a)(1), (c).

*Id.* at 1.

The Open Letter described these products (which are marketed as "80 percent" frames) and explained that they could be completed quickly and easily, even without supporting materials, therefore meeting the Rule's definition of "readily." *See id.* at 6 (explaining that a Polymer80 "80 percent" Glock-type frame can be completed "by a person with novice skill, using common tools, such as a Dremel-type

rotary tool, within minutes—an amount of time and a set of circumstances that are far less than required to fall within the meaning of the term 'readily' in the Final Rule"). Notably, Plaintiffs' Amended Complaint makes clear that Plaintiffs believe that "80 percent" pistol frames sold by Polymer80—some of the very products that the Open Letter determined are "firearms" under the Rule—are a significant source of the ghost gun problem. *See* Am. Compl. ¶ 77 (alleging that "Polymer80 contributes significantly to ghost gun violence nationwide," and specifically referring to "DIY handguns" constructed from Polymer80's products); *see also id.* ¶¶ 79, 95. But because the Rule makes clear that such frames are firearms, Plaintiffs cannot plausibly argue that any harm caused by such ghost guns is traceable to the Rule.

The only text in the Rule with which Plaintiffs express actual disagreement is a single illustrative example applicable to a narrow class of products. Plaintiffs disagree with ATF's conclusion that "[a] billet or blank of an AR-15 variant receiver" without supporting materials (such as jigs) or indexing or machining in "critical interior areas" is "not a receiver." 87 Fed. Reg. at 24,739 (27 C.F.R. § 478.12(c), Example 4). Plaintiffs mischaracterize this example as providing that *no* standalone 80 percent frames or receivers are firearms, *see* Opp. 11 & n.5 (citing Example 4 as sole support for the proposition that under the Rule, "80 percent frames and receivers sold **without** a template, jig, parts kit, or other materials are not firearms"), but they ignore that this example is limited only to "AR-15 variant" receivers without indexing or machining in critical interior areas. *Id.* at 11. By its terms, Example 4 does not apply to any products other than incomplete AR-15 variant receivers, and it does not even apply to AR-15 variant receivers with any machining or indexing in critical interior areas, nor does it apply to any incomplete frames or receivers sold with supporting materials such as templates or jigs.

In sum, Plaintiffs agree with the Rule's definition of firearms as including products that can readily be completed into an operable weapon or an operable frame or receiver. They merely have a limited and technical disagreement with ATF about the application of that standard to a narrow class of products. Even to the extent that harm caused by ghost guns could establish injury (and Plaintiffs' standing arguments have other flaws, described further below, *see infra* Part II.B), only harm caused by the narrow class of products that are the subject of Plaintiffs' legal disagreement with ATF could possibly be relevant to standing. But there are no factual allegations in the Amended Complaint about any harm caused by

that narrow class of products.

**B. None of the Plaintiffs Has Standing to Challenge the Rule.**

Plaintiffs' primary claims in this case are a challenge to ATF's Rule. *See* Am. Compl. ¶¶ 143, 148-52. Plaintiffs claim that the Rule has injured California by forcing California to expend funds to prevent ghost gun violence, has exacerbated ghost gun violence in a way that has forced GLC to divert resources to combatting ghost gun violence, and has subjected the individual Plaintiffs to substantial risk of ghost gun violence (and attendant emotional harm). But Plaintiffs fail to set forth factual allegations that plausibly support the legal requirements for any of these theories of standing. At bottom, Plaintiffs' standing arguments suffer from the common flaw that they allege harm caused by ghost guns in general, not the narrow class of products that they contend the Rule wrongly failed to classify as firearms.

**1. California Lacks Standing.**

California claims to have standing because it has enacted legislation and expended funds to combat ghost gun violence. Opp. 15-18. This theory of standing is precluded by *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976), which holds that state expenditures to remedy harms purportedly caused by other sovereigns' laws are "self-inflicted" and do not constitute injury-in-fact. *Id.* at 664. Plaintiffs argue that *Pennsylvania* does not apply here, Opp. 17, but the case Plaintiffs cite, *California v. Azar*, 911 F.3d 558 (9th Cir. 2018), expressly explains that *Pennsylvania* applies where the state's choice to expend funds is "tethered to the legislative decisions of other sovereigns." *Id*. at 574. Here, California's theory of standing is that its ghost gun legislation "was necessary in large part because ATF has failed in its duty to properly regulate 80 percent frames and receivers." Opp. 16. Therefore, California asserts that its decision to spend money combatting ghost guns was "tethered" to the "decisions" of "[an]other sovereign[]," *California*, 911 F.3d at 574, the United States. That is precisely the situation in which *Pennsylvania* precludes standing.

