1

2

3

4                                    UNITED STATES DISTRICT COURT

5                                NORTHERN DISTRICT OF CALIFORNIA

6

7      STATE OF CALIFORNIA, et al.,              Case No.  20-cv-06761-EMC

8                           Plaintiffs,

9              v.                                 ORDER GRANTING IN PART AND
                                                  DENYING IN PART DEFENDANTS'
10     BUREAU OF ALCOHOL, TOBACCO,                MOTION TO DISMISS
       FIREARMS, AND EXPLOSIVES, et al.,
11                                                Docket No. 125
                            Defendants.

12

13

14          Plaintiffs are the State of California, the Giffords Law Center to Prevent Gun Violence

15   ("GLC"), Bryan Muehlberger, and Frank Blackwell (collectively, "Plaintiffs").  They have filed

16   suit against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); the Department of

17   Justice ("DOJ"); and several federal employees, all in their official capacities (collectively, the

18   "federal government" or "government").  According to Plaintiffs, Defendants have violated the

19   Administrative Procedure Act ("APA") in at least two ways:

20               (1) the ATF's determinations on "ghost guns" are not in accordance with the Gun

21                   Control Act which deems a firearm any weapon that is designed to be or may

22                   readily be converted into a firearm; and

23               (2) the ATF's recently issued final rule on ghost guns (87 Fed. Reg. 24,652) is

24                   arbitrary and capricious because it "deems as firearms only those 80 percent

25                   receivers and frames sold in kits or alongside jig, templates, or similar aids, leaving

26                   80 percent receivers and frames sold separately wholly unregulated."  FAC ¶ 150.

27          Currently pending before the Court is the federal government's motion to dismiss.  The

28   government's main contention is that Plaintiffs do not have standing to assert their claims.  Having

United States District Court
Northern District of California

1   considered the parties' briefs and accompanying submissions, as well as the oral argument of

2   counsel, the Court hereby **GRANTS** in part and **DENIES** in part the motion to dismiss.  The

3   Court also **DENIES** amici's request to dismiss or stay this suit.

4   I.        <u>FACTUAL & PROCEDURAL BACKGROUND</u>

5        In the operative first amended complaint ("FAC"), Plaintiffs allege as follows.

6        The Gun Control Act ("GCA") imposes restrictions on the purchase and sale of firearms in

7   the United States.  *See* FAC ¶ 1.  The statute defines "firearm," in relevant part, as follows: "(A)

8   any weapon (including a starter gun) which will or is *designed to or may readily be converted to*

9   expel a projectile by the action of an explosive; [or] (B) the *frame or receiver* of any such

10  weapon."  18 U.S.C. § 921(a)(3) (emphasis added).  With respect to the definition in (B), the

11  receiver (for a long gun) or a frame (for a handgun) is the part of the weapon that "houses the

12  hammer, bolt, or breechblock, as well as the firing mechanism." [1]  FAC ¶ 3.  It is the "central

13  piece" of a firearm, as reflected by the fact that the GCA expressly provides that a "'frame or

14  receiver' *is* a 'firearm.'"  FAC ¶ 3 (emphasis in original).

15       Included among the GCA's restrictions on the purchase and sale of firearms are

16  requirements that any firearm sold or imported in the United States "must have a unique serial

17  number"; that "licensed gun dealers must maintain identifying records, including the serial

18  numbers of guns they sell and the identity of the buyer"; that "licensed gun dealers [must] conduct

19  criminal background checks on would-be gun purchasers"; and that certain categories of people

20  are prohibited from purchasing firearms (*e.g.*, minors and individuals with disqualifying criminal

21  convictions).  FAC ¶ 1.

22       "Ghost guns" are weapons that effectively evade the protections of the GCA.  *See* FAC ¶

23  43 (alleging that ghost guns "are designed specifically to circumvent [the] common-sense

24  ───────────────

25  [1] Congress itself has never defined the terms "frame" and "receiver."  Thus, ATF has stepped in
    with regulations that define those terms.  The current definitions can be found in 27 C.F.R. §
26  478.12.  *See* 27 C.F.R. § 478.12(a)(1) (providing that a firearm frame is the part of a handgun that
    "provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back
27  the hammer, striker, bolt or similar primary energized component prior to initiation of the firing
    sequence"); *id.* § 478.12(a)(2) (providing that a firearm receiver is the part of a long gun that
28  "provides housing or a structure for the primary component designed to block or seal the breech
    prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent)").

United States District Court
Northern District of California

requirements in the GCA"); *see also* Opp'n at 1 (asserting that ghost guns "can be purchased without a background check and without being serialized, rendering them untraceable to law enforcement"). They are weapons that anyone can build at home to be fully operable firearms – and "within minutes." FAC ¶ 2. They are "'ghosts' because, lacking serial numbers, they are not traceable by law enforcement when they are used in a crime." FAC ¶ 2. According to Plaintiffs, "Defendants have allowed ghost guns to proliferate because they have determined that the core component of a ghost gun is not a 'firearm' under the GCA." FAC ¶ 3.

That core component is what the ghost gun industry calls an "80 percent" receiver/frame. *See* Mot. at 4 (noting that federal law does not use the term "80 percent" receiver/frame, that the term is a "marketing term[] used by some firms in the firearms industry to describe a wide variety of partially complete frames and receivers," and that "ATF does not consider the terms useful in determining whether any particular product qualifies as a firearm"). As suggested by the term "80 percent," an 80 percent receiver/frame is not a finished receiver/frame, but rather is a partially complete one. Although an 80 percent receiver/frame is only partially complete (*e.g.*, having "'a solid, un-machined fire-control cavity area with no holes or dimples for the selector, trigger, or hammer pins,'" FAC ¶ 44), it is both designed to and may readily be converted into a functional firearm "with ease." FAC ¶ 3. In fact, ghost gun manufacturers have developed tools that allow 80 percent receivers/frames to be converted into fully operable firearms "in as little as *15 minutes*." FAC ¶ 5 (emphasis in original).

Prior to 2006, ATF took the position that "many unfinished receivers and frames that are identical to the 80 percent receivers and frames on the market today were 'firearms' under the GCA." FAC ¶ 61. ATF reached this conclusion based on a "temporal approach" – *i.e.*, the speed and ease with which an unfinished receiver/frame could be turned into a fully functioning firearm. *See* FAC ¶¶ 62-63.

However, in 2006, ATF changed course and adopted a "machining operations approach"– *i.e.*, the agency "began to mechanically analyze which machining operations still needed to be performed to determine whether a partially completed receiver or frame is a 'firearm' under the GCA." FAC ¶ 64. Applying this approach, "ATF concluded that 80 percent receivers with fire-

control cavity areas that are completely '**solid and un-machined**' do not qualify as firearms under the GCA."  FAC ¶ 64 (emphasis in original); *see also* FAC ¶ 83 (discussing ATF's Ghost Gun Guidance which states, *inter alia*, that a "'fire-control cavity area [that] is completely solid and un-machined [has] not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA'").

In 2020, Plaintiffs initiated the instant action challenging ATF's approach toward ghost guns.  As alleged in their original complaint, ATF had improperly decided that 80 percent receivers/frames were not "firearms" under the GCA even though they were "nearly finished," Compl. ¶ 4, and could "quickly and easily" be used to create a "fireable weapon," Compl. ¶ 6 – especially in light of tools that ghost gun manufacturers have developed, which "make it possible to convert 80 percent receivers and frames into fully operable firearms '**in under 15 minutes**.'" Compl. ¶ 10 (emphasis in original).  Subsequently, litigation in this case was put on hold because, in 2021, following several mass shootings, "the White House announced that it intended to 'issue a proposed rule to help stop the proliferation of "ghost guns."'" FAC ¶ 88.  In May 2021, ATF issued a proposed rule, and, in April 2022, the final rule.  *See* FAC ¶¶ 88-89.

In the final rule, "ATF stated that the goals of the Rule were to 'provide a more comprehensive definition of "frame" or "receiver" so that these terms more accurately reflect how most modern-day firearms are produced and function' and to 'reduce unserialized "ghost guns."'" FAC ¶ 89.  Under the final rule,

> [t]he terms "frame" and "receiver" shall include a *partially complete*, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver . . . .  [But] [t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material).  When issuing a classification, the Director *may* consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are *sold, distributed, or possessed with the item or kit*, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

27 C.F.R. § 478.12(c) (emphasis added).

United States District Court
Northern District of California

The final rule gives examples of what is and what is not a receiver/frame:

> Example 1 to paragraph (c) – Frame or receiver: A frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed *with* a compatible jig or template *is* a frame or receiver, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver.
>
> . . . .
>
> Example 4 to paragraph (c) – Not a receiver: A billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is *not* sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is *not* a receiver.

*Id.* (emphasis added).

