GIBSON, DUNN & CRUTCHER LLP
SCOTT A. EDELMAN, SBN 116927
sedelman@gibsondunn.com
2029 Century Park East
Los Angeles, CA 90067-3026
Telephone: (310) 552-8500
Facsimile: (310) 551-8741

LEE R. CRAIN, *pro hac vice*
ERICA PAYNE, *pro hac vice*
LIESEL SCHAPIRA, *pro hac vice*
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

PAUL HASTINGS LLP
AVI WEITZMAN, *pro hac vice*
aviweitzman@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 752-3620

*Attorneys for Plaintiff Giffords Law Center to
Prevent Gun Violence*

[Additional Counsel Listed on Next Page]

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
Supervising Deputy Attorney General
S. CLINTON WOODS, SBN 246054
Deputy Attorney General
Clint.Woods@doj.ca.gov
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-7004
Telephone:  (415) 510-3807
Facsimile:  (415) 703-5843

*Attorneys for Plaintiff State of California, by
and through Attorney General Rob Bonta*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

STATE OF CALIFORNIA, BRYAN
MUEHLBERGER, FRANK BLACKWELL,
GIFFORDS LAW CENTER TO PREVENT
GUN VIOLENCE,

        Plaintiffs,

v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, et al.,

        Defendants.

CIVIL CASE NO.:  3:20-CV-06761-EMC

**PLAINTIFFS' NOTICE OF CROSS-
MOTION FOR SUMMARY JUDGMENT;
COMBINED MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND IN
SUPPORT OF PLAINTIFFS' CROSS-
MOTION FOR SUMMARY JUDGMENT**

Hon. Edward M. Chen
Hearing Date:  January 25, 2024
Hearing Time:  1:30 PM
Hearing Place:  Courtroom 5, 17th Floor

1   Additional Counsel

2   GIFFORDS LAW CENTER TO
    PREVENT GUN VIOLENCE
3   DAVID M. PUCINO, *pro hac vice*
4   244 Madison Ave Ste 147
    New York, NY 10016
5   Telephone: (917) 524-7816

6   *Attorney for Plaintiff Giffords Law Center to*
    *Prevent Gun Violence*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>NOTICE OF MOTION AND MOTION</u>

2

TO THE COURT AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD IN THE

3

ABOVE-CAPTIONED CASE, PLEASE TAKE NOTICE that the following motion will be heard at

4

1:30 PM on January 25, 2024, or as soon thereafter as counsel may be heard, in Courtroom 5, 17th

5

Floor of this Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or at another

6

location convenient for the Court, before the Honorable Edward M. Chen.

7

Plaintiffs State of California and Giffords Law Center to Prevent Gun Violence ("Plaintiffs")

8

will, and hereby do, move the Court for an order granting summary judgment with respect to Plaintiffs'

9

claims under Federal Rule of Civil Procedure 56(a).

10

This motion is based on this notice of motion and motion, the following memorandum of points

11

and authorities and declarations filed in support, the pleadings and papers on file in this action, any

12

matters of which the Court may take judicial notice, any evidence or argument presented at the hearing

13

on the motion, and any other matters the Court deems proper.[1]

14

Dated: October 26, 2023

15

16

ROB BONTA

17

By:  */s/ S. Clinton Woods*
S. Clinton Woods

18

19

*Attorney for Plaintiff State of California, by*

20

21

[1] Plaintiffs file one consolidated brief in support of their cross-motion for summary judgment and in opposition to Defendants' motion for summary judgment in the interests of judicial economy and efficiency and consistent with this Court's prior orders and the parties' agreement. Rather than filing two briefs totaling up to 50 pages (*see* Civ. L.R. 7-2; Civ. L.R. 7-4), Plaintiffs filed on October 24, 2023 a Joint Stipulation and Proposed Order requesting a page limitation of up to 40 pages for one consolidated brief (*see* ECF No. 183). That Joint Stipulation was consistent with the Joint Stipulation Defendants filed on October 3, 2023 (ECF No. 180), which reflected the parties' agreement to request an extension of the page limitation to 35 pages for Defendants' opening summary judgment brief and a reasonable extension for subsequent summary judgment briefs. The Court entered that Joint Stipulation on October 5, 2023 (ECF No. 181). Although the Court has yet to enter the Joint Stipulation Plaintiffs submitted on October 24, Plaintiffs respectfully submit that this brief is consistent with the Court's prior order and the parties' agreement on page length.

22

23

24

25

26

27

28

1

*and through Attorney General Rob Bonta*

2

3

GIBSON, DUNN & CRUTCHER LLP

4

By:   */s/ Scott A. Edelman*
       Scott A. Edelman

5

*Attorney for Plaintiff Giffords Law Center to
Prevent Gun Violence*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................1

II. FACTUAL BACKGROUND ...............................................................................................4

    A.    Congress Enacts The Gun Control Act To Keep Guns Out Of Criminals'
        Hands And To Assist Law Enforcement In Investigating Serious Crimes ..................4

    B.    The Ghost Gun Epidemic Spreads Throughout The Country .........................................5

    C.    ATF Promulgates The Final Rule But Carves Out Certain Partially Complete
        AR-Style Receivers ......................................................................................................7

III. RELEVANT PROCEDURAL BACKGROUND ...............................................................11

IV. LEGAL STANDARDS ......................................................................................................13

V. ARGUMENT .......................................................................................................................14

    A.    ATF's Actions Classifying Partially Complete AR-Style Receivers Conflict
        With The GCA And Are Therefore "Not In Accordance With Law" ..........................16

        1.    ATF's Actions Classifying Partially Complete AR-Style Receivers
            Conflict With 18 U.S.C. § 921(a)(3)(A) ...................................................16

        2.    ATF's Actions Classifying Partially Complete AR-Style Receivers
            Conflict With 18 U.S.C. § 921(a)(3)(B) ...................................................21

    B.    ATF's Actions Classifying Partially Complete AR-Style Receivers Are
        Arbitrary And Capricious ...........................................................................................22

        1.    ATF Ignored The GCA's Clear Statutory Commands ...................................23

        2.    ATF Failed To Examine The Relevant Data, Including Factors The
            Agency Itself Identified As Relevant, When Classifying Partially
            Complete AR-Type Receivers ......................................................................26

        3.    ATF Failed To Articulate A Satisfactory Explanation For Its Illogical
            Treatment of AR-Style Receivers ................................................................28

    C.    The Court Should Declare Void ATF's Actions Determining That AR-Style
        Receivers Are Not Firearms And Remand To ATF......................................................31

    D.    Plaintiffs Have Article III Standing ...........................................................................33

        1.    The State of California Has Standing.............................................................33

        2.    Giffords Law Center Has Standing ...............................................................37

VI. CONCLUSION...................................................................................................................40

# TABLE OF AUTHORITIES

Pages

**Cases**

*Abramski v. United States*,
573 U.S. 169 (2014) ..................................................................................................4

*Air Alliance Houston v. Envt'l Prot. Agency*,
906 F.3d 1049 (D.C. Cir. 2018) ...............................................................................36

*All. for the Wild Rockies v. Petrick*,
68 F.4th 475 (9th Cir. 2023) ...............................................................................22, 23

*Allen Bradley Co. v. Local Union No. 3*,
325 U.S. 797 (1945) ................................................................................................32

*Altera Corp. & Subsidiaries v. I.R.S. Comm'r*,
926 F.3d 1061 (9th Cir. 2019) .................................................................................22

*Am. Diabetes Ass'n v. U.S. Dep't of the Army*,
938 F.3d 1147 (9th Cir. 2019) .................................................................................38

*Animal Def. Council v. Hodel*,
840 F.2d 1432 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989) .....................14

*Animal Legal Def. Fund v. U.S. Dep't of Agric.*,
223 F. Supp. 3d 1008 (C.D. Cal. 2016) .....................................................................39

*Apple Inc. v. Motorola Mobility, Inc.*,
2012 WL 12846983 (S.D. Cal. July 17, 2012) ..........................................................32

*Arrington v. Daniels*,
516 F.3d 1106 (9th Cir. 2008) .................................................................................29

*Asbestos Disease Awareness Org. v. Wheeler*,
508 F. Supp. 3d 707 (N.D. Cal. 2020) ...............................................15, 33, 38, 39, 40

*Asgrow Seed Co. v. Winterboer*,
513 U.S. 179 (1995) ................................................................................................16

*Black Mountain Equities, Inc. v. Players Network, Inc.*,
2020 WL 804452 (S.D. Cal. Feb. 18, 2020) ..............................................................32

*California v. Ross*,
358 F. Supp. 3d 965 (N.D. Cal. 2019) .................................................................35, 36

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018).....................................................................................37

*California v. Bureau of Land Mgmt.*,
612 F. Supp. 3d 925 (N.D. Cal. 2020), *appeal docketed*, No. 20-16157 (9th Cir.
June 12, 2020) ....................................................................................................34, 35

ii

*Carey v. Population Servs. Int'l,*
 431 U.S. 678 (1977) ................................................................................................ 33

*Carrillo v. Schneider Logistics, Inc.,*
 501 F. App'x 713 (9th Cir. 2012) .......................................................................... 31

*Celano v. Marriott Int'l, Inc.,*
 2008 WL 239306 (N.D. Cal. Jan. 28, 2008) ......................................................... 33

*Central Delta Water Agency v. United States,*
 306 F.3d 938 (9th Cir. 2002).................................................................................. 40

*Chinook Indian Nation v. Bernhardt,*
 2020 WL 128563 (W.D. Wash. Jan. 10, 2020) ..................................................... 30

*City & Cnty. of S.F. v. United States,*
 130 F.3d 873 (9th Cir. 1997).................................................................................. 13

*Clapper v. Amnesty Int'l USA,*
 568 U.S. 398 (2013)........................................................................................... 35, 36

*Com. v. Cofoni,*
 503 A.2d 431 (Pa. Super. Ct. 1986) ...................................................................... 20

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
 657 F.3d 936 (9th Cir. 2011).................................................................................. 39

*Ctr. for Bio. Diversity v. U.S. Fish & Wildlife Serv.,*
 33 F.4th 1202 (9th Cir. 2022) ................................................................................ 29

*Ctr. for Bio. Diversity v. Salazar,*
 2010 WL 11575282 (N.D. Cal. 2010) ................................................................... 14

*Daniels-Hall v. Nat'l Educ. Ass'n,*
 629 F.3d 992 (9th Cir. 2010).................................................................................. 35

*Dep't of Com. v. New York,*
 139 S. Ct. 2551 (2019)............................................................................................ 37

*Doe v. Wolf,*
 2020 WL 3128874 (N.D. Cal. June 12, 2020) .......................................... 16, 22, 27

*E. Bay Sanctuary Covenant v. Biden,*
 2023 WL 4729278 (N.D. Cal. July 25, 2023) ....................................................... 16

*Env't Protection Info. Ctr. v. Blackwell,*
 389 F. Supp. 2d 1174 (N.D. Cal. 2004) ................................................................. 14

*ExxonMobil Gas Mktg. Co. v. FERC,*
 297 F.3d 1071 (D.C. Cir. 2002) ....................................................................... 22, 30

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC,*
 666 F.3d 1216 (9th Cir. 2012)................................................................................ 39

*Fair Hous. of Marin v. Combs,*
   285 F.3d 899 (9th Cir. 2002)................................................................................................37

*Fortyune v. Am. Multi-Cinema, Inc.,*
   364 F.3d 1075 (9th Cir. 2004)............................................................................................31

*Gill v. Dep't of Justice,*
   246 F. Supp. 3d 1264 (N.D. Cal. 2017) ............................................................................14

*Harlan Land Co. v. U.S. Dept. of Agr.,*
   186 F. Supp. 2d 1076 (E.D. Cal. 2001)............................................................................30

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982)...................................................................................................37, 38

*Hecox v. Little,*
   79 F.4th 1009 (9th Cir. 2023) ...........................................................................................31

*Humane Soc. of U.S. v. Locke,*
   626 F.3d 1040 (9th Cir. 2010)..........................................................................................28

*Idaho Conservation League v. Mumma,*
   956 F.2d 1508 (9th Cir. 1992)..........................................................................................14

*Innovator Enters., Inc. v. Jones,*
   28 F. Supp. 3d 14 (D.D.C. 2014) .....................................................................................26

*J&G Sales Ltd v. Truscott,*
   473 F.3d 1043 (9th Cir. 2007).....................................................................................26, 30

*Judulang v. Holder,*
   565 U.S. 42 (2011)............................................................................................................22

*Leather Indust. of Am. v. EPA,*
   40 F.3d 392 (D.C. Cir. 1994) ...........................................................................................30

*Leonard v. Clark,*
   12 F.3d 885 (9th Cir. 1993), *as amended* (Mar. 8, 1994) ...............................................33

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992)...................................................................................................33, 34

*Massachusetts v. EPA,*
   549 U.S. 497 (2007)..........................................................................................................23

*United States v. Mead Corp.,*
   533 U.S. 218 (2001)..........................................................................................................22

*Miranda Alvarado v. Gonzales,*
   449 F.3d 915 (9th Cir. 2006)............................................................................................22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)................................................................................................23, 27, 29

iv

*Nat. Res. Def. Council v. E.P.A.*,
    526 F.3d 591 (9th Cir. 2008)................................................................................23

*Nat. Res. Def. Council v. U.S. EPA*,
    31 F.4th 1203 (9th Cir. 2022) ........................................................................28, 29

*Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*,
    966 F.2d 1292 (9th Cir. 1992)...........................................................................30

