GIBSON, DUNN & CRUTCHER LLP
SCOTT A. EDELMAN, SBN 116927
sedelman@gibsondunn.com
2029 Century Park East
Los Angeles, CA 90067-3026
Telephone: (310) 552-8500
Facsimile: (310) 551-8741

LEE R. CRAIN, *pro hac vice*
ERICA PAYNE, *pro hac vice*
LIESEL SCHAPIRA, *pro hac vice*
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

PAUL HASTINGS LLP
AVI WEITZMAN, *pro hac vice*
aviweitzman@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 752-3620

*Attorneys for Plaintiff Giffords Law Center to Prevent Gun Violence*

[Additional Counsel Listed on Next Page]

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
Supervising Deputy Attorney General
S. CLINTON WOODS, SBN 246054
Deputy Attorney General
Clint.Woods@doj.ca.gov
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-7004
Telephone:  (415) 510-3807
Facsimile:  (415) 703-5843

*Attorneys for Plaintiff State of California, by and through Attorney General Rob Bonta*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

STATE OF CALIFORNIA, BRYAN MUEHLBERGER, FRANK BLACKWELL, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE,

    Plaintiffs,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al.,

    Defendants.

CIVIL CASE NO.:  3:20-CV-06761-EMC

**PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Hon. Edward M. Chen
Hearing Date:  January 25, 2024
Hearing Time:  1:30 PM PST
Hearing Place:  Courtroom 5, 17th Floor

1    Additional Counsel

2    GIFFORDS LAW CENTER TO
     PREVENT GUN VIOLENCE
3    DAVID M. PUCINO, *pro hac vice*
4    244 Madison Ave Ste 147
     New York, NY 10016
5    Telephone: (917) 524-7816

6    *Attorney for Plaintiff Giffords Law Center to*
     *Prevent Gun Violence*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................1

II. ARGUMENT ........................................................................................................................3

    A.    Partially Complete AR-Style Receivers Are "Firearms" Within The Plain
        Meaning Of The GCA. ....................................................................................................3

        1.    Partially Complete AR-Style Receivers Are "Designed To" Function
             As Receivers And To Expel Projectiles. ...............................................3

        2.    Partially Complete AR-Style Receivers May Be "Readily Converted"
             To Function As Receivers And To Expel Projectiles. ........................5

    B.    ATF's Actions With Respect To Partially Complete AR-Style Receivers Are
        Arbitrary And Capricious. ..............................................................................................7

        1.    The Post-Hoc Hoffman Declaration Should Be Stricken In Part, And In
             Any Event, Only Confirms ATF's Actions Are Arbitrary And
             Capricious. ...........................................................................................7

        2.    ATF's Actions Are Not The Result Of Reasoned Decision-Making. ...............10

             a.    ATF Ignored The GCA's Clear Statutory Commands. ........................11

             b.    ATF Failed To Examine The Relevant Data, Including Factors
                The Agency Itself Identified As Relevant. ............................................12

             c.    ATF Failed To Articulate A Satisfactory Explanation For Its
                Treatment Of Jigs, Templates, Equipment, Or Tools. .........................14

    C.    This Court Can And Should Declare Unlawful ATF's Actions, Vacate Them In
        Relevant Part, And Remand To ATF. ...........................................................................17

    D.    Plaintiffs' Undisputed Evidence Confirms They Have Standing. ...............................20

III. CONCLUSION ...................................................................................................................22

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*All. for the Wild Rockies v. Petrick,*
   68 F.4th 475 (9th Cir. 2023) .................................................................................................10

4

5

*America's Community Bankers v. FDIC,*
   200 F.3d 822 (D.C. Cir. 2000) .............................................................................................13

6

*Aragon v. Tillerson,*
   240 F. Supp. 3d 99 (D.D.C. 2017) .....................................................................................18

7

8

*Asbestos Disease Awareness Org. v. Wheeler,*
   508 F. Supp. 3d 707 (N.D. Cal. 2020) ..................................................................................9

9

*Bair v. Cal. State Dep't of Transp.,*
   867 F. Supp. 2d 1058 (N.D. Cal. 2012) ..............................................................................10

10

11

*California ex rel. Becerra v. Azar,*
   950 F.3d 1067 (9th Cir. 2020) .............................................................................................17

12

*Bidi Vapor LLC v. U.S. Food & Drug Admin.,*
   47 F.4th 1191 (11th Cir. 2022) ...........................................................................................15

13

14

*Brown v. Gardner,*
   513 U.S. 115 (1994) ...............................................................................................................7

15

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
   631 F.3d 1072 (9th Cir. 2011) .............................................................................................17

16

17

*California v. Bernhardt,*
   472 F. Supp. 3d 573 (N.D. Cal. 2020) ..........................................................................18, 19

18

*California v. Trump,*
   963 F.3d 926 (9th Cir. 2020) ...............................................................................................6

19

20

*Caritas Medical Center v. Johnson,*
   603 F. Supp. 2d 81 (D.D.C. 2009) ......................................................................................13

21

*Cassell v. F.C.C.,*
   154 F.3d 478 (D.C. Cir. 1998) ............................................................................................17

22

23

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ...............................................................................................................8

24

*Ctr. for Bio. Diversity v. Salazar,*
   2010 WL 11575282 (N.D. Cal. 2010) ...............................................................................8, 9

25

26

*Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgmt.,*
   698 F.3d 1101 (9th Cir. 2012) ...........................................................................2, 9, 11, 15

27

*Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgmt.,*
   2023 WL 3796675 (D. Idaho June 2, 2023) .................................................................18, 19

28

ii

*Ctr. for Food Safety v. Perdue,*
    2022 WL 4793438 (N.D. Cal. Sept. 30, 2022) ............................................................................10

*Defs. of Wildlife v. U.S. Fish & Wildlife Serv.,*
    584 F. Supp. 3d 812 (N.D. Cal. 2022) ......................................................................................18

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ............................................................................................2, 8, 14, 21

*Diaz-Rodriguez v. Garland,*
    55 F.4th 697 (9th Cir. 2022).......................................................................................................6

*Encino Motorcars LLC v. Navarro,*
    579 U.S. 211 (2016) ...............................................................................................................7, 9

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
    36 F.4th 850 (9th Cir. 2022) ....................................................................................................18

*Erlenbaugh v. United States,*
    409 U.S. 239 (1972) ..................................................................................................................6

*Fogo De Chao (Holdings), Inc. v. DHS,*
    211 F. Supp. 3d 31 (D.D.C. 2016) ...........................................................................................18

*Hernandez v. Garland,*
    38 F.4th 785 (9th Cir. 2022)....................................................................................................16

*Humane Soc. of U.S. v. Locke,*
    626 F.3d 1040 (9th Cir. 2010) .......................................................................................9, 12, 14

*Idaho Conserv. League v. Mumma,*
    956 F.2d 1508 (9th Cir. 1992) ...................................................................................................9

*Innovator Enterprises, Inc. v. Jones,*
    28 F. Supp. 3d 14 (D.D.C. 2014) .............................................................................................14

*King Cty. v. Azar,*
    320 F. Supp. 3d 1167 (W.D. Wash. 2018) .................................................................................8

*Ksanka Kupaqa Xa'lcin v. U.S. Fish & Wildlife Serv.,*
    534 F. Supp. 3d 1261 (D. Mont. 2021) ....................................................................................18

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015) .............................................................................................................11

*Montana Wildlife Fed'n v. Bernhardt,*
    2022 WL 742477 (D. Mont. Mar. 11, 2022)............................................................................18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .......................................................................................................11, 12, 14

*Nat. Res. Def. Council, Inc. v. Evans,*
    2003 WL 22025005 (N.D. Cal. Aug. 26, 2003)..........................................................................8

iii

*Nat. Res. Def. Council v. E.P.A.*,
   526 F.3d 591 (9th Cir. 2008)......................................................................................10, 11

*Nat. Res. Def. Council v. Kempthorne*,
   506 F. Supp. 2d 322 (E.D. Cal. 2007).................................................................................9

*Nat'l Urb. League v. Ross*,
   489 F. Supp. 3d 939 (N.D. Cal. 2020) ..............................................................................8

*Perrin v. United States*,
   444 U.S. 37 (1979) ..............................................................................................................3

*S.E.C. v. McCarthy*,
   322 F.3d 650 (9th Cir. 2003) ..............................................................................................4

