UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No.  20-cv-06761-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND GRANTING IN PAT AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, et al., | |
| Defendants. | Docket Nos. 182, 184 |

The dangers of "ghost guns" – guns that are assembled from parts, that are unregistered, and that are therefore untraceable – are without doubt real and substantial.  The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has responded with regulations addressing, *inter alia*, ghost guns and their components.  The instant case concerns those regulations.  The issue in the case at bar, however, is narrow – though important and potentially consequential.  It does not concern the general merits or constitutionality of gun control legislation.  Rather, the question before this Court concerns the legality of two specific aspects of ATF's technical regulations and rulings addressing ghost guns.  ATF has ruled that the regulatory provisions of the Gun Control Act ("GCA") apply to certain parts used to assemble a fully functioning firearm under some circumstances but not others.  Plaintiffs challenge the lines drawn by the ATF in this regard.  Mindful of the deference generally afforded to agency regulations implementing a statute, the Court, for the reasons stated below, upholds one part of the challenged regulations/rulings but finds another portion invalid.

Plaintiffs are the State of California and the organization Giffords Law Center to Prevent

Gun Violence ("GLC").  They have filed suit against ATF as well as the Department of Justice ("DOJ") and several federal employees (all in their official capacities).  In April 2022, ATF issued a new final rule that addressed, *inter alia*, ghost guns.  *See* 87 Fed. Reg. 24,652 (2022).  According to Plaintiffs, certain of ATF's determinations related to ghost guns, as codified in the final rule and as reflected in, *e.g.*, Open Letters and Classification Letters applying the final rule, violate the Administrative Procedure Act ("APA").

Currently pending before the Court are the parties' cross-motions for summary judgment. An amicus brief has also been submitted in support of Plaintiffs' motion.  The issues pending before the Court are: (1) whether Plaintiffs have standing to pursue this case and (2) whether ATF's determinations related to certain AR-type partially complete receivers violate the APA, either because the determinations are contrary to the plain text of the GCA or because they are arbitrary and capricious.  Having considered the parties' briefs and accompanying submissions, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion and **GRANTS** in part and **DENIES** in part Plaintiffs' motion.  The Court finds that there is no genuine dispute of material fact that Plaintiffs have standing.  The Court further finds that ATF acted arbitrarily and capriciously with respect to its categorical determinations that AR-type partially complete receivers that are not indexed or machined and not sold with, *e.g.*, a jig or tools are not firearms for purposes of the GCA.  In other respects, the Court finds that the regulations are not arbitrary and capricious.

## I.        FACTUAL & PROCEDURAL BACKGROUND

A.    Supplemental First Amended Complaint

In the operative pleading (*i.e.*, the supplemental first amended complaint), Plaintiffs allege as follows.

The GCA imposes restrictions on the purchase and sale of firearms in the United States. *See* Supp. FAC ¶ 1.  The statute defines "firearm," in relevant part, as follows: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon."  18 U.S.C. § 921(a)(3); *see also* 27 C.F.R. § 478.11.

United States District Court
Northern District of California

With respect to the definition in (B), Congress has never defined the terms "frame" and "receiver." Thus, ATF has enacted regulations that define those terms. In essence, the receiver (for a long gun) or a frame (for a handgun) is the part of the weapon that "houses the hammer, bolt, or breechblock, as well as the firing mechanism." Supp. FAC ¶ 3.[1] It is a significant piece of a firearm, as reflected by the fact that "the GCA expressly provides that a 'frame or receiver' *is* a 'firearm.'" Supp. FAC ¶ 3 (emphasis in original).

Included among the GCA's restrictions on the purchase and sale of firearms are requirements that any firearm sold or imported in the United States "must have a unique serial number"[2] and that "licensed gun dealers must maintain identifying records, including the serial numbers of guns they sell and the identity of the buyer. These requirements allow law enforcement to trace guns recovered at crime scenes to their first retail purchaser." Supp. FAC ¶ 1; *see also* Supp. FAC ¶ 37 ("Identifying [the] initial purchaser is critical to law enforcement's ability to investigate and solve crimes committed with the recovered firearm."). In addition, "licensed gun dealers [must] conduct criminal background checks on would-be gun purchasers," which "ensur[es] that weapons do not fall into the wrong hands." Supp. FAC ¶ 1. Furthermore, certain categories of people are prohibited from purchasing firearms, including minors as well as individuals with disqualifying criminal convictions (*i.e.*, "those who pose the greatest threat of violence"). Supp. FAC ¶ 1.

Ghost guns are weapons that evade the restrictions imposed by the GCA. *See* Supp. FAC ¶ 44. They are weapons that anyone can build at home to be fully operable firearms – and "within

---

[1] The current definitions for "frame" and "receiver" can be found in 27 C.F.R. § 478.12. *See* 27 C.F.R. § 478.12(a)(1) (providing that a firearm frame is the part of a handgun that "provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt or similar primary energized component prior to initiation of the firing sequence"); *id.* § 478.12(a)(2) (providing that a firearm receiver is the part of a long gun that "provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent)").

[2] It is the frame or receiver that must bear a serial number. *See* 18 U.S.C. § 923(i) ("Licensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer.").

minutes."[3]  Supp. FAC ¶ 2.  Ghost guns are "'ghosts' because, lacking serial numbers, they are not traceable by law enforcement when they are used in a crime."  Supp. FAC ¶ 2; *see also* Proposed Rule, 86 Fed. Reg. at 27,722 & 27,724.  Today, ghost guns

> can be purchased by anyone with an internet connection and a credit card or other form of online payment (as well as at gun shows and from brick-and-mortar gun stores) – including people convicted of felonies or domestic violence, people addicted to drugs, minors, and individuals with serious mental illnesses, despite the fact that all of them are prohibited by federal law from purchasing and possessing firearms.

Supp. FAC ¶ 44.

In recent years, the ghost gun market has expanded, with "ghost gun retailers widely report[ing] substantially increased demand."  Supp. FAC ¶ 10.  And in recent years, there has been an increase in the use of ghost guns to commit crimes, which is unsurprising given that ghost guns bear no serial numbers and therefore cannot be traced.  "Law enforcement agencies [have] connected at least 2,513 ghost guns to criminal activity between 2010 and April 2020," and, "[o]f that number, more than half . . . were used or sold by criminal enterprises to facilitate crimes including gun trafficking, robbery, drug trafficking, terrorism, and murder."  Supp. FAC ¶ 56.  In May 2020, *60 Minutes* reported that "[g]host guns were linked to criminal cases in at least 38 states between late 2018 and May 2020," Supp. FAC ¶ 56, and that "ghost guns were used in 'at least four mass shootings, violent police shootouts . . . and cases involving terrorism and white supremacists.'"  Supp. FAC ¶ 11; *see also* Supp. FAC ¶¶ 51-53, 55 (describing multiple incidents in which ghost guns were used in crimes, including mass shootings).

The federal government has expressly acknowledged that "the number of crimes committed with ghost guns is 'increasing significantly and rapidly.'"  Supp. FAC ¶ 12.  In fact,

> [t]he number of ghost guns recovered in connection with criminal activity is growing each year.  [For instance,] [i]n 2017, the District of Columbia recovered only three ghost guns.  But by 2019, law enforcement recovered 116 ghost guns in one year, before recovering another 106 ghost guns in just the first five months of 2020.  According to information from the District of Columbia's

---

[3] Because ghost guns can be built at home, they are also called privately made firearms, or "PMFs."  See Proposed Rule, 86 Fed. Reg. 27,720, at 27,722 (2021).

United States District Court
Northern District of California

United States District Court
Northern District of California

> Department of Forensic Sciences, of the 250 ghost guns recovered in Washington D.C. between 2017 and May 29, 2020, at least 208, or 83.2%, were manufactured by a single company, Polymer80.

Supp. FAC ¶ 57.

The situation in California is similar.

> According to California law enforcement agencies, during 2020 and 2021, ghost guns "accounted for 25 to 50 percent of firearms recovered at crime scenes." The "vast majority" of these weapons were wielded by individuals prohibited from owning a firearm. In Los Angeles, the number of ghost guns recovered increased by 144% from 2015 to 2019. In San Francisco, no ghost guns were recovered in 2015, but beginning in 2016, ghost gun recoveries began to sharply rise – increasing by 1517% from 2016 to 2019.

Supp. FAC ¶ 58.

The problem is nationwide. "From 2016 to 2021, 'approximately 45,240 suspected PMFs' were reported to have been recovered by law enforcement agencies[:] 1,758 in 2016, 2,552 in 2017, 3,960 in 2018, 7,517 in 2019, 10,109 in 2020, and 19,344 in 2021." Supp. FAC ¶ 59. Notably, these statistics likely underreport the problem "because they rely on instances where ghost guns are [actually] recovered by law enforcement." Supp. FAC ¶ 60.

In 2020, Plaintiffs initiated their lawsuit challenging ATF's approach toward ghost guns. Specifically, they challenged ATF's determinations that certain products known in the industry as 80% receivers and frames were not firearms for purposes of the GCA.[4] As noted above, a receiver (for a long gun) or a frame (for a handgun) is the part of the weapon that "houses the hammer, bolt, or breechblock, as well as the firing mechanism." Supp. FAC ¶ 3. The GCA expressly provides that a receiver or a frame *is* a firearm. An 80% frame or receiver is an unfinished frame or receiver – *i.e.*, a partially complete one. *See* Supp. FAC ¶ 3. According to Plaintiffs,

> [g]host gun manufacturers have . . . developed tools that make it easier than ever to convert 80 percent receivers and frames into fully

---

[4] As Defendants note, the GCA and implementing regulations do not use the term "80% frame" or "80% receiver." "80%" is an industry term – *i.e.*, a term that the ghost gun industry uses to market certain products. *See* Mot. at 4-5, 15-16; *see also* Final Rule, 87 Fed. Reg. at 24,663 n.47 ("The term '80% receiver' is a term used by some industry members, the public, and the media to describe a frame or receiver that has not yet reached a stage of manufacture to be classified as a 'frame or receiver' under Federal law. However, that term is neither found in Federal law nor accepted by ATF.").

> operable firearms in as little as **15 minutes**.  These tools include jig kits (a collection of tools, measurements, and physical guides designed to quickly make unfinished or 80 percent receivers functional), milling machines (a pre-programmed "mill" that automatically turns 80 percent receivers into functioning weapons) and even free, easy to use printable blueprints for building ghost guns.  Even without these products however, anyone with internet access can easily find detailed instructions for completing their frame or receiver with common household tools.

Supp. FAC ¶ 5 (emphasis in original).

Subsequently, litigation in this case was put on hold because, in 2021, following several mass shootings in Boulder, Colorado, and Atlanta, Georgia, "the White House announced that it intended to 'issue a proposed rule to help stop the proliferation of "ghost guns."'"  Supp. FAC ¶ 89.  In May 2021, ATF issued a proposed rule, and, in April 2022, the final rule (which is currently the subject of this lawsuit).  *See* Supp. FAC ¶¶ 89-90.

In the final rule, "ATF stated that the goals of the Rule were to 'provide a more comprehensive definition of "frame" or "receiver" so that these terms more accurately reflect how most modern-day firearms are produced and function' *and* to 'reduce unserialized "ghost guns."'"  Supp. FAC ¶ 89 (emphasis added).  Regarding the latter, the final rule provides that it is possible for a partially complete frame or receiver to be deemed a frame or receiver, and therefore a firearm, for purposes of the GCA.  The final rule provides in relevant part as follows:

> The terms "frame" and "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver . . . .  [But] [t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material).  When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

27 C.F.R. § 478.12(c).

The term "readily" is defined as follows:

> A process, action, or physical state that is fairly or reasonably

efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state. With respect to the classification of firearms, factors relevant in making this determination include the following:

(1) Time, i.e., how long it takes to finish the process;
(2) Ease, i.e., how difficult it is to do so;
(3) Expertise, i.e., what knowledge and skills are required;
(4) Equipment, i.e., what tools are required;
(5) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained;
(6) Expense, i.e., how much it costs;
(7) Scope, i.e., the extent to which the subject of the process must be changed to finish it; and
(8) Feasibility, i.e., whether the process would damage or destroy the subject of the process, or cause it to malfunction.