Even in cases where allegations of state expenditures could be relevant to standing, another case cited by Plaintiffs acknowledges that such expenditures must be "'reasonably incur[red] costs to mitigate or avoid' a 'substantial risk' of harm." *California v. Ross*, 358 F. Supp. 3d 965, 1004 (N.D. Cal.) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)), *vacated and remanded*, 139 S. Ct. 2778 (2019). As explained above, California alleges that ghost guns as a whole have proliferated in California

and have been involved in crimes in California. *See* Opp. 16 ("residents, including law enforcement officers, have repeatedly been victimized in recent years in devastating incidents involving ghost guns"); Am. Compl. ¶¶ 113-15 (citing statistics about seizures of "ghost guns" in California). But the Amended Complaint contains no specific allegations of any harm caused by ghost guns constructed from products that the Rule does not regulate as firearms. Therefore, California fails to allege that the purported harm these state laws were intended to mitigate was caused by the Rule, as opposed to ghost guns regulated as firearms by the Rule that proliferated before the Rule went into effect.

California's erroneous conflation of all ghost guns with the narrow class of products in dispute also undermines California's argument that its "'theory of standing' rests not on 'mere speculation' but on 'the predictable effect of Government action on the decisions of third parties.'" Opp. 19 (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2009)). Plaintiffs' purported "overwhelming evidence supporting this chain of causation," *Id.*, consists of evidence of harm caused by "ghost guns" in general. *See* Am. Compl. ¶¶ 111-25. But Plaintiffs point to no specific factual allegations of harm caused by a ghost gun constructed from a product that the Rule does not classify as a firearm.[2]

## 2. Giffords Law Center (GLC) Lacks Standing.

GLC argues for organizational standing to challenge the Rule based on the theory that the Rule has caused GLC to divert its resources. As GLC acknowledges, this theory requires showing: "(1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [conduct] in question." Opp. 20 (quoting *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004)). But GLC fails to satisfy either requirement.

For the first requirement, GLC asserts that its interests have been frustrated by "the ghost gun problem," or "a gun violence epidemic exacerbated by ghost guns." Opp. 20-21. This argument fails for the same reason that California's argument fails: alleged harm caused by "ghost guns" in general does not equate to harm caused by the narrow class of products in dispute, and GLC (like California) makes no

---

[2] For similar reasons, California does not plausibly allege standing based on "its 'quasi-sovereign interest in the health and well-being . . . of its residents in general.'" Opp. 15 n.7 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)). Such a theory must be based on "alleged injury to a sufficiently substantial segment of [a state's] population." *Snapp*, 458 U.S. at 607. California does not allege that absent the relief it seeks, a substantial segment of California's population will be injured by the ghost guns constructed from the narrow class of products that are the subject of Plaintiffs' legal dispute with ATF.

factual allegations of harm caused by ghost guns constructed from products that are not firearms under the Rule. GLC therefore fails to "show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

GLC also fails to allege that the Rule has caused it to divert resources. GLC points solely to paragraphs 135-137 of the Amended Complaint as containing such allegations. Opp. 21-22. But those allegations are nearly identical to allegations in Plaintiffs' original Complaint, filed in 2020, long before the Rule was promulgated or went into effect; both the original Complaint and Amended Complaint allege that GLC has expended resources on legislative, policy, and educational initiatives concerning "ghost guns." *Compare* Compl. for Declaratory & Injunctive Relief ¶ 113-15, ECF No. 1, *with* Am. Compl. ¶¶ 135-37.[3] Because GLC was expending its resources in the same way before the Rule went into effect as after, GLC does not plausibly allege that the Rule has caused the organization to "change [its] behavior" to spend more resources on combatting ghost gun violence. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015).

### 3. Mr. Muehlberger and Mr. Blackwell ("Individual Plaintiffs") Lack Standing.

The individual Plaintiffs suffered the most heartbreaking loss imaginable when they lost children to gun violence. Defendants deplore such gun violence and are working earnestly to take actions to reduce such violence. However, the individual Plaintiffs have not alleged an ongoing Article III injury-in-fact traceable to the Rule necessary to sustain a claim for prospective relief.

Individual Plaintiffs first argue that their emotional harm constitutes injury-in-fact. Opp. 23-24. But they fail to allege that their emotional harm is traceable to the Rule. Rather, Individual Plaintiffs allege their emotional harm results from "fear of ghost gun violence." Am. Compl. ¶¶ 127, 132. But as explained above, Plaintiffs make no factual allegations about proliferation or violence involving ghost guns constructed from products that the Rule does not classify as firearms.

For the same reason, individual Plaintiffs fail to plausibly allege an injury caused by the Rule from

---

[3] The only new allegation in the Amended Complaint concerning GLC's standing is that GLC made two legal filings in 2021. *See* Am. Compl. ¶ 136. But legal filings in 2021 could not have been caused by the Rule, which went into effect in 2022. In any event, the Ninth Circuit has indicated that an expenditure on "litigation . . . is generally insufficient" to constitute diversion of resources for organizational standing purposes. *Smith*, 358 F.3d at 1105.