Plaintiffs acknowledge that the final rule "takes important steps to eliminate ghost gun-making 'kits' – meaning where 80 percent receivers or frames are sold together with other essential firearm parts, such as the magazine to store ammunition, and the jigs to assemble the firearm."[2]  FAC ¶ 7.  However, Plaintiffs criticize the rule because it essentially "double[s] down on the 'machining operations' approach."  FAC ¶ 67.  Moreover, the rule "still permits the selling of . . . '80 percent' receivers and frames as *stand-alone* items."  FAC ¶ 7 (emphasis omitted and added).  In other words, even if a person cannot buy an 80 percent receiver/frame if it is sold *with* other essential firearm parts, nothing prevents a person from purchasing "all the items needed to create a firearm" so long as they purchase the 80 percent receiver/frame in a *separate* transaction from the other firearm parts.  FAC ¶ 7.  "When ghost gun manufacturers sought to enjoin the Final Rule in court [referring to two federal suits in Texas and one federal suit in North Dakota], [the federal government] confirmed what the text of the Rule suggests: that gun manufacturers can still sell un-machined 80 percent components so long as they do not bundle those components with jigs or tool kits in the same package."  FAC ¶ 92.  ATF took the same position in, *e.g.*, a slide-deck presentation, in a YouTube video, in a training aid for the Final Rule, and in an "Open

---

[2] A jig is a "device that guides the drilling and milling necessary to complete the receiver."  FAC ¶ 45.  With a jig, a person can "finish an 80 percent receiver 'in **under 30 minutes**' using basic household tools, such as [a] simple drill bit, file set, and a hand drill, to drill the remaining holes."  FAC ¶ 45 (emphasis in original).

1    Letter" to federal firearms licensees issued in September 2022.  *See* FAC ¶¶ 99-102.

2           Plaintiffs assert that ATF's ghost gun determinations violate the law in two ways.

3        •   ATF's determination that 80 percent receivers/frames are not firearms "contravenes

4           the plain text of the GCA" because 80 percent receivers/frames "are '***designed to or***

5           ***may be readily converted***' into fully fireable weapons."  FAC ¶ 14 (emphasis in

6           original).

7        •   ATF's determination that "only 80 percent receivers and frames *sold with* jig kits,

8           templates, or similar items qualify as firearms under the GCA, while leaving the 80

9           percent receivers and frames themselves entirely unregulated," is arbitrary and

10          capricious.  FAC ¶ 15 (emphasis in original).

11          As indicated above, after the final rule issued, several ghost gun manufacturers filed

12   lawsuits in other federal district courts, challenging its validity in its entirety.  *See* Opp'n at 13

13   (taking note of two suits filed in Texas and one in North Dakota).  In one of the Texas cases, the

14   district court preliminary enjoined the final rule with respect to two ghost gun manufacturers.  *See*

15   Opp'n at 13-14 (noting that the court determined plaintiffs were "likely to succeed in showing that

16   the Final Rule exceeded ATF's statutory authority under the GCA").

17          In the currently pending motion to dismiss, Defendants largely challenge Plaintiffs'

18   standing to bring suit.  Plaintiffs' FAC contains allegations related to standing.  *See* FAC ¶ 111 *et*

19   *seq.*  The specific allegations related to each Plaintiff are addressed below.

20                              **II.      DISCUSSION**

21   A.    Standing

22          Plaintiffs seek declaratory and injunctive relief with respect to the ATF final rule.

23   Defendants argue that Plaintiffs each lack standing to seek such relief, and therefore the Court

24   lacks subject matter jurisdiction over the case.

25          A party may move to dismiss for lack of subject matter jurisdiction, including lack of

26   standing, under Federal Rule of Civil Procedure 12(b)(1).  *See In re Apple iPhone Antitrust Litig.*,

27   846 F.3d 313, 319 (9th Cir. 2017).

28          Under Rule 12(b)(1), a defendant may challenge the plaintiff's

United States District Court
Northern District of California

6

> jurisdictional allegations in one of two ways.  A "facial" attack accepts the truth of the plaintiff's allegations but asserts that they "are insufficient on their face to invoke federal jurisdiction."  The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction.
>
> A "factual" attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings.

*Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

In the case at bar, Defendants have launched a facial challenge to Plaintiffs' standing.  Thus, the Court must take all of Plaintiffs' well-pled allegations related to standing as true and make all reasonable inferences in their favor.

> To have standing, plaintiffs must establish (1) that they have suffered an injury in fact, (2) that their injury is fairly traceable to a defendant's conduct, and (3) that their injury would likely be redressed by a favorable decision. . . . At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice."

*Mecinas v. Hobbs*, 30 F.4th 890, 896-97 (9th Cir. 2022).

In a multi-plaintiff suit, only one plaintiff need have standing in order for the case to proceed.  *Cf. Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others.").  Below the Court addresses each Plaintiff's standing to challenge the ATF final rule.

B.   <u>California</u>

California alleges that it has been and/or will be injured by the final rule because:

(1) ATF's actions and/or inactions – essentially leaving ghost guns unregulated – have led to a proliferation of ghost guns (what Plaintiffs refer to as a ghost gun "epidemic"), *see, e.g.*, FAC ¶ 135 (alleging that ATF's "stance on ghost guns . . . permit[s] the proliferation of untraceable firearms that can be purchased by prohibited and dangerous persons and without any background check");

(2) California, in particular, has been impacted by the epidemic of ghost guns as

reflected by the number of ghost guns that have been seized in the state, *see, e.g.*, FAC ¶ 112 (noting that, in 2015, the number of ghost gun seizures in the state was 26; by 2021, the number had jumped to 12,388); *cf.* FAC ¶ 115 (alleging that, in 2020, 65% of all ghost guns seized by ATF were seized in California); FAC ¶ 57 (alleging that, "[a]ccording to California law enforcement agencies, during 2020 and 2021, ghost guns 'accounted for 25 to 50 percent of firearms recovered at crime scenes'"); and

(3) as a result of the epidemic, California has had to spend time, money, and resources:

(a) to solve or otherwise deal with ghost gun-related crimes, to deter ghost gun-related crimes, and to train on ghost-gun related crimes, *see* FAC ¶¶ 112, 114-15; and

(b) to enact and implement legislation at the state level to close the "loophole" left by ATF.  *See* FAC ¶¶ 116-18 (discussing A.B. 857, 879, and 1621).[3]

1.      Increased Costs of Policing and Law Enforcement

In its motion, the government argues first that California has failed to show an injury in fact with respect to (3)(a) above – *i.e.*, "increased costs of policing and law enforcement."  FAC ¶ 112.  The government's main contention is as follows:

California nowhere links the unserialized firearms used in [ghost-

---

[3] As described in the opposition:

- A.B. 857 (passed in 2016) "requires self-assembled firearms to be stamped with unique serial numbers provided by the California Department of Justice, and also requires those possessing unserialized firearms to apply to the Department for serial numbers."  Opp'n at 16.

- A.B. 879 (passed in 2019 but subject to delayed implementation) "would have required sales of unfinished frames and receivers to be conducted through licensed dealers, subject to a California-only background check and sale record."  Opp'n at 16.

- A.B. 1621 (passed in 2022) "expand[s] the definition of 'firearm and precursor part' to include any precursor part that has reached a stage in manufacture where it may be readily converted into a firearm or is marketed or sold the public for use as the frame or receiver of a firearm."  Opp'n at 16.  It also "generally prohibits the sale or transfer of all firearm precursor parts that are not covered by the Final Rule, such as 80 percent frames and receivers."  Opp'n at 16.

United States District Court
Northern District of California

> gun related] crimes to any specific ATF action challenged in this
> lawsuit.  In particular, California fails to allege that any of the
> unserialized firearms used in these crimes were assembled from the
> types of incomplete receiver blanks that ATF would determine not
> to be firearms under the Rule [*i.e.*, 80 percent frames/receivers sold
> standalone].

Mot. at 7.  According to the government, this problem means that California has failed to show not only an injury in fact but also traceability and redressability.[4]

As an initial matter, the Court notes that the final rule was not issued until April 2022 and, thereafter, a period of time passed during which ATF's interpretation of the final rule was being clarified (*e.g.*, through its September 2022 Open Letter).  Thus, the fact that California has not yet pointed to a specific instance in which an 80 percent frame/receiver was sold standalone and then used in a crime is not dispositive.  Moreover, California fairly contends that its ability to point to a specific instance has been hampered by the very fact of the final rule.  In other words, the final rule leaves 80 percent receivers/frames when sold standalone unregulated, which means that they are not serialized, which is then an obstacle to California to tracking down their sale.  *See* Opp'n at 19 n.12 (arguing that Defendants' claim of "'speculation' is a direct result of ATF's failure to track the sale of 80 percent receivers and frames[;] Defendants should not be permitted to challenge standing based on their own unlawful determinations").

But putting the above aside, the Court finds that California has sufficiently established standing to proceed with this litigation as all reasonable inferences must be made in Plaintiffs' favor at this juncture of the proceedings, and standing may be based on the likelihood of future injury.  "A plaintiff threatened with future injury has standing to sue if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *McGee v. S-L Snacks*

---

[4] Although Defendants have challenged traceability on the above basis, they have not made any proximate cause-type argument that California's asserted injury is too many steps down the causal chain. *Cf. City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1032-33, 1035 (9th Cir. 2021) (taking note of plaintiff-city's allegation that bank violated the Fair Housing Act "by engaging in mortgage-lending practices that discriminated against African-American and Latino borrowers" which then impacted the city because "the discriminatory loans to minority borrowers increased default and foreclosure rates and decreased property values, when [then] resulted in two economic harms: a decrease in property tax revenue and the simultaneous need for increased municipal expenditures to address public health and safety issues"; concluding that plaintiff-city failed to sufficiently plead proximate cause for its claim under the statute because "'[t]he general tendency . . . [is] not to go beyond the first step' of the causal chain").