*Nat'l Ass'n for Gun Rights v. Lamont*,
    2023 WL 4975979 (D. Conn. Aug 3, 2023) .......................................................6

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom. Nat'l Collegiate Athletic Ass'n v.
    Alston*, 141 S. Ct. 2141 (2021).........................................................................32

*Nat'l Parks Conservation Ass'n v. U.S. EPA*,
    788 F.3d 1134 (9th Cir. 2015)..........................................................................29

*Nw. Env't Advocs. v. U.S. Dep't of Com.*,
    2019 WL 110985 (W.D. Wash. Jan. 4, 2019) ..................................................14

*Nw. Envtl. Advocs. v. U.S. E.P.A.*,
    537 F.3d 1006 (9th Cir. 2008)..........................................................................16

*Or. Nat. Res. Council Fund v. Brong*,
    492 F.3d 1120 (9th Cir. 2007)..........................................................................14

*Ramos v. Nielsen*,
    2018 WL 3109604 (N.D. Cal. June 25, 2018) ..................................................14

*Sabra v. Maricopa Cty. Cmty. Coll. Dist.*,
    44 F. 4th 867 (9th Cir. 2022) ...........................................................................38

*Schmidt v. Lessard*,
    414 U.S. 473 (1974).........................................................................................32

*Scholl v. Mnuchin*,
    494 F. Supp. 3d 661 (N.D. Cal. 2020) .............................................................13

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007)..........................................................................14

*Sig Sauer, Inc. v. Brandon*,
    826 F.3d 598 (1st Cir. 2016)...............................................................................9

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1994).........................................................................................22

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,
    968 F.3d 738 (9th Cir. 2020)............................................................................33

*Smith v. Pac. Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004)..........................................................................37

v

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:20-CV-06761-EMC

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ............................................................................................36

*Teixeria v. Cty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ..............................................................................35

*United States v. Dotson*,
   712 F.3d 369 (7th Cir. 2013) ..............................................................................17

*United States v. Thomas*,
   2019 WL 4095569 (D.D.C. Aug. 29, 2019) ......................................................17

*United States v. Dodson*,
   519 F. App'x 344 (6th Cir. 2013) .......................................................................20

*United States v. Holtzman*,
   762 F.2d 720 (9th Cir. 1985) ..............................................................................31

*United States v. Kelly*,
   276 F. App'x 261 (4th Cir. 2007) .......................................................................20

*United States v. One TRW, Model M14, 7.62 Caliber Rifle*,
   441 F.3d 416 (6th Cir. 2006) .........................................................................19, 20

*United States v. Smith*,
   477 F.2d 399 (8th Cir. 1973) ..............................................................................20

*United States v. TRW Rifle 7.62x51mm Caliber*,
   447 F.3d 686 (9th Cir. 2006) .........................................................................19, 22

*United States v. V-1 Oil Co.*,
   63 F.3d 909 (9th Cir. 1995) ................................................................................31

*United States v. Wick*,
   2016 WL 10637098 (D. Mont. July 1, 2016), *aff'd*, 697 F. App'x 507 (9th Cir. 2017) ....................................................................................................................19

*W. Watersheds Project v. Schneider*,
   417 F. Supp. 3d 1319 (D. Idaho 2019) ..............................................................15

*Yaak Valley Forest Council v. Vilsack*,
   563 F. Supp. 3d 1105 (D. Mont. 2021), *appeal dismissed*, 2022 WL 571529 (9th Cir. Jan. 26, 2022) ..............................................................................................40

## Statutes

5 U.S.C. § 704 ..........................................................................................................9

5 U.S.C. § 706 ....................................................................................14, 15, 16, 22

18 U.S.C. § 921 .................................................................................................*passim*

Brady Handgun Violence Prevention Act, Pub. L. No. 103-159 (1993) ................5

Cal. Pen. Code § 16531 .....................................................................................34, 35

vi

Cal. Pen. Code § 30400 ...................................................................................................34, 35

Pub. L. No. 90-351, Title IV, § 901(a)(3), 82 Stat. 197 (1968) .........................................4

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................13

Fed. R. Civ. P. 65 ................................................................................................................31

**Regulations**

27 C.F.R. § 478.11 ................................................................................................................8

27 C.F.R. § 478.12 .......................................................................................................... *passim*

86 Fed. Reg. 27,720 (May 21, 2021) ...................................................................................7

87 Fed. Reg. 24,652 (Apr. 26, 2022) ...................................................................5, 6, 7, 19, 20

**Other Authorities**

FINAL RULE 2021R-05F-Definition of Frame Or Receiver And Identification Of
   Firearms, YouTube (Aug. 26, 2022),
   https://youtu.be/q7XWhcx_Q3A?feature=shared&t=550 .......................................9, 17

*Webster's Third New International Dictionary of the English Language* (1965) .........................16, 17

# I.  INTRODUCTION

The Gun Control Act of 1968 ("GCA") subjects *all* firearms to certain critical public safety requirements.  To ensure that firearms stay out of the hands of criminals, domestic abusers, and other prohibited persons, the GCA requires firearms dealers to conduct a background check on a purchaser before selling a firearm.  And to ensure that law enforcement can identify and trace firearms when they are used in crimes, the GCA requires all firearms to be marked with a serial number.  In the GCA, Congress defined "firearm" broadly to include not only presently operable weapons but also their core building blocks—the "frame" for a pistol and the "receiver" for a rifle—as well as "*any* weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."  18 U.S.C. § 921(a)(3) (emphasis added).  The rationale for this broad definition is straightforward:  If a product will be, or is designed to be, or is readily convertible into an operable firearm, it almost certainly will become operable and capable of inflicting violence and ending lives.

"Ghost guns" are do-it-yourself ("DIY") firearms designed specifically to evade the GCA's public safety requirements.  Members of the ghost gun industry have seized on a regulatory loophole to manufacture and sell products that (they argue) are not yet "complete" enough to qualify as "firearms" under the statute.  The sole purpose of these products is to enable purchasers to create an operable weapon quickly and easily—without undergoing standard background checks and without serialization.  The resulting weapon is a "ghost" because it has no serial number, meaning that law enforcement cannot trace it.  These features make ghost guns uniquely attractive to violent criminals, gun traffickers, and others intent on doing harm who cannot otherwise purchase weapons through lawful channels.  Indeed, the number of ghost guns recovered by law enforcement from crime scenes— including in California—has increased exponentially over the past decade.

Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has created a significant and ongoing public safety threat by determining that many ghost gun products are not "firearms" within the meaning of the GCA.  When Plaintiffs first brought this suit in 2020, they challenged several letters ATF had issued to members of the ghost gun industry determining that certain

ghost gun products known as "80%" or "partially complete"[2] frames and receivers were not firearms. In 2021, ATF announced it intended to promulgate a new rule that would finally address the ghost gun problem and properly classify partially complete frames and receivers as firearms subject to common-sense federal gun safety regulations.  When ATF promulgated the Final Rule in 2022, however, it initially suggested that it would consider partially complete frames and receivers to be "firearms" under the Final Rule only if those products were sold together with other parts in a ghost gun "kit." Defendants later acknowledged that the Final Rule did not create a blanket rule excluding standalone partially complete frames and receivers from regulation.

Defendants' summary judgment motion has crystallized ATF's position.  Defendants represent that ATF will consider at least certain categories of partially complete frames and receivers to be "firearms," even if they are sold standalone.  Yet ATF is still not fully complying with federal law.

Specifically, ATF has unlawfully determined that many partially complete AR-style receivers—the fundamental component of deadly AR-style assault rifles—are not "firearms" under the GCA.  The Final Rule itself enshrines ATF's determination that a partially complete AR-style receiver is not a "firearm" unless certain "interior areas" have been machined and indexed and unless that receiver is "sold, distributed, or possessed with" with jigs, instructions, or other materials.  ATF has repeated this determination in multiple agency actions since the Final Rule:  in 23 classification letters to members of the ghost gun industry concluding that 23 AR-style receiver products are not "firearms" (and therefore can be sold without a background check or serial number to anyone, even over the internet with a credit card), in a YouTube video and PowerPoint slide deck advising the public about how to comply with the Final Rule, and in a September 2022 Open Letter to members of the ghost gun industry.  Each of these agency actions must be set aside under the Administrative Procedure Act ("APA") for two reasons.

*1. Contrary to Law.*  ATF's actions with respect to partially complete AR-style receivers are contrary to law.  The GCA unambiguously requires ATF to classify as "firearms" all weapons that are

---

[2]   In this memorandum, Plaintiffs refer to these products interchangeably as "unfinished" or "partially complete" frames or receivers.

"designed to" or may "readily be converted" to function as operable firearms.  Partially complete AR-style receivers are "designed to" function as operable firearms, whether or not they are machined or indexed and whether or not they are sold in the same transaction as a jig, instructions, or other tools.  Partially complete AR-style receivers are also "readily" converted into operable firearms under the case law ATF itself cites in the Final Rule.  ATF's determinations also violate the GCA's requirement that ATF classify as "firearms" *all* "frame[s] or receiver[s]" of any "such weapon."  Just as a bicycle without pedals or a handlebar is a bicycle, an AR-style receiver without certain machining operations is an AR-style "receiver."

     ***2. Arbitrary & Capricious.***  ATF's actions with respect to partially complete AR-style receivers are arbitrary and capricious.  To classify partially complete AR-style receivers, ATF has been applying a bright-line, mechanical approach that is untethered from the statutory definition of "firearm."  It has been classifying partially complete AR-style receivers based *solely* on a measurement of the fire control cavity, without even considering (let alone analyzing) how long it would take or how easy it would be to convert the product into an operable firearm.  The administrative record contains no support or justification for this myopic approach, utterly fails to take into account the factors ATF has identified in the Final Rule as relevant to the determination of whether a given product is a firearm.  While ATF repeatedly urges the Court to defer to its "technical expertise," it is hornbook administrative law that an agency must consider the relevant factors and provide a well-reasoned explanation for its decisions.  ATF has failed to do so.

     Unable to defend ATF's unlawful decisions, Defendants resort to downplaying their public safety impact.  *See* Defendants' Motion for Summary Judgment ("Defs.' Mot.") 18.  But Defendants cannot excuse ATF's failure to comply with federal law by claiming that the consequences will be minimal.  In any event, Defendants are wrong.  ATF's failure to properly regulate partially complete AR-style receivers not only injures—and confers standing on—Plaintiffs State of California and Giffords Law Center to Prevent Gun Violence ("GLC"):  It is also quite literally a matter of life and death.  AR-15s are particularly dangerous semi-automatic rifles.  Shooters have used AR-style weapons to commit 10 of the 17 deadliest mass shootings in the United States since 2012, including shootings in Las Vegas, San Bernardino, and Uvalde.  AR-style weapons are easy to use and inflict much more

3

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:20-CV-06761-EMC

damage on the human body than handguns.  Whereas a bullet fired from a handgun will puncture a lung, a bullet fired from an AR-style rifle will completely destroy the organ.  The impact is worse for children:  Because of their small bodies, smaller organs, and lower body fat, each AR-15 shot destroys more tissue, impacts more organs, and causes a larger blast effect inside their bodies.  Despite this history and the palpable danger AR-style weapons pose, ATF's agency actions still allow prohibited persons, including felons, minors, domestic abusers, and those with severe mental illnesses, to purchase and create AR-style "ghost" guns without a background check or serialization—a clear and present danger to public safety.

For all of these reasons, and as described further below, the Court should grant Plaintiffs' cross-motion for summary judgment and deny Defendants' motion for summary judgment.

## II.  FACTUAL BACKGROUND

### A.   Congress Enacts The Gun Control Act To Keep Guns Out Of Criminals' Hands And To Assist Law Enforcement In Investigating Serious Crimes

Enacted after the assassinations of President John F. Kennedy, Senator Robert F. Kennedy, and Dr. Martin Luther King, Jr., the GCA has served as the foundation of federal firearms law for more than 50 years.  The GCA reflects "twin goals":  first, "to keep guns out of the hands of criminals and others who should not have them"; and second, to "assist law enforcement authorities in investigating serious crimes."  *Abramski v. United States*, 573 U.S. 169, 180 (2014).  The GCA also reflects Congress' determination that "only through adequate Federal control . . . over all persons engaging in the businesses of importing, manufacturing, or dealing in [firearms], can th[e] grave problem [of firearms moving in interstate commerce] be properly dealt with."  Pub. L. No. 90-351, Title IV, § 901(a)(3), 82 Stat. 197, 225 (1968).

Accordingly, Congress enacted certain requirements for persons who engage in the business of importing, manufacturing, or dealing in "firearms."  *See* 18 U.S.C. §§ 921 *et seq*.  Among the GCA's key provisions are (i) a requirement that firearms importers, manufacturers, and dealers obtain a federal firearms license; (ii) a ban on sales of firearms to certain individuals, including people convicted of felonies, people addicted to drugs, minors, and people with serious mental illnesses; and (iii) a requirement that all firearms importers and manufacturers identify each firearm they import or

4

manufacture with a serial number.  *See id.*  Subsequent amendments introduced the now-fundamental requirement that all licensed firearm importers, manufacturers, and dealers conduct a background check before transferring a firearm to a non-licensee.  *See* Brady Handgun Violence Prevention Act, Pub. L. No. 103-159 (1993).  As Defendants recently told the U.S. Supreme Court, "th[e]se requirements play a vital role in keeping guns away from criminals and allowing law enforcement to trace guns used in serious crimes."  Crain Ex. 1, at 2.[3]

To achieve its important aims, the GCA defines "firearm" broadly.  The GCA defines "firearm" to include "any weapon (including a starter gun) which will ***or is designed to or may readily be converted*** to expel a projectile by the action of an explosive," as well as "***the frame or receiver*** of any such weapon."  18 U.S.C. § 921(a)(3) (emphases added).  As Defendants concede, this broad definition includes presently "inoperable" or "nonfunctional" weapons.  *See* Crain Ex. 2, at 5–6; *see also* Crain Ex. 3, at 2–3 (Defendants arguing that "limiting the federal firearms laws to functional firearms *would invite evasion*" (emphasis added)).