*Scholl v. Mnuchin*,
   494 F. Supp. 3d 661 (N.D. Cal. 2020) ..........................................................................8, 14

*Schroeder v. United States*,
   683 F. Supp. 2d 1129 (D. Or. 2010) ..................................................................................8

*Se. Alaska Conserv. Council v. U.S. Army Corps of Eng'rs*,
   486 F.3d 638 (9th Cir. 2007)..........................................................................................2, 17

*United States v. Dodson*,
   519 F. App'x 344 (6th Cir. 2013) .......................................................................................6

*United States v. Dotson*,
   712 F.3d 369 (7th Cir. 2013) ..............................................................................................4

*United States v. Gravel*,
   645 F.3d 549 (2d Cir. 2011)............................................................................................4, 5

*United States v. One TRW Model M14, 7.62 Caliber Rifle*,
   441 F.3d 416 (6th Cir. 2006)..........................................................................................5, 6

*United States v. Smith*,
   477 F.2d 399 (8th Cir. 1973) ..............................................................................................6

*United States v. Thomas*,
   2019 WL 4095569 (D.D.C. Aug. 29, 2019)........................................................................4

*United States v. TRW Rifle 7.62X51MM Caliber*,
   447 F.3d 686 (9th Cir. 2006)..............................................................................................6

*W. Watersheds Project v. Bernhardt*,
   392 F. Supp. 3d 1225 (D. Or. 2019) ................................................................................13

*Watkins v. United States*,
   846 A.2d 293 (D.C. Cir. 2004)..........................................................................................10

**Statutes**

5 U.S.C. § 706..................................................................................................................17, 18

iv

18 U.S.C. § 921 .................................................................................................... *passim*

26 U.S.C. § 5845 ...........................................................................................................7

## Regulations

27 C.F.R. § 478.12 ...........................................................................................12, 14, 15

87 Fed. Reg. 24,652 (Apr. 26, 2022) ...........................................................6, 12, 16

## Other Authorities

National Firearms Act, ATF.gov, https://www.atf.gov/rules-and-regulations/national-
firearms-act (last visited Dec. 26, 2023) .........................................................6

# I.  INTRODUCTION

The Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") has determined that certain partially complete AR-style receivers—the fundamental components of deadly AR-style rifles—are not firearms under the federal Gun Control Act ("GCA").  Because of that determination, firearm manufacturers can continue to make these receivers with no serial number and sell them in person or online without ever conducting a background check.  Buyers, in turn, can put together a "ghost" AR-style rifle within hours.  Unable to defend ATF's actions on their merits, Defendants urge this Court not to intervene in what Defendants mischaracterize as a "policy disagreement."  ECF No. 197 ("Defs.' Opp."), at 1.  But Plaintiffs do not challenge ATF's actions as bad policy.  Rather, as Plaintiffs explained in their opening brief, ATF's actions are unlawful for at least two reasons.

*First*, ATF's actions are contrary to law because partially complete AR-style receivers are "firearms" within the unambiguous meaning of the GCA.  Whether or not they are fully indexed or machined, or sold together with a jig, partially complete AR-style receivers are plainly "designed to" function as receivers and ultimately to "expel a projectile by the action of an explosive."  18 U.S.C. § 921(a)(3)(A).  Defendants' interpretation of this statutory language to exclude any item that requires even one small modification to perform the intended function is simply wrong, and it finds no support even in the few out-of-circuit cases they cite.  Partially complete AR-style receivers can also be "readily" completed—into either a functional receiver or an operable weapon, or both.  *Id.* § 921(a)(3)(B).  Defendants do not dispute that the statutory term "readily" incorporates factors like time and ease.  Nor do they cite anything in the Administrative Record or elsewhere supporting their bald assertion that partially complete AR-style receivers are "quite difficult" to complete or convert. In short, ATF's actions were contrary to law and must be set aside on that basis.

*Second*, ATF's actions with regard to these AR-style receivers were arbitrary and capricious. To the extent they even acknowledge the Challenged Classification Letters, Defendants all but concede that ATF did not analyze relevant factors (like time) when deciding whether a particular AR-style receiver product can be "readily" completed or converted into an operable weapon.  ATF also failed to articulate in the Administrative Record any rational explanation for its disparate treatment of materially indistinguishable partially complete AR-style receivers.  While Defendants refer repeatedly to ATF's

1

supposedly "extensive" analysis, Defendants' opposition brief is almost completely devoid of citations to the Administrative Record.  Instead, Defendants attempt to paper over the absence of any contemporaneous analysis in the Administrative Record with a post-hoc declaration.  But even if that declaration were to support ATF's actions with respect to partially complete AR-style receivers (it does not), it is a "settled proposition[]" that—to preserve public confidence in the administrative process and ensure the orderly functioning of judicial review—a court may not consider additional or other reasons an agency proffers after the fact in defense of the original decision.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).  The declaration thus "serve[s] only to underscore the absence of an adequate explanation in the [A]dministrative [R]ecord itself." *Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012) (quotation marks omitted).

Defendants' continued challenge to Plaintiffs' standing also lacks merit.  Defendants have submitted no evidence countering the declarations of Laura Cutilletta, Giffords Law Center's ("GLC's") Chief of Staff and Vice President for Programs, and Salvador Gonzalez, a Special Agent Supervisor for the California Department of Justice's Bureau of Firearms, and thus the facts alleged in those declarations are undisputed.  And while Defendants reprise their unsuccessful argument from the motion to dismiss stage that Plaintiffs' injuries are not connected to AR-style receivers, that contention is incorrect.  As both Ms. Cutilletta and Mr. Gonzalez have averred, ATF's actions excluding partially complete AR-style receivers from regulation create a dangerous loophole that Plaintiffs must expend time, money, and resources to address.

This Court should grant summary judgment in favor of Plaintiffs.  As detailed in Plaintiffs' Proposed Order, this Court should adopt the "normal remedy for [an] unlawful agency action" and set aside the particular portion of the Final Rule and specific agency actions determining that certain partially complete AR-style receivers are not firearms.  *Se. Alaska Conserv. Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007), *rev'd on other grounds sub nom. Coeur Alaska v. Se. Alaska Conserv. Council*, 557 U.S. 261 (2009).  Although Defendants have now twice briefed the issue of remedy, they have not identified any reason why this Court should depart from this Circuit's standard practice of vacating unlawful agency action.

## II.  ARGUMENT

**A.**     **Partially Complete AR-Style Receivers Are "Firearms" Within The Plain Meaning Of The GCA.**

Defendants do not dispute that the GCA requires ATF to classify a product as a firearm if that product is "designed to" or "may readily be converted" to expel a projectile.  *See* Defs.' Opp. 1, 6; *see also* 18 U.S.C. § 921(a)(3)(A).  Defendants also agree that the GCA requires ATF to classify a product as a firearm if it is a "receiver," which in turn depends on whether the product is either "designed to" or "may readily be converted" to function as a receiver.  *See* Defs.' Opp. 1, 5, 9; *see also* 18 U.S.C. § 921(a)(3)(B).  Defendants instead argue that certain partially complete AR-style receivers fall outside of these categories.  That argument is not supported by the GCA's plain text.

**1.  Partially Complete AR-Style Receivers Are "Designed To" Function As Receivers And To Expel Projectiles.**

As Plaintiffs explained in their opening brief, partially complete AR-style receivers—whether or not indexed or machined, and whether or not sold standalone—are designed specifically to function as receivers and ultimately as an operable AR-style gun.  *See* ECF No. 184 ("Pls.' MSJ"), at 17.  Defendants do not meaningfully dispute this point.  Nor do they suggest that partially complete AR-style receivers could ever "really be anything" else.  *Id.* (quoting ATF 000674); *see* Defs.' Opp. 6 (conceding that partially complete AR-style receivers are "designed for the purpose of being modified to the point that they could become part of an operable weapon").