*Id.* § 478.11.

The final rule also gives examples of what is and what is not a receiver/frame:

Example 1 to paragraph (c) – Frame or receiver: A frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template **is** a frame or receiver, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver.

. . . .

Example 4 to paragraph (c) – **Not** a receiver: A billet or blank of an AR-15 variant[5] receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver.

*Id.* § 478.12(c) (emphasis added).

As reflected by the parties' briefs, the parties' current dispute essentially boils down to Example 4 and related determinations (including ATF's decision to disregard, *e.g.*, jigs and tools sold by third parties in the open market in determining when a partially complete receiver is readily convertible to a fully functional one). *See, e.g.*, Opp'n at 14-15 (noting that ATF *repeated* its determination in Example 4 "in multiple final agency actions that followed the Final Rule,

---

[5] "The terms 'variant' and 'variants thereof' mean a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments." 27 C.F.R. § 478.12(a)(3).

United States District Court
Northern District of California

1   including the 23 Challenged Classification Letters, the September 2022 Open Letter, and ATF's

2   slide deck and YouTube video"); *see also* Opp'n at 2 (arguing that, even though "ATF will

3   consider at least certain categories of partially complete frames and receivers to be 'firearms,'

4   even if they are sold standalone[,] . . . ATF is still not fully complying with federal law" because it

5   has "unlawfully determined that many partially complete AR-style receivers – the fundamental

6   component of deadly AR-style assault rifles – are not 'firearms' under the GCA").

7         Because Example 4 is now the focus, it bears repeating what the parameters of Example 4

8   are.  Example 4 specifies that, if a partially complete AR-15 type receiver is not machined or

9   indexed in critical interior areas *and* is not sold with, *e.g.*, a jig or tools, then it is not a receiver

10   (and therefore not a firearm for purposes of the GCA).  This is true even if jigs and tools may be

11   purchased easily from sources other than the seller of the partially complete receiver.  However, if

12   a partially complete AR-15 type receiver is machined or indexed in critical interior areas, then it *is*

13   a receiver (and therefore a firearm for purposes of the GCA).  *See, e.g.*, 27 C.F.R. § 478.12(c)

14   ("Example 2 to paragraph (c) – Frame or receiver: A partially complete billet or blank of a frame

15   or receiver with one or more template holes drilled or indexed in the correct location is a frame or

16   receiver, as a person with common hand tools may readily complete the billet or blank to function

17   as a frame or receiver.").  As for a partially complete AR-15 type receiver that is not machined in

18   critical areas but is sold with, *e.g.*, a jig or tools, that *may* be a receiver (and therefore a firearm for

19   purposes of the GCA).  *See, e.g.*, ATF Supp. 240 (Classification Letter) ("[E]ven when a sample is

20   not classified as a "**receiver**," or "**firearm**," that determination can change if it is sold, distributed,

21   marketed, possessed, or otherwise made available with any associated templates, jigs, molds,

22   equipment, tools, instructions, or guides, such as within a receiver parts kit.") (all emphasis in

23   original).

24         Plaintiffs make various legal arguments challenging Example 4 but underlying those

25   arguments is their position that a partially complete AR-type receiver[6] that is not machined or

26

27   ───────────────

28   [6] Example 4 focuses on partially complete AR-15 type receivers.  However, Plaintiffs' challenge is not limited to partially complete AR-15 type receivers but expands more broadly to other partially complete AR-type receivers (*e.g.*, partially complete AR-10 receivers).

indexed in critical areas and is not sold with, *e.g.*, a jig or tools should still be deemed a receiver (and therefore a firearm) because jigs, tools, and so forth are easy to obtain or purchase from open sources other than the seller/distributor of the receiver, and, with these items, it does not take much time or effort to make the partially complete receiver a fully functional one – *i.e.*, it may be readily converted.  Plaintiffs maintain:

> As a result of ATF's decisions, no background check is required to buy 80 percent receivers and frames, no records of the buyers' identities must be kept, and no 80 percent receiver or frame has to carry federal serial numbers or other markings that clearly identify the product's manufacturer, importer, make, model, or caliber. Thus, while a person cannot purchase an assembled gun at a gun store without passing a background check to ensure that he is not a prohibited person under the GCA, a prohibited person can purchase an 80 percent frame or receiver from the very same gun store without any background check or any questions asked. With an 80 percent receiver or frame in hand, that prohibited person can then purchase all ancillary products needed to complete the firearm (like jigs and templates), either in a different contemporaneous transaction or from a different seller, and quickly and easily assemble a firearm functionally indistinguishable from the firearm he would have been . . . barred from buying after a background check.

Supp. FAC ¶ 44.

B.     Record Evidence

       In terms of record evidence, there is both the original administrative record that Defendants filed, *see* Docket No. 144 (notice of administrative record), and the supplemental administrative record.  *See* Docket No. 179 (notice of certified supplement administrative record).  The supplemental administrative record contains the main evidence relevant to the pending dispute.  It includes, *inter alia*, the final rule (Ex. 1), an Open Letter that ATF issued in September 2022 (Ex. 6), and the classification letters challenged by Plaintiffs (Exs. 9, 12-13, 18, 27-30, 33-34, 36-37, 40-42, 45, 51-54, 57, 62-63).  The September 2022 Open Letter (Ex. 6) is significant because it addresses partially complete AR-type receivers specifically.  *See* ATF Supp. 199 *et seq.*  An exemplar classification letter that addresses a partially complete AR-type receiver is Classification Letter #313696 (Ex. 9).  *See* ATF Supp. 221 *et seq.*

C.     Extra-Record Evidence

       Although APA cases are typically resolved based on the administrative record, both parties

have submitted declarations.

1.      Declarations Submitted by Plaintiffs

Plaintiffs have submitted three declarations.  Defendants agree that two of the declarations (the Gonzalez and Cutilletta Declarations) may be considered, even though this is an APA case, because they are relevant to standing.  *See* Gonzalez Decl. (focusing on the standing of California); Cutilletta Decl. (focusing on the standing of GLC).

Defendants, however, do object to the third declaration (the Yurgealitis Declaration) on the basis that it is relevant only to the merits and therefore is impermissible extra-record evidence. Mr. Yurgealitis is a former ATF employee.  *See* Yurgealitis Decl. ¶ 1.

It is appropriate to consider parts of the Yurgealitis Declaration, specifically, so that the Court has an understanding of the technical aspects of AR-type receivers.  *See Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) (noting that, "[g]enerally judicial review of agency action is limited to review of the administrative record" but "certain circumstances may justify expanding review beyond the record or permitting discovery – *e.g.*, "if supplementation of the record is necessary to explain technical terms or complex subject matter involved in the agency action").  In this regard, the Court takes into account the following testimony from the Yurgealitis Declaration.

- "AR-15 type firearms are semiautomatic rifles . . . ."  Yurgealitis Decl. ¶ 9; *see also* Yurgealitis Decl. ¶¶ 18-19 (providing similar testimony).

- Semiautomatic "means that the rifle fires one round per each pull of the trigger. After the cartridge is fired, the rifle automatically extracts and ejects the spent cartridge case and loads another cartridge into the chamber.  This is different than a full-automatic firearm (or machine gun) which will fire continuously with a single pull of the trigger until it is released or the supply of ammunition is exhausted." Yurgealitis Decl. ¶ 19.

- "AR-15 type rifles . . . have little recoil as compared to larger caliber rifles, which facilitates rapid and accurate firing."  Yurgealitis Decl. ¶ 21.

- "The original design [of an AR-15] features a two piece receiver assembly.  The

United States District Court
Northern District of California

10

United States District Court
Northern District of California

upper receiver is the portion which houses the bolt and is attached to the barrel. The lower receiver (which is the serialized portion and considered the 'firearm' under the GCA) is the part which houses the fire control components and the attachment point for the magazine." Yurgealitis Decl. ¶ 18 & Fig. 1 (example of two-piece receiver assembly). For purposes of the pending motions, the parties use – and the Court uses – the term "receiver" to mean the lower receiver since that is the piece that is considered a firearm for purposes of the GCA.

- "The 'fire control cavity' in an AR-15 type receiver is the area behind the magazine well and above the trigger guard where the trigger mechanism, or 'fire control' mechanism, is located." Yurgealitis Decl. ¶ 31.



**Figure 4: Description of the control cavity and where pin holes should be drilled**

- The "main steps" to convert a partially complete receiver for an AR-15 rifle into a fully functional receiver are: "removing excess material (either aluminum or polymer depending on the product purchased) and drilling a small number of holes for various pins." Yurgealitis Decl. ¶ 27; *see also* Yurgealitis Decl. ¶ 28 (referring to "metal roll pins installed horizontally across the receiver to support or provide pivot points for trigger mechanism components").

United States District Court
Northern District of California

1    Yurgealitis Decl. ¶ 35, Fig. 4.

2          Plaintiffs, however, maintain that the Yurgealitis Declaration should also be considered for

3    the merits of the case – *e.g.*, he addresses "which factors ATF failed to consider and how it failed

4    to properly explain its decisions classifying partially complete AR-style receivers."  Opp'n at 15

5    n.9.  Plaintiffs note that

6                exceptions exist to the rule that review of agency action is limited to
             the administrative record.  A court may consider evidence outside
7                the administrative record as necessary to explain agency action.
             *Asarco, Inc. v. United States Environmental Protection Agency*, 616
8                F.2d 1153, 1159 (9th Cir. 1980).  *See also Arizona Past & Future
             Foundation v. Lewis*, 722 F.2d at 1426 n.5.  When there is "such a
9                failure to explain administrative action as to frustrate effective
             judicial review," the court may "obtain from the agency, either
10               through affidavits or testimony, such additional explanations of the
             reasons for the agency decision as may prove necessary."  *Public
11               Power Council v. Johnson*, 674 F.2d 791, 793-94 (9th Cir. 1982),
             *quoting*, *Camp v. Pitts*, 411 U.S. 138, 142, 36 L. Ed. 2d 106, 93 S.
12               Ct. 1241 (1973) (per curiam).  The purpose of the court's enquiry
             should be to ascertain whether the agency considered all relevant
13               factors or fully explicated its course of conduct or grounds of
             decision.

14

15   *Friends of Earth v. Hintz*, 800 F.2d 822, 829 (9th 1986).  As indicated below, the Court does not

16   rely on the Yurgealitis Declaration to determine whether ATF failed to consider relevant factors or

17   failed to provide an explanation for its determinations.

18          2.     Declaration Submitted by Defendants

19          Defendants have submitted a single declaration (the Hoffman Declaration).  Mr. Hoffman

20   is a firearms enforcement officer at ATF and the Chief of the Firearms Technology Industry

21   Services Branch.  Since 2016, he has worked in the Firearms & Ammunition Technology

22   Division.  "The Division is the federal technical authority relating to firearms and ammunition and

23   their classification under federal laws and regulations."  Hoffman Decl. ¶ 1.

24          Defendants take the position that the Court does not need to consider the Hoffman

25   Declaration unless it decides to consider the Yurgealitis Declaration (implicitly, on the merits).

26   Plaintiffs argue that Defendants are improperly trying to use the Hoffman Declaration as a post-

27   hoc rationalization of ATF's determinations on partially complete AR-type receivers.  Because the

28   Court is not considering the Yurgealitis Declaration for the merits, it does not consider the

Hoffman Declaration for the merits.

## II.        LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.

In the case at bar, Defendants are moving for summary judgment on two grounds: (1) because Plaintiffs lack standing and (2) because Plaintiffs have failed to show a violation of the APA, *i.e.*, that ATF failed to act in accordance with the law or otherwise acted arbitrarily and capriciously (*i.e.*, with respect to Example 4).