"increased risk of suffering from future ghost gun violence." Opp. 24. Again, Plaintiffs' allegations concerning the risk of violence in Southern California concern ghost guns in general, not ghost guns constructed from products that the Rule does not classify as firearms. *See*, *e.g.*, Am. Compl. ¶ 127 ("[i]n 2021, the Los Angeles Police Department announced that ghost guns 'accounted for 33 percent of all guns recovered by the department'") (citation omitted). To allege injury based on future harm, such harm must be "certainly impending," or at least there is a "substantial risk" that such harm will occur. *Clapper*, 568 U.S. at 410, 414 n.5. But individual Plaintiffs fail to allege a substantial risk that not only will they be injured by a ghost gun, but that it will be a ghost gun constructed from a product that the Rule does not classify as a firearm. For that reason, individual Plaintiffs also fail to allege plausibly that changing the Rule would redress any harm by appreciably reducing the risk of ghost gun violence. Individual Plaintiffs essentially concede the point when they argue that they need only allege an "increased risk of ghost gun violence," rather than "allege that they would suffer violence committed with one of the specific ghost guns at issue." Opp. 26. But any injury caused by a ghost gun constructed from a product that the Rule regulates as a firearm could not logically be caused by the Rule.

### C. Plaintiffs' Contingent Challenges to ATF's Classifications and Guidance that Preceded the Rule Are Unripe.

Plaintiffs' challenges to ATF guidance documents and classifications that were superseded by the Rule are unripe because they depend on the hypothetical prediction that in the future, ATF will readopt past guidance that is not currently operative. As a case cited by Plaintiffs explains, "[f]or a case to be ripe, it must present issues that are 'definite and concrete, not hypothetical or abstract.'" *Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1153 (9th Cir. 2017) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000)). It is hard to imagine a dispute more abstract and hypothetical than a challenge to superseded guidance expressing positions an agency does not currently hold.

Plaintiffs argue that it is not "speculative" that another court will vacate the Rule, given that one court has preliminary enjoined ATF from enforcing certain provisions of the Rule against certain litigants. Opp. 29. But the precise probability of a future court ruling in another case is beside the point, and this Court need not and should not venture guesses about how other Article III courts will rule. The crucial point, which Plaintiffs do not dispute, is that the guidance and classifications they challenge are not in

effect now, making Plaintiffs' challenge "hypothetical." *Bishop Paiute Tribe*, 863 F.3d at 1153.

Furthermore, Plaintiffs' claims rest not just on a single contingency of a future court ruling vacating the Rule but on a series of contingencies. Plaintiffs' claims could become ripe only if ATF were to respond to such a court ruling by readopting the guidance and classifications that Plaintiffs challenge. In arguing otherwise, Plaintiffs cite a case holding that "[t]he effect of invalidating an agency rule is to reinstate the rule previously in force." Opp. 29-30 (quoting *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005)). But that case is inapposite because Plaintiffs do not seek to challenge "the rule previously in force," *Paulsen*, 413 F.3d at 1008, meaning ATF's regulatory definition of "firearm" that existed before the Rule went into effect; rather, they seek to challenge a variety of agency guidance documents and classification letters issued to specific manufacturers. Plaintiffs cite no authority for the contention that such guidance and classifications would automatically be reinstated upon a hypothetical future court ruling.

A claim is not ripe if it hinges on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)). That is true even where a plaintiff argues that a reasonable probability exists that the future contingencies necessary to ripen the dispute will occur. For example, in *Trump v. New York*, 141 S. Ct. 530, 535 (2020), the Supreme Court held that a challenge to a potential future policy was unripe, even where the President issued a memorandum to a cabinet secretary that "made clear his desire" to implement the allegedly unlawful policy and directed the secretary to provide him information necessary to implement that policy. Nonetheless, the Supreme Court reasoned that "the policy may not prove feasible to implement in any manner whatsoever," and there was also "[u]ncertainty" about the exact contours of any future policy the President might implement. *Id.* So too, here, it is uncertain what guidance or policies ATF might pursue in response to a hypothetical future court ruling. Plaintiffs' challenges to superseded guidance and classifications that they predict ATF might adopt in the future present only an abstract and hypothetical dispute, not a ripe controversy.[4]

---

[4] Plaintiffs argue that it is permissible under the Federal Rules of Civil Procedure to plead claims in the alternative, Opp. 27-28, a point Defendants do not dispute. The jurisdictional problem with Plaintiffs' challenges to ATF's superseded guidance and classifications is that they are unripe, not that they are pleaded in the alternative.

# CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed for failure to establish subject matter jurisdiction under Federal Rule 12(b)(1).

DATED: January 12, 2023                    Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Daniel Riess*
MARTIN M. TOMLINSON
DANIEL RIESS
TAISA M. GOODNATURE
JEREMY S.B. NEWMAN
Trial Attorneys
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone: (202) 353-3098
FAX: (202) 616-8460
Email: Daniel.Riess@usdoj.gov

*Attorneys for Federal Defendants*