United States District Court
Northern District of California

1  *Nat'l*, 982 F.3d 700, 709 (9th Cir. 2020) (internal quotation marks omitted).  Here, when all

2  reasonable inferences are made in California's favor – including the predictable effects of

3  government action or inaction on third parties, *see Dep't of Commerce v. N.Y.*, 139 S. Ct. 2551

4  (2019)[5] – there is a "substantial risk" that California will be harmed by the final rule which leaves

5  80 percent receivers/frames sold standalone unregulated.  The Court finds California has

6  sufficiently alleged such a substantial risk for several reasons.

7  First, it is predictable that 80 percent receivers/frames will be sold standalone.  Indeed, in

8  the FAC, Plaintiffs allege that ghost gun manufacturers have already advised consumers to

9  purchase such receivers/frames standalone to avoid regulation under the final rule – *i.e.*, buying

10  the 80 percent receiver/frame separate from the other tools or components needed to build a

11  functional weapon.  *See* FAC ¶ 15 & n.27 (taking note of advertising by one company that

12  "consumers are free to purchase one 'Assemble for Thyself' kit to use on multiple, unserialized

13  receivers they buy separately"); *see also* FAC ¶¶ 96-97.  Plaintiffs also take note that, "[i]n

14  response to a YouTube video posted by a gun-rights lawyer describing the effects of the Final

15  Rule, commenters recognized that so long as 80 percent components are sold separately from jigs

16

17

---

[5] In *Department of Commerce v. New York*, a challenge was made to a decision by the Secretary of
18  Commerce to reinstate a question about citizenship on the 2020 census questionnaire.  The suit
was brought by various plaintiffs, including state and local governments and nongovernmental
19  organizations that worked with immigrant and minority communities.  The plaintiffs claimed a
number of injuries as a result of the Secretary's decision: "diminishment of political
20  representation, loss of federal funds, degradation of census data, and diversion of resources – *all of
which turn on their expectation that reinstating a citizenship question will depress the census
21  response rate* and lead to an inaccurate population count."  *Dep't of Commerce v. New York*, 139
S. Ct. at 2565 (emphasis added).

22
The federal government argued that "any harm to respondents is not fairly traceable to the
23  Secretary's decision, because such harm depends on the independent action of third parties
choosing to violate their legal duty to respond to the census."  *Id.*  The federal government also
24  argued that "[t]he chain of causation is made even more tenuous" because it was based on the third
parties being "motivated by unfounded fears that the Federal Government itself will break the law
25  by using noncitizens' answers against them for law enforcement purposes."  *Id* at 2565-66.  The
Supreme Court rejected these arguments, explaining that, "in these circumstances, respondents
26  have met their burden of showing that third parties will likely react in predictable ways to the
citizenship question, even if they do so unlawfully and despite the requirement that the
27  Government keep individual answers confidential."  *Id.* at 2566.  "Respondents' theory of
standing . . . does not rest on mere speculation about the decisions of third parties; it relies instead
28  on the *predictable effect of Government action on the decisions of third parties*."  *Id.* (emphasis
added).

10

and tool kits, they can continue using ghost guns without being subjected to the serialization, background check, or recordkeeping requirements of the GCA."  FAC ¶ 98.  From this, it can reasonably be inferred that the number of ghost guns that will be sold standalone is not insubstantial.  Notably, the FAC alleges that, "[a]s of 2020, [California] was home to at least 18 of the then-estimated 80 current online ghost gun retailers – the most of any state – and more than double the number of retailers that existed in the State just six years before."  FAC ¶ 111.

Second, it is predictable that at least some of the 80 percent receivers/frames sold standalone will be used in crimes.  The entire point of buying an 80 percent receiver/frame standalone is to avoid regulation, which requires, *inter alia*, serialization which enables law enforcement to track sales.  *See* FAC ¶ 40 (explaining that serialization "ensures that every firearm – including those firearms recovered by law enforcement agencies at crime scenes – can be traced back to its manufacturer or importer and first retail purchaser," and "[t]racing firearms helps link a recovered firearm to crime suspects in a criminal investigation by helping law enforcement officials track the movement of a firearm through the supply chain").  Although not every person who procures an 80 percent receiver/frame standalone does so for purposes of committing a crime, it is a reasonable inference that there will be some who do so.  This may be reasonably inferred from the substantial number of ghost gun seizures in the state in connection with crimes over the years.  *See* FAC ¶ 112 (alleging that, "from 2015 to 2021, California's annual ghost gun seizures have increased from 26 to 12,388, representing a staggering 47,546% increase"); *see also* FAC ¶ 57 (alleging that, "[a]ccording to California law enforcement agencies, during 2020 and 2021, ghost guns 'accounted for 25 to 50 percent of firearms recovered at crime scenes'"); FAC ¶ 115 (alleging that, "in 2020, 65% of all ghost guns seized by ATF were seized in California").

In short, as the Court noted at the hearing, California's basic contention is that the final rule contains a loophole/exception which enables people to avoid regulation.  If that loophole/exception is substantial, it is entirely predictable that crimes involving such guns will occur and thereby injure the state.  California has alleged that the size of the loophole/exception is substantial: to wit, there is an easy way to avoid regulation by making a purchase of an 80 percent receiver/frame standalone without, *e.g.*, an accompanying kit.

United States District Court
Northern District of California

1    In the reply brief, the government argues for the first time that California – and the other

2  Plaintiffs – have interpreted the final rule incorrectly.  The government points to an Open Letter

3  that ATF recently issued in December 2022.[6]  In the letter, ATF states as follows:

4    Applying the regulatory text of Final Rule 2021-05F, partially
   complete Polymer80, Lone Wolf, and similar striker-fired

5    semiautomatic pistol frames, including, but not limited to, those sold
   within parts kits, have reached a stage of manufacture where they

6    "*may readily be completed, assembled, restored, or otherwise
   converted*" to a functional frame.  This definition of "readily"

7    applies to each and every classification of a partially complete frame
   or receiver under this Rule, whether sold alone or as part of a kit.

8    Therefore, *even without* any associated templates, jigs, molds,
   equipment, tools, instructions, guides, or marketing materials, these

9    partially complete pistol frames are "**frames**" and also "**firearms**"
   as defined in the GCA and its implementing regulations, 18 U.S.C. §

10   921(a)(3)(B) and 27 CFR 478.12(a)(1), (c).

11  Reply, Ex. 1 (Dec. 2022 Open Letter at 1) (emphasis in original); *see also* Reply, Ex. 1 (Dec. 2022

12  Open Letter at 9) (stating that, "for these partially complete frames, such analysis [of whether the

13  frame was sold with any associated templates, jigs, molds, etc.] was not necessary because they

14  are, by themselves, 'frames' and 'firearms' as defined in the GCA"); *cf.* Reply, Ex. 1 (Dec. 2022

15  Open Letter at 3) (noting that the "analysis may include consideration of any associated templates,

16  jigs, molds, [etc.] that are . . . sold . . . with the component part or kit" but indicating that this is

17  just one factor and "the analysis must consider all factors that are relevant").  At the hearing, the

18  government maintained that the Open Letter is consistent with the language of the final rule,

19  which on its face simply states that,

20   [w]hen issuing a classification, the Director *may* consider any
   associated templates, jigs, molds, equipment, tools, instructions,

21   guides, or marketing materials that are sold, distributed, or
   possessed with the item or kit, or otherwise made available by the

22   seller or distributor of the item or kit to the purchaser or recipient of
   the item or kit.

23

24  27 C.F.R. § 478.12(c) (emphasis added).

25    California has not argued that judicial notice of the December 2022 Open Letter is

26

27  ─────────────────────
   [6] The Open Letter was not issued until several months after Plaintiffs had filed their FAC

28  challenging the final rule.  It also was not issued until about a week after Plaintiffs' brief in
   opposition to the motion to dismiss was filed.

improper.  Thus, the Court may consider whether the letter appreciably decreases the size of the asserted loophole/exception in the final rule.  The Court is not persuaded that the letter, on its face, does so.  First, the letter addresses specific 80 percent receivers/frames only (*i.e.*, certain products made by certain manufacturers), not all receivers/frames.  Second, the letter states that whether an 80 percent receiver/frame is sold standalone or as part of a kit or with other tools or components is still a factor to consider.  Third, the letter leaves unclear when and/or how much consideration is given to this factor – *e.g.*, when is this factor dispositive or at least significant?  Fourth, in spite of ATF's December 2022 Open Letter, its earlier Open Letter from September 2022 still stands.  There, the agency indicated that "80 percent AR-type receivers . . . are *not* firearms if they lack 'indexing or machining of any kind . . . in the area of the fire control cavity' and are '<u>not sold, distributed, or marketed with any associated templates, jigs, molds, [etc.], such as within a receiver parts kit</u>.'"  FAC ¶ 102 (emphasis in original); *see also* 27 C.F.R. § 478.12(c) (in Example 4, stating that the following is *not* a receiver: "A billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold distributed, or possessed with instructions, jigs, templates, [etc.] such that it may readily be completed is not a receiver").  In light of the September 2022 Open Letter, the size of the loophole/exception, even after the issuance of the December 2022 Open Letter, is ambiguous, and, at this juncture all reasonable inferences must be drawn to California's favor.