### B.      The Ghost Gun Epidemic Spreads Throughout The Country

In recent years, there has been an explosion in DIY "ghost guns" that are designed specifically to circumvent gun safety laws like the GCA.  *See* 87 Fed. Reg. 24,652, 24,656 (Apr. 26, 2022); *see id.* at 24,689 (explaining that ghost guns "undermine the GCA's comprehensive regulatory scheme that requires licensing, marking, recordkeeping, and background checks").  The ghost gun industry has developed products that allow consumers to quickly and easily assemble their own firearms.  One such product is an "80%" or "partially complete" frame or receiver—the core component of a functional gun.  *See id.* at 24,652, 24,663; *see also* Yurgealitis Decl. ¶¶ 14–28.

Because they are sold without any background check and lack serial numbers, ghost guns are uniquely attractive to criminals and others who are legally prohibited from buying firearms or intend to use firearms to commit a crime.  Unsurprisingly, the number of ghost guns recovered from crime scenes (including homicides) has steadily increased since 2016.  *See* 87 Fed. Reg. at 24,656; *see also* Crain Ex. 4 (reporting that ghost guns were linked to criminal cases in at least 38 states between late

---

[3]      Plaintiffs refer to exhibits to the accompanying Declaration of Lee R. Crain as "Crain Ex."

2018 and May 2020).  Many of these crimes were committed by people with criminal records or severe mental illness—the very people the GCA prohibits from buying or possessing firearms.  *See, e.g.*, Crain Exs. 4, 10, 14.  Law enforcement officials have also announced several indictments and investigations related to ghost gun-trafficking rings.  *See, e.g.*, Crain Exs. 5–9.

The ghost gun epidemic is particularly acute in California.  Of the approximately 74,000 suspected ghost guns recovered in the United States since 2018, 34,700 of them—or nearly half—were recovered in California.  *See* Crain Ex. 19.  The state with the next-highest number of recoveries for the same period was Maryland, with 3,940 recoveries.  *Id.*  California law enforcement officials reported that, during 2020 and 2021, ghost guns "accounted for 25 to 50 percent of [all] firearms recovered at crime scenes."  Crain Ex. 10; *see also* ATF_000893 (ATF Intelligence Assessment showing that California was the "[t]op recovery State[]" in 2018 and 2019 "in which a prohibited person was in possession of a [privately made firearm]"); Declaration of Salvador Gonzalez ("Gonzalez Decl.") ¶¶ 13–14.  California has also been the location of tragic shootings involving ghost guns, including the murder of former Plaintiffs' children at Saugus High School in Santa Clarita.  *See* Crain Exs. 11–13.

As ATF is aware, many of the ghost guns flooding the country are modeled on the AR-15 rifle.  *See, e.g.*, Crain Ex. 14 (cited at 87 Fed. Reg. at 24,663).  The AR-15 is a type of semi-automatic rifle that "originated in response to the U.S. military's request for an improved infantry weapon in the 1950s."  *Nat'l Ass'n for Gun Rights v. Lamont*, 2023 WL 4975979, at *4 (D. Conn. Aug 3, 2023); *see also* Yurgealitis Decl. ¶ 19 (explaining that AR-15s are "civilian versions of military weapons").  AR-style rifles are built for rapid and accurate firing, and they expel bullets with much greater energy than handguns, causing far more destruction to the human body.  *See* Crain Ex. 20; *see also* Yurgealitis Decl. ¶¶ 19, 21–23.  Several of the deadliest and most prominent mass shootings in America over the past decade have involved AR-style rifles, including the mass shootings at Sandy Hook, Parkland, Las Vegas, Sutherland Springs, Aurora, and Boulder.  *See* Yurgealitis Decl. ¶ 20.

A person can construct a fully functional (and unserialized) AR-style assault rifle by purchasing online and finishing a partially complete AR-style receiver.  A retailer named Juggernaut Tactical, for example, offers an "AR-15 80% Lower Receiver" for sale on its website.  *See* Declaration of Laura

6

Cutilletta ("Cutilletta Decl.") ¶ 8, Ex. A.  It takes as little as one to three hours to complete the weapon, especially when using jigs, instructions, or other common and easily accessible tools.  *See* Yurgealitis Decl. ¶ 27.  Many vendors sell jigs, which are inexpensive and reusable tools that make drilling accurate pinholes easier.  *Id.* ¶ 28.  Instructions and templates are also readily accessible online—often for free.  *Id.* ¶¶ 36, 39–40.

### C.  ATF Promulgates The Final Rule But Carves Out Certain Partially Complete AR-Style Receivers

After devastating mass shootings in Boulder, Colorado and Atlanta, Georgia, the Biden Administration announced that it intended to "issue a proposed rule to help stop the proliferation of 'ghost guns.'"  Crain Ex. 15.  ATF published a notice of proposed rulemaking on May 21, 2021.  *See* Proposed Rule, Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27,720 (May 21, 2021).  Eleven months later, ATF issued the Final Rule, entitled "Definition of 'Frame or Receiver' and Identification of Firearms."  *See* 87 Fed. Reg. 24,652.  ATF explained in the preamble to the Final Rule that the Final Rule was designed to address the urgent "problem of untraceable firearms being acquired and used by violent criminals and terrorists."  *Id.* at 24,658.  It also explained that "maintaining the status quo" with respect to partially complete frames and receivers was not possible because "the GCA requires that all firearms be regulated."  *Id.* at 24,724.

The Final Rule defines the term "frame" as "the part of a handgun, or variants thereof, that provides housing or a structure for the component designed to hold back the hammer, striker, bolt, or similar component prior to initiation of the firing sequence."  27 C.F.R. § 478.12(a)(1).  It defines the term "receiver" as the "part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the

7

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:20-CV-06761-EMC

breach prior to initiation of the firing sequence." *Id.* § 478.12(a)(2).




*See* ATF Supp 000085, 000089.  The Final Rule states that these definitions encompass any partially complete frame or receiver "that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c).

The Final Rule defines "readily" as "a process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state."  27 C.F.R. § 478.11.  It lists eight factors "relevant" to "the classification of firearms" and the determination of whether a product can "readily" be converted: (1) the time it would take for a product to be converted, (2) the ease with which a product can be converted, (3) the expertise required to convert a product, (4) the equipment required to convert a product, (5) the availability of any parts needed to convert a product, (6) the expense associated with converting a product, (7) the scope of changes needed to convert a product, and (8) the feasibility of converting a product without damaging or destroying it.  *Id.*

Supposedly in order to "illustrate" these definitions, the Final Rule sets forth several examples that show how ATF would classify particular partially complete frames and receivers under the Rule. 27 C.F.R. § 478.12(c).  As relevant here, Example 4 states: "A billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is ***not*** a receiver."  *Id.* (emphasis added).

Since the Final Rule took effect, ATF has implemented it through an explanatory YouTube video and slide deck, an open letter to members of the firearms industry, and a series of classification

1  letters to ghost gun manufacturers and sellers.  ATF also continues to host a Question & Answer page

2  on its website that it maintains "is consistent with" the Final Rule.  Defs.' Mot. 22.[4]

3        YouTube Video and Slide Deck.  Shortly after it issued the Final Rule, ATF took "other actions

4  that reiterate, clarify, or apply Example 4" of the Final Rule.  Defs.' Mot. 19.  *First*, ATF published a

5  slide deck with a slide reiterating that "[a] billet or blank of an AR-15 variant receiver without critical

6  interior areas having been indexed, machined, or formed" that is sold standalone is "not a receiver."

7  ATF Supp 000115.  *Second*, ATF published a YouTube video presenting and quoting from the same

8  slide.  *See* FINAL RULE 2021R-05F-Definition of Frame Or Receiver And Identification Of Firearms,

9  YouTube, at 9:10-9:43 (Aug. 26, 2022), https://youtu.be/q7XWhcx_Q3A?feature=shared&t=550.

10        September 2022 Open Letter.  On September 27, 2022, ATF issued an Open Letter titled

11  "Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers" in order to

12  "further assist the firearms industry and the public in understanding" whether partially complete AR-

13  15 receivers are "firearms" under the GCA.  ATF Supp 000199 (the "September 2022 Open Letter"),

14  at 1.  The September 2022 Open Letter reiterated that "a partially complete AR-type receiver with no

15  indexing or machining of any kind performed in the area of the fire control cavity" is ***not*** a firearm if

16  it is not sold "with any associated templates, jigs, molds, equipment, tools, instructions, or guides, such

17  as within a receiver parts kit."  *Id.*  The September 2022 Open Letter also explained that a partially

18  complete AR-15 receiver is not a firearm if:  (1) drilling of the takedown-pin area does not exceed

19  .800-inch; and (2) there is no other "indexing or machining of any kind performed in the area of the

20  fire control cavity."  *Id.* at 4–7.

21        Post-Rule Classification Letters.  ATF has also issued at least 55 classification letters in

22  response to industry members' requests for classification under the Final Rule.  "Classification letters"

23  are letters ATF issues to industry members that contain "the agency's official position" with respect to

24  whether particular products qualify as "firearms under Federal firearms laws."  *See* Crain Ex. 17

25

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [4]   Defendants do not dispute that any of these actions are "final" agency actions challengeable under

27      the APA.  5 U.S.C. § 704.  And Defendants have conceded in prior filings that ATF classification
        letters are final agency actions.  *See* ECF No. 29, at 14; *see also Sig Sauer, Inc. v. Brandon*, 826

28      F.3d 598, 600 n.1 (1st Cir. 2016).

§ 7.2.4.1.

In 23 of the 55 post-Final Rule classification letters (the "Challenged Classification Letters"), ATF determined that an AR-type partially complete receiver is not a "firearm." *See* ATF Supp 000216–506; *see also* Defs.' Mot. 6 ("[A]bout half [of ATF's classification letters] have concluded that the product is not a firearm.").[5]  In concluding that these products are not "firearms," ATF applied the same machining approach it used in classification letters and other guidance predating the Final Rule, as well as in the September 2022 Open Letter.  *See* Defs.' Mot. 22.  Specifically, ATF determined that the submitted product was not a "firearm" because (1) "[t]he forward edge of the takedown pin lug clearance area of th[e] sample item does not measure more than .800 inch immediately forward of the front of the buffer retainer hole"; and (2) other than the takedown pin area, there is "no indexing or machining of any kind performed in the area of the fire control cavity." *E.g.*, ATF Supp 000223-224.[6] While the "Background" section of the Challenged Classification Letters recites the eight factors listed in the Final Rule, nowhere do the letters actually analyze or apply those factors.  Instead, the sole and determinative factor ATF uses to decide whether a given product is or is not a firearm is whether the drilling of the takedown-pin area on a submitted product exceeds 0.800 inches (or 1.600 inches for AR-10 products).  *Compare* ATF Supp 000236 (determining that a partially complete AR-type receiver *was* a firearm because "[t]he forward edge of the takedown pin lug clearance area of th[e] sample **does measure more than .800 inch**" (emphasis in original)), *with* ATF Supp 000241 (determining that a partially complete AR-type receiver *was not* a firearm because "[t]he forward edge of the takedown

---

[5]   In 21 of the classification letters Plaintiffs do not challenge, ATF determined that the AR-style receiver under analysis was a firearm.  The remaining nine letters Plaintiffs do not challenge include three letters classifying a pistol frame as a "firearm," two letters classifying dummy receivers as not "firearms," two letters addressing the Final Rule's grandfathering provisions, one letter classifying a partially complete machine gun receiver as a "firearm," and one letter clarifying a definition.

[6]   Two of the Challenged Classification Letters address a partially complete AR-10 receiver.  An AR-10 is an assault rifle materially similar to the AR-15.  *See* Yurgealitis Decl. ¶ 32 n.26.  ATF's analysis of partially complete AR-10 receivers is identical to its analysis of partially complete AR-15 receivers, except that ATF considers whether the forward edge of the takedown pin lug clearance area measures more than 1.600 inch (instead of 0.800 inch).  *See* ATF Supp 000408–12; ATF Supp 000318–22.

10

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:20-CV-06761-EMC

pin lug clearance area of th[e] sample does not measure more than .800 inch").

_Question and Answer Webpage._  Since promulgating the Final Rule, ATF has continued to host a "Question and Answer" webpage that it first posted in 2015.  _See_ ATF Supp 000163–72; Defs.' Mot. 21.  The webpage states:  "ATF has long held that items such as receiver blanks . . . in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the classification of a firearm according to the GCA."  ATF Supp 000164.  Defendants apparently maintain that the Question and Answer webpage is still in effect notwithstanding the Final Rule.  Indeed, Defendants argue that the Question and Answer website "essentially reaches the same conclusion as the September 2022 Open Letter" and "is lawful for the same reasons."  Defs.' Mot. 21.