Instead, Defendants argue that these products are not "designed to" expel projectiles within the meaning of the GCA because certain additional steps must be performed before they can expel projectiles.  *See* Defs.' Opp. 1, 6–8.  Defendants argue, in other words, that the phrase "designed to" excludes any item that cannot *already* perform the intended function—no matter what the original design purpose of the item is.  This argument finds no support in the statutory text.  It contravenes both ordinary understanding and well-established canons of construction.  "Designed to"—as Defendants concede—refers to what an item was "conceived of and designed" ultimately *to do*.  Defs.' Opp. 6.  No ordinary person would suggest, as Defendants argue, that a nearly complete airplane "wing . . . is not designed to fly," *id.* at 8; *see Perrin v. United States*, 444 U.S. 37, 42 (1979) (explaining that a

3

"fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning").  And of course, no ordinary person would suggest that a nearly complete airplane wing was not "designed" **to be a wing**.  *See* Defs.' Opp. 9 (arguing that partially complete AR-style receivers are not "receivers" under the GCA because they "are not designed to 'function as a . . . receiver'").

Defendants' arguments that "significant" or "complex" steps are needed to complete or convert a partially complete AR-style receiver are wholly unsupported by the Administrative Record.  Defs.' Opp. 1, 6, 9; *see infra* Section II.B.2.  Moreover, they incorrectly conflate the "designed to" prong of subsection (A) with the "readily converted" prong.  The relevant question for purposes of the "designed to" prong is not, as Defendants suggest, whether the item can "readily" be converted into a receiver or an operable weapon, but whether the item was manufactured *for the purpose of becoming* a receiver or an operable weapon.  *See S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) (noting the "well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words").[1]

Defendants' heavy reliance on *United States v. Gravel*, 645 F.3d 549 (2d Cir. 2011), is misplaced.  In *Gravel*, the parties agreed that the weapon at issue was originally "designed to" shoot automatically and therefore qualified as a "machinegun" under the National Firearms Act ("NFA").  The question presented in *Gravel* was whether the later disabling of the weapon such that it could no longer shoot automatically meant that the weapon no longer qualified as a "machinegun."  *Id.* at 550–51.  Finding that the weapon was still a machinegun, the Second Circuit held that the ordinary meaning of "designed to" must "consider what was contemplated at the time the [weapon] was being conceived and devised."  *Id.* at 552.  *Gravel* thus does not support Defendants' argument, *see* Defs.' Opp. 1, that

---

[1]     Defendants also suggest that the phrase "designed to" is limited *only* to "unserviceable" firearms or formerly functional weapons, *see* ECF No. 182 ("Defs.' MSJ") at 1, 10, but that categorical limitation appears nowhere in the text or legislative history of the GCA.  Although *United States v. Dotson*, 712 F.3d 369 (7th Cir. 2013), and *United States v. Thomas*, 2019 WL 4095569 (D.D.C. Aug. 29, 2019), addressed formerly functional weapons, neither case held or even implied that "designed to" is limited only to that category.  To the contrary.  In concluding that the revolver at issue was "designed" to expel a projectile, the *Thomas* court reasoned that "nothing in that definition [of 'designed'], nor ordinary usage of the word, suggests that the 'design' or 'plan' for a thing changes merely because that thing is inoperable."  2019 WL 4095569, at *4.

"designed to" excludes "items that cannot function as a firearm without additional machining operations."  Nor does it support Defendants' view, *see id.* at 10, that items "designed to perform a function" are distinct from items "designed to be converted into something that will perform a function."

Indeed, there is no real dispute that partially complete AR-style receivers were in fact "conceived of, and planned for use as," *Gravel*, 645 F.3d at 552, AR-style receivers—and ultimately as operable AR-style weapons.  Even where "the fire-control cavity has not been machined," a partially complete "AR-15-type lower receiver . . . ***could never really be anything but an AR-15-type lower receiver***."  ATF 000674 (emphasis added).  This Court should therefore hold that that these products are "firearms" under the "designed to" prong of 18 U.S.C. § 921(a)(3)(A) or under 18 U.S.C. § 921(a)(3)(B), and that ATF's actions concluding otherwise are contrary to law.

## 2. Partially Complete AR-Style Receivers May Be "Readily Converted" To Function As Receivers And To Expel Projectiles.

Plaintiffs and Defendants broadly agree that the statutory term "readily . . . converted" demands an analysis of how efficiently, quickly, and easily an item can be converted into a receiver or functional weapon.  *See* Defs.' Opp. 8 (noting that the parties "appear largely to agree" that "readily" refers to a process "that is fairly or reasonably efficient, quick, and easy but not necessarily the most efficient, speediest, or easiest").  But the record does not support Defendants' argument that—as a sweeping categorical matter—"the disputed receiver blanks may [not] be readily converted" under this definition. *Id.* at 8–9.

Defendants first suggest that ATF's conclusion that certain partially complete AR-style receivers are not "readily converted" to expel projectiles follows necessarily from the fact that a person must take certain steps to complete the receiver as part of an operable firearm.  *See* Defs.' Opp. 9 (arguing that a completed receiver must "still be aggregated with all other parts of the firearm").  But this argument ignores the reality that the particular steps required to take a product from a partially complete AR-style receiver to a functional AR-style weapon are relatively "easy" and "reasonably efficient." *United States v. One TRW Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 422 (6th Cir. 2006).

Even if Defendants were correct that "the disputed receiver blanks may [not] be readily converted" into **functional AR-style weapons** (and Defendants are not), those products are certainly readily convertible into **functional receivers**. *See* Pls.' MSJ 21.  Aside from a few conclusory assertions that the process is "quite difficult," *see* Defs.' Opp. 2, 10, Defendants do not seriously dispute that a person can complete these do-it-yourself products in a few hours using "ordinary tools." *United States v. TRW Rifle 7.62X51MM Caliber*, 447 F.3d 686, 692 (9th Cir. 2006).  In fact, Defendants' own declarant testified that he "completed [his] first AR-type receiver" in a few hours "using a [jig], a hand drill, and a drill press." *See* ECF No. 198 ("Hoffman Decl.") ¶ 38; *see id.* ¶ 27 (explaining that partially complete AR-style receivers "averaged 1.5 – 3 hours to complete" and that "once completed," they "functioned as an AR-type receiver").[2]  Courts have frequently deemed analogous processes—requiring only a few hours and basic tools—as satisfying the ordinary meaning of "readily." *One TRW Model M14, 7.62 Caliber Rifle*, 441 F.3d at 422–23 & n.11 (a remanufactured M–14 that "could be restored to fully-automatic-shooting capacity" in six hours was "readily" restorable); *United States v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973) (firearm could be "readily restored to shoot automatically," even though "[t]o do so would take about an 8-hour working day in a properly equipped machine shop"); *accord TRW Rifle 7.62X51MM Caliber*, 447 F.3d at 692 ("[T]wo hours. . . is . . . within a range that may properly be considered 'with fairly quick efficiency,' 'without needless loss of time,' or 'reasonably fast.'"); *United States v. Dodson*, 519 F. App'x 344, 353 (6th Cir. 2013) (gun that could be restored with "90 minutes of work, using widely available parts," met definition of "readily").[3]

---

[2]   Like Mr. Hoffman, first-time builders can also complete AR-style receivers in just a few hours. *See* Yurgealitis Decl. ¶ 27; *see also* Yurgealitis Ex. K.  And even if it took an inexperienced first-time builder a few hours more than Mr. Hoffman to complete an AR-style receiver, such a difference would be immaterial. *See, e.g.*, *United States v. Smith*, 477 F.2d 399 (8th Cir. 1973).