In turn, Plaintiffs move for summary judgment on the merits only – *i.e.*, contending that ATF did in fact fail to act in accordance with the law and further acted arbitrarily and capriciously.

## III.        STANDING

A party may move to dismiss for lack of subject matter jurisdiction, including lack of standing, under Federal Rule of Civil Procedure 12(b)(1).

> To have standing, plaintiffs must establish (1) that they have suffered an injury in fact, (2) that their injury is fairly traceable to a defendant's conduct, and (3) that their injury would likely be redressed by a favorable decision. . . . At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice."

*Mecinas v. Hobbs*, 30 F.4th 890, 896-97 (9th Cir. 2022).

In a multi-plaintiff suit, only one plaintiff need have standing in order for the case to proceed.  *Cf. Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the

United States District Court
Northern District of California

1  plaintiffs has standing, it need not decide the standing of the others.").

2  A.    Prior Order on Standing

3      Previously, the Court denied Defendants' *facial* challenge to Plaintiffs' standing.  *See*

4  Docket No. 135 (Order at 7).  Now, at summary judgment, Defendants launch another attack on

5  standing, but one *factual* in nature.  Only Defendants move for summary judgment on standing;

6  Plaintiffs do not.

7      Although Defendants' current challenge is a factual attack on standing, the Court reviews

8  its prior order on standing as it is informs how the Court evaluates the current challenge.  In its

9  prior order, the Court  held that Defendants' facial attack on standing lacked merit as to the state

10  of California and GLC.  For both Plaintiffs, the issue was whether they had adequately alleged an

11  injury in fact.

12      As to **California**, the Court held that the state had sufficiently alleged an injury in fact

13  based on (1) increased cost of policing and law enforcement and (2) the enactment and

14  implementation of state legislation.

15      With respect to (1), Defendants argued that California had failed to allege that there were

16  crimes that involved receivers/frames not deemed firearms under the final rule.  The Court

17  rejected the argument:

18          As an initial matter, the Court notes that the final rule was not issued
19          until April 2022 and, thereafter, a period of time passed during
           which ATF's interpretation of the final rule was being clarified (*e.g.*,
20          through its September 2022 Open Letter).  Thus, the fact that
           California has not yet pointed to a specific instance in which an 80
21          percent frame/receiver was sold standalone and then used in a crime
           is not dispositive.  Moreover, California fairly contends that its
22          ability to point to a specific instance has been hampered by the very
           fact of the final rule.  In other words, the final rule leaves 80 percent
23          receivers/frames when sold standalone unregulated, which means
           that they are not serialized, which is then an obstacle to California to
24          tracking down their sale.

25  Docket No. 135 (Order at 9).

26      The Court then stated that, "when all reasonable inferences are made in California's favor

27  – including the predictable effects of government action or inaction on third parties – there is a

28  'substantial risk' that California will be harmed by the final rule which leaves 80 percent

14

United States District Court
Northern District of California

receivers/frames sold standalone unregulated."  Docket No. 135 (Order at 10 & n.5) (with respect to predictable effects, citing *Dep't of Commerce v. N.Y.*, 139 S. Ct. 2551 (2019), where the Supreme Court recognized that a citizenship question on the census questionnaire would provoke a predictable reaction from certain third parties).

- "First, it is predictable that 80 percent receivers/frames will be sold standalone. Indeed, in the FAC, Plaintiffs allege that ghost gun manufacturers have already advised consumers to purchase such receivers/frames standalone to avoid regulation under the final rule – *i.e.*, buying the 80 percent receiver/frame separate from the other tools or components needed to build a functional weapon."  Docket No. 135 (Order at 10).

- "Second, it is predictable that at least some of the 80 percent receivers/frames sold standalone will be used in crimes.  The entire point of buying an 80 percent receiver/frame standalone is to avoid regulation, which requires, *inter alia*, serialization which enables law enforcement to track sales."  Docket No. 135 (Order at 11).  "California's basic contention is that the final rule contains a loophole/exception which enables people to avoid regulation.  *If that loophole/exception is substantial*, it is entirely predictable that crimes involving such guns will occur and thereby injure the state.  California has alleged that the size of the loophole/exception is substantial: to wit, there is an easy way to avoid regulation by making a purchase of an 80 percent receiver/frame standalone without, *e.g.*, an accompanying kit."  Docket No. 135 (Order at 11) (emphasis added).

As for the injury identified in (2), *i.e.*, the enactment and implementation of state legislation, the Court noted that "standing may be based on 'reasonably incur[red] costs to mitigate or avoid' harm or a '"substantial risk"' of harm.  That is the gist of California's position here – *i.e.*, it has had to incur costs to regulate because ATF is not regulating, which has led to the proliferation of ghost guns."  Docket No. 135 (Order at 14).

For **GLC**, the Court found that there were sufficient allegations supporting an injury in fact

15

1  because the organized had alleged that (1) "the rule frustrates its 'core mission [of] sav[ing] lives

2  from gun violence,'" and (2) "the rule has forced the organization to divert its resources to focus

3  on ghost guns." Docket No. 135 (Order at 19). With respect to (2), the Court noted that, as

4  alleged,

> ATF's actions on ghost guns [*i.e.*, not regulating them] have
> required [GLC] to expend more resources and staff time because
> ATF's regulatory approach undermines every other firearm policy
> that [GLC] advocates for. This includes the organization's core
> policy platform of supporting background check and licensing laws
> at the federal and state level," for all firearms *in general*. FAC ¶ 136
> (adding that "[b]ackground check laws and other efforts to ensure
> firearms are legally and responsibly possessed are impeded and
> undermined by ATF"). GLC has shifted resources to activity related
> to ghost guns *in particular* and away from activity related to other
> firearms.

11  Docket No. 135 (Order at 23) (emphasis added).

12  B.  <u>Factual Challenge to Standing</u>

13         Defendants mount a factual challenge to Plaintiffs' standing. At summary judgment,

14  Defendants make the same basic argument that they did in their prior motion challenging standing.

15  To wit:

> Plaintiffs have submitted no evidence to establish that their
> expenditures would decrease if ATF regulated any products that the
> Rule does *not* treat as firearms. Relatedly, Plaintiffs also have failed
> to submit evidence that their purported injuries are caused by any of
> the particular products that ATF has classified as *not* firearms . . . .

19  Mot. at 8 (emphasis added). Defendants underscore that their argument has even more bite now

20  because the size of the alleged loophole/exception has narrowed – *i.e.*, Plaintiffs are contesting the

21  validity of ATF's actions with respect to partially complete AR-type receivers only (Example 4).

22  This is a subset of the partially complete frames/receivers in the market.

23         As an initial matter, the Court bears in mind that it is only Defendants who are moving for

24  summary judgment on standing. Plaintiffs have submitted unrebutted evidence that they have

25  suffered an injury in fact and thus Defendants are not entitled to summary judgment.

26         **California** has submitted the Gonzalez Declaration to support its claim of injury (*i.e.*,

27  increased cost of policing and law enforcement and the enactment and implementation of state

28  legislation). *See* Gonzalez Decl. ¶ 2 (testifying that he is "a Special Agent Supervisor for the

United States District Court
Northern District of California

1   California Department of Justice ('CA DOJ'), Division of Law Enforcement, Bureau of Firearms

2   ('BOF')").  In his declaration, Mr. Gonzalez discusses injury resulting from ghost guns generally.

3   The question is what in his declaration addresses AR-type ghost guns specifically, as only AR-

4   type receivers are allegedly underregulated.  Below is the portion of his declaration that mentions

5   AR-type ghost guns.

> 13.   As reflected in the AFS chart [at Exhibit E[7]], the number of
> ghost guns recovered by California state and local LEAs
> [*i.e.*, law enforcement agencies] has increased dramatically
> since 2016.   For example, in July 2016, LEAs recovered
> 2,106 guns in Los Angeles County, but only two were ghost
> guns without serial numbers.   By July 2020, that number
> exploded to 82 ghost guns in Los Angeles County,
> accounting for nearly 6% of all weapons recovered.   July
> 2021 saw another dramatic increase, with 321 ghost guns
> recovered in Los Angeles County, accounting for over 9% of
> all recovered firearms.   In 2022 through January 2023, the
> percentage of ghost guns recovered in Los Angeles County
> remained high, accounting for approximately 5 to 8% of
> firearms recovered each month.
>
> 14.   Other counties saw a similar increase in both the raw
> numbers of ghost guns recovered and ghost guns as a
> percentage of overall firearms recovered.   For example,
> Alameda County recovered just four ghost guns in the entire
> second half of 2016, but recovered 50 ghost guns in October
> 2021 alone.   And while there were only eight ghost guns
> recovered in San Bernardino County from July to December
> 2016, by 2022 ghost guns accounted for over 10% of the
> over 1,000 guns recovered per month in that jurisdiction.
> Based on my knowledge and experience, the vast majority of
> these ghost guns were assembled using commercially-
> available firearm precursor parts known colloquially as
> "80% frames" or "80% receivers," or other precursor part
> variants.   **Moreover, since 2018 approximately 15-20% of
> the ghost guns recovered statewide were made with AR-
> style receivers.**

22   Gonzalez Decl. ¶¶ 13-14 (emphasis added); *see also* Yurgealitis Decl. ¶ 24 noting that ("the Santa

23   Monica mass shooter who killed five people in the summer of 2013 used an AR-15-style 'ghost

24   gun'"); *cf.* Yurgealitis Decl., Ex. F (NPR article, "How AR-15-style rifles write the tragic history

25   of America's mass shootings," dated 5/2023) (at page 4, noting that "an AR-15-style weapon was

---

[7] "California law requires all recovered firearms to be recorded in the statewide Automated
Firearm System (AFS)."  Gonzalez Decl. ¶ 12.

United States District Court
Northern District of California

1    used in [multiple] mass shooting[s]," including in San Bernardino, California, in 2015).[8]

2         In addition to the Gonzalez Declaration, the Cutilletta Declaration submitted by GLC takes

3    note that, "[i]n 2021, . . . the *New York Times* published an article in which California law

4    enforcement officials estimated that ghost guns [generally] accounted for 25 to 50 percent of all

5    firearms recovered at crime scenes over the previous 18 months." Cutilletta Decl. ¶ 6.

6         Based on the Gonzalez and Cutilletta Declarations, it is predictable that crimes will be

7    committed in California with AR-type ghost guns because ghost guns are commonly used in

8    crimes and a notable percentage of the ghost guns recovered in the state are AR-type ghost guns.

9         To be sure, the issue in this case focuses on the alleged loophole in the new ATF final rule

10   which regulates some ghost guns but leaves untouched those that can be readily converted by use

11   of easily available jigs or tools not sold with the receiver blanks.  Hence, the question is whether

12   this alleged shortcoming in the final rule gives rise to California's injuries.  In this regard, it is also

13   predictable that a significant portion of the AR-type ghost guns used in crimes will have been

14   assembled using partially complete AR-type receivers that are not deemed firearms because they

15   were not sold with jigs or tools – *i.e.*, the partially complete AR-type receivers described in

16   Example 4.  This likelihood is supported by the supplemental administrative record which reflects

17   that more than twenty Classification Letters were issued by ATF, each concluding that a partially

18   complete AR-type receiver was not a firearm because it was not indexed or machined and not sold

19   with, *e.g.*, a jig or tools.  It is further substantiated by the Cutilletta Declaration which notes that a

20   company known as Juggernaut Tactical "continues to offer an 'AR-15 80% Lower Receiver' for

21   sale on its webpage" which states as follows: "If you would like to finish your AR-15 80% Lower

22   Receiver at home, we offer AR-15 jig kits here.  Because 80% Lower Receivers are not considered

23   firearms by ATF, we can ship them right to your front door with no FFL [federal firearms license]

24   required."  Cutilletta Decl. ¶ 8 & Ex. A (Juggernaut Tactical webpage).  The Court acknowledges

25   Defendants' point that "[t]he [Final] Rule makes clear that sellers or distributors may not

26   undermine the Rule's requirements 'by working with others or structuring transactions to avoid

27   _____

28   [8] The Court considers these parts of the Yurgealitis Declaration as they bear on standing (*i.e.*, the
     Court is not restricted to the administrative record).

the appearance that they are not commercially manufacturing and distributing firearms.'"  Mot. at 30.  Nevertheless, the Juggernaut Tactical webpage demonstrates that an end run is simple: jigs and tools are easily obtainable and can be purchased separately from the partially complete receiver.  Defendants also do not dispute that jigs and tools can be purchased from the open market with relative ease; there is no evidence to the contrary.