### 2.    Enactment and Implementation of State Legislation

As noted above, California also claims as an injury increased costs related to its enactment and implementation of state legislation on ghost guns made necessary by the federal government's failure to fully implement the GCA.  In its motion to dismiss, the federal government argues that "[t]he expenses associated with California's decision itself to regulate a broader class of receiver blanks than the federal government and its 'accelerated efforts to implement' its legislation . . . cannot give rise to Article III standing" because "'[d]ecisions by . . . state legislations' to expend money from the public fisc or otherwise to enact new laws are 'self-inflicted,' and '[n]o State can be heard to complain about [such] damage.'"  Mot. at 7 (quoting *Penn. v. N.J.*, 426 U.S. 660, 664 (1976)).  The government's argument is not persuasive.

United States District Court
Northern District of California

1   As California points out, the Supreme Court has stated that standing may be based on

2   "reasonably incur[red] costs to mitigate or avoid" harm or a "'substantial risk'" of harm.  *Clapper*

3   *v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (stating that, "[i]n some instances, we have

4   found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs

5   to reasonably incur costs to mitigate or avoid that harm"); *see also Air Alliance Houston v. Envt'l*

6   *Prot. Agency*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018) (stating that "[m]onetary expenditures

7   [made by the state] to mitigate and recover from harms that could have been prevented [*i.e.*, if the

8   EPA did not decide to delay the effective date of a rule] are precisely the kind of 'pocketbook'

9   injury that is incurred by the state itself"); *Cal. v. Ross*, 358 F. Supp. 3d 965, 1003, 1005 (N.D.

10   Cal. 2018) (Seeborg, J.) (agreeing that state and local governments would suffer from inclusion of

11   a citizenship question on the census questionnaire because they would have to "expend[] . . . funds

12   for census outreach to mitigate the substantial risk of harm flowing from the citizenship question";

13   "[t]he California Plaintiffs' expenditures were reasonably incurred because they face a substantial

14   risk of a differential undercount of their residents").  That is the gist of California's position here –

15   *i.e.*, it has had to incur costs to regulate because ATF is not regulating, which has led to the

16   proliferation of ghost guns.

17   The decision in *California v. Bureau of Land Management*, No. C18-cv-00521-HSG, 2020

18   U.S. Dist. LEXIS 53958 (N.D. Cal. Mar. 27, 2020) (hereinafter "*California v. BLM*"), is

19   instructive.  There, California challenged a final rule issued by the Bureau in 2017 that "repealed a

20   previous rule [from 2015] regulating hydraulic fracturing operations on federal and tribal lands."

21   *Id.* at *5 (explaining that hydraulic fracturing is a process used by oil and natural gas producers to

22   increase production from wells).  The government argued that any harms claimed by California

23   were not traceable to the repeal of the 2015 rule – *i.e.*, any harms were general harms related to

24   hydraulic fracturing that were not addressed by the 2015 rule and therefore could not be traced to

25   the repeal of the 2015 rule.  *See id.* at *11.  The district court disagreed:

26          California Plaintiffs allege that "the repeal of the [2015] Rule
          eliminates an additional layer of regulatory protection on federal
27          lands in California that supplements and bolsters state hydraulic
          fracturing regulations . . . . As a result of the Repeal, responsibility
28          for ensuring compliance with hydraulic fracturing regulations will

14

1
2
3

> fall entirely on California, placing additional burdens on State resources." Given that "California contains millions of acres of federal lands that are managed by [BLM] for energy production," . . . the burdens placed on California's resources to ensure state regulatory compliance on BLM lands increased due to the Repeal.

4
5
6
7
8
9

*Id.* at *12-13. The court added: "California Plaintiffs state an injury in fact[] since they will need to ensure state regulatory compliance to fill the regulatory gap that will be created if the 2015 Rule does not take effect." *Id.* at *14. The instant case is analogous to *California v. BLM*: although the case at bar does not involve the repeal of a federal rule, it focuses on a similar problem, *i.e.*, a lack of regulation by the federal government which causes an affirmative harm that the state must address.

10
11
12
13
14
15
16
17

The federal government's reliance on *Pennsylvania v. New Jersey*, 426 U.S. at 660, is misplaced. In that case, Pennsylvania sued New Jersey because New Jersey taxed the New Jersey-derived income of nonresidents (*i.e.*, income that nonresidents earned in New Jersey). *See id.* at 663. Pennsylvania claimed injury of its own because it allowed a tax credit to any of its residents for income taxes paid to other states, including New Jersey. *See id.* The Supreme Court held that this injury was "self-inflicted, resulting from decisions by [the] . . . state legislature[]." *Id.* at 664. The Supreme Court noted that nothing prevented Pennsylvania from withdrawing the tax credit that it gave for taxes paid to New Jersey. *See id.*

18
19
20
21
22
23
24
25

Based on *Pennsylvania v. New Jersey*, the federal government asserts that California's decision to enact and then implement its state legislation on ghost guns must also be considered self-inflicted injury. But as courts and treatises have pointed out, "[a]lthough 'standing has been denied because the injury seems *solely* attributable to the plaintiff,'" it is "'not defeated merely because the plaintiff has in some sense contributed to his own injury. Standing is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain.'" *St. Pierre v. Dyer*, 208 F.3d 394, 402 (2d Cir. 2000) (quoting Wright & Miller, 13 Fed. Prac. & Proc. § 3531.5 (2d ed.)[7]; *cf. Petro-Chem. Processing, Inc. v. E.P.A.*, 866 F.2d 433,

26

---

27
28

[7] The current Wright & Miller treatise notes that, although

> [s]elf-inflicted injury may seem a suspicious basis for standing[,] [i]t is clear . . . that no rigid lines are drawn on this basis. A good

438 (D.C. Cir. 1989) (considering whether the injury claimed "is 'so completely due to the [complainant's] own fault as to break the causal chain'"; here, "members . . . can avoid the threatened injury by choosing safer methods") (emphasis added).  In *Pennsylvania*, it was Pennsylvania's own tax law that caused it financial harm.  It did not suffer an affirmative harm imposed upon it by another sovereign's failure.  The harm, resulting from Pennsylvania's own law, was wholly avoidable, and thus was truly self-inflicted.  Not so in *Air Alliance Houston*, *California v. Ross*, or *California v. BLM*, cited above.  Nor is it so in this case.

Notably, in *California v. Azar*, 911 F.3d 558 (9th Cir. 2018), the Ninth Circuit concluded that the state of California did have standing to bring suit because, even though one could have argued that the state contributed to its own injury, the state was not so solely at fault that it was proper to deem the injury self-inflicted.  In *California v. Azar*, several states challenged interim final rules ("IFRs") that exempted employers with religious and moral objections from a requirement that group health plans must cover contraceptive care without imposing cost sharing.  The states claimed standing based on the following:

> the IFRs expanded the number of employers categorically exempt from the '[Affordable Care Act's] contraceptive coverage requirements, and [so] states will incur significant costs as a result of their residents' reduced access to contraceptive care. . . . [W]omen who lose coverage will seek contraceptive care through state-run programs or programs that the states are responsible for reimbursing.

*Id.* at 571.  The dissent argued this claimed injury was "self-inflicted because the states voluntarily chose to provide money for contraceptive care to its residents through state programs."  *Id.* at 573 (noting that the dissent cited *Pennsylvania v. New Jersey*).  But the Ninth Circuit rejected this

---

illustration is provided by *Havens Realty Corporation v. Coleman* [465 U.S. 363 (1982)].  Two plaintiffs were permitted standing to challenge racially discriminatory practices in apartment rentals.  One was a "tester," who sought information solely for the purpose of proving that false information was provided to black applicants; the other was an organization that claimed the defendants' practices forced it to greater efforts in combatting discrimination.  Neither plaintiff needed to become involved at all.  The voluntary choice to suffer the injury that conferred standing was sufficient.

Wright & Miller, 13A Fed. Prac. & Proc. & Proc. Juris. § 3531.5 (3d ed.).

United States District Court
Northern District of California

contention:

> In *Pennsylvania* [*v. New Jersey*], the plaintiff states challenged other states' laws that increased taxes on nonresident income.  The plaintiff states provided tax credits to their residents for taxes paid to other states.  Accordingly, the defendant states' tax increases also increased the amount of tax credits provided by the plaintiff states, and the plaintiff states lost revenue.  In denying leave to file bills of complaint invoking the Supreme Court's original jurisdiction, the Court held that the plaintiff states could *not* "demonstrate that the injury for which [they sought] redress was *directly* caused by the actions of another State" because the injuries to the plaintiff states' fiscs "were self-inflicted . . . and nothing prevents [them] from withdrawing [the] credit for taxes paid to [defendant states]."
>
>  . . . . [T]he injury here is not "self-inflicted" within the meaning of *Pennsylvania*.

*Id.* at 574 (emphasis added).