### III. RELEVANT PROCEDURAL BACKGROUND

Plaintiffs filed this APA action on September 29, 2020.  ECF No. 1.  Plaintiffs alleged that Defendants' then-operative agency actions with respect to ghost guns, including classification letters ATF had issued to a major ghost gun retailer named Polymer80, conflicted with the GCA and were arbitrary and capricious.  _Id._ ¶¶ 116–43.  Plaintiffs' original Complaint explained that, in or around 2016, ATF had inexplicably switched from a "temporal" approach (which considered how long it took to complete or convert a partially complete frame or receiver) to a "machining" approach (which considered only which particular machining operations still had to be performed to complete a ghost gun product).  _Id._ ¶¶ 8, 137.  It also alleged that ATF's "machining" approach was untethered from the text and purpose of the GCA.  _Id._ ¶¶ 66–70, 122.

Defendants moved to dismiss Plaintiffs' original Complaint on November 30, 2020.  _See_ ECF No. 29.  While Defendants' motion was pending, ATF announced its intention to promulgate a new rule that would address the proliferation of ghost guns.  The parties agreed to stay this action in light of the proposed rule.  _See_ ECF No. 86.  On September 19, 2022, after it had become apparent that the Final Rule and ATF's interpretation of it excluded certain unfinished frames and receivers from the definition of "firearm"—and thus allowed these ghost gun products to be sold without serial numbers

or background checks—Plaintiffs asked the Court to lift the stay. *See* ECF No. 118. The Court did so and granted Plaintiffs leave to file an Amended Complaint. *See id.*

Plaintiffs filed their Amended Complaint on October 20, 2022. *See* ECF No. 122. The Amended Complaint alleges that the Final Rule and ATF's subsequent actions implementing the Final Rule are (1) contrary to the plain language of the GCA and (2) arbitrary and capricious. *See id.* ¶¶ 139–55. The Amended Complaint details the injuries that ATF's actions have inflicted and continue to inflict on Plaintiffs. *See id.* ¶¶ 111–25 (Plaintiff California); *id.* ¶¶ 135–37 (Plaintiff GLC).

Defendants again moved to dismiss on November 18, 2022, arguing primarily that Plaintiffs lack Article III standing. ECF No. 125. This Court denied the motion as to Plaintiffs California and GLC. ECF No. 135.[7] This Court held that California had "sufficiently established standing" because increased policing costs and costs associated with the enactment and implementation of legislation are cognizable injuries-in-fact. *Id.* at 8–18. The Court also held that ATF's actions had created a "substantial risk" of ghost gun violence because "it is predictable that at least some of the 80 percent receivers/frames" excluded from regulation "will be used in crimes." *Id.* at 10–11 (noting that "[t]he entire point of buying an 80 percent receiver/frame standalone is to avoid regulation"). The Court separately held that GLC had alleged organizational standing because ATF's actions frustrated its core organizational mission and forced it to divert resources to combat "ghost guns and resulting violence." *Id.* at 20; *see also id.* at 18–24. Finally, the Court dismissed Plaintiffs' alternative claims challenging ATF's pre-Final Rule determinations as unripe but noted that Plaintiffs could amend their pleading should another court vacate the Final Rule. *Id.* at 28–29.

Meanwhile, separate litigation challenging the Final Rule was proceeding in parallel in other courts. On June 30, 2023, the district court in one of those cases, *VanDerStok v. Garland*, No. 4:22-cv-00691-O (N.D. Tex.), granted summary judgment in favor of the plaintiffs, holding that ATF had exceeded its statutory authority by promulgating the Final Rule. The district court vacated the Final Rule in its entirety. *See* Final Judgment, *VanDerStok v. Garland*, No. 4:22-cv-00691-O, at 1 (N.D.

---

[7] The Court granted Defendants' motion to dismiss with respect to the individual Plaintiffs Bryan Muehlberger and Frank Blackwell. *See id.* at 27–28.

12

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:20-CV-06761-EMC

Tex. July 5, 2023).  The government sought an emergency stay in the Fifth Circuit and then the Supreme Court, arguing that even a temporary vacatur of the Final Rule—and a return to the pre-Final Rule regulatory regime—would cause "grave and irreparable harm to the government and the public by enabling the irreversible flow of large numbers of untraceable ghost guns into our Nation's communities."  Crain Ex. 1, at 7; *see id.* at 17–18 (arguing that a return to the pre-Final Rule regulatory regime would "pos[e] an acute threat to public safety" by ensuring "the ready availability of ghost guns online").  On August 8, 2023, the Supreme Court granted the government's application for a stay "pending disposition of the [government's] appeal in the United States Court of Appeals for the Fifth Circuit and disposition of a petition for a writ of certiorari, if such writ is timely sought."  *See* ECF Nos. 169, 171–72.  Because of the Supreme Court's order, the Final Rule remains in effect.[8]

After the Supreme Court's stay, this Court granted Plaintiffs leave to file the Supplemental First Amended Complaint to allow Plaintiffs to allege certain facts that had occurred since they filed the original Amended Complaint.  *See* ECF No. 177.  After Defendants produced the Supplemental Administrative Record, *see* ECF No. 179, they moved for summary judgment, *see* ECF No. 182. Plaintiffs now oppose that motion and cross-move for summary judgment.

## IV.  LEGAL STANDARDS

A movant is generally entitled to summary judgment where it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In APA cases, however, "the function of the district court [at summary judgment] is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 673 (N.D. Cal. 2020) (quoting *City & Cnty. of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997)).  "Thus, the usual standard set forth in Rule 56(c) does not apply."  *Id.*  In APA cases, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Id.* (quoting *Gill v.*

---

[8]  The Fifth Circuit heard oral argument on the merits of the government's appeal in *VanDerStok* on September 7, 2023, but has not yet rendered a decision.

*Dep't of Justice*, 246 F. Supp. 3d 1264, 1268 (N.D. Cal. 2017)).

An agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Courts must conduct a "thorough, probing, in-depth review" of a challenged agency action.  *See Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007); *see also Sierra Club v. Bosworth*, 510 F.3d 1016, 1023 (9th Cir. 2007) (explaining that courts "defer to an agency's decision only if it is fully informed and well-considered" and "disapprove of an agency's decision if it made a clear error of judgment" (internal quotations and citations omitted)).

Judicial review of agency action is generally based on the "whole" administrative record before the agency when it made the challenged decision, meaning "all documents and materials directly or indirectly considered by agency decision-makers."  *Ramos v. Nielsen*, 2018 WL 3109604, at *3 (N.D. Cal. June 25, 2018) (Chen, J.) (emphasis omitted) (citation omitted).  In addition to the administrative record, a court may consider extra-record evidence "to determine whether the agency has considered all relevant factors or has explained its course of conduct or grounds of decision" and where "supplementation of the record is necessary to explain technical terms or complex subject matter involved in the agency action."  *Ctr. for Bio. Diversity v. Salazar*, 2010 WL 11575282, at *2 (N.D. Cal. 2010) (alteration omitted) (quoting *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989)).  A court may also consider extra-record evidence offered to support standing.  *See Env't Protection Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1220–21 (N.D. Cal. 2004); *see also Nw. Env't Advocs. v. U.S. Dep't of Com.*, 2019 WL 110985, at *1–2 (W.D. Wash. Jan. 4, 2019).[9]

## V.  ARGUMENT

In the Final Rule, ATF expressly concluded that AR-style receivers "without critical interior areas having been indexed, machined, or formed that [are] not sold, distributed, or possessed with

---

[9]  Plaintiffs have submitted certain extra-record material—including declarations from Salvador Gonzalez and Laura Cutilletta, and accompanying exhibits—to demonstrate their standing. Plaintiffs have also submitted a declaration from James Yurgealitis, a 26-year veteran federal law enforcement officer and former ATF Senior Special Agent/Program Manager for Forensic Services. *See* Yurgealitis Decl. ¶ 1.  Plaintiffs introduce Mr. Yurgealitis's declaration to assist the Court in understanding certain technical terms relevant to classifying "incomplete" AR-style receivers as

14

instructions, jigs, templates, equipment, or tools" are *not* firearms.  ATF repeated this determination in multiple final agency actions that followed the Final Rule, including the 23 Challenged Classification Letters, the September 2022 Open Letter, and ATF's slide deck and YouTube video.  Because of these agency actions, any person who wants to obtain and complete an AR-style receiver—including convicted felons, domestic abusers, minors, and other prohibited persons—can do so as long as they have access to the internet and a valid credit card.  That person can then convert such a product into an unserialized, deadly assault rifle in just a few hours.

ATF's agency actions addressing partially complete AR-style receivers violate the APA.  That statute provides that courts "*shall . . .* hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (emphasis added).  Here, ATF's determinations are not in accordance with law because failing to classify purportedly "incomplete" AR-style receivers as firearms conflicts with the GCA's plain text.  ATF's determinations must also be set aside for the independent reason that they are arbitrary and capricious.  Agency action is arbitrary and capricious where an agency has failed to consider the relevant factors.  In the agency actions Plaintiffs challenge, ATF failed to consider the eight factors the agency *itself* decided were relevant to assess whether a product is a firearm.  Nor does ATF adequately explain or justify its approach.

Finally, Defendants' attempt to challenge Plaintiffs' standing is meritless.  This Court has already considered and rejected the same contentions Defendants make here.  The Court concluded at the motion to dismiss stage that Plaintiffs had each alleged facts that would establish standing.  The evidence Plaintiffs submit with this motion substantiates and bolsters the facts alleged in the complaint.

---

firearms and to address which factors ATF failed to consider and how it failed to properly explain its decisions classifying partially complete AR-style receivers.  This Court may consider each of these declarations on summary judgment.  *See, e.g.*, *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 n.22 (9th Cir. 1992); *Asbestos Disease Awareness Org. v. Wheeler*, 508 F. Supp. 3d 707, 733 (N.D. Cal. 2020) (Chen, J.); *see also W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1331 (D. Idaho 2019) (considering declarations to evaluate "whether the [Bureau of Land Management] neglected to evaluate a serious environmental consequence or failed to consider an important factor").

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:20-CV-06761-EMC

For all of these reasons, this Court should grant summary judgment to Plaintiffs, set aside the challenged agency actions, and remand to ATF with directions to consider the relevant factors when classifying partially complete AR-style receivers.

### A.     ATF's Actions Classifying Partially Complete AR-Style Receivers Conflict With The GCA And Are Therefore "Not In Accordance With Law"

The GCA requires ATF to classify a product as a "firearm" if that product (A) is "designed to or may readily be converted" into an operable firearm, or (B) is a "frame or receiver" of "such a weapon." 18 U.S.C. § 921(a)(3).  Here, ATF has repeatedly determined that "[a] billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is ***not***" a firearm.  27 C.F.R. § 478.12(c) (emphasis added).  That determination—reflected in numerous final agency actions—contravenes the GCA's unambiguous statutory requirements and is therefore "not in accordance with law."  5 U.S.C. § 706(2)(A); *see Doe v. Wolf*, 2020 WL 3128874, at *4 (N.D. Cal. June 12, 2020) ("[A]gency action is 'not in accordance with the law' when it is in conflict with the language of the statute relied upon by the agency." (quoting *Nw. Envtl. Advocs. v. U.S. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008)); *E. Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278, at *9 (N.D. Cal. July 25, 2023) (holding that agency action was "not in accordance with law" because it conflicted "with the unambiguous intent of Congress as expressed" in the relevant statute).

### 1.     ATF's Actions Classifying Partially Complete AR-Style Receivers Conflict With 18 U.S.C. § 921(a)(3)(A)

Section 921(a)(3)(A) is written in the disjunctive.  Under Section 921(a)(3)(A), a weapon is a firearm if it is "designed to" become an operable firearm ***or*** "may readily be converted" into an operable firearm.  The AR-style receivers that ATF classified in Example 4 of the Final Rule, the Challenged Classification Letters, the September 2022 Open Letter, the YouTube video, and the PowerPoint slide deck fit within both of those definitions, even if they lack certain indexing and even if they are not "sold, distributed, or possessed with" the common household tools that will render them fireable. Classifying those products as anything other than firearms is not in accordance with law.

16

**1. "Designed To."**  The word "designed" must be given its "ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995).  When Congress enacted the GCA, "design" was understood to mean "to plan or have in mind as a purpose." *Webster's Third New International Dictionary of the English Language* 611 (1965).  An object need not be complete (or even close to completion) to be "designed" for a certain purpose.  A bicycle is "designed to" operate as a bicycle before it gets its pedals, seat, or handlebar.  A bow is "designed to" shoot arrows even if it is missing its string.  And "a revolver may still be 'designed' to expel a projectile even though, due to the removal of certain components, it can no longer do so." *United States v. Thomas*, 2019 WL 4095569, at *5 (D.D.C. Aug. 29, 2019).  In fact, "[e]very circuit to consider the question has come to the same conclusion: an inoperable weapon that 'will' not expel a projectile . . . still falls within the statutory definition of a firearm if it is 'designed' to do so." *Id.*  And once an object is designed to operate as a firearm, it does not lose that characteristic until it has been "redesigned to be something other than a gun." *United States v. Dotson*, 712 F.3d 369, 372 (7th Cir. 2013).

Partially complete AR-style receivers—whether indexed or not, and whether sold standalone or not—are designed for a single purpose: to become an operable gun.  Unlike a raw block of metal, they are too far along in the manufacturing process to be turned into anything but a firearm.  As a 2015 Department of Justice Bulletin acknowledged, a "blank" or "casting[] of an AR-15-type lower receiver that [is] partially milled . . . ***could never really be anything but an AR-15 type lower receiver***."  ATF 000674 (emphasis added).