[3]   Defendants try to distinguish these cases—many of which ATF itself cited in the Final Rule—by arguing that they interpreted the term "readily" in the NFA. *See* Defs.' Opp. 14.  But Defendants fail to explain why that distinction matters.  "Related statutes should be 'construed as if they are one law.'" *California v. Trump*, 963 F.3d 926, 947 n.15 (9th Cir. 2020) (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)); *accord Diaz-Rodriguez v. Garland*, 55 F.4th 697, 717 (9th Cir. 2022).  And here, Defendants previously conceded that the NFA is related to the GCA. *See* Defs.' MSJ 4, 10–11; *see also* 87 Fed. Reg. at 24,741 (discussing the GCA and NFA together for purposes of defining "frame or receiver").  In fact, the GCA was enacted to amend and expand the NFA. *See generally* National Firearms Act, ATF.gov, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Dec. 26, 2023).  The Court should therefore construe

**B.** **ATF's Actions With Respect To Partially Complete AR-Style Receivers Are Arbitrary And Capricious.**

As Plaintiffs explained in their opening brief (Pls.' MSJ 22–30), ATF's actions with respect to partially complete AR-style receivers—Example 4 of the Final Rule, a YouTube video and PowerPoint deck, a Question and Answer webpage, a September 2022 Open Letter, and the 23 Challenged Classification Letters—are arbitrary and capricious.  By determining whether a given product is a firearm based on a single, arbitrary measurement of the fire control cavity, ATF ignored critical factors relevant to the classification of these products.  *See* Pls.' MSJ 10–11, 24–26; *see also, e.g.*, ATF Supp 000223–225 (finding that the submitted item was not a "firearm" because "[t]he forward edge of the takedown pin lug clearance area" did "not measure more than .800 inch").  What is more, ATF entirely failed to explain or justify this deeply flawed approach in the Administrative Record.  *See* Pls.' MSJ 28–30.  Instead, Defendants now submit a declaration that attempts to provide belated support for ATF's decisions.  But it is hornbook administrative law that an agency must justify its actions in the Administrative Record itself.  Defendants' declaration—and their near-exclusive reliance on it—only confirms ATF's failure to comply with the "basic" obligation to "give adequate reasons for its decisions." *Encino Motorcars LLC v. Navarro*, 579 U.S. 211, 221 (2016).

**1. The Post-Hoc Hoffman Declaration Should Be Stricken In Part, And In Any Event, Only Confirms ATF's Actions Are Arbitrary And Capricious.**

Defendants submitted with their opposition brief a declaration from Daniel Hoffman, the Chief of the Firearms Technology Industry Services Branch and a Firearms Enforcement Officer at ATF.  Under the guise of "rebutting" testimony from Plaintiffs' declarant Jim Yurgealitis, Mr. Hoffman purports to justify ATF's disparate treatment of materially indistinguishable AR-type receivers with explanations that are not contained in the Administrative Record.  To the extent it belatedly supplements the Administrative Record, the Hoffman Declaration should be stricken.  *See, e.g.*,

the word "readily"—present in both statutes, *see* 26 U.S.C. § 5845—the same way in both statutes. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) (looking to how a term is used in "analogous statutes").

7

Hoffman Decl. ¶ 28 (discussing the "standard procedure" and "[f]orm" that ATF purportedly uses to evaluate whether submitted items meet the Final Rule's definition of "readily").[4]

It is a "settled proposition[]" of administrative law that "in reviewing agency action, a court is ordinarily limited to evaluating the agency's *contemporaneous explanation* in light of the existing administrative record." *Dep't of Commerce*, 139 S. Ct. at 2573 (emphasis added). This requirement "is meant to ensure that agencies offer genuine justifications for important decisions . . . that can be scrutinized by courts and the interested public." *Id.* at 2575–76. Under this established regime, a court generally may not consider reasons proffered after the fact in defense of an agency's decision. *Id.*; *see also, e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971); *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 690 (N.D. Cal. 2020) (rejecting defendants' explanation of IRS action because the explanation "was not publicly advanced by the agency at the time it reached its determination and therefore constitutes an impermissible post hoc rationalization"); *King Cty. v. Azar*, 320 F. Supp. 3d 1167, 1177 (W.D. Wash. 2018) ("As Defendants well know, the Court cannot consider *post hoc* justifications or materials outside the administrative record."). Accordingly, courts in the Ninth Circuit routinely refuse to consider post-hoc declarations purporting to explain agency action because those declarations constitute "improper[] attempts to correct omissions in the record after the fact." *Nat. Res. Def. Council, Inc. v. Evans*, 2003 WL 22025005, at *2 (N.D. Cal. Aug. 26, 2003); *see also, e.g.*, *Nat'l Urb. League v. Ross*, 489 F. Supp. 3d 939, 981 (N.D. Cal. 2020) (finding that agency's employee declarations were "merely post hoc rationalizations which have traditionally been found to be an inadequate basis for review" (cleaned up)); *Schroeder v. United States*, 683 F. Supp. 2d 1129, 1142 (D. Or. 2010) (refusing to consider agency employee declaration that "[a]t best . . . offer[ed] post-hoc reasons *which th[e] court may not consider*" (emphasis added)).

The Hoffman Declaration offers exactly the kind of post-hoc justification that courts regularly refuse to consider. Mr. Hoffman tries to supplement the Administrative Record by: (a) noting that

---

[4]   Plaintiffs do not object to certain paragraphs in the Hoffman Declaration that, like Mr. Yurgealitis's declaration, can assist the Court in understanding technical terms. *See* Hoffman Decl. ¶¶ 10–22; *see also Ctr. for Bio. Diversity v. Salazar*, 2010 WL 11575282, at *2 (N.D. Cal. 2010) (courts may consider extra-record evidence where it "is necessary to explain technical terms or complex subject matter involved in the agency action").

ATF "attempted to complete numerous partially complete AR-type receivers with a fixture/jig" before issuing its September 2022 Open Letter, Hoffman Decl. ¶ 27; (b) detailing a purported "standard procedure," including a "[f]orm" that ATF supposedly uses when classifying products, *id.* ¶ 28; and (c) insisting that ATF did analyze features other than the fire control cavity when determining whether a partially complete AR-style receiver can "readily" be completed or converted, *id.* ¶¶ 29–32. None of these statements appear anywhere in the Administrative Record. Defendants' nearly exclusive reliance on Mr. Hoffman's declaration to justify ATF's actions, *see* Defs.' Opp. 12–17, 24, is thus an implicit concession that the Administrative Record does not contain an "adequate explanation" or analysis as to these challenged products. *Ctr. for Bio. Diversity*, 698 F.3d at 1124; *Encino Motorcars LLC*, 579 U.S. at 221 ("an agency must give adequate reasons for its decisions" and "articulate a satisfactory explanation for its action[s]"); *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1050–51 (9th Cir. 2010) (an agency has a "duty to explain cogently the bases of its decisions").

While the Court need not consider the Yurgealitis Declaration to conclude that the Administrative Record fails to support ATF's actions regarding partially complete AR-style receivers, the Court may largely strike the Hoffman Declaration and still consider the Yurgealitis Declaration. *See Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 343–47 (E.D. Cal. 2007) (granting plaintiffs' motion to strike declaration submitted by defendant agency, except for paragraphs "drawn directly from the [administrative record] itself," and reaffirming earlier decision to admit extra-record evidence submitted by plaintiffs). The Hoffman Declaration seeks improperly to supplement the Administrative Record with analysis ATF supposedly undertook that appears nowhere in the record. *See* Hoffman Decl. ¶¶ 27–32. By contrast, the Yurgealitis Declaration assists the Court in "determin[ing] whether the agency has considered all relevant factors or explained its course of conduct or grounds of decision." *Ctr. for Bio. Diversity*, 2010 WL 11575282, at *2; *see* Yurgealitis Decl. ¶¶ 1–2, 29–40. Because "[i]t will often be impossible . . . for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not," *Asbestos Disease Awareness Org. v. Wheeler*, 508 F. Supp. 3d 707, 733 (N.D. Cal. 2020) (Chen, J.) (cleaned up), courts in this Circuit consider extra-record declarations for this purpose. *See, e.g., Idaho Conserv. League v. Mumma*, 956 F.2d 1508, 1520 n.22

9

(9th Cir. 1992) (relying on expert declaration to determine whether agency's process omitted consideration of relevant factors); *Bair v. Cal. State Dep't of Transp.*, 867 F. Supp. 2d 1058, 1067 (N.D. Cal. 2012) (similar).  Defendants do not identify any portion of the Administrative Record that addresses the issues that Mr. Yurgealitis asserts ATF should have considered but did not.  The Court may therefore consider Mr. Yurgealitis's declaration as it determines whether ATF excluded or failed to consider factors relevant to its classification decisions.  *See Ctr. for Food Safety v. Perdue*, 2022 WL 4793438, at *8 (N.D. Cal. Sept. 30, 2022) (considering extra-record data that "[the agency] did not analyze . . . in the Final Rule" for the purposes of determining whether the agency had considered all relevant factors).[5]

## 2. ATF's Actions Are Not The Result Of Reasoned Decision-Making.

ATF's actions with respect to partially complete AR-style receivers are not the result of "reasoned decisionmaking" for at least three reasons.  *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023).  *First*, they ignore the GCA's clear dictate that products "designed to" be or that may "readily be converted" into fireable weapons must be classified as firearms.  *Second*, ATF's so-called "standard process" for determining whether a given product "may readily be converted" necessarily excludes consideration of relevant factors.  *Third*, ATF's treatment of jigs and similar tools ignores important "aspect[s] of the [ghost gun] problem," *Nat. Res. Def. Council v. E.P.A.*, 526 F.3d 591, 602 (9th Cir. 2008), *i.e.*, that even if jigs and tools are not sold literally *with* a given partially complete receiver, those tools are readily available to and easily obtained by the average consumer.