Furthermore, a reasonable jury could infer that, because California has not dismantled or otherwise walked back its regulatory scheme put in place to fill in the gap left by the final rule, the gap is still significant.  In other words, one would not expect the state to spend sums on a problem of little to no significance.

Finally, Plaintiffs make a fair point that, "[e]ven if ATF were to regulate all ghost gun products other than partially complete AR-style receivers, the 'predictable effect of [ATF's] action[s]" is increased demand for and use of those partially complete AR-style receivers.'"  Sur-Reply at 21.  The resulting increase in the demand for the unregulated partially complete receivers increases the chances of ghost guns with such receivers being used in crimes.

As for **GLC**, the same evidence above also supports that it has sustained an injury in fact, even if the only concern at this point is partially complete AR-type receivers.  That is, the alleged loophole/exception left by the final rule is big enough that the organization will continue to have to divert resources to addressing ghost guns instead of other kinds of firearms.

At bottom, the fact of, and not the precise magnitude of, the harms alleged by Plaintiffs is what counts for standing.  Defendants have thus failed to show either Plaintiff lacks standing to proceed with this suit; the record evidence of injuries to the Plaintiffs establishes standing.  Defendants' motion based on standing is thus denied.

### IV.     APA

The Court now turns to the merits of the case where both parties have moved for summary judgment.  As noted above, Plaintiffs assert that Defendants have violated the APA because ATF has determined that certain partially complete AR-type receivers are not firearms.

Under the APA, an agency's decision should not be overturned unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

706(2)(A). "'Agency action is "not in accordance with the law" when it is in conflict with the language of the statute'" relied upon by the agency. *Nw. Envtl. Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008). As for the arbitrary and capricious standard,

> [a] decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or product of agency expertise."
>
> *O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983)). . . . "[R]eview under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency." *Id.* (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376, 104 L. Ed. 2d 377, 109 S. Ct. 1851 (1989)); *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1160 (9th Cir. 1998) (citations omitted).

*United States v. Snoring Relief Labs., Inc.*, 210 F.3d 1081, 1085 (9th Cir. 2000); *see also Kalispel Tribe of Indians v. United States DOI*, 999 F.3d 683, 688 (9th Cir. 2021).

In an APA case, "'summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.'" *City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997). That is, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Engineering Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985).

A.    AR-Type Receivers

As noted above, the basic dispute between the parties is over Example 4 as provided for in the relevant regulation.

> Example 4 to paragraph (c) – **Not** a receiver: A billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver.

27 C.F.R. § 478.12(c) (emphasis added). Plaintiffs contend that this determination by ATF

20

violates the APA because it is not in accordance with the law (*i.e.*, the GCA) and further is arbitrary and capricious.[9]

Example 4 is expanded upon in other ATF determinations, including, most notably, the September 2022 Open Letter and certain Classification Letters.

### 1. September 2022 Open Letter

"ATF periodically publishes Open Letters to the industries it regulates in order to remind or assist licensees with understanding their regulatory compliance responsibilities under the laws and regulations administered by ATF."  ATF Supp. 173 (ATF website).

A copy of the September 2022 Open Letter (issued after the final rule) can be found in the supplemental administrative record.  *See* ATF Supp. 199 *et seq.*  The letter addresses AR-type weapons specifically and states in relevant part as follows:

> In an AR-15 variant weapon, the "fire control cavity is the critical area of the receiver because this area "provides housing for the trigger mechanism and hammer."  27 CFR 478.12(f)(1)(i).  To be a "functional" receiver, an AR-type receiver must include a cavity sufficient to house the relevant internal parts, including a hole for a selector and 2 pin holes (trigger pin and hammer pin) in precise locations.  Removing or indexing any material in this critical area, or completing or indexing any of these holes, is therefore a crucial step in producing a functional receiver.
>
> Thus, in order <u>not</u> to be considered "**readily**" completed to function, ATF has determined that a partially complete AR-type receiver must have no indexing or machining of any kind performed in the area of the trigger/hammer (fire control) cavity.  <u>A partially complete AR-type receiver with no indexing or machining of any kind performed in the area of the fire control cavity is not classified as a "**receiver**," or "**firearm**," if not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides, such as within a receiver parts kit.</u>
>
> [Photos omitted.]
>
> Because the front of the takedown-pin lug clearance area merges with the back of the fire control cavity in a functional AR-type receiver, it was necessary for ATF to determine the point at which the takedown-pin lug clearance area stops, and the fire control cavity begins.  AFT has determined that drilling or milling a standard

---

[9] Again, Plaintiffs' challenge implicates partially complete AR-type receivers generally, and not just partially complete AR-*15* type receivers specifically.  *See* note 7, *supra*.  However, the parties have often focused on partially complete AR-15 type receivers since that is the specific example (Example 4) given in the regulation.

0.800-inch takedown-pin area, measured from immediately forward of the front of the buffer retainer hole next to the fire control cavity, does not impact the ability of the fire control cavity to house the trigger mechanism and hammer. Provided this length is not exceeded, the fire control cavity remains "*without critical interior areas having been indexed, machined, or formed*" as stated in 27 CFR 478.12(c), Example 4.

The following illustration demonstrates the fire control cavity of an AR-type receiver.



September 2022 Open Letter, ATF Supp. 201-02 (all emphasis in original).[10]

The letter further states:

> It is important that persons engaged in the business of manufacturing, importing, or dealing in these items do not take any steps to avoid [the requirements of the GCA] by selling or shipping the parts or parts kits in more than one box or shipment to the same person, or by conspiring with others to do so (18 U.S.C. §§ 2, 371).

September 2022 Open Letter, ATF Supp. 205 (emphasis in original).

    2.   <u>Exemplar Classification Letter</u>

ATF issues not only Open Letters but also Classification Letters. As alleged in the complaint,

---

[10] As indicated above, for purposes of the pending motions, the Court often focuses on partially complete AR-15 type receivers. However, Plaintiffs have also challenged ATF's determinations related to partially complete AR-10 type receivers on similar grounds. *See* Opp'n at 10 n.6 (noting that "ATF's analysis of partially complete AR-10 receivers is identical to its analysis of partially complete AR-15 receivers, except that ATF considers whether the forward edge of the takedown pin lug clearance area measures more than 1.600 inch (instead of 0.800 inch)").

United States District Court
Northern District of California

> [i]n [Classification] [L]etters, ATF responds to questions that manufacturers, distributors, and others submit to ATF to adjudicate, such as whether the product they are proposing to sell is subject to the GCA's requirements, including background checks and serialization.  According to the ATF Handbook, ATF encourages firearms manufacturers to "seek an ATF classification of its product prior to manufacture" in order to "avoid an unintended classification and violations of the law."  The ATF Handbook further explains that such Classification Letters "may generally be relied upon by their recipients as the agency's official position concerning the status of the firearms under Federal firearms law."

FAC ¶ 34.

The Classification Letters that Plaintiffs are challenging relate to AR-type weapons.  An exemplar letter is Classification Letter #315916 which can be found in the supplemental administrative record as Exhibit 12.  *See* ATF Supp. 238 *et seq.*; *see also* Supp. FAC ¶ 109.

The content of the Classification Letter is similar to that in the September 2022 Open Letter.  For example, the Classification Letter states:

> FTISB has determined that the submitted sample[] may not "readily be completed, assembled, restored or otherwise converted to function as a frame or receiver."  Therefore, taken alone, the submitted partially complete AR-type receiver is not a "**firearm**" as defined in the GCA, 18 U.S.C. § 291(a)(3). . . .
>
> . . . .
>
> . . . ATF conducts its classification review of the submitted sample, precisely as submitted.  Based on the statutory and regulatory definitions above, a partially complete AR-type receiver alone, with no indexing or machining of any kind performed in the area of the fire control cavity (except the .800 inch takedown pin area, explained below) will be examined to ascertain if it can "readily be completed, assembled, restored or otherwise concerted to function as a frame or receiver."  We note that even when a sample is not classified as a "**receiver**," or "**firearm**," that determination can change if it is sold, distributed, marketed, possessed, or otherwise made available with any associated templates, jigs molds, equipment, tools, instructions, or guides, such as within a receiver parts kit.
>
> . . . .
>
> The forward edge of the takedown pin lug clearance area of this sample item does not measure more than .800 inch immediately forward of the front of the buffer retainer hole.  Additionally, the trigger/hammer recess of your submitted sample is sold with exception of the previously noted takedown pin clearance lug, and there are no index detents machined for the safety lever or the trigger/hammer pins.

United States District Court
Northern District of California

1   ATF Supp. 240-41 (all emphasis in original).

2        The Classification Letter also states:

3            It is important that persons engaged in the business of
         manufacturing, importing, or dealing in firearms do not take any
4            steps to avoid [the requirements of the GCA] by selling or shipping
         the parts or parts kits in more than one box or shipment to the same
5            person, or by conspiring with others to do so (18 U.S.C. §§ 2, 371).

6   ATF Supp. 242.

7        It is apparent from Example 4, the Open Letter, and the Classification Letters that if a

8   receiver blank without indexing or machining is not sold with any associated templates, jigs

9   molds, equipment, tools, instructions, or guides, it categorically will not be deemed a "receiver" or

10  "firearm" irrespective of the availability of such ancillary tools from other sources.

11  B.    Not in Accordance with Law

12       The APA provides that a court shall "hold unlawful and set aside agency action, findings,

13  and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).  According to

14  Plaintiffs, ATF's determinations above (*e.g.*, Example 4, the September 2022 Open Letter, and the

15  exemplar Classification Letter) are not in accordance with law because they do not comply with

16  the GCA.  Plaintiffs underscore: "Agency action is not in accordance with the law *when it is in*

17  *conflict with the language of the statute*."  *Northwest Envtl. Advocates*, 537 F.3d at 1014 (internal

18  quotation marks omitted; emphasis added); *see also* Opp'n at 22 (arguing that the Court need not

19  defer to the ATF's construction of the GCA because its interpretation is "'manifestly contrary to

20  the statute'" and "'the statute is unambiguous'").

21       The relevant provision of the GCA is 18 U.S.C. § 921(a)(3).  This provision defines

22  "firearm" in relevant part as "(A) any weapon (including a starter gun) which will or is designed to

23  or may readily be converted to expel a projectile by the action of an explosive" or "(B) the frame

24  or receiver of any such weapon."  18 U.S.C. § 921(a)(3).  Below the Court addresses §

25  921(a)(3)(A) and § 921(a)(3)(B) separately.

26       1.    Section 921(a)(3)(A)

27       Under § 921(a)(3)(A), a "firearm" for purposes of the GCA includes "any weapon

28  (including a starter gun) which will or is designed to *or* may readily be converted to expel a

United States District Court
Northern District of California

1   projectile by the action of an explosive." *Id.* § 921(a)(3)(A) (emphasis added).  According to

2   Plaintiffs, a partially complete AR-type receiver that is not machined or indexed in critical interior

3   areas and not sold with, *e.g.*, a jig or tools, is still a weapon "designed" to expel a projectile or

4   "may readily be converted to expel a projectile." *Id.*

5                    a.       Designed

6          Plaintiffs argue that a partially complete AR-type receiver is a firearm under §

7   921(a)(3)(A), even if it is not machined or indexed and not sold with a jig or tools, because it is

8   "designed for a single purpose: to become an operable gun.  Unlike a raw block of metal, [such a

9   partially complete receiver is] too far along in the manufacturing process to be turned into

10  anything but a firearm."  Opp'n at 17.  Plaintiffs assert: "A bicycle is 'designed to' operate as a

11  bicycle before it gets its pedals, seat, or handlebar."  Opp'n at 17.  They also note: "ATF's Final

12  Rule and implementing guidance never mention, let alone evaluate, the design purpose of these

13  AR-style receivers."  Opp'n at 17.

14         Although Plaintiffs' position has some appeal,  the Court rejects it.  The problem for

15  Plaintiffs is that they have strayed from the language of the GCA.  Section 921(a)(3)(A) provides

16  that a "firearm" for purposes of the GCA includes "any *weapon* (including a starter gun) which

17  will or is designed to or may readily be converted to expel a projectile by the action of an

18  explosive."  18 U.S.C. § 921(a)(3)(A) (emphasis added).  A partially complete AR-type receiver

19  cannot fairly be characterized as a weapon.