The Ninth Circuit went on to discuss another decision where the Supreme Court did find standing, namely, *Wyoming v. Oklahoma*, 502 U.S. 437 (1992).  There, the state of Wyoming challenged an Oklahoma law that required Oklahoma power plants to use Oklahoma coal on the theory that the law reduced demand for Wyoming coal and thus inflicted a pocketbook injury on Wyoming through reduced tax revenues.  *See id.* at 442 (noting that "Wyoming does not itself sell coal, [but] it does impose a severance tax upon the privilege of severing or extracting coal from land within its boundaries").  The Ninth Circuit explained in *California v. Azar* that

> [w]hat distinguishes [*Pennsylvania v. New Jersey* and *Wyoming v. Oklahoma*], and what caused the Supreme Court to reach different results, is that the plaintiff states' laws in Pennsylvania directly and explicitly tied the states' finances (revenue loss caused by tax credit) to another sovereign's laws (other states' taxes on nonresident income).  Wyoming did not involve such state laws; the tax on Wyoming-mined coal was not so tethered to the legislative decisions of other sovereigns.  The same is true of the contraceptive coverage laws of the plaintiff states here.  Accordingly, we are not convinced that *Pennsylvania* controls in this case.

*Id.*  As the Ninth Circuit explained, in *Pennsylvania v. New Jersey*, Pennsylvania made the choice to "tether" its tax laws to the laws of New Jersey, and Pennsylvania thus had the power to avoid injury by removing that tether – *i.e.*, it simply could withdraw the tax credit it gave for taxes paid to New Jersey.  The instant case is different: although California was motivated to act because of ATF's actions/inactions, there is no similar tether between California and federal law; removing

17

California's legislation on ghost guns would not resolve the problem for the state.[8]

In *California v. Azar*, the Ninth Circuit also pointed out that "[c]ourts regularly entertain actions brought by states and municipalities that face economic injury, *even though those governmental entities theoretically could avoid the injury by enacting new legislation*." *Id.* at 574 (emphasis added).  Thus, under *California v. Azar*, here, California cannot be blamed for "avoiding" injury by enacting legislation to fill the regulatory gap left by the ATF.  As noted above, if California did *not* enact legislation, it would face injury resulting from that regulatory gap which has led to the proliferation of ghost guns.  *See Tex. v. U.S.*, 809 F.3d 134, 158 (5th Cir. 2015) (taking note that, in *Wyoming v. Oklahoma*, Wyoming "sought to tax the extraction of coal and had *no way to avoid* being affected by other states' laws that reduced demand for that coal"; thus, it had standing) (emphasis added).  This is not a case where California has self-inflicted its own wound.

Accordingly, the Court concludes that California has made out a plausible showing of standing, and this is so whether the government has made challenges to standing based on injury in fact, traceability, or redressability.[9]  And because the Court finds standing in California's favor, that is enough for this case to proceed.  *Cf. Leonard*, 12 F.3d at 888 (noting that, "once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others.").  However, out of an abundance of caution, the Court addresses the standing of both the organizational plaintiff GLC as well as that of the individual plaintiffs.

C.     GLC

GLC is a nonprofit organization.  Its "core mission is to save lives from gun violence by shifting culture, changing policies, and challenging injustice."  FAC ¶ 135; *see also* FAC ¶ 20

---

[8] Nothing suggests that the Ninth Circuit meant that any time a state were to take action in response to federal government action, that would be "self-inflicted" injury.

[9] Because California has standing in its own right, the Court need not address the government's argument that "a state 'does not have standing as *parens patriae* to bring an action against the Federal Government.'"  Mot. at 7 (quoting *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011)); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600-01 (1982) (stating that, "if [a] State is only a nominal party without a real interest of its own[,] then it will not have standing under the *parens pat*riae doctrine"; but adding that a state could have standing based on a quasi-sovereign interest).

United States District Court
Northern District of California

(alleging that GLC is "dedicated to finding sensible solutions that will prevent further gun violence"). GLC's "core policy platform" is "supporting background check and licensing laws at the federal and state level." FAC ¶ 135.

An organization such as GLC may assert standing in its own right (*i.e.*, instead of on behalf of its members). As the Ninth Circuit has noted, the parameters of this kind of organizational standing were addressed in the Supreme Court's decision *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).

> There, a fair housing organization alleged in its complaint that it "ha[d] been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing" and that the organization had needed "to devote significant resources to identify and counteract" those practices. The Supreme Court held that those allegations were sufficient to establish standing at the motion to dismiss stage, explaining that "[s]uch concrete and demonstrable injury to the organization's activities –with the consequent drain on the organization's resources –constitute[d] far more than simply a setback to the organization's abstract social interests."

*Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019) (quoting *Havens*).

Thus, under *Havens*, "an organization may establish 'injury in fact [for purposes of standing] if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [injurious behavior] in question.'" *Id.* Notably, "a diversion-of-resources injury is sufficient to establish organizational standing at the pleading stage, even when it is 'broadly alleged.'" *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (quoting *Havens*, 455 U.S. at 379).

In the instant case, GLC alleges that it has been and/or will be injured by the final rule (which effectively leaves ghost guns unregulated) because (1) the rule frustrates its "core mission [of] sav[ing] lives from gun violence," FAC ¶ 135, and (2) the rule has forced the organization to divert its resources to focus on ghost guns. Regarding the latter, GLC alleges that it has had to

> expend a substantial portion of its substantial human capital and resources to educate the public and combat the violence ghost guns cause. Addressing ghost guns and the violence they facilitate is currently among the organization's top policy and legislative priorities: in recent years, [GLC] has contributed technical assistance to or monitored and analyzed over 100 state and federal bills pertaining to ghost guns. [GLC] has also launched a series of

United States District Court
Northern District of California

> specific ghost gun initiatives, including drafting proposed legislation
> [on ghost guns], publishing white papers [on ghost guns]; and
> helping produce videos and other educational materials for the
> public [related to ghost guns].

FAC ¶ 135.  Furthermore, GLC has provided "policy expertise and technical assistance in support of violence intervention programs in communities disproportionately impacted by . . . ghost gun violence" and provided "direct support services to victims of gun violence."  FAC ¶ 137 (also referring to "increased expenditure of human and financial capital and resources by [GLC] toward work supporting violence intervention programs and violence reduction work by community-based organizations").  In addition, GLC has engaged in "legal action, [either] as co-counsel or an amicus in lawsuits" related to ghost guns.  *See* FAC ¶ 136 (identifying suits in San Francisco Superior Court and the Southern District of New York).  In San Francisco Superior Court, GLC joined with the California Attorney General and the San Francisco District Attorney to file suit against ghost gun retailers because ghost guns are an "urgent priority" in the state, with ghost guns "rang[ing] from 25 5o 50% of all crime guns recovered" in the state.  FAC ¶ 136.

GLC's time, energy, and resources spent on ghost guns has taken away from

> every other firearm policy that [GLC] advocates for.  This includes
> the organization's core policy platform of supporting background
> check and licensing laws at the federal and state level.  Background
> check laws and other efforts to ensure firearms are legally and
> responsibly possessed are impeded and undermined by ATF's
> choice to create a loophole by which buyers can evade all otherwise
> applicable firearm sales regulations.  This loophole has forced
> [GLC] to redouble its violence prevention efforts and direct even
> more resources into addressing gun violence even in states with
> strong firearm laws, like the organization's home state of California.

FAC ¶ 136.  In sum, ATF's actions have forced GLC to adjust many of its organizational priorities and divert substantial resources to combat ghost guns and resulting violence.

According to the government, GLC has not adequately pled an injury in fact for several reasons: (1) because GLC has articulated only a setback to abstract social interests (saving lives from gun violence); (2) because GLC "is in the business of lobbying, policymaking, and carrying out legal activities related to gun safety [and] [a]n organization cannot establish standing based on a diversion of resources theory when it is 'merely going about its business as usual'"; and (3) because GLC has essentially manufactured its injury "by disagreeing with an interpretation of

federal law and then 'choosing to spend money' on efforts to change that interpretation."  Mot. at

6.  None of these arguments is persuasive.

Regarding (1), GLC has simply identified savings lives as its mission and asserted that the

final rule frustrates that mission.  GLC has not claimed injury based simply on frustration of

mission alone; rather it claims a diversion of resources, *see* FAC ¶¶ 135-37, consistent with

*Havens*.  *See Havens*, 455 U.S. at 379 ("If, as broadly alleged, [defendants' racially

discriminatory] steering practices have perceptibly impaired [plaintiff-organization's] ability to

provide counseling and referral services for low- and moderate-income home-seekers, there can be

no question that the organization has suffered injury in fact.  Such concrete and demonstrable

injury to the organization's activities – with the consequent drain on the organization's resources –

constitutes far more than simply a setback to the organization's abstract social interests."); *see also*

Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.9.5 (3d ed.) (noting that "[i]njury to an

organization's efforts to help others or address social problems has supported standing in a

number of cases since the *Havens Realty* case[;] [t]he most secure foundation for standing seems

to be found in showings that the organization has devoted specific effort and expense to combat

the challenged activity").

On (2), just because GLC is in the business of gun safety does not mean that any resources

spent on gun safety means it is going about its "business as usual."  An organizational plaintiff

simply must show that it has redirected resources to "combat the *specific challenged conduct*."