Yet ATF has ignored the "designed to" language when classifying partially complete AR-style receivers.  ATF's Final Rule and implementing guidance never mention, let alone evaluate, the design purpose of these AR-style receivers.  *See* 27 C.F.R. § 478.12(c) (Example 4; no discussion of design); ATF Supp 000164 (Question and Answer Page; no reference to design); ATF Supp 000115 (slide deck; no mention of design); FINAL RULE 2021R-05F-Definition of Frame Or Receiver And Identification Of Firearms, YouTube, at 9:10-9:43 (Aug. 26, 2022), https://youtu.be/q7XWhcx_Q3A?feature=shared&t=550 (YouTube video discussing same slide as in ATF Supp 000115, without mention of design).  Similarly, the Challenged Classification Letters never consider whether the partially complete AR-style receivers submitted for classification are *designed to* become functional firearms.

17

*See infra* at 23–24 (discussing letters failing to apply the "designed to" prong of the GCA).  All of them

are.  *See* Yurgealitis Decl. ¶ 26.

       The photo ATF used in its PowerPoint slide deck to illustrate an AR-15 receiver product that is

supposedly not a firearm underscores the legal error in ATF's approach:



ATF Supp 000115.  While the partially complete AR-15 receiver shown in this image is not completely




indexed, it is unmistakably designed to be the receiver of an AR-15 weapon.  *See* Yurgealitis Decl.

¶¶ 26, 35–36.  A side-by-side comparison of receivers ATF has classified underscores this point:

ATF Supp 000201, 000203.  Both of these products were "designed" to do the same thing.  Both were

designed to be the foundational component—the receiver—of an AR-15 assault rifle.  Defendants'

purported concern that manufacturers will need to serialize even "unformed blocks of metal" is thus

unfounded.  Unlike each of the pictured receivers, it would be "nearly impossible, even for the strongest

firearms enthusiast or machinist," to "buy raw aluminum and manufacture it to function as a lower

receiver."  ATF 000673–674 (2015 DOJ Bulletin explaining options available to those who desire

untraceable firearms).

**2. *"Readily Be Converted."*** Partially complete AR-style receivers are "firearms," even when they lack indexing and are sold standalone, for the independent reason that they may "readily be converted" to expel a projectile.  18 U.S.C. § 921(a)(3)(A); *see United States v. Wick*, 2016 WL 10637098, at *1 (D. Mont. July 1, 2016) ("a plain reading of § 921(a)(3) indicates that if the receiver of a weapon can be readily converted to expel a projectile, then that receiver can be considered a 'firearm' under the statute"), *aff'd*, 697 F. App'x 507 (9th Cir. 2017).

While Congress did not separately define "readily" in the GCA, courts have construed the term when interpreting analogous federal statutes like the National Firearms Act ("NFA").  *See* Defs.' Mot. 4, 10–11 (conceding the NFA is analogous to the GCA).  Specifically, the Ninth Circuit has explained that "the plain and unambiguous ordinary meaning of 'readily' may be defined by a temporal component ('with fairly quick efficiency: without needless loss of time: reasonably fast') *or* a component related to a manner or methodology ('with a fair degree of ease: without much difficulty: with facility')."  *United States v. TRW Rifle 7.62x51mm Caliber*, 447 F.3d 686, 690 (9th Cir. 2006) (construing the NFA).  Applying this definition, the Ninth Circuit held that a "two-hour restoration process using ordinary tools . . . is within the ordinary meaning" of "readily."  *Id.* at 692.  The Court explained that two hours is "within a range that may properly be considered 'with fairly quick efficiency,' 'without needless loss of time,' or 'reasonably fast.'"  *Id.* (citation omitted).

Other Circuits agree.  The Sixth Circuit has held that "'readily' is a relative term, one that describes a process that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speedy, or easy process."  *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 422 (6th Cir. 2006).  It explained further that the phrase "readily restored" in the NFA "encompass[es] several elements: (1) time, i.e., how long it takes to restore the weapon; (2) ease, i.e., how difficult it is to restore the weapon; (3) expertise, i.e., what knowledge and skills are required to restore the weapon; (4) necessary equipment, i.e., what tools are required to restore the weapon; (5) availability, i.e., where additional parts are required, how easily they can be obtained; (6) expense, i.e., how much it costs to restore the weapon; (7) scope, i.e., the extent to which the weapon has been changed . . . ; (8) feasibility, i.e., whether the restoration would damage or destroy the weapon or cause

it to malfunction." *Id.*[10]  The Sixth Circuit ultimately concluded that the defendant's M-14 rifle could be "readily" restored to shoot—making it a "machine gun" under the NFA—even though the restoration would take six hours and required "particular machinery."  *Id.* at 423 & n.11; *see also United States v. Dodson*, 519 F. App'x 344, 353 (6th Cir. 2013) (gun that could be restored with "90 minutes of work, using widely available parts and equipment and common welding techniques," fit "comfortably" within the definition of "readily restorable").  The Eighth Circuit reached the same result in *United States v. Smith*, 477 F.2d 399 (8th Cir. 1973), another case ATF cited in the Final Rule, *see* 87 Fed. Reg. at 24,661 n.43.  There, the Eighth Circuit held that an unserviceable Thompson submachine gun was "readily" restorable even though the restoration process (including the "drill[ing]" and "rethreading" of "a hole in the forward end of the receiver") would take *eight hours* and a "properly equipped machine shop."  *Smith*, 477 F.2d at 400.  And the Fourth Circuit has concluded that a receiver was "readily" restored where the restoration process took "fifty minutes" and required only inexpensive "spare parts" and "common tools . . . including a Dremmel drill, a carbide burr, and a Tig welder."  *United States v. Kelly*, 276 F. App'x 261, 267 (4th Cir. 2007).

Under the plain text of the GCA, as construed by courts across the country, partially complete AR-style receivers are "readily" convertible to expel a projectile even if they lack indexing and are sold standalone.  "The amount of time it takes to convert a partially complete frame or receiver into a firearm does not significantly vary based on whether the fire control cavity is indexed."  Yurgealitis Decl. ¶ 36.  Without indexing, "[u]sers simply need to spend a few minutes . . . determining where to drill holes, then a few more actually drilling the relevant holes."  *Id.*  The conversion process can be completed by "[e]ven inexperienced consumers," because the "instructions to complete these basic steps [are] online."  *Id.*  Indeed, a consumer can convert a partially complete AR-style receiver into a fully functional AR-style weapon within a few hours using a drill and an easily-obtained jig.  Yurgealitis Decl. ¶¶ 27–28; *cf. Com. v. Cofoni*, 503 A.2d 431, 435 (Pa. Super. Ct. 1986) (rejecting

---

[10]  ATF claimed in the Final Rule to have adopted the same eight "readily" factors the Sixth Circuit identified in *One TRW*.  *See* 87 Fed. Reg. at 24,663.  Yet ATF's approach to classifying partially complete AR-style receivers, including in Example 4 of the Final Rule, is divorced from and fails to take into account these factors.  *See infra* at 26–28.

"specious" argument that a need to drill precludes a finding of "ready" conversion under a state statute analogous to the GCA.  ATF has provided no analysis suggesting the contrary.

### 2.    ATF's Actions Classifying Partially Complete AR-Style Receivers Conflict With 18 U.S.C. § 921(a)(3)(B)

ATF's decisions deeming partially complete AR-style receivers "*not* firearms" are independently unlawful under Section 921(a)(3)(B).  That provision provides that a "firearm" includes the "frame or receiver of any such weapon."  18 U.S.C. § 921(a)(3)(B).  "[A]ny such weapon" refers back to Section 921(a)(3)(A), which refers to "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" is a firearm.  18 U.S.C. § 921(a)(3)(A).  Partially complete AR-style receivers are firearms under Section 921(a)(3)(B), even if they lack indexing and are not "sold, distributed, or possessed with" jigs, templates and other tools, for the simple reason that they *are* receivers.

Defendants concede that a receiver need not be finished or ready to use in order to qualify as a "receiver" under the GCA.  ATF has affirmatively argued—here and in other cases—that the term "receiver" includes a partially complete receiver that is "designed to or may readily be converted to function as a . . . receiver."  Defs.' Mot. 9; *see also* Crain Ex. 3, at 4 (arguing that the term "receiver" includes a partially complete receiver that "can readily be made functional").  It has insisted that this position accords with "ordinary usage":  "Just as a bicycle is still a bicycle even if it is sold without pedals, a frame or receiver is still a frame or receiver even if the buyer must drill a few holes or remove some plastic tabs before attaching other parts of the firearm."  Crain Ex. 3, at 4–5.  ATF nonetheless concluded, however, that "the billet or blank of an AR-15 variant receiver is not a firearm if its fire control cavity is not machined or indexed."  Defs.' Mot. 17.  That conclusion conflicts with ATF's own interpretation of Section 921(a)(3)(B) because partially complete AR-style receivers may be "readily" converted to function as a receiver even without indexing or machining.  *See* Yurgealitis Decl. ¶¶ 35–36, 40; *see supra* at 18–20.  ATF provides no analysis of these products to the contrary.

\*     \*     \*

In sum, ATF's decisions not to classify partially complete AR-style receivers as "firearms" conflict with the GCA.  The text of that statute is unambiguous, and it requires that each partially

complete AR-style receiver that ATF evaluated be classified as a firearm.  To the extent Defendants present a contrary construction of the text and argue that the Court should defer to that construction, Defendants are wrong.  *See* Defs.' Mot. 8–9 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1994)).  No deference is warranted here—not even the "lesser" form of *Skidmore* deference, *Miranda Alvarado v. Gonzales*, 449 F.3d 915, 924 n.6 (9th Cir. 2006)—because ATF's interpretation is "manifestly contrary to the statute," *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001), and "the statute is unambiguous," *TRW Rifle 7.62x51mm Caliber*, 447 F.3d at 689 n.4 (declining to "defer[] to the ATF's definition of 'machinegun' . . . because the statute is unambiguous"); *see also Doe*, 2020 WL 3128874, at \*8 (finding that "deference to the [agency]'s decision [wa]s unwarranted" because defendants had not "identif[ied] an ambiguity in the statute . . . that would necessitate . . . consideration of the persuasiveness of the agency's interpretation").[11]  This Court should set aside ATF's agency actions classifying partially complete AR-style receivers as "not in accordance with law."  5 U.S.C. § 706(2)(A).

**B.    ATF's Actions Classifying Partially Complete AR-Style Receivers Are Arbitrary And Capricious**

ATF's actions with respect to partially complete AR-style receivers are also arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).  "[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned decisionmaking.'" *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (alterations in original) (quoting *Altera Corp. & Subsidiaries v. I.R.S. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019)); *see also Judulang v. Holder*, 565 U.S. 42, 53, 55 (2011) (explaining that the APA requires agencies to act "in a reasoned manner" and make decisions "based on non-arbitrary" and relevant factors (internal citations omitted)).  "An agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider

---

[11]    Defendants also urge this Court to defer to ATF's "technical expertise," Defs.' Mot. 9, but cite a single case applying *Chevron* deference, *see ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1085 (D.C. Cir. 2002)—a form of deference Defendants do not suggest should apply here.  In any event, *ExxonMobil* does not support the proposition that courts should defer to an agency's erroneous statutory interpretation merely because the agency itself recharacterizes it as a "line-drawing" exercise.

22

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:20-CV-06761-EMC

an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Nat. Res. Def. Council v. E.P.A.*, 526 F.3d 591, 602 (9th Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Agency action "can only survive arbitrary or capricious review where [the agency] has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *All. for the Wild Rockies*, 68 F.4th at 493 (cleaned up).

Here, ATF's actions with respect to partially complete AR-style receivers are arbitrary and capricious for at least three reasons. *See Nat. Res. Def. Council*, 526 F.3d at 602.  *First*, ATF ignored the factors that the GCA required it to consider when classifying partially complete AR-style receivers. *Second*, ATF failed to examine the relevant data—including data relevant to the "readily" factors the agency espoused in the Final Rule—instead using a deeply flawed machining approach.  *Third*, ATF failed to articulate a satisfactory (or any) explanation for its decision that a partially complete AR-type receiver is not a firearm unless the degree of machining exceeds a certain arbitrary threshold and unless the product is sold or distributed together with a jig or similar tools.

### 1. ATF Ignored The GCA's Clear Statutory Commands

To engage in reasoned decision-making, an agency must "ground its reasons for action or inaction in the statute" and "comply with . . . clear statutory command[s]." *Massachusetts v. EPA*, 549 U.S. 497, 533–35 (2007).  Here, ATF concluded that partially complete AR-style receivers are not firearms without ever engaging with the required factors.

*1.  **Designed To**.*  The Challenged Classification Letters nowhere consider whether the submitted products were *designed to* become functional firearms.  For example, in a letter dated October 6, 2022, ATF determined that because "the submitted sample may not 'readily be completed, assembled, restored or otherwise converted to function as a frame or receiver,' . . . the submitted 'partially complete' AR-type receiver is not a 'firearm' as defined in the GCA."  ATF Supp 000225. The other Challenged Classification Letters likewise ignore the "designed to" language in the GCA. *See, e.g.*, ATF Supp 000238 ("[T]he submitted sample, may not 'readily be completed, assembled, restored or otherwise converted to function as a frame or receiver.'  Therefore, taken alone, the

23

submitted partially complete AR-type receiver is not a 'firearm' as defined in the GCA.").  Example 4 in the Final Rule, the September 2022 Open Letter, the YouTube video, and the PowerPoint slide deck are no different.  None assesses whether the products at issue were "designed to" become operable weapons.  *See* Defs.' Mot. 19–20.