---

[5]  Contrary to Defendants' contentions, *see* Defs.' Opp. 11–12, Plaintiffs have not waived their argument that this Court may consider Mr. Yurgealitis' declaration.  Defendants have long been on notice not only that Plaintiffs planned to submit a declaration with their opening summary judgment brief, but also of the precise bases on which Plaintiffs argued in their brief that this declaration is admissible extra-record evidence.  *See* ECF Nos. 151–55.  Defendants even reserved the right to seek to depose Mr. Yurgealitis (yet declined to do so).  Defendants had a full opportunity to respond to Plaintiffs' arguments that Mr. Yurgealitis's declaration is admissible to assist the Court in understanding technical terms and evaluating relevant factors that ATF failed to consider.  *See* Defs.' Opp. 10–15; *see also Watkins v. United States*, 846 A.2d 293, 296 (D.C. Cir. 2004) (finding "no waiver" where party raised argument in a footnote in sufficient detail that "upon receipt of the brief, the government had been apprised of the essence of the [] claim").

1        a.    **ATF Ignored The GCA's Clear Statutory Commands.**

2        As Plaintiffs explained in their opening brief, Pls.' MSJ 23–26, ATF's failure to implement the

3   GCA's statutory requirements through the regulation of partially complete AR-style receivers is

4   arbitrary and capricious.   It is hornbook law that agency action is "arbitrary and capricious if the

5   agency . . . entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*

6   *v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  To determine whether an agency considered

7   all the "relevant factors" and "important aspect[s] of the problem," courts look to the language of the

8   relevant statutes.  *Michigan v. EPA*, 135 S. Ct. 2699, 2706–08 (2015) (holding that cost was a relevant

9   factor that agency unreasonably failed to consider after the Supreme Court interpreted statutory phrase

10  "appropriate and necessary"); *Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101,

11  1122 (9th Cir. 2012) (holding that "groundwater withdrawals were a relevant factor" that agency failed

12  to consider after court looked to the Endangered Species Act).  Here, ATF's actions both disregarded

13  and misinterpreted "designed to" and "readily" in the GCA.

14       *1.  Designed To*.  ATF admittedly "did not consider" whether specific AR-style receiver

15  products were "designed to" become a functional receiver and/or expel a projectile, as the GCA

16  requires.  Defs.' Opp. 16.  Defendants argue, without citation, that a "designed to" analysis was

17  "irrelevant."  *Id.*  But even if ATF disagrees with the plain meaning of "designed to," *see supra*

18  Section II.A.1, it must still make classification decisions based on the "factors which Congress []

19  intended it to consider."  *Nat. Res. Def. Council*, 526 F.3d at 602.  Here, that includes what a particular

20  product is "designed to" do.  *See* 18 U.S.C. § 921(a)(3)(A).

21       *2.  Readily Convertible*.  Defendants' assertion that ATF necessarily considered whether a given

22  product may "readily be converted" because it "adopted a standard [classification] process" likewise

23  does not pass muster.  Defs.' Opp. 16.  Defendants' proffered "standard process" assesses whether

24  "critical [interior] areas" are "indexed, machined, or formed."  *Id.* at 18.  But the Administrative Record

25  provides no analysis supporting Defendants' argument that this "standard process" satisfies the GCA's

26  requirement that any "readily" convertible product be classified as a firearm.  *See* Pls.' MSJ 24–26.

27  Defendants' reliance on their "standard process" also contradicts their concession that "readily" refers

28  to a process "that is fairly or reasonably efficient, quick, and easy."  Defs.' Opp. 8.  ATF's rigid

machining test is unmoored from the governing statute, which demands that ATF actually consider how long it would take to complete a particular AR-style receiver.

### b. ATF Failed To Examine The Relevant Data, Including Factors The Agency Itself Identified As Relevant.

As Plaintiffs explained in their opening brief, Pls.' MSJ 26–28, ATF failed to consider the data relevant to determining whether a partially complete AR-type receiver is a firearm.  In response, Defendants yet again invoke ATF's "standard process"—one in which ATF classifies an AR-style receiver based solely on whether "critical [interior] areas" are "indexed, machined, or formed."  Defs.' Opp. 18.  In relying upon that purported process, ATF effectively concedes that it failed to consider the eight factors ATF itself has deemed relevant to assessing how "readily" an AR-type receiver may be completed or converted into a fireable weapon.  ATF's process therefore does not reflect "reasoned decisionmaking."  *Motor Vehicle Mfrs*., 463 U.S. at 30–31 (agency actions must be "the product of reasoned decisionmaking," and agencies "must examine the relevant data and articulate a satisfactory explanation for its action").  Nor was ATF's "standard process" clearly explained.  *Humane Soc. of U.S.*, 626 F.3d at 1050–51 (an agency has a "duty to explain cogently the bases of its decisions").

As Defendants acknowledge, whether a product may "readily be converted" to expel a projectile refers to the speed and ease of the conversion process.  *See* Defs.' Opp. 8.  To conduct such an analysis, ATF has stated that it must apply "eight factors relevant to the determination in the context of classification of firearms: (1) time, (2) ease, (3) expertise, (4) equipment, (5) parts availability, (6) expense, (7) scope, and (8) feasibility."  *Id.* (citing 87 Fed. Reg. 24,652, 24,735 (Apr. 26, 2022)).  But ATF ignores those factors in its analysis of the challenged partially complete AR-style receivers.  Instead, the agency has adopted a rigid, binary test:  If certain "critical [interior] areas" are "indexed, machined, or formed," Defs.' Opp. 18, AR-style unfinished receivers are firearms, 27 C.F.R. § 478.12(c).  ATF implements that binary test with arbitrary measurements pertaining to the fire control cavity.  ATF determined, for example, that one partially complete AR-type receiver was a firearm because "[t]he forward edge of the takedown pin lug clearance area . . . measure[d] more than .800 inch"; it determined that another partially complete AR-style receiver was not a firearm because "[t]he

1    forward edge of the takedown pin lug clearance area . . . does not measure more than .800 inch."

2    *Compare* ATF Supp 000236, *with* ATF Supp 000241.

3        Defendants even admit that ATF only "***tacitly*** consider[ed] the eight factors that the Rule

4    enumerates as relevant" in each of the Challenged Classification Letters.  Defs.' Opp. 23 (emphasis

5    added).  According to Defendants, ATF's "tacit" analysis was appropriate because ATF "adopted a

6    standard process that utilizes the eight factors"—*i.e.*, a rigid, binary machining test.  *See id.* at 16.  That

7    is wrong.

8        Defendants cite nothing in the Administrative Record that delineates ATF's "standard process"

9    or how that process "utilized" the eight factors.  Instead, Defendants rely solely on the Hoffman

10   Declaration, improperly attempting to supplement the Administrative Record with post-hoc testimony.

11   *See supra* Section II.B.1; *see also W. Watersheds Project v. Bernhardt*, 392 F. Supp. 3d 1225, 1248

12   (D. Or. 2019) ("Defendants' arguments that [agency] findings were made or were made 'implicitly'

13   are improper *post hoc* rationalizations.").[6]  Regardless, the actual "analysis" ATF applied in the

14   Challenged Classification Letters consists solely of determining whether the "front of the takedown

15   pin lug clearance area" contains "drilling or milling" in a length greater than .800 inches.  *See, e.g*,

16   ATF Supp 000221–23.  But the Administrative Record does not support that analysis, either—let alone

17   articulate how it can substitute for the eight factors identified in the Final Rule.