20         First, the ordinary meaning of weapon is "something (such as a club, knife, or gun) used to

21  injure, defeat, or destroy."  https://www.merriam-

22  webster.com/dictionary/weapon?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last

23  visited on 1/10/2024); *see also* Webster's 3d New Int'l Dictionary (1966) (defining "weapon" as

24  "an instrument of offensive or defensive combat: something to fight with: something (as a club,

25  sword, gun, or grenade) used in destroying, defeating, or physically injuring an enemy").  A

26  partially complete receiver does not satisfy that definition.

27         Second, additional text from the GCA indicates that a partially complete receiver cannot be

28  deemed a weapon.  Section 921(a)(3)(B) provides that a "firearm" also includes "the frame or

United States District Court
Northern District of California

receiver *of any such weapon*."  18 U.S.C. § 921(a)(3)(B) (emphasis added).  This language from the GCA underscores that a receiver is not a weapon in and of itself but rather is *part* of a weapon.

### b.   May Readily be Converted

Plaintiffs argue that, even if a partially complete AR-type receiver that is not machined or indexed and not sold with a jig or tools is not "designed" to expel a projectile, it still is a firearm under the GCA because it "may readily be converted to expel a projectile."  21 U.S.C. § 921(a)(3)(A) (defining a firearm as, *inter alia*, "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive").  In support, Plaintiffs look to the National Firearms Act ("NFA") which governs machineguns.  The NFA provides in relevant part: "The term 'machinegun' means any weapon which shoots, or is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  28 U.S.C. § 5845(b).  Plaintiffs cite NFA cases holding that a weapon is a machinegun because it can be restored to shoot automatically in two hours using ordinarily tools (Ninth Circuit) or even in six to eight hours using particular machinery (Sixth and Eighth Circuits).  *See* Opp'n at 19-20.

The problem for Plaintiffs is, once again, that their position runs up against the text of § 921(a)(3)(A).  Section 921(a)(3)(A) requires that the item be a *weapon* that may readily be converted to expel a projectile.  As discussed above, a partially complete AR-type receiver is not a weapon but rather is a part of a weapon.

### 2.   Section 921(a)(3)(B)

Section 921(a)(3)*(B)* of the GCA provides that a "firearm" also includes "the frame or receiver of any such weapon [*i.e.*, a weapon which will or is designed to or may readily be converted to expel a projectile]."  21 U.S.C. § 921(a)(3)(B).  According to Plaintiffs, a partially complete AR-type receiver that is not machined or indexed and not sold with a jig or tool is still a receiver within the meaning of § 921(a)(3)(B).  Plaintiffs assert:

> Defendants concede that a receiver need not be finished or ready to use in order to qualify as a "receiver" under the GCA.  ATF has affirmatively argued – here and in other cases – that the term "receiver" includes a partially complete receiver that is "designed to or may readily be converted to function as a . . . receiver."

26

United States District Court
Northern District of California

1   Opp'n at 21.

2          ATF's concession – *i.e.*, that a receiver includes a partially complete receiver that is

3   designed to or may readily be converted to function as a receiver – comes from ATF's own

4   regulation (as promulgated with the final rule):

5              The terms "frame" and "receiver" shall include a **partially
               complete**, disassembled, or nonfunctional frame or **receiver**,
6              including a frame or receiver parts kit, **that is designed to or may
               readily be** completed, assembled, restored, or otherwise **converted
7              to function as a frame or receiver** . . . .  [But] [t]he terms shall not
               include a forging, casting, printing, extrusion, unmachined body, or
8              similar article that has not yet reached a stage of manufacture where
               it is clearly identifiable as an unfinished component part of a
9              weapon (e.g., unformed block of metal, liquid polymer, or other raw
               material).  When issuing a classification, the Director may consider
10             any associated templates, jigs, molds, equipment, tools, instructions,
               guides, or marketing materials that are sold, distributed, or
11             possessed with the item or kit, or otherwise made available by the
               seller or distributor of the item or kit to the purchaser or recipient of
12             the item or kit.

13  27 C.F.R. § 478.12(c) (emphasis added).  Thus, Plaintiffs are not really arguing that ATF has

14  failed to act in accordance with the *GCA* but rather has failed to properly implement one of its

15  regulations.[11]

16  _____

17  [11] The Fifth Circuit has held that ATF's definition of "frame" or "receiver" as including partially
    complete frames or receivers is invalid on the basis that it is "an impermissible extension of the
18  statutory text [of the GCA] approved by Congress."  *Vanderstok v. Garland*, 86 F.4th 179, 189
    (5th Cir. 2023).  The Fifth Circuit reasoned as follows:

19
               In the GCA's definition of "firearm," the first subsection includes
20             flexible language such as "designed to or may readily be converted
               to expel a projectile by the action of an explosive."  *See* 18 U.S.C. §
21             921(a)(3)(**A**).  But the subsection immediately thereafter [§
               921(a)(3)(**B**)], which contains the term "frame or receiver," does not
22             include such flexibility [*i.e.*, does not contain the language
               "designed to" or "may readily be converted"].  "[W]hen Congress
23             includes particular language in one section of a statute but omits it in
               another section of the same Act, it is generally presumed that
24             Congress acts intentionally and purposely in the disparate inclusion
               or exclusion."  *Collins v. Yellen*, 141 S. Ct. 1761, 1782, 210 L. Ed.
25             2d 432 (2021) (citation omitted). . . .

26             There is also a clear logical flaw in ATF's proposal.  As written, the
               Final Rule states that the phrase "frame or receiver" includes things
27             that are admittedly not yet frames or receivers but that can easily
               become frames or receivers – in other words: parts. [ ] As the district
28             court put it, under the Final Rule, "ATF may properly regulate a
               component as a 'frame or receiver' even after ATF determines that

27

_____

the component in question is *not* a frame or receiver." *VanDerStok*, 2023 U.S. Dist. LEXIS 115474 (emphasis in original).  Such a proposition defies logic: "a part cannot be both *not yet* a receiver and a receiver at the same time."

*Id.* at 189-90 (italics in original; bold added).

Respectfully, the analysis above is problematic for several reasons.  Although *Collins* states that a presumption may obtain from silence, case law also makes clear that any such presumption is simply a canon of construction that is not, on its own, necessarily dispositive.  *Cf. United States v. Vonn*, 535 U.S. 55, 65 (2002) ("[T]he canon that expressing one item of a commonly associated group or series excludes another left unmentioned is only a guide, whose fallibility can be shown by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion of its common relatives.").

Indeed, a contrary inference may be drawn: "because silence 'may signal permission rather than proscription,' the fact 'that Congress spoke in one place but remained silent in another . . . rarely if ever suffices for the question of what Congress intended.  *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1260 (11th Cir. 2020); *see also Catawba Cnty. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (stating that, "[w]hen interpreting statutes that govern agency action, we have consistently recognized that a congressional mandate in one section and silence in another often 'suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion'"); *cf. Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 222 (2009) (Scalia, J.) (stating, in case under consideration, that "silence is meant to convey nothing more than a refusal to tie the agency's hands as to whether cost-benefit analysis should be used, and if so to what degree").  In assessing whether an agency has exceeded its statutory authority, a court must "'ascertain whether Congress had a specific intent on the precise question before [it],'" and, if the statute is ambiguous on the point, [the court] assume[s] that Congress delegated to the agency the authority to reasonably answer the question."  *Gateway Radiology Consultants*, 983 F.3d at 1256.  Hence, Congress's silence with respect to "frame" or "receiver" does not compel the conclusion that the definition of these terms is beyond interpretation by the ATF; it could support the inference that it affords ATP the authority to render and interpretation of the statute.

In respect to Congress's intent, courts should not presume that the legislature intended absurd results that might obtain upon a given interpretation of the law.  *See United States v. Thomsen*, 830 F.3d 1049, 1058 (9th Cir. 2016) ("Notwithstanding the importance of the text [of a statute], we must avoid a literal interpretation of the statute that produces an absurd result.") (internal quotation marks omitted).  Here, it makes no sense that something less than a fully functional receiver could never be a receiver regardless of the circumstances.  For example, if a receiver were partially complete because it was missing only one pinhole or dimple which could easily be drilled, it would make little sense to hew to the position that the partially complete receiver still is not a receiver for purposes of the GCA, as the Fifth Circuit's logic suggests.  This is particularly true given that the GCA was enacted to strengthen its predecessor statute (the Federal Firearms Act ("FFA")), not dilute it, as indicated by, *e.g.*, the fact that § 921(a)(3)(A) was revised to make the definition of firearm more inclusive.

The definition of the term "firearm" in paragraph (3) is a restatement and revision of the provisions of existing law (15 U.S.C. 901(3)) [i.e., the FFA].  The revised definition has been extended to include any weapon by whatsoever name known "which will," or "which may be readily converted to," expel a projectile or projectiles by the action of an explosive.  This represents a much needed clarification and strengthening of existing law designed to prevent circumvention

28

1    Some "courts have concluded that an agency's failure to comply with its own regulations is

2    'not in accordance with law'" for purposes of the APA. *Am. Stewards of Liberty v. DOI*, 370 F.

3    Supp. 3d 711, 728 (W.D. Tex. 2019). Other courts have held that, when an agency fails to comply

4    with its own regulations, it has acted arbitrarily and capriciously for purposes of the APA. *See*

5    *Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("[A]n

6    agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its

7    own regulations.'"); *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986) ("The failure of an

8    agency to comply with its own regulations constitutes arbitrary and capricious conduct. The

9    courts must overturn agency actions which do not scrupulously follow the regulations and

10    procedures promulgated by the agency itself."). For purposes of the instant action, precisely

11    which standard technically applies is not significant; the analysis is largely the same.

12         a.    <u>Designed</u>

13    In their papers, Defendants disagree that they are not adhering to their own final

14    rule/regulation. Defendants contend:

15         The disputed receiver blanks are not designed to "function as a
16         frame or receiver." Rather, they are designed *to be converted into* a
         functional receiver through a complex set of machining operations.
17         They are far from being *able* to function as a receiver because the

         of the purposes of the act. As under existing law, the definition also
18         includes weapons "designed to" expel a projectile or projectiles by
19         the action of an explosive, and firearm mufflers and firearm
         silencers.
20

21    111 Cong. Rec. 5520, 5527 (Mar. 22, 1965) (Sen. Dodd, introducing the bill). It is highly unlikely
22    that Congress intended the perverse result that no matter how close to completion a partially
         complete receiver may be, it is categorically exempt from regulation under § 921(a)(3) of the
         GCA.
23

24         It is true that the GCA's predecessor statute "had specific language that authorized
         regulation of 'any part or parts of' a firearm," but that "Congress removed this language when it
25    enacted the GCA, replacing 'any part or parts' with just 'the frame or receiver of any such
         weapon.'" *Vanderstok*, 86 F.4th at 191. However, the legislative history for the GCA reflects that
26    the "parts" language was dropped because of impracticality. As Senator Dodd noted: "The present
         definition of this term [in the FFA] includes 'any part or parts' of a firearm. It has been
27    impractical to treat *each small part* of a firearm as if it were a weapon [i.e., firearm]. The revised
         definition substitutes the words 'frame or receiver' for the words 'any part or parts.'" *Id.* That it
         was not practical to treat each small part of a firearm as a firearm does not mean there was an
28    intent to regulate less.