*Rodriguez*, 930 F.3d at 1134 (emphasis added).  For example, as the Ninth Circuit has explained:

> in *East Bay Sanctuary Covenant v. Trump,* 909 F.3d 1219 (9th Cir.
> 2018), *as amended by* 932 F.3d 742, 2018 U.S. App. LEXIS 37150,
> 2018 WL 8807133 (9th Cir. December 7, 2018), the plaintiff
> organizations created "education and outreach initiatives regarding
> the [challenged] rule."  *Id.* at 1242.  In *National Council of La Raza
> v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015), to counteract alleged
> voter registration violations, civil rights groups "expend[ed]
> additional resources" that "they would have spent on some other
> aspect of their organizational purpose."  *Id.* at 1039.  In these cases,
> the plaintiffs were not "simply going about their 'business as
> usual,'" *id.* at 1040-41, but had altered their resource allocation *to
> combat the challenged practices*, *see also Valle del Sol Inc. v.
> Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (finding
> organizational standing where the plaintiffs "had to divert resources
> to educational programs to address its members' and volunteers'

United States District Court
Northern District of California

concerns about the [challenged] law's effect"); *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (finding organizational standing where the plaintiff, in response to the defendant's challenged practices, "started new education and outreach campaigns targeted at discriminatory roommate advertising"); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943-44 (9th Cir. 2011) (finding organizational standing where resources directed toward "assisting day laborers during their arrests and meeting with workers about the status of the [challenged] ordinance would have otherwise been expended toward [the advocacy group's] core organizing activities"); *Smith*, 358 F.3d at 1105 (finding organizational standing where complaint was dismissed without leave to amend and plaintiff alleged it "divert[ed] its scarce resources from other efforts" so it could "monitor the [subject] violations and educate the public regarding the discrimination"); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (finding organizational standing where plaintiff alleged it had expended thousands of dollars to "redress[] the impact" of defendant's discrimination and, as a result, was unable "to undertake other efforts to end unlawful housing practices"); *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) (finding organizational standing where plaintiffs "expend[ed] resources in representing clients they otherwise would spend in other ways").

*Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1154-55 (9th Cir. 2019) (emphasis added).

The fact that a plaintiff has previously engaged in a particular kind of activity does not mean that the plaintiff is going about its "business as usual" if it engages in the same kind of activity *in response to the defendant's conduct*, so long as the uptick in that activity causes a diversion of resources away from the organization's affairs, *See, e.g.*, *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040-41 (9th Cir. 2015) (noting that "[r]esources Plaintiffs put toward registering someone who would likely have been registered by the State, had it complied with the [National Voter Registration Act], are resources they would have spent on some other aspect of their organizational purpose – such as registering voters the NVRA's provisions do not reach, increasing their voter education efforts, or any other activity that advances their goals[;] . . . Plaintiffs have not alleged that they are simply going about their 'business as usual,' unaffected by the State's conduct"); *Sabra v. Maricopa Cty. Cmty. Coll. Dist.*, 44 F.4th 867, 878-80 (9th Cir. 2022) (rejecting district court's conclusion that nonprofit organization "'committed to advocacy and protecting the civil rights of American Muslims'" lacked standing to challenge a module on

22

Islamic terrorism taught in a college course on the basis that it failed to show "how its remedial actions – developing a public-awareness campaign to combat Islamophobia – fell outside 'the realm of [its] normal advocacy'"; organization alleged that, "in response to [the professor's] allegedly harmful depiction of Islam, it went out of its way to develop a public-awareness campaign rebutting the information in [the] course," divert[ing] [its] resources' by contracting with a religious scholar who assisted in creating materials for the campaign"); *cf. Fair Hous. Council v. Roommate.com, LLC*, 666 F.3d 1216, 129 (9th Cir. 2012) (finding that plaintiff-Fair Housing Councils had standing to sue defendant, which ran a website helping roommates find each other and used a questionnaire requiring disclosure of sex, sexual orientation, and familial status to match people based on those characteristics; in response to defendant's conduct, Fair Housing Councils "started new education and outreach campaigns targeted at discriminatory roommate advertising"). *Compare Am. Diabetes*, 938 F.3d at 1155 (noting that "the only resource the Association claims it diverted as a result of the New Policy [being challenged] is the time one of its two staff attorneys took to handle a single intake call"; this was just business as usual because Association's staff attorneys "dedicate a portion of their time to taking calls, and one [person] used that service" – there was no showing that, "as a result of the New Policy, the Association had altered or intended to alter its resource allocation to allow its attorneys to take a higher volume of calls or separately address the New Policy").

In the case at bar, GLC has sufficiently alleged that it has altered its resource allocation. Specifically, it has alleged that "ATF's actions on ghost guns [*i.e.*, not regulating them] have required [GLC] to expend more resources and staff time because ATF's regulatory approach undermines every other firearm policy that [GLC] advocates for.  This includes the organization's core policy platform of supporting background check and licensing laws at the federal and state level," for all firearms in general.  FAC ¶ 136 (adding that "[b]ackground check laws and other efforts to ensure firearms are legally and responsibly possessed are impeded and undermined by ATF").  GLC has shifted resources to activity related to ghost guns in particular and away from activity related to other firearms.

Finally, the government's argument in (3) has little to no merit.  An organizational plaintiff

United States District Court
Northern District of California

1  "cannot manufacture [an] injury by incurring litigation costs or simply choosing to spend money

2  fixing a problem that otherwise would not affect the organization at all.  It must instead show that

3  it would have suffered some other injury if it had not diverted resources to counteracting the

4  problem."  *La Asociacion De Trabajadores De Lake v. City of Lake Forest*, 624 F.3d 1083, 1088

5  (9th Cir. 2010).  But the instant case does not present this concern.  GLC has not simply

6  manufactured an injury by incurring litigation costs (*i.e.*, it has actually diverted resources to

7  counteract the loophole/exception in the ATF regulation), nor has it been spending money

8  addressing a problem that would not affect it at all.

9  D.     Individual Plaintiffs

10         The final plaintiffs in the pending action are two individuals: Mr. Muehlberger and Mr.

11  Blackwell.  Mr. Muehlberger lives in Santa Clarita, California, and works in Santa Monica,

12  California, both located in Los Angeles County.  *See* FAC ¶¶ 126, 128.  Mr. Blackwell also lives

13  in Santa Clarita.  The FAC does not specify the city where Mr. Blackwell works but does state that

14  it is also located in Los Angeles County.  *See* FAC ¶ 131.

15         In 2019, Mr. Muehlberger's teenage daughter and Mr. Blackwell's teenage son were killed

16  in a shooting at Saugus High School.  The shooter was a classmate who used a ghost gun that "law

17  enforcement officials believe he obtained from his father, who was legally prohibited from owning

18  and possessing firearms."  FAC ¶ 126.  The high school is located in Los Angeles County.  The

19  Court takes judicial notice of the fact that the school is located in Santa Clarita specifically.

20         Mr. Muehlberger and Mr. Blackwell assert that they have suffered and/or will suffer injury

21  as a result of the final rule because they "live in acute fear of ghost gun violence."  FAC ¶ 127; *see*

22  *also* FAC ¶ 132.  They worry not only for their own lives but also for the lives of their other

23  children, one of whom (a child of Mr. Blackwell's) currently attends Saugus High School.  *See*

24  FAC ¶¶ 129, 133.  Mr. Muehlberger and Mr. Blackwell maintain that their fear is substantiated

25  because their children were killed and because they live and work in Los Angeles County which

26              has a significant and growing rate of ghost gun possession and
              violence.  In 2021, the Los Angeles Police Department announced
27              that ghost guns "accounted for 33 percent of all guns recovered by
              the department" and that "the number of ghost guns seized by the
28              department increased 400 percent since 2017 and more than doubled

from 2020 to 2021 alone."

FAC ¶ 127; *see also* FAC ¶ 114 (alleging that, "[i]n January 2020, the ATF special agent in charge of the Los Angeles Field Division stated that 41% of the Los Angeles Field Division's cases have involved ghost guns"); FAC ¶ 115 (alleging that, in the first half of 2021, "the Los Angeles Police Department reported a nearly 300% increase in ghost gun seizures as compared to the same period in 2020"). Mr. Muehlberger and Mr. Blackwell underscore that they have regular therapy to assist in processing their ongoing fear and trauma. *See* FAC ¶¶ 129, 133.

In the motion to dismiss, the federal government argues that the individual plaintiffs lack standing because "[a] plaintiff threatened with future injury has standing to sue [only] if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *McGee*, 982 F.3d at 709 (internal quotation marks omitted). According to the government, the FAC "lacks any specific allegation that [the individual plaintiffs] are 'realistically threatened' by an actual likelihood they – or their surviving family members – will be the victims of a crime committed with an unserialized firearm made from a receiver blank that would not be classified as a firearm under the [Final] Rule." Mot. at 10.

As an initial matter, the Court takes note that, per the allegations in the FAC, Mr. Muehlberger and Mr. Blackwell are *currently* experiencing fear – *i.e.*, that there is a present injury, not a future injury. That being said, one cannot claim a current or ongoing injury such as fear based on future events that are implausible. *See Clapper*, 568 U.S. at 416 (concluding that domestic entities lacked standing to challenge a statute that allowed the government to intercept communications between the entities and foreigners: although entities claimed they had a current fear of surveillance which led them to take measures to protect the confidentiality of their communications, the harm they sought to avoid was "not certainly impending"). The fears must be reasonably founded. *See Coddington v. Crow*, Nos. 22-6100, 22-6112, 2022 U.S. App. LEXIS 28996, at *23 (10th Cir. Oct. 19, 2022) (stating that, "if current emotional distress based on fear of future harm is enough for injury-in-fact, we believe that such a fear would need to be reasonably founded"). In *Clapper*, the Supreme Court noted that the plaintiffs "present no concrete evidence to substantiate their fears, but instead rest on mere conjecture about possible governmental

United States District Court
Northern District of California

1     actions." *Clapper*, 568 U.S. at 420.