   **2.** ***Readily Convertible***.  ATF also failed meaningfully to engage with or apply the term "readily."  *See supra* at 18–20.  Out of 55 post-Final Rule Classification Letters, ATF has only twice considered the "time" it would take to complete or convert the submitted product "within the meaning of the term 'readily' in the Final Rule."  In both of those letters, ATF determined that the product at issue *was* a firearm.  *See* ATF Supp 000478–81 (explaining that the time taken to complete the submitted products is "far less than required to fall within the meaning of the term 'readily,'" and that completion times could be between "10 to 30 minutes"); *see also* ATF Supp 000252–53 (noting that the "completion time of less than 10 minutes . . . [is] far less than [what is] required to fall within the meaning of the team 'readily' in the Final Rule").

   But in Example 4 of the Final Rule, the YouTube video, and the PowerPoint slide deck, ATF arbitrarily concluded that partially complete AR-type receivers are not firearms "without critical interior areas having been indexed, machined, or formed" and that are "not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is ***not*** a receiver."  27 C.F.R. § 478.12(c).  ATF further decided in the September 2022 Open Letter and in the Challenged Classification Letters that a product has not been sufficiently "indexed, machined, or formed" when the "front of the takedown pin lug clearance area" does not contain "drilling or milling" in a length greater than .800 inches (or 1.600 inches for AR-10 products).  *See, e.g*, ATF Supp 000221–23.  In other words, instead of analyzing the time and ease with which someone can turn a submitted product into a functional firearm, ATF considers only a single measurement.  *See* Yurgealitis Decl. ¶¶ 37–38.

   Under ATF's approach, the difference between partially complete AR-style receivers that *are* firearms and those that are *not* firearms is sometimes a mere hundredth of an inch.  In one classification letter, for example, ATF determined that a partially complete AR-15 receiver was a firearm where "[t]he forward edge of the takedown pin lug clearance area of th[e] sample item **does measure more**

1   **than .800 inch immediately forward of the front of the buffer retainer hole**" (ATF Supp 000311

2   (emphasis in original)):



Takedown pin clearance recess exceeds .800 inch in length (0.82 inch)

8   But in another classification letter, a substantially similar AR-15 receiver was *not* a firearm because

9   "[t]he forward edge of the takedown pin lug clearance area of this sample item does not measure more

10  than .800 inch immediately forward of the front of the buffer retainer hole" and "the trigger/hammer

11  recess . . . is solid with exception of the previously noted takedown pin clearance lug, and there are no

12  index detents machined for the safety lever or the trigger/hammer pins" (ATF Supp 000323–26).



Takedown pin clearance recess does not exceed .800 inch in length

19  There is no support for such an arbitrary distinction in the GCA.

20      Tellingly, ATF's approach to partially complete AR-type receivers appears to be identical to

21  the one ATF used to classify products *before* the Final Rule.  A February 2015 classification letter

22  addressing an AR-type receiver applied the exact same machining analysis ATF applies now,

23  explaining that the product at issue was not a firearm because "the takedown-pin lug clearance area is

24  less than .800 inch."  Crain Ex. 18.  That fact alone exemplifies precisely how arbitrary ATF's treatment

25  of these products is.  Before and after the Final Rule, ATF has consistently failed to analyze partially

26  complete AR-style receivers in the manner required by the clear statutory term "readily"—adopting an

27  approach Defendants themselves recently represented to the Supreme Court would cause "grave and

28

1    irreparable harm . . . by enabling the irreversible flow of large numbers of untraceable ghost guns into

2    our Nation's communities."  Crain Ex. 1, at 7.

3            **2.  ATF Failed To Examine The Relevant Data, Including Factors The Agency Itself**

4                    **Identified As Relevant, When Classifying Partially Complete AR-Type Receivers**

5            ATF also failed to consider the data relevant to determining whether a partially complete AR-

6    type receiver is a "firearm," including the eight factors the Final Rule itself identifies as relevant.  Those

7    factors include: (1) time, (2) ease, (3) expertise, (4) equipment, (5) parts availability, (6) expense, (7)

8    scope, and (8) feasibility.  Defs.' Mot. 13.  While the Challenged Classification Letters cursorily recite

9    these factors in a "Background" section, no letter analyzes or discusses them.  Instead, ATF relies

10   solely on its machining approach.  It says that "a partially complete AR-type receiver alone, with no

11   indexing or machining of any kind performed in the area of the fire control cavity (except the .800 inch

12   takedown pin area . . . ) will be examined to ascertain if it can 'readily be completed, assembled,

13   restored or otherwise converted to function as a frame or receiver,'" but again, ATF's final

14   determination hinges solely on a single measurement of "the takedown-pin lug clearance area."  ATF

15   Supp 000365.

16           Defendants claim that ATF used this approach "in order to *apply*" the eight factors in the Final

17   Rule and that any distinction between the approaches is "illusory."  Defs.' Mot 13–14 (emphasis in

18   original).  But focusing exclusively on indexing in or near the fire control cavity does *not* take into

19   account all of the factors that are relevant to determining whether a partially complete AR-style receiver

20   may "readily" be converted into a functional weapon.  *See* Yurgealitis Decl. ¶¶ 37–39; *see also*

21   *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 25 (D.D.C. 2014) (holding that ATF classification

22   letters were arbitrary and capricious because "the agency's methodology for deciding whether a

23   particular device" qualified as a silencer—i.e., focusing solely on the physical characteristics of the

24   device—was "deeply flawed").  And in any event, Defendants' insistence that ATF silently considered

25   "most, if not all," of the relevant factors does not discharge the agency's obligations under the APA.

26   Defs.' Mot. 13.  As Defendants' own cases recognize, an agency must "*articulate* a satisfactory

27   explanation for its action" and "*demonstrate* that its [decisions] stem[] from reasoned decisionmaking."

28   *J&G Sales Ltd v. Truscott*, 473 F.3d 1043, 1052 (9th Cir. 2007) (emphases added) (cited at Defs.' Mot.

32); *see also Innovator Enterprises, Inc.*, 28 F. Supp. at 25 (explaining that an agency must "perform a scientific or rigorous comparison" even if its "general approach . . . [is] sound"). The Court cannot simply defer to Defendants' counsel's post hoc, unsupported statements that it is "sufficiently difficult" or "quite difficult" to complete or convert an AR-15 receiver blank without machining or indexing in the fire control cavity. Defs.' Mot. 18; *see State Farm*, 463 U.S. at 50 ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself."); *see also Doe*, 2020 WL 3128874, at *7 (declining "to consider Defendants' post hoc rationalizations for the [agency's] decision which are being offered for the first time in this litigation").

ATF's December 2022 Open Letter confirms that the agency's approach to classifying partially complete AR-15 receivers is arbitrary and capricious. *See* Defs.' Mot. 14. The December 2022 Open Letter evaluated a different category of products—"partially complete Polymer80, Lone Wolf, and similar striker-fired semiautomatic pistol frames"—and concluded those products "'may readily be completed, assembled, restored, or otherwise converted' to a functional frame" and are therefore firearms under the GCA. ATF Supp 000206–15 ("December 2022 Open Letter"), at 1. ATF classified these striker-fired pistol frames as "firearms" after it analyzed how quickly and easily the products could be completed. *See id.* at 7. Specifically, ATF recognized that the products could be completed "by a person with novice skill, using common tools . . . within minutes." *Id.*[12]

ATF's actions with respect to partially complete AR-style receivers are devoid of any remotely similar analysis. These actions do not reflect that any ATF officer actually put these products together, or that ATF had access to (let alone considered) evidence showing how long it would take to do so. *See* Yurgealitis Decl. ¶ 39. Nor did ATF consider the types of tools necessary to complete the product, how easy or inexpensive it would be to procure those tools, whether instructions and templates are readily available online, or how the product was marketed. *Id.* Rather, the only evaluation ATF appears

---

[12] Defendants have now represented to this Court that the December 2022 Open Letter does not reflect any determination or opinion, "one way or the other, on whether any other type of product . . . is a frame or firearm under the GCA," including "a partially complete hammer-fired pistol frame." Defs.' Mot. 24 (explaining that the December 2022 Open Letter did not "state or imply that any product" besides those mentioned "was not a firearm"). Plaintiffs agree based on this representation that a specific challenge to ATF's actions with respect to hammer-fired pistol frames is not yet ripe.

to have undertaken in the Challenged Classification Letters is a superficial skim of the product's appearance and the taking of a few measurements.  *See id.* ¶¶ 33, 35.  That plainly does not suffice to discharge ATF's obligations under the APA.[13]

In sum, ATF's failure to consider the relevant factors and the data pertaining to them renders its actions arbitrary and capricious.

### 3.   ATF Failed To Articulate A Satisfactory Explanation For Its Illogical Treatment of AR-Style Receivers

ATF has also failed to articulate a satisfactory explanation for the illogical and arbitrary distinctions it has made between categories of partially complete AR-style receivers.  Again, ATF has not articulated *any* explanation for the arbitrary 0.800-inch (or 1.600-inch) threshold it has been using to classify partially complete AR-15- (or AR-10-) style receivers.  *See supra* at 10–11, 24–25; *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1048–53 (9th Cir. 2010).

ATF's other critical distinction appears to be whether a product is "sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools."  27 C.F.R. § 478.12(c); Defs.' Mot. 15.  If a partially complete AR-style receiver is sold, distributed, or possessed with those items, Defendants suggest, ATF may classify it as a firearm.  But ATF has utterly failed to explain this distinction.  Templates and instructions are easy to locate online, sometimes for free, and jigs are both inexpensive and readily available for purchase (either from a different retailer or in a different transaction from the same retailer).  *See* Yurgealitis Decl. ¶¶ 36, 39.  ATF has also failed to explain how it will consider whether partially complete AR-style receivers are "possessed with" instructions, guides, or tools—an especially egregious error because ATF has already admitted that the tools required to finish these items are often common household items.  *See* Crain Ex. 1, at 5.  These distinctions are illogical and unsupported and cannot survive judicial review under the APA.  *See Nat.*

---

[13]  To the extent Defendants argue that ATF had evidence before it sufficient to evaluate each of the relevant factors, Defendants are wrong.  The Supplemental Administrative Record contains the underlying request letters in which industry members asked ATF to classify their products.  The information that these manufacturers provided to ATF was sparse and superficial at best.  *See* ATF Supp 000507–789.  These request letters provide no support for an argument that ATF conducted the requisite analysis or even had sufficient evidence before it to do so.

*Res. Def. Council v. U.S. EPA*, 31 F.4th 1203, 1207 (9th Cir. 2022) (explaining courts do not credit an agency's "arbitrary" calculations).

Recognizing the hole in ATF's analysis, Defendants insist that ATF "did consider that partially complete frames and receivers may be sold separately from kits, jigs, or similar items, but decided to address this problem through . . . criminal law." Defs.' Mot. 30. They also suggest that ATF made this decision based on "an analysis of factors" like "the difficulty of enforcing a broader scope of regulatory behavior" and purportedly "undesirable applications of the [Final Rule]." *Id.* at 30–31. Defendants' argument is meritless. For one thing, "[t]his argument is precisely the type of 'post hoc rationalization' . . . that [the Court is forbidden] to consider in conducting review." *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008). Again, it is hornbook administrative law that a court can uphold agency action only on bases articulated by the agency itself. *See State Farm*, 463 U.S. at 50; *see also Nat'l Parks Conservation Ass'n v. U.S. EPA*, 788 F.3d 1134, 1143 (9th Cir. 2015) (holding that "unexplained assertions . . . unsupported by any explained reasoning" were "arbitrary and capricious"). Here, the few citations Defendants include to the Administrative Record do not show that ATF "analy[zed]" or even considered any of these factors when it made the relevant decision to consider jigs and similar items only when they are sold or distributed "with" a partially complete AR-style receiver. Defs.' Mot. 30.

Even if ATF *did* in fact consider these factors, its distinction between partially complete AR-style receivers sold with and without jigs would still be arbitrary. Relying on "criminal law" as a backstop still fails to take into account the *relevant* factor: that jigs and similar items are inexpensive, are readily available on the marketplace, and can be easily purchased in a nominally separate transaction—whether or not ghost gun manufacturers are "conspir[ing]" or intentionally "structur[ing] . . . transactions." Defs.' Mot. 30. Relying on criminal sanctions after the fact also flouts one of the key purposes animating the GCA (and the Final Rule): to prevent unserialized weapons from entering the market in the first instance. And Defendants' alleged concern that faithfully applying the GCA would lead to purportedly "undesirable" outcomes—like a need to serialize "at early stages" of a weapon's manufacture (*id.*)—is a consideration for Congress, not the agency. *See Ctr. for Bio. Diversity v. U.S. Fish & Wildlife Serv.*, 33 F.4th 1202, 1224 (9th Cir. 2022) (holding that agency "acted

29

arbitrarily and capriciously" and explaining that "amendment of the [relevant statute] is a task for Congress, not for the [agency], and certainly not for [the Court]").