18       The sole portion of the Administrative Record on which Defendants rely—ATF's September

19   2022 Open Letter, Defs.' Opp. 17 (citing ATF Supp 000199–205)—merely stated ATF's *conclusion*

20   that partially complete AR-style receivers are not "readily" completed where they are sold standalone

21   and lack "indexing or machining" in the fire control cavity.  Yet it did not state the *basis* for that

22   conclusion.  *See* ATF Supp 000201.  As to why ATF focused on the "fire control cavity" (and the

23   related "takedown-pin lug clearance area" measurement), all the September 2022 Open Letter states is

---

24   [6]  Defendants' out-of-circuit cases do not suggest that the Court should consider Defendants' post-
25       hoc explanations.  In *Caritas Medical Center v. Johnson*, 603 F. Supp. 2d 81, 92 (D.D.C. 2009),
         for example, the court made clear that it was considering arguments that "expand[ed] on the points
26       raised in the text of the final rule," rather than those that supplanted the text.  *Id.* at 92.  Similarly,
         in *America's Community Bankers v. FDIC*, 200 F.3d 822 (D.C. Cir. 2000), the court accepted the
27       defendant's arguments because—rather than providing an entirely new rationale—they "continued
         to support" those the agency affirmatively made in the administrative record itself.  *Id.* at 836.
28

that "[r]emoving or indexing any material" in the fire control cavity is "a crucial step in producing a functional receiver." *Id*. The Open Letter fails to explain why such actions are "crucial" or why their absence necessarily indicates that a given product is *not* readily convertible. Indeed, loading ammunition into a firearm is a "crucial step in producing" a fireable weapon, yet that "crucial step" is easy. It takes seconds. And like the September 2022 Open Letter, none of the Challenged Classification Letters contain any application of ATF's eight factors or explanation why the "fire control cavity" measurement is sufficient to assess whether a product is "readily convertible."

Defendants' post-hoc explanations confirm ATF's failure to comply with the APA. *Dep't of Commerce*, 139 S. Ct. at 2573; *Scholl*, 494 F. Supp. 3d at 690. Defendants assert for the first time and without any citation to the record that "drilling or milling an area greater in size than 0.800 inches would . . . allow[] a person to use that milled-out area to ***more quickly and easily*** drill out the fire control cavity to house the trigger mechanism and hammer." Defs.' Opp. 18 (emphasis added); *compare* ATF Supp 000201 (stating that drilling the fire control cavity is a "crucial step" but failing to explain the 0.800 threshold or how it contributes to a quicker and easier build). This Court "may not accept" Defendants' "post hoc rationalizations," *Motor Vehicle Mfrs*., 463 U.S. at 50, which "serve only to underscore the absence of an adequate explanation in the administrative record itself," *Humane Soc. of U.S.*, 626 F.3d at 1050.[7]

### c. ATF Failed To Articulate A Satisfactory Explanation For Its Treatment Of Jigs, Templates, Equipment, Or Tools.

Finally, ATF's distinction between unfinished AR-style receivers "sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools," 27 C.F.R. § 478.12(c), and those sold, distributed, or possessed *without* those items is arbitrary and capricious. Defendants admit that "the presence or absence of jigs [is] . . . important" and "significantly affects" most of the factors ATF

---

[7] Defendants ignore the district court's decision in *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14 (D.D.C. 2014). There, the court held that an ATF classification letter analyzing whether a device qualified as a "firearm silencer" was "deeply flawed"—and therefore arbitrary—because ATF's analysis focused "solely on the physical characteristics of the device." *Id*. at 25. Defendants do not even try to distinguish ATF's methodology with respect to AR-style receivers—because they cannot do so. *See* Pls.' MSJ 24–28.

considers relevant to whether a product is "readily" completed or converted. Defs.' Opp. 14. ATF

knows that "equipment such as jigs" is "significant[]" because jigs "reduc[e] the time to complete"

unfinished receivers, "reduc[e] the required expertise," "reduc[e] the required expense," and

"increase[e] the feasibility of completion." *Id.*; *see also* Yurgealitis Decl. ¶¶ 27–28, 36. And ATF

admits that these products are "available . . . elsewhere in the marketplace." Defs.' Opp. 18. Yet

despite the wide accessibility of those "significant[]" tools, ATF considers how they affect the ease

with which a product can be converted into a firearm *only* if they are "sold, distributed, or possessed

with" an unfinished receiver.[8] 27 C.F.R. § 478.12(c). This approach ignores critical and obvious

information that should materially impact the analysis, rendering ATF's actions arbitrary and

capricious. *See, e.g.*, *Ctr. for Bio. Diversity*, 698 F.3d at 1122 (agency action was arbitrary and

capricious where evidence indicated that "groundwater withdrawals" may impact the agency's

biological opinion but were not considered); *Bidi Vapor LLC v. U.S. Food & Drug Admin.*, 47 F.4th

1191, 1203 (11th Cir. 2022) (agency action was arbitrary and capricious where agency ignored aspects

of tobacco companies' submissions before denying the tobacco companies' request).

ATF utterly fails to justify its refusal to consider the ready availability of jigs on the

marketplace. Defendants do not explain how the availability of jigs from different sellers, or even from

the same seller in a different transaction, would make a given partially complete AR-type receiver any

less "readily convertible" than one sold with that very same jig in a kit. Although Defendants suggest

that "the additional time and expense required to obtain additional equipment also affects whether an

item may be readily converted into a functional frame or receiver," Defs.' Opp. 19, Defendants fail to

identify that conclusion or any support for it in the Administrative Record. Nor would such a

conclusion make sense: At most, the procurement of a jig would reflect a modest start-up cost. *See*

Yurgealitis Decl. ¶¶ 24, 39(d) (noting jigs to complete certain unfinished receivers can be purchased

---

[8]  As *Amicus* Everytown for Gun Safety noted, at least two manufacturers of unfinished AR-style
receivers that ATF deemed "not firearms" in the Challenged Classification Letters (*see* ATF Supp
000408–412; 000438–457; 000468–472; 000502–506) sell *both* AR-style unfinished receivers
and compatible kits with tools and parts on the very same website and even in the same transaction.
*Compare* Crain Exs. 21, 21-A, 21-B, 21-C, 21-D, 22, 22-A, 22-B, 22-C, 22-D, *with* Everytown
Amicus Br., App'x A.

for as little as $29.99); ECF No. 193-1 ("Everytown Amicus Br."), at 9 (explaining that "AR-15 lower receivers can be purchased for as little as $50" and that "single-use jigs are available for as low as $60").   Once procured, jigs can easily create ready-made pipelines of AR-style rifles sold without background checks or serial numbers.   *See* Yurgealitis Decl. ¶ 40 (explaining that "[j]igs can help facilitate drilling and machining and—once bought—can be used over and over again to convert AR-15 variant 'incomplete' receivers into functional receivers with ease").   Purchasers who can access jigs online, in a hardware store down the block, or in their own homes can still "readily" convert their weapons.   *See id.*; Hoffman Decl. ¶ 27 (builds completed by ATF "with a fixture/jig . . . averaged 1.5-3 hours to complete").

Defendants justify the gaps in their analysis by arguing that they simply had to exclude certain products in order to limit compliance and enforcement costs.   Defs.' Opp. 19.   But these costs don't impact whether a weapon "is designed to or may readily be converted to expel a projectile."   18 U.S.C. § 921(a)(3).   Nor do Defendants explain why the failure to consider the availability of jigs on the broader market would result in greater compliance and enforcement costs—indeed, providing clarity to the market could actually result in *fewer* administrative costs by more clearly articulating the types of products that fall under the definition of "firearm" under the GCA.   Similarly, Defendants' purported consideration of criminal law does not help them.   *See* Defs.' Opp. 21–22.   Criminal prohibitions on "manufacturing[] or dealing in firearms without a license" do not bear on the statutory text or the analysis of a given product, what it was "designed" to do, and how "readily" it can be converted into a deadly weapon.   87 Fed. Reg. at 24,713 (discussing "[f]ederal felony violations that can apply to circumstances involving the final rule's requirements").