United States District Court
Northern District of California

> fire control cavity is solid and unmachined.  *See* Sept. Open Letter at 3-4. . . .
>
> . . . . [Plaintiffs] ignore[] the distinction between being designed to perform a function and being designed to be converted into something that will perform a function.  *See* [*United States v.*] *Gravel*, 645 F.3d [549,] 551 [(2d Cir. 2011)] ("designed" refers to what a product "was conceived of and designed for, and not to any modifications made afterwards").  Therefore, unserviceable or damaged receivers may, depending on the factual circumstances, be designed to function as a receiver under the Rule.  Defs.' MSJ at 10 n.5; [Final Rule,] 87 Fed. Reg. at 24,685-86 & nn.99-100, 105.  But the disputed receiver blanks, which were designed to have a solid fire control cavity that cannot be used to house fire control components, plainly are not designed to function as a receiver in their present state.

Reply at 9-10 (emphasis added).

In response, Plaintiffs argue that Defendants have lost sight of the ordinary meaning of "design": "to create, fashion, execute, or construct according to a plan"; "to conceive and plan out in mind"; "to have as a purpose: INTEND"; or "to devise for a specific function or end." https://www.merriam-webster.com/dictionary/designed (last visited 2/23/2024); *see also United v. Thomas*, No. 17-194 (RDM), 2019 U.S. Dist. LEXIS 147264, at *12 (D.D.C. Aug. 29, 2019) (providing the same first definition for "design," as that term is used in § 921(a)(3)); *cf. United States v. Gravel*, 645 F.3d 549, 551 (2d Cir. 2011) (in considering "designed" as used in 26 U.S.C. § 5845(b), which regulates machineguns, finding a similar ordinary meaning for "design"; adding that "[t]he 'ordinary, contemporary, common meaning' of design must consider what was contemplated at the time the weapon was being conceived and devised").  According to Plaintiffs, under the ordinary meaning of "design," a partially complete receiver *is* designed to function as a receiver, and Defendants improperly conflate the "designed" prong of the regulation with the "may readily be converted" prong.  *See* Sur-Reply at 4 (arguing that "[t]he relevant question for the purposes of the 'designed to' prong is not, as Defendants suggest, whether the item can 'readily' be converted into a receiver . . . , but whether the item was manufactured *for the purpose of becoming* a receiver") (emphasis in original).

Plaintiffs' position is not unreasonable.  "Designed" and "may readily be converted" are distinct concepts. The problem for Plaintiffs, however, is that Defendants have articulated a position that is not unreasonable, one that does not conflate the two concepts – in essence, that

"designed" evaluates what an item's *immediate* purpose is, and not what its purpose *may be* if later converted. *Cf. United States v. Gravel*, 645 F.3d 549, 551-52 (2d Cir. 2011) ("find[ing] that the word 'designed,' when applied to a manufactured object such as a firearm, refers to what the gun was conceived and designed for, and not to any modifications made afterwards").[12]  Such an interpretation makes particular sense given that the phrase used in the regulation (§ 478.12(c)) is "designed . . . *to function*," and not, *e.g.*, "designed *to become*."  Defendants have also made a fair argument that, under Plaintiffs' position, there is no real difference between the "designed" and "may readily be converted" prongs of the regulation, which is contrary to the use of the disjunctive "or" in the regulation.  Finally, under Plaintiffs' position, the regulation would have an internal inconsistency: a partially complete receiver would always be a receiver (and therefore a firearm)

---

[12] *Gravel* was a criminal case.  The defendant had stolen a weapon that "originally was manufactured to fire automatically, but was later modified to shoot semi-automatically." *Gravel*, 645 F.3d at 550.  The modification "did not change the fundamental design of the weapon or . . . 'redesign' the weapon into something other than an automatic fire weapon." *Id.* at 552.  Rather, "[t]he evidence indicated that simply replacing the auto sear [which had been removed] would reenable the gun's automatic fire capabilities." *Id.*

On appeal, the issue was whether the district court properly applied a six-level enhancement based on its finding that the weapon was a "machinegun" as defined in 26 U.S.C. § 5845(b) (which is part of the National Firearms Act).  Under that statute, a machinegun is a weapon that "'is designed to shoot . . . automatically more than one shot.'" *Id.* at 550.

> Gravel [the defendant] argues that the M-16A1 was "re-designed" into a semi-automatic weapon, and that because Section 5845 uses the present tense "is designed," we may consider only the state of the weapon as it existed at the time of his crime.  The government argues that under the plain meaning of the statute, "designed" refers to what the weapon was originally designed to do, not to post-manufacture modifications.

*Id.*

The Second Circuit ultimately sided with the government:

> We find that the word "designed," when applied to a manufactured object such as a firearm, refers to what the gun was conceived and designed for, and not to any modifications made afterwards.  This is consistent with the statutory language further defining "machinegun" as a weapon readily restorable to automatic fire.  There would be no need to include a definition taking future modifications into account if the word "design" encompassed post-manufacture modifications.

*Id.* at 551-52.

United States District Court
Northern District of California

under the "designed" prong which would then conflict with Example 4 – which, as noted above, provides that a partially complete receiver is not a receiver (and therefore a firearm) so long as it is not machined or indexed and is not sold with a jig or tools.  Presumably, ATF did not intend for there to be an internal inconsistency in its own regulation, and therefore, the regulation should be construed in a way to reconcile any potential internal inconsistency if it can reasonably be so construed.  *Cf. Momeni v. Chertoff*, 521 F.3d 1094, 1097 (9th Cir. 2008) ("Where an appellate court can construe two statutes so that they conflict, or so that they can be reconciled and both can be applied, it is obliged to reconcile them.").  Defendants' interpretation of "designed" – taking a narrower view compared to Plaintiffs' view – reconciles any potential inconsistency with Example 4.

Accordingly, the Court finds that Defendants did not fail to comply with their own regulations, and therefore they did not fail to act in accordance with the law, nor did they act arbitrarily and capriciously.  There is thus no APA violation here.  *See Davis v. Latschar*, 83 F. Supp. 2d 1, 5 (D.D.C. 1998) ("[P]rovided it does not violate the Constitution or a federal statute, an agency's interpretation of its own regulations 'will prevail unless it is "plainly erroneous or inconsistent" with the plain terms of the disputed regulations.'"); *see also Stinson v. United States*, 508 U.S. 36, 45 (1993).

> b.  <u>May Readily be Converted</u>

Plaintiffs argue that, under the final rule/regulation, a partially complete receiver must be deemed a receiver (regardless of what it is "designed" to do) if it "may readily be converted" to function as receiver.

This argument overlaps with that below – *i.e.*, as to how ATF has acted arbitrarily and capriciously in construing and applying the "readily be converted" test – and is therefore addressed below.

C.  <u>Arbitrary and Capricious</u>

"[A]n agency's action can only survive arbitrary or capricious review where it has articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th

United States District Court
Northern District of California

1    Cir. 2023) (internal quotation marks omitted).

> A decision is arbitrary and capricious if the agency
> "has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an
> important aspect of the problem, offered an
> explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that
> it could not be ascribed to a difference in view or
> product of agency expertise."
>
> *O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d
> 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State
> Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 103 S.
> Ct. 2856 (1983)). . . . "[R]eview under the arbitrary and capricious
> standard is narrow, and the reviewing court may not substitute its
> judgment for that of the agency." *Id.* (citing *Marsh v. Oregon
> Natural Resources Council*, 490 U.S. 360, 376, 104 L. Ed. 2d 377,
> 109 S. Ct. 1851 (1989)); *Presidio Golf Club v. National Park
> Service*, 155 F.3d 1153, 1160 (9th Cir. 1998) (citations omitted).

*Snoring Relief*, 210 F.3d at 1085.

In their papers, Plaintiffs have three main theories as to how ATF has acted arbitrarily and capriciously in failing to find that partially complete receivers without machining or indexing and not being sold with jigs or tools are not firearms:

(1) ATF has ignored the "GCA's [c]lear [s]tatutory [c]ommands."  Opp'n at 23;

(2) ATF has ignored data demonstrating that such a partially complete receiver may readily be converted into a receiver, taking into account the definition of "readily" in 27 C.F.R. § 478.11 which includes multiple factors for consideration, including "[t]ime, i.e., how long it takes to finish the process," "[e]ase, i.e., how difficult it is to do so," "[e]xpertise, i.e., what knowledge and skills are required," etc.  27 C.F.R. § 478.11; and

(3) ATF has failed to sufficiently explain (a) why such a partially complete AR-15 type receiver with machining of *more* than 0.800 inch in the area near the fire control cavity (known as the takedown-pin lug clearance area) is a firearm but not one with machining of 0.800 inch or less, *see* Opp'n at 23; *see also* Opp'n at 30 (arguing that there must be data to support an agency's line drawing); Sur-Reply at 16-17 (arguing that line drawing must be consistent with the statute and relate to the

underlying regulatory problem), and (b) why such a partially complete receiver is not a receiver given that jigs and tools are so easy to obtain even if sold separately from the partially complete receiver. *See* Opp'n at 28 (noting that "[t]emplates and instructions are easy to locate online, sometimes for free, and jigs are both inexpensive and readily available for purchase (either from a different retailer or in a different transaction from the same retailer)").

### 1. Theory No. 1: Ignoring GCA's Clear Statutory Commands

In their first theory, Plaintiffs argue that ATF acted arbitrarily and capriciously because it ignored the GCA's clear text by not deeming the partially complete receivers described in, *e.g.*, Example 4 firearms (*i.e.*, partially complete receivers with no machining or indexing and not sold with jigs or tools). Plaintiffs emphasize that ATF never even considered whether such partially complete receivers were designed to expel a projectile.

Plaintiffs' first theory is based on § 921(a)(3)*(A)* of the GCA. For the reasons discussed above, Plaintiffs' arguments based on § 921(a)(3)(A) fail because that subsection uses the word "weapon" and a partially complete receiver is not in and of itself a weapon but rather a part of a weapon.

### 2. Theory No. 2: Ignoring Relevant Data

In their second theory, Plaintiffs criticize ATF on the basis that the challenged determinations (including Example 4, the September 2022 Open Letter, and the exemplary Classification Letter) were made without taking into account all relevant data, including the factors listed in 27 C.F.R. § 478.11 which defines "readily" as follows:

> A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state. With respect to the classification of firearms, factors relevant in making this determination include the following:
>
> (1)   Time, i.e., how long it takes to finish the process;
> (2)   Ease, i.e., how difficult it is to do so;
> (3)   Expertise, i.e., what knowledge and skills are required;
> (4)   Equipment, i.e., what tools are required;
> (5)   Parts availability, i.e., whether additional parts are required, and how easily they can be obtained;
> (6)   Expense, i.e., how much it costs;

(7)    Scope, i.e., the extent to which the subject of the process
       must be changed to finish it; and

(8)    Feasibility, i.e., whether the process would damage or
       destroy the subject of the process, or cause it to malfunction.