2        In their papers, the individual plaintiffs do not really dispute the above legal standard. *See*

3     Opp'n at 24-25 (arguing that "[c]ourts routinely find that an increased risk of future injury is

4     cognizable"). Instead, they suggest that, at the very least, there is a question of fact as to whether

5     their fear is reasonably founded. *Cf. Cent. Delta Water Agency v. United States*, 306 F.3d 938,

6     948 (9th Cir. 2002) (where plaintiffs claimed future injury, stating that "[p]laintiffs have at the

7     very least raised a material question of fact with respect to the issue whether they suffer a

8     substantial risk of harm as a result of the Bureau's policies").

9        Although it is reasonable to infer that 80 percent receivers/frames will be sold standalone,

10     *i.e.*, to exploit the loophole/exception in the ATF regulations (as the Court addressed in the section

11     on California's standing), the Court finds that Mr. Muehlberger and Mr. Blackwell have not made

12     out a plausible case for standing as individuals. First, their position is dependent on 80 percent

13     receivers/frames being sold standalone in Los Angeles County; however, they have failed to

14     explain why it is fair to consider the entirety of the County when they both live in Santa Clarita

15     and Mr. Muehlberger works in Santa Monica. *See* https://hr.lacounty.gov/about-the-county/ (last

16     visited 2/7/2023) (stating that Los Angeles County covers 4,084 square miles);

17     https://www.census.gov/quickfacts/fact/table/losangelescountycalifornia,CA/PST045221 (last

18     visited 2/7/2023) (estimating that, in 2021, Los Angeles County had a population of more than 9.8

19     million).[10] To be sure, there appears to be (as alleged) some ghost gun violence in both cities, *see*

20     *also* FAC ¶ 128 (alleging that, in 2013, a person used a ghost gun to kill five people in Santa

21     Monica), but Mr. Muehlberger and Mr. Blackwell have not shown that there is an actual or likely

22     ghost gun epidemic in either city based on 80 percent frames/receivers being sold standalone.

23        Second, even if the Court were to consider Los Angeles County more broadly, Mr.

24     Muehlberger and Mr. Blackwell would fare no better. As the federal government has argued, the

25     individual Plaintiffs cannot predicate standing on there being a general ghost gun problem in Los

26     Angeles County. Rather, they must plausibly show that crimes have occurred or will occur based

27

28     _____

[10] The Court takes judicial notice of the size and population of Los Angeles County.

United States District Court
Northern District of California

United States District Court
Northern District of California

on 80 percent receivers/frames being sold standalone in the County and to such an extent that it is reasonable for them to fear violence because of those sales. The allegations in the FAC are not sufficient. Notably, the cases on which Mr. Muehlberger and Mr. Blackwell rely in support of their position are distinguishable because they involved a "broader" problem. For example, in *Powell v. Illinois*, No. 18 CV 6675, 2019 U.S. Dist. LEXIS 168209 (N.D. Ill. Sep. 30, 2019), the problem was violence based on guns generally. *See id.* at *2, 18-20 (where mental injuries to children were alleged as a result of "the threat of continuing exposure to incidents of gun violence in the five primarily African-American Chicago neighborhoods in which it is most concentrated," finding that the complaint "contain[ed] ample statistical evidence that gun violence in Chicago is concentrated in . . . predominately African-American neighborhoods"). Similarly, in *Brady Campaign to Prevent Gun Violence United with the Million Mom March v. Ashcroft*, 339 F. Supp. 2d 68. 75-76 (D.D.C. 2004), the problem was violence based on semiautomatic weapons generally (and not a subset of such weapons). *See id.* at 75-76 (finding that organization had satisfied the injury-in-fact requirement because, as alleged in the complaint, "specific members of the Brady Campaign live in neighborhoods where violent crimes involving SAWs occur at higher than average rates; and the challenged ATF policy increases the risk that criminals in those neighborhoods will be able to obtain SAWs [semiautomatic weapons], thus increasing the risk of violent SAW related crimes involving Brady Campaign members"). Here, the claim is based on the incremental addition of ghost guns on the streets resulting from the limited reach of the new regulation.

The Court's conclusion here is not inconsistent with its conclusion that the state of California has sufficiently pled standing. For California, the asserted injury is aggregative based on the state's position. Even a relatively few instances of a standalone 80 percent receiver/frame (made available as a result of the challenged regulation) being used in a crime may impose costs on the state which provides a basis for the state's standing. As noted above, the state will suffer an injury as a result if any nonserialized weapon makes it more difficult for California to trace the weapon. For Mr. Muehlberger and Mr. Blackwell, a chance of a particular instance of a standalone 80 percent receiver/frame (attributable to the challenged regulation) being used in a

crime against these individuals is not a sufficient basis to support standing; their fear – which affects Mr. Muehlberger and Mr. Blackwell individually – must be reasonably founded.  To be clear, the Court is not finding here that there is no general ghost gun violence problem in Los Angeles County.  However, the allegations in the FAC do not plausibly demonstrate that Mr. Muehlberger and Mr. Blackwell, as individuals, have sufficiently alleged a reasonable fear of violence based on 80 percent receivers/frames being sold standalone in the County.

Accordingly, the Court dismisses Mr. Muehlberger and Mr. Blackwell from this suit based on lack of standing.  Its ruling here does not preclude either individual from participating in the suit in an amicus capacity.

E.      Ripeness

For the reasons stated above, the Court concludes that the state of California and GLC have adequately alleged standing.  The government contends that, even if this is true, a part of the case should still be dismissed.  Specifically, the government argues that the state/GLC's "alternative" claim for relief should be dismissed.  The alternative claim is that, should the final rule be "vacated, altered, or amended at any point," FAC ¶¶ 144, 153, then (1) ATF's prior ghost gun determinations will essentially be reactivated (to "fill [the] void," Opp'n at 29), and (2) those prior determinations likewise "disregard the GCA," FAC ¶ 144, and are "arbitrary and capricious."  FAC ¶ 154.  In other words, California/GLC's alternative claim is their original lawsuit.  According to Defendants, this alternative claim warrants dismissal because it is not ripe; there is no indication that the final rule will be vacated, altered, or amended at any point.[11]

Plaintiffs' response is that they have included this alternative claim because there is litigation pending in other districts (two federal suits in Texas and one federal suit in North Dakota[12]) primarily brought by ghost gun manufacturers and "seeking to enjoin the Final Rule in

_____

[11] In their reply, Defendants also suggest that prior determinations would not automatically be reactivated to fill the void.  *See* Reply at 9 ("Plaintiffs cite no authority for the contention that such guidance and classifications would automatically be reinstated . . . .").  However, it is a fair inference that such prior determinations would essentially be reinstated.

[12] *See VanDerStok v. Garland*, No. 4:22-cv-00691-O (N.D. Tex.); *Morehouse Enters., LLC v. Bur. of Alcohol, Tobacco, Firearms & Explosives*, No. 3:22-cv-00116-PDW-ARS (D.N.D.); *Div. 80 v. Garland*, No. 3:22-cv-00148 (S.D. Tex.).

its entirety."  Opp'n at 27.  According to Plaintiffs, the alternative claim is ripe because "there is a sufficient likelihood that the Final Rule will be vacated."  Opp'n at 27; *see also* Opp'n at 28 (emphasizing that "a 'factual contingency' does not automatically render [a] claim unripe"). Plaintiffs underscore that, in one of the Texas cases (*VanDerStok*), the district court has already issued preliminary injunctions enjoining enforcement of the final rule "against two different ghost gun manufacturers.  The court did so after concluding that the ghost gun manufacturers demonstrated a 'substantial likelihood of success' on their claims that provisions of the Final Rule exceed ATF's statutory authority."  Opp'n at 29; *see also VanDerStok v. Garland*, No. 4:22-cv-00691-O, 2022 U.S. Dist. LEXIS 159459, at *11, 14 (N.D. Tex. Sept. 2, 2022) (concluding that plaintiffs were likely to succeed on both of their arguments – to wit, (1) "the Final Rule expands ATF's authority over parts that may be 'readily converted' into frames or receivers when Congress limited ATF's authority to 'frames or receivers' as such," and (2) "the Final Rule unlawfully treats weapon parts kits as firearms"; noting, *e.g.*, that something "which *may become* a receiver is not itself a receiver," and "Congress could have included firearm parts that 'may readily be converted' to frames or receivers, as it did with 'weapons' that 'may readily be converted' to fire a projectile," but did not) (emphasis in original); *VanDerStok v. Blackhawk Mfg. Grp. Inc.*, No. 4:22-00691-O, 2022 U.S. Dist. LEXIS 200315, at *-9 (N.D. Tex. Nov. 3, 2022) (making the same likelihood-of-success analysis for different plaintiff).