\*   \*   \*

Defendants argue that ATF simply "chose to draw the line in a different place than Plaintiffs would have preferred." Defs.' Mot. 29. But ATF must actually explain and adequately justify the lines it chose to draw. *See Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 966 F.2d 1292, 1306 (9th Cir. 1992); *Harlan Land Co. v. U.S. Dept. of Agr.*, 186 F. Supp. 2d 1076, 1085 (E.D. Cal. 2001). ATF's failure to do so distinguishes this case from those Defendants cite.[14]

Defendants' cases also recognize that courts will not defer to an agency when its line-drawing "appear[s] irrational" and when "the consequences of the line-drawing are in any respect dire." *J&G Sales Ltd.*, 473 F.3d at 1052 (quoting *Leather Indust. of Am. v. EPA*, 40 F.3d 392, 409 (D.C. Cir. 1994)); *see also Chinook Indian Nation v. Bernhardt*, 2020 WL 128563, at \*8 (W.D. Wash. Jan. 10, 2020) (same). Here, ATF's approach to classifying partially complete AR-style receivers is irrational for all of the reasons identified above. And the consequences of ATF's arbitrary decision-making with respect to partially complete AR-style receivers are indeed "dire." AR-style weapons are "civilian versions of military weapons," Yurgealitis Decl. ¶ 19, designed to "inflict mass casualties on large numbers of people in a short period of time," *id.* ¶ 20. They have been used to perpetrate 10 of the 17 deadliest mass shootings in the United States since 2012. *Id.* ¶ 9. When a child is shot with an AR-15—as more than 40 were in the Sandy Hook and Robb Elementary School shootings, *id.* ¶ 20—they have almost no chance of survival. *See* Crain Ex. 20. Innocent Americans—shoppers, concert-goers, worshippers, schoolchildren, and too many others—will suffer the consequences of ATF's arbitrary and capricious refusal to regulate partially complete AR-style receivers.

---

[14]   In *ExxonMobil Gas Mktg. Co. v. FERC*, for example, the court acknowledged that there was "no easy answer" to the "line-drawing problem" it faced and concluded that the agency had given "reasoned consideration to each of the pertinent factors." 297 F.3d at 1084. In stark contrast, ATF's actions here reflect a wholesale failure to apply the clear terms of the GCA, to consider the relevant factors or examine the relevant data, and to provide an adequate explanation or justification.

1   In sum, Defendants' actions with respect to partially complete AR-style receivers are arbitrary

2   and capricious in violation of the APA. They must be set aside.

3   **C.      The Court Should Declare Void ATF's Actions Determining That AR-Style**

4   **Receivers Are Not Firearms And Remand To ATF**

5   Because ATF's actions with respect to partially complete AR-style receivers are both contrary

6   to the GCA and arbitrary and capricious, the Court should declare those actions void and remand to the

7   agency with directions to apply the GCA's plain text and the relevant factors. Plaintiffs' Proposed

8   Order identifies the specific actions this Court should set aside, and it contains clear and concise

9   instructions that Plaintiffs respectfully suggest the Court should provide to ATF on remand. That

10  plainly satisfies the Federal Rules of Civil Procedure, which require only that the Court "describe in

11  reasonable detail—and not by referring to the complaint or other document—the act or acts restrained

12  or required." Fed. R. Civ. P. 65(d)(1)(C).

13  Defendants do not dispute that declaratory and injunctive relief are appropriate remedies should

14  the Court conclude that ATF's approach to classifying partially complete AR-style receivers is

15  unlawful. *See* Defs.' Mot. 33–34. They argue only that Plaintiffs' requested relief is "inadequately

16  defined" and not "specific[]" enough. *Id.* (citing Fed. R. Civ. P. 65(d)). This argument—made before

17  Defendants even saw Plaintiffs' Proposed Order—is meritless. As the Ninth Circuit has repeatedly

18  held, "[i]njunctions are not set aside unless they are *so vague* that they have no reasonably specific

19  meaning." *Hecox v. Little*, 79 F.4th 1009, 1037 (9th Cir. 2023) (emphasis added) (quoting *United

20  States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985)); *see also Carrillo v. Schneider Logistics, Inc.*,

21  501 F. App'x 713, 716–17 (9th Cir. 2012) (finding district court orders sufficiently clear despite

22  acknowledging that "the district court could have been clearer in articulating [defendant's] specific

23  duties under the injunctions"); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir.

24  2004) (holding that permanent injunction was sufficiently specific and explaining that district court

25  was not required to "elucidate how to enforce the injunction"); *United States v. V-1 Oil Co.*, 63 F.3d

26  909, 913 (9th Cir. 1995) (holding that injunction requiring defendant to allow warrantless

27  administrative searches "for the purpose of enforcing [a statute] and its implementing regulations" was

28  "not ambiguous"). Here, Plaintiffs' Proposed Order more than satisfies this standard. It reasonably

31

1    details the acts restrained or required—focusing on specific, discrete final agency actions and

2    categories of ghost gun products.

3        Plaintiffs' Proposed Order is nothing like the hopelessly vague relief in the decisions that

4    Defendants cite. *See* Defs.' Mot. 33–34. In *Schmidt v. Lessard*, 414 U.S. 473 (1974), the district

5    court's order stated only that the plaintiffs were "entitled to declaratory and injunctive relief against

6    enforcement of the [challenged] Wisconsin scheme," without describing *any* terms of that relief. *Id.* at

7    476. In *Allen Bradley Co. v. Local Union No. 3*, 325 U.S. 797 (1945), the Supreme Court concluded

8    that a district court's judgment was too vague where it simply declared unlawful all of "the acts done

9    and being done in furtherance [of a conspiracy] as set forth in" 375 different findings of fact made from

10   25,000 pages of evidence. *Id.* at 811–13. Defendants' remaining two cases—which were both in a

11   motion to dismiss posture—are likewise distinguishable. In *Apple Inc. v. Motorola Mobility, Inc.*, 2012

12   WL 12846983 (S.D. Cal. July 17, 2012), the court dismissed a claim for declaratory judgment that the

13   plaintiff was contractually entitled to use components without threat of patent litigation under "any and

14   all future circumstances." *Id.* at *4. And in *Black Mountain Equities, Inc. v. Players Network, Inc.*,

15   2020 WL 804452 (S.D. Cal. Feb. 18, 2020), the court dismissed a counterclaim for declaratory

16   judgment "setting forth the respective rights, duties and obligations of the parties hereto concerning

17   said allegations [in the complaint]." *Id.* at *1 (finding that "without more factual allegations, it is

18   unclear exactly what Defendant is seeking"). Unlike the parties in those cases, Defendants cannot

19   seriously claim they lack notice of what conduct Plaintiffs seek to proscribe. Indeed, Defendants'

20   summary judgment brief reveals that Defendants know exactly what products are at issue in this case

21   and what loophole Plaintiffs seek to close. *See* Defs.' Mot. 17 ("[T]he heart of Plaintiffs' disagreement

22   with ATF concerns partially complete AR-15 variant receivers.").

23       Even if the Court has questions about Plaintiffs' Proposed Order, that would not be a reason to

24   reject it wholesale. If the Court has any unresolved questions about terminology or methodology, it

25   can solicit the parties' assistance or hold a conference to discuss these issues. *See In re Nat'l Collegiate*

26   *Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1263–64 (9th Cir. 2020), *aff'd*

27   *sub nom. Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021) (district court injunction was

28   sufficiently specific to satisfy Rule 65(d); injunction "invite[d]" defendant to help craft definitions

"based on its institutional expertise" that would be "subject to the court's approval"); *see also Celano v. Marriott Int'l, Inc.*, 2008 WL 239306, at *21 (N.D. Cal. Jan. 28, 2008) (rejecting defendant's argument that court could not "possibly enter injunctive relief that is clear and enforceable" and scheduling a conference "at which the parties will be required to discuss and attempt to resolve the specific contours of the injunction to be entered").

This Court should grant summary judgment in favor of Plaintiffs and, as set forth in the Proposed Order, permanently enjoin and declare void the specified agency actions and remand to ATF.

### D.    Plaintiffs Have Article III Standing

Defendants devote barely one page of their summary judgment motion to arguing that Plaintiffs "have submitted no evidence" to establish Article III standing.  Defs.' Mot. 7–8.  That argument stumbles out of the gate.  Although Plaintiffs had not "submitted . . . evidence" when Defendants filed their summary judgment motion, Plaintiffs now do so in the form of multiple declarations and exhibits—all of which confirm that both Plaintiffs have standing.

To establish Article III standing, "a plaintiff must establish 'three elements': (1) injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) that is likely to be redressed by a favorable decision."  *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 746 (9th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  A plaintiff can do so at the summary judgment stage by "set[ting] forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true."  *Asbestos Disease Awareness Org. v. Wheeler*, 508 F. Supp. 3d 707, 719 (N.D. Cal. 2020), *as amended* (June 7, 2021) (quoting *Lujan*, 504 U.S. at 561).  Plaintiffs State of California and GLC have each introduced ample evidence to confirm their standing.  Defendants' motion for summary judgment should be denied.[15]

### 1.    The State of California Has Standing

The State of California has standing to sue because it has shown numerous "concrete and particularized" injuries resulting from ATF's determination that certain partially complete receivers

---

[15]    In an action with multiple plaintiffs, the case may proceed as long as one plaintiff has standing.  *See Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993), *as amended* (Mar. 8, 1994) (citing *Carey*

1   are not "firearms" under the GCA.  *See Lujan*, 504 U.S. at 560.  As one of the states hit hardest by the

2   ongoing ghost gun epidemic, California's injuries include increased expenditures to implement and

3   accelerate implementation of State legislation regulating ghost gun parts, as well as increased

4   expenditures of time, money, and resources to train law enforcement personnel statewide on ghost

5   guns.  *See* Gonzalez Decl. ¶¶ 7–18; *see also* Crain Ex. 16, at 21–23.

6        As the Court has recognized, *see* ECF No. 135 at 7–8, ATF's determinations that certain

7   partially complete receivers and frames are not covered as "firearms" under the GCA has led to a

8   proliferation of ghost guns in California.  *See supra* at 6.  California law enforcement agencies have

9   reported that, during 2020 and 2021, ghost guns accounted for 25 to 50 percent of firearms recovered

10  at crime scenes.  Crain Ex. 10; *see also* Gonzalez Decl. ¶¶ 13–14.  California's residents, including law

11  enforcement officers and children, have repeatedly been victimized in recent years in devastating

12  incidents involving ghost guns.  *See* Crain Exs. 10–11, 13–14.

13       ATF's determination that certain partially complete receivers are not "firearms" under the GCA

14  has required California to take necessary measures "to fill the regulatory gap left by" ATF's decision.

15  *California v. Bureau of Land Mgmt.*, 612 F. Supp. 3d 925, 935 (N.D. Cal. 2020), *appeal docketed*, No.

16  20-16157 (9th Cir. June 12, 2020); *see also* ECF No. 135 at 18.  Since 2016, the State has enacted

17  several relevant ghost gun-related statutes.  Gonzalez Decl. ¶¶ 8, 12.  In particular, A.B. 857 (Cal.

18  2016) requires self-assembled firearms to be stamped with unique serial numbers provided by the

19  California Department of Justice, and also requires those possessing unserialized firearms to apply to

20  the Department for serial numbers.  Gonzalez Decl. ¶¶ 8, 12.  As ghost gun violence continued to

21  escalate throughout the state, the Legislature most recently passed A.B. 1621 (Cal. 2022), which

22  expands the definition of "firearm precursor part" to include any precursor part that has reached a stage

23  in manufacture where it may be readily converted into a firearm or is marketed or sold to the public for

24  use as the frame or receiver of a firearm.  Cal. Pen. Code §§ 16531, 30400.  A.B. 1621 also generally

27       *v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977)).  In any event, both the State of California and
28       GLC have demonstrated the requisite elements to establish Article III standing.

prohibits the sale or transfer of all firearm precursor parts that are not covered by the Final Rule, such as partially complete receivers.  *Id.*

To implement these reasonable safety measures, the California Legislature has allocated millions of dollars statewide.  *See* Gonzalez Decl. ¶ 18.  These costs are reflected in a Budget Change Proposal (BCP) approved by the Legislature in 2023, which allocated $2,762,000 in expenditures from the General Fund during the 2023-24 fiscal year, along with an additional $2,518,000 in 2024-25, and $1,153,000 in 2025-26.  *Id.*; *see* Crain Ex. 16, at 23.[16]  Among other uses for the aforementioned funds, the BCP approved the addition of ten California Bureau of Firearms (BOF) positions to handle such tasks as processing applications to add FMBUS (Firearm Manufactured by Unlicensed Subject) numbers to unserialized firearm precursor parts and firearms, and enforcing criminal penalties for possession of unserialized firearms.  *Id.*  Indeed, in recent years California has incurred hundreds of thousands of dollars in costs to process applications to serialize unregulated firearm precursor parts and firearms.  Specifically, BOF records confirm that California has spent nearly $370,000 since 2018 administering its Unique Serial Number Application (USNA) program, which requires BOF to run a background check and generate a unique serial number for all self-made weapons and unserialized weapons recovered by state and local law enforcement agencies, and for all firearm precursor parts which are not otherwise regulated by federal law.  Gonzalez Decl. ¶¶ 15–17.

California would not have been required to expend these funds if ATF had properly regulated these firearm precursor parts as firearms under the GCA.  *Id.*  "These additional expenditures, which constitute a direct injury to the State of California, are sufficient to establish injury-in-fact for standing purposes."  *California v. Ross*, 358 F. Supp. 3d 965, 1004–05 (N.D. Cal. 2019) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (standing may be based on "reasonably incur[red] costs to mitigate or avoid" a "substantial risk" of harm)), *vacated and remanded on other grounds*, 139 S. Ct. 2778 (2019); *see also California*, 612 F. Supp. 3d at 935 ("Monetary expenditures to mitigate

---

[16] The approved BCP is available on the California Department of Finance website at https://tinyurl.com/3nz984dc.  This information is judicially noticeable because it is information "made publicly available by [a] government entit[y]" and "is not subject to reasonable dispute." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010); *see also Teixeria v. Cty. of Alameda*, 873 F.3d 670, 676 n.6 (9th Cir. 2017).

and recover from harms that could have been prevented absent [the challenged conduct] are precisely the kind of 'pocketbook' injury that is incurred by the state itself.") (quoting *Air Alliance Houston v. Envt'l Prot. Agency*, 906 F.3d 1049, 1059–60 (D.C. Cir. 2018)).