Defendants ask the Court to defer to ATF's "line drawing," irrespective of how ATF decided to draw the purported lines or whether they conform to the statutory text.   That's not how the APA works.[9]   As Defendants' own cases confirm, an agency's line drawing must be "consistent with [an

---

[9]   Defendants contend in a footnote that "this Court need not decide" whether to apply *Chevron* deference because ATF's challenged decisions "reflect[] the best statutory interpretation."   Defs.' Opp. 20 n11.   As detailed above and in Plaintiffs' opening brief, ATF's "statutory interpretation" is contrary to the plain meaning and intent of the GCA.   Nor do ATF's actions regarding AR-type receivers reflect the "thoroughness" the agency displayed in *Hernandez v. Garland*, 38 F.4th 785,

16

agency's] statutory obligation," and the agency must "demonstrate[] that line's relationship to the underlying regulatory problem." *Cassell v. F.C.C.*, 154 F.3d 478, 485 (D.C. Cir. 1998); *see California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1103–04 (9th Cir. 2020) (finding defendant's explanation for a distinction between medical providers with different levels of education—that more education makes providers more qualified to provide certain services—not "so implausible"). Because ATF disregarded the availability of jigs and other common household tools, its actions are arbitrary and capricious. *See Cassell*, 154 F.3d at 485.

**C.     This Court Can And Should Declare Unlawful ATF's Actions, Vacate Them In Relevant Part, And Remand To ATF.**

In their opening brief, and in their Proposed Order, Plaintiffs requested a narrow remedy tailored to specific ATF actions. Should this Court agree that ATF's actions with respect to partially complete AR-style receivers were unlawful—either because they were contrary to law or because they were arbitrary and capricious—Plaintiffs respectfully request that this Court: (1) declare one subsection of the Final Rule (Example 4) and related agency actions to be unlawful and enjoin Defendants from enforcing them; (2) vacate one subsection of the Final Rule (Example 4) and related agency actions; and (3) remand to ATF for further proceedings consistent with the Court's opinion.[10]

Defendants concede, as they must, that declaratory and injunctive relief are appropriate remedies should the Court find an APA violation. Defendants appear to take issue only with Plaintiffs' additional request that the Court vacate a portion of the Final Rule and other agency actions that rely on that portion of the Final Rule. *See* Defs.' Opp. 24–27. But the APA explicitly provides that a "reviewing court shall . . . hold unlawful ***and set aside*** agency action, findings, and conclusions found to be" "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added). An unbroken line of Ninth Circuit precedent stands for the proposition that "the normal remedy for an unlawful agency action is to . . . vacate the agency's action." *Se. Alaska Conserv.*

---

791–92 (9th Cir. 2022), because ATF's analysis was not "extensive," nor was "its reasoning. . . persuasive [or] consistent." *Id.* at 792.

[10]   Plaintiffs' Proposed Order specifically identifies each of the discrete agency actions for which Plaintiffs seek relief. *See* ECF No. 184-1.

*Council*, 486 F.3d at 654 (internal quotation marks omitted); *see Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011) (cited at Defs.' Opp. 24).   In fact, "[i]n the Ninth Circuit," vacatur is not only a permissible remedy but "the ***presumptive*** remedy for [unlawful] agency action." *Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgmt.*, 2023 WL 3796675, at *3 (D. Idaho June 2, 2023) (emphasis added) (citing *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022)); *see also, e.g.*, *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, 584 F. Supp. 3d 812, 833–34 (N.D. Cal. 2022) (vacating final rule after concluding that rule was arbitrary and capricious); *Montana Wildlife Fed'n v. Bernhardt*, 2022 WL 742477, at *4–5 (D. Mont. Mar. 11, 2022) (vacating BLM leasing decisions that were contrary to law); *Ksanka Kupaqa Xa'lcin v. U.S. Fish & Wildlife Serv.*, 534 F. Supp. 3d 1261, 1273–74 (D. Mont. 2021) (vacating agency opinion that failed to consider the effects of agency action on listed species); *California v. Bernhardt*, 472 F. Supp. 3d 573, 630–32 (N.D. Cal. 2020) (vacating agency rescission of earlier rule that restricted venting and flaring of methane from oil and gas operations on public lands).[11]   Nor does vacatur violate any "equitable principles." Defs.' Opp. 27.   While Defendants profess concern that vacatur could "conflict with the decision of other courts" considering challenges to the Final Rule, *id.*, Plaintiffs ask for relief that is narrowly tailored to one part of the Final Rule and the precise agency actions that have injured Plaintiffs, *see Texas v. Becerra*, 2023 WL 2754350, at *30 (N.D. Tex. Mar. 31, 2023) (defendants' argument that "setting aside [a] Rule will affect other court decisions made or currently pending" was "more relevant to the question of the scope of" vacatur than to the propriety of vacatur).

Remand without vacatur also would make little sense here.   *Contra* Defs.' Opp. 27–28.   It "is the exception rather than the rule" in this Circuit, *Defs. of Wildlife*, 584 F. Supp. 3d at 833, and is reserved only for those "***limited circumstances***" in which equity demands it, *Pollinator Stewardship*

---

[11]   Aside from ignoring a mountain of contrary authority, Defendants' arguments are without merit. Defs.' Opp. 25.   Defendants claim, for example, that section 706(2) must not provide for vacatur because it would make "little sense" for a court to vacate an agency's "findings" and "conclusions." Yet courts routinely do just that.   *See, e.g.*, *Fogo De Chao (Holdings), Inc. v. DHS*, 211 F. Supp. 3d 31, 41–42 (D.D.C. 2016) (finding); *Aragon v. Tillerson*, 240 F. Supp. 3d 99, 120 (D.D.C. 2017) (conclusion).   Defendants' interpretation would also make section 706(2)'s "hold unlawful" command superfluous.   Congress would not have required courts to both "hold unlawful and set aside" rules if a court could "set aside" a rule by merely deeming it unlawful.   5 U.S.C. § 706(2).

*Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citation omitted; emphasis added).  To determine whether equity demands remand without vacatur, Ninth Circuit courts "weigh the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed." *Migrant Clinicians Network v. U.S. EPA*, 88 F.4th 830 (9th Cir. 2023) (internal quotation marks omitted).  And "[b]ecause vacatur is the presumed remedy, the burden is on the agency to establish [that] equity demands" remand without vacatur.  *See Ctr. for Bio. Diversity*, 2023 WL 3796675, at *3; *see also W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1083 (D. Idaho 2020) ("The burden is on [the agency] to show that compelling equities demand anything less than vacatur.").

Although they devoted multiple pages in two separate briefs to the question of remedy,[12] Defendants have not carried their burden of justifying remand without vacatur.  Nor could they. Vacating Example 4 in the Final Rule and discrete agency actions relying on Example 4 would not "cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error." *Klamath-Siskiyou Wildlands Ctr. v. NOAA*, 109 F. Supp. 3d 1238, 1241–43 (N.D. Cal. 2015) (citation omitted).  To the contrary, leaving these actions in place would cause serious and irremediable harms by allowing the continued sale of partially complete AR-style receivers without serialization or a background check.  Nor are ATF's fundamental errors, *see supra* Sections II.A–B, "minor" enough to justify remand without vacatur, *California*, 472 F. Supp. 3d at 630, and Defendants' cases do not support that approach here, *see Calcutt v. FDIC*, 598 U.S. 623, 629–30 (2023) (deciding only whether to remand with specific instructions); *Sierra Club v. EPA*, 346 F.3d 955, 963 (9th Cir. 2003) (vacating and remanding arbitrary and capricious agency action; deciding only whether to remand with specific instructions).  In short, there is "no reason" for this Court "to depart from the standard remedy of vacatur." *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1251 (D. Or. 2019).

---

[12]   The Court should reject Defendants' request to brief the question even further.  *See* Defs.' Opp. 24. Defendants have "not offer[ed] a reason why they could not have briefed the issue[s] in the first place, or otherwise why further briefing is necessary." *Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1228 n.15 (D. Mont. Aug. 5, 2010) (vacating agency rule despite defendants' request to "further brief" remedy).

**D.      Plaintiffs' Undisputed Evidence Confirms They Have Standing.**

Defendants have not submitted any evidence contradicting the multiple declarations and exhibits Plaintiffs submitted in support of their standing, *see* ECF No. 187 ("Cutilletta Decl."); ECF No. 188 ("Gonzalez Decl.")—and thus the facts contained in those declarations are uncontested. Instead, Defendants recycle the same legal arguments they advanced—and this Court rejected—at the motion to dismiss stage.  *See* Defs.' Opp. 2–5.  These arguments are no more persuasive now.  *See Yaak Valley Forest Council v. Vilsack*, 563 F. Supp. 3d 1105, 1114 (D. Mont. 2021), *appeal dismissed*, 2022 WL 571529 (9th Cir. Jan. 26, 2022).