27 C.F.R. § 478.11.  Of particular note, ATF's determinations do not reflect how long it takes to convert the contested partially complete receivers into functional ones.  For example, the September 2022 Open Letter and the exemplary Classification Letter both focus on machining/indexing of the fire control cavity and do not make any mention of time.  Similarly, the final rule – though it does refer to the factor of time in some instances – never does so in discussing Example 4.  *See, e.g.*, Final Rule, 87 Fed. Reg. at 24,663 (discussing the definition of "readily" in § 478.11, of which one factor is time); *id.* at 24,699 (taking note that "[n]umerous commenters focused on the factor of 'time' under the proposed definition of 'readily,' arguing that it is not an adequate factor, without more specificity, by which to measure if a . . . partially completed frame or receiver may be readily convertible or assembled into a firearm"); *id.* at 24,700 (rejecting suggestion that "[the] factors should incorporate minimum time limits, percentages of completion, or levels of expertise, or otherwise create thresholds to determine when weapon or frame or receiver parts are 'readily' converted").  Plaintiffs contend with the assistance of available tools (which may be obtained from the open market), it can take just a few hours to convert a partially completed receiver into a fully functional one.[13]

In response, Defendants argue that "the machining operations necessary for [a receiver's] completion are highly relevant to [*e.g.*] the time and ease with which it can be rendered functional."  Reply at 16; *see also* Mot. at 13 (asserting that "ATF does consider the machining

---

[13] The Court notes that the parties do not appear to be disagree on this point.  *Compare* Yurgealitis Decl. ¶ 27 (testifying that the "conversion process can take one to three hours, depending on the available tools, the quality of the partially complete frame or receiver, the demarcations on the frame or receiver designed to guide swift conversion, and the mechanical aptitude of the individual completing the receiver"), *with* Hoffman Decl. ¶ 38 (testifying that it took him 4.5 hours to do his first conversion, although "the completed receiver build quality was substandard, with the fire control cavity not being cut to exact specifications"); Hoffman Decl. ¶ 27 (testifying that, prior to the September 2022 Open Letter, "FEOs in FTISB completed or attempted to complete numerous partially complete AR-type receivers with a fixture/jig" and "[t]hese builds averaged 1.5-3 hours to complete depending on the quality of the fixtures/jigs and the tools used and the experience of the FEO").  Though these declarations are not admitted for consideration for the reasons stated above, they are cited here simply to show the parties do not dispute this particular fact.  Ultimately, on remand, the time needed to convert and its implications will need to be considered by the agency.

operations . . . but it considers [them] in order to *apply* the Rule's 'designed to or may readily be . . . converted to function' test, not to *repudiate* it"; "the machining operations . . . are highly relevant to most, if not all, of [the eight] factors" listed in § 478.11) (emphasis in original).  But that machining operations are relevant to, *e.g.*, time does not establish that ATF considered the actual time it takes to convert the kind of partially complete receiver at issue into a functional one, including when jigs and tools are available.

The agency's failure to address time is particularly troubling given that time is clearly one of the most important factors in assessing "readily."  It is the first factor identified in 27 C.F.R. § 478.11.  It is also a factor highlighted in case law addressing the similar issue of whether a weapon should be considered a "machinegun" as defined in 26 U.S.C. § 5845(b) (which is part of the NFA).  *See* 26 U.S.C. § 5845(b) (providing that "[t]he term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger").  *See, e.g.*, *United States v. TRW Rifle 7.62x51mm Caliber*, 447 F.3d 686, 692 (9th Cir. 2006) (stating as follows: "A **two-hour** restoration process using ordinary tools, including a stick weld, is within the ordinary meaning of 'readily restored.'  As to the temporal component, two hours, while not an insignificant amount of time, is still within a range that may properly be considered 'with fairly quick efficiency,' 'without needless loss of time,' or 'reasonably fast.'  As to the means of restoration, requiring the use of ordinary tools and a stick weld, even by a skilled worker, is likewise within what may properly be considered 'with a fair degree of ease,' 'without much difficulty,' or 'with facility.'") (emphasis added).

Moreover, any evaluation of time should take into account the object at issue.  For instance, in *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416 (6th Cir. 2006), the Sixth Circuit addressed whether a weapon could be "readily restored" to shoot automatically, in which case it would be deemed a "machinegun" for purposes of the National Firearms Act.  The court noted that the phrase "readily restored" "must not be construed as an abstract phrase, but rather its contours should be determined in the context of what it means to be able to 'readily restore[]' a machinegun as opposed to some other object."  *Id.*  "The sort of object

being restored, primarily its complexity, helps to determine whether a given amount of time, money, expertise, and skill required to restore it is considered a 'ready' restoration" – *e.g.*, "a car that could be restored in ten hours for $500 would likely be considered 'readily restored,' whereas a skateboard that required the same inputs likely would not be considered 'readily restored.'" *Id.* The record in the case at bar does not reflect that the complexity of the object at issue (an AR-15) was actually considered by ATF in assessing how to factor time in connection with what "may readily be converted."

To the extent Defendants argue that ATF did in fact consider factors such as time, that position is based on the Hoffman Declaration – which Defendants admit the Court should not consider if it does not consider the Yurgealitis Declaration submitted by Plaintiffs. Moreover, Plaintiffs make a fair argument that the Hoffman Declaration largely provides a post-hoc explanation for ATF's determinations.[14]  *See, e.g.*, Hoffman Decl. ¶ 28 (testifying that, "[t]o help implement the Final Rule, FTISB also developed a standard procedure to assist FEOs in evaluating the tracked . . . factors under the 'readily' definition" – *i.e.*, it "developed a 'Readily' Assembled Firearm Completion Form for this purpose"; the form has several fields including "Time needed to complete build").

3.    Theory No. 3: Some Machining/Indexing and Jigs/Tools Sold Separately

In their third theory, Plaintiffs argue that ATF has acted arbitrarily and capriciously with respect to partially complete receivers that are not machined or indexed and not sold with jigs or tools by the seller or distributor of the receiver because ATF has failed to sufficiently explain:

(a) why such a partially complete AR-15 type receiver with machining of *more* than 0.800 inch in the area near the fire control cavity (known as the takedown-pin lug clearance area) is a firearm but not one with machining of 0.800 inch or less, *see* Opp'n at 23; *see also* Opp'n at 30 (arguing that there must be data to support an

---

[14] *See generally DOC v. New York*, 139 S. Ct. 2551, 2573 (2019) (noting that, "in order to permit meaningful judicial review, an agency must 'disclose the basis' of its action" and, "in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record"); *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 690 (N.D. Cal. 2020) (stating that an "explanation . . . not publicly advanced by the agency at the time it reached its determination . . . constitutes an impermissible post hoc rationalization").

agency's line drawing); Sur-Reply at 16-17 (arguing that line drawing must be consistent with the statute and relate to the underlying regulatory problem), and

(b) why such a partially complete receiver is not a receiver when jigs and tools are easy to obtain from the open market, even if sold separately from the partially complete receiver.  *See* Opp'n at 28 (noting that "[t]emplates and instructions are easy to locate online, sometimes for free, and jigs are both inexpensive and readily available for purchase (either from a different retailer or in a different transaction from the same retailer)").

Each sub-theory is addressed below.

      a.     0.800-Inch Measurement

Plaintiffs' first subtheory lacks merit.  In their papers, Defendants address the 0.800-inch measurement as follows.

> In an AR-15 variant weapon, the area known as the "fire control cavity" is critical because it "provides housing for the trigger mechanism and hammer."  ATF has determined that to be a "functional" receiver, an AR-type receiver must include a cavity large enough to house the relevant internal parts, including holes for certain of these parts.  Removing or indexing any material in this critical area, or completing or indexing any of these holes, is thus a crucial step in producing a functional receiver.

Reply at 17.  Defendants continue: "[B]ecause another cavity within the receiver – the takedown-pin lug clearance area – merges with the fire control cavity in a functional AR-type receiver, it was necessary for ATF to determine the point at which the former area ends and the fire control cavity begins."  Reply at 17-18.  Drilling or milling greater than 0.800 inch "would breach the fire control cavity."  Reply at 18.

The above explanation that Defendants give in their papers is consistent with the explanation given in the September 2022 Open Letter:

> In an AR-15 variant weapon, the "fire control cavity is the critical area of the receiver because this area "provides housing for the trigger mechanism and hammer."  27 CFR 478.12(f)(1)(i).  To be a "functional" receiver, an AR-type receiver must include a cavity sufficient to house the relevant internal parts, including a hole for a selector and 2 pin holes (trigger pin and hammer pin) in precise locations.  Removing or indexing any material in this critical area, or

completing or indexing any of these holes, is therefore a crucial step in producing a functional receiver.

Thus, in order <u>not</u> to be considered "**readily**" completed to function, ATF has determined that a partially complete AR-type receiver must have no indexing or machining of any kind performed in the area of the trigger/hammer (fire control) cavity. <u>A partially complete AR-type receiver with no indexing or machining of any kind performed in the area of the fire control cavity is not classified as a "**receiver**," or "**firearm**," if not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides, such as within a receiver parts kit.</u>

[Photos omitted.]

Because the front of the takedown-pin lug clearance area merges with the back of the fire control cavity in a functional AR-type receiver, it was necessary for ATF to determine the point at which the takedown-pin lug clearance area stops, and the fire control cavity begins.  AFT has determined that drilling or milling a standard 0.800-inch takedown-pin area, measured from immediately forward of the front of the buffer retainer hole next to the fire control cavity, does not impact the ability of the fire control cavity to house the trigger mechanism and hammer.  Provided this length is not exceeded, the fire control cavity remains "*without critical interior areas having been indexed, machined, or formed*" as stated in 27 CFR 478.12(c), Example 4.

The following illustration demonstrates the fire control cavity of an AR-type receiver.



September 2022 Open Letter, ATF Supp. 201-02 (all emphasis in original).

Based on the above, ATF has given an explanation as to why it sees the fire control cavity as being critical – *i.e.*, because it houses the firing components.  *See also* Hoffman Decl. ¶ 22 ("In

United States District Court
Northern District of California

an AR-type firearm, the fire control cavity provides housing or a structure for the trigger mechanism and hammer.  The trigger initiates the firing cycle and releases the hammer.  Once released, the hammer strikes an explosive primer at the rear of the ammunition cartridge to ignite propellant powder and expel a projectile (bullet) through the barrel.").[15]  It has also explained why it came up with the 0.800-inch measurement – *i.e.*, to distinguish between the fire control cavity and the takedown-pin lug clearance area.  Machining beyond this measurement is implicitly condemned because it would constitute machining of the fire control cavity.  Thus, Plaintiffs' challenge comes down to two points: (1) it is not clear why a partially complete AR-15 type receiver that has a measurement of 0.800 inches or less cannot readily be converted into a functional receiver, *see* Sur-Reply at 14 , and (2) 0.800 inch is an arbitrary number.

With respect to (1), that essentially replicates the argument that Plaintiffs made in Theory No. 2 (discussed above in Part IV.C.2).   As for (2), some line drawing needed to be done and it does not appear that ATF picked the 0.800-inch number arbitrarily but rather based on the physical structure of an AR-15 type receiver.  Therefore, the ATF's interpretation is not arbitrary or capricious; it has a rational basis.

### b.    Jigs or Tools Not Sold with Partially Complete Receiver

Although Plaintiffs' first sub-theory is problematic, Plaintiffs' second sub-theory has merit.  Essentially, Plaintiffs contend that it makes no sense to say that a partially complete receiver that is not machined or indexed and is not sold with a jig or tools is not a firearm even where jigs and tools are easy to obtain (*i.e.*, can easily be purchased separately).  In response, Defendants do not dispute that jigs and tools may be purchased separately from sources other than the seller or distributor of the receiver with ease.  Indeed, Defendants contend that ATF *did* "consider that partially complete frames and receivers may be purchased separately from an assembly kit or from templates, jigs, and other similar equipment."  Mot. at 30.  But ATF's solution, Defendants explain, was to address that problem through the application of criminal law.

---

[15] Plaintiffs have expressly stated that they do not object to, *inter alia*, ¶ 22 of the Hoffman declaration since it "can assist the Court in understanding technical terms."  Sur-Reply at 8 n.4.

> The Rule makes clear that sellers or distributors may not undermine the Rule's requirements "by working with others or structuring transactions to avoid the appearance that they are not commercially manufacturing and distributing firearms." Sellers thus may not make an end run around the Rule's requirements by structuring sales transactions, for example, by shipping a partially complete receiver to a buyer in one transaction and then shipping the jigs, tools, or written materials allowing the partially complete receiver to be readily concerted into a functional receiver in a separate package or at a different time. Nor may sellers conspire with other sellers to evade the Rule's requirements by agreeing that they will separately sell to a buyer a partially complete frame and tools allowing for its ready conversion into a functional frame. ATF thus did consider that partially complete frames and receivers may be sold separately from kits, jigs, or similar items, but decided to address this problem through well-established criminal law: conspiracy, aiding and abetting, and structuring of transactions.