Although Plaintiffs' position is not entirely meritless, it is difficult to say that the alternative claim is ripe since a preliminary injunction is simply a preliminary assessment – and it appears that the preliminary injunction rulings are on appeal.  *See* Amicus Br. at 6 (referring to Case No. 22-11071 before the Fifth Circuit for which the opening brief was due on 12/20/2022; also referring to Case No. 22-11086 before the Fifth Circuit for which the opening brief was due on 1/3/2023).  Furthermore, as a practical matter, it is not clear that California or GLC would suffer any injury if the Court were not to permit the claim at this time.  To be clear, the Court is not barring California/GLC from asking for leave to amend should things become more concrete in nature, but, at this point at least, the contingent nature of the outcome and effect of the other suits presents a problematic ripeness problem.  The Court thus dismisses the "alternative" claim

1     for relief without prejudice.

2     F.     <u>Amicus Brief</u>

3        Finally, the Court takes note that an amicus brief has been filed by some of the

4 individuals/entities who previously moved to intervene (hereinafter the "Blackhawk Applicants").

5 The Blackhawk Applicants argue that the FAC should be dismissed because "it concerns an

6 entirely distinct agency action and the basis for Plaintiffs' original lawsuit is moot." Amicus Br.

7 at 1. Alternatively, the Blackhawk Applicants ask the Court to stay this pending the outcome of

8 the Texas and North Dakota actions that challenge the final rule in its entirety.

9        Neither of the arguments is persuasive.

10        As to the first argument, the Blackhawk Applicants ignore the fact that the Court already

11 allowed Plaintiffs to file an amended complaint. To the extent they ask the Court to reconsider,

12 their argument still lacks merit. The Blackwell Applicants contend that the amended pleading is

13 governed by Federal Rule of Civil Procedure 15(d). Rule 15(d) governs supplemental pleadings.

14 It provides that, "[o]n motion and reasonable notice, the court may, on just terms, permit a party to

15 serve a supplemental pleading setting out any transaction, occurrence, or event that happened after

16 the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).

17        Rule 15(d) is implicated even though a fair amount of time has transpired since this case

18 was filed. The Blackhawk Applicants argue that, "'[w]hile leave to permit supplemental pleading

19 is 'favored,' it cannot be used to introduce a 'separate, distinct and new cause of action.'" Amicus

20 Br. at 3 (quoting *Planned Parenthood of S. Ariz. v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997)). But

21 the Blackhawk Applicants have glossed over the facts underlying *Planned Parenthood*. There, the

22 plaintiffs filed their original action in 1989, challenging the constitutionality of a state's parental

23 consent abortion law. The plaintiffs prevailed, and a final judgment was entered in their favor.

24 The district court did not retain jurisdiction after entering its final order declaring the statute

25 unconstitutional, and the judgment was not appealed. Several years later, in 1996, a new parental

26 consent abortion statute was enacted. Before the effective date of the new statute, the plaintiffs

27 filed a motion for leave to file a supplemental complaint to their original action filed back in 1989.

28 *See id.* at 401-02.

United States District Court
Northern District of California

It was in this context that the Ninth Circuit stated as follows:

> The supplemental complaint filed by plaintiffs involved a new and
> distinct action that should have been the subject of a separate suit.
> Although both the original suit and the supplemental complaint
> sought to challenge Arizona's parental consent law, the
> supplemental complaint challenged a different statute than the one
> that had been successfully challenged in the original suit.
> Additionally, a final judgment had been rendered in the original
> action four years prior to plaintiffs' request to supplement their
> complaint.  That judgment was not appealed and in no way would be
> affected by plaintiffs' supplemental complaint. Nor did the district
> court retain jurisdiction after entering that order.
>
> We also note that permitting the plaintiffs to supplement their
> complaint did not serve to promote judicial efficiency, the goal of
> Rule 15(d).  To determine if efficiency might be achieved, courts
> assess "whether the entire controversy between the parties could be
> settled in one action . . . ."  In the case at hand there would
> necessarily be two actions since the original suit had been settled for
> some time.  There were also no "technical obstacles" to plaintiffs
> bringing a new, separate action to challenge § 36-2152 as amended.

*Id.* at 402.  And notably, in a subsequent decision, the Ninth Circuit cited *Planned Parenthood* for

the following proposition: "[a] supplemental pleading cannot be used to introduce a 'separate,

distinct and new cause of action' where the original action between the parties has reached a final

resolution and the district court does not retain jurisdiction."  *Cabrera v. City of Huntington Park*,

159 F.3d 374, 382 n.11 (9th Cir. 1997), *overruled in part on other grounds by Shalabi v. City of*

*Fontana*, 11 Cal. 5th 842 (2021).

The posture of the case at bar is clearly different from that in *Planned Parenthood*.  Here,

there was no conclusion to the proceedings initiated by the original complaint.  Rather, the matter

was stayed pending modification of the regulations in question.  *Planned Parenthood*, therefore,

does not dictate how the Court should proceed in the case at bar.

Furthermore, judicial economy would not be furthered by denying Plaintiffs an opportunity

to supplement their pleading and requiring them to file a new action.  *See also Keith v. Volpe*, 858

F.2d 467, 473 (9th Cir. 1988) (noting that Rule 15(d) "'is a useful device, enabling a court to

award complete relief, or more nearly complete relief, in one action, and to avoid the cost, delay

and waste of separate actions which must be separately tried and prosecuted[;] [s]o useful they are

and of such service in the efficient administration of justice that they ought to be allowed as of

course, unless some particular reason for disallowing them appears'"); *see also* 6A Wright &

Miller, Fed. Prac. & Proc. § 1506 (3d ed.) (noting that "[o]ne of the basic policies of the rules . . .

is that a party should be given every opportunity to join in one lawsuit all grievances against

another party regardless of when they arose"; adding that "the usual effect of denying leave to file

a supplemental pleading because it states a new 'cause of action' is to force plaintiff to institute

another action and move for consolidation under Rule 42(a) in order to litigate both claims in the

same suit, a wasteful and inefficient result"). The Court thus exercises its "broad discretion" to

allow Plaintiffs' supplemental pleading. *Keith*, 858 F.2d at 473.

As for the Blackhawk Applicants' second argument, in which they request a stay of

proceedings, it is also predicated Rule 15(d), which, as noted by the Ninth Circuit, has the goal of

"promot[ing] judicial efficiency." *Planned Parenthood*, 130 F.3d at 402.

Notably, the Blackhawk Applicants have invoked only Rule 15(d) as a basis for a stay.

They have not, *e.g.*, asked for a stay under the first-to-file rule. *See Alltrade, Inc. v. Uniweld

Prods.*, 946 F.2d 622, 623 (9th Cir. 1991) (stating that the first-to-file rule "allows a district court

to transfer, stay, or dismiss an action when a similar complaint has already been filed in another

federal court"); *Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1240 (9th Cir.

2015) (noting that, for the first-to-file doctrine, three factors are considered: (1) the chronology of

the actions; (2) similarity of the parties; and (3) similarity of the issues). Nor have they asserted

that the Court should stay pursuant to its inherent authority and *Landis v. North American Co.*, 299

U.S. 248, (1936). *See Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (noting that,

for a *Landis* stay, a court should consider "the possible damage which may result from the

granting of a stay, the hardship or inequity which a party may suffer in being required to go

forward, and the orderly course of justice measured in terms of the simplifying or complicating of

issues, poof, and questions of law which could be expected to result from a stay").

Just as judicial efficiency is not furthered by a dismissal, judicial efficiency is not furthered

by a stay. This case has been ongoing since 2020. It began with a challenge to the ATF's ghost

gun policy and continues to be a challenge to the ATF's ghost gun policy (even if that challenge

has now narrowed). Furthermore, Plaintiffs have been diligent in litigating the case: agreeing to a

32

1    stay when it was clear that the ATF was coming up with a new rule and then evaluating ATF's

2    interpretation of the final rule after its issuance before proceeding with the FAC.  Indeed, with

3    respect to judicial efficiency, the Blackhawk Applicants and/or others similarly situated could

4    have filed a challenge to the final rule in this case where the matter was already pending and the

5    competing claims could have been coordinated, but they chose not to do so.  The Court further

6    notes that, as discussed below, it shall move forward with the intervention motions; if those

7    motions are granted, then the Blackhawk Applicants cannot argue that their viewpoints will not be

8    considered in and coordinated within this litigation.

9                              **III.    CONCLUSION**

10           For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part the federal

11   government's motion to dismiss.  The motion to dismiss for lack of standing is denied as to

12   California and GLC, but granted as to Mr. Muehlberger and Mr. Blackwell.  The motion to

13   dismiss the "alternative" claim for relief is granted, but California and/or GLC are not barred from

14   raising the claim in the future should circumstances change.

15           Finally, the Court sets an expedited briefing schedule on the intervention motions as

16   follows.  The parties seeking intervention shall file a supplemental brief in support of their motion

17   on February 23, 2023.  The Court notes that, although there are two sets of proposed intervenors, a

18   joint brief is strongly preferred since their positions are aligned.  By March 9, 2023, any

19   opposition to intervention, whether from Plaintiffs or the federal government, shall be filed.  Each

20   supplemental brief shall be no longer than ten (10) pages.

21           This order disposes of Docket No. 125.

22           **IT IS SO ORDERED**.

23

24   Dated: February 9, 2023

25

26   _____

27   EDWARD M. CHEN
     United States District Judge

28

United States District Court
Northern District of California