In addition, California has reasonably increased its expenditures on policing and law enforcement in an attempt to mitigate the harm caused by ATF's failure to properly regulate partially complete receivers and frames.  Gonzalez Decl. ¶¶ 7–18; Crain Exs. 16, 21–23.  California has undertaken significant efforts to educate law enforcement agencies and dealers within the state on how to apply state law where the Final Rule leaves gaps in regulation.  In 2022 alone, California expended nearly $20,000 to generate multiple guidebooks and informational documents for public distribution explaining the application of state law in regulating the sale, manufacture, and possession of federally unregulated precursor parts.  Gonzalez Decl. ¶¶ 10–11.

In their motion, Defendants argue that California has failed to show that any of their injuries are traceable to products left unregulated by the Final Rule.  Defs.' Mot. 8.  In other words, Defendants argue that California cannot show that it has suffered an injury in fact, or that such injury is traceable to Defendants' actions or would be redressed by a favorable decision in this action.  Defendants are wrong in each respect, and ignore that California need only prove—as it has done here—that it reasonably incurred costs to avoid a "substantial risk" of harm caused by ATF's failure to regulate partially complete receivers.  *Ross*, 358 F. Supp. 3d at 1004–05; *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 414 n.5).  California's continued outlays of millions of dollars annually would not be necessary but for the Final Rule's failure to regulate the specific products at issue here—partially complete AR-style receivers—which constitute a significant percentage of ghost guns recovered by California law enforcement agencies.  Gonzalez Decl. ¶¶ 14, 18.

Defendants' argument also missed the mark because, as the Court has acknowledged, *see* ECF No. 135 at 9, California's "ability to point to a specific instance" where a partially complete receiver or frame was used in a crime "has been hampered by the very fact of" the Final Rule, which permits partially complete AR-style receivers to be sold unserialized, making them impossible to trace.  In any event, California's theory of standing relies on the "substantial risk" of harm it will suffer if ATF does

36

not regulate partially complete receivers and frames, and "on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). It is predictable that, if ATF does not regulate partially complete receivers and frames under the GCA, third parties will continue to make and sell these products specifically to evade serialization and licensing laws. Indeed, "[t]he entire point of buying an 80 percent receiver/frame standalone is to avoid regulation, which requires, *inter alia*, serialization which enables law enforcement to track sales." ECF No. 135 at 11. Considering the increasing number of ghost gun seizures in the State, *see supra* at 6, California has shown "with reasonable probability" that if ATF does not regulate partially complete AR-style receivers, the State will continue to incur significant expenditures to address the ghost gun problem. *See California v. Azar*, 911 F.3d 558, 571–72 (9th Cir. 2018) (finding standing where there was a "reasonable probability" that a chain of events would "result in economic harm to the [plaintiff] states"). California has sufficiently met its burden to establish Article III standing.

### 2.      Giffords Law Center Has Standing

This Court held in its February 9, 2023 opinion denying in relevant part Defendants' motion to dismiss that GLC had sufficiently alleged facts to establish its standing because it had alleged that ATF's actions "frustrated its core mission of saving lives from gun violence" and "forced the organization to divert its resources to focus on ghost guns." ECF No. 135 at 19 (internal quotation marks and citations omitted); *see also Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). GLC has now submitted a declaration attesting to those facts and more, *see* Cutilletta Decl. ¶¶ 9–19, thereby satisfying the two-part test for organizational standing established by *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). That test requires GLC to introduce evidence that: (a) ATF's actions with respect to partially complete AR-style receivers frustrate GLC's organizational mission; and (b) GLC has diverted resources to combat the effects of ATF's actions. GLC meets both prongs.

*1.     Frustrated Mission.* As the Supreme Court and this Court have recognized, where an organization shows "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources," "there can be no question that the organization has suffered injury in fact." *Havens*, 455 U.S. at 379; *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 903

37

(9th Cir. 2002); *see* ECF No. 135 at 19.  This Court held that GLC sufficiently alleged it would be injured by ATF's failure to classify partially complete receivers and frames as firearms because ATF's actions "frustrate [GLC's] 'core mission [of] sav[ing] lives from gun violence.'" ECF No. 135 at 19. Laura Cutilletta, Chief of Staff and Vice President for Programs at GLC, avers on behalf of GLC that ATF's actions with respect to partially complete AR-style receivers "compromise" and "undermine" GLC's core mission of saving lives from gun violence.  *See* Cutilletta Decl. ¶¶ 9–10.  Ms. Cutilletta also avers that ATF's actions have frustrated, and continue to frustrate, one of GLC's key policy platforms:  supporting firearms background checks and licensing laws at the federal and state level. *Id.*; *see Havens*, 455 U.S. at 379.  They do so by creating a loophole through which buyers and sellers can evade background checks and other legal requirements applicable to "firearms" and other sensible measures intended to reduce gun violence.   Cutilletta Decl. ¶ 15.  These are the same facts that GLC alleged in the Amended Complaint and that the Court previously deemed sufficient to show frustration of mission.  *See* ECF No. 135 at 19–20 (quoting FAC ¶¶ 135–37).  And now GLC has substantiated them with competent evidence for purposes of summary judgment.  *See Asbestos Disease Awareness Org.*, 508 F. Supp. 3d at 717–19.

       *2. Diversion of Resources.*  As the Court explained in its prior Opinion, "GLC has not claimed injury based simply on frustration of mission alone; rather it claims a diversion of resources."  ECF No. 135 at 21-22 (citing *Havens*, 455 U.S. at 379; *Sabra v. Maricopa Cty. Cmty. Coll. Dist.*, 44 F. 4th 867, 878–80 (9th Cir. 2022); *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154–55 (9th Cir. 2019)).  And as this Court held, GLC's allegations demonstrated that "ATF's actions have forced GLC to adjust many of its organizational priorities and divert substantial resources to combat ghost guns and resulting violence."  ECF No. 135 at 20.  Specifically, GLC "had sufficiently alleged that it has altered its resource allocation" by alleging that it had expended human capital and resources "to educate the public," to provide "policy expertise and technical assistance in support of violence intervention programs," and to engage in "legal action" related to ghost guns.  *Id.* at 19–20, 23 (citing and quoting FAC ¶¶ 135–37).  Ms. Cutilletta now avers on GLC's behalf that ATF's unlawful actions with respect to partially complete AR-style receivers have forced GLC to divert and to continue diverting resources to combat the proliferation of ghost guns and ghost gun-related violence.  *See*

38

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:20-CV-06761-EMC

Cutiletta Decl. ¶¶ 11–19.  Because ATF refuses to classify partially complete AR-style receivers as "firearms" under the GCA, "GLC has shifted resources to activity related to ghost guns in particular and away from activity related to other firearms."  ECF No. 135 at 23; *see* Cutiletta Decl. ¶¶ 17–19. Ms. Cutiletta testified that GLC has "altered its resource allocation," ECF No. 135 at 23, to combat ghost gun-related violence in at least four specific ways: (i) by devoting significant resources to legislative and policy initiatives aimed at combatting the ghost gun epidemic; (ii) by producing videos and other educational materials to educate the public on the threat ghost guns pose and support efforts to address that threat; (iii) by redoubling GLC's gun violence prevention efforts because ATF's actions undermine every other firearms policy GLC advocates for; and (iv) by pursuing legal action aimed at combatting ghost-gun related violence, including as co-counsel in a lawsuit filed in July 2023 against a leading ghost gun company.  *See* Cutiletta Decl. ¶¶ 12-16.  As this Court already held, such diversion of resources to activities aimed at combating ghost guns is an injury sufficient to confer Article III standing.  *See* ECF No. 135, at 21–23; *see also Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (finding organizational standing where plaintiff, in response to defendant's actions that "frustrated [the organization's] central mission," "started new education and outreach campaigns targeted at discriminatory roommate advertising").

Courts throughout the Ninth Circuit have consistently held at the summary judgment stage that an organization has standing where it has shown both frustration of mission and diversion of resources. For example, the Ninth Circuit held in *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011), that a plaintiff organization had standing to challenge a city ordinance where the plaintiff "offered uncontradicted evidence that enforcement of the ordinance ha[d] forced it to divert resources . . . that it would have spent in other ways." *Id.* at 943–44.  And in *Asbestos Disease Awareness Org. v. Wheeler*, this Court held that a nonprofit organization had standing in an APA challenge to actions that forced the organization to "spend . . . less time pursuing their stated mission of reducing asbestos-related health risks and advocating for asbestos-related legislation." 508 F. Supp. 3d at 718; *see also, e.g.*, *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 223 F. Supp. 3d 1008, 1018 (C.D. Cal. 2016) (holding that animal rights organization had standing where agency practice frustrated organizational mission and forced organization "to continue expending resources to

39

counteract the practice," including writing press releases, initiating letter-writing campaigns, and filing petitions aimed at banning the practice).  Like the plaintiffs in these cases, GLC has been forced to divert substantial resources—including through educational campaigns, legal action, drafting proposed legislation, and providing policy expertise and technical assistance to violence intervention programs—to combat ATF's decision not to classify partially complete receivers as "firearms."  Cutilletta Decl. ¶¶ 12–16.  GLC has organizational standing because "it has actually diverted resources to counteract the loophole/exception in the ATF regulation" and implementing guidance.  ECF No. 135, at 24.

\*     \*     \*

Defendants' standing challenge ultimately fails because it simply "track[s] those [arguments] unsuccessfully made previously in this case."  *Yaak Valley Forest Council v. Vilsack*, 563 F. Supp. 3d 1105, 1114 (D. Mont. 2021), *appeal dismissed*, 2022 WL 571529 (9th Cir. Jan. 26, 2022).  Defendants' legal arguments here are "no more persuasive than [their] arguments at the motion to dismiss stage." *Id.* at 1115 (concluding that plaintiff had provided sufficient evidence to establish standing at the summary judgment stage).

Defendants try to evade this Court's prior decision by suggesting that the Court must apply a more stringent standard of review at this stage.  Not so.  Although on a motion to dismiss this Court was required to accept as true the allegations in the Amended Complaint and draw inferences in Plaintiffs' favor,  ECF No. 135, at 7, the standard of review now is not materially different.  Because California and GLC are non-movants with respect to standing, their evidence is entitled to the same credit on a summary judgment motion as their allegations were at the motion to dismiss phase.  The Court should, for purposes of this motion, accept Plaintiffs' declarations and exhibits as true and assess whether Defendants create any "genuine question of material fact as to the standing elements." *Central Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002); *see also Asbestos Disease Awareness Org.*, 508 F. Supp. 3d at 719.  They cannot.  Plaintiffs' evidence plainly satisfies their burden.

## VI. CONCLUSION

The Court should deny Defendants' Motion for Summary Judgment and grant Plaintiffs' Cross-Motion for Summary Judgment.

1    *Dated:* October 26, 2023                          */s S. Clinton Woods*

2                                                       ROB BONTA
                                                        Attorney General of California
3                                                       THOMAS S. PATTERSON
                                                        Senior Assistant Attorney General
4                                                       R. MATTHEW WISE, SBN 238485
                                                        Supervising Deputy Attorney General
5                                                       S. CLINTON WOODS, 246054
                                                        Deputy Attorney General
6                                                       Clint.Woods@doj.ca.gov
                                                        455 Golden Gate Ave.,
7                                                       Suite 11000
                                                        San Francisco, CA 94102-7004
8                                                       Telephone:  (415) 510-3807
                                                        Facsimile:  (415) 703-5843
9
                                                        *Attorneys for Plaintiff State of California, by*
10                                                      *and through Attorney General Rob Bonta*

11                                                      */s Scott A. Edelman*

12                                                      GIBSON, DUNN & CRUTCHER LLP
                                                        SCOTT A. EDELMAN, SBN 116927
13                                                      2029 Century Park East, Suite 4000
                                                        Los Angeles, CA 90067-3026
14                                                      sedelman@gibsondunn.com
                                                        Telephone: (310) 357-8061
15                                                      Facsimile: (310) 552-7041

16                                                      LEE R. CRAIN, *pro hac vice*
                                                        ERICA PAYNE, *pro hac vice*
17                                                      LIESEL SCHAPIRA, *pro hac vice*
                                                        200 Park Avenue
18                                                      New York, NY  10166-0193
                                                        Telephone: (212) 351-4000
19                                                      Facsimile: (212) 351-4035

20                                                      */s/ Avi Weitzman*

21                                                      PAUL HASTINGS LLP
                                                        AVI WEITZMAN, *pro hac vice*
22                                                      aviweitzman@paulhastings.com
                                                        200 Park Avenue
23                                                      New York, NY 10166
                                                        Telephone: (212) 318-6000
24                                                      Facsimile: (212) 752-3620

25                                                      *Attorneys for Plaintiff Giffords Law Center to*
                                                        *Prevent Gun Violence*
26

27

28
                                                        41

1

/s/ David M. Pucino

2

GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE

3

DAVID M. PUCINO, *pro hac vice*
223 West 38th St. # 90

4

New York, NY 10018
Telephone: (917) 680-3473

5

6

*Attorney for Plaintiff Giffords Law Center to
Prevent Gun Violence*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:20-CV-06761-EMC

1

**SIGNATURE ATTESTATION**

2

3

Pursuant to Local Rule 5-1(i), I hereby attest that concurrence in the filing of the document has been obtained from each of the other Signatories.

4

5

*Dated*: October 26, 2023

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ Scott A. Edelman
Scott A. Edelman

PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:20-CV-06761-EMC