Defendants assert that Plaintiffs have not shown that their injuries "result from the specific agency actions that they challenge here."  Defs.' Opp. 3; *see* ECF No. 125 (Defs.' Mot. to Dismiss Am. Compl.), at 1 (arguing that "Plaintiffs lack standing to challenge the Rule because they do not allege that they will suffer harm caused by the narrow class of products for which they disagree with ATF"). But this Court already rejected that argument, holding that Plaintiffs' allegations—allegations that Plaintiffs have now proven through sworn declarations and documentation, *see* Pls.' MSJ 33–40—were legally sufficient to establish standing.  With respect to Plaintiff California, this Court found the requisite "risk" that California would be harmed by ATF's actions because (i) "it is predictable that 80 percent receivers/frames will be sold standalone"; and (ii) "it is predictable that at least some [of those products] will be used in crimes," especially because "[t]he entire point of buying" them "is to avoid regulation."  *See* ECF No. 135, at 10–11.  The Court additionally concluded that California had alleged standing based on "its enactment and implementation of state legislation on ghost guns made necessary by the federal government's failure to fully implement the GCA."  *Id.* at 13–18.  And with respect to Plaintiff GLC, this Court found that GLC had standing because ATF's actions frustrate its core mission and "forced the organization to divert its resources to focus on ghost guns."  *Id.* at 19, 23.[13]

Having failed to grapple with this Court's legal analysis, Defendants instead suggest that

---

[13]   Although Defendants largely conflate Plaintiffs in the standing analysis, Defendants do not dispute that this Court has jurisdiction should it find that even one Plaintiff has standing.  *See* ECF No. 135, at 7 ("[i]n a multi-plaintiff suit, only one plaintiff need have standing in order for the case to proceed").

1    Plaintiffs' request to take limited third-party discovery, *see* ECF No. 151, was a silent concession that

2    Plaintiffs could not establish standing without such discovery, *see* Defs.' Opp. 3–4.  Not so.  Plaintiffs

3    have never suggested that they *needed* third-party discovery to prove their standing.  Nor have Plaintiffs

4    ever conceded that they could not establish standing without establishing the exact size of the loophole

5    that ATF created in allowing untraceable ghost gun products to be sold without background checks.

6    Critically, Defendants do not dispute that ATF created a loophole when it determined that certain

7    partially complete AR-style receivers are not firearms—or that the loophole involves a particularly

8    deadly and dangerous weapon.  Pls.' MSJ 3; Everytown Amicus Br. 2–6; *see also* ECF No. 135, at 11

9    (crediting California's contention that "the loophole/exception is substantial; to wit, there is an easy

10   way to avoid regulation by making a purchase of an 80 percent receiver/frame standalone").  Even if

11   ATF were to regulate all ghost gun products *other than* partially complete AR-style receivers, the

12   "predictable effect of [ATF's] action[s]" is increased demand for and use of those partially complete

13   AR-style receivers, which will continue to injure California and GLC for the reasons Plaintiffs have

14   identified.  *See Dep't of Commerce,* 139 S. Ct. at 2566.

15          Defendants also mistakenly suggest that no evidence in the record "connect[s]" Plaintiffs'

16   injuries and ATF's actions with respect to partially complete AR-style receivers.  Defs.' Opp. 3.  Ghost

17   gun sellers are already relying on the Final Rule's loophole to market and sell partially complete AR-

18   style receivers—specifically to customers who might wish to avoid federal background check and

19   serialization laws.  *See* Cutilletta Decl. ¶ 8 & Ex. A ("we can ship them right to your front door with

20   no FFL required"); *see also* Pls.' MSJ 5–7; Everytown Amicus Br. 6–11 (discussing widespread

21   availability of AR-style receivers after Final Rule has taken effect).  California has submitted evidence

22   that, of the total number of ghost guns recovered statewide since 2018, approximately 15-20% of those

23   ghost guns were made with AR-style receivers.  *See* Gonzalez Decl. ¶ 14.  In addition to the time and

24   money California must expend to locate and confiscate such unserialized AR-style receivers, California

25   also must (i) record each such AR-style receiver in the statewide Automated Firearm System (AFS)

26   and (ii) assign each recovered AR-style receiver a serial number.  *See id*. ¶¶ 12–14.  Of the millions of

27   dollars California has allocated statewide to address the ongoing and worsening ghost gun epidemic, a

28   significant portion of those expenditures has focused on AR-style receivers.  *See id*. ¶¶ 14–17.  GLC's

Chief of Staff similarly offered uncontroverted testimony that GLC's core mission has been frustrated by ATF's conclusion than an unfinished AR-type receiver in particular is not a "firearm" under the GCA.  *See* Cutilletta Decl. ¶¶ 7–10.  She testified further that "ATF's decision not to classify a significant category of unfinished receivers as 'firearms' creates a continued risk of ghost gun violence . . . and therefore requires GLC to keep expending resources on violence intervention programs and violence reduction work," and that if ATF properly classified AR-type receivers as firearms, then "GLC could devote fewer of its limited resources to combatting ghost guns and ghost gun-related violence" and instead focus on other organizational priorities.  *Id*. ¶¶ 15, 19. [14]

Plaintiffs' evidence is more than sufficient to establish standing.  To the extent the Court concludes that there is any genuine dispute of material fact as to justiciability (and there is none), the Court should deny both parties' summary judgment motions and proceed to a trial on standing.

## III. CONCLUSION

The Court should deny Defendants' Motion for Summary Judgment and grant Plaintiffs' Cross-Motion for Summary Judgment.

---

[14] Moreover, as *Amicus* Everytown for Gun Safety explains, citing judicially noticeable public records, "the continuing accessibility of AR-15 component parts . . . pose[s] a threat to public safety in California" because perpetrators "continue to use these [specific AR-style] weapons to commit crimes and to circumvent firearms regulations."  Everytown Amicus Br. 11–12 (collecting criminal complaints filed in California federal district courts within the past year against defendants for using, purchasing, manufacturing, dealing, and/or selling unserialized AR-15 style firearms); *see also* Crain Ex. 23 (convicted felon used privately manufactured AR-15 style rifle to shoot and kill Selma, California police officer); Crain Ex. 24 (man using unserialized AR-15 rifle fired dozens of rounds at police responding to a domestic violence call, leading to 6-hour standoff outside man's home in Bakersfield, California); Crain Ex. 25 (man used ghost AR-style rifle to fire more than a dozen shots at an inhabited residence in Spring Valley, California).

Dated: January 4, 2024     /s/ S. Clinton Woods

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
Supervising Deputy Attorney General
S. CLINTON WOODS, 246054
Deputy Attorney General
Clint.Woods@doj.ca.gov
455 Golden Gate Ave.,
Suite 11000
San Francisco, CA 94102-7004
Telephone:  (415) 510-3807
Facsimile:  (415) 703-5843

*Attorneys for Plaintiff State of California, by and through Attorney General Rob Bonta*

/s/ Lee R. Crain

GIBSON, DUNN & CRUTCHER LLP
SCOTT A. EDELMAN, SBN 116927
2029 Century Park East, Suite 4000
Los Angeles, CA 90067-3026
sedelman@gibsondunn.com
Telephone: (310) 357-8061
Facsimile: (310) 552-7041

LEE R. CRAIN, *pro hac vice*
ERICA PAYNE, *pro hac vice*
LIESEL SCHAPIRA, *pro hac vice*
200 Park Avenue
New York, NY  10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

PAUL HASTINGS LLP
AVI WEITZMAN, *pro hac vice*
aviweitzman@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 752-3620

*Attorneys for Plaintiff Giffords Law Center to Prevent Gun Violence*

PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:20-CV-06761-EMC

1

*/s/ David M. Pucino*

2

GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE

3

DAVID M. PUCINO, *pro hac vice*
223 West 38th St. # 90

4

New York, NY 10018
Telephone: (917) 680-3473

5

6

*Attorney for Plaintiff Giffords Law Center to
Prevent Gun Violence*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:20-CV-06761-EMC

1

**SIGNATURE ATTESTATION**

2

3
Pursuant to Local Rule 5-1(i), I hereby attest that concurrence in the filing of the document has been obtained from each of the other Signatories.

4

5

6
*Dated*: January 4, 2024                    /s/ Lee R. Crain
                                            Lee R. Crain

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:20-CV-06761-EMC