Mot. at 30 (quoting Final Rule, 87 Fed. Reg. at 24,713); *see also* Reply at 21 (asserting that, "[t]o the extent that Plaintiffs raise concerns about licensees evading the Rule through improper structuring of transactions or entities, those concerns may be ameliorated by the application of ordinary criminal principles like conspiracy and aiding and abetting liability to any unlawful conduct').

The first problem with Defendants' position is that ATF itself never clearly identified criminal law as the solution to the specific problem pinpointed by Plaintiffs. Nor did ATF ever explain why that was the appropriate solution. Defendants cite a D.C. Circuit case for the proposition that "[i]t does no violence to *Chenery* or *Kansas City* principles[16] for an agency to advance a legal argument in support of its administrative position which *bolsters* rather than duplicates the consistent position upon which its decision was made below." *America's Community Bankers v. FDIC*, 200 F.3d 822, 836 (D.C. Cir. 2000) (emphasis added). But the D.C. Circuit case is of little support because ATF's solution here was lacking in *any* explanation at the time it enacted the final rule – *i.e.*, this is not a situation where Defendants are now, in litigation,

---

[16] In *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), the Supreme Court held that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Id.* at 87. In *City of Kansas City v. Department of Housing & Urban Development*, 923 F.2d 188 (D.C. Cir. 1991), the D.C. Circuit held: "In whatever context we defer to agencies, we do so with the understanding that the object of our deference is the result of agency decisionmaking, and not some *post hoc* rationale developed as part of a litigation strategy." *Id.* at 192.

simply *expanding* on ATF's explanation that was given during the rulemaking below.

Furthermore, even if the Court were to consider the "solution" now framed by Defendants, that solution is patently incomplete. Even if criminal law could be used against, *e.g.*, a supplier who sold a partially complete receiver and a jig/tools in two separate transactions to the same consumer, that would *not* address the problem of a consumer buying a partially complete receiver and a jig/tools from two different, nonconspiring suppliers – the situation most likely to be encountered in the marketplace.

More fundamentally, criminal prohibitions and the existence of some deterrence against circumventing the regulations are issues *separate from* whether a receiver blank can be "readily converted" to a functioning receiver – the central point of the regulations implementing the GCA. The regulation defining "readily convertible" does not list as a factor the role of criminal law deterrence. *See* Sur-Reply at 16; *cf. Snoring Relief*, 210 F.3d at 1085 (indicating that a decision is arbitrary and capricious if the agency "'has relied on factors which Congress has not intended it to consider'"). In short, whether criminal law may deter certain behavior is not material to whether a partially complete receiver may be "readily converted" to a fully functioning one. ATF's citation to criminal law enforcement against some forms of circumvention does not address the basic problem that renders this aspect of the ATF's regulation and rulings arbitrary and capricious – the ATF his simply disregarded the ease by which tools/jigs are available (from whatever source) which would render a receiver blank "readily convertible" to a completed receiver.

For similar reasons, the Court is troubled by several of ATF's post-hoc explanations as to why it decided to rely on criminal law as the solution. *See* Reply at 19 (asserting that, "[b]ased on ATF's expertise in enforcing federal firearm laws, the agency drew this line where it did, because of such factors as the difficulty of enforcing a rule of broader scope and the costs to manufacturers of a broader rule").[17] To be valid, any line drawing done by an agency must be consistent with the

---

[17] Defendants maintain that these are not post-hoc explanations because the Final Rule references all or many of these concerns. *See* Reply at 22. *See, e.g.*, Final Rule, 87 Fed. Reg. at 24,697 ("Commenters opposed to inclusion of partially complete frames or receivers in the proposed definition of frame or receiver stated that the proposed rule would be difficult, if not impossible, to enforce. They opined that there is no purpose in trying to "ban 80%" receivers or regulate partially complete receivers because the rule is easily undercut by 3D-printing technology and the

statute/regulation at issue. *Compare Natural Resources Defense Council, Inc. v. United States EPA*, 966 F.2d 1292, 1306 (9th Cir. 1992) (finding that EPA's decision not to regulate construction sites smaller than five acres was arbitrary when EPA provided no data to justify the five-acre threshold and admitted that unregulated sites could have significant impact on water quality), *with Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998) (stating that "the FCC has provided a reasonable explanation for the line it has drawn, and demonstrated that line's relationship to the underlying regulatory problem addressed by the finder's preference program[;] [i]t is also a line that is consistent with the Commission's statutory obligation to 'manage the spectrum to be made available for use by the private land mobile services' in a manner that will 'improve the efficiency of spectrum use and reduce the regulatory burden upon spectrum users'"). *See also Mass. v. EPA*, 549 U.S. 497, 527, 532-33, 535 (2007) (acknowledging that "any agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities" and this "discretion as at its height when the agency decides not to bring an enforcement action"; but still finding agency's rationale for inaction problematic because it "rest[ed] on reasoning divorced from the statutory text" – "EPA must ground its reasons for action or inaction in the statute")[18]; *Prometheus Radio Proj. v. FCC*, 373 F.3d 372, 420 (3d Cir. 2004)

---

availability of online tutorials, which will only become more available and affordable for the public over time."); *id.* ("Manufacturers also raised concerns because they purchase partially machined raw materials or receiver shells without drilled fire control holes from domestic and foreign sources that are not current licensees. The manufacturers were concerned that the proposed rule would subsequently require their suppliers to obtain an FFL license, apply the markings, and keep A&D records, which would be very costly and disruptive."); *id.* at 24,699 ("Commenters asserted that no one can predict what 'instructions, guides, templates, [and] jigs' the ATF Director will rely on in any given case.").

While at least some of these concerns were raised by commenters responding to the Proposed Rule, ATF did not expressly assert that these concerns were the basis for its line-drawing that Plaintiffs are now challenging (*e.g.*, to justify Example 4). And as noted *infra*, in any event, these consideration are not clearly sanctioned by the GCA and do not fall within the ambit of the ATF regulation on "readily convertible."

[18] Defendants argue that *Massachusetts v. EPA* is distinguishable: "The case involved an agency's determination not to regulate at all despite a congressional command to regulate whenever the agency made certain findings. Because Congress has not dictated that ATF regulate under certain prescribed circumstances, the case is inapposite." Reply at 15 n.9. But that argument is problematic because Congress has dictated that ATF regulate firearms, *see* 18 U.S.C. § 926 (providing that "[t]he Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter"), and Plaintiffs are asserting that certain

United States District Court
Northern District of California

1    (stating that "[t]he deference with which we review the Commission's line-drawing decisions

2    extends only so far as the line-drawing is consistent with the evidence or is not 'patently

3    unreasonable'").

4         Likewise, the Court is troubled by ATF's argument that it is permissible for an agency to

5    undertake reform one step at a time.  While that may be true as a general matter, ATF cannot

6    properly be said to be engaged in "reform one step at a time" when it rules that partially complete

7    receivers not machined or indexed and not sold with jigs/tools are *not* firearms regardless of the

8    availability of such jigs/tools in the open – it has enacted a *categorical* bar.  This is not, *e.g.*, a

9    situation where ATF has chosen to first focus on regulation of a particular kind of firearm over

10   another (*i.e.*, made an enforcement decision).

11   D.    Remedy

12        For the reasons stated above, Plaintiffs have several meritorious arguments:

13        (1) ATF's determinations regarding partially complete receivers that are not machined

14            or indexed and not sold with jigs or tools (*e.g.*, in Example 4, the September 2022

15            Open Letter, and the exemplary Classification Letter) were made without taking

16            into account all relevant data, including the factors listed in 27 C.F.R. § 478.11

17            (which defines "readily" for purposes of "readily converted"); and

18        (2) ATF has failed to explain why it is not regulating such partially complete receivers

19            given that jigs and tools are easily obtainable.

20        The Court now turns to the issue of remedies.  The remedies sought by Plaintiffs are as

21   follows:

22            (1) declare one subsection of the Final Rule (Example 4) and related
             agency actions to be unlawful and enjoin Defendants from enforcing
23           them; (2) vacate one subsection of the Final Rule (Example 4) and
             related agency actions; and (3) remand to ATF for further
24           proceedings consistent with the Court's opinion.

25   Sur-Reply at 17; *see also* Pls.' Prop. Order (Docket No. 184-1).

26        Defendants argue that the Court should simply remand to the agency *without* any vacatur

27

28   ─────────────────────
     partially complete receivers *are* firearms.

United States District Court
Northern District of California

United States District Court
Northern District of California

of any part of the final rule/regulation.  They contend, for example, that "set aside" as used in the APA simply means to disregard, not to vacate.  *See* 5 U.S.C. § 706(2) (providing that a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be – [*e.g.*] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  They also argue that, even if vacatur is permitted under the APA, *universal* vacatur is not a remedy that should be awarded lightly because it comes with many of the same problems as a universal injunction.  Again, Defendants suggest that there should simply be a remand to ATF without any vacatur.[19]

The Ninth Circuit, however, has held that "vacatur is the presumptive remedy under the APA, and [w]e order remand without vacatur only in limited circumstances.  Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed."  *350 Mont. v. Haaland*, 29 F.4th 1158, 1177 (9th Cir. 2022) (internal quotation marks omitted); *cf. Am. Pub. Gas Ass'n v. United States DOE*, 72 F.4th 1324, 1342 (D.C. Cir. 2023) ("The decision to vacate depends on two factors: the likelihood that deficiencies in an order can be redressed on remand, even if the agency reaches the same result, and the disruptive consequences of vacatur.") (internal quotation marks omitted).  Given this authority, the Court rejects Defendants' arguments.  It is questionable whether the deficiencies identified by the Court can be redressed on remand, particularly given that many of ATF's post-hoc explanations are problematic.  Furthermore, vacatur will not be substantially disruptive given that the Court is, in effect, simply setting aside Example 4 and adjudicating on the margins of the ATF's regulatory domain; the order leaves in place the core guiding principle in § 478.12(c) that a partially complete receiver is still deemed a receiver if it is designed to or may readily be converted to function as a receiver.  The vast corpus of ATF's

---

[19] Many of Defendants' arguments are the same as points made by Justice Gorsuch in his concurrence in *United States v. Texas*, 143 S. Ct. 1964, 1978-85 (2023) (Gorsuch, J., concurring).  Justice Gorsuch did note, however, that there were "[t]houghtful arguments and scholarship . . . on both side of the debate," and that he did not "mean to equate vacatur of agency action with universal injunctions . . . . But the questions here are serious ones.  And given the volume of litigation under the APA, this Court will have to address them sooner or later.  Until then, we would greatly benefit from the considered views of our lower court colleagues."  *Id.*

regulation of ghost guns and constituent parts remains untouched.

## V.       CONCLUSION

For the foregoing reasons, the Court hereby grants in part and denies in part Defendants' motion for summary judgment and grants in part and denies in part Plaintiffs' motion for summary judgment.  The Court rejects Plaintiffs' challenge to ATF's use of the 0.800 inch measurement with respect to the fire control cavity.  However, the Court agrees with Plaintiffs that ATF's actions related to Example 4 are arbitrary in capricious in failing to take into account all eight factors related to the "readily" assessment (in particular, time) and in failing to address the impact of easy availability of, *e.g.*, jigs and tools from sources other than the seller or distributor of the incomplete receiver.

The Court therefore: (1) declares one subsection of the final rule (Example 4) and related agency actions to be unlawful and enjoins Defendants from enforcing them; (2) vacates one subsection of the final rule (Example 4) and related agency actions; and (3) remands to ATF for further proceedings consistent with the Court's opinion.

The Clerk of the Court is instructed to enter a final judgment in accordance with this order and close the file in the case.

This order disposes of Docket Nos. 182 and 184.

**IT IS SO ORDERED**.

Dated: February 26, 2024

_____
EDWARD M. CHEN
United States